IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **KATHARINE PILEGGI ET AL.,** | ) | |
| | ) | |
| **Plaintiff** | ) | **CIVIL NO. 3:22-cv-01315-AWT** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MATHIAS ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | **JUNE 5, 2023** |

### MEMORANDUM OF LAW IN SUPPORT OF
### MOTION TO DISMISS AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the undersigned defendants,

**Connecticut Children's Medical Center ("CT Children's"), Lawrence Zemel, M.D., and**

**Kevin Fitzsimmons**, P.A., respectfully submit this Memorandum of Law in support of their

Motion to Dismiss the Amended Complaint dated May 15, 2023. ECF No. 47. There are multiple

grounds on which the Court should dismiss the action, specifically, (1) the action is untimely

under the applicable statutes of limitation; (2) neither the continuing treatment doctrine nor the

continuing course of conduct doctrine applies; (3) the defendants are entitled to immunity from

liability as mandated reporters; (4) the Amended Complaint fails to allege any causal connection

between the defendants' actions and the plaintiffs' harms; (5) the Amended Complaint fails

sufficiently to allege any involvement by the defendant Kevin Fitzsimmons related to the claims

in this case; (6) the plaintiffs have not pled any direct cause of action against CT Children's and

have not pled facts establishing vicarious liability for the conduct of any of the individually

named defendants; (7) the defendants were not state actors and were not acting under color of

state law, and the plaintiffs have failed to set forth a plausible § 1983 claim against them; (8) the

defendants did not owe a duty of care to the plaintiffs; (9) the defendants did not engage in any

extreme or outrageous conduct; and (10) the defendants did not initiate any civil action against the plaintiffs within the meaning of Conn. Gen. Stat. § 52–568.

For these reasons, more fully set forth below, the Court should dismiss the claims against the undersigned defendants in their entirety.

## I.      FACTUAL BACKGROUND

### A.      Factual History Underlying the Plaintiffs' Claims.

The plaintiffs initially filed a twelve-count Complaint against various defendants on October 19, 2022. ECF No. 1. The CT Children's defendants appeared on December 29, 2022; ECF Nos. 11–13; and filed their Rule 12(b)(6) Motion to Dismiss on January 31, 2023. ECF No. 25. The plaintiffs filed an Objection on February 21, 2023; ECF No. 30; and the defendants filed a Reply on March 6, 2023. ECF No. 34.

On April 27, 2023, the plaintiffs filed a Motion to Amend the Complaint. ECF No. 42. The Court granted this Motion on May 12, 2023. ECF No. 46.[1] The plaintiffs' proposed Amended Complaint makes several changes to the allegations against the CT Children's defendants. First, pursuant to 42 U.S.C. § 1983, the Amended Complaint purports to make a First and Fourteenth Amendment claim against the CT Children's defendants, which claim previously had been made only against the co-defendants. Am. Compl., ECF No. 47 at 21–23. Second, the plaintiffs have redirected Count Nine, alleging violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), to the CT Children's defendants, where those claims previously had been alleged as

---

[1]The defendants respectfully note that they intended to object to the Motion to Amend on the ground that the proposed amendment would be futile because it would not withstand a Rule 12(b)(6) motion. *E.g.*, *Tocker v. Phillip Morris Cos.*, 470 F.3d 481, 491 (2d Cir. 2006); *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). The Court granted the Motion to Amend prior to the defendants' deadline to respond, however. Nonetheless, the defendants' arguments made in this Motion to Dismiss incorporate the arguments that they would have made in any such objection to the Motion to Amend.

2

against the co-defendants. *Id.* at 32–33. Third, the plaintiffs have removed their claim for "civil battery," which had been set forth previously in Count Ten. *See* Compl., ECF No. 1 ¶¶ 114–17. Fourth and finally, the plaintiffs have added a new claim for medical malpractice against the CT Children's defendants in what is now Count Twelve. Am. Compl., ECF No. 47 at 35–37. The substance of the claims against the CT Children's defendants is otherwise unchanged.

Briefly stated, the plaintiffs allege that, in June 2018, their daughter, "EP," was bitten by a tick and began experiencing symptoms including a low-grade fever, vomiting, joint pain, fatigue, and swollen lymph nodes. *Id.* at 7 ¶ 17. The plaintiffs took their daughter to their family medicine practitioner, the codefendant Dr. Alder, who, in turn, referred them to the undersigned defendant Dr. Zemel, a rheumatologist alleged to practice at the defendant CT Children's. *Id.* ¶¶ 17–18. Dr. Zemel allegedly evaluated EP and diagnosed her with Rheumatoid Arthritis.[2] *Id.* ¶ 17. Dr. Zemel made recommendations for treatment, but the plaintiffs declined to adhere to those recommendations, apparently believing further testing was necessary. *Id.*

Later in June 2018, the plaintiffs requested that both Dr. Alder and Dr. Zemel "test the tick," but both doctors declined to do so. *Id.* ¶ 19. When the plaintiffs expressed their desire to get a second opinion, Dr. Zemel allegedly "bullied" the plaintiffs and "harassed" Ms. Pileggi concerning her knowledge of Lyme Disease. *Id.* ¶ 21. Dr. Zemel allegedly pressed Ms. Pileggi to explain the basis for her professed knowledge of Lyme Disease, but Ms. Pileggi refused to

---

[2]When identifying Dr. Zemel's alleged diagnosis of EP, the Amended Complaint refers varyingly to "Juvenile Arthritis," "Juvenile Idiopathic Rheumatoid Arthritis," and "Rheumatoid Arthritis." *See* Am. Compl., ECF No. 47 at 2 ("Juvenile Arthritis"), 5 ¶ 7 ("Juvenile Idiopathic Rheumatoid Arthritis"), 7 ¶ 18 (both "Juvenile Idiopathic Rheumatoid Arthritis" and "RA," apparently as shorthand for "Rheumatoid Arthritis"), 19–20 ¶¶ 80–82, 86 ("Rheumatoid Arthritis" and "RA"), 21 ¶ 89 ("RA"). For purposes of this Motion only, the defendants will refer to the alleged diagnosis as "Rheumatoid Arthritis," as this appears to be the verbiage that the plaintiffs use most often in their Amended Complaint. Notwithstanding the plaintiffs' allegations, the defendants note for the record that Dr. Zemel diagnosed EP with "juvenile idiopathic arthritis."

respond. *Id.* ¶ 22. The plaintiffs allege that, because Dr. Zemel "disagreed" with the plaintiffs' belief that EP was suffering from Lyme Disease, he filed a complaint with the department of children and families ("DCF"). *Id.* at 30 ¶ 142.

In late June 2018 and into July 2018, the plaintiffs began treating with naturopaths who prescribed homeopathic treatment for EP, which allegedly improved her symptoms. *Id.* at 8–9 ¶¶ 24–25. Because EP seemed to be improving, the plaintiffs allege DCF closed its file. *Id.* at 9 ¶ 9.

In December 2018, Ms. Pileggi's father made a report to DCF, alleging that the plaintiffs were not providing appropriate care for EP. *Id.* at 9 ¶ 26. DCF instructed the plaintiffs to cease using the naturopathic providers they had been utilizing for EP's care and to find new medical providers. *Id.* ¶¶ 27–28. EP began treating with the codefendant Lindsay Laughinghouse, APRN, as a result. *Id.* at 10 ¶¶ 30–31. DCF remained involved with the family during this time. *Id.*

In March 2019, EP suffered a broken leg, which the plaintiffs attribute to their older daughter dropping her. *Id.* ¶ 32. DCF investigated this incident. *Id.* ¶ 33. Later in March 2019, the plaintiffs took EP to Florida to see a Dr. Morse, a naturopath and "Master Herbalist" who the plaintiffs found through "extensive research on how to naturally detoxify [EP's] body for Lyme Disease." *Id.* at 11 ¶¶ 37–38. DCF alerted its counterpart in Florida that EP had been removed from the state, and EP was taken into Florida child protective custody. *Id.* at 11–12 ¶¶ 39–43. The Connecticut Juvenile Court issued an order of temporary custody placing EP in the custody of DCF and ordered DCF to ensure EP received appropriate medical care. *Id.* at 13 ¶¶ 45–46.

