**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
---------------------------------------------------------x
KATHARINE PILEGGI
ANTHONY PILEGGI
          Plaintiffs,

Also, as Next Friend to their
Minor Child "EP"

                                     **Docket No.: 22-cv-1315 AWT**

v.

KIM MATHIAS Assistant Attorney General
State of Connecticut, in her individual and
Official capacity, KAELA MINERLY in her
Individual and official capacity, FRANK
ROTOVNIK in his individual and official
capacity, CONNECTICUT CHILDREN'S
MEDICAL CENTER, DR. ROMAN ALDER,
DR. LAWRENCE ZEMMEL, DR. LINDSEY
LAUGHINGHOUSE, DR. ANDREW BAZOS,
DR. KEVIN FITZSIMMONS, CONNECTICUT
DEPARTMENT OF CHILDREN AND FAMILIES
("DCF") and "JOHN and JANE DOES 1-10",
          Defendants.
---------------------------------------------------------x

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS ACTION
AGAINST CONNECTICUT CHILDREN'S MEDICAL CENTER (CCMC), KEVIN
FITZSIMMONS, AND DR. LAWRENCE ZEMMEL**

**I. BACKGROUND**

In June 2018, the Plaintiffs' child, EP who was three (3) years old at the time, was bitten by a tick. As a result, EP was experiencing symptoms including, but not limited to, a low-grade fever, vomiting, joint pain, weakness, fatigue, and swollen lymph nodes. Plaintiffs immediately took EP to their family Pediatrician Roman Alder, MD. Plaintiffs explained to Dr. Adler that EP had been bitten by a tick, and they needed to test the tick. Dr. Alder dismissed the Plaintiffs' request.

Dr. Adler refused to show the results of the blood work to Plaintiffs, or to give any type of preventive medications for EP. Dr. Adler simply told the Plaintiffs they needed to see Dr. Lawrence Zemmel a Rheumatologist at Connecticut Children's Medical Center (CCMC) in the Pediatric Rheumatology Department. Dr. Zemmel diagnosed EP with Juvenile Idiopathic Rheumatoid Arthritis. At that time, the Plaintiffs were presented with treatment options for EP, per the standard of care for treating RA, but the Plaintiffs' declined this treatment as they felt further testing was necessary. Thus, this is what they required. However, they were denied.

In late June of 2018, Plaintiffs once again requested that both Dr. Alder and Dr. Zemmel test the tick that appeared on EP. Both doctors continued to refuse their request which was exacerbating Ep's condition. Dr. Zemmel, however, kept persisting over and over for Ms. Pileggi to tell him how she "knew so much" about Lyme Disease. When she refused to entertain his inquiries and mockery, Dr. Zemmel promptly retaliated with the filing of a report to DCF. Hence, in or about late June of 2018, the Torrington Department of Children and Families (DCF) received a report from Dr. Zemmel, alleging medical neglect of EP by her parents. DCF subsequently contacted the Plaintiffs regarding Dr. Zemmel's report.

Multiple other anonymous reports were sent to DCF related to the plaintiffs and EP, and all of them likely came from CCMC and/or their agents Zemmel and Fitzsimmons. These reports contained false information, were exaggerated, and were crafted to retaliate against the plaintiffs simply for seeking a second opinion.

2

As it turns out, the plaintiffs were correct, and EP did in fact have Lyme Disease. Despite this, the plaintiffs were continuously harassed by DCF agents Minerly and Rotovnik. These defendants filed a false report with a Florida DCF agency and had Ms. Pileggi arrested at gun point in the presence of her daughter, simply for traveling out of state to seek medical treatment from a preferred provider, something she had every right to do and even consulted with DCF prior to doing so. Minerly and Rotovnic had Ms. Pileggi arrested and detained regardless.

Simultaneously, in Connecticut, an *Ex Parte Emergency Motion for Medical Attention*, was being held in front of the Honorable Judge Turner for DCF to be granted authority to remove EP from Plaintiffs.  Judge Turner granted DCF's motion.  Plaintiffs were never notified of this proceeding, or the filing of the motion, and thus were **denied all due process**.

Plaintiffs were even denied the right to choose an appropriate placement for their daughter as all the recommendations or volunteer placement suggestions from both Plaintiffs were completely denied. Defendants Minerly and Rotovnik ignored the plaintiff's family members and family friends who were willing to take EP, thus violating their own preference of keeping a child with a relative whenever possible. Instead, EP was placed with total strangers in Southbury, to be further traumatized by the extreme and sudden separation from her parents and siblings who loved her dearly.

