```
UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-------------------------------------------------------x
KATHARINE PILEGGI
ANTHONY PILEGGI
            Plaintiffs,

Also, as Next Friend to their
Minor Child "EP"

v.                                                          Case No.: 22-cv-1315 AWT

KAELA MINERLY, JOETTE KATZ,                                 September 13, 2023
and FRANK ROTOVNIK,
            Defendants
-------------------------------------------------------x
```

### PLAINTIFFS' SUR-REPLY TO DEFENDANTS' MOTION TO DISMISS THE CLAIMS AGAINST MINERLY, ROTOVNIK, AND KATZ

PLAINTIFFS KATHARINE AND ANTHONY PILEGGI, COME NOW through counsel, and hereby submit the following sur-reply to the Defendants' *Motion to Dismiss*, pursuant to this court's Order (Dkt No. 70). The Defendants begin their *Motion* by misleadingly stating that: "The Plaintiffs insist in their response that they have stated a plausible claim under Section 1983 because "they were never notified of any proceeding effecting E.P.'s medical care or custody and thus had no opportunity to defend themselves." This is only somewhat correct.

### 1. The Vaccinations

The Plaintiffs expressly allege that these defendants unlawfully vaccinated the Plaintiffs' children without their consent. (**Exhibit A. ¶¶ 78, 118**). This act deprived the plaintiffs of the "care, custody, or management" of their children, including EP, without any due process under the law and in violation of DCF's own policies. The *Rooker-Feldman* doctrine applies to state-court trial orders and has nothing to do with the plaintiff's vaccination allegations. To address these allegations, the Defendants point to several cases which are not parallel and make several arguments that are not persuasive.

First, the defendants assert that it was not them who ordered the vaccination of the Pileggi's' children, but possibly one of the thousands of other DCF employees. This is a transparent attempt by the defendants to assert that "DCF Defendants," as stated by plaintiff, refers to the agency as whole and not *these specific defendants*. The term "DCF Defendants," as the defendants know, refers to Katz, Minerly, and Rotovnik. The defense's assertion that the plaintiffs are lodging these allegations with "general references to the State agency, which has thousands of employees and numerous employees involved in each case…" (**Reply p. 12**), is <u>dishonest</u> and <u>made in bad faith</u>. Defendants Minerly and Rotovnik were the case managers for EP and there is no reason to suspect that a random employee inserted his or herself into the matter and started ordering vaccinations on all of the plaintiffs' children. It is also very concerning that DCF would assert that they have no clue who could have possibly ordered the vaccination of *all of the plaintiffs' children*, asserting that it could be "one of the thousands of DCF employees". *Id*. This is an absurd contention and one that these defendants know to be false. Yet, if this contention were true, it only serves as further evidence of gross negligence which must be discovered.

The allegations against Ms. Katz were sufficiently plead (**Exhibit A**), and it is the defendants that are using a "plausible deniability" pleading tactic regarding such allegations. The problem with this tactic however, is that as the Commissioner, Ms. Katz' "involvement" in this case, and especially in relation to the vaccinations of the children, is inherent in her job title. Perhaps Ms. Katz skirting responsibility for her and her subordinates' unconstitutional and egregious behavior is part of the reason the Department remained under federal oversight throughout the entirety of her tenure, and for years afterwards.

The attached "Health Care Standards and Practice for Children in Youth Care" (hereafter known as the 'Standards' and referenced as **Exhibit B**), outlines DCF policy regarding standards and practice related to the medical treatment of children who are in their custody. The defendants' assertion that it was never alleged that Ms. Katz was involved in the vaccinations fails, as per DCF's

2

own policy, this type of decision involves a detailed process and procedure, which requires the <u>consent of the Commissioner</u>, or that of a <u>designee of the Commissioner</u>…

> "The DCF designee shall not provide consent for any medical or mental health care for a child without first obtaining an explanation from the health care provider. When consent is provided by DCF, **such consent may be given by the Commissioner or designee** at the level of a Social Work Supervisor (SWS) or higher DCF administrator. (**Exhibit B**).

According to this language, **only Ms. Katz** or her designee could sign off on the vaccinations. Further, the Standards explicitly state that "[T]hough immunizations are required for school attendance, parents and legal guardians have the right to exempt their children from receiving vaccines", and that "[P]arents or guardians will need to consent and sign the immunization provision on the 460R to allow for the child to receive immunizations as recommended by the child's medical provider." *Id*. The Pileggi's explicitly stated that their children should not be vaccinated. Finally, the Standards dictate that "[i]f DCF is unable to get permission from a parent or legal guardian, the Social Worker shall seek a court order prior to providing informed consent for any health care, including for routine health care." *Id*. Notably, this Standard refers to "**the** Social Worker," not "DCF," and not "**A** Social Worker." The Social Worker is/are the Social Workers assigned to EP's case; in this context, it was Social Workers Minerly and Rotovnik, and Commissioner Katz.

Further, it is the Commissioner of DCF who is assigned temporary custody, not "one of the thousands of DCF employees," as Ms. Katz would have this Court believe. It is also true that "although the children have been committed to the custody of the **commissioner**, the respondents' parental rights remain intact." *In re Elianah T.-T.,* 326 Conn. 614 (Conn. 2017). Therefore, the plaintiffs do not need to present factual allegations that Ms. Katz was directly responsible for ordering the vaccinations, as her title of "Commissioner" implies it. Also notable from this decision, is the court's use of the term "parental rights" and describing them as "remaining intact", not to mention the following decision stating that "[t]he **fundamental liberty interest** of natural parents in the **care, custody, and management** of their child does not evaporate simply because they have

3

Case 3:22-cv-01315-AWT   Document 71   Filed 09/13/23   Page 4 of 12

not been model parents or have lost temporary custody of their child to the [s]tate"). *Id* These defendants are also being misleading when they allege that "The Connecticut Supreme Court expressly avoided finding a constitutional violation regarding vaccinations (*In re Elianah T.-T*), ("Because we resolve this appeal on statutory grounds, we do not address [the Constitutional] claims")." While the court may not have decided the constitutional claims, they did address them by referring multiple times to " fundamental liberty interests" and "parental rights," both of which are implicated in the instant case, were violated by the Defendants, and are guaranteed by the constitution.  While utilizing the exact same language as *Elianah T.T,* the court in *Abubakari v. Schenker*, 3:19-cv-510 (MPS) (D. Conn. Dec. 27, 2021), declared that "[t]he interest of natural parents '**in the care, custody, and management of their child**' is a 'fundamental liberty interest **protected by the Fourteenth Amendment**."

There is no doubt that the plaintiffs' constitutional rights were violated by Ms. Katz in her role as Commissioner and by all remaining defendants as the Social Workers assigned to the Pileggi's for the imposition of forced vaccinations. Ms. Katz cannot argue plausible deniability as she attempts to, when as the commissioner of DCF, custody of the child is her inherent responsibility and her consent to the vaccinations is required. The defendants' argument referring to *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015) (citing *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38 (1905), in stating that "The Court rejected the claim that the individual liberty guaranteed by the Constitution overcame the State's judgment that mandatory vaccination was in the interest of the population as a whole", is entirely irrelevant. *Jacobson v. Comm. of Massachusetts* is described in the first sentence as "Plaintiffs brought this action challenging on constitutional grounds **New York State's requirement that all children be vaccinated in order to attend public school**." *Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015). The plaintiffs here are not challenging the constitutionally of a New York City vaccine mandate to attend public school, they are instead alleging that their constitutional rights to the "care,

4

custody, and management of their child", as protected by the Fourteenth Amendment were violated by these defendants when they unlawfully and without legal authorization or due process, vaccinated the plaintiffs' children against the plaintiffs' will. In fact, DCF themselves has an entire process outlined in their standards for this exact scenario, and it can be confirmed that none of them were followed. (**Exhibit B**).

In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004). "Additionally, [i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Brown v. City of New York*, No. 1: 18-cv-570 (FB)(PK), at *6 (E.D.N.Y. Nov. 7, 2019). As it relates to the vaccination of the plaintiffs' children against their will, the plaintiffs have sufficiently shown that this action deprived them of their federal right to the "care, custody, and management of their child", that it was done without any due process, and that it was ordered by Ms. Katz and the Social Workers assigned to EP (Minerly and Rotovnik), under obvious color of law.

## 2. The Rooker-Feldman Doctrine

In order to take custody of EP, these defendants filed an *ex-parte* motion with the court seeking emergency custody of EP based on false and misleading information, and they did so while the plaintiffs were actively providing medical treatment for EP and remaining in communication with the defendants. Not only did they acquire custody fraudulently, but the Defendants specifically waited to file the OTC until they knew the Plaintiffs would be out of state for a medical appointment for EP, completely (and intentionally) blindsiding the Plaintiffs' into losing temporary custody of EP while depriving them of Due Process.

The intrusion of the state into the integrity and privacy of the family implicates fundamental constitutional rights. *See Stanley v. Illinois,* 405 U.S. 645, 649, 92 S.Ct. 1208, 1211, 31 L.Ed.2d

551 (1972). These rights encompass the parents' interests in the companionship, custody, and care of their children and those "of the children in not being dislocated from the `emotional attachments that derive from the intimacy of daily association' with the parent." *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir. 1977), quoting *Smith v. Organization of Foster Families,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977). Whether defendants in the case at bar are entitled to qualified immunity, turns on the reasonableness of their belief that a sufficient emergency existed to warrant taking EP into temporary custody. "This analysis is not one of hindsight, but rather is determined by defendants' action "in the context of `the circumstances with which [the official] was confronted.'" *Doe v. Conn. Dept. of Child. Youth Serv.*, 712 F. Supp. 277, 284 (D. Conn. 1989). The emergency removal of [EP] required "probable cause" to believe that she was in immediate physical danger from her surroundings and that removal was necessary to ensure her safety. *Id*. ("**the statute limits intervention to** cases where the state interest is compelling, i.e., where "**immediate physical danger**" is present"). *Id*. None of that was present here, and the defendants knew this.

      The defendants sought their OTC on March 29, 2019. In the months and weeks leading up to this, the Plaintiffs were cooperative with DCF, brought EP to her appointments, and were in constant communication with the defendants. In fact, on March 25, 2019, just four (4) days prior to the OTC, DCF reported that they spoke to Mr. Pileggi, who informed them that he would be flying Ms. Pileggi and EP down to Florida to see Dr. Troyer. Mr. Pileggi further reported that he had scheduled an appointment for EP with Mr. Fitzsimmons for March 29, 2019, the exact day the OTC was filed. On March 26, 2019, just three days prior to filing the OTC, Ms. Pileggi spoke on the phone to Rotovnik. During this call, DCF reports that Ms. Pileggi informed them that she intended to take EP to Florida in the coming days, and also that she had spoken to Mr. Fitzsimmons who reported to Ms. Pileggi that <u>EP's cast could come off</u>. This same day, DCF conducted a home visit at the Pileggi's. They informed her that a naturopath doctor had filed a complaint against her with DCF regarding EP. Frightened, Ms. Pileggi vehemently denied the allegations in the complaint as

6

untrue, which was obvious on their face, for by simply looking at EP, noting that her condition did not match what was asserted in the complaint. When Ms. Pileggi asked what the next steps for her and EP would be, the response from the Social Worker was the DCF "wants to transfer the case to <u>ongoing services</u>."

On March 28, 2019, the day before the OTC was filed, Dr. Morse, who was treating EP at the time, spoke to DCF from Florida and informed them that EP had shown dramatic improvement, reduced pain, significantly reduced swelling, no nausea or vomiting, and was sleeping much better. Yet, despite all of this occurring prior to March 29th, DCF stating EP would be transferred to "ongoing services", Ms. Pileggi in Florida treating EP who was showing signs of improvement, Mr. Fitzsimmons "ready to take the cast off [EP's leg]), DCF home visit 3 days prior resulting in "no issues" with EP, and the fact that DCF had information from Dr. Troyer suggesting EP was improving, they surreptitiously filed an *ex-parte* OTC. They did so simply because they disagreed with the plaintiffs' choice of doctor. The facts clearly show that EP was nowhere close to being in the "immediate physical danger" required to assert temporary custody, and as stated previously, the <u>intrusion of the state into the integrity and privacy of the family implicates fundamental constitutional rights</u>. These rights encompass the parents' interests in the companionship, custody, and care of their children and those "of the children in not being dislocated from the `emotional attachments that derive from the intimacy of daily association' with the parent."

Notably, the defendants submitted an affidavit from Mr. Fitzimmons in support of their OTC alleging that EP was in "immediate physical danger" (**Exhibit E**). First, Mr. Fitzsimmons is not a doctor, and what's more concerning, is that Mr. Fitzsimmons was dishonest in his affidavit in that he stated that "**Due to EP being non-ambulatory for nearly 2 years**, not walking under her own power, the lower extremity bones become osteopenic, or lose the ability to form new bone and become more fragile." (**Exhibit E ¶ 4**). This was not true, and this hyperbolic lie to the court was one that DCF knew was a lie, as they had obviously observed EP walking on her power for quite

7

some time at this point. Mr. Fitzsimmons was also the one who suggested that EP's cast come off and was scheduled to examine her within days of the OTC. Hence, the "immediate physical danger" asserted by these defendants and Mr. Fitzsimmons was a falsehood crafted to create a sense of urgency to the court to remove EP from her parents' custody. It is this blatant lie that defendants presented to the Court when seeking the OTC.

The defendants also failed to follow Sec. 45(a)-607(b), which requires that **two physicians** (not one physician and a physician's assistant) certify that the minor child **is hospitalized** as the result of serious physical illness or injury, that lack of immediate care would be **life-threatening**, and that the need to take EP **could not await** a properly noticed hearing. None of these standards were met by the Defendants. EP was not hospitalized; lack of the defendants' preferred medical treatment would **not have been life-threatening,** and no such showing was made. Nothing in Mr. Fitzsimmons' affidavit even remotely indicated that EP's life was in immediate danger and that a hearing could not have been properly noticed. Thus, at an emergency *ex-parte* hearing with no notice, the Plaintiffs here obviously had no opportunity to immediately dispute the fact that the defendants' Petition was legally deficient, and that Mr. Fitzsimmons blatantly lied to the court. These defendants filed an *ex-parte* order specifically to remove the right of the plaintiffs to attend the hearing and to thus secure an OTC under knowingly false premises, and they succeeded in doing so. (**Exhibit C**). While the defendants may argue that the plaintiffs could have raised these issues at the April 5, 2019 hearing, the due process violations had already played out, as the court granted the OTC and the defendants took custody of EP as a result. Without referencing any minimum period of separation, the courts have determined that "[P]arental rights are implicated when a child is **temporarily removed from the custody of a parent** and placed in foster care on an emergency basis **or for all or part** of the duration of a child protective proceeding." *Graham v. City of New York*, 869 F. Supp. 2d 337, 349 (E.D.N.Y. 2012). Therefore, it was not the OTC granted by the State court that violated the rights of the plaintiffs', it was the actions and inactions taken by the

defendants in order to secure the OTC that did so, and accordingly the plaintiffs are not seeking review of the state court decision, nor could they. The court in *Green v. Mattingly* held,

> The rationale underlying the *Rooker-Feldman* doctrine is that only the U.S. Supreme Court — and not lower federal courts — may "review and reject[]" state-court decisions under 28 U.S.C. § 1257. *Hoblock*, 422 F.3d at 85 (citing *Exxon Mobil*, 544 U.S. at 284, 125 S.Ct. 1517). That rationale is undercut if plaintiff had neither a practical reason **nor a legal basis** to appeal the state-court decision that caused her alleged injuries *Green v. Mattingly*, 585 F.3d 97, 102-03 (2d Cir. 2009).

The court further declared that *Rooker-Feldman* did not apply under the following scenario:

> "**The situation would have been different if the Family Court had entered a final order of disposition permanently removing** plaintiff's child from her custody and plaintiff had brought this action seeking the return of her child. In such a case, plaintiff could have appealed the Family Court's ruling to higher New York courts and, eventually, to the U.S. Supreme Court under 28 U.S.C. § 1257. If, at the completion of her appeals, plaintiff were to bring a § 1983 action in federal court seeking the return of her child, her action would unquestionably "invite district court review and rejection" of the Family Court's order of disposition and, assuming the other requirements were met, the *Rooker-Feldman* doctrine would likely apply. *See Hoblock*, 422 F.3d at 87 (alteration omitted)."

> "Here, however, plaintiff brings a § 1983 action only after the Family Court proceedings were dismissed without a final order of disposition. Her action, moreover, complains only of injuries caused by a state-court order that was **interlocutory, unappealable, and effectively reversed by a superseding order**.[1] Under those circumstances, the *Rooker-Feldman* doctrine does not apply.

In accordance with the decision in *Green*, it cannot be said that the plaintiff's "lost in state court," when the final disposition was that custody of the children shall be returned to Mr. Pileggi. (**Exhibit D**). Just like in *Green*, the State Court Order against the Pileggi's was "interlocutory, unappealable, and effectively reversed by a superseding order." *Id*. Whereby, the court was very clear, "the *Rooker-Feldman* doctrine **does not apply**."

---

[1] The decision to reverse the OTC and place the child back in the care of Mr. Pileggi was filed by the court on October 9, 2019.

9

**CONCLUSION**

A federal court exercises limited jurisdiction pursuant to Article III of the Constitution. It may exert subject matter jurisdiction over claims in which: (1) there is a "federal question" in that a colorable claim arises under the "Constitution, laws or treaties of the United States," 28 U.S.C. § 1331" *Gonzalez v. Ocwen Home Loan Servicing*, 74 F. Supp. 3d 504, 511 (D. Conn. 2015). Here, the court has subject-matter jurisdiction pursuant to 28 U.S.C § 1331, as to the plaintiff's well-plead claim of due process violations against these defendants for their unlawful vaccination of their children, which presents a federal question under the Constitution; and for the due process violations in securing an OTC against the plaintiffs' under false pretenses, without an affidavit from **two** physicians, which was later reversed by a superseding order. The plaintiffs' allegations related to the OTC do not fit the framework of *Rooker-Feldman*, as they do not contain each of the four factors enumerated by the courts, and said *Order* was not even appealable due to its interlocutory nature. Further, the facts of this case do not align with the rationale behind *Rooker-Feldman*, which is that "only the U.S. Supreme Court — and not lower federal courts — may "review and reject[]" state-court decisions under 28 U.S.C. § 1257." The purpose of *Rooker-Feldman* was not to insulate bad actors using color of law to violate the due process of parents within the DCF system. It was designed to prevent any court, other than the Supreme Court, from reviewing final judgements from State Courts.

**Wherefore**, Plaintiffs' respectfully request that the court deny these defendants Motion to Dismiss on the basis of the *Rooker-Feldman* doctrine.

**Dated: Mount Vernon, NY
September 13, 2023**

                          Respectfully submitted,

                          THE LAW OFFICES OF
                          TRICIA S. LINDSAY, PC

By: /s/ *Tricia S. Lindsay*
        TRICIA S. LINDSAY ct31017
        Attorney(s) for Plaintiff
        531 E. Lincoln Ave., Ste 5B
        Mount Vernon, New York 10552
        Ph: (914) 668-4908; (347) 386-4604
           (860) 783-8877
        Fax: (914) 840-1196
        attorney@tricialindsaylaw.com
        tricialindsaylaw@gmail.com

## CERTIFICATE OF SERVICE

This is to certify that on September 13, 2023, the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Tricia S. Lindsay*