## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------- x
KATHARINE PILEGGI, ANTHONY        :
PILEGGI, and EP, by next friends  :
KATHARINE PILEGGI and ANTHONY     :
PILEGGI,                          :
                                  :
          Plaintiffs,             :
                                  :
v.                                :
                                  :
KIM MATHIAS, Assistant Attorney   :
General State of Connecticut, in  :
her individual and Official       :
capacity; JOETTE KATZ, in her     :
individual and Official           :
capacity; KAELA MINERLY, in her   :  Civil No. 3:22-cv-1315 (AWT)
individual and official           :
capacity; FRANK ROTOVNIK, in his  :
individual and official           :
capacity; CONNECTICUT CHILDREN'S  :
MEDICAL CENTER; DR. ROMAN ALDER;  :
DR. LAWRENCE ZEMEL; DR. LINDSEY   :
LAUGHINGHOUSE; DR. ANDREW BAZOS;  :
DR. KEVIN FITZSIMMONS; HEATHER    :
PERRAULT; CONNECTICUT DEPARTMENT  :
OF CHILDREN AND FAMILIES; and     :
"JOHN and JANE DOES 1-10,"        :
                                  :
          Defendants.             :
------------------------------- x
```

### RULING ON MOTION TO DISMISS AMENDED COMPLAINT

Defendants Connecticut Children's Medical Center ("CCMC");

Dr. Lawrence Zemel; and Kevin Fitzsimmons, (collectively, the

"CCMC Defendants"), have moved to dismiss all claims against

them in the Amended Complaint, ECF No. 47. For the reasons set

forth below, their motion is being granted in part and denied in

part.

## I.   **FACTUAL ALLEGATIONS**

"The complaint, which [the court] must accept as true for purposes of testing its sufficiency, alleges the following circumstances." <u>Monsky v. Moraghan</u>, 127 F.3d 243, 244 (2d Cir. 2013).

Plaintiff Katharine Pileggi is EP's mother, and plaintiff Anthony Pileggi is EP's father.

> In June 2018, the [plaintiffs'] child, EP who was three (3) years old at the time, was bitten by a tick. As a result, EP was experiencing symptoms including, but not limited to, a low-grade fever, vomiting, joint pain, weakness, fatigue, and swollen lymph nodes. [The plaintiffs] immediately took EP to their family Pediatrician Roman Alder, MD. [The plaintiffs] explained to Dr. Adler that EP had been bitten by a tick, and they needed to test the tick. Dr. Alder dismissed the [plaintiffs'] requests, drew blood, and referred them to a doctor they had never been to before with no further explanation except that it was urgent.

Amended Complaint at ¶17.

In June 2018, the plaintiffs brought EP, their then-three-year-old child, to defendant Zemel, who was a rheumatologist at CCMC, after a referral from their family pediatrician, Dr. Roman Adler. "Dr. Zemel diagnosed EP with Juvenile Idiopathic Rheumatoid Arthritis,"[1] ("Rheumatoid Arthritis"). <u>Id.</u> at ¶18.

> At that time, the [plaintiffs] were presented with treatment options for EP, per the standard of care for treating RA, but the [plaintiffs] declined this treatment as they felt further testing was necessary,

---

[1] The docket has been corrected to reflect the proper spelling of this defendant's name. <u>See</u> ECF No.79. When the court uses quoted material, it also corrects the spelling of this defendant's name.

which is what they requested. With that, [the
plaintiffs] requested alternative options and again
suggested the tick be tested.

Id. at ¶18.

"In late June of 2018, [the plaintiffs] once again
requested that both Dr. Alder and Dr. Zemel test the tick that
appeared on EP." Id. at ¶19. "[The plaintiffs] expressed their
desire to get a second opinion and further testing of their
child." Id. at ¶21. "At this point Dr. Zemel became angry and
began to bully and threaten the [plaintiffs], even harassing Ms.
Pileggi for more than a month with sarcastic and condescending
comments about her knowledge of Lyme Disease, all while EP's
condition was worsening." Id. "Dr. Zemel continuously and
aggressively pushed for Ms. Pileggi to tell him how she 'knew so
much' about Lyme Disease. Ms. Pillegi refused to entertain his
inquiries and covert threats." Id. at ¶22. "This is when Dr.
Zemel promptly retaliated with the filing of a report with [the
Connecticut Department of Children and Families ("DCF")]. In
roughly late June, the Torrington Department of Children and
Families received a report from Dr. Zemel, alleging medical
neglect of EP by her parents." Id. at ¶23. "DCF subsequently
contacted the [plaintiffs] regarding Dr. Zemel's report." Id.

"On or about June 30, 2018, [the plaintiffs] sought the
service of Katherine Layman, NP, a Naturopathic doctor. [The
plaintiffs] hired Dr. Layman to assist them with the care of EP.

Notably, almost immediately, after her first dose of homeopathy EP began to show signs of improvement." Id. at ¶24. "On July 17, 2018, during a teleconference with parents, RRG nurse, ISW, and ISWS, Dr. Layman reported improvement in EP's mobility and decrease in swelling, and pain, with improved sleep, appetite, and demeanor." Id. at ¶25. "Additionally, Dr. Layman had no recommendations or concerns in the household[.] Thus the risk assessment was low, and the file with DCF was closed. (Ex. B)." Id.

"This is when Dr. Zemel promptly retaliated with the filing of a report with DCF. In roughly late June, the Torrington Department of Children and Families received a report from Dr. Zemel, alleging medical neglect of EP by her parents. DCF subsequently contacted the [plaintiffs] regarding Dr. Zemel's report." Id. at ¶23. "Dr. Zemel, in his DCF report states that EP's condition "has nothing to do with Lyme Disease or a tick bite." (Ex. E)." Id. at ¶73.

Exhibit E reflects that Dr. Zemel made the report on July 3, 2018, "alleging medical neglect of [EP] by her parents" and "stat[ing] that [EP's] parents have refused treatment of [EP] who is diagnosed with Juvenile Idiopathic Rheumatoid Arthritis." Id., Exh. E at 121. The DCF investigation following this report included home visits and a teleconference with Dr. Layman and the plaintiffs. The DCF records indicate the investigators

-4-

reported that EP's parents "have many holistic providers involved to assist in [EP's] progress." Id. The DCF report further stated that one of these providers, Dr. Layman, "stated parents are involved in their daughter's treatment and are following the recommendations made," "are very proactive and [that she had] no concerns regarding them neglecting their daughter's diagnosis" and that "EP will remain a patient in her care." Id. Based on its investigation, DCF concluded that "[EP] [was] responding positively to holistic treatment and [EP's] parents are responding appropriately to her needs" and the "[c]ase was closed." Id.

"However, on December 26, 2018, Ms. Pileggi's father, Brad Johnson made a false anonymous report to the Department of Children and Families (DCF) out of malice and retaliation against his daughter, and the family." Id. at ¶26. "During the call, Mr. Johnson alleged child neglect of EP and psychological issues related to [the plaintiffs]." Id. "The impetus for Mr. Johnson's actions was because he was asked to leave the Pileggi's' residence on Christmas Day when he became unjustifiably belligerent and abusive." Id.

"Consequently two (2) days later, on or about December 28, 2018, Kaela Minerly from the Danbury Department of Children and Families (DCF), called the [plaintiffs], and informed them they intended to visit, and [the plaintiffs] needed to let her in."

Id. at ¶27.

"On March 13, 2019, EP sustained a femur fracture to her left leg as a result of her older sister accidentally dropping her." Id. at ¶32. "Multiple providers made multiple calls as a result of what was an unfortunate accident." Id. at ¶33. "[Defendant] Fitzsimmons informed DCF in his sworn affidavit that EP had not walked in years. This was demonstrably and knowingly false." Id. at ¶34.

"[T]he medical report related to EP's broken leg . . . stated that EP's injury was consistent with the innocent explanation provided, which was that she had fallen from a countertop while her sister was watching her." Id. at ¶36. "There was no reason for any complaint to be filed in this instance other than maliciousness and retaliation." Id.

"On or about March 28, 2019, Plaintiff took EP to Florida to see Doctor Morse for an evaluation." Id. at ¶37. "DCF filed a false report with Florida's DCF, stating that Ms. Pillegi had 'fled the state to visit her lover', despite knowing in advance that she was going to Florida to see a specialist." Id. at ¶42. "EP was then taken by Florida police without explanation. Plaintiff was not informed where her child was taken to or by whom." Id. at ¶43.

"On or about April 5, 2019, the Honorable Judge Turner ordered the Department of Children and Families to provide

necessary medical treatment, as recommended by the treating physicians and/or medical specialists . . . ." Id. at ¶45. "Judge Turner further issued a Temporary Order of Custody to DCF . . . ." Id. at ¶46.

"Plaintiff suggested multiple appropriate placements for EP with family members and friends who volunteered to care for her. DCF rejected them all, and EP was placed with strangers." Id. at ¶54.

"After some time, [the plaintiffs] refused to continue taking EP to the medical doctors forced on them by DCF." Id. at ¶79. "Part of the reason for this was that each time [the plaintiffs] brought her for a visit, CCMC practitioners would repeatedly craft false reports to DCF and file them anonymously." Id. "This includes false information presented in an affidavit by Defendant Fitzsimmons, which lied about EP's ability to walk, simply to fortify his false claims." Id.

In or around October 2021, "[the plaintiffs] identified Dr. Tara Tranguch, a Doctor of Naturopathic Medicine." Id. at ¶81. "Upon reviewing EPs files and running a series of tests, Dr. Tranguch was able to identify that EP did not have RA as diagnosed by the previous doctors, that the labs done at CCMC were inconclusive and thus not comprehensive enough to make an accurate diagnosis. (Ex. C)." Id.

"On or about December 2021, EP's bloodwork was negative for

-7-

Rheumatoid Arthritis, and she subsequently tested positive for Lyme Disease, Babesia, Bartonella, anaplasmosis, parasites and mold. (Ex. D)." Id. at ¶82. "Hence, years of the Defendants' intentional interference with EP's treatment for Lyme Disease directly resulted in an unnecessary and severe exacerbation of her medical condition and prolonged suffering resulting in severe medical harm." Id. at ¶83. "The results of the tests administered by Dr. Tranguch also showed EP as having parasitic levels as well as Bartonella showing up in the tick panels." Id. at ¶85. "The levels demonstrated chronic infection, meaning EP had past Lyme infection which became chronic in the body." Id. "They also showed dangerous bacterial mold present, which the plaintiff's begged CCMC and Zemel to test for years prior, but they refused. (Ex. C)." Id. "DCF's own report admits that Ms. Pillegi pleaded with CCMC and Zemel to test for mold, (Ex. E) . . . ." Id. "[I]n or around January 2022, EPs labs came back with a negative finding for RA on every level, which meant there was no history of her contracting RA at any time." Id. at ¶86. "The defendants put the [plaintiffs] and their child through years of torment simply because they couldn't possibly imagine being incorrect." Id. at ¶87. This is explicit medical malpractice and gross negligence . . . ." Id.

"Hence, after years of pleading with multiple doctors and hospitals to test EP for Lyme and to treat her appropriately,

being treated like neglectful parents, including the persistent
effort of DCF to make Ms. Pileggi out to be a neurotic
psychopath, and after causing severe emotional, physical and
psychological harm to EP, [the plaintiffs] and their minor
children, the lab tests they requested all along were finally
demonstrating what [the plaintiffs], especially Ms. Pileggi, had
been saying all along, which is that EP was bitten by a tick and
contracted Lyme Disease as a result." Id. at ¶88. "Since being
correctly treated for Lyme, being weaned off the harmful drugs
for RA, which took some time to accomplish; and receiving the
complete proper regimen, EP is finally showing signs of healing
and promises of full recovery, though not without permanent harm
and injuries due to the willful neglect of the defendants. (Ex.
F)." Id. at ¶89.

## II.  LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the
court must accept as true all factual allegations in the
complaint and must draw inferences in a light most favorable to
the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).
Although a complaint "does not need detailed factual
allegations, . . . a plaintiff's obligation to provide the
'grounds' of his 'entitle[ment] to relief' requires more than
labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations and internal quotations omitted). However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

"The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)). The issue

on a motion to dismiss "is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." <u>United States v. Yale New Haven Hosp.</u>, 727 F. Supp. 784, 786 (D. Conn. 1990) (citing <u>Scheuer</u>, 416 U.S. at 232).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." <u>Samuels v. Air Transp. Local 504</u>, 992 F.2d 12, 15 (2d Cir. 1993).

"[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" <u>Goel v. Bunge, Ltd.</u>, 820 F.3d 554, 559 (2d Cir. 2016) (quoting <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002)).

## III. DISCUSSION

The CCMC Defendants are named in seven counts, some of which are simply asserted "Against All Defendants."

Claim One is a claim against all defendants pursuant to 42

U.S.C. § 1983 for interference with the plaintiffs' liberty interest in raising their child, making medical decisions and in intimate association.

Claim Six is a claim for negligence against the CCMC Defendants.

Claim Seven is a claim against all defendants for negligent infliction of emotional distress.

Claim Eight is a claim against all defendants for intentional infliction of emotional distress.

Claim Nine is a claim against the CCMC Defendants for violation for the Connecticut Unfair Trade Practices Act, Connecticut General Statutes § 42-110g ("CUTPA").

Claim Ten is a claim against the CCMC Defendants pursuant to Connecticut General Statutes § 52-568 for vexatious litigation.

Claim Twelve is a claim against the CCMC Defendants for medical malpractice.

The motion to dismiss is being granted, as to the CCMC Defendants, with respect to Claims One, Six, Seven, Eight, Nine and Ten and being denied with respect to Claim Twelve.

**A. Claim One**

Claim One is a claim brought pursuant to 42 U.S.C. § 1983. In order to state a claim under § 1983, a plaintiff must allege that the conduct at issue (1) was "'committed by a person acting

under color of state law,'" and (2) "'deprived [the plaintiff]
of rights, privileges, or immunities secured by the Constitution
or laws of the United States.'" Cornejo v. Bell, 592 F.3d 121,
127 (2d Cir. 2010) (quoting Pitchell v. Callan, 13 F.3d 545, 547
(2d Cir. 1994)).

As to the first element, in general, one is not a state
actor because they are a mandated reporter by law. See Ortolaza
ex rel. E. v. Capitol Region Educ. Council, 388 F. Supp. 3d 109,
128 (D. Conn. 2019) (school principal was not state actor or
acting under color of law in making report to police in capacity
as a mandated reporter); Mione v. McGrath, 435 F. Supp. 2d 266,
272 (S.D.N.Y. 2006) (hotel employees did not act under color of
state law when they reported to state child protection
authorities suspected child abuse by a hotel guest); Thomas v.
Beth Israel Hosp. Inc., 710 F. Supp. 935, 940-41 (S.D.N.Y. 1989)
(private hospitals, physicians reporting suspected instances of
child abuse pursuant to state law are not state actors).

In Kia P. v. McIntyre, the court concluded that the medical
providers there functioned as state actors under § 1983, but the
court did so based on the fact that the hospital refused to
release a child to her mother due to "its concern about her care
in the hands of her mother," and in doing so it was acting "as
part of the reporting and enforcement machinery for [the New
York City Child Welfare Administration], a government agency

charged with detection and prevention of child abuse and neglect." Kia P. v. McIntyre, 235 F.3d 749, 756 (2d Cir. 2000). There are no allegations in this case that could support such a conclusion.

Thus, Claim One is being dismissed.

**B. Claim Six: Claim for Negligence**

Claim Twelve is a claim against the CCMC Defendants that was added in the Amended Complaint and is specifically for medical malpractice. Therefore, the court construes Claim Six as excluding medical malpractice.

Claim Six is based on two categories of alleged conduct by the CCMC Defendants. First, the plaintiffs base this claim on the fact that they "filed a DCF report against the [plaintiffs]." Amended Complaint at ¶141. The plaintiffs allege that "[t]he DCF report was filed because the [plaintiffs] sought a second opinion and the defendants disagreed and wanted EP treated by them and only them." Id. at ¶142. "The defendants abused the DCF reporting system and their positions as mandated reporters when they falsely reported the [plaintiffs]." Id. at ¶143.

Second, the plaintiffs allege that the "[d]efendants misdiagnosed EP and refused to further research her symptoms or test for Lyme Disease." Id. at ¶140. They allege further that "[t]he defendants' misdiagnosis was negligent, their DCF report

was negligent, their threats and intimidation of [the
plaintiffs] was negligent, and their influence over DCF to
enforce treatment of their misdiagnosis was negligent." Id. at
¶145.

### 1. Mandated Reporter Immunity

The CCMC Defendants contend that they acted properly as
mandated reporters of suspected child abuse or neglect under
Connecticut law, and consequently have statutory immunity,
pursuant to Connecticut General Statutes 17a-101e(b), from civil
liability based on filing the reports with DCF. The plaintiffs
contend that the CCMC Defendants do not have statutory immunity
because they did not adhere to the mandated reporting statutes
in that they "intentionally and maliciously filed false
reports." (ECF No. 56 at 9-12). The Amended Complaint fails to
allege facts sufficient to show that the CCMC Defendants did not
adhere to the mandated reporting statutes.

The CCMC Defendants are mandated reporters under
Connecticut law. See Conn. Gen. Stat. § 17a-101(b) ("The
following persons shall be mandated reporters: (1) Any physician
or surgeon licensed under the provisions of chapter 370, . . .
(25) any physician assistant").

Under Connecticut law,

> (a)(1) Any mandated reporter, as described
> in section 17a-101, who in the ordinary course of
> such person's employment or profession has

> **reasonable cause to suspect or believe** that any child under the age of eighteen years (A) has been abused or neglected, as described in section 46b-120, (B) has had nonaccidental physical injury, or injury which is at variance with the history given of such injury, inflicted upon such child, or (C) is placed at imminent risk of serious harm, . . . shall report or cause a report to be made in accordance with the provisions of sections 17a-101b to 17a-101d, inclusive. . . .
>
> (d) For purposes of this section and section 17a-101b, a mandated reporter's suspicion or belief may be based on factors including, but not limited to, observations, allegations, facts or statements by a child, victim, as described in subdivision (2) of subsection (a) of this section, or third party. **Such suspicion or belief does not require certainty or probable cause.**

Conn. Gen. Stat. §§ 17a-101a(a), (d) (emphasis added). In addition:

> Any person, institution or agency which, **in good faith**, (1) makes a report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103 . . . shall be immune from any liability, civil or criminal, which might otherwise arise from or be related to the actions taken pursuant to this subsection and shall have the same immunity with respect to any judicial proceeding which results from such report or actions, provided such person did not perpetrate or cause such abuse or neglect. The immunity from civil or criminal liability extends only to actions done pursuant to this subsection and does not extend to the malpractice of a medical professional that results in personal injury or death.

Conn. Gen. Stat. § 17a-101e(b) (emphasis added).

Thus, to the extent that the CCMC Defendants, as mandated reporters, filed any reports in accordance with Connecticut law,

and did so "in good faith," and on the basis of "reasonable cause," they are immune from liability.

The term "reasonable cause to suspect" in this statute has a meaning "[c]onsistent with case law governing the concept of 'reasonable suspicion' in the criminal law context," which is "'a lower standard'" of proof than probable cause or preponderance of the evidence. Doe v. Town of Madison, 340 Conn. 1, 23-24 (2021) (quoting State v. Peterson, 320 Conn. 720, 730-31 n.4 (2016)). This standard "'is an objective standard that focuses not on the actual state of mind of the [decision maker], but on whether a reasonable person, having the information available to and known by the [decision maker], would have had that level of suspicion.'" Id. at 24 (alteration in original) (quoting Peterson, 320 Conn. at 730).

The assessment under this objective standard "considers the 'totality of the circumstances' at the time of the decision and must be based on 'specific and articulable facts' and 'rational inferences' taken therefrom." Id. (quoting Peterson, 320 Conn. at 731). The Connecticut Supreme Court "emphasize[d] that mandated reporters . . . should not hesitate to ask questions or to act further—including by making a report—when confronted with a situation that might in fact be an indicator of abuse." Id. at 28.

Under Connecticut law,

> "[p]robable cause has been defined as the knowledge
> of facts sufficient to justify a reasonable [person]
> in the belief that he has reasonable grounds for
> prosecuting an action . . . . Mere conjecture or
> suspicion is insufficient . . . . Moreover, belief
> alone, no matter how sincere it may be, is not
> enough, since it must be based on circumstances which
> make it reasonable . . . . Although want of probable
> cause is negative in character, the burden is upon
> the plaintiff to prove affirmatively, by
> circumstances or otherwise, that the defendant had no
> reasonable ground for instituting the criminal
> proceeding."

Bhatia v. Debek, 287 Conn. 397, 410-11 (2008) (some modification in original) (quoting Zenik v. O'Brien, 137 Conn. 592, 597 (1951)). The "'probable cause determination is, simply, an analysis of probabilities,'" and it is "'not a technical [determination], but is informed by the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act.'" State v. Brown, 279 Conn. 493, 523 (2006) (some modification in original) (quoting State v. Eady, 249 Conn. 431, 440 (1999)).

With respect to the "good faith" requirement, immunity under Connecticut General Statutes § 17a-101e(b) "would not apply if the defendants intentionally and maliciously filed false reports." Pagliuco v. City of Bridgeport, No. 3:01-CV-836 (WIG), 2005 WL 3416131, at *8 (D. Conn. Dec. 13, 2005). See also Bhatia, 287 Conn. at 416 (there is no statutory immunity under § 17a-101e(b) when a "defendant acted with malice and without probable cause").

In Bhatia v. Debek, the Connecticut adopted the common law definition of "good faith":

> "In common usage, the term good faith has a well defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation. . . . It has been well defined as meaning [a]n honest intention to abstain from taking an unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious. . . . It is a subjective standard of honesty of fact in the conduct or transaction concerned, taking into account the person's state of mind, actual knowledge and motives. . . .  Whether good faith exists is a question of fact to be determined from all the circumstances."

Id. at 412-13 (quoting Kendzierski v. Goodson, 21 Conn. App. 424, 429-30 (1990)) (alteration in original).

With respect to reasonable cause, the factual allegations in the Amended Complaint establish that the CCMC Defendants had reasonable cause to suspect neglect or abuse. Dr. Zemel was presented with a child patient who had a number of symptoms. After examining the patient, he concluded that she had Rheumatoid Arthritis, and presented the parents with treatment options, but they declined the treatment. They insisted that further testing was necessary and asked that the tick be tested. Over the course of a month, Dr. Zemel made clear his disagreement with Ms. Pileggi, pushing her to tell him how she

knew so much about Lyme disease. Ms. Pileggi refused to respond, and all the while EP's condition was worsening.

In light of the "the 'totality of the circumstances' at the time of [Zemel's] decision," the "'specific and articulable facts' and 'rational inferences' taken therefrom," Doe v. Town of Madison, 340 Conn. at 24 (quoting Peterson, 320 Conn. at 730), and the fact that "a mandated reporter's suspicion or belief" "does not require certainty or probable cause," Conn. Gen. Stat. §§ 17a-101a(a),(d), and drawing all reasonable inferences in favor of the plaintiffs, the only reasonable conclusion that can be reached based on the factual allegations in the Amended Complaint is that Dr. Zemel had reasonable cause to suspect facts that required him to file the DCF report.

As to Fitzsimmons, the requirement of "reasonable cause" was satisfied with respect to the affidavit that he sent to DCF. He treated a young patient who broke a leg during a fall at home and who he was reporting as unable to walk. That one detail in Fitzsimmons' report was allegedly wrong does not change the analysis with respect to "reasonable cause."

Nor does the Amended Complaint contain factual allegations that could establish that either Dr. Zemel or Fitzsimmons acted in a manner inconsistent with the requirement of "good faith."

The court puts no weight on the plaintiff's conclusory assertion that Dr. Zemel, in making his report to DCF, was

retaliating against the plaintiffs for seeking a second medical opinion. "[The court] accept[s] as true factual allegations but not conclusions, such as [this] statement[] concerning a defendant's state of mind." See, e.g., Nat'l Rifle Ass'n of Am. v. Vullo, 49 F.4th 700, 713 (2d Cir. 2022) (citing Iqbal 556 U.S. at 681); see also Whiteside v. Hover-Davis, Inc., 995 F.3d 315, 321 (2d Cir. 2021) (same).

The facts alleged in the Amended Complaint show that Dr. Zemel completed a full evaluation and diagnosis of EP and had more than one discussion with the plaintiffs about EP's condition during June 2018. Zemel suggested treatment options for EP, and also made repeated inquiries concerning the basis of plaintiffs' opinions about EP's condition. The Amended Complaint does not contain factual allegations regarding Fitzsimmons' conduct that are sufficient to support a conclusion that he did not act in good faith. A conclusory allegation that Fitzsimmons submitted an affidavit to DCF that was knowingly false unaccompanied by any factual allegations that could support an inference that it was knowingly false is a conclusion "concerning a defendant's state of mind" that the court need not accept as true. See, e.g., Vullo, 49 F.4th at 713.

The Amended Complaint alleges that during the course of Zemel's treatment of EP, he "became angry and began to bully and threaten the [plaintiffs], even harassing Ms. Pileggi for more

-21-

than a month with sarcastic and condescending comments about her knowledge of Lyme Disease," and that he "continuously and aggressively pushed for Ms. Pileggi to tell him how she 'knew so much' about Lyme Disease." Amended Complaint at ¶22. But these allegations only serve to suggest that there was disagreement between Zemel and the plaintiffs.

Thus, Claim 6 is being dismissed to the extent it is based on the CCMC Defendants filing reports with DCF.

### 2. Remainder of Claim Six: Statute of Limitations

The balance of the negligence claim in Claim Six is barred by the statute of limitations. The balance of the conduct on which Claim Six is based is the misdiagnosis of EP, the threats and intimidation of the plaintiffs, and "their influence over DCF to enforce treatment of their misdiagnosis." Amended Complaint at ¶145. It is unclear what this latter conduct is meant to encompass, but the court construes it as encompassing the conduct by the CCMC Defendants in conveying information to DCF about the diagnosis by Zemel. Also, the heading for Claim Six makes reference to Fitzsimmons, but there is no reference in the body of Claim Six to any conduct by Fitzsimmons. The court does not construe the reference in paragraph 144 of the Amended Complaint to John and Jane Does 1-10 as referring to Fitzsimmons because John and Jane Does 1-10 are named in the heading for Claim Six.

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citing Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008)). "[T]orts based in negligence generally are subject to the two year statute of limitations in § 52-584." Doe #2 v. Rackliffe, 337 Conn. 627, 635 (2020) (citation omitted). Section 52-584 provides in relevant part:

> No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician . . . [or] hospital . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed.

Conn. Gen. Stat. § 52-584.

Thus, § 52-584 contains both a two-year "limitation section" sometimes called the "discovery section," and a three-year "repose section." See Barrett v. Montesano, 269 Conn. 787, 790, 793-94 (2004) (comparing the two sections of § 52-584). While a statute of limitations "'bars [a] right of action unless it is filed within a specified period of time after [an] injury

-23-

occurs,'" comparatively, "'statute[s] of repose [terminate] any
right of action after a specific time has elapsed, regardless of
whether there has as yet been an injury.'" Normandy v. Am. Med.
Sys., Inc., 262 A.3d 698, 709 n.15 (Conn. 2021) (alteration in
original) (quoting Lombardo Bros. Mason Contractors, Inc., 307
Conn. at 416 n.2). Thus,

> [u]nlike the two year limitation section of § 52-
> 584, "the repose portion of § 52-584 . . . bars the
> bringing of suit more than three years after the
> alleged negligent conduct of a defendant regardless
> of when a plaintiff discovers the proximate cause of
> his harm or any other essential element of a
> negligence cause of action."

Barrett, 269 Conn. at 793 (quoting Catz, 201 Conn. at 49-50);
see also Peek v. Manchester Mem'l Hosp., 193 Conn. App. 337, 344
(2019), affirmed, 342 Conn. 103 (2022) (noting an action is
"absolutely barred" beyond three-year period in repose section
of § 52-584). Additionally, Connecticut courts use the term
"statute of limitations" in a "global sense" to refer to both
the two-year discovery and the three-year repose sections of §
52-584. See Barrett, 269 Conn. at 794-96 (collecting cases and
statutory examples; holding that statutory ninety-day extension
using term "statute of limitations" "applies equally to both
sections of § 52-584").

As to the discovery section of § 52-584, the term "injury"
in the statute is

> synonymous with "legal injury" or "actionable harm."
> "Actionable harm" occurs when the plaintiff
> discovers, or in the exercise of reasonable care,
> should have discovered the essential elements of a
> cause of action. <u>Catz v. Rubenstein</u>*,* [201 Conn. 39,
> 44 (1986)]. A breach of duty by the defendant and a
> causal connection between the defendant's breach of
> duty and the resulting harm to the plaintiff are
> essential elements of a cause of action in
> negligence; they are therefore necessary ingredients
> for "'actionable harm.'" <u>Id.</u> Furthermore,
> "actionable harm" may occur when the plaintiff has
> knowledge of facts that would put a reasonable
> person on notice of the nature and extent of an
> injury, and that the injury was caused by the
> negligent conduct of another. [<u>Id.</u>, at 47]. In this
> regard, the harm complained of need not have reached
> its fullest manifestation in order for the
> limitation period to begin to run; a party need only
> have suffered some form of "'actionable
> harm.'" [<u>Id.</u>, at 43, 45].Finally, the determination
> of when a plaintiff in the exercise of reasonable
> care should have discovered "actionable harm" is
> ordinarily a question reserved for the trier of
> fact. <u>Taylor v. Winsted Mem'l Hosp.</u>*,* [262 Conn. 797,
> 810 (2003)].

<u>Lagassey v. State</u>, 268 Conn. 723, 748-49 (2004).

The operation of the statutes of limitations in Connecticut was suspended by Governor Ned Lamont's Executive Order 7G, which was issued in response the COVID-19 pandemic on March 19, 2020.[2] Courts have interpreted that Executive Order 7G, and the

---

[2] Executive Order 7G provided, in relevant part:

> **Suspension of Non-Critical Court Operations and Associated Requirements.** Notwithstanding any provision of the Connecticut General Statutes or of any regulation, local rule or other provision of law, I hereby suspend, for the duration of this public health and civil preparedness emergency, unless earlier modified or terminated by me, all statutory . . . time requirements, statutes of limitation or other limitations or deadlines relating to service of process, court proceedings or court filings . . . .

subsequent Executive Order 10A that rescinded it, as operating to toll statutes of limitations in Connecticut between March 19, 2020 and March 1, 2021, a period of 347 days. See, e.g., Taylor v. Pillai, No. 3:21-cv-623 (SALM), 2022 WL 4080525, at *4-*6 (D. Conn. Sept. 6, 2022) (interpreting and applying the executive orders); Esposito v. Aldarondo, No. 3:22-cv-621 (MPS), 2023 WL 2228412, at *3-*5 (D. Conn. Feb. 24, 2023) (explaining that applying the tolling rule in these executive orders serves the aims of 42 U.S.C. § 1983). Therefore, in determining when the statute of limitations ran with respect to claims at issue here, the court uses a date that is 347 days after the date on which a statute of limitations would otherwise have run.

The last act by Zemel covered by this part of Claim Six occurred prior to July 3, 2018, when he made a report to DCF. Thus the two-year statute of limitations ordinarily would have run prior to July 3, 2020, but was extended by Executive Orders 7G and 10A to no later than June 15, 2021. Even if the claim is not barred by the statute of limitations, it is nonetheless barred by the three-year statute of repose, which would have been extended to no later than June 15, 2022 by the Executive Orders. This action was not filed until October 19, 2022.

Thus, the remainder of Claim Six is barred by the statute of limitations.

**C. Claims Seven, Eight, Nine, and Ten**

Claim Seven is a claim for negligent infliction of emotional distress, brought against all defendants. The only actions referred to in Claim Seven related to conduct by the CCMC Defendants is their allegedly filing the false report with DCF. The same is true with respect to Claim Eight, which is a claim for intentional infliction of emotional distress.

Claim Nine is a CUTPA claim brought against the CCMC Defendants. It is based on the CCMC Defendants allegedly filing a false report with DCF.

Claim Ten is a claim for vexatious litigation in violation of Connecticut General Statutes § 52-568. The only conduct on which this claim is based is "wrongfully commenc[ing] a DCF complaint against the [plaintiffs]."[3] Amended Complaint at ¶167.

Because each of these claims is based on the filing by the CCMC Defendants of a report with DCF, the CCMC Defendants have statutory immunity pursuant to Connecticut General Statutes § 17a-101e(b) for the reasons discussed in part III.B.1 above.

---

[3] Regardless of the statutory immunity considerations here, "[a] report to DCF is not equivalent to the initiation of a proceeding before an administrative body that has the power, on its own, to effectuate a permanent deprivation." Cerejo v. Cerejo, No. CV11-5034020-S, 2012 WL 3089772, at *2 (Conn. Super. Ct. June 29, 2012); see also Sullivan v. Campbell, No. CV98-0581706, 1999 WL 512534, at *1 (Conn. Super. Ct. July 9, 1999) ("The alleged investigation by DCF in this case is insufficient at law to constitute a civil action or complaint on which to base an action for vexatious litigation, either under statute or common law.").

### D. Claim Twelve: Medical Malpractice

Claim Twelve is a claim for medical malpractice. The plaintiffs allege that "CCMC and Dr. Zemel incorrectly diagnosed EP. They refused to test for Lyme Disease or mold and mocked the plaintiff when she requested that they do so." Amended Complaint at ¶181. "They then began treating EP for the wrong illness." Id. at ¶182. "These defendants continued treating EP for the wrong illness and ignored the worsening of her condition for more than two (2) years . . . ." Id. at ¶185. The plaintiffs also allege that "[i]n or around October 2021, despite the target on their backs, [the plaintiffs] began to ween EP off of the RA regimen they were being forced to adhere to under the threat of DCF and the doctors she was being compelled to be treated by, as EP's condition showed no signs of improvement." Id. at ¶80. In addition, they allege that around October 2021, they arranged for EP to be treated by Dr. Tara Tranguch who found that the labs done at CCMC were "not comprehensive enough to make an accurate diagnosis." Id. at ¶81. They further allege that in or about December 2021, bloodwork for EP showed that she did not have Rheumatoid Arthritis but that she did have several other conditions including Lyme Disease.

The plaintiffs attach to the Amended Complaint reports from DCF, which reflect that Dr. Zemel saw EP at least five times

-28-

during the period from June 2018 through April 15, 2019, and
Fitzsimmons saw EP as late as March 19, 2019.

Drawing all reasonable inferences in favor of the
plaintiffs, they allege that the first date on which they
discovered or in the exercise of reasonable care should have
discovered that they had a cause of action for medical
malpractice against the CCMC Defendants was in December 2021.
Consequently, the two-year statute of limitations for medical
malpractice, Connecticut General Statutes § 52-584, ran in or
around December 2023. With respect to the three-year statute of
repose in Connecticut General Statutes § 52-584, the last date
on which Dr. Zemel treated EP was April 15, 2019. Thus, the
statute of repose would have ordinarily run on April 15, 2022,
but was extended, pursuant to Executive Orders 7G and 10A, to
March 28, 2023.

Thus, Claim Twelve is not barred by the statute of
limitations because it was filed on October 19, 2022.

## IV.  CONCLUSION

For the reasons set forth above, the Motion to Dismiss
Amended Complaint (ECF No. 53) is hereby GRANTED in part and
DENIED in part.

Claims One, Seven, Eight, Nine, and Ten are dismissed
against defendants Connecticut Children's Medical Center; Dr.

Lawrence Zemel; and Kevin Fitzsimmons. The sole remaining claim
against these defendants is Claim Twelve.

It is so ordered.

Dated this 29th day of March 2024, at Hartford,
Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge
