**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **KATHARINE PILEGGI, et al**., | ) | **CIVIL ACTION NO.3:22-CV-01315** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **KIM MATHIAS, et al.,** | | |
| Defendants. | ) | JANUARY 27**,** 2026 |

<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION  FOR SUMMARY JUDGMENT
IN FAVOR OF KAELA MINERLY AND FRANK ROTOVNIK</u>

I.    <u>**INTRODUCTION**</u>:

The plaintiffs, the minor child, EP, and her parents, Anthony and Katharine

Pileggi, brought this suit against state employees, including employees of the

Connecticut Department of Children and Families (DCF or the Department) and the

Office of the Attorney General.  The genesis of this lawsuit is a child welfare proceeding

in state court concerning the failure of the plaintiff parents to obtain appropriate medical

treatment for their three-year-old daughter, EP, to address her diagnosis of Idiopathic

Rheumatoid Arthritis.[1]  This Court previously dismissed all claims against former DCF

Commissioner Joette Katz and Assistant Attorney General Kim Mathias, as well as

against all the named state defendants in their official capacities.  (Entry Nos. 68, 69).

In addition, the Court dismissed all counts of the amended complaint (Entry No. 47),

except Count 3 (42 U.S.C. § 1983) and Count 8 (intentional infliction of emotional

---

[1] Because of the sensitive nature of the information concerning minor children
defendants will refer to any minors by their initials.

distress) directed against DCF Social Workers Kaela Minerly and Frank Rotovnik in their individual capacities. (Entry No. 81).

Because the plaintiffs' allegations contradict the records attached to their amended complaint and the court documents of which the court took judicial notice, the Court concluded "it is most appropriate to resolve those issues in the context of a motion for summary judgment…."[2]  (Entry No. 81, p. 2).  Accordingly, defendants Minerly and Rotovnik now seek summary judgment on Counts 3 and 8.  This Court should grant their motion because:  (1) the undisputed facts show there was no constitutional violation or intentional infliction of emotional distress, (2) res judicata/collateral estoppel precludes the plaintiffs from contesting that the parents medically neglected their child, EP, and (3) Minerly and Rotovnik are entitled to qualified immunity.

## II.    **FACTS:**

DCF is the executive branch agency responsible for child welfare in the State of Connecticut and is authorized to bring petitions alleging child neglect and abuse before the Superior Court for Juvenile Matters in furtherance of its child protection duties. Conn. Gen. Stat. §§ 4-38c, 17a-2, 17a-3; 46b-121(a).  (SUMF, 1)

Minerly is a social worker employed by DCF.[3]  She has a master's degree in social work and received training in child welfare social work.  (Ex. A, ¶ 3).  Minerly was

---

[2] Appended to the plaintiffs' amended complaint (Entry No. 47) are miscellaneous documents including a DCF investigation protocol (social worker notes) with handwritten annotations of an unknown source.

[3] The following exhibits are filed in support of this motion for summary judgment: Ex. A--Affidavit of Kaela Minerly; Ex. B—Affidavit of Frank Rotovnik with attachments; Ex. C—Final Administrative Decision; Ex. D—Judicial Branch Docket Sheet *Pileggi* v.

assigned the investigation into the Pileggi family on December 27, 2018.  (Ex. A, Minerly Aff., ¶ 4).  After taking initial steps to investigate, such as visiting the family and requesting medical records, Rotovnik replaced her as the investigator.  (*Id*., ¶¶4,5).  Minerly was not assigned as a social worker to the Pileggi case after February 6, 2019.  (*Id*., ¶5).[4] (SUMF, 2)

Rotovnik is a social worker who holds a master's degree in social work and a Licensed Master of Social Work (LMSW) designation. and has received training in child welfare social work.  (Ex. B., ¶3).  In 2019, Rotovnik was an investigative social worker.  At the time he was assigned the Pileggi case on February 6, 2019, he had been employed by DCF for over four years.  (Ex. B, ¶4).  Subsequent to his involvement as an investigator, Rotovnik was promoted to supervisor and remained involved in the Pileggi case as a supervisor until its conclusion in March 2020.  (Ex. B, ¶4).[5]  (SUMF, 3)

---

*Pileggi*; Ex. E.—Superior Court for Juvenile Matters Orders/Transcripts; Ex. F—Excerpt of transcript of deposition of Katherine Pileggi; Ex. G—Excerpt of transcript of deposition of Anthony Pileggi; Ex. H—Excerpt of transcript of deposition of Lawrence Zemel.

[4] When EP came into DCF's care she was hospitalized at Connecticut Children's Medical Center (CCMC). (Ex. A, Minerly Aff. ¶6)  A series of DCF employees took turns spending time with EP while she was hospitalized.  Minerly spent time with EP in the hospital on a few occasions:  March 31, 2019, April 8, 2019, April 10, 2019.  (Entry No. 47, pp. 165, 175, 177).  Except for those few hospital visits, Minerly had no involvement with the Pileggi family after February 6, 2019.  (Ex. A, Minerly Aff. ¶6)

[5] Appended to Rotovnik's affidavit are true and accurate copies of the following affidavits that were submitted to state superior court in support of DCF's motion for order of temporary custody:  Ex. B-1, Social Worker Affidavit by Frank Rotovnik 3/28/2019; Ex. B-2, Social Worker Affidavit of Koren Kermashek 3/28/2019; Ex. B-3, Affidavit of Pamela Santapaola 3/28/2019; Ex. B-4, Affidavit of Kevin Fitzsimmons 3/28/2019.  The superior court granted the order and it was sustained by agreement. The affidavits have been redacted to remove identifying information of minor children.

EP's parents first brought her to the Connecticut Children's Medical Center (CCMC) in June of 2018. They sought care from Dr. Lawrence Zemel, a rheumatologist in the Pediatric Rheumatology Department for EP's bilateral knee effusions and inability to ambulate. Dr. Zemel diagnosed EP with Idiopathic Rheumatoid Arthritis. (Amended Complaint,¶¶ 7,18; Ex. B-4, ¶¶3-4). (SUMF, 4) E.P.'s parents disputed the diagnosis and refused the treatment Dr. Zemel recommended. (Amended Complaint, ¶ 33; Ex. B-1; Ex. B-4, ¶3). (SUMF, 5)

Except for the time period immediately prior to his retirement Dr. Zemel was head of the Pediatric Rheumatology Department at CCMC. He is a medical doctor with advanced training in pediatric rheumatology and extensive experience treating both arthritis and Lyme disease. (Ex. H, Zemel Depo, Vol I, pp.6-17, 34). He practiced pediatric rheumatology for over forty years from 1978 until his retirement in 2021. (*Id.*, pp. 8, 10). At all times referenced in the complaint he was board certified in pediatrics and pediatric rheumatology. (*Id.*, p. 13). (SUMF, 6)

The plaintiffs allege that Dr. Zemel misdiagnosed EP and/or that Dr. Zemel and other CCMC personnel falsely reported to DCF that the parents were failing or refusing to have EP treated for Idiopathic Rheumatoid Arthritis when the medical experts knew or should have known that she did not suffer from that condition. (Amended Complaint, ¶¶ 181, 183-189). The plaintiffs allege that, contrary to the opinion of Dr. Zemel, EP had Lyme disease.[6] (Amended Complaint, ¶ 73).

---

[6] Dr. Zemel was the coauthor of the national guidelines on the diagnosis and treatment of Lyme Disease that was published in 2020. (Ex. H, Zemel Depo, Vol I, pp. 14-16) He opined that EP did not have Lyme Disease. (*Id.*, pp. 54-56).

Beginning on February 6, 2019, Rotovnik investigated reported child neglect related to the Pileggi family.  He reported information to the Juvenile Session of Superior Court in an affidavit submitted to the court.  (Ex. B-1, Rotovnik Aff. 3/28/2019). The information reported included statements from the parents and information provided by the parents related to EP, the social worker's observations of the family, and information from medical providers.  (*Id*.) (SUMF, 7)

EP sustained a left distal femur fracture after being dropped by a family member in March, 2019.  (Ex. B-4, ¶2).  Because EP was non-ambulatory for a significant period of time prior to this injury her lower extremity had become fragile.  (Ex. B-4, ¶4)  "The type of injury she sustained due to the decreased bone density from not walking from untreated idiopathic arthritis is called an insufficiency fracture.  This type of insufficiency fracture is seen more commonly in patient[s] [who] are non-ambulatory, and/or wheelchair bound."  (Ex. B-4, ¶4). (SUMF, 8)

On March 20, 2019, Dr. Zemel related to DCF that EP was "completely disabled" and was "deteriorating and is showing muscle wasting in her legs as a result of lack of proper treatment for her arthritis."  (Ex. B-1, ¶38).  He stated that EP "needs medical intervention in order to prevent further damage and have a chance of recovery."  (Ex. B-1, ¶38). (SUMF, 9)  Dr. Zemel was of the view that EP's prognosis without standard of care treatment was "grim" and he had "grave concerns" -- including "that she was looking at permanent disability and the inability to walk."  (Ex. H, Zemel Depo Vol II, pp.253-257; *see* Vol I, pp. 49, 71).  He communicated his concerns to a DCF nurse. (*Id*., 256). (SUMF, 10)

DCF's medical director, Dr. Nicole Taylor, opined that she had "grave concern" for EP's medical safety and her family's ability to meet the child's needs in light of her current presentation and medical status.  (Ex. B-1, ¶41). (SUMF, 11)  Pamela Santapaola, N.D., a naturopathic physician who the plaintiff parents consulted, opined: "Based upon my medical opinion this child may suffer from irreversible damage or injury if left untreated by conventional means."  (Ex. B-3, Santapaola Aff).  (SUMF, 12)

On March 28, 2019, DCF filed neglect petitions in the juvenile session of superior court regarding the plaintiff-parents' children: SP (born 2009), NP (born 2012), EP (born 2015) and MP (born 2017).  (Court orders and transcript attached as Exhibit E).  The Department also filed a motion for *ex parte* order of temporary custody ("OTC") for EP. On March 28, 2019, the trial court (*Turner, J.*) granted the motion for order of temporary custody of EP, finding that the child was in immediate physical danger from her surroundings in the parental home.  The trial court further ordered that DCF was authorized to consent to necessary medical treatment for EP as recommended by her treating physician or medical specialist.  (Ex. E). (SUMF, 13)

On April 5, 2019, a preliminary hearing was held in state court.  All parties agreed to sustain the OTC of EP.  The trial court (*Grogins, J.*) canvassed the parents and found that their agreement was voluntarily and knowingly made with the effective assistance of counsel and that there was a factual basis for the OTC.  (Ex. E). (SUMF, 14) If any party had wished to contest the OTC, that party would have been entitled to an expeditious evidentiary hearing within ten days.  *See* Conn. Gen. Stat. § 46b-129 (b); Conn. Practice Bk. §§ 33a-6, 33a-7 (d). (SUMF, 15)

On September 19, 2019, by agreement of all parties, the trial court (*Cremins, J.*) adjudicated all of the Pileggi children neglected, including EP.[7]  (Ex. E).  By agreement of all parties the trial court committed EP to DCF.  The trial court ordered a period of protective supervision of the other children from September 19, 2019 to March 19, 2020.[8]  (Ex. E).  By agreement of all parties the trial court vested custody of the other children in the father, Anthony Pileggi.  The trial court canvassed the parents and found that the agreement was knowingly and voluntarily made with the effective assistance of counsel and that there was a factual basis for the parents' plea.  (Ex. E). (SUMF, 16) If any party had wished to contest the Department's petition that party would have been entitled to an evidentiary hearing.  Conn. Gen. Stat. § 46b-129 (j) (2)); *See* Conn. Practice Bk. §§ 35a-7, 35a-8, 35a-9, 35a-10, 35a-11. (SUMF, 17)

After EP was removed from the parents' custody and care, she received treatment for Idiopathic Rheumatoid Arthritis at CCMC.  (Ex. B, ¶8).  EP's treatment included medication, physical therapy, aquatics therapy, occupational therapy and nutritional and orthopedic consults.  (*Id.*)  After a period of in-patient hospitalization, EP

---

[7] Under Connecticut law, "Neglect proceedings . . . consist of two phases:  adjudication and disposition."  *In re David L.*, 54 Conn. App. 185, 191 (1999).  If DCF proves the adjudicatory grounds, the court will go on to make a dispositional ruling which could be commitment, transfer of guardianship or placement with a parent(s) with or without protective supervision.  Conn. Gen. Stat. § 46b-129 (j).  The burden of proof is on the state to prove the allegations of the petition by a fair preponderance of the evidence. *See* Connecticut Practice Book §§ 35a-7A, 35a-8, 35a-9.

[8] "Protective Supervision" is a disposition that the Court may order following a neglect adjudication of a child. *See* Conn. Gen. Stat. § 46b-129 (j) (2) (D). Often the child returns home and lives with a parent or parents and the family is monitored by the agency.  During protective supervision, the state court has continuing jurisdiction and oversight over the case.  *Pace* v. *Montalvo*, 186 F. Supp. 2d 90, 99 (D. Conn. 2001). *See* Conn. Practice Bk. § 26-1.

continued treatment on an outpatient basis while she was placed in a DCF licensed foster home that was supported by a visiting nurse service.  (*Id.*)  Registered nurses employed by DCF were also involved in monitoring her care.  (*Id.*)  CCMC staff informed the Department that EP's treatment was successful.  (*Id.*)  Dr. Zemel "observed improvement in her condition" during the period of time she was hospitalized.  (Ex. H, Zemel Depo Vol II, p.257).  Before she received treatment, she was unable to walk. (*Id.*)  After treatment, Rotovnik observed that she was able to walk without difficulty and she appeared to have regained good health.  (Ex. B, ¶8.)  (SUMF, 19)

On October 9, 2019, pursuant to DCF's motion and with the agreement of all parties, the trial court (*Turner, J.*) revoked EP's commitment and placed her under protective supervision vested with her father to run concurrently with the other children. (Ex. E).  On February 18, 2020, after the trial court (*Turner, J.*) held an in-court review of the case, all parties and the court agreed to allow protective supervision to expire as scheduled on March 19, 2020. (Ex. E).  On March 19, 2020, the juvenile case ended. (*Id.*) (SUMF, 18 and 20)

Minerly's involvement with the family ended before the petitions were filed in the juvenile session of superior court.  She had no role in vaccinating the Pileggi  children. She did not contact the police or child welfare authority in Florida.  And she did not submit any filings in the Juvenile Session of Superior Court.  (Ex. A, ¶¶ 7, 8). (SUMF, 21)

Rotovnik did not play any role in vaccinating the Pileggi children.  He did not contact the police or child welfare authorities in Florida except to speak to a Florida social worker named Nicole to arrange to pick up EP in the airport.  (Ex. B, ¶12).  He

was not responsible for providing notice for the court hearing on the order of temporary custody.  (*Id*.)  The clerk's office provides such notice. (Id.) Regardless, the parents attended the OTC preliminary hearing.  (*Id*.; Ex. E--Transcript April 5, 2019). (SUMF, 22)

When the parties agreed to return EP to the custody of her father in October 2019 (Ex. E), DCF believed that the father was being cooperative and was appropriately handling EP's medical treatment.  (Ex. B, ¶10).  The Department credited the opinions of Dr. Zemel; Kevin Fitzsimmons, an orthopedic physician's assistant; and the other medical professionals at CCMC related to EP's condition and the need for treatment. (Ex. B, ¶ 7).

After the case was closed and DCF had no further involvement with the family, at the request of the plaintiff parents DCF held an administrative hearing during which the parents were represented by legal counsel.  In a decision dated January 28, 2021, the hearing officer upheld substantiations of medical and physical neglect of EP. (Ex. C) The plaintiff parents did not appeal the hearing officer's decision as they had a right to do under the Uniform Administrative Procedure Act (UAPA), Conn. Gen. Stat. § 4-166, *et seq*. (SUMF, 23)

During the pendency of this lawsuit, on February 22, 2024, Katharine Pileggi filed an action in state court for dissolution of marriage. *Katharine Pileggi* v. *Anthony Pileggi*, Docket No. LLI-FA24-6035829-S (Judicial District of Litchfield). Judgement of dissolution entered on May 14, 2024. *See* Ex. D.

## STANDARD

A motion for summary judgment may be granted if the court determines that there is no genuine issue of material fact to be tried and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); *see Celotex Corp*. v. *Catrett*, 477 U.S. 317 (1986).  Although a litigant seeking summary judgment bears the initial burden of demonstrating the absence of any genuine factual issues, once this burden is met, the nonmoving party must demonstrate more than "some metaphysical doubt as to the material facts…[it] must come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co.* . v. *Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986).  The mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; there must be sufficient evidence upon which a jury could reasonably find for the opposing party.  *Anderson* v. *Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

The non-moving party cannot defeat a motion for summary judgment based upon by allegations in the complaint or by conclusory statements.  *Gottlieb* v. *Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment."  *Stern* v. *Trs. of Columbia Univ*., 131 F.3d 305, 315 (2d Cir. 1997).  "A complaint must set forth all of the claims in a lawsuit….A plaintiff cannot assert new claims for the first time in opposing summary judgment."  *Stefanidis* v. *Jos. A. Bank Clothiers, Inc*. (VAB), Docket No. 3:14-CV-971(VAB), 2016 U.S. Dist. LEXIS 26133, at *12 (D. Conn. Mar. 2, 2016).

## IV.    ARGUMENT

### A.  UNDISPUTED FACTS SHOW THAT THERE WAS NO DEPRIVATION OF PROCEDURAL DUE PROCESS.

To prevail in a procedural due process claim, the plaintiff must show (1) the defendants deprived him of a cognizable interest in life, liberty or property, (2) without affording him constitutionally sufficient process.  *Proctor* v. *LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (quoting *Wolff* v. *McDonnell*, 418 U.S. 539, 556 (1974)).  The focus of a procedural due process claim is the sufficiency of the process afforded to the plaintiff.

In relation to the first step, the care, custody, and management of a natural parent's children is a protected liberty interest that requires due process before, or in an emergency, soon after any infringement.  *Stanley v. Ill.*, 405 U.S. 645 (1972); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Defore* v. *Premore*, 863 F. Supp. 91, 95 (N.D.N.Y. 1994); *see also Brenna* v. *Wood*, Docket No. 3:03-cv-01101 (WWE), 2006 U.S. Dist. LEXIS 99496, at *9 (D. Conn. Aug. 8, 2006).  Although the first step is satisfied by the facts alleged, courts have recognized on multiple occasions that certain circumstances involving investigations of child neglect and abuse necessitate abrogation of the right to family integrity.  *See Pace v. Montalvo*, 186 F. Supp. 2d. 90, 98 (D. Conn. 2001); *Defore*, 863 F. Supp. at 95.  In child protection proceedings, by statute, parents may be subject to orders mandating therapeutic services, psychological testing, drug testing, safe custody arrangements, and monitored visitation.  Conn. Gen. Stat. § 46b-129 (b)(6) and (j)(3); *see In re Allison G.*, 276 Conn. 146, 161 (2005); *cf. In re Jayce O.*, 323 Conn. 690, 708 (2016).  DCF has the obligation to seek and the court has broad discretion to issue orders to advance the welfare of children.  Conn. Gen. Stat. §§ 46b-121(b); 46b-129.

To apply the second step, courts have employed a three-part test to determine what process is constitutionally due: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The plaintiffs here do not identify a specific deprivation of procedural due process; and the undisputed facts show that there was no procedural due process violation. In fact, the parties entered into the orders of the state court, the order of temporary custody of EP, the commitment of EP and the return of her care and custody to her father by agreement. If there had not been an agreement, the parents or child would have had the opportunity for a hearing that would have imposed the burden of proof on the State. *See* Conn. Gen. Stat. § 46b-129 (b) and (j); Conn. Practice Bk. §§ 33a-6, 33a-7 (d), 35a-7, 35a-8, 35a-9; *see also In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 285 (1983) (upholding constitutionality of statutory scheme regarding removal of neglected or abused children). In such proceedings the Commissioner of DCF is not acting to vindicate her personal rights; rather she is "acting for the state as parens patriae, to ensure, first and foremost the child's safety…." *In re Allison G.*, 276 Conn. 146 (2005).

Although it is plain that the plaintiffs are dissatisfied with the handling of their case and Minerly and Rotovnik's alleged unprofessional and discourteous conduct, they have not identified any procedural due process violation in their amended complaint.

(*See* Amended Complaint, ¶¶ 3,4,27). Moreover, the plaintiffs have failed to tie any claimed procedural deprivation to the Minerly or Rotovnik's conduct. The plaintiffs do not assert that they did not have a timely opportunity to be heard or that the procedures they were provided were insufficient or unfair. *See Fuentes* v. *Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard"). Indeed, DCF's decision to seek an Order of Temporary Custody and Judge Turner's *ex parte* order granting same are permitted by statute and provide for due process. *See* Conn. Gen. Stat. § 46b-129. In fact, the plaintiffs were present at the ten-day hearing with legal counsel and had every opportunity to be heard. (Ex. E). In sum, the undisputed facts show that there was no procedural due process violation.

### B. UNDISPUTED FACTS SHOW THERE WAS NO SUBSTANTIVE DUE PROCESS VIOLATION.

The third count, the plaintiffs allege that defendants Rotovnik and Minerly violated 42 U.S.C. § 1983 by "Abrogating The Plaintiff's Rights Protected By The Fifth And Fourteenth Amendment To The Constitution."[9] Specifically, the plaintiffs claim: (1) the defendants made the decision that EP would not be returned "unless the parties divorced and one of them left the marital home" (Amended Complaint, ¶113); (2) "DCF" vaccinated the other children of the plaintiff parents against their wishes (Id., ¶118); (3)

---

[9] The plaintiffs' claim must be considered under the Fourteenth Amendment. The Fifth Amendment is inapplicable because the plaintiffs do not allege any deprivation of their rights by the federal government. *Lopez* v. *Lantz*, Docket No. 3:09-CV-22 (CSH), 2010 U.S. Dist. LEXIS 24390, at *10 (D. Conn. Mar. 12, 2010) (citing *Bussey* v. *Phillips*, 419 F. Supp. 2d 569 (S.D.N.Y. 2006) and *Dusenbery* v. *United States*, 534 U.S. 161, 167 (2002)); *see Kloth-Zanard* v. *Malloy*, Docket No. 3:15-cv-00124 (MPS), 2016 U.S. Dist. LEXIS 133986, at *15 (D. Conn. Sept. 29, 2016).

"DCF defendants" failed to notify the plaintiffs of the hearing regarding the temporary custody of EP (Id., ¶123); (4) "DCF" filed a false report with the authorities in Florida (*Id*., ¶42); and (5) the defendants improperly credited the CCMC physicians and staff and thereby subjected EP to inappropriate medical treatment (*Id*., ¶¶ 114-117).

The plaintiffs allege that they suffered damages caused by the defendants' "willful and negligent acts."  (Id., ¶ 127).  Negligence is not cognizable under 42 U.S.C. § 1983.  *Rodriguez* v. *Dougherty*, Docket No. 3:23-cv-1542 (KAD), 2024 U.S. Dist. LEXIS 36056, at *20 (D. Conn. Mar. 1, 2024); *Davidson* v. *Cannon*, 474 U.S. 344, 346-47 (1986); *Daniels* v. *Williams*, 474 U.S. 327, 330 (1986).  Moreover, the undisputed facts do not show that the defendants engaged in any "willful" conduct that would be violative of substantive due process.

**Divorce**: As is evident from Ex. B-1, Katharine Pileggi, was adamant about rejecting medical advice from CCMC providers and seeking treatment for EP based upon her own dogmatic views.  The conditions under which EP was returned to her father's care were by agreement of all parties.  Specifically, the agreement was for the parents to share joint legal custody of the children, but the father was to have primary physical custody.  (Ex. E—court hearing memo 10/9/2019).  At the time of the agreement the father presented as being cooperative with DCF and with EP's medical treatment.  (Ex. B, ¶¶ 9-10).  Therefore, it was reasonable for the children, and specifically EP,  to be in the father's custody.[10]  Moreover, the court order provided that

---

[10] In Mr. Pileggi's deposition he testified that he lied to and misled DCF and the medical providers from CCMC; and in fact he withheld EP's prescribed medication for a period of time after she was returned to his care because he secretly concurred with Mrs. Pileggi's views.  (Anthony Pileggi Depo Vol II, pp. 125-127, 161-163).

the custody arrangement was subject to modification in the family court should either of the parents become dissatisfied with the court's order.  (*Id*.).  Neither of the defendants advocated for the parents to be divorced.  (Ex. A, ¶ 9; Ex. B, ¶14).

Mr. Pileggi enigmatically testified at his deposition that on an unknown date and time a "lady from DCF" whispered to him and his attorney that he would get his daughter back sooner if the parents divorced.  (Ex. G, Anthony Pileggi Depo Vol II, pp. 170-176).  Notably Pileggi did not identify the alleged whisperer as either Minerly or Rotovnik.  Mr. Pileggi also testified that that "Frank" (presumably referring to Rotovnik) communicated to him on an unknown date and time that: "It would be better for me to get Emma back sooner if Katharine was not in the home."  (Ex. G, pp. 174).  He did not testify that Rotovnik said that the parents should divorce.

In fact, the parents did not divorce during DCF's involvement with the family. During the pendency of this lawsuit, on February 22, 2024, Mrs. Pileggi filed an action in state court for dissolution of marriage.  *Katharine Pileggi* v. *Anthony Pileggi*, Docket No. LLI-FA24-6035829-S (Judicial District of Litchfield).  Judgment of dissolution entered on May 14, 2024.  *See* Ex. D.[11]

Even if one or both of the defendants had advocated for the parents to divorce, the suggestion would not have been conduct that is "brutal' and 'offensive to human dignity' as to shock the conscience" as required to establish a substantive due process violation.  *See Smith* v. *Half Hollow Hills Cent. Sch. Dist*., 298 F.3d 168, 173 (2d Cir. 2002).  Indeed, in an appropriate case DCF and/or the court may appropriately require a

---

[11] Among other problems with this claim, the plaintiffs cannot establish that either Minerly or Rotovnik was the cause of the parties' divorce some five years later.

parent to separate from a spouse or significant other whose behaviors are inconsistent with the welfare and safety of children.  *See In re Alison M*., 127 Conn. App. 197, 202 (2011).

**Vaccination**:  Neither defendant was involved with vaccinating the Pileggi children.[12]  (Ex. B, ¶12; Ex. A, ¶ 7).

**Notice of the OTC Preliminary Hearing:** Minerly was not assigned to the Pileggi investigation at the time of the OTC; therefore, she would not have had any responsibility for providing notice of the OTC preliminary hearing.  (Ex. A, ¶¶ 5-6). Rotovnik was assigned the case at the time the OTC was filed; however, he was not responsible for providing notice of the OTC: that was the responsibility of the superior court clerk's office.  (Ex. B,¶13).  In any event, the parents must have been aware of the court hearing because they attended the OTC preliminary hearing with their respective attorneys and agreed to sustain the OTC.  (Exhibit E—Transcript 4/5/2019; Ex. B,¶13).

**False Report to Florida Authorities**:  Minerly had no contact with the Florida authorities regarding the Pileggi family.  (Ex. A, ¶8).  Rotovnik did not make a report to the Florida authorities, and only had contact with a Florida social worker to arrange for pickup of EP.  (Ex. B, 12).

**Reliance On Medical Experts**: It was reasonable for DCF and Rotovnik to have relied upon the medical experts at CCMC.  The providers there, including Dr. Zemel, were highly credentialed and well qualified to provide a diagnosis and treatment to EP. (Ex. B, ¶ 7).

---

[12] The medical decision-making order extended only to EP, not the "other children."  (Ex. E).

Although parents enjoy an interest in family integrity, this interest is "counterbalanced by the 'compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" *Wilkinson* v. *Russell*, 182 F.3d 89, 104 (2d Cir. 1999). There is no "clear right to unfettered parental decision-making with regard to a child's care and custody." *Defore* v. *Premore*, 863 F. Supp. 91, 95 (N.D.N.Y. 1994); *see also Brenna* v. *Wood*, 3:03-cv-01101 (WWE), 2006 U.S. Dist. LEXIS 99496, at *9 (D. Conn. Aug. 8, 2006) ("[the] right to family integrity is not absolute and the constitutional right to due process may be suspended."); *see also Prince* v. *Massachusetts*, 321 U.S. 158, 167 (1944) ("[T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare . . ."); *In re Cassandra C*., 316 Conn. 476 (2015) (upholding order of temporary custody of child so that child could receive necessary medical treatment).

Violation of substantive due process rights by executive action requires that the underlying conduct "be characterized as arbitrary, or conscious shocking, in a constitutional sense." *County of Sacramento* v. *Lewis*, 523 U.S. 833, 847(1998).  "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense'" and therefore unconstitutional. *Id.* (citation omitted)." *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2nd Cir. 1999).  "[T]he cases in which courts have recognized a viable substantive due process claim are limited to those presenting extraordinary circumstances." *Radolf* v. *Univ. of Conn*., 364 F. Supp. 2d 204, 227 (D. Conn. 2005). "[T]o raise successfully a substantive due process claim, the defendant's conduct must be unusually extreme and shocking." *McDonald* v. *Sweetman*, No. 3:02cv1040 (MRK),

17

2004 U.S. Dist. LEXIS 5558 *20 (D. Conn. March 24, 2004). Such conduct must be "brutal' and 'offensive to human dignity' as to shock the conscience." *Smith* v. *Half Hollow Hills Cent. Sch. Dist.*, 298 F. 3d 168, 173 (2d. Cir. 2002); *see, e.g.*, *Rochin* v. *California*, 342 U.S. 165 (1957) (forced pumping of suspect's stomach offends Due Process).

The plaintiffs have repeatedly alleged that Minerly and Rotovnik were discourteous and unprofessional.[13] However, they fail to identify any extreme and shocking conduct in the complaint. Minerly and Rotovnik's alleged erroneous reliance on CCMC medical professionals, rather than the unlicensed providers relied upon by the plaintiff parents cannot be construed as extreme or shocking. *See* Ex. A, ¶ 4. Robert Morse, the proprietor of Dr. Morse's Herbal Health Care, believes that using certain kinds of herbal regimes is the key to treating disease. (Ex. F, Katharine Pileggi Depo II, p. 295) He is not a licensed health care provider.[14] (Ex. F, pp. 305-307). Even if Minerly and Rotovnik were wrong to have relied upon the highly credentialed medical experts at CCMC, their reliance would not have amounted to conduct shocking to the conscience.[15]

Finally, there is no constitutional right to be free from the filing of neglect petitions. DCF "has a mandate to take whatever actions may be necessary to protect

---

[13] Child welfare social workers are obligated to vigorously pursue their duties to ensure the safety and welfare of children, which sometimes require them to ask parents intrusive questions. *See* W*alden* v. *Wishengrad*, 745 F.2d 149, 152 (2d Cir. 1984).

[14] Plaintiff Katherine Pileggi admitted that she knows little about the educational background of Morse or Dr. Zemel. (Ex. F, Katherine Pileggi Depo II, pp. 305-307; 315-317).

[15] As discussed earlier, Kaela Minerly was no longer assigned to the Pileggi investigation when the Department filed the neglect petition.

the safety and welfare of children, including the filing of court petitions." *Pace* v.

*Montalvo*, 186 F. Supp. 2d 90, 99 (D. Conn. 2001).  Indeed, if DCF had done nothing to

help EP obtain necessary medical treatment under these circumstances, that inaction

could have been construed as shocking the conscience.  *See id*., at 98 n. 5 ("This Court

holds that the only thing which would have shocked its conscience was if the

Defendants, knowing what they knew…had <u>not</u> taken the action they did").

### C. RES JUDICATA/COLLATERAL ESTOPPEL BARS RELITIGATION OF WHETHER PARENTS COMMITTED MEDICAL NEGLECT.

Plaintiff parents are precluded from now claiming that they did not medically

neglect EP under the doctrines of res judicata and/or collateral estoppel.  "The

doctrines of collateral estoppel and res judicata, also known as issue preclusion and

claim preclusion, respectively, 'have been described as related ideas on a

continuum.'… Both doctrines share common purposes, namely, to 'protect the finality of

judicial determinations, [to] conserve the time of the court, and [to] prevent wasteful

litigation . . . .'" *Solon* v. *Slater*, 345 Conn. 794, 810 (2023) (citations omitted); *see also*

*Monahan* v. *New York City Dep't of Corrections*, 214 F. 3d 275, 284 (2d Cir. 2000).  "As

a general matter administrative decisions are entitled to preclusive effect."  *Cumberland*

*Farms* v. *Town of Groton*, 262 Conn. 45, 61 (2002).

Separate and apart from the juvenile court proceedings that took place in state

superior court, DCF administratively substantiated medical neglect and physical neglect

against the plaintiff parents following an investigation. *See* Conn. Gen. Stat. § 17a-101

(g) (b) (requiring DCF during a child welfare investigation to determine whether

parent(s) committed child neglect or abuse); *Hogan* v. *Dep't of Children and Families*,

290 Conn. 545 (2009); *Frank* v. *Dep't of Children and Families*, 312 Conn. 393 (2014)

(discussing statutory scheme regarding child abuse or neglect substantiation hearings). At the request of the plaintiff parents, DCF held an administrative hearing during which the parents were represented by legal counsel.  In a decision dated January 28, 2021, the hearing officer upheld the substantiations of medical neglect and physical neglect.[16] (Administrative decision attached as Exhibit C).  The plaintiff parents did not appeal the hearing officer's decision as they had a right to do under the Uniform Administrative Procedure Act (UAPA), Conn. Gen. Stat. § 4-166, *et seq*. (SUMF, 23)

"For an issue to be subject to collateral estoppel, (1) it must have been fully and fairly litigated in the first action, and (2) it also must have been actually decided[,] and (3) the decision must have been necessary to the judgment.'" *Gladstein* v. *Goldfield*, 3:18-CV-00926 (VAB), 2021 U.S. Dist. LEXIS 96778, *11 (D. Conn. May 21, 2021). The procedures of the UAPA "exceed the minimal procedural safeguards mandated by the due process clause."  *Taylor* v. *Robinson*, 171 Conn. 691, 698 (1976).

The issue of medical neglect was fully and fairly litigated in the administrative hearing that is governed by the UAPA.  *See Matthew M*. v. *Department of Children and Families*, 143 Conn. App. 813, 824 (2013).  The hearing officer actually decided and necessarily determined that the plaintiff parents medically neglected E.P. by failing to treat her for Idiopathic Juvenile Arthritis, thereby implicating the doctrine of collateral estoppel.  *See Solon* v. *Slater,* at 824.  Thus, the administrative decision holding that

---

[16] The hearing officer concluded that that the parents were "victimized" by "Dr. Morse" of "Dr. Morse's Herbal Health Club" located in Florida.  (Ex. C).  The hearing officer did not place the parents on the central registry and did not uphold the substantiation of emotional neglect.  (*Id*.)

the parents medically neglected E.P. precludes the parents from claiming in this lawsuit

that they did not medically neglect E.P.

### D.  UNDISPUTED FACTS SHOW THAT MINERLY AND ROTOVINK ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity protects public officials from liability for civil damages when

one of two conditions is satisfied: "'(a) the defendant's action did not violate clearly

established law, or (b) it was objectively reasonable for the defendant to believe that his

action did not violate such law.'"  *Russo* v. *City of Bridgeport*, 479 F. 3d 196, 211 (2d

Cir. 2007).  "[T]he Supreme Court instructs courts that '[t]he dispositive question is

whether the violative nature of particular conduct is clearly established,' and that '[t]his

inquiry must be undertaken in light of the specific context of the case, not as a broad

general proposition.'"  *Vega* v. *Semple*, 963 F. 3d 259, 275 (2d Cir. 2020) (citing *City of

Escondido* v. *Emmons*, 139 S. Ct. 500, 503, 202 L. Ed. 2d 455 (2019)).  Qualified

immunity "provides ample protection to all but the plainly incompetent or those who

knowingly violate the law."  *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986).

"In determining whether a particular right was clearly established at the time

defendants acted, this Court has considered three factors: (1) whether the right in

question was defined with "reasonable specificity;" (2) whether the decisional law of the

Supreme Court and the applicable circuit court support the existence of the right in

question; and (3) whether under preexisting law a reasonable defendant official would

have understood that his or her acts were unlawful."  *Jermosen* v. *Smith*, 945 F. 2d 547,

550 (2d. Cir. 1991), *cert. denied*, 503 U.S. 962 (1992).

"This [Second] Circuit has adopted a standard governing case workers which

reflects the recognized need for unusual deference in the abuse investigation

context.  An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse. . . . In applying a reasonableness standard in the abuse context, courts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between "difficult alternatives" often need to be made on the basis of limited or conflicting information."  *Wilkinson ex rel.* v. *Russell*, 182 F.3d 89, 99 (2d. Cir. 1999); *see also Van Emrik* v. *Chemung County Dep't of Social Services*, 911 F.2d 863, 866 (1990).  "When a child's safety is threatened, that is justification enough for action first and hearing afterward."  *Pace v. Montalvo*, 186 F. Supp. 2d 90, 98 (D. Conn. 2001); *see also Doe* v. *Conn. Dept. of Children & Youth Services*, 712 F. Supp. 277 (D. Conn. 1989), *aff'd*, 911 F 2d 868 (1990).

The due process clause "is not a guarantee against incorrect or ill-advised [government] decisions."  *Bishop* v. *Wood*, 426 U.S. 341, 350 (1976).  The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended."  *Collins* v. *City of Harker Heights*, 503 U.S. 115, 125.  Even in a seriously flawed child abuse investigation social workers are entitled to qualified immunity.  *Wilkinson*, 182 F.3d at 104-105; *see also Langton* v. *Maloney*, 527 F. Supp. 538, 546-47 (D. Conn. 1981) ("The discretionary decisions of the social worker in the field should not be impeded by liability in damages for decisions which might later be challenged").

Here, the DCF social workers reasonably relied on opinions of medical professionals, including a highly credentialed specialist at CCMC, in support of initiating

proceedings in the superior court for juvenile matters and seeking temporary custody of EP.  *See V.S.* v. *Muhammad*, 595 F. 3d 426, 431 (2nd Cir. 2010) (reliance by social worker upon medical doctor's opinion was objectively reasonable even when supposedly the doctor had a reputation for over diagnosing child abuse); *Ward* v. *Murphy*, 330 F. Supp. 2d 83 (D. Conn. 2004) (DCF Social Worker appropriately relied on opinion of medical professional); *Haraz* v. *Katz*, 327 F. Supp. 3d 418 (D. Conn. 2018) (DCF personnel were objectively reasonable in relying on treating psychologist).  Minerly and Rotovnik's reliance on the CCMC medical experts was objectively reasonable.  As a result, they are entitled to qualified immunity.

Finally, even if  Minerly or Rotovnik had urged the parents to divorce – which they did not—there is no clearly established law that makes advocating for a divorce a constitutional violation.  Regardless, although the parents ultimately divorced, it was long after DCF's involvement had ended -- on May 14, 2024.  *Katharine Pileggi* v. *Anthony Pileggi*, Docket No. LLI-FA24-6035829-S (Judicial District of Litchfield).  *See* Ex. D.

### E.  UNDISPUTED FACTS SHOW NO INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

To prevail on an intentional infliction of emotional distress claim, the plaintiff must prove: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  *Appleton* v. *Board of Educ.*, 254 Conn. 205, 210 (2000).  The conduct must exceed "all bounds usually tolerated by decent society . . . . Liability has been

found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Perez-Dickson* v. *City of Bridgeport*, 304 Conn. 483, 527 (2012).  Conduct on the part of the defendant that is "merely insulting or displays bad manners or results in hurt feelings is insufficient…." (Id.) For the tort of intentional infliction of emotional distress to be established, the plaintiff must prove "conduct considerably more egregious than that experienced in the rough and tumble of everyday life." *Whelan* v. *Whelan*, 41 Conn. Supp. 519, 522 (1991).

"DCF is the state agency responsible for ensuring the welfare of Connecticut's children. DCF social workers are tasked with investigating suspected child abuse or neglect and deciding whether to take action to protect the safety and welfare of the children in question." *P.C.* v. *Conn. Dep't of Children and Families*, 662 F. Supp. 2d 218, 236 (D. Conn. 2009).  Minerly and Rotovnik are child welfare social workers assigned to investigate parental child neglect—a charge fraught with strong emotions. Such social workers are tasked with asking parents tough questions and at times challenging parents' views regarding the care of their child.

The defendants strongly dispute plaintiffs' characterization of them as discourteous and unprofessional, but even they were discourteous, such conduct does not amount to intentional infliction of emotional distress.  Minerly was only involved with the Pileggi family during the initial stages of the investigation.  Rotovnik replaced Minerly as the assigned investigator.  At the direction of his superiors, he filed a child welfare petition and motion for order of temporary custody of EP.  He and DCF placed

greater reliance upon *Dr.* Zemel a credentialed specialist in pediatric rheumatology, rather than the unlicensed provider selected by the plaintiff parents.  Even if the Department were wrong in such reliance, it does not amount to conduct by the social workers "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *P.C.* v. *Conn. Dep't of Children and Families*, 662 F. Supp. 2d 218, 236 (D. Conn. 2009).

Courts applying Connecticut law have consistently held that conduct arguably more severe than what is alleged in the complaint does not satisfy the requirements for a successful intentional infliction of emotional distress claim.  *See Grasso* v. *Conn. Hospice, Inc.*, 138 Conn. App. 759, 775 (2012) (Allegations of "a vindictive conspiracy" does not in and of itself give rise to an intentional infliction of emotional distress claim, and "harass[ment], intimidat[ion], defam[ation] and … discipline . . . without proper investigation" does not rise to the level of "extreme and outrageous" conduct).

Ultimately, the superior court judge granted the motion for temporary custody of EP, agreeing with DCF's position.  (Ex. E).  The plaintiffs could have challenged this order by requesting an evidentiary hearing, but they did not.  (Id.)  The actions of Rotovnik and the Department allowed EP to receive necessary medical treatment, then to be returned to the physical custody of her father with joint legal guardianship with both parents.  (Id.)  Although the plaintiffs may perceive such actions as rude, unprofessional or intrusive, those actions do not come close to meeting the threshold for intentional infliction of emotional distress under Connecticut law.

## V.    <u>CONCLUSION</u>

For the reasons stated above, Defendants Minerly and Rotovnik respectfully move for summary judgment.

DEFENDANTS

KAELA MINERLY, SOCIAL WORKER, DEPARTMENT OF CHILDREN AND FAMILIES

FRANK ROTOVNIK, SOCIAL WORKER, DEPARTMENT OF CHILDREN AND FAMILIES

WILLIAM TONG
ATTORNEY GENERAL

BY:    <u>/S/ *John E. Tucker*</u>
John E. Tucker
Assistant Attorney General
Federal Bar No. ct 04576
Samuel Shapiro
Assistant Attorney General
Federal Bar No. ct 31373
165 Capitol Avenue
Hartford, CT  06106
Tel: (860) 808-5020
Fax: (860) 808-5084
Email: John.Tucker@ct.gov

## **CERTIFICATION**

I hereby certify that on January 27, 2026, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_/S/ John E. Tucker_
John E. Tucker
Assistant Attorney General
Federal Bar No. ct 04576