In June 2019, DCF indicated that, as a condition to EP being returned to the family home, Ms. Pileggi would no longer be permitted to live there. *Id.* at 15 ¶ 56. Ms. Pileggi claims that the plaintiffs were "coerced" to file for divorce as a result. *Id.* ¶ 58.

1754136_1
DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

In July 2019, DCF scheduled a psychological examination of the plaintiffs. *Id.* at 16 ¶ 64. The plaintiffs allege this examination went forward in August or September 2019. *Id.* ¶ 65. Following the examination, EP was permitted to return home, however, Ms. Pileggi was not allowed to live in the home with her. *Id.* at 17 ¶ 66.

Two and a half years later, in October 2021, the plaintiffs refused to continue taking EP to the providers to whom DCF had ordered them to take her. *Id.* at 19 ¶¶ 79–80. Instead, they located a Dr. Tranguch, another naturopath, who allegedly ran certain tests on EP. *Id.* ¶ 81. Dr. Tranguch allegedly opined that EP did not have Rheumatoid Arthritis, but, rather, that previous laboratory results were "inconclusive." *Id.* In December 2021, the plaintiffs allege that new bloodwork was negative for Rheumatoid Arthritis but positive for Lyme Disease, Babesia, Bartonella, anaplasmosis, parasites, and mold. *Id.* at 20 ¶ 82. The plaintiffs claim that these laboratory results reflected "chronic infection," meaning Lyme Disease that "became chronic in the body." *Id.* ¶ 85.

The plaintiffs allegedly informed CT Children's, Dr. Zemel, and Kevin Fitzsimmons, a physician assistant (who is misidentified in the Complaint as a physician) that they had been "misdiagnosing" EP with Rheumatoid Arthritis. *Id.* The plaintiffs allegedly informed the defendants of purported mold exposure by EP when she was born, which they claim was the result of water damage in their home around the time of EP's birth. *Id.* The plaintiffs requested that the defendants test EP for Lyme Disease and mold exposure, but the defendants allegedly declined to do so. *Id.* The plaintiffs allege that, since EP has started treating for Lyme Disease and being weaned off medications intended to treat Rheumatoid Arthritis, her condition has improved. *Id.* at 21 ¶ 89.

1754136_1
DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

### B.    Claims in the Present Case.

The plaintiffs' Amended Complaint alleges twelve counts, seven of which are directed at least in part against the undersigned defendants. Specifically, Count One purports to allege a claim pursuant to 42 U.S.C. § 1983 against each of the defendants for a violation of the plaintiffs' liberty interest to raise their child, as guaranteed by the First and Fourteenth Amendments. Am. Compl., ECF No. 47 at 21. Count Six alleges negligence against the CT Children's defendants for allegedly filing a false report with DCF against the plaintiffs. *Id.* at 29–30. Count Seven alleges negligent infliction of emotional distress in that the defendants knew or should have known that that their allegedly false report to DCF would likely result in emotional distress. *Id.* at 31. Count Eight alleges intentional infliction of emotional distress on the same basis. *Id.* Count Nine alleges a violation of CUTPA as against the CT Children's defendants. *Id.* at 32. Count Ten alleges a cause of action against all the CT Children's defendants pursuant to Conn. Gen. Stat. § 52–568 for wrongfully initiating a DCF complaint. *Id.* at 33. Finally, Count Twelve alleges medical malpractice against the CT Children's defendants. *Id.* at 35–37.

## II.    LAW AND ARGUMENT

### A.    Standard on Motion to Dismiss.

Federal Rule of Civil Procedure 12(b)(6) requires the dismissal of a claim for "failure to state a claim upon which relief can be granted." *E.g.*, *Barone v. Jud. Branch Conn.*, No. 3:17-CV-00644 (VAB), 2018 U.S. Dist. LEXIS 43281, at *8–9 (D. Conn. Mar. 16, 2018). The plaintiff's claims must be dismissed unless the Complaint "state[s] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is "guided by two working principles." *Iqbal*, 556 U.S. at 678. First, "threadbare recitals of the elements of a cause of action, supported

6

by mere conclusory statements, do not suffice." *Id.* Second, "to survive a motion to dismiss, the complaint must state a plausible claim for relief." *Id.* at 679.

> **B.    All the Plaintiffs' Claims Against the Undersigned Defendants Are Untimely.**

All the plaintiffs' claims against these defendants are untimely. Each of the plaintiffs' claims against these defendants were brought beyond the applicable limitations period. Conn. Gen. Stat. §§ 42-110g(f), 52–584, 52–577. Because the untimeliness of the plaintiff's claims is apparent on the face of the Complaint, the Court should dismiss these claims in their entirety. As will be described in greater detail below, the plaintiffs' claims are untimely under either a two- or three-year statute of limitations.

There are three statutes of limitation at issue regarding the claims against the CT Children's defendants:  Conn. Gen. Stat. §§ 52-584, 52-577 and 42-110g.  Counts Six, Seven, and Twelve allege causes of action for negligence, negligent infliction of emotional distress, and medical malpractice.  These claims are subject to the two-year discovery and three-year repose periods within Conn. Gen. Stat. § 52–584. *Rivera v. Double A Transp., Inc.*, 248 Conn. 21, 31, 727 A.2d 204 (1999).[3]

The claims in Counts One, Eight, and Ten are all are governed by the three-year limitation period in Conn. Gen. Stat. § 52-577[4] as follows. To the extent that the plaintiffs

---

[3]Conn. Gen. Stat. § 52–584 provides: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, advanced practice registered nurse, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

[4]Conn. Gen. Stat. § 52-577 provides:  "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

1754136_1

purport to bring § 1983 claims in Count One, those claims are governed by the three-year limitations period in Conn. Gen. Stat. § 52–577. *E.g.*, *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994) (holding the three-year limitations period in Conn. Gen. Stat. § 52–577 applied to § 1983 claims). Conn. Gen. Stat. § 52–577 also provides a three-year limitations period for the plaintiffs' intentional infliction of emotional distress claims in Count Eight and vexatious litigation claim in Count Ten. *E.g.*, *DeCorso v. Watchtower Bible & Tract Society of New York Inc.*, 78 Conn. App. 865, 873, 829 A.2d 38, cert. denied, 266 Conn. 931, 837 A.2d 805 (2003) (three-year limitations period in § 52–577 applies to intentional infliction of emotional distress claims); *Karwowski v. Fardy*, No. CV030522489S, 2005 Conn. Super. LEXIS 1787, at *7 (Conn. Super. Ct. June 27, 2005) (limitations period in § 52–577 applies to § 52–568 claims).

Finally, the CUTPA claims set forth in Count Nine are governed by the three-year limitations period in Conn Gen. Stat. § 42–110g(f). *See id.* ("[a]n action under this section may not be brought more than three years after the occurrence of a violation of this chapter").

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Deswal v. United States N.A.*, 603 Fed. Appx. 22, 24 (2d. Cir. 2015).

The gravamen of the plaintiffs' claims against the undersigned defendants arises out of an allegedly improper referral that Dr. Zemel made to DCF sometime in late June 2018. Am. Compl., ECF No. 47 at 8 ¶¶ 20–23. This is the *only* alleged DCF report made by any of the undersigned defendants.[5] Each of the plaintiffs' claims against these defendants flows from this

---

[5] A subsequent DCF report allegedly was made in December, 2018 by Ms. Pileggi's father. Am. Compl., ECF No. 47 at 9 ¶ 26.

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

allegedly improper report. In the plaintiff's Preliminary Statement, they allege "[t]his initial DCF report perpetuated a series of events where all defendants, maliciously and without conscience, engaged in a conspiracy . . . to remove EP from the care of her parents." *Id.* at 2. Count One alleges that the defendants "filed and contributed to DCF reports containing information they knew to be false." *Id.* at 22 ¶ 92. Count Six alleges negligence against the undersigned defendants in that "[t]he Defendants had a duty of care to not file a false report with DCF." *Id.* at 30 ¶ 146. Count Seven alleges negligent infliction of emotional distress in that "[t]he Defendants knew and should have known that the acts they engaged in –that being, filing a false report with DCF because they disagreed with the PLAINTIFFS' decision to seek other medical advice and care, filing a false report with Florida DCF, and having the plaintiff and EP detained – and the foregoing action listed above - would result or likely result in emotional distress." *Id.* at 31 ¶ 150. Count Eight similarly alleges intentional infliction of emotional distress on this same basis. *Id.* at 31–32 ¶¶ 155–59. Count Nine alleges a CUTPA violation against the undersigned defendants on the ground that "[i]t is a violation of public policy to file a false, misleading, or deceptive report or engage in acts that impose liability . . . as a consequence of the PLAINTIFFS having desired a second medical opinion or medical treatment elsewhere from other healthcare practitioners." *Id.* at 32 ¶ 162. Count Ten alleges a cause of action against the defendants pursuant to Conn. Gen. Stat. § 52–568 claiming "[t]he Defendants knew or should have known that the allegations in the DCF complaints were false and absolutely reckless in their falsity." *Id.* at 33 ¶ 169. Finally, Count Twelve alleges that "CCMC and Dr. Zemmel incorrectly diagnosed EP," "refused to test for Lyme disease or mold and mocked the plaintiff when she requested that they do so," and "[a]fter the PLAINTIFFS objected to both the diagnosis and course of treatment, these defendants filed a false DCF report." *Id.* at 35 ¶¶ 181, 183.

In their Amended Complaint, the plaintiffs seemingly attempt to address this deficiency by asserting that the CT Children's defendants were the source of certain "anonymous" DCF reports at other, unspecified times. *E.g.*, Am. Compl., ECF No 47 at 22 ¶ 92 ("CCMC, Zemmel, Fitzsimmons, Laughinghouse, and Bazos, all filed and contributed to DCF reports containing information they knew to be false. Plaintiff believes that JOHN and JANE DOES 1-10 listed in the caption and are the 'anonymous' DCF complainers, are these same defendants"); 30 ¶ 144 ("[u]pon information and belief, defendants are also the 'JOHN and JANE DOES 1-10' who filed repeated false DCF reports against the PLAINTIFFS, not just the initial one"). This allegation is nothing more than self-serving conjecture. The plaintiffs have pled no facts as to these purported subsequent DCF reports; their timing; their subject matter; or the facts demonstrating that the CT Children's defendants were in any way involved. The Court should reject this transparent effort by the plaintiffs to avoid the statute of limitations when the only DCF report to which the plaintiffs' claims plausibly could relate is Dr. Zemel's June 2018 report.

The plaintiffs clearly have pled actual notice of Dr. Zemel's allegedly improper June 2018 report. The plaintiffs repeatedly characterize Dr. Zemel's report as false and made for the improper reason that he disagreed with the plaintiffs' refusal to continue treating EP for Rheumatoid Arthritis. *E.g.*, Am. Compl., ECF No. 47 at 17 ¶ 71, 18 ¶¶ 73–74, 22 ¶ 92. Thus, it is clear from the face of the Amended Complaint that the plaintiffs had actual knowledge in June 2018 that Dr. Zemel had made the alleged improper report to DCF. The making of this report forms the basis for all the plaintiffs' claims in this case against these defendants.

Even assuming, *arguendo*, that this allegedly improper DCF referral was made on the very last day of that month, June 30, 2018, the plaintiffs' claims in this case are untimely under

1754136_1
DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

either a two- or three-year statute of limitations. Three years from that date would be June 30, 2021, over one year prior to the plaintiffs' filing of this action on October 19, 2022.

Any argument by the plaintiffs that they did not have actual or constructive notice of the identity of the individual who made the June 2018 DCF report is belied by the allegations of the Amended Complaint. Specifically, the Amended Complaint alleges that Dr. Zemel "bullied and threatened" the plaintiffs "for more than a month." Am. Compl., ECF No. 47 at 8 ¶ 21. When Ms. Pileggi allegedly refused to tell Dr. Zemel "how she 'knew so much' about Lyme Disease" or to "entertain his inquiries and covert threats," Dr. Zemel allegedly "promptly retaliated with the filing of a report with DCF." *Id.* ¶¶ 22–23. That report was followed immediately by a DCF investigation over the next two weeks regarding this very issue, and which culminated in a teleconference with DCF on July 17, 2018. *Id.* at 8–9 ¶¶ 23–25. The records attached to the Complaint as Ex. B even recount that a DCF nurse visited the plaintiff's home. *Id.* at 51.

It would be implausible for the plaintiffs to allege both a month-long bullying campaign by Dr. Zemel, followed by an allegedly improper DCF referral, and also that the plaintiffs were somehow unaware that it was Dr. Zemel had filed the DCF report at issue. Indeed, it is not clear from the Amended Complaint *who else* would have made a report of child neglect on the basis of improper Rheumatoid Arthritis care, when it was Dr. Zemel alone who allegedly made that diagnosis and recommended that course of treatment. Rather, accepting the allegations of the Amended Complaint as true, the plaintiffs plainly had actual or constructive knowledge in June 2018 that Dr. Zemel had reported their refusal to treat EP's Rheumatoid Arthritis, which the plaintiffs claim was improper. That is all that is required to trigger the discovery portion of § 52– 584. *Rivera v. Double A Transp., Inc.*, 248 Conn. at 31.

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

The plaintiffs' claims are untimely even when accounting for the suspension of statutes of limitation that resulted from Governor Lamont's Executive Orders relating to the COVID-19 pandemic. The Governor's Executive Orders are a matter of public record of which the Court may take judicial notice. *E.g.*, *Taylor v. Pillai*, No. 3:21-cv-00623 (SALM), 2022 U.S. Dist. LEXIS 159977, at *7 (D. Conn. Sep. 6, 2022) (taking judicial notice of Governor Lamont's Executive Orders relating to the COVID-19 pandemic).

As Judge Merriam capably summarized in *Taylor*, Connecticut courts routinely have determined that Governor Lamont's Executive Order 7G, dated March 19, 2020, operated to suspend all statutes of limitation in civil actions until that suspension eventually was lifted by Executive Order 10A, dated March 1, 2021. *Id.*, at *10–11. The result was a nearly one-year suspension of the statute of limitations, totaling 329 days. *Id.*

The operation of these Executive Orders in this case is as follows. As of March 19, 2020, the allegedly improper DCF report by Dr. Zemel would have been made one year, eight months, and nineteen days ago, leaving just under four months to bring an action under the two-year discovery period in § 52–584, or one year and four months to bring an action under § 42–110g(f), § 52–577, or the three-year repose period in § 52–584. Those limitation periods then were suspended until March 1, 2021 by operation of the Governor's Executive Orders 7G and 10A.[6] On March 1, 2021, the statutes began to run again. The remaining three months and eleven days expired on June 12, 2021 for claims governed by the two-year discovery period in § 52–584 (Counts Six, Seven, and Twelve). The remaining one year, three months, and eleven days

---

[6] No appellate court has ruled as to the constitutionality of the Governor's suspension of statutes of limitation as set forth in these Executive Orders. The defendants specifically reserve the right to argue, if necessary, that the Executive Orders were unconstitutional, whether facially or as applied in this case, to the extent they purportedly suspended any limitations periods that otherwise would apply in this case. The defendants assume their constitutionality for purposes of this Motion only.

1754136_1

expired on June 12, 2022 for claims governed by § 42–110g(f) (Count Nine), § 52–577 (Counts

One, Eight, and Ten), or the three-year repose period in § 52–584 (Counts Six, Seven, and

Twelve).

The plaintiffs did not bring this action until October 19, 2022. Thus, the action is more

than one year and four months too late under the two-year discovery period within § 52–584 and

four months too late under the three-year limitations period within § 42–110g(f) or § 52–577, or

the three-year repose period in § 52–584. As a result, all the plaintiffs' claims against the

defendants are time-barred and should be dismissed.[7]

### C.    The Plaintiffs' Untimely Medical Malpractice Claims Are Not Saved by the Continuing Treatment Doctrine or the Continuing Course of Conduct Doctrine.

In their Amended Complaint, the plaintiffs have added a new Count Twelve alleging

medical malpractice against the CT Children's defendants. *See* Am. Compl., ECF No. 47 at 35–

37.[8] The plaintiffs claim that Dr. Zemel improperly diagnosed rheumatoid arthritis instead of

Lyme disease.  Although the Amended Complaint does not invoke any tolling doctrine

specifically, there is language in Count Twelve suggesting that the plaintiffs intend to argue that

their medical malpractice claims were tolled by virtue of continuing to treat with the CT

Children's defendants. *See id.* at 36 ¶ 185 ("The defendants continued treating EP for the wrong

illness and ignored the worsening of her condition for more than two (2) years, then imputed

---

[7]The defendants note that the plaintiffs' addition in the Amended Complaint of a § 1983 claim in Count One and a medical malpractice claim in Count Twelve against them do not change this analysis. As described above, the plaintiffs' § 1983 claim flows from Dr. Zemel's allegedly improper June 2018 report, and the plaintiffs' medical malpractice claim similarly relates to his alleged June 2018 misdiagnosis of EP with Rheumatoid Arthritis. *See also* discussion *infra*, Part II.C.

[8]Count Twelve also makes allegations consistent with a § 1983 claim, however, those allegations are repetitive of those made in Count One. *Compare* Am. Compl., ECF No. 47 at 21 ¶ 91 *with* id. at 37 ¶ 192.

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

blame for EP's failure to improve to the PLAINTIFFS. This was intentionally and maliciously communicated to DCF."). Neither the continuing treatment doctrine nor the continuing course of conduct doctrine, however, operate to save the plaintiffs' claims in this case.

Both the continuing treatment doctrine and the continuing course of conduct doctrine apply only to toll the statute of repose applicable to claimed medical negligence. "[B]oth tolling doctrines apply only to the repose portion of the statute and not to the discovery portion. The two-year discovery portion addresses the plaintiff's knowledge of the injury and not the defendant's act or omission. Once the plaintiff has discovered her injury, the statute begins to run." *Rosato v. Mascardo*, 82 Conn. App. 396, 405, 844 A.2d 893 (2004).

"A comparison of the elements of the continuous treatment doctrine with the elements of the continuing course of conduct doctrine reveals that the primary difference between the doctrines is that the former focuses on the *plaintiff's* reasonable expectation that the treatment for an existing condition will be ongoing, while the latter focuses on the *defendant's* duty to the plaintiff arising from his knowledge of the plaintiff's condition. As we have indicated, the policy underlying the continuous treatment doctrine is to allow the plaintiff to complete treatment for an existing condition with the defendant and to protect the doctor-patient relationship during that period." *Grey v. Stamford Health Sys.*, 282 Conn. 745, 755, 924 A.2d 831 (2007) (emphases in original).

As set forth in detail above, the allegations of the plaintiffs' Amended Complaint clearly establish actual notice of the alleged negligence at the time of Dr. Zemel's purportedly improper June 2018 DCF referral. Therefore, neither doctrine applies. Permitting the plaintiffs on the one hand to argue that they understood in June 2018 that their daughter really had Lyme disease; *e.g.*, Am. Compl., ECF No. 47 at 8 ¶ 20 (EP displaying "obvious Lyme Disease symptoms" in June

14

2018); and yet toll their claim based on continuing treatment would be contrary to the policies underlying either tolling doctrine. "[T]he accrual of the cause of action is a singular moment in time. Allowing that point in time to be pushed forward as long as it is claimed that the negligent conduct continued would eviscerate the policies underlying the statute of limitations. The plaintiff would be allowed to acquiesce in the defendant's conduct as long as it was convenient to the plaintiff. That would undermine the promotion of 'finality in the litigation process' . . . and the prevention of the 'unexpected enforcement of stale claims concerning which the persons interested have been thrown off their guard by want of prosecution.'" *Rosato*, 82 Conn. App. at 405–06 (citations omitted).

To the extent the plaintiffs intend to invoke the continuing course of conduct doctrine, it must be noted that the Connecticut Supreme Court has cautioned against applying that doctrine to a claim against a physician relating to an allegedly incorrect diagnosis. "[W]e disagree with the premise that a physician who has performed a misdiagnosis has a continuing duty to correct that diagnosis in the absence of proof that he subsequently learned that his diagnosis was incorrect. While there may be instances in product liability situations where a continuing duty to warn may emanate from a defect, without proof that the manufacturer actually knew of the defect . . . the same principle does not apply to a physician's misdiagnosis. To apply such a doctrine to a medical misdiagnosis would, in effect, render the repose part of the statute of limitations a nullity in any case of misdiagnosis." *Martinelli v. Fusi*, 290 Conn. 347, 360, 963 A.2d 640 (2009) (internal quotation marks omitted).

In the present case, the plaintiffs have not pled any facts that arose subsequent to June 2018 suggesting that the CT Children's defendants knew their diagnosis of Rheumatoid Arthritis was supposedly incorrect. Accordingly, the defendants could have no duty to communicate that

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

information to the plaintiff. In the absence of any such notice to the defendants, the continuing course of conduct doctrine clearly does not apply. *Grey*, 282 Conn. at 757 ("when only the defendant has knowledge of the need for additional treatment or monitoring, only the continuing course of conduct doctrine is implicated").

For all the above reasons, neither the continuing treatment doctrine nor the continuing course of conduct doctrine applies in the present case. As such, the plaintiffs' claims are untimely, and the Court should dismiss the plaintiffs' claims against the CT Children's defendants in their entirety.

> **D.      The Defendants Are Entitled to Immunity from Liability in this Matter, Because They Are Mandated Reporters Whose Referral to DCF was Required by Law.**

The plaintiffs' claims against these defendants fail to state a claim upon which relief may be granted, because the plaintiffs have not pled anything more than conclusory allegations of malice against the defendants. At most, the plaintiffs have pled facts that tend to show the defendants made a referral to DCF based on their disagreement with the plaintiffs' beliefs as to what was causing EP's symptoms at the time. This is not sufficient to maintain claims against these defendants.

The defendants are mandated reporters under Connecticut law. Conn. Gen. Stat. § 17a–101(b)(1), (25). As mandated reporters, the defendants were required to report suspected child neglect to DCF. Conn. Gen. Stat. § 17a–101a(a) provides in relevant part:

> (a)(1) Any mandated reporter, as described in section 17a-101, who in the ordinary course of such person's employment or profession has reasonable cause to suspect or believe that any child under the age of eighteen years (A) has been abused or neglected, as described in section 46b-120 . . . shall report or cause a report to be made in accordance with the provisions of sections 17a-101b to 17a-101d, inclusive.

16

Any mandated reporter who fails to make such a report shall be guilty of class A misdemeanor. Conn. Gen. Stat. § 17a–101a(b).

Mandated reporters are immune from liability for making such reports. Conn. Gen. Stat. § 17a–101e(b) provides in relevant part:

> Any person, institution or agency which, in good faith, (1) makes a report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103 . . . shall be immune from any liability, civil or criminal, which might otherwise arise from or be related to the actions taken pursuant to this subsection and shall have the same immunity with respect to any judicial proceeding which results from such report or actions, provided such person did not perpetrate or cause such abuse or neglect.

The Connecticut Supreme Court has noted that this statutory scheme reflects the state legislature's "strong public policy of encouraging medical professionals and other persons to report actual and suspected child abuse to the appropriate authorities and agencies." *Zamstein v. Marvasti*, 240 Conn. 549, 559, 692 A.2d 781 (1997).

The plaintiffs' Complaint does not offer anything more than a conclusory allegation that the June 2018 report was made as a form of "retaliation." For one thing, the Amended Complaint pleads that Dr. Zemel made this report to DCF because he "disagreed" with the plaintiffs' belief that EP was suffering from Lyme Disease, rather than Rheumatoid Arthritis, and wanted to keep treating her for Rheumatoid Arthritis. Am. Compl., ECF No. 47 at 30 ¶ 142. A physician's belief that a child is not getting appropriate medical care is precisely the sort of good-faith basis reporting that § 17a–101e(b) is intended to protect. Even an allegedly strenuous disagreement with a patient's caregiver about appropriate care is entirely consistent with a good faith basis for reporting. In fact, one would expect a caring physician to advocate forcefully for a patient child's well-being. And, as the Connecticut Supreme Court has noted in the context of this statute, "we will not supply an exception or limitation to a statute that the legislature clearly intended to have broad application." *Manifold v. Ragaglia*, 272 Conn. 410, 422, 862 A.2d 292

17

(2004). The Amended Complaint pleads, at best, a strong disagreement between the defendants and the plaintiffs concerning EP's medical care. The plaintiffs cannot overcome the defendants' immunity in this case by affixing labels to the defendants' conduct, which was plainly reasonable.

The plaintiffs' characterization of the June 2018 report as "retaliation" is purely conclusory. Am. Compl., ECF No. 47 at 8 ¶ 23. There are no facts pled in the Amended Complaint that would suggest that Dr. Zemel's conduct was in any way retaliatory. Rather, the facts that are pled reflect just the opposite. Namely, assuming the facts in the Amended Complaint to be true, Dr. Zemel diagnosed EP with Rheumatoid Arthritis and recommended a course of treatment. *Id.* at 7 ¶ 18. Rather than agreeing to provide EP with this recommended medical treatment, the plaintiffs demanded that EP be tested for Lyme Disease. *Id.* In response, Dr. Zemel questioned the plaintiffs as to why they were refusing to treat EP as recommended. *Id.* at 8 ¶ 21. He questioned Ms. Pileggi as to the basis for her professed expertise in Lyme Disease, but she refused to respond or explain why she would not permit EP to be treated for her diagnosis of Rheumatoid Arthritis. *Id.* ¶ 22. In response, given that the plaintiffs were refusing to provide EP with recommended medical treatment and were refusing to explain their basis for doing so, Dr. Zemel made the June 2018 referral to DCF in question. *Id.* ¶ 23.

These facts, even assumed to be true, do not demonstrate any "retaliation" by Dr. Zemel against the plaintiffs. Rather, they evidence a disagreement concerning medical care that Dr. Zemel sought to resolve directly with the plaintiffs "for more than a month" before ultimately making the referral to DCF. *Id.* ¶ 21. The plaintiffs' use of labels such as "bullying" and "harassing" to describe Dr. Zemel's efforts in this regard does not transform a disagreement over medical care into something that rises to the level of bad faith. Rather, the Amended Complaint

18

pleads, at most, that Dr. Zemel made a report of concern for child neglect that was unfounded. Connecticut courts consistently have held that unfounded reports of child abuse or neglect are not a basis for civil liability in mandated reporters. *E.g.*, *Greene v. Town of Bloomfield*, No. CV07-5010745-S, 2011 Conn. Super. LEXIS 729, at *14 (Conn. Super. Ct. Mar. 22, 2011) ("requiring such direct evidence of abuse or neglect, as opposed to circumstantial evidence supportive of reasonable cause to suspect abuse or neglect, as a precondition to reporting would defeat the underlying purpose of the statute, which is to encourage the reporting of suspected child abuse or neglect to DCF . . . . In that way, the child can promptly and appropriately be protected from further abuse or neglect if the reporter's reasonable suspicion of abuse or neglect is confirmed or the cloud of suspicion can promptly be lifted from anyone suspected of abuse or neglect if the reporter's suspicion, however reasonable at the outset, is not confirmed.").

Because there are no facts in the Amended Complaint that would suggest the June 2018 referral was caused by anything other than Dr. Zemel's good-faith disagreement and concern regarding EP's medical care, the defendants are entitled to immunity from liability. Therefore, the Court should dismiss all the claims against these defendants.

> **E.     All the Plaintiffs' Claims Against the Undersigned Defendants Fail to State a Claim Upon Which Relief May Be Granted, Because the June to July 2018 DCF Investigation Was Closed Prior to Any of the Harms Alleged.**

As noted above, the plaintiffs' claims against these defendants (other than the medical malpractice claim) stem from the allegedly improper June 2018 DCF referral. However, the Amended Complaint reflects that the investigation following this referral was short-lived—DCF closed its file in response to this particular complaint on or about July 17, 2018, approximately three weeks later. Am. Compl., ECF No. 47 at 9 ¶ 25.

19

In the time between the June 2018 DCF referral and the DCF matter being closed on July 17, 2018, the plaintiffs have not pled any damages whatsoever. On June 30, 2018, they spoke with a naturopath and sought her assistance in treating EP. *Id.* at 8 ¶ 24. The plaintiffs further claim that "almost immediately, after her first dose of homeopathy EP began to show signs of improvement." *Id.* On July 17, 2018, this provider participated in a conference call with DCF and "reported improvement in EP's mobility and decrease in swelling, and pain, with improved sleep, appetite, and demeanor." *Id.* at 9 ¶ 25. She also reported "no recommendations or concerns in the household." *Id.* As a result, DCF concluded that there was a low risk to EP at that time, and it closed its file. *Id.*

DCF did not become involved in EP's care again until nearly six months later, following a report made not by any defendant but by Ms. Pileggi's father alleging child neglect and health issues caused by the plaintiffs. *Id.* at 9 ¶ 26. As a result of this new report, which had nothing to do with the defendants, DCF initiated a new investigation and visited the family at their home on December 28, 2018. *Id.* ¶ 27. DCF remained involved with EP's care over the ensuring months, including directing the plaintiffs to cease using naturopaths to treat EP. *Id.* at 9–10 ¶¶ 27–31.

In March 2019, EP suffered a broken left leg. *Id.* at 10 ¶ 32. The plaintiffs claim in this lawsuit that this leg fracture resulted from EP's older sister dropping her. *Id.* The plaintiffs allege that, "[t]his event triggered a chain reaction of anonymous medical providers making calls to DCF." *Id.* The plaintiffs allege that "[m]ultiple providers made multiple calls as a result of what was an unfortunate accident." *Id.* ¶ 33. The plaintiffs do not identify these providers in the Amended Complaint. They do, however, claim that the defendant Mr. Fitzsimmons submitted

an affidavit to DCF erroneously stating that EP "had not walked in years." *Id.* at 11 ¶ 34.[9] The

plaintiffs allege in purely conclusory fashion that Mr. Fitzsimmons did so with a "goal of

removing" EP from the plaintiffs' custody. As explained more fully in Part II.F, below, the

plaintiffs do not plausibly allege that Mr. Fitzsimmons's affidavit, even if erroneous, caused the

plaintiffs any injury or damages.  In fact, if anything Mr. Fitzsimmons's lent credibility to the

plaintiffs' explanation of how EP broke her leg.

DCF's involvement with the family continued throughout the remainder of the period at

issue in the Amended Complaint and eventually culminated in EP being placed in DCF custody

for a period of time. After that, EP was permitted to return to the family home, but only on the

condition that Ms. Pileggi could not live there with her.  But, as the Amended Complaint makes

clear, none of this was related to Dr. Zemel's 2018 DCF report because that investigation had

been closed almost as soon as it began with no DCF action.

Therefore, the Amended Complaint demonstrates that the defendants' conduct *did not*

cause the plaintiffs any injury. "The causal relation between the defendant's wrongful conduct

and the plaintiff's injuries must be established in order for the plaintiff to recover damages.'"

*Johnson v. Sears Roebuck & Co.*, No. 3:05-CV-139(JCH), 2007 U.S. Dist. LEXIS 63657, at *19

(D. Conn. Aug. 29, 2007) (quoting *Wu v. Town of Fairfield*, 204 Conn. 435, 438, 528 A.2d 364

---

[9]The defendants note that, in their Opposition to the defendants' initial Motion to Dismiss, the plaintiffs attached a document that was purportedly a report generated by DCF. *See* Pls.' Opp., ECF No. 30 at 30. That report acknowledged that Mr. Fitzsimmons "was mistaken" as to the length of time prior to March, 2019 that EP apparently was unable to walk, but it substantiated a finding that EP was unable to walk for approximately three months. ECF No. 30 at 28. It also made a number of grave findings concerning the disturbing lack of medical care that EP received while in the custody of the plaintiffs, prior to March 2019, including that "[t]he [plaintiffs'] decision to remove [EP] from a local practice that would be able to conduct in person assessments of [EP's] very serious condition was a denial of proper care and attention that had a devastating impact on the child." *Id.* at 31. It credited Dr. Zemel's diagnosis and even noted that another provider described EP's condition as "the worst case of juvenile arthritis she had ever seen." *Id.* at 31–32. The plaintiffs have elected not to reference that document in the Amended Complaint, but it plainly belies their false characterization of Mr. Fitzsimmons' behavior in March 2019.

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

(1987)). Accepting the allegations of the Amended Complaint as true, the investigation that resulted from the June 2018 DCF referral was not related to the eventual damages claimed by the plaintiffs. Rather, those damages followed separate DCF involvement unrelated to the June 2018 report, which began in response to a December, 2018 report by Ms. Pileggi's father. In the absence of any causal relationship between the defendants' alleged conduct and the claimed harms, the plaintiffs' claims against these defendants fail.

  **F.**  **All the Plaintiffs' Claims Against Kevin Fitzsimmons Should Be Dismissed Because the Plaintiffs' Allegations Establish That Mr. Fitzsimmons's Conduct Did Not Proximately Cause Any Alleged Injury.**

The plaintiffs have not alleged any personal involvement by Mr. Fitzsimmons in connection with the alleged June 2018 DCF report at issue in the case. Rather, the plaintiffs allege only in the vague terms that he "filed and contributed to DCF reports" without identifying any reports. *Id.* at 22 ¶ 92.

As noted above, the plaintiffs do claim that Mr. Fitzsimmons was involved in treating EP in March 2019, after she experienced a broken leg. Am. Compl., ECF No. 47 at 11 ¶ 34.

With respect to Mr. Fitzsimmons' care and treatment of EP in March 2019, the plaintiffs allege only that he submitted an "affidavit" to DCF that contained erroneous information as to how long EP could not walk. *Id.* at 11 ¶ 34. By the plaintiffs' own allegations, DCF was, at the time, already involved with the family and was dictating medical decision-making relating to EP's care. *Id.* at 9–10 ¶¶ 27–31. Thus, unlike the plaintiffs' claims against Dr. Zemel relating to the June 2018 report, the plaintiffs have not even pled that Mr. Fitzsimmons initiated a complaint against them. At most, there were "anonymous providers making calls to DCF"; *id.* at 10 ¶ 32; and Mr. Fitzsimmons submitted an affidavit in connection with his care and treatment of EP's broken leg. *Id.* at 11 ¶ 34.

1754136_1
DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

Courts in this District routinely have dismissed state-law negligence claims and other claims sounding in state law when the plaintiff failed to allege facts demonstrating that a named defendant was involved in the conduct at issue. *See, e.g.*, *Shand v. Conn. Dept. of Corr.*, No. 3:21-cv-523 (SVN), 2022 U.S. Dist. LEXIS 29407, at \*28 (D. Conn. Feb. 18, 2022) (dismissing state-law negligence claims for failure to plead personal involvement); *Petty v. City of New Britain*, No. 3:17-cv-1798 (JAM), 2018 U.S. Dist. LEXIS 13472, at \*9–10 (D. Conn. Jan. 29, 2018) (declining to exercise supplemental jurisdiction over state-law negligence claims for lack of personal involvement).

Although the above cases arose in the context of § 1983 claims brought by incarcerated individuals, the fundamental concept is the same: a plaintiff's complaint must allege at least a plausible basis for recovery against each of the defendants. *Twombly*, 550 U.S. at 570. Absent *any* allegation that Mr. Fitzsimmons made or even was involved in the 2018 report allegedly made to DCF, there is no plausible basis for relief against him in any of the five counts directed to the undersigned defendants related to the June 2018 report. As discussed above, each count is premised on the allegedly negligent or improper report made to DCF in June 2018. Am. Compl., ECF No. 47 at 8 ¶¶ 22–23. Mr. Fitzsimmons is not alleged, except in the most conclusory fashion, to have been involved in filing that report.

To the extent Mr. Fitzsimmons later supplied an "affidavit" that contained erroneous information about the duration of EP's inability to walk, the affidavit could not have caused any injury because DCF recognized the supposed error and therefore could not possibly have been misled by it. *See* Pls.' Opp., ECF No. 30 at 28. The plaintiffs allege no adverse DCF action resulting from Mr. Fitzsimmons' affidavit—in fact, they note that the medical report of this emergency department encounter "stated that EP's injury was consistent with the innocent

explanation provided, which was that she had fallen from a countertop while her sister was watching her." Am. Compl., ECF No. 47 at 11 ¶ 36. Thus, not only did Mr. Fitzsimmons' affidavit not cause the plaintiffs any harm, his treatment of EP in March 2019 apparently substantiated the plaintiffs' version of what had happened to EP.

To the extent the plaintiffs allege that DCF escalated its involvement in the family's affairs during this time frame, the escalation occurred after Ms. Pileggi brought EP to Florida on March 28, 2019 to treat with a Dr. Morse, alleged to be a naturopath with expertise in how to "naturally detoxify" EP of Lyme disease. *Id.* ¶¶ 37–38. This event apparently triggered further involvement by DCF, including coordination with its counterpart in Florida to return EP to Connecticut, purportedly without Ms. Pileggi's knowledge. *Id.* at 11–12 ¶¶ 39–40, 42–43. But all of this occurred weeks after EP broke her leg and was treated by Mr. Fitzsimmons, and is not plausibly related to anything Mr. Fitzsimmons did. Accordingly, Mr. Fitzsimmons' conduct in March 2019 plainly caused the plaintiffs no injury whatsoever. Instead, subsequent events—in which Mr. Fitzsimmons was not involved—resulted in further escalation of the DCF matter.

For all these reasons, the Court should dismiss all the claims against Mr. Fitzsimmons.

### G. All the Plaintiffs' Claims Against CT Children's Should Be Dismissed for Failing to Allege Direct Claims Against It or the Elements of a Vicarious Liability Claim.

In a similar vein to the above, the plaintiffs' claims against CT Children's Medical Center are conclusory and appear to be based solely on Dr. Zemel's alleged conduct in making the June 2018 DCF referral, as well as Mr. Fitzsimmons conduct in March 2019 relating to his evaluation of EP in the emergency department. *See* Am. Compl., ECF No. 47 at 8 ¶¶ 22–23, 11 ¶ 34. There is no direct claim of negligence against CT Children's Medical Center. However, the plaintiffs do not plead facts anywhere in the Amended Complaint sufficient to state a vicarious liability

24

claim against CT Children's for the conduct of Dr. Zemel, Mr. Fitzsimmons, or any other individual. The Court should, therefore, dismiss all the allegations against CT Children's Medical Center for failure to state a claim.

To make a claim of vicarious liability against a hospital or medical center, a Complaint must plead facts that tend to support a finding of the elements of vicarious liability, namely, "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Fletcher v. City of New London*, No. 3:16-cv-241 (MPS), 2017 U.S. Dist. LEXIS 23519, at *21 (D. Conn. Feb. 21, 2017) (quoting *Wesley v. Schaller Subaru, Inc.*, 277 Conn. 526, 543, 893 A.2d 389 (2006)).

The plaintiff's claims against CT Children's Medical Center appear to be focused solely on the conduct of Dr. Zemel and Mr. Fitzsimmons. As in *Fletcher*, there are no other well-pled facts that any other agent or servant of CT Children's acted negligently.[10] Unlike in *Fletcher*, however, the plaintiffs have not pled the elements of a vicarious liability claim against CT Children's for Dr. Zemel or any other of the defendants in the case. In the absence of well-pled facts supporting a finding of vicarious liability, the claims against CT Children's should be dismissed.

---

[10]As discussed above, the Court should not credit the plaintiffs' conclusory allegations regarding supposed reports made at some time after the March 2019 episode during which EP suffered a broken leg. Am. Compl., ECF No. 47 at 22 ¶ 92, 30 ¶ 144. The plaintiffs have pled no facts supporting their allegation that some or all of those reports, which they have pled were anonymous in nature, were made by CT Children's agents or employees. *See* discussion *supra*, Part II.B. The only well-pled allegations in the Amended Complaint relate to the June 2018 DCF report allegedly made by Dr. Zemel.

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

**H.**    **Each of the Plaintiffs' Claims Should Be Dismissed on the Merits, Because Each Fails to State a Claim Upon Which Relief May Be Granted.**

Even if the Court were to reach the merits of the individual claims against these defendants, contained in Counts One, Six, Seven, Eight, Nine, and Ten, the Court should dismiss these claims because each of these Counts fails to state a claim upon which relief may be granted against these defendants.

**1.**    **The plaintiffs' § 1983 claims against the defendants in Count One fail because the defendants are not state actors and were not acting under color of law.**

The CT Children's defendants are not subject to suit under § 1983, because they are not state actors, and they were not acting under color of law. Courts in this Circuit routinely have held that mandated reporters do not act under color of state law merely because they make reports to state entities pursuant to their state-law duty to do so. *E.g.*, *Ortolaza ex rel. E. v. Capitol Region Educ. Council*, 388 F. Supp. 3d 109, 128 (D. Conn. 2019) (school principal was not state actor or acting under color of law in making report to police in capacity as a mandated reporter); *Mione v. McGrath*, 435 F. Supp. 2d 266, 272 (S.D.N.Y. 2006) (hotel employees did not act under color of state law when they reported to state child protection authorities suspected child abuse by a hotel guest); *Storck v. Suffolk County Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 941 (E.D.N.Y. 1999) (holding physicians who reported suspicions of child abuse pursuant to mandated reporter statutes did not become state actors by virtue of making such reports).

There are no allegations in the Amended Complaint that would support that the CT Children's defendants' conduct was anything other than the ordinary provision medical care and mandated reporting of suspected child abuse and neglect. The only notable circumstance in which the Court of Appeals for the Second Circuit has held medical providers potentially

26

responsible for § 1983 claims is when such providers act solely "as part of the reporting and enforcement machinery" for the state. *Kia P. v. McIntyre*, 235 F.3d 749, 756 (2d Cir. 2000). In *Kia P.*, the defendant hospital medically cleared the minor patient for release but nonetheless continued to hold the child in conjunction with an ongoing child protection investigation being conducted by the state. *Id.* In that respect, when the hospital determined the minor child was medically appropriate for discharge but refused to discharge the patient while the state conducted a child protection investigation, the hospital acted as "an instrumentality of the government," rather than a provider of healthcare. *Id.* at 757.

There are no comparable allegations in this case. Rather, the plaintiffs allege that "CCMC Zemmel, Fitzsimmons, Laughinghouse, and Bazos, all filed and contributed to DCF reports containing information they knew to be false. Plaintiff believes that JOHN and JANE DOES 1-10 listed in the caption are the 'anonymous' DCF complainers, are these same defendants." Am. Compl., ECF No. 47 at 22 ¶ 92. Unlike the allegations in *Kia P.*, however, these allegations are not tantamount to the CT Children's defendants acting solely "as part of the reporting and enforcement machinery" of the state. Instead, these allegations are nothing more than claims that the CT Children's defendants made reports required by law, which, as described above, courts consistently have held are insufficient to state a § 1983 claim. For this reason, the Court should dismiss Count One against these defendants.[11]

---

[11]The CT Children's defendants also respectfully join in the substantive response to the allegations in Count One previously made by the Office of the Attorney General. Specifically, the plaintiffs have failed to plead particularized facts that plausibly would support a § 1983 claim founded upon a claimed violation of the plaintiffs' liberty interest in the care and custody of their child. *See* Defs'. Mem. of Law, ECF No. 28-1 at 12–15. In the interests of brevity, the CT Children's defendants adopt those arguments in full but do not repeat them here.

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

2.       **The plaintiffs' negligence claims against the defendants in Counts Six and Seven fail to state a claim upon which relief may be granted.**

The plaintiffs' negligence claims against the defendants in Counts Six and Seven fail as a matter of law because the defendants did not owe a duty to the plaintiffs. Rather, the defendants owed EP a duty of care as her medical providers. The Connecticut Supreme Court has held that a medical provider making a report to DCF on a concern of child abuse or neglect does not owe a duty to the parents of that child. For that reason, Counts Six and Seven of the Complaint fail to state a claim upon which relief may be granted.

In *Zamstein*, 240 Conn. at 558–64, the Connecticut Supreme Court affirmed the trial court's decision striking claims of both negligence and negligent infliction of emotional distress made against a psychiatrist who made a report of sexual abuse following his interview of the plaintiff parent's children. That report resulted in the plaintiff's prosecution for charges of sexual abuse, which charges ultimately were determined to be false. *Id.* at 551–52. The plaintiff brought suit against the psychiatrist, arguing, just as the plaintiffs do in Count Seven and Eight, negligence in the report and negligent infliction of emotional distress resulting from the report. *Id.* at 552. The trial court granted the defendant's motion to strike both counts. *Id.* On appeal, the Connecticut Supreme Court affirmed, concluding that, as a matter of public policy, a mental health professional performing a sexual abuse evaluation owes no duty of care to the alleged abuser. *Id.* at 559.

In reaching this conclusion, the Supreme Court relied on the mandated reporter statutes also at issue in this case, including the immunity provision within Conn. Gen. Stat. § 17a–101e. *Id.* at 558–59. The Court determined that these statutes showed a "strong public policy of encouraging medical professionals and other persons to report actual and suspected child abuse

28

to the appropriate authorities and agencies." *Id.* at 559. The Court further emphasized "imposing a duty on mental health professionals . . . would carry with it the impermissible risk of discouraging such professionals in the future from performing sexual abuse evaluations of children altogether, out of a fear of liability to the very persons whose conduct they may implicate. Such a result would necessarily run contrary to the state's policy of encouraging the reporting and investigation of suspected child abuse . . . because effective evaluation and diagnosis of children is a necessary component of discovering the abuse in the first instance." *Id.* at 560–61. The Court further noted, "[t]hey should not be distracted from their duty by the specter of potential liability to the suspected abuser in the event that their assessment of the child eventually turns out to be incorrect but honest." *Id.* at 564.

The Supreme Court's reasoning applies with equal force to the plaintiffs' claims in this case in Counts Six and Seven of the Complaint. In these Counts, the plaintiffs allege that "[t]he Defendants had a duty of care to not file a false report with DCF." Compl., ECF No. 1 ¶ 96. In support, the plaintiffs cite to Conn. Gen. Stat. § 53a–156, which is Connecticut's criminal statute providing that perjury is a Class D felony. *Id.* That statute does not speak to or create a duty or a cause of action in the context of a mandated reporter making a referral to DCF. In Count Seven, the plaintiffs do not allege any other duty owed by the defendants to the plaintiffs, but rather incorporate by reference the preceding paragraphs of the Complaint. *Id.* ¶ 101–03.

The plaintiffs' argument that the defendants owed the plaintiffs a duty of care in this circumstance contradicts the *Zamstein* decision. As in *Zamstein*, the defendants owed a duty of care only to EP as her medical providers. Extending a duty of care to the plaintiffs would undermine the public policy considerations discussed by the *Zamstein* Court. Namely, if plaintiffs were permitted to sue defendants who allegedly made reports to DCF, it would have a

29

chilling effect on medical providers who have a duty to report suspected neglect. Providers should not have to take into consideration the "specter of potential liability" when considering whether to relay concerns of suspected abuse or neglect to the appropriate authorities, as required by law. *Zamstein*, 240 Conn. at 564.

In the absence of any duty to the plaintiffs not to make a report of concern for child neglect, the plaintiffs' allegations in Counts Six and Seven fail to state a claim upon which relief may be granted. As such, the Court should dismiss Counts Six and Seven in their entirety.

>    **3.**    **The plaintiffs' intentional infliction of emotional distress claim against the defendants in Count Eight fails to state a claim upon which relief may be granted.**

The plaintiffs' allegations in the Amended Complaint do not state a legally cognizable claim for intentional infliction of emotional distress. As described above, at most, the allegations describe a disagreement between Dr. Zemel and the plaintiffs concerning the appropriate medical diagnosis and treatment of EP. The June 2018 referral under these circumstances is not the kind of behavior that Connecticut law has recognized as "extreme and outrageous." Rather, in similar cases, Connecticut courts have dismissed such claims. Therefore, the defendants respectfully submit that this Court should dismiss Count Eight in its entirety.

"The standard for extreme and outrageous behavior has historically been construed very strictly . . . and it has been said that [t]his tort must be strictly policed to avoid turning ordinary life and its insults and ignorant behavior into an endless and uncontrollable pool for litigation." *Maselli v. Regional Sch. District Number 10*, 198 Conn. App. 643, 666, 235 A.3d 599 (2020) (citations omitted; internal quotation marks omitted).

In *Eaddy v. Dept. of Children & Families*, No. HHDCV106013363S, 2012 Conn. Super. LEXIS 2949, at *5 (Conn. Super. Ct. Dec. 5, 2012), the court granted a motion to strike an

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

intentional infliction of emotional distress claim founded upon an allegedly false report to DCF made by school officials. The court determined that the Complaint, "at most, alleged that the school defendants made a wrong decision to report her son's situation to DCF." *Id.* The court found that this did not constitute extreme and outrageous conduct as a matter of law. *Id.*

Similarly, in this case, the plaintiffs allege that the defendants were negligent in the June 2018 referral to DCF, arguing that "[t]he DCF report was filed because the PLAINTIFFS sought a second opinion and the defendants disagreed and wanted EP treated by them and only them." Am. Compl., ECF No. 47 at 30 ¶ 142. The filing of a report with DCF, even if it allegedly was determined eventually to be unfounded at the time, does not rise to the level of "extreme and outrageous" behavior. On the contrary, the defendants were *required* by law to make such reports if they had a concern that the absence of appropriate medical care could rise to the level of neglect. Conn. Gen. Stat. § 17a–101a(b).

Further, even if the June 2018 report ultimately was determined to be false or unfounded, the DCF referral itself was a privileged communication that does not rise give to a cause of action for intentional infliction of emotional distress. *E.g.*, *Cygler v. Klingberg Family Ctrs., Inc.*, Docket No. CV054008150S, 2006 Conn. Super. LEXIS 3462, at *21 n.1 (Conn. Super. Ct. Nov. 13, 2006) ("[t]his absolute privilege applies regardless of whether the representations at issue could be characterized as false, extreme or outrageous" (citing *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986))).

On the facts pled in the Amended Complaint, the plaintiffs have failed to state a claim for intentional infliction of emotional distress. The defendants did not engage in any extreme or outrageous behavior, and the Court should dismiss Count Eight.

1754136_1
DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

**4.    The plaintiffs' CUTPA claim in Count Nine fails to state a claim upon which relief may be granted.**

The plaintiffs have failed to state a legally sufficient CUTPA claim. Specifically, they have not alleged an "ascertainable loss" as that term is defined by CUTPA. Thus, the Court should dismiss Count Nine in its entirety.

CUTPA is a remedial statute designed to compensate "actual loss." Conn. Gen. Stat. § 42–110b(d); see also *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 725–26, 627 A.2d 374 (1993). It provides that a person who suffers "ascertainable loss of money or property, real or personal . . . may bring an action . . . to recover actual damages." Conn. Gen. Stat. § 42–110g(a). "The ascertainable loss requirement [of § 42–110g] is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief. . . . Thus, to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation." *Marinos v. Poirot*, 308 Conn. 706, 713, 66 A.3d 860 (2013).

On this basis, Connecticut courts have distinguished the damages compensable through CUTPA claims from those available in tort actions. For instance, Connecticut courts regularly have held that emotional distress is not an "ascertainable loss" in and of itself that can give rise to a CUTPA claim. E.g., *Parnoff v. Aquarion Water Co.*, 188 Conn. App. 153, 183, 204 A.3d 717 (2019) ("claim of emotional distress does not constitute an ascertainable loss of money or property for purposes of CUTPA"); *Di Teresi v. Stamford Health System, Inc.*, 149 Conn. App. 502, 512, 88 A.3d 1280 (2014) (same).

In the healthcare context, where CUTPA claims have been permitted, they have involved economic damages, typically financial loss due to an unfair entrepreneurial activity of the healthcare provider. *See, e.g., Gianetti v. Siglinger*, 279 Conn. 130, 900 A.2d 520 (2006)

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

(affirming award of economic damages and punitive damages against physician for unfair and deceptive practice of "balance billing," in which the physician initiated a collections action against the patient to seek payments from the patient more than the insurer's payment, in violation of insurance agreement).

There are no such damages alleged in this case. The only elements of damage alleged are "severe temporary and permanent psychological, emotional, and physical harm." Am. Compl., ECF No. 47 at 33 ¶ 165. These are plainly not actionable, ascertainable losses under CUTPA.

In *Rivera v. Simonetti*, No. CV04-4000920-S, 2005 Conn. Super. LEXIS 1999, at *13 (Conn. Super. Ct. Aug. 5, 2005), the court granted the defendant's motion to strike a CUTPA count within an action alleging wrongful death. The court observed that the financial loss pled in the CUTPA count was identical to the losses alleged in the wrongful death count. The court held that "[t]he plaintiff has not alleged any recoverable financial loss independent from wrongful death damages," and, as a result, the CUTPA claim was insufficient as a matter of law.

As in *Rivera*, the plaintiffs have not pled a financial loss that could form the basis of a CUTPA claim. The damages in Count Nine are tort damages, not financial losses that are actionable under CUTPA. This demonstrates unambiguously that the plaintiffs are not making a CUTPA claim at all but are instead thinly veiling a tort claim in CUTPA language to attempt to gain access to punitive damages. This is plainly improper, and the Court should dismiss Count Nine in its entirety.

> **5.    The plaintiffs' § 52–568 claim against the defendants in Count Ten fails to state a claim upon which relief may be granted.**

The plaintiffs' § 52–568 claims against these defendants must fail, because the defendants did not commence or prosecute a "civil action or complaint" within the meaning of that statute. Connecticut courts have held, specifically, that neither this statute nor the common

33

1754136_1

law regarding vexatious litigation claims provides a basis to sue an individual who makes a DCF

referral. For this reason, the Court should dismiss Count Ten in its entirety as against these

defendants.

Conn. Gen. Stat. § 52–568 provides:

Any person *who commences and prosecutes any civil action or complaint against another*, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages.

In *Cerejo v. Cerejo*, No. CV11-5034020-S, 2012 Conn. Super. LEXIS 1734, at *4 (Conn.

Super. Ct. June 29, 2012) (*Lager, J.*), the court considered the same question as to whether

making a DCF complaint constituted a "commencing or prosecuting a civil action or complaint"

that would give rise to a cause of action under 52–568. The court concluded that it did not. The

court explained, "[a] report to DCF is not equivalent to the initiation of a proceeding before an

administrative body that has the power, on its own, to effectuate a permanent deprivation." *Id.*, at

*6. Moreover, the court noted that "a determination that making a complaint to DCF constitutes

the commencement and prosecution of a civil action for the purposes of a vexatious litigation

claim is inconsistent with the public policy of this state that requires the reporting of suspected

child abuse." *Id.*

The *Cerejo* court cited the decision in *Sullivan v. Campbell*, CV 980581706, 1999 Conn.

Super. LEXIS 1811, at *2 (Conn. Super. Ct. July 9, 1999), which similarly held that a complaint

made to DCF could not form the basis for a claim under either § 52–568 or the common law of

vexatious litigation.

Similarly, in this case, the defendants did not initiate or prosecute a civil action or

complaint against the plaintiffs within the meaning of § 52–568. As described above,

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

Connecticut courts have held that the mere filing of a DCF referral does not satisfy the standard for bringing a claim under § 52–568. Thus, Count Ten fails to state a claim upon which relief may be granted against these defendants, and the Court should dismiss it in its entirety.

### III.    <u>CONCLUSION</u>

For all the above reasons, the defendants, Connecticut Children's Medical Center, Lawrence Zemel, M.D., and Kevin Fitzsimmons, respectfully submit that the Court should grant their Motion to Dismiss the Amended Complaint against them in its entirety.

> THE DEFENDANTS,
> CONNECTICUT CHILDREN'S MEDICAL
> CENTER, LAWRENCE ZEMEL, AND
> KEVIN FITZSIMMONS
>
> BY:    _/s/ Stuart C. Johnson, Esq._
> Joyce A. Lagnese, Esq.
> Fed. Bar No. ct05527
> Stuart C. Johnson, Esq.
> Fed. Bar No. ct20277
> Thomas J. Plumridge, Esq.
> Fed. Bar No. ct29394
> DANAHERLAGNESE, P.C.
> 21 Oak Street, Suite 700
> Hartford, Connecticut 06106
> Telephone: 860.247.3666
> Facsimile: 860.547.1321
> Email: jlagnese@danaherlagnese.com
>           sjohnson@danaherlagnese.com
>           tplumridge@danaherlagnese.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 5, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


 */s/ Stuart C. Johnson, Esq.*
Stuart C. Johnson, Esq.

1754136_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666