After all of this, Defendants Minerly, Rotovnik, and Mathias, then decided that if EP was to return home, the plaintiffs would have to get a divorce and Ms. Pileggi would have to leave the residence. Accordingly, Mr. Pileggi filed for divorce under **duress**.

3

On or about December 2021, EP's bloodwork was negative for Rheumatoid Arthritis, and she subsequently tested positive for Lyme Disease, Babesia, Bartonella, anaplasmosis, parasites and mold.   Hence, years of the Defendants' intentional interference with EP's treatment for Lyme Disease directly resulted in a severe exacerbation of EP's her medical condition and prolonged suffering resulting in severe medical harm, not to mention the economic damages and emotional harm incurred by the plaintiffs.

## II. STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the *Federal Rules of Civil Procedure,* the Court should "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true." *Todd v. Exxon Corp.,* 275 F.3d 191, 197 (2d Cir. 2001). "A complaint should not be dismissed for failure to state a claim `unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* at 197-98 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996) (internal quotation marks omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to `state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The "plausible grounds" requirement "does not impose a probability

4

requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claim for relief. *Twombly,* 550 U.S. at 556; *see also Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120-21 (2d Cir. 2010) ("We reject the contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible.")

### III. ARGUMENT
### 1. <u>Statute of Limitations</u>

The crux of the defendants' motion to dismiss the CCMC defendants is based on their theory that the statute of limitations against them began to toll on June 18th, 2018, when Dr. Zemmel filed his false and retaliatory DCF report. However, this theory requires that as a matter of law, it be determined that the filing of said report was the sole harmful and negligent action committed against the plaintiffs by these defendants. As is demonstrated in the Amended Complaint and will be shown here as well, this is far from accurate. These defendants committed multiple egregious acts against the plaintiffs, and contrary to the defendants' assertion, the continuous course of treatment and the continuing course of conduct doctrines both apply.

"A statute of limitations analysis is generally riddled with questions of fact which *the Defendants* must establish in order to bar Plaintiffs' claims. . . . Accordingly, unless the complaint alleges facts that create an **ironclad defense**, a limitations argument must await factual development." *Allen v. Dairy Farmers of Am., Inc.,* 748 F.Supp.2d 323, 354 (D. Vt. 2010); *see also OBG Technical Servs., Inc. v. Northrop*

5

*Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 503 (D. Conn. 2007) ("A statute of limitations defense . . . requires a factual inquiry beyond the face of the complaint."). *Bartold v. Wells Fargo Bank, N.A.*, No. 14-cv-00865 (VAB), at *7 (D. Conn. Nov. 24, 2015).

The defendants' attempt to frame the filing of the false DCF report as the only act alleged against them should not be given any weight. The *Amended Complaint* alleges the following against the CCMC defendants…

- Refused to test EP for Lyme Disease and subsequently treated her for the wrong illness, despite defendants having a Lyme Disease clinic at the hospital and flaunting Dr. Zemmel as a "Lyme Disease expert". (¶ 20).

- Fitzsimmons lied in his affidavit to DCF and CCMC took no steps to correct this. (¶ 34).

- Defendants Minerly and Rotovnik conspired with CCMC, Zemmel, Fitzsimmons, and Laughinghouse, to justify an abuse of process and to violate the PLAINTIFFS' civil rights. (¶ 70).

- CCMC and Dr. Zemmel actively interfered with the PLAINTIFFS' absolute right to seek medical care and alternative medical opinions from other healthcare practitioners during the course of business and trade. Ones who were able to correctly diagnose her. CCMC and Zemmel used their position and power to harass and threaten PLAINTIFFS, even demanding that they turn over EP's birth certificate because they "lost all their rights". (¶ 74)

- On or about **December 2021**, EP's bloodwork was negative for Rheumatoid Arthritis, and she subsequently tested positive for Lyme Disease, Babesia, Bartonella, anaplasmosis, parasites and mold. (¶ 82)
- Hence, years of the Defendants' intentional interference with EP's treatment for Lyme Disease directly resulted in an unnecessary and severe exacerbation of her medical condition and prolonged suffering resulting in severe medical harm. (¶ 83)

- This interference also caused PLAINTIFFS to suffer an enormous amount of financial harm due to the costs to treat EP and nurse her back to health, which was all paid out of pocket by PLAINTIFFS, who would do anything to ensure their

6

daughter received the best and most effective treatment necessary to cure her. (¶ 84)

The court should reject the defendants' attempt to reduce the entire case alleged against them down to a single act. It is clear from the *Amended Complaint* that the defendants' act of filing a false DCF report was not the only action complained of, but one of several, all of which took place while EP was still being cared for by the defendants. The statute of limitations in this case is a question of fact, not one of law. "Where, as here, a complaint does not demonstrate facial infirmity with respect to the statute of limitations, a motion to dismiss on this ground must fail."); *Slainte Investments Ltd. P'ship v. Jeffrey*, No. 3:14-cv-01750, 2015 WL 6692242, at *9-10, 2015 U.S. Dist. LEXIS 148682, at *29 (D. Conn. Nov. 3, 2015) ("In short, a motion to dismiss may be granted if a complaint's allegations affirmatively establish an action's untimeliness, but it may not be granted simply because a complaint failed to include allegations affirmatively establishing its timeliness." *Bartold v. Wells Fargo Bank, N.A.*, No. 14-cv-00865 (VAB), at *8 (D. Conn. Nov. 24, 2015) [emphasis added].

The Connecticut Supreme Court has recognized that "under certain circumstances, the limitations period may be tolled under the continuing course of conduct doctrine." *Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 177 (D. Conn. 2000) (citing *Blanchette v. Barrett*, 229 Conn. 256, 265 (Conn. 1994). Specifically, the Supreme Court has recognized two general categories in which the continuing course of conduct doctrine has tolled, or theoretically could toll, the statute of limitations. One category may be satisfied when an initial act or omission occurs, and a special relationship creates an ongoing duty to correct or otherwise ameliorate the wrong. A second general

7

category addresses situations in which, because of a continuous course of contacts or dealings, it cannot be said with precision when a specific act or omission occurred in the course of the relationship. In this situation, the statute may be tolled until the time of the last act within the course of the relationship. There may, of course, be scenarios which analytically fit both categories." *Bartold \*9.*

The Amended Complaint alleges that these defendants had a duty of care to plaintiff EP, that they misdiagnosed her, and continued to treat her for the wrong illness. The defendants had a duty to correct their misdiagnosis and provide EP the appropriate care, but for *years*, **they did not**. Hence, the defendants' attempt to overcome this fact by blaming the plaintiffs', while instructing the court to "not permit the plaintiffs on the one hand to argue that they knew EP had Lyme Disease in June of 2018, yet to toll the statute of limitations based on continuing treatment." (*Motion p.15*). The defendants support this request by stating that a plaintiff should not be "allowed to acquiesce in the defendant's conduct so long as it is convenient to the plaintiff." (*Id.*)

For the defendants to infer that the plaintiffs "acquiesced in the defendants' conduct" is patently absurd and quite frankly insulting. The entire *Amended Complaint* explains how the plaintiffs begged and pleaded to take EP to multiple other physicians and facilities but were shut down by the collective work of **all the defendants**, including CCMC, Zemmel, and Fitzsimmons, yet the defendants infer that EP was free to go at any time. Obviously that is not true. In fact, when the plaintiffs sought a second opinion, these defendants filed a false DCF report against them, and assisted DCF in taking temporary custody of EP so they could force their treatment on her, for the wrong illness, yet they

8

now claim that the plaintiffs "acquiesced" to their negligent care.  This is nothing short of preposterous.

The continuing treatment of EP by these defendants, against the plaintiffs' will, and their continuing dealing with the plaintiffs both in the medical and legal settings, tolls the statute of limitations in this matter. These defendants were involved in EP's maltreatment and negligent care the entire time and on multiple levels.   The continuing course of conduct doctrine "reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." *Bartold* *9.

The defendants' theory related to the statute of limitations in this matter is not a matter of law, as there are a tremendous number of facts to consider when applying the statute of limitations in this case and it is hardly evident from the face of the *Amended Complaint* precisely what that date is. As our courts have cautioned, "[A]sserting a statute of limitations defense in a pre-answer motion to dismiss is especially difficult where a continuing course of conduct might apply, as "[t]he continuing course of conduct doctrine is 'conspicuously fact-bound." (*Id*).  The defendants' theory and conclusions related to the statute of limitations are not sufficient to grant dismissal.

## 2.  **Immunity**

The allegations made by the plaintiffs include those of submitting a false and malicious report to DCF, in part for retaliation against the plaintiffs for seeking a second opinion regarding EP's care. The fact that this *Amended Complaint* was unsubstantiated by DCF does not mean that it could not contribute to any damage or be used and relied

9

upon to supplement and strengthen future reports and allegations. When DCF receives a report of abuse or neglect, it places the name of the alleged perpetrator in its child abuse registry. Agency regulations require removing a person's name from the registry when DCF determines a report is unfounded or it finds that, while the child is at risk, abuse or neglect has not occurred (Conn. Agency Regs., § 17a-101-4). In this situation, DCF's policy calls for removing the names from publicly available registry sites <u>but keeping them for 12 months</u> in a sub-file available to DCF staff, in case other reports are made about the person.

It is entirely presumptuous  to state that simply because the defendants are mandated reporters, that any report they file is protected by immunity. This is clearly false, as Conn. Gen. Stat. § 17a–101e(b) states in relevant part:

> Any person, institution or agency which, **in good faith**, (1) makes a report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103 . . . shall be immune from any liability, civil or criminal, which might otherwise arise from or be related to the actions taken pursuant to this subsection and shall have the same immunity with respect to any judicial proceeding which results from such report or actions, provided such person did not perpetrate or cause such abuse or neglect.

The argument here is whether the DCF report filed by Dr. Zemmel was done in good faith. The term "in good faith" was not accidently placed into the statute. It mandates that reports be made with reasonable and justifiable concern. The evidence here suggests that this report was not.

Beginning at the time when the plaintiffs chose to seek a second opinion, Dr. Zemmel began harassing and bombarding them with bullying tactics and threats, indicating a strong dislike and bias towards the plaintiffs. Dr. Zemmel's DCF report was

10

not a good faith effort to obtain medical care for EP, it was a bad faith report made in retaliation for the plaintiffs not choosing his preferred method of care. This report was not substantiated, but it was held for at least 12-months by the DCF staff "in case other reports are made about the person". How much or how little Dr. Zemmel's false report contributed to the future treatment of the plaintiffs is mostly unknown at this point. However, it can be taken as true that his report at least proximately, caused damage to the plaintiffs, if not directly, and that the resulting harm was its true intent.

Not only was Dr. Zemmel's DCF report unsubstantiated, but his diagnosis of EP was also incorrect. Dr. Zemmel reported the plaintiffs to DCF for failing to treat EP for an illness that she did not have. What's more unsettling is that Dr. Zemmel flat out refused to test EP for Lyme Disease or mold, despite the plaintiffs pleading for him to do so AND explaining that their home had been recently found to contain mold. If this non-feasance does not demonstrate gross negligence, which the plaintiff asserts that it does, it certainly demonstrates that Dr. Zemmel's report was not made in good faith, nor was it based on accurate information. The defendants cannot hide behind the immunity provided to mandated reporters if they knowingly make a false report. This is plainly obvious when knowingly making a false report of child abuse or neglect is a criminal offense, for which the penalty is a $2,000 fine, up to a year in prison, or both (CGS § 17a-101e). The law requires DCF to tell people who phone in abuse reports (1) that their call is being recorded and (2) the penalties for knowingly making a false report.

Clearly, a mandated reporter in the State of Connecticut is not allowed to plead immunity when their report is false and baseless. The statutory immunity cited by the

11

defendants do not apply if the defendants intentionally and maliciously filed false reports, and the evidence presented at this point indicates that they did. See; *Pagliuco v. City of Bridgeport*, No. 3:01-CV-836(WIG) (D. Conn. Dec. 13, 2005).

Accordingly, immunity should be denied to the defendants at this stage.

### 3. The Amended Complaint Properly Asserts Damages

The defendants claim that their false DCF report was closed on July 17th and that they were not responsible for any damages after that date, as pled in the *Amended Complaint*. (*Motion p. 20*). They assert that this is so because EP began improving immediately after she began seeing a doctor of the plaintiff's choice. (*Id.*) However, this conclusion takes for granted that EP was forced into the care of the defendants who continued to negligently treat her well after this date.

After the incident where the Pileggi's family member called DCF on them resulting in another unsubstantiated report, EP was forced into the care of the defendants. The defendants state in their motion that "DCF remained involved with EP's care over the ensuing months...". What this means and what the defendants omit, is that *they* were involved in EP's care for the ensuing months, despite essentially claiming in their motion that after July 17th, they had nothing to do with her. This attempt to mislead the court cannot be overlooked.

The defendants address the lies told to DCF by Fitzsimmons by praising him for it, stating that the lies actually "lent credibility to the plaintiffs' explanation...", rather than they misled DCF. The defendants then assert their own theory of causation, stating that "those damages followed separate DCF involvement unrelated to the June 2018 report,

12

which began in response to a December, 2018 report by Ms. Pileggi's father." (*Motion p.22*).

The parties here simply have conflicting theories as to what exactly caused the damages, and it is the plaintiff that is entitled to all reasonable inferences and presumptions of truth at this stage, not the defendants. The proof of causation that the defendants are seeking is simply not required at this stage... " [a]t the motion to dismiss stage, a plaintiff "need not . . . specify the measure of damages nor plead . . . [specific] proof of causation." *Terex S. Dakota, Inc. v. Carraro Drive Tech, S.P.A.*, No. 3:17-CV-00154, 2018 WL 1211198, at *3 (D. Conn. Mar. 8, 2018).

This argument holds true as it relates to Fitzsimmons and his involvement in this matter. Fitzsimmons was actively assisting in the negligent treatment of EP and lied to DCF in a report, which is evidence of bad faith, and further evidence of the crime of filing a false report with DCF. The defendants agree in their motion that at the time Fitzsimmons submitted his false statement to DCF, that "DCF was already involved with the family at that time and was dictating medical decision-making relating to EP's care." However, this is just another reason why the allegations against Fitzsimmons stand. DCF was already involved in EP's care, and Fitzsimmons decided to insert himself into the investigation by lying to them about EP's care, and not in a small way. The defendant can downplay Fitzsimmons' role, but falsely informing DCF that a child has not walked in years is not a small lie, but a massive one, particularly with the nature of the illness EP was suffering from.

The defendants then return to their unproven theory that the June 18th DCF report was their sole act of negligence, arguing that "[a]bsent any allegation that Mr. Fitzsimmons made or even was involved in the 2018 report allegedly made to DCF, there is no plausible basis for relief against him in any of the five counts directed to the undersigned defendants related to the June 2018 report." (Motion p. 23). This is completely misguided and is nothing more than the defendants crafting their own theory of the case and applying their theory as fact throughout their motion. The defendants are simply using conclusory statements/theories, to attack what they think are conclusory allegations, and they cannot prove as a matter of law that the statute of limitations began to run on any of their proffered dates.

### 4. Vicarious Liability Was Properly Alleged

Not surprisingly, the defendants return to their statute of limitations argument in order to immunize CCMC from vicarious liability. They also argue that "the plaintiffs do not plead facts anywhere in the Amended Complaint sufficient to state a vicarious liability claim against CT Children's for the conduct of Dr. Zemmel, Mr. Fitzsimmons, or any other individual." (Motion p.25). This is not true, and according to their case of *Fletcher v. City of New London*, this claim is sufficiently plead.

> The three elements required to show the existence of an actual agency relationship in Connecticut are: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Fletcher v. City of New London, No.* 3:16-cv-

14

241 (MPS) (D. Conn. Feb. 21, 2017); *Wesley v. Schaller Subaru, Inc.*, 277 Conn. 526, 543 (2006).

In this case, Zemmel and Fitzsimmons were both employees of CCMC, they both attended to EP, CCMC was legally placed in charge of EP's care over the objections of the plaintiffs, and CCMC was in control of EP's medical decision making. Defendants then unlawfully vaccinated all the Pileggi's children without their knowledge and/or consent. In the case presented by the defendants of *Fletcher v. City of London*, the vicarious liability charge was considered sufficiently pled on the grounds that "Plaintiffs allege that Dr. Cronin-Vorih was <u>an employee</u> of Lawrence and Memorial Hospital, attended to [Plaintiff] in the hospital's emergency room with other hospital staff, and that there was an understanding that the <u>hospital was in control</u>. Drawing reasonable inferences in the plaintiffs' favor, this states a claim of an actual agency relationship between Dr. Cronin-Vorih and Lawrence and Memorial Hospital, and I need not reach the arguments about apparent agency. It may well be that the facts will not prove an agency relationship in this case, but the pleadings state a claim sufficient to survive the motion to dismiss. *Fletcher v. City of New London*, No. 3:16-cv-241 (MPS), at *14-15 (D. Conn. Feb. 21, 2017).

The defendants are being extremely misleading in asserting that "[t]here is no direct claim of negligence [in the complaint] against CT Children's Medical Center." (*Motion p. 24*), and so therefore all claims against them should be dismissed. (*Id.*) Numerous allegations in the *Amended Complaint* name CCMC as an actor, (*See Am. Compl.*, ¶¶ 20, 30, 34, 70, 71, 73, 74), and Claims 6 and 7 both accuse CCMC of "Negligence" (count 6), and "Negligent Infliction of Emotional Distress" (count 7). Thus, this argument by the defendants is simply untrue.

15

The defendants, in regard to the negligence claim, assert that based on their own theory of the case that the false DCF report filed by CCMC is the only issue, and that the negligence claims cannot stand because no duty not to file a false DCF report was owed to the plaintiffs'. (*Motion p.28*). Since filing a false DCF report is a crime, the defendants are arguing here that they had no duty not to break the law and had every right to do so. Clearly this argument fails.

Second, a duty owed was to EP, who is a plaintiff, and it was not simply to "not file a DCF report". The claims of negligence against CCMC contain allegations "against all defendants", including CCMC. CCMC cannot escape liability by narrowing the case down to a single incident of their choosing and attempting to sever themselves from their oversight of defendants Zemmel and Fitzsimmons. This was not a single, one-time incident from five years ago that led to this action against CCMC. It was the defendants' persistent, pervasive, and overt violations of the plaintiffs' rights, and the negligent care of EP over a period spanning years. CCMC did everything in their power to take control of the treatment of EP and then botched it. Zemmel and Fitzsimmons were not operating in a vacuum and CCMC has failed to prove that they are accordingly entitled to dismissal.

### 5. The Anonymous DCF Reports

In keeping with the defendants' statute of limitations argument, they refuse to declare whether they are, or are not, responsible for the anonymous DCF reports. However, based on facts and circumstances, it is quite evident that these reports were in fact filed by CCMC and/or their agents.

16

The defendants argue that Dr. Zemmel's DCF report could not have caused any damage to the Plaintiffs because it was unsubstantiated and closed. This conclusion ignores the administrative mandate that DCF keep even unsubstantiated reports for 12-months in case another report is made against the same person. The defendants cannot possibly state with any reasonable degree of certainty that DCF did not rely upon Dr. Zemmel's first complaint when making future determinations regarding the plaintiffs and EP. Particularly, when DCF's own guidelines seem to indicate that even unsubstantiated reports can be relied upon to make future determinations, and based on the nature of the report, the subsequent investigation and violations, it is likely that DCF relied on the initial report filed by Zemmel and Fitzsimmons.

The defendants seeking dismissal have also notably failed to assert despite numerous opportunities, that they are not the individuals responsible for the subsequent reports, and the DCF defendants have not produced these names. This information must come to light before the court can definitively determine the level of culpability of these defendants and the damages caused by Dr. Zemmel's report. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct." *Winn v. Posades*, 281 Conn. 50, 56-57 (2007). "The second component of legal cause is proximate cause.... [T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries." "The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection.... This causal connection must be based upon more than conjecture and surmise." *Id.*

17

Dr. Zemmel's DCF report was unsubstantiated. More importantly, his diagnosis was wrong. He also expressed hostility towards the plaintiffs for exercising their right to a second medical opinion. He further refused to test EP for the precise disease she ended up being diagnosed with years later, and refused to test her for mold, which was also found to be contributing to her illness.

Despite all of these errors by Dr. Zemmel, he reported to DCF that it was the plaintiffs who were denying proper medical care to EP, when in fact, it was Dr. Zemmel himself that clearly failed to provide proper care to EP and his defiant certainty in his erroneous diagnosis is what prompted him to file the DCF report without doing any diligence in relation to the plaintiff's concerns about EP, which turned out to be 100% correct. Dr. Zemmel acted with malice when he filed the DCF report, and the exact nature and verbiage of the report is still unknown. The Plaintiffs have properly plead causation between Dr. Zemmel's actions and the damages they have sustained.

It is a fact that Mr. Fitzsimmons contributed to at least one of the false DCF reports, and DCF even acknowledged his dishonesty in their analysis, stating that:

Indeed, Mr. Fitzsimmons falsely stated to DCF that:

"Due to (EP) being non-ambulatory for nearly two-years, not walking under her own power, the lower extremity bones become osteogenic, or lose the ability to form new bone and become more fragile. The type of injury she sustained due to the decreased bone density from not walking from untreated juvenile idiopathic arthritis is called an insufficiency fracture."

The DCF report containing Mr. Fitzsimmons' false affidavit was filed with them on March 27th, 2019. This was the same month that multiple DCF reports were filed against the plaintiffs and strongly infers that the defendants seeking dismissal were involved in

18

the complaints, and that Mr. Fitzsimmons and CCMC most definitely were. In fact, the document clearly states that "CCMC filed reports of suspected medical neglect" after EP was brought to them for her broken leg. The document also states that "(EP) had a fracture in her left femur which was consistent with the explanation for the injury". (Ex. E of Amended Complaint). The *Amended Complaint* is also loaded with details about the plaintiffs that realistically make CCMC the only reasonable "medical provider" who could have filed the report. [1]

The foregoing is yet another question of fact, which at this stage must be presumed in favor of the plaintiffs, and it further delegitimizes the defendants' statute of limitations theory.

## 6. Defendants' Duty of Care

The defendants argue that the Plaintiffs' complaint "at most, depicts a disagreement between Dr. Zemmel and the plaintiffs concerning the appropriate medical diagnosis and treatment of EP". This is incorrect and no more than a perpetuation of the same false premise utilized throughout the defendants' motion. The *Amended Complaint* is based on far more than the single incident the defendants would like to attribute it to. It begins with Dr. Zemmel's incorrect diagnosis, failure to test EP for Lyme Disease and mold, and the manner in which he aggressively and threateningly attempted to procure care of EP while the plaintiffs sought a second opinion. One which turned out to be

---

[1] These facts also bring the statute of limitations back only to January 28th, 2021 at the earliest, when the subject DCF report(s) was/were completed and the plaintiffs were provided with a copy.
Paragraph 8 of this DCF report names Dr. Zemmel for the first time.

correct. Then, they unlawfully vaccinated all the Pileggi's children without their knowledge or consent.

The Plaintiffs' *Amended Complaint* is also based on the false DCF reports which caused a vexatious litigation against the plaintiffs. The defendants have a common law duty not to file false reports to DCF, not to mention an ethical one.

The actions of the defendants resulted in substantiation proceedings from DCF which are akin to a state criminal investigation and therefore, qualify as a malicious prosecution:

> "In determining whether a civil enforcement action is akin to a criminal proceeding, we consider whether the action involved a state sanctioning a party 'for some wrongful act,' was 'initiated [by the State] to sanction the federal plaintiff,' and involved "[i]nvestigations [that] culminat[e] in the filing of a formal complaint or charges." *Sprint*, 571 U.S. at 79-80. The substantiation process at issue here possessed these features. Therefore, DCF's proceeding constituted an ongoing state proceeding akin to a criminal prosecution." (*Lowell v. Vt. Dep't of Children & Families*, 19-3987-cv, at *4-5 (2d Cir. Dec. 15, 2020).

It can certainly be considered negligent on the part of all defendants to assist in the procurement of a criminal investigation into the plaintiffs by the State under false pretenses and dishonest reports, which ultimately led to the removal of EP from her parents' care and custody. While Defendants are, indeed, mandated reporters, this does not provide them with a license to abuse the system, generate false reports, or help procure a criminal investigation under false pretenses. In fact, all of these actions are explicitly banned by Connecticut law.

20

Defendants also argue that they cannot possibly be negligent towards the Plaintiffs because they had no duty of care to them. To demonstrate this, they cite *Zamstein v. Marvasti,* 240 Conn. 549 (Conn. 1997), which states that:

> "The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand." (Internal quotation marks omitted.) RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 384, 650 A.2d 153 (1994). We have stated that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would "anticipate that harm of the general nature of that suffered was likely to result," and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. Id., 386-87."

Any ordinary person in the defendants' position would know that filing false DCF reports and failing to test EP for the disease and illnesses she ultimately had would result in some type of harm to the plaintiffs. In fact, it did, and this harm formed the basis for the *Complaint* and *Amended Complaint*. Moreover, the Court in *Zamstein* is very explicit in the fact that a defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.

The theory of negligence is not a "one size fits all" theory, as the court makes clear. It depends on the nature and circumstances of each particular case. In this case, the defendants meet the foregoing standard for owing a duty of care to both plaintiffs in properly treating their daughter and not illicitly attempting to interfere with the parent-child relationship which is so vehemently protected by law:

> "Choices about marriage, family life, and the upbringing of children' are 'of basic importance in our society.'" *Cox v. Warwick Valley Cent. School Dist.,* 654 F.3d 267, 275(2d Cir. 2011) (quoting M.L.B. v. S.L.J., 519 U.S. 102, 116

(1996)). "The interest of natural parents 'in the care, custody, and management of their child' is a 'fundamental liberty interest protected by the Fourteenth Amendment.'" (Id); (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). "Family members have, in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state. (*Id*).

The fact that these "choices are of basic importance in our society", means that the defendants should have known that infringing on these choices by illicitly abusing their status as mandated reporters, filing false statements with DCF, and failing to properly treat and diagnose EP would be oppressive and unconscionable to the plaintiffs as her parents; and they had a duty, at least in this case, not to engage in such behavior:

> "Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." (*Zamstein*, 549).

The Court in *Zamstein* was notably determining whether a Mental Health Professional, tasked with analyzing allegations of sexual abuse, had a duty to the accused, who was the child's parent. That is not parallel to the individual circumstances here, where the defendants were the ones who initiated the false allegations. In *Zamstein*, the defendant was the doctor who was determining the veracity of allegations made by someone else, which is an entirely different scenario.

## 7. Defendants as State Actors

Defendant CCMC was acting under color of state law when they vaccinated the Pileggi's children against their will, without their consent, and in violation of the law. CCMC was wrongly given medical custody of EP due to the false reports, in order to

provide "medical treatment". When CCMC vaccinated EP, they were not providing medical treatment, "[T]hese definitions make clear that the phrase "medical treatment" in § 17a–10 (c) contemplates the cure of an **existing** illness, injury, or disease." *In re Elianah T.-T.*, 326 Conn. 614, 622 (Conn. 2017).

Accordingly, the courts have concluded that "[CGS] § 17a–10 (c) does not authorize the commissioner to vaccinate children committed to her temporary custody without parental consent." (*Id.*) Despite this, CCMC and most likely EP's attending physician and assistant, Dr. Zemmel and Fitzsimmons, were responsible for unlawfully vaccinating the children. "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character that it can be regarded as governmental action."'" *Rose v. City of Waterbury*, CIVIL ACTION No. 3:12cv291(VLB), at *9 (D. Conn. Mar. 21, 2013). The defendants were acting under color of law when they abused their state granted temporary custody of EP and provided non-medical treatments against their will to all the Pileggi's children, not just EP.

The Second Circuit has emphasized that cases on the subject of state action have not been a model of consistency and therefore there is no single test to identify state actions and state actors but rather "'there are a host of factors that can bear on the fairness of an attribution of a challenged action to the state.'" *Id.* (quoting *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009)). The Second Circuit has identified three main tests:

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state ... (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity,

the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the state ("the public function test"). (*Id.*)

The defendants' actions here meet the standard for this test. They vaccinated the children pursuant to the coercive power of DCF (the State), and they were a willful participant in doing so. The defendants pass the "compulsion test" and "the joint-action test" and were acting under color of law for purposes of 42 U.S.C § 1983.

It is therefore categorically false for the defendants to assert that "[T]here are no allegations in the Amended Complaint that would support that the CT Children's defendants' conduct was anything other than the ordinary provision medical care and mandated reporting of suspected child abuse and neglect." (*Motion p.26*). Paragraphs 77 and 78 of the *Amended Complaint* specifically allege the unlawful vaccination of plaintiffs' children. In anticipation of the defendants arguing that the allegations relate to "DCF and their agents vaccinating the children", and not them, this clearly fails because DCF obviously did not directly vaccinate the children themselves (all reasonable inferences must be in favor of the plaintiffs), the defendants did, under coercion and joint action from and with the State.

<div align="center"><strong>CONCLUSION</strong></div>

The defendants have failed to come forth with evidence showing that dismissal is appropriate on *any of the claims*. The plaintiffs have first adequately pled their claims and have now further defended their pleading. The CCMC defendants were acting under color of law when they vaccinated the children. These defendants have not made any argument or presented any evidence that grants them immunity on its face. They had a

<div align="center">24</div>

duty of care to all plaintiffs and acted negligently in carrying out that duty. Finally, the defendants' statute of limitations argument is a theory that they failed to prove by any preponderance of the evidence. When the statute of limitations began to toll in this case is not conclusively proven in any way by the defendants' motion and is a question of fact.

WHEREFORE, defendants Motion to Dismiss all claims should be denied, and this matter should be allowed to proceed to discovery.

Dated: June 26th, 2023

<div style="margin-left:40%">

Respectfully submitted,
PLAINTIFFS,

By:    *Tricia S. Lindsay*
Tricia S. Lindsay
Law Offices of Tricia S. Lindsay, PC
531 E. Lincoln Ave., Ste. 5B
Mount Vernon, New York 10552
Ph: (914) 668-4908; (860 783-8877
        (347) 386-4604
Fax: (914) 840-1196
Email:  Tricialindsaylaw@gmail.com
            attorney@tricialindsaylaw.com

</div>