Exhibit A

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DOCKET NO: CIVIL NO. 3:22-cv-1315 (AWT)

KATHARINE PILEGGI, et al.

                         :

                         :

      v.                  :

KIM MATHIAS, et al.         :     JANUARY   , 2026

## AFFIDAVIT OF KAELA MINERLY

I, KAELA MINERLY, having been duly sworn do hereby depose and say of my own personal knowledge the following:

1. I am over eighteen years old and understand the nature and obligation of an oath.

2. At all times referenced in the complaint filed in the above-entitled action, I was employed by the State of Connecticut, Department of Children and Families.

3. I hold a bachelor's degree in social work from Western Connecticut State University, from where I graduated in 2013. I hold a master's degree in social work from New York University, from where I graduated in 2014. I have been continuously employed as a social worker with the Connecticut Department of Children and Families since May 2014, including roles as a social worker in both ongoing services and investigations and as a social work supervisor. I have completed many trainings with the Department's Training Academy including: pre-service training, differential response system, car seat installation, structured decision making, child welfare, legal, permanency, engaging families, meeting the healthcare needs of children, child development, finding words, sexual abuse of children, behavioral health, medical

1

evaluation of child abuse, substance use, education, child development, case planning, intimate partner violence, supervision and training related to my role as a supervisor.

4.    On December 27, 2018, I was assigned to investigate reported child neglect related to the Pileggi family, and specifically alleged medical neglect of a minor child, EP.  I interviewed the parents and observed the children.  The mother provided medical information related to EP.  She told me that she had been consulting with "Dr. Morse's Herbal Health Care." I requested CCMC records and records from EP's pediatrician (Dr. Adler), and requested the involvement of a registered nurse employed by DCF to help the social work team understand EP's circumstances. I was concerned about EP because I understood that at the time of my involvement, she was not able to walk.

5.  My management re-assigned the investigation to a colleague, Social Worker Frank Rotovnik.  I had no further involvement as an investigator after February 6, 2019.

6. EP was later hospitalized at Connecticut Children's Medical Center.  As is the usual practice when a child in the custody of DCF is hospitalized, staff from the DCF Danbury area office took turns spending time with EP during her hospitalization.  On several occasions, I spent time with EP while she was hospitalized.  I was not involved in filing any documents or pleadings with the juvenile session of superior court related to the Pileggi family.

7.  I did not play any role in vaccinating the Pileggi children.

8. I did not contact or communicate with the police or child welfare authority in Florida relative to the Pileggi family.

9. I did not ever advocate that the parents should divorce.

10. At all times related to my involvement with the Pileggi family I acted in good faith and within the scope of my duties as a social worker for the Department of Children and Families and in accordance with my training and experience as a child welfare social worker.

The foregoing is true to the best of my knowledge, information, and belief.

_____

Kaela Minerly

STATE OF CONNECTICUT )
                       )    ss
COUNTY OF New Haven )

Subscribed and sworn before me this ~~3/st~~ rd day of ~~January~~ December, 2025 ~~2026~~.

Patricia L Hickey

Notary Public/
Commissioner of the Court

Notary Public
PATRICIA L HICKEY
My Commission Expires 1/31/29

3

Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DOCKET NO: CIVIL NO. 3:22-cv-1315 (AWT)

KATHARINE PILEGGI, et al.

                        :

                        :

      v.                :

KIM MATHIAS, et al.          :     JANUARY 14, 2026

### AFFIDAVIT OF FRANK ROTOVNIK

I, FRANK ROTOVNIK, having been duly sworn do hereby depose and say of my own personal knowledge the following:

1. I am over eighteen years old and understand the nature and obligation of an oath.

2. At all times referenced in the complaint filed in the above-entitled action, I was employed by the State of Connecticut, Department of Children and Families.

3. I hold a bachelor's degree in Criminology/ Criminal Justice and Sociology from Keuka College from where I graduated in 2006. I hold a master's degree in social work from Southern Connecticut State University, from where I graduated in 2017. I have my Licensed Master of Social Work (LMSW) which I received in 2021 and I am a Licensed Alcohol and Drug Counselor (LADC) which I have held since 2021. I have been continuously employed with the Department of Children and Families since July of 2014, in which I have held several roles including social worker for ongoing services and investigations and a social work supervisor for ongoing services, investigations, probate, and my current role as the supervisor for the foster care division. I have completed many trainings with the Department's Academy for Workforce Development including: Ethics, Mandated Reporter, Equity, Pre-service, Differential Response

1

system, car seat installation, Structured Decision Making, Child Welfare, Legal, Permanency, Engaging Families, Child Development, Finding Words, Child and Infant Mental Health, Child Safety Practice, CPR/ First Aid, Child Trafficking, Mental Health First Aid, Implicit Bias, Sexual Harassment, Sexual Abuse, Substance Abuse and Motivational Interviewing, Intimate Partner Violence, Introduction to Child Welfare, and training related to the supervisory role.

4.    On February 6, 2019, I was assigned to investigate reported child neglect related to the Pileggi family.  I replaced Social Worker Kaela Minerly as the investigator.  Later, I was promoted to supervisor, and participated in the case as a supervisor until the case closed in March 2020.

5.  The Department of Children and Families decided to file neglect petitions and a motion for order of temporary custody of one of the children, EP.  The central presenting issue was that EP had been diagnosed with Idiopathic Rheumatoid Arthritis and the parents withheld effective treatment for this condition. The decision to pursue legal action was made by my manager who oversaw my work, although I did not disagree with that decision.

6.    Appended to this affidavit are true and accurate copies of the following affidavits that were submitted to state superior court except to the extent that identifying information is redacted:  Ex. B-1, Social Worker Affidavit by Frank Rotovnik 3/28/2019; Ex. B-2, Social Worker Affidavit of Koren Kermashek 3/28/2019; Ex. B-3, Affidavit of Pamela Santapaola 3/28/2019; Ex. B-4, Affidavit of Kevin Fitzsimmons 3/28/2019.  These affidavits were submitted in support of  DCF's motion for order of temporary custody that was granted by the superior court and sustained by agreement of all parties. To the best of my knowledge and belief, my affidavit, B-1, accurately details the information I obtained during the course of my investigation.

2

7. Dr. Laurence Zemel, a pediatric Rheumatologist at CCMC, had diagnosed EP with Idiopathic Rheumatoid Arthritis, and advised the Department that EP had an urgent need for treatment for that condition. The Department placed great reliance on Dr. Zemel's opinions since he was a pediatric rheumatologist and highly qualified to provide diagnosis and treatment regarding EP. The Department credited the opinions of Dr. Laurence Zemel, Kevin Fitzsimmons, an orthopedic physician's assistant, and the other medical professionals at CCMC related to EP's condition and the need for treatment.

8.    After EP was removed from the parents' custody and care, she received treatment for Idiopathic Rheumatoid Arthritis at Connecticut Children's Medical Center (CCMC), the preeminent children's hospital in the greater Hartford area. It was my understanding that EP's treatment included medication, physical therapy, aquatics therapy, occupational therapy and nutritional and orthopedic consults. After a period of in-patient hospitalization, it was my understanding that EP continued treatment on an outpatient basis while she was placed in a DCF licensed foster home that was supported by a visiting nurse service. Also registered nurses employed by DCF were involved in monitoring her care. CCMC staff informed the Department that EP's treatment was successful. Before she received treatment she was unable to walk. After treatment I observed that she was able to walk without difficulty and she appeared to have regained good health.

9. On June 11, 2019, the father told me he was one hundred percent on board with the treatment EP is getting from CCMC and was loving the progress she was making. On August 27, 2019, I received a text message from the father: "Just wanted you to know I had a great conversation with dr zemel, short as he's busy but he took my call right away. I started off with thanking him and his team!! On another note [EP] was discharged from pt. Also want to thank

3

you guys for waking me the F up. Of course this is not how I could of imagined it going but had to happen to make me a better father and again wake me up...."

10. At the time of my involvement it was my belief that the father was accepting of medical advice from CCMC personnel, including Dr. Zemel. The mother appeared to continue to reject medical advice from CCMC personnel.

11. After EP had received treatment for her medical condition and the parents had received services, the parties agreed to return EP to the physical custody of her father. At the time of the agreement the father presented himself as being cooperative with the Department of Children and Families and, as far as I was aware, was appropriately handling EP's medical treatment.

12. I did not play any role in vaccinating the Pileggi children or contacting the police or child welfare authority in Florida. My only contact with Florida DCF was that I spoke to a social worker named Nicole to arrange pick up of EP in the airport.

13. I was not responsible for providing notice to the parties for the court hearing on the order of temporary custody (OTC). The clerk's office provides such notice. The parents were reminded of the hearing at a meeting held at DCF on April 1, 2019. In any event, the parents were in attendance at the OTC preliminary hearing.

14. I did not advocate that the parents should divorce.

15. Attached as Exhibit C is a true and accurate copy of the final decision dated January 28, 2021 of a hearing officer.

16. At all times related to my involvement with the Pileggi family I acted in good faith and within the scope of my duties as a social worker for the Department of Children and Families and in accordance with my training and experience as a child welfare social worker.

The foregoing is true to the best of my knowledge, information, and belief.

4

Frank Rotovnik

STATE OF CONNECTICUT )
                     )        ss
COUNTY OF Litchfield )

Subscribed and sworn before me this 14th day of January, 2026.

Notary Public/
Commissioner of the Court

MAXINE HUDSON
Notary Public, State of Connecticut
My Commission Expires 7-31-29

5

# EXHIBIT B-1

RE: ████ ████ DOB ████2015

**Date:** March 28, 2019

<u>**SOCIAL WORKER AFFIDAVIT**</u>

I, Frank Rotovnik, am an investigative social worker for the Department of Children and Families (DCF) at 131 West Street Danbury, Connecticut. I am over the age of eighteen and understand and believe in the obligations of an oath. I hold a masters degree in social work and have worked for DCF for four plus years. I was assigned to the Pileggi Family case on 02/06/2019. Upon being assigned this case, I reviewed DCF's case record. Being duly sworn, I do hereby depose and say that the following is the truth to the best of my knowledge and belief:

<u>**Child for whom motion is filed:**</u>



| | |
|---|---|
| Name: | E███ P██ |
| Date of Birth: | ████2015 |
| Address: | |
| | |
| Legal Status: | N/A |

<u>**Parents:**</u>

Mother:
| | |
|---|---|
| Name: | Katharine Pileggi |
| Date of Birth: | |
| Address: | |

Father:
| | |
|---|---|
| Name: | Anthony Pileggi |
| Date of Birth: | |
| Address: | |

**Reasons for Motion:**

1) On 12/26/2018, the Department received a report from an anonymous reporter alleging Medical neglect of E███ P███ by her parents, Mrs. Katharine Pileggi and Mr. Anthony Pileggi. The anonymous reporter alleged that E██ has some sort of physical abnormality and cannot walk. The anonymous reporter alleged that Mrs. Pileggi was ordered by the State of Connecticut to take E███ to a doctor and Mrs. Pileggi never followed up with a doctor and that Mrs. Pileggi does not believe in medical intervention as she is a "healer" and the children do not need medical intervention.

2) On 12/28/18, the Department conducted an announced home visit.
Mr. and Mrs. Pileggi reported that they wanted to talk with the Department about the details of the report together, and declined to speak with the Department separately. The

Department reviewed the report and Mrs. Pileggi stated that based off what is in the report, she knows this came from maternal grandfather. The Department discussed Birth to Three Services and parents stated that the Department can make a referral for M█ █████'s 1 year old sibling but that they don't think they will utilize this. Mr. and Mrs. Pileggi reported that █████ is physically limited as a result of her medical needs.

The Department observed Mr. Pileggi holding █████, who was sitting comfortably in his arms. The Department attempted to greet █████ but received no response.  Mr. Pileggi prompted █████ to say "hi" but she did not. Mr. Pileggi stated that she takes a little while to warm up. █████ did not present with marks or bruises but the Department observed her knees which were both swollen. Mr. Pileggi rubbed her knee, stating that over the summer he could not even do this without her crying in response. Mr. Pileggi stated that it is a slow process, but that she is showing small improvements.

Mr. and Mrs. Pileggi both confirmed that they are invested in █████'s treatment through Naturopathic Medicine. Mr. and Mrs. Pileggi confirmed that █████ cannot walk currently, and stated that this is something they are working on.

Mr. Pileggi stated that █████'s symptoms began in June 2018 and reported that prior to then, she was healthy and had no medical concerns. Mr. Pileggi stated that one day the family was on a hike and that he found a tick on █████ afterwards which he removed. Both parents reported that over the next few days, she was not acting herself and that this progressed to her being unable to walk. Parents reported that they first brought her to her pediatrician who then recommended taking her to Connecticut Children's Medical Center (CCMC.) Mrs. Pileggi stated that the Doctor at CCMC said she has arthritis, wanted to drain her knees and give her a heavy dose of ongoing antibiotics.  Mrs. Pileggi stated that parents declined this treatment and that this is what prompted the last Child Protection Services (CPS) report.

Mr. and Mrs. Pileggi reported that █████ is currently following a very strict protocol outlined by her Naturopathic Doctor (ND), Dr. Robert Morse. Mrs. Pileggi reported that over the summer, █████ was being seen by her previous ND, Katherine Layman, and that █████ was in pain. In September of 2018, parents reported that they were following the ND's plan but that █████ was in pain so they took her to Western Connecticut Medical Group Primary Care of New Milford for conventional medical care due to █████ not walking and to alleviate the pain. Mr. and Mrs. Pileggi stated that there was some improvement after using steroids and antibiotics but that this was only suppressing her symptoms. Prior to █████ stopping to walk, she was able to hold onto things and maintain her weight on her knees. Mrs. Pileggi stated that this is when she reached out to the office of Dr. Robert Morse, who she had heard of and had researched.  Mrs. Pileggi stated that she kept █████ on the prescription medications and discussed with the provider, Dr. Lindsey Laughinghouse (via WCMG Primary Care of New Milford,) their plan to transition her care to Dr. Morse.  Mr. and Mrs. Pileggi reported that they worked

2

with Lindsey Laughinghouse to titrate █████ off the medication before beginning with Dr. Morse. Mrs. Pileggi reported that she was communicating with Dr. Morse's office about the preparation that had to be done to detox █████ before beginning her first protocol. Mrs. Pileggi stated that █████'s primary counselor at Dr. Morse's office is Marcie Troyer but that Mrs. Pileggi's first contact person was named Kandace who obtained all of █████'s preliminary information. █████ was put on a very strict diet of all natural, 100% raw, live fruits and vegetables. In addition to detox program, Kandace recommended the following tinctures: Glycerin Kidney & Bladder I, Parasite M, Lymphatic I, Adrenal Glycerin, and Heal All Glycerin. All tinctures are directed to be used as follows: 1/3 dropper full, 3 times a day, 15-30 minutes before food.

█████s first Skype session with Dr. Marcie Troyer scheduled for 11/30/2018. Mrs. Pileggi stated that on 11/30/2018, Dr. Troyer started █████ on her first protocol. The Department was able to verify the protocol and noted that the bottles matched the outlined protocol. Mrs. Pileggi stated that she maintains contact with the Dr. Troyer by phone and email however stated that her next scheduled appointment is scheduled for 01/10/2019. Mrs. Pileggi explained that Dr. Troyer told them that the first protocol is the hardest to get through as it is detoxing the lymphatic system and that Dr. Troyer calls this a 'healing crisis.' Mrs. Pileggi stated that during this time █████ may regress, but that this is part of healing. Mrs. Pileggi stated that █████ has been doing well. Mrs. Pileggi stated that there has been no gap in █████s care and that she is so happy to have found Dr. Morse.

Mrs. Pileggi stated that █████ is on a very strict diet which is dictated by Dr. Troyer. Mrs. Pileggi stated that █████ is on a vegan diet which is very low in acidity. Mrs. Pileggi stated that Dr. Troyer directed this diet as eating acidic foods contributes to inflammation. Mrs. Pileggi stated that Arthritis is acidosis of the body causing inflammation. Mrs. Pileggi stated that conventional medicine says that █████ has Arthritis and the treatment for this only suppresses symptoms. Mrs. Pileggi stated that █████ would require steroids and antibiotics for life. Mr. Pileggi noted that the doctors also outlined all the serious risks of taking these medications long term and this is why the family sought to see Dr. Morse, who is world renowned for his work in healing cases like this.

Mrs. Pileggi stated that she previously was bedridden as a result of symptoms related to Epstein Barr Virus (EBV.) Mrs. Pileggi stated that she followed a naturopathic regimen and was healed. Mrs. Pileggi stated that this was sometime around 2012. Mrs. Pileggi stated that she would not believe the effectiveness of this if she had not gone through it herself. Mrs. Pileggi stated that at CCMC █████ was tested for EBV and was positive.

Mrs. Pileggi stated that she has been following Dr. Morse's educational videos and she was learning a lot. Mrs. Pileggi stated that she is hopeful to become one of his students. Mr. and Mrs. Pileggi stated that their number one priority is █████'s health. Mrs. Pileggi

stated that if she had any doubt regarding the effectiveness of Dr. Morse's treatment for
█████, she would not be following this and would be open to going the conventional
route.

3) On 12/31/18, the Department received 13 emails from Mrs. Pileggi with screenshots of
information she obtained from Dr. Morse's book. The documents speak about the detox
process and healing crisis. Mrs. Pileggi stated the following regarding these emails:

"I sent over some screen shots of the book I highly suggest you get an understanding of
detoxification and also Epstein Barr and how viruses are actually able to penetrate the
body to inadequate lymphatic adrenal kidney functions. I will detail for you my notes and
Marci so you can see what we are treating in the body. Diagnosis is just a label for
something not properly functioning in the body. For example arthritis and inflammation
are just names and labels for acidosis. I will send you some good educational videos and
you can also look up Dr. Morse on YouTube. If you read about him and his clinic you
will see he is superior to any doctor globally. We are going for a cure and proper body
function NOT symptom suppression which is what conventional medicine does! How do
we do this? Whole cell body regeneration and detoxification. How does a conventional
doctor treat what they would call arthritis which is really acidosis? By symptom
suppression or covering up the root problem which then in turn adds more acidity to the
body? NOT what anyone needs! All illness known to man including cancer comes from
acidosis, lymphatic and improper body functions such as kidney, adrenal, hypothalamus,
endocrine etc. and the where and how's of how this can occur in a body particularly
young children will be in my next email. This entire process and experience has pushed
me into a greater understanding and knowledge of the human body and modem and
indigenous medicine. We have dropped the ball completely on treating illness and it's my
job along with so many others Bringing to light what really works and the true medicine
that Mrs. Pileggi Earth has intended for us. Other people to follow are raw, wild and the
teachings of Dr. Sebi. There's many others but Dr. Morse and Dr. Sebi (now deceased)
are the true healers who expose the deception of modern medicine. Again I will reiterate
modern medicine has a place for emergency and acute situations but that is all. If you ask
any Dr. what is "autoimmune "or "arthritis" and where does it come from they have no
idea and can't answer that. Well I can and I challenge all who don't understand proper
body functions and the role of nutrition the lymphatic and vital organs. I've yet to meet a
doctor or nurse who understands it properly. I stand up and advocate for my children and
the world for the truth and what will make people well again. Thank you for reading over
this material and having a better understanding of what real medicine truly is and that this
takes time to heal a toxic body. We are not only healing our lifetime of toxicity but what
we accumulated from our relatives."

4) On 12/31/2018, the Department received an email from Mrs. Pileggi. Mrs. Pileggi
provided a list of concerns that occur while utilizing traditional medicine. Mrs. Pileggi
noted the following:

-Joints are destroyed by cellular acids
-Adrenals make steroids naturally that fight acids and inflammation
-Kidneys filter acids and help eliminate them, the body will rub calcium from joints and bones to fight these acids, Proteins are an anti-acidic
-You can't eat an acidic diet and expect to heal and regenerate cells
-Detoxification is necessary in the immune system and lymphatic system via fruitarian diet
-Kidney filtration is via food hydration, no excessive water intake, juice celery and cucumber but has to be mostly fruits. Eating dead foods communicates death to cells - living foods turn cells on and inspire them to function properly, promoting proper cellular activity. Need kidneys to filter to create lymphatic fluidity
-When you are acidic, your body tends to fight acids by pulling calcium from the bones. Strengthening the adrenals and eating alkaline foods so your body doesn't rub calcium from bones. Clean your lymphatic system by getting it moving to the kidneys where acids and toxins are removed. This is the golden key to health.
-Fruit consciousness, eliminate vegetables.
-Arthritis is the name to classify different forms of inflammation
-Alkaline foods are anti-inflammatory
-Mrs. Pileggi wrote down the regimen outlined in █████'s protocol established
-Can begin movement and activities with █████
- EFT Tapping for █████? Emotional Tapping

5) On 01/07/2019, the Department received an Email from Mrs. Pileggi. Mrs. Pileggi stated that she is also looking into a local naturopath who can see █████ between appointments with Dr. Morse and is going to ask Dr. Troyer about this at the next appointment. Mrs. Pileggi stated that she wants to be very thorough.

6) On 01/10/2019, the Department contacted Mrs. Pileggi via phone call to follow up on the Skype sessions that are being held with Dr. Marcie Troyer. Mrs. Pileggi stated that she spoke with Dr. Troyer who reported that the Skype sessions are for the provider to assess █████ and that it is not appropriate for the Department to participate. Mrs. Pileggi stated that the appointment with the provider went well and that Dr. Troyer is scaling back on █████'s protocol and is going to start a new protocol which Mrs. Pileggi will receive on 01/11/2019. Mrs. Pileggi stated that Dr. Marcie Troyer said that she can begin getting █████ back into activities like swimming and using the baby walker. Dr. Troyer noted that █████ is healing well and is ready to progress to the next protocol. Mrs. Pileggi stated that █████ is not due for a physical exam until 02/22/2019. Mrs. Pileggi stated that all of her children have physical exams scheduled for 02/25/2019. Mrs. Pileggi stated that Dr. Lindsey Laughinghouse is their primary care physician who will see them for their wellness visits. Mrs. Pileggi stated that █████ has a follow up with her eye doctor for 01/16/2019.

7) On 01/11/2019, the Department contacted Dr. Robert Morse and Marcie Troyer via phone call. The Department informed Dr. Morse and Dr. Troyer of the Department's involvement. Dr. Morse and Dr. Troyer reported that ██████'s diagnoses are Fumarase Deficiency, Polymicrogyria, Parathyroid Disorder, and possible Cerebral Palsy.

Dr. Morse and Dr. Troyer stated that ██████'s case was either triggered by a virus or the tick bite which occurred prior to her symptoms. Dr. Troyer stated that ██████ is a normal three year old female in a body that is not working which can frustrate ██████. She reported that she has had behavioral outbursts in which she will yell to get what she wants due to her frustrations.

Dr. Troyer reported that Mrs. Pileggi first reached out to Dr. Troyer in 2015 but has been working with Mrs. Pileggi in regards to ██████'s case over the last year. She did not begin treating ██████ until late 2018. In November 2018, Dr. Troyer created her first treatment protocol for ██████. She has never physically assessed ██████ in person but has Skype sessions every 2-3 months. Dr. Troyer noted that Mrs. Pileggi is in communication with the office in between sessions. Last session was yesterday at which time a new treatment protocol was developed. Next session has not yet been scheduled but Mrs. Pileggi is aware of recommended time frame.

Dr. Troyer reported that since starting the first protocol there has been a slight decrease in inflammation, decreased complaints of pain, improved bowel movements, and improvement in sleeping. Dr. Morse and Dr. Troyer verbalized that it is too soon in treatment to see a significant decrease in inflammation as the healing process of the body takes time. Dr. Troyer noted that antibiotics and steroids give immediate relief but that she would require treatment for the rest of her life which she does not need as the body is able to heal itself through natural treatment. Dr. Morse stated that his goal is to treat the underlying cause of the problem, not just suppress the symptoms. Dr. Morse reports that within 6 months there should be more of an improvement. He reports that he has never had a case like this that he could not correct and denied concern that this treatment will not be effective.

The Department expressed their concerns regarding ██████'s immobility which Dr. Troyer and Dr. Morse were aware of. Dr. Troyer believes this is partially psychological; ██████ could be associating walking with pain, therefore she prefers to be carried as opposed to attempting to walk. Dr. Troyer stated that she counseled parents on how to manage this and that the psychological symptoms have been resolved. Dr. Troyer stated that ██████ has responded well to treatment and reports that in addition to complying with the protocol that she said parents can begin some physical activities with ██████ including various stretches, the use of a baby walker and Johnny seat bouncer to build muscles. She reported that she previously told parents to discontinue these activities during the first protocol as ██████'s body was going through detox and this could have caused her pain. Dr. Morse stated that physical activity during the initial protocol exacerbates the problem

6

because the body needs to clean out the toxins from the lymphatic system before she can benefit from physical activity. Diet recommendations along with the use of botanicals are also part of the protocol to enhance organ function. It is reported that Mrs. Pileggi has been compliant with all recommendations thus far. No further concerns were reported.

8)  On 01/11/2019, the Department participated in an announced home visit. The Department observed █████'s knees and fingers to be in the same condition as during previous home visits, they were visibly swollen.

Mr. and Mrs. Pileggi confirmed that █████ is going to begin her next protocol. Mr. and Mrs. Pileggi stated that Dr. Troyer advised them to begin physical activity with █████ as part of her new protocol.  Mr. and Mrs. Pileggi stated that █████ is signed up to begin swimming on Saturday mornings at New Milford Fitness and Aquatics where there is a salt water pool.  Mr. and Mrs. Pileggi stated that they are encouraging █████ to use the baby walker but that when they put her in it, she cries and says she is not a baby. Mr. and Mrs. Pileggi reported that they have a swing for her to use to jump and stated that they are going to set this up in their new home for her to build up her muscles.

The Department spoke to parents regarding the 6 month timeframe for which parents should be seeing drastic improvement, per Dr. Morse. The Department challenged Mr. and Mrs. Pileggi by inquiring what their plan is if improvement is not seen and Mr. and Mrs. Pileggi stated that they are committed to trusting Dr. Morse as he has provided care to many people who have been healed.  Mrs. Pileggi spoke about the healing process of the body again and stated that this is not something conventional medical providers understand.  Mrs. Pileggi stated that it is complicated and she understands this.  Mrs. Pileggi stated that █████ will improve over the six months as she is following the protocol precisely.  Mrs. Pileggi stated that there is a place for conventional medicine and stated that she is not opposed to this treatment when needed especially in an emergency. Mrs. Pileggi reiterated that █████ began her initial 'prep your body' protocol on 10/05/2018, began her first protocol on 11/30/2018, and that she is now moving on to her next protocol which was established yesterday. Parents stated that they are committed to this protocol and unwilling to try a different treatment. The Department noted the concerns of █████'s lack of development due to her not walking and Mrs. Pileggi stated that her not walking is related to her healing crisis, and that they are anticipating improvement as directed by Dr. Morse. Mr. and Mrs. Pileggi stated that they are doing everything that they can for █████ Mr. and Mrs. Pileggi stated that they are willing to fly with █████ to Florida to see Dr. Morse if needed but are unwilling to have █████ seen again by CCMC. Parents stated that they are upset with how CCMC handled the matter and then filed the report with the Department.  Mr. and Mrs. Pileggi stated that they have considered suing Dr. Zemel for filing this report.

9)  On 01/12/2019, the Department received a completed medical request regarding █████ from her prior pediatrician, Dr. Alder. The document stated that █████ was last seen for a

7

physical exam on 07/03/2018. Dr. Alder noted that Mr. and Mrs. Pileggi declined immunizations. Dr. Alder noted that █████ was referred to Dr. Zemel at CCMC and noted that he is uncertain of the current status of her diagnosis and prescriptions. At the bottom of the form, the provider noted: "I am very concerned that it took so long for the Department to get involved!"

10) On 01/17/2019, Mrs. Pileggi sent the Department a forwarded email from Suzanne Rossini via The Tapping Practice in Newtown. The email indicates that Mrs. Pileggi contacted the provider for consultation for █████ to begin EFT (Emotional Freedom Technique) with Suzanne Rossini. After consultation, Suzanne recommended 3 consecutive sessions to start for retention as █████ is 3 years old.

11) On 01/17/2019, the Department received records from Dr. Morse's office from assistant, Megan French. Included in the email were hand written notes regarding █████s appointments on 11/30/2018 and 1/10/2019 as well as her protocols. The notes have no indications of progress but rather notes █████'s diet and some background information.

12) On 01/25/2019, the Department contacted Dr. Lindsey Laughinghouse to confirm █████s upcoming appointment. Mr. and Mrs. Pileggi scheduled an appointment on 11/14/2018 but canceled the appointment on 11/13/2019 and never rescheduled.

13) On 01/25/2019, the Department contacted Mr. and Mrs. Pileggi via phone call to discuss █████'s last appointment with Dr. Laughinghouse. Mr. and Mrs. Pileggi reported that they were at her office three times and titrated █████ off of the prednisone before starting the detox with Dr. Morse. Mr. and Mrs. Pileggi confirmed that the provider was overseeing this process. The Department discussed the canceled appointment with Dr. Laughinghouse which Mr. and Mrs. Pileggi denied and explained that Dr. Laughinghouse was aware of the plan for █████ to begin with Dr. Morse and that Dr. Laughinghouse titrated █████ off the prednisone.

14) On 01/28/2019, the Department received the case record from Dr. Laughinghouse. The documentation reflects that on 12/21/2018, Dr. Laughinghouse contacted Mrs. Pileggi regarding █████'s follow up appointment which was cancelled on 11/14/2018. Mrs. Pileggi informed Dr. Laughinghouse that █████ is now seeing Dr. Morse in Florida for care and that Mrs. Pileggi broke her leg and underwent surgery resulting in her being unable to make █████s last scheduled appointment on 11/14/2018.

15) On 01/28/2019, the Department received a second report on the family, this report was made by maternal grandfather Brad J█████ who alleged concerns of physical neglect of █████ and her siblings by Mr. and Mrs. Pileggi. Mr. J█████ reported concerns over Mrs. Pileggi's mental health. Mr. J█████ reported that Mrs. Pileggi is often on her phone and not caring for the children. Mr. J█████ reported that Mrs. Pileggi has erratic behavior and told Mr. J█████ that the world is going to end because there are aliens

walking around that look like humans.  Mr. ▮▮▮▮ reported that he has had concerns with Mrs. Pileggi's mental health since she was young and believes that Mr. and Mrs. Pileggi need a psychological evaluation.  Mr. ▮▮▮▮ further stated that Bi-Polar issues run in both Mr. and Mrs. Pileggi's family.

16) On 01/29/2019, the Department conducted an announced home visit to the Pileggi home. The Department discussed with Mr. and Mrs. Pileggi ▮▮▮'s treatment and the concern of lack of follow up with the primary care physician.  Mrs. Pileggi and Mr. Pileggi were both adamant that there was no missed appointment, reporting that they met with Lindsey on two occasions. The Department explained that there was supposed to be a follow up which was canceled and that ▮▮▮ was supposed to be seen after being titrated off her prednisone. Mr. and Mrs. Pileggi confirmed that they weaned ▮▮▮ off the medication under the oversight of the pediatrician.  Mr. and Mrs. Pileggi stated that they informed Dr. Laughinghouse that ▮▮▮ was going to begin treatment with Dr. Morse. Mr. and Mrs. Pileggi stated that all of the children have physical exams scheduled in February of 2019 with Dr. Laughinghouse.

17) On 01/30/2019, the Department received a phone call from Dr. Alder regarding ▮▮▮▮. Dr. Alder stated that he has not seen ▮▮▮ since she was referred to CCMC. He stated that if she is not being treated by a rheumatologist, she is being neglected.  Dr. Alder vocalized this concern to the Department previously and that he previously sent records. He stated that arthritis is a serious condition and that if the child is not being treated medically that this is neglectful as medical treatment is required.  Dr. Alder stated that the family is no longer a patient of his office.

18) On 2/04/2019 the Department conducted a home visit. Upon opening the door, Mrs. Pileggi was hesitant to allow the Department to proceed with the visit as Mr. Pileggi was not present. Mrs. Pileggi added that the children were all sick with upper respiratory infections, herself included.  The Department verbalized to Mrs. Pileggi that Mr. Pileggi can join the visit via phone call which Mrs. Pileggi agreed and allowed visit to continue.

The Department noticed that ▮▮▮s knee was inflamed, as well as swelling of 3 fingers of the right hand and both ankles. Mrs. Pileggi called Mr. Pileggi, via telephone to include him in the visit.  Mr. and Mrs. Pileggi report that ▮▮▮ has had some improvements in condition including a 10% decrease in swelling. Mr. and Mrs. Pileggi were made aware that notes provided by Dr. Troyer do not reflect what is being reported. The follow up Skype call with Dr. Troyer has not yet been scheduled.  Mr. and Mrs. Pileggi are not receptive to having a follow up appointment for assessment with Dr. Zemel or any other specialist provider other that Dr. Morse.

19) On 02/14/2019, the Department conducted a home visit.  Mr. and Mrs. Pileggi reported that ▮▮▮ is doing better and at this time is on track with her treatment as noted by Dr.

Morse. Mrs. Pileggi reported that she is working with Dr. Troyer and Dr. Morse who are out of Florida.

Mrs. Pileggi reported that she has bi-weekly Skype sessions with Dr. Troyer but they are in constant contact through email and phone calls. Mr. and Mrs. Pileggi reported that she had a recent Skype session and her next one will be on 02/26/2019. She reported that the whole family is getting over being sick and that during their last Skype session, it was noted that ███ had some inflammation in her feet which was noted to be from being sick. She reported that she weighs currently 27 pounds which is 1 pound weight gain from last year. Mrs. Pileggi reported that they also recently changed ███'s diet to being fully vegan which can cause some weight loss, as fruits and vegetables do not cause massive weight gain, along with the lack of movement means that ███ will lose muscle mass which weighs more than fat. Mr. and Mrs. Pileggi reported from what they have been told, ███ should be gaining weight in the near future. Parents reported that she has had a much better appetite as well.

It was explained to parents that the Department was informed that Dr. Morse was going to provide a letter to the Department stating that it was not necessary for ███ to be seen in person. Mrs. Pileggi explained that a few weeks ago, they were going to fly down to Florida to see Dr. Morse as requested by the Department. The Department inquired about how ███s health has been and Mr. and Mrs. Pileggi stated that it is getting better. Mrs. Pileggi explained that she knows what ███ is going through as she had Epstein Bar as well growing up. She reported that the doctors were treating her with tons of antibiotics and vaccinations which are heavy in metals which is the exact opposite of what is needed for Epstein Bar. She stated that while she was pregnant, she was on tons of antibiotics which she believes has something to do with ███ having Epstein Bar. Mrs. Pileggi reported that Epstein Bar is a disease that hinders your immune system and makes you more prone to viruses. She stated that the medication that she was on was helping her in the short term but would have lasting negative effects.

The Department asked what ███'s medical regiment is at this time and Mr. and Mrs. Pileggi explained that there are many things that they do to help ███ Parents reported that ███ is very shy and they are helping her play more and be more active. They reported that even at home, they are always trying to help her. Mr. Pileggi reported that during the evenings while they are just winding down for the day, he will lay her on the couch and work out her legs. He stated that he will basically pump her legs to help her movement and to gain muscle. Mrs. Pileggi reported that she attends the gym daily where they have a daycare and do exercises with the children as well. Mrs. Pileggi stated that while she is there, she will work with her on the soft mats and work out her legs. Mr. and Mrs. Pileggi reported that at home, she has a scooter that she uses to get around and to work out her legs. They reported that on Saturdays and Sundays, they go to a salt water pool and she is able to swim on Saturdays as it is a youth swim and on Sundays is a family swim. Mr. and Mrs. Pileggi reported that 3 times a day she will take her protocol

which is prescribed by Dr. Morse.  Parents reported that every other evening, ██████ receives a detox bath that is provided by Dr. Morse.

Mrs. Pileggi reported that she is a Reiki master and has friends that are also Reiki masters.  Mrs. Pileggi stated that it is not the best to practice Reiki on family members so she will perform Reiki on her friends' children and her friends will perform Reiki on ████.  Mrs. Pileggi stated that ████ has the strict food diet which consists of only organic fresh vegetables and fruits.

Mrs. Pileggi stated that ████ does see a reflexologist as well who provides Acupressure. Mrs. Pileggi stated that they had tried Acupuncture with ████ but felt as though Acupressure was better for her.  Mrs. Pileggi explained that Acupressure is performed by pushing on certain pressure points in the body, mostly the feet in which helps work out different parts of the body.

Mrs. Pileggi stated that she has a friend out in San Diego as well that has performed Matrix Healing on ████.  Mrs. Pileggi explained that Matrix Healing works on past life trauma as Mrs. Pileggi reported that everyone is born with trauma from past lives and Matrix Healing helps to get rid of the negative energy that comes with our past lives.  She stated that the last time she received the Matrix Healing was in November of 2018.

She reported that Dr. Troyer performs Iridology which she takes a picture or looks into ████'s eyes and can tell how she is doing and what is wrong through the eyes.  Mrs. Pileggi stated that the eyes tell everything going on with a person.

Mr. and Mrs. Pileggi explained that ████ is doing better and reported that they do not want to take their daughter to a "regular" doctor because all doctors do is push medication on them.  They reported that the medication could have a positive effect in the beginning but they explained that the long term negative effects can last the rest of your life.  They reported that they understand that it appears that ████ is not getting better but they believe that she is making great strides and believe that in the end, this will be the better route for them.

20) On 02/25/2019, the Department contacted Dr. Morse's Herbal Health Club via phone call. The Department was able to speak to Marci Troyer, ████'s doctor, a naturopathic doctor, certified natural health practitioner.

Dr. Troyer reported that the in person visit would not be necessary at this time but reported that seeing a patient in person is always helpful.  Dr. Troyer reported that Dr. Morse and she work with people around the world by Skype sessions only.  She reported that this is normal practice for them that they do all the time.  She reported that they will work with families without meeting them.

The Department explained their request for something in writing from her practice stating that they would not need to see █████ in person to continue to treat her and Dr. Troyer reported that he would speak to Dr. Morse about this and get back to the Department.

The Department asked what Dr. Troyer's impression of █████ was and how she is progressing and Dr. Troyer reported that she believes that things are going well and are coming along. She stated that things do take time and that if they are following the regiment, she believes that she will continue to make progress.

Dr. Troyer reported that her concern is that █████ may not be putting her legs down to try to walk or put pressure on them due to psychological reasoning. She explained that as it does cause her pain to either straighten out or to put pressure on her legs, she might not be working as hard. She reported that working out █████'s legs is important and good for █████

21) On 02/26/2019, the Department conducted an announced home visit. During the home visit, Mrs. Pileggi reported that █████ has actually been moving and crawling on her own again. Mr. Pileggi was able to show the Department a video of █████ crawling across the couch to get something and Mr. and Mrs. Pileggi stated that this was unprompted and she moved pretty well. Mrs. Pileggi stated that she is getting better but is swollen on this day. Mrs. Pileggi stated that █████ had her meeting with Dr. Troyer today and she stated that she was doing very well. Dr. Troyer reported that the swelling will come and go and that it all can depend on how well her kidneys are getting rid of the toxins. She stated that Dr. Troyer had no concerns for █████ at this time and told parents to continue to do what they are doing.

The Department explained to parents that after speaking to Dr. Troyer, she had reported that she was worried that some of the issues with █████ not wanting to walk or utilize her legs could be psychological. Mrs. Pileggi reported that this is something that they have been working on with her as well. She stated that they are utilizing Emotional Freedom Technique (EFT) which Mrs. Pileggi explained was an acupressure method which helps with █████s ability to move and get past the pain. Mrs. Pileggi stated that the Reiki and Matrix Healing are also great for the psychological concerns and they have been working on that with █████ for some time now. The Department asked if any type of traditional therapy would be beneficial for █████ and Mrs. Pileggi stated that they did not think so as █████ is very shy and would struggle to talk to anyone as well as the fact that she is young. Mr. and Mrs. Pileggi reported that they did not feel as though therapy would have any positive affect.

The Department explained to Mrs. Pileggi that after reviewing some of the records from Dr. Laughinghouse, there was a referral for other providers. Mrs. Pileggi reported that these providers from Dr. Laughinghouse were all naturopaths and homeopaths that they looked into and decided not to work with. She reported that she did her research on them

and she felt they were not as equipped to take care of █████. She reported that she also found Dr. Morse/ Dr. Troyer and did not need the referrals. Mrs. Pileggi also reported that she had to cancel an appointment for the children to receive their physicals on 02/25/2019 as they do not have insurance at this time. The parents mistakenly let Husky insurance lapse for their four children.

The Department was looking to see if it would be possible for █████ to have a physical check up with a provider and Mrs. Pileggi reported that this is not necessary. Mr. Pileggi explained that this was the whole reason why he was going to send Mrs. Pileggi and █████ to Florida when the Department requested this but after hearing Dr. Morse's office state that it was not necessary, they do not feel it is necessary either at this time. They reported that not all naturopaths are the same and they do not want to see another one just for the sake of seeing someone. They reported that they will not be taking her for a physical update at this time.

22) On 02/28/2019, the Department received an email from Dr. Morse's office confirming that their practice works with patients all over the world and in most cases, including █████'s, it is not needed for █████ to come in person but Dr. Troyer reported that they have no problem seeing █████ in person if it was needed but not requested by her office at this time.

23) On 03/04/2019, the Department received a third report from an anonymous medical provider from OrthoConnecitcut alleging medical neglect of █████ █████ by Mr. and Mrs. Pileggi. The anonymous medical provider reported that on 03/01/2019, █████ was seen at New Milford Hospital as █████ fell off of a table after her older sister S███ placed her on the table. █████ fell hitting her head, wrist and sustained a fracture to her left femur. The anonymous medical provider saw █████ on 03/02/2019 and reported his concern that █████ does not walk and has restricted range of motion in both of her knees. The medical provider reported that █████ has not been walking for three months and has an inflammatory condition. The medical provider provided █████ with a splint to stop the motion and █████ was in clear agony. The medical provider recommended that █████ be seen by a child orthopedic at CCMC which Mrs. Pileggi was very much against so the anonymous medical provider recommended another child orthopedic which Mrs. Pileggi stated initially she would follow up with but failed to do so. The medical provider's concern was Mrs. Pileggi's lack of follow through with recommended treatment and that █████ doesn't have any range of motion in both of her knees and that there are longer term implications if she is not treated appropriately.

24) On 03/04/2019, the Department conducted an announced home visit. The Department arrived at the Pileggi residence and was greeted at the door by S███ P███, █████'s 9 year old sister. The Department was able to engage S███ and asked how she was which she stated that she was ok but appeared to be upset. The Department inquired about what was wrong and she stated that she accidentally hurt her sister by putting her

on the counter and she fell. The Department asked if she and her sister were ok and she stated that she was just upset and did not want to talk about it. The Department noticed that █████ had a small bruise on her forehead and was wearing a cast on her leg.

Mrs. Pileggi explained that on the evening of 03/01/2019, she was making dinner and Mr. Pileggi was in the living room with █████'s siblings, M███ 1 year old and N███ 6 years old. Mrs. Pileggi stated that S█████ was spending time with █████ in the kitchen. Mrs. Pileggi stated that S█████ picked █████ up and put her on the countertop and █████ fell off the counter and fractured her femur.

Mrs. Pileggi stated that she took █████ to New Milford Emergency Room on 03/01/2019 when the incident occurred. She reported that they looked over █████ and saw the fracture and recommended that she is seen by an orthopedic. Mrs. Pileggi explained that the next day, 03/02/2019 she took █████ to OrthoConnecticut in Trumbull. Mrs. Pileggi stated that she is a patient at OrthoConnecitcut but was unable to see her doctor and instead saw Dr. Andrew Bazos. Mrs. Pileggi stated that Dr. Bazos was very rude to her and Mr. Pileggi. She reported that he would not even look them in the eyes and was accusatory in the way that he was speaking to them. She reported that she explained the situation and what had occurred with Dr. Bazos and he recommended that █████ be seen by a specialist and to return to his care after they consult with a specialist. She reported that she made an appointment with Yale New Haven Pediatric Orthopedic on 03/08/2019. Mrs. Pileggi stated that █████ was not prescribed any medication and was only told to use Tylenol for the pain. Mrs. Pileggi stated that the incident happened within seconds and that S█████ has been struggling ever since. Mrs. Pileggi explained that █████ has been getting better and was almost walking the days leading up to the incident. She stated that she had been putting her legs to the ground and trying to move. She stated that she has been trying to crawl as well which is great but this will slow her down.

Mrs. Pileggi explained that she followed up with Dr. Morse as well and wanted to ensure there is no issue with the protocol that she is on, which there was not.

25) On 03/05/2019, the Department contacted OrthoConnecticut via phone call. Orthoconnecticut reported that Mrs. Pileggi and █████ came in on 03/01/2019 due to a fall by █████. They reported that Dr. Andrew Bazos met with the family and █████ was referred to a specialist. █████ does not have a follow up with Dr. Bazos but will be following up with Dr. Ganal after her appointment with Yale New Haven Pediatric Orthopedics.

26) 03/05/2019, the Department contacted Yale New Haven Pediatric Orthopedic via phone call. The Department called to confirm that █████ had an upcoming appointment at Yale New Haven Pediatric Orthopedic. █████ had an appointment on 03/08/2019 at 11am with Nurse Practitioner Katherine Holmes in the Trumbull office.

14

27) On 03/05/2019, the Department received documentation from Danbury Hospital. The Documentation from Danbury Hospital reports that on 03/01/2019, █████ was seen at New Milford Hospital by Dr. Andrew Webber. Dr. Webber was able to x-ray █████s leg and wrist and no concerns were found on her wrist but she was diagnosed with a closed facture of left distal femur and was recommended to follow up with an orthopedist. The doctor reported that he does believe that the injury was an accident and that he did not suspect physical abuse.

28) On 03/06/2019, the Department contacted Dr. Mathias of Danbury Eye Physicians and Surgeons via phone call. The Department contacted Dr. Mathias to gather an update on █████. Dr. Mathias stated that █████ was in their office a few weeks ago and that they will be returning for a follow up appointment in a few months which is their recommendation. He stated that at this time, they are up to date and there are no recommendations regarding any following up appointments and no recommendations to see any other eye specialist. Dr. Mathias reported that he is following up to see if she has Juvenile Idiopathic Arthritis and he reported that at this point in time, there are no concerns with her eyes.

29) On 03/06/2019, the Department spoke with Dr. Bazos of OrthoConnecticut. Dr. Bazos reported that he tried to explain to Mrs. Pileggi that this is a real mechanical injury that needs to be addressed by an orthopedist. Dr. Bazos reported that the child has no range of motion in her knee and the fact that Mrs. Pileggi is treating the illness with herbal medicine is concerning. He reported that █████ should be fully mobile. Dr. Bazos reported that if this was a normal child who had a fracture, he would not have any concerns but due to the herbal route Mr. and Mrs. Pileggi are taking, he is unsure if the fracture would not have happened to a child not under these conditions.

30) 03/08/2019, the Department received a fax from OrthoConnecticut regarding the visit on 03/02/2019 confirming what was previously stated.

31) On 03/08/2019, the Department received a phone call from Yale New Haven Hospital Orthopedics, Nurse Practitioner Katharine Holmes. Nurse Practitioner Holmes reported that she had Mrs. Pileggi and █████ in her office at this time and wanted to gather some further information regarding the case. The Department was able to give her an update on the case and gave her a full breakdown of our concerns, previous doctor's concerns, and how the lack of assessment on the child is a huge concern. She reported that she would work with the family the best she could and make recommendations as needed.

32) On 03/11/2019, the Department contacted Yale New Haven Hospital Orthopedics, Nurse Practitioner Katharine Holmes. Nurse Practitioner Holmes wanted to provide the Department with an update on what occurred. She reported that she recommended Mrs. Pileggi to take █████ to Yale New Haven Hospital Emergency Department as they did not have the ability to put the cast on her due to the lack of supplies. She stated that Mrs.

Pileggi agreed to the plan and she gave the Emergency Department notice that the family would coming.

Nurse Practitioner Holmes reported that Mrs. Pileggi and ██ never arrived. She reported that they had called Mrs. Pileggi and the family decided that they would bring ██ to Bridgeport Hospital but they never arrived. Mr. and Mrs. Pileggi wanted to go to Danbury and Nurse Practitioner Holmes reported that they wanted to ensure that ██ went so they sent the police to check on the family and they are unsure if they went to the hospital at all.

Nurse Practitioner Holmes reported that Mrs. Pileggi appeared to be aggressive as to her medical treatment and reported that she believes ██ is ill and needs updated medical treatment. She reported that she has some serious concerns regarding the medical treatment that ██ is receiving and reported that it is concerning that the family is so unwilling to compromise.

33) On 03/11/2019, the Department conducted an announced home visit. Mrs. Pileggi explained when she got to Yale New Haven Orthopedics, she met with Nurse Practitioner Holmes. Mrs. Pileggi explained that Nurse Practitioner Holmes was not patient with her and automatically started to pass judgment. Mrs. Pileggi reported that Nurse Practitioner Holmes could not service her at her office and was unable to provide the cast that Nurse Practitioner Holmes wanted. Nurse Practitioner Holmes suggested that Mrs. Pileggi go to Yale New Haven Hospital Emergency Department to receive the appropriate cast. Mrs. Pileggi reported that she was not too fond of how Nurse Practitioner Holmes spoke to her and reported she wanted a second opinion.

Mrs. Pileggi reported that she contacted Danbury OrthoConnecticut to discuss alternatives. Mrs. Pileggi spoke to her orthopedist who has taken care of Mrs. Pileggi in the past. This doctor recommended Mrs. Pileggi go to Danbury Hospital to get a referral to see a referred doctor at CCMC. Mrs. Pileggi reported that she went to Danbury Hospital and received a referral to CCMC. Mrs. Pileggi reported that she went to CCMC the same day and saw Physician Assistant Kevin Fitzsimmons at CCMC.

Mrs. Pileggi reported that CCMC orthopedics was very patient with her and reported that ██ did not need a full leg cast. Mrs. Pileggi reported that they went over all the x-rays and the concern in regards to ██s leg. Mrs. Pileggi reported that she was told that ██ is in a good place at this time but would need to follow up with their doctor this week. Mrs. Pileggi reported that she will be making an appointment for some time this week. Mrs. Pileggi reported that Physician Assistant Fitzsimmons did not recommend a full cast and explained that she would be fine in a soft cast. Mrs. Pileggi reported that she plans to attend these appointments for CCMC.

16

Mrs. Pileggi reported that she feels as though the Yale New Haven Hospital doctor was trying to set her up. Mrs. Pileggi reported that she was comfortable with the current physician assistant and has no problems going for follow ups for E███. The Department asked Mrs. Pileggi if she was still going to go for the children's physical coming up this week and Mrs. Pileggi reported that she did plan on still going. Mrs. Pileggi reported her concerns being that Dr. Laughinghouse would make unnecessary recommendations when all she wants is the kids to have physicals.

Mrs. Pileggi also reported that at 11pm on Friday, after she had called Yale New Haven Hospital Orthopedics to let them know that she would not be returning to their practice, the police showed up. She stated that she had to tell the police that she canceled her appointments with Yale and they left her alone.

34) On 03/13/2019, the Department received their fourth report from an anonymous medical provider at Yale New Haven Hospital Pediatric Orthopedics alleging medical neglect of E███ P███ by Mr. and Mrs. Pileggi. The anonymous medical provider reported that E███ was seen last week for a distal femur fracture and Mrs. Pileggi delayed care as E███ was advised to go to Connecticut Children's Medical Center (CCMC) by a local orthopedist but Mrs. Pileggi has been dissatisfied with their services in the past and did not go. The anonymous medical provider reported that E███ fell off a kitchen counter after her sister placed her there. It was noted that the fracture is consistent with the explanation. The anonymous medical provider saw E███ on 03/08/2019 and advised Mrs. Pileggi that E███ would need to be seen by Yale New Haven Hospital Pediatric Emergency Department for casting but Mrs. Pileggi never showed and explained that they did not want to go to Yale New Haven Hospital Pediatric Emergency Department as they felt set up. The anonymous medical provider reported that Mrs. Pileggi is an ardent believer of naturopathic medicine and E███ is not vaccinated. Mrs. Pileggi believes that E███'s symptoms are caused by Epstein Barr virus but is not a clinically substantiated finding and rather, 8 months ago E███ was diagnosed with Juvenile Idiopathic Arthritis. E███ is being treated with Juvenile Idiopathic Arthritis personalized herbal protocol. E███ has developed atrophy in her muscles in both legs and has been non-ambulatory for 8 months and has six contractures of her hamstrings and Achilles and is now unable to straighten her legs. The anonymous medical provider reported that there is a possibility that if this condition continues to be left untreated, E███ will not be able to walk and will require surgery. On 03/11/2019, E███ was seen at CCMC for her fracture. E███ appeared to be malnourished, her hair is thinning, she is pale, and grossly underweight. E███ is on a raw and organic diet only.

35) On 03/18/2019, the Department contacted Dr. Laughinghouse. Dr. Laughinghouse reported concerns of medical neglect of E███ due to lack of follow up with her appointments. E███ was seen on 9/19/2018 as a new patient at Dr. Laughinghouse's office she came in with significant swollen knees. According to Mrs. Pileggi, E███ was seen by another pediatrician, Dr. Adler, who referred E███ to a rheumatologist. Mrs.

17

Pileggi didn't like the recommendation and switched to callers office for pediatric care. Dr. Laughinghouse reported that ███ has juvenile arthritis in her joints.

36) On 03/19/2019, the Department received a phone call from Mrs. Pileggi. Mrs. Pileggi reported that they just got done with their appointment with ███'s orthopedist. She reported that ███ is ahead of schedule and that by next week, her cast will come off. She stated that she will have a follow up in 2 weeks. She reported that after next week, they will return to the pool, gym, and do the at home therapy that Mr. Pileggi was doing. She reported that Dr. Fitzsimmons was happy with the progress. Mrs. Pileggi reported that she will be going to the physical on Thursday and will provide the Department with a release for the new doctor.

37) On 03/22/2019, the Department participated in an announced home visit. ███ was dressed appropriately and had no visible marks or bruises. ███'s knees were still visibly swollen still looking like tennis balls and on this home visit, her fingers were observed to be a bit more swollen.

Mrs. Pileggi stated that the appointment with Dr. Fitzsimmons went well and he stated that ███ is healing fine and that her soft cast can come off next week after their visit. Mrs. Pileggi stated that she took ███ and her sibling M███ to the naturopath for her physical and everything went fine. The Department asked if the new naturopath had any concerns or recommendations and Mrs. Pileggi stated that there were no concerns and no recommendations. She stated that they were seen for their physicals and that was all. The Department asked Mrs. Pileggi to collect a release for the new doctor and Mrs. Pileggi stated that she will not be signing any more releases for the Department. The Department asked Mrs. Pileggi if she could have the doctor provide her with documentation regarding the visit and Mrs. Pileggi stated that she would do that but just does not want to sign any more releases.

The Department explained to Mrs. Pileggi that they did receive progress notes from Dr. Troyer and explained that they were minimal at best. The Department was concerned over the lack of documentation that they provide to them. The Department explained that the concern is that Dr. Troyer and Dr. Morse are not providing clear progress notes regarding how ███ is doing and how/why she is getting better. Mrs. Pileggi explained that holistic medicine is simple like this and that long progress notes are not common and the Department explained that Dr. Troyer/Dr. Morse are stating that they can service ███ and provide her care but are not showing how in their progress notes. Mrs. Pileggi stated that she can get in touch with Dr. Troyer/ Dr. Morse and have them provide her with the progress notes and what is requested by the Department.

The Department then explained to Mrs. Pileggi that after being able to review the case that parents had in Torrington, there were past mentioned concerns of Mr. Pileggi using and abusing alcohol. The Department explained that with that concern being noted, the

Department would ask Mr. Pileggi to go for an evaluation. Mr. Pileggi stated that he has no concerns with drinking and does not believe this is fair and stated that this is not necessary.

The Department explained further that in reviewing their case, there have been concerns of doctors reporting concerns of Mrs. Pileggi be delusional and that in a past report, an anonymous reporter expressed concerns of Mrs. Pileggi's mental health. Mrs. Pileggi stated that this was maternal grandfather and that he has no validity to his reports. The Department explained that the way the Department would rule this out would be by Mrs. Pileggi attending a psychological evaluation which Mrs. Pileggi stated that she would not do. Mrs. Pileggi stated that she has no issues with her mental health and this would only include more people on her case. Mrs. Pileggi stated that she would not go and it is not necessary.

Mrs. Pileggi questioned why the Department continues to be involved with her family and the Department explained that the concern is not that parents are practicing an alternative form of medicine but that there are concerns expressed by doctors as well as naturopaths that the family has chosen. The Department explained that these doctors are expressing concerns that █████ may not recover fully from some of the current issues. Mrs. Pileggi explained that Dr. Morse/Dr. Troyer know what they are doing and that █████ is progressing which the Department has not been able to see this as Dr. Troyer is not providing notes that have any substance. Mrs. Pileggi explained that she would get the documents to the Department. The Department explained that Dr. Morse/ Dr. Troyer would have to attest to the progress and how █████ is doing better because there are a number of doctors who do not agree. Mrs. Pileggi understood and explained that this was only due to financial reasons and that the doctors are looking for more money and want patients to continue to come to them so they can be continuously billed. The Department explained that at this time, the concerns remain from the doctors reporting that █████ is not getting better and that parents are not following the recommendations and when a doctor has a recommendation, they leave the practice. Mrs. Pileggi stated that she does not agree with what they are saying and that these doctors do not know what they are talking about.

38) On 03/20/2019, the Department received a phone call from Dr. Zemel, Rheumatologist at CCMC. Dr. Zemel reported that he was consulted by Physician Assistant Kevin Fitzsimmons regarding █████s recent femur fracture. Per Dr. Zemel, Based on PA Fitzsimmons recent assessment, it has been determined that █████'s femur fracture is directly related to her current medical condition as lack of treatment to her arthritis has resulted in local osteoporosis. Dr. Zemel verbalized that due to Mrs. Pileggi's delusional beliefs, █████ is completely disabled and is suffering permanent damage. She is deteriorating and is showing muscle wasting in her legs as a result of lack of proper treatment for her arthritis. Dr. Zemel verbalized that █████ needs medical intervention

in order to prevent further damage and have a chance at recovery. He is willing to see child for follow-up and treatment. He is recommending hospitalization for treatment.

39) On 03/25/2019, the Department received their fifth report from an anonymous naturopathic medical provider alleging medical neglect of ▇ by Mr. and Mrs. Pileggi. The anonymous medical provider reported that she learned the information first hand from Mr. and Mrs. Pileggi. Mr. and Mrs. Pileggi came in for a well-child check for ▇ who is diagnosed with Juvenile Idiopathic Rheumatoid Arthritis which she was diagnosed with in June of 2018. The anonymous medical provider reported that ▇ should be receiving pharmaceutics treatment. The anonymous medical provider reported that Mrs. Pileggi is against traditional treatment and has refused steroid and non-steroid anti-inflammatory medication.

The anonymous medical provider is concerned as it appears that Mrs. Pileggi is attempting to "doctor hop" as she is seeing multiple doctors until she gets a doctor to sign off that ▇ is healthy. The anonymous medical provider reported that this is the worst case of Juvenile Rheumatoid Arthritis that they have worked with.

The anonymous medical provider reported that due to the medical neglect, ▇'s internal organs are getting worse. The anonymous medical provider reported that she cannot be sure as Mrs. Pileggi refused to conduct blood work and ultra sound. Mrs. Pileggi reported that she is working with a doctor in Florida, Dr. Robert Morse but the anonymous medical provider researched Dr. Morse and learned that he is not a licensed medical doctor but a herbal specialist and has ▇ on a strict diet of fruit only which the anonymous medical provider reported could be having a negative effect on the child's medical condition as she is lacking protein.

40) On 03/26/2019, the Department made a telephone call to the anonymous medical provider who made the report on 03/25/2019. The anonymous medical provider reported that on 03/21/2019, Mrs. Pileggi, Mr. Pileggi and all the children came to the doctor for a wellness check for M▇ and ▇ as parents reported that the Department wanted the kids checked. The anonymous medical provider reported that she did an intake on ▇ and noted that she could not walk and that it was the worst case of juvenile arthritis that she has ever seen. She stated that she did a physical exam of ▇ and observed her to have an enlarged liver and a mass in her stomach around her bladder which the anonymous medical provider related possibly to her diet as she is on a strict fruit and mild vegetable diet. She reported that she is taking way too many supplements and that she has not heard of a lot of them.

The anonymous medical provider reported that parents told her that she was working with Dr. Morse from Florida and she reported that she did her own research on Dr. Morse and reported that she could not find any credentials on Dr. Morse and could not find any information regarding Dr. Troyer.

20

The anonymous medical provider reported that she wanted to be able to run some tests on ███ and recommended some lab work to be done but parents refused to do any lab work. She reported that she thought the lab work was imperative for her to work with ███ so she had her medical director contact parents to go over the concerns and the importance of the tests and parents still refused. She reported that she will not work with ███ any further unless they agree to do the lab work as she will not work with a patient if she does not know what is wrong with them. She reported that parents have stated that they will not be coming back to their practice.

On 03/26/2019, the Department participated in an announced home visit. ███ was observed and had no visible marks or bruises and was dressed appropriately. ████'s knees were the same size and appeared enlarged compared to her legs. Her hands and feet appeared less swollen. The Department asked Mrs. Pileggi how everything was going and Mrs. Pileggi stated that she has gotten in touch with Dr. Morse's office and reported that Dr. Troyer was away on a personal emergency and would be back on Monday. She reported that the office staff stated that they were going to put together the documents for the Department but she was not sure how long this would take. The Department suggested to Mrs. Pileggi that she speak to them again and see if she can get the paperwork as soon as possible as it will only help the case.

The Department explained to parents that they received a new report which the Department went over and explained that it was anonymous and read the report to parents. Mr. and Mrs. Pileggi came to the conclusion that it was the naturopath that they went to late last week.

Mrs. Pileggi explained that this doctor was wrong and that she did not know what she was talking about. Mrs. Pileggi stated that ███ is getting better and these doctors do not know what they are talking about as ███ should not take any medications as it will worsen her condition.

The Department explained that this report was very concerning and that we now have 5 reports, 2 non-accept reports and a team of doctors who are reporting concerns for ███'s medical state and that there is irreversible damage that is being done. Mrs. Pileggi stated that she would never put her daughter in a position to have irreversible damage. The Department explained that concerns remain that there have been a number of doctors who have expressed alarm that their daughter is in danger of permanent damage and Mrs. Pileggi continued to try to explain how traditional medicine is killing people and how traditional doctors are scamming.

The Department pointed out that if parents believe that this report is from the doctor they recently saw, this doctor is a naturopath and Mrs. Pileggi explained that this naturopath did not know what she was talking about. The Department challenged Mrs. Pileggi and

21

explained that this cannot always be the case that the doctors do not know what they are talking about and furthermore, there is now rheumatologists, orthopedists, primary care physicians, and naturopaths who all have concerns for █████.

Mr. Pileggi asked if █████ was being treated by a traditional doctor, would they have time to work with her and asked why they do not have more time to have █████ work with Dr. Morse. The Department explained that they have yet to get something in writing from Dr. Morse's office regarding the treatment regiment, the progress, the steps, outcomes, or anything more than just a few written lines of notes. Mrs. Pileggi stated that naturopathic doctors do not take a lot of notes and SW explained that Dr. Layman, who Mr. and Mrs. Pileggi have worked with in the past, provided several lengthy notes and Mrs. Pileggi stated that Dr. Layman did not know what she was talking about and struggled when Mrs. Pileggi would challenge her.

The Department explained that █████ was on Prednisone for a short period of time and she was walking. Mrs. Pileggi argued that prednisone kills people and Mrs. Pileggi refused to give this to her daughter. Mrs. Pileggi stated that she would get the notes from Dr. Morse's office tomorrow. She stated that she would call them in the morning and tell them that she needs this immediately. As of 3/28/2019 Mrs. Pileggi has yet to produce the requested documentation from Dr. Morse/Dr. Troyer.

41) On 3/27/2019, the child protective service team at DCF participated in a conference call with DCF Legal and DCF Medical Director, Dr. Nicole Taylor. It should be noted that both RRG Nurse Ashia Velez and RRG Nursing Supervisor, Aimee Fong participated in this meeting as well to consult on the facts of this case. During this meeting, Dr. Nicole Taylor stated grave concern for █████'s medical safety and the family's ability to meet the child's needs due to her current presentation and medical status.

42) █████ is a 3 year old child who is not visible in the community. █████ is in need of immediate medical attention that Mr. and Mrs. Pileggi have failed to provide. █████'s health is continuing to deteriorate with her current course of treatment and immediate medical intervention is required to ensure that there is no irreversible damage to █████'s overall health and physical state. The Department is requesting that custody be vested in the Department of █████ to ensure that her health and safety is ensured and that she receives proper medical treatment is being implemented.


WHEREFORE, based on the aforementioned allegations, this Department believes this child is in immediate physical danger from her surroundings, and that immediate removal from such surroundings is necessary to ensure the child's safety, and further that the conditions or circumstances surrounding the care of said child requires that custody be immediately assumed to safeguard the welfare of said child.

SUBMITTED BY: _____     3/28/19
                Frank L. Rotovnik, CAC, MSW Social Worker     Date
                Department of Children and Families

SUBSCRIBED AND SWORN before me on this 28th day of March 2019.

Attest:

_____
Notary Public

        Mary E. Malone
        *Notary Public*
        My Commission Expires 1/31/21

23

# EXHIBIT B-2

 **DEPARTMENT of CHILDREN and FAMILIES** 
*Making a Difference for Children, Families and Communities*

Vannessa L. Dorantes
Commissioner Designate

Ned Lamont
Governor

**RE:** █ P█ **DOB** █ 2015

**Date: March 28, 2019**

### SOCIAL WORKER AFFIDAVIT



**Child for whom motion is filed:**

Name: E█ P█
Date of Birth: █ 2009
Address: ██████

Legal Status: N/A

**Parents:**

Mother:
Name: Katharine Pileggi
Date of Birth:
Address: ██████

Father:
Name: Anthony Pileggi
Date of Birth:
Address: ██████

I, Koren Kermashek, am a Social Work Supervisor for the Department of Children and Families at 131 West Street in Danbury, Connecticut. I am over the age of eighteen and understand and believe in the obligations of an oath. Being duly sworn, I do hereby depose and say that the following is the truth to the best of my knowledge and belief:

1. On 03/20/2019, the Department received a phone call from Dr. Zemel, Rheumatologist at CCMC. Dr. Zemel reported that he was consulted by Physician Assistant Kevin Fitzsimmons regarding █████s recent femur fracture. Per Dr. Zemel, Based on PA Fitzsimmons recent assessment, it has been determined that █████s femur fracture is directly related to her current medical condition as lack of treatment to her arthritis has resulted in local osteoporosis. Dr. Zemel verbalized that due to Mrs. Pileggi's delusional beliefs, █████ is completely disabled and is suffering permanent damage. █████ is deteriorating and is showing muscle wasting in her legs as a result of lack of proper treatment for her arthritis. Dr. Zemel verbalized that █████ needs medical intervention in order to prevent further damage and have a chance at recovery. He is recommending hospitalization for treatment.

2. On 03/25/2019, the Department received their fifth report from an anonymous medical provider alleging medical neglect of █████ by Mr. and Mrs. Pileggi. The anonymous medical provider reported that she learned the information first hand from Mr. and Mrs. Pileggi. Mr. and Mrs. Pileggi came in for a well-child check for █████ who is diagnosed with Juvenile Idiopathic Rheumatoid Arthritis which she was diagnosed with in June of 2018. The anonymous medical provider reported that █████ should be receiving pharmaceutics treatment. The anonymous medical provider reported that this is the worst case of Juvenile Rheumatoid Arthritis that they have worked with. The anonymous medical provider reported that due to the medical neglect, █████'s internal organs are getting worse.

3. On 03/26/2019, the Department made a telephone call to the anonymous medical provider who made the report on 03/25/2019. The anonymous medical provider reported that she did an intake on █████ and noted that she could not walk and that it was the worst case of juvenile arthritis that she has ever seen. She stated that she did a physical exam of █████ and observed her to have an enlarged liver and a mass in her stomach around her bladder which the anonymous medical provider related possibly to her diet as she is on a strict fruit and mild vegetable diet. She reported that she is taking way too many supplements and that she has not heard of a lot of them. The anonymous medical provider reported that she wanted to be able to run some tests on █████ and recommended some lab work to be done but parents refused to do any lab work. She reported that she thought the lab work was imperative for her to work with █████ so she had her medical director contact parents to go over the concerns and the importance of the tests and parents still refused.

4. On 03/27/19, the Department received a signed affidavit from Dr. Pamela Santapaola indicating that █████ obtain blood work "(Complete blood counth with differential, blood lipids, comprehensive metabolic panel, led, antinuclear antibody, rheumatoid factor, c-reactive proten and erythrocyte sedimentation rate) as well as wellness exam and assess autoimmune inflammatory status".

5. The Department is asking the courts to grant Department of Children and Families permission to consent to H████s medical treatment given Mr. and Mrs. Pileggi have failed to do so which have resulted in her significant, grave decline in her physical health.

WHEREFORE, based on the aforementioned allegations, this Department believes this child is in immediate physical danger from her surroundings, and that immediate removal from such surroundings is necessary to ensure the child's safety, and further that the conditions or circumstances surrounding the care of said child requires that custody be immediately assumed to safeguard the welfare of said child.

SUBMITTED BY: _____                    3/28/19
Koren Kermashek, LMSW Social Work Supervisor              Date
Department of Children and Families

SUBSCRIBED AND SWORN before me on this 28th day of March 2019.

Attest:

Notary Public

Mary E. Malone
Notary Public
My Commission Expires 7/31/21

# EXHIBIT B-3

Affidavit

In Re: E████ P████

Date: March 27, 2019

I am, Pamela Santapaola, ND a licensed naturopathic physician in the state of Connecticut. I practice at Healing Duo Integrative Family Medical Practice, LLC located at 129 Kings Highway North in Westport, Connecticut.

I am over the age of eighteen and understand and believe in the obligations of an oath,

Being duly sworn, I do hereby depose and say that the following is the truth to the best of my knowledge and belief:

Childs name: E████ P████

Parents Name: Katharine Pileggi and Anthony Pileggi

On March 21, 2019, I met with the family (Katharine, Anthony, E████, M████, two other siblings) at Healing Duo Integrative Family Medical Practice in Westport, CT regarding E████ P████. E████ was scheduled for a wellness exam. Emma presented with a previous diagnosis of Juvenile Idiopathic Rheumatoid Arthritis, diagnosed in June of 2018. Katharine Pileggi state that E████ was already being treated for her condition by Dr. Robert Morse (Katharine reports E████ being on specific herbal protocol), and was not seeking any medical treatment by any other practitioners at this time. The child was in no acute distress, however, was unable to ambulate on her own, being carried around by parents. The child also presented with a soft-cast on left leg due to previous femur fracture that the parents reported occurred two weeks prior, as a result of sibling accidentally dropping child. The patient appeared slightly underweight (the patient presented on 4th percentile on the growth chart by weight). Katharine reports that E████ eats table food, three meals per day. E████ follows a vegan diet, primarily consisting of fruits and some vegetables. Katharine reports that based on Dr. Morse's protocol, E████ is only allowed to eat foods that are categorized as alkaline and must avoid foods that are categorized as acidic.

E████ was interactive and happy. The patient was attempting and wanted to stand on her own. Father held patient while she tried to stand. The child also wanted to have a snack because she was hungry. Family dynamic appears cohesive: both mother and father were caring for E████ as well as her siblings during the visit. All siblings (three) were happy and playful during the office visit.

Upon physician exam there was the presence of swelling in joints: proximal interphalangeal joints and distal interphalangeal joints of the first, third, fourth, and fifth phalanges of the right and left hand, right and left knee. Limited range of motion was also noted bilaterally in knee joints. All swollen joints were grossly warm to touch. Hepatomegaly (enlarged liver) and a hard, non-tender mass was noted in the hypogastrium area of the abdomen. All other aspects of physical exam were unremarkable: head, eyes, ears, nose, throat, neck, lungs, cardiovascular, female genitalia, skin.

My recommendations for E████ were to obtain blood work (complete blood count with differential, blood lipids, comprehensive metabolic panel, lead, antinuclear antibody, rheumatoid factor, c-reactive protein, and erythrocyte sedimentation rate) to complete wellness exam and assess autoimmune and inflammatory status. Ultrasonography was also ordered of abdomen and pelvis to rule out extra-articular involvement. Dietary changes

focusing on macronutrients (carbohydrate, fats, and proteins) were also recommended. Parents (Katharine and Anthony) refused to complete blood work, ultrasonography and reported they would not modify █████'s diet. I also notified parents that I could not be the child's pediatrician according to the state laws in CT and made recommendations of pediatricians.

Based upon my medical opinion this child may suffer from irreversible damage or injury if left untreated by conventional means.

THE AFFIANT:

[Signature]

SUBSCRIBED AND SWORN TO before me on this _27th_ day of March, 2019

Attest: [signature]

Notary Public's Signature

My Commission Expires: MARCH 27, 2019

O'DONNA-HUE W. OSBOURNE
Notary Public, State of New York
Registration #01OS6262368
Qualified in Westchester County
Commission Expires May 21, 2020

# EXHIBIT B-4

In Re: █████ █████
Date: March 27, 2019

## AFFIDAVIT

I, Kevin Fitzsimmons, orthopedic physician assistant at Connecticut Children's Medical Center in Hartford, Connecticut, am over the age of eighteen and understand and believe in the obligations of an oath. Being duly sworn, I do hereby depose and say that the following is the truth to the best of my knowledge and belief:

Child who is subject of this affidavit



█████ █████ (name)

████ 2015 (DOB)

████████ (address)

██████████

Katherine Pileggi (parent's name)

████████ (parent's address)

██████████

[The next statements should indicate in numbered paragraph form the affiant's personal knowledge about the case. Be as specific as possible, use dates where appropriate, and include all relevant information.]

1. Brief paragraph describing expertise of the affiant.
    I have been a pediatric orthopedic physician assistant at Connecticut Children's Medical Center for 7 years. I treat patients in our outpatient clinics, take orthopedic trauma call, manage inpatient orthopedic patients, and assist with the orthopedic surgeons in the operating room

2. When, where, and how the child came to be treated by the affiant.

On Saturday, 3/9/19, I met █████ and her family while I was on call. On 3/1/19 █████ sustained a left distal femur fracture after being dropped by a family member. █████ was diagnosed with juvenile idiopathic arthritis (JIA), and is non-ambulatory secondary to her chronic knee effusions and JIA., █████ was seen at New Milford Hospital, was splinted and instructed to follow-up with Yale Pediatric orthopedics. She followed up with Yale pediatric orthopedics on 3/8/19. As reported by the family, they were instructed to be seen in Yale's Emergency Department for spica cast application. It was reported that the family did not follow the recommendation to take █████ to Yale's Emergency Department. It was reported that Yale contacted DCF, and were instructed to be seen at another facility. On 3/9/2019, █████ was seen in the Emergency Department at Connecticut Children's with a long leg splint in place. X-ray imaging obtained, and a new long leg splint was placed. The patient and family were instructed to follow up in 1 week with orthopedics.

3. Relevant medical history of the child. █████ initially presented to CT Children's Medical Center in June 2018, when they sought care for her bilateral knee effusions and inability to ambulate with Dr. Lawrence Zemel, in the Department of Rheumatology. She was diagnosed with juvenile idiopathic arthritis (JIA) and it was documented that █████ did not follow-up or initiate the care-plan prescribed by Dr. Zemel. On 3/9/19, during █████'s evaluation at Connecticut Children's Emergency Department, █████'s mother informed this writer, that they were continuing care for █████'s juvenile arthritis diagnosis with a local naturopathic physician. She reported an improvement in █████'s symptoms, however, stated she had been non-ambulatory since the symptoms and knee swelling began around age 8 months.

4. Current medical condition and diagnosis. Be specific, but also describe the condition in lay terms so others can understand the situation. Due to █████ being non-ambulatory for nearly 2 years, not walking under her own power, the lower extremity bones become osteopenic, or lose the ability to form new bone and become more fragile. The type of injury she sustained due to the decreased bone density from not walking from untreated juvenile idiopathic arthritis is called an

insufficiency fracture. This type of insufficiency fracture is seen more commonly in patient that are non-ambulatory, and/or wheelchair bound. E█████ sustained a mildly angulated left distal femoral insufficiency buckle fracture. The treatment for this is splinting for 3-4 weeks, then once adequate healing has occurred the splint may be removed around that time. Many times casting is not necessary as the patients do not walk or put the fracture at risk of further displacement. I saw E█████ on 3/19/19 for follow-up of the distal femur fracture which did show early bony callus formation, she had no pain and was reportedly sleeping well and without issue at that time. I instructed that they continue splinting for comfort for 1-2 more weeks, and that the splint could be removed and reapplied for bathing or changing clothes. They have a follow-up appointment to see me for the femur fracture on 4/16/19 which is acceptable follow-up based on this type of injury.

5. If child abuse is suspected, include a statement that the injury is most likely non-accidental and not self-inflicted. Also, if the reason for suspecting abuse is that the parents' statements are at a variance with the nature of the injury, state this. I do not suspect child abuse at this time, but medical neglect.

6. Factors impacting parent's ability to provide care (religious objections, incompetence, incapacitation). I do not know of any religious objections to medical treatment. There does not appear to be any cognitive barriers to understanding the necessity for the medical interventions prescribed.

THE AFFIANT:

_____ (signature)

Kevin Fitzsimmons (name)

SUBSCRIBED AND SWORN TO before me on this 28ᵗʰ day of March, 20 19.

_____ (signature of Notary Public)

TRACIE L. KAVANAGH
NOTARY PUBLIC
State of Connecticut
My Commission Expires
April 30, 2022

_____ (my commission expires)

Exhibit C

**STATE OF CONNECTICUT**
**DEPARTMENT OF CHILDREN AND FAMILIES**
**ADMINISTRATIVE HEARINGS UNIT**
**505 HUDSON STREET**
**HARTFORD, CT 06106**

**<u>Final Decision</u>**

<u>Substantiation Hearing</u>

RE:                                       **Katharine and Anthony P.**
                                          **LINK # 385605**

HEARING DATES:             November 18, and December 14, 2020 and January 8, 2021

HEARING OFFICER:          Attorney Robin D. O'Shea

PARTIES:                           Katharine P., Appellant
                                          Anthony P., Appellant
                                          Frank Rotovnik, Investigator

REPRESENTATIVES:         Attorney Lisa Vincent, for the Appellants
                                          Attorney Amy Klein, for the Department

DATE OF DECISION:        January 28, 2021

I.       <u>Introduction</u>

A Substantiation Hearing for an investigation completed by the Danbury DCF Area Office was held via Microsoft Teams on November 18, 2020, December 14, 2020 and January 8, 2021, at the Appellants' request. At issue in the hearing was the Department's decision to substantiate the Appellants for physical, emotional and medical neglect of their daughter, Emma, following a report to the Department on December 26, 2019. In addition, the Department also recommended that the Appellants' names be placed on the Central Registry of Persons Responsible for Child Abuse and Neglect. **HELD: The Department's decisions to substantiate the Appellants for emotional neglect and to recommend Registry placement are not supported by the record and are REVERSED. The Department's decisions to substantiate the Appellants for physical and medical neglect are supported by the record and are UPHELD.**

II.      <u>Documents Entered onto the Record</u>

Exhibit #1       Request for Substantiation Hearing, September 28, 2020.
Exhibit #2       Notice of Substantiation Hearing, October 20, 2020.
Exhibit #3       DCF Investigation Protocol, April 15, 2019.
Exhibit #4       Notice of Rescheduled Substantiation Hearing, October 22, 2020.
Exhibit #5       Nine photographs of Emma
Exhibit #6       Text message from Anthony P., August 27, 2019.
Exhibit #7       none



PLAINTIFF'S
EXHIBIT
Zemel 2
KN 7/25/2025

PENGAD 800-631-6989

Anthony and Katharine P. Substantiation Hearing Decision
January 28, 2021
Page 2

Exhibit #8      Florida Department of Health Article, August 6th.
Exhibit #9      Affidavit of Frank Rotovnik, March 28, 2019.
Exhibit #10     Affidavit of Pamela Santapaola, March 27, 2019.
Exhibit #11     Affidavit of Kevin Fitzsimmons, March 27, 2019[1].
Exhibit #12     Notice of Continuation and Ruling on Proposed Exhibit, November 19, 2020.
Exhibit #13     Multidisciplinary Examination report, April 26, 2019.

III.     Findings of Fact and Conclusions of Law

1.  The Appellants are the married parents of four children, Savannah, who was born in April 2009, Noah, who was born in September 2012, Emma, who was born in September 2015, and Mairin, who was born in April 2017.
2.  The Appellants' family experienced two health crises that led to their decision to pursue naturopathic and homeopathic medicine and a healthy plant-based diet. The Appellant Katharine was bedridden with Lyme disease and the Epstein Barr virus, and Noah had an episode of apnea immediately following vaccination at age three months.
3.  Emma was a healthy child until June 2018. Following a family hike, the Appellants found a tick on Emma. Emma began showing symptoms consistent with Lyme disease almost immediately, and the family took her to see her pediatrician, Dr. Alder. The pediatrician ordered blood work and quickly referred Emma to Connecticut Children's Medical Center ("CCMC"). Based on the results of the bloodwork, Emma was diagnosed with Juvenile Idiopathic Rheumatoid Arthritis by CCMC pediatric rheumatologist, Dr. Zemel.
4.  The Appellants disagreed with Dr. Zemel's diagnosis and urged him to test for Lyme. Dr. Zemel was confident with his diagnosis and laid out his treatment plan for Emma's arthritis.
5.  The Appellants declined Dr. Zemel's treatment and sought the services of a naturopathic physician, Katherine Layman to treat Emma for Lyme disease and not arthritis.
6.  Dr. Alder concurred with Dr. Zemel's diagnosis and opined that failure to treat Emma's arthritis as such was medically neglectful and could have long term repercussions.
7.  Emma was walking at this time.
8.  Dr. Zemel phoned in a report of suspected medical neglect on July 3, 2018 because the Appellants refused his treatment for their daughter.
9.  The July 2018 report was investigated by the Department's Torrington Area Office. During that investigation, the Department learned that the Appellants were very involved in their daughter's treatment and were following the recommendations made by Emma's naturopathic physician, Katherine Layman. Emma's symptoms had improved, and the doctor had no concerns for abuse or neglect. At the time of this investigation, the Appellants had also enrolled Emma in water therapy and other holistic treatment modalities to improve her mobility. The case was closed.
10. Dr. Layman was treating Emma for Lyme and was not Emma's pediatrician. The parents enlisted Dr. Diane Lopusny for pediatric care.
11. Emma stopped walking in August or September 2018.

---

[1] Exhibits 10 and 11 were admitted for the limited purpose of demonstrating the rationale for the Department's position.

**Anthony and Katharine P. Substantiation Hearing Decision**
**January 28, 2021**
**Page 3**

12. The parents sought the assistance of APRN Lindsey Laughinghouse who prescribed liquid prednisone for Emma at around this same time. Emma's condition improved with the use of steroids; however, Emma was tapered off of the steroids and discontinued visits with APRN Laughinghouse's practice after three visits.

13. The parents engaged the services of "Dr. Morse's Herbal Health Club" in Florida in the fall of 2018. They tapered Emma off the steroid to begin the club's detox protocol of herbal supplements and skype sessions with the family.

14. "Dr. Morse" is Robert Morse of Port Charlotte Florida. Mr. Morse is not a licensed physician and has been repeatedly cited by the Florida Department of Health for the unlawful practice of medicine. Although the Appellant Katharine researched Mr. Morse, she was not aware of his deceptive history of holding himself out as a doctor.

15. Mr. Morse was also affiliated with the International School of Detox. The Appellant Katharine enrolled in the school's holistic medicine program.

16. Marci Troyer is affiliated with the health club and also worked with the family. Ms. Troyer and Mr. Morse agreed that Emma did not need to be seen in person and that they would be able to see all that they needed to know through bi-weekly skype sessions and the family's observations of Emma's progress.

17. The Appellant Katharine believed that Marci Troyer practiced Iridology, which is the practice of observing the characteristics of one's eyes to determine a patient's overall health.

18. Emma was able to bear some weight on her legs during her treatment with the health club's protocol and the parents observed improvement in her appetite and mobility.

19. On Christmas day, 2018, the parents had a family fight with the maternal grandfather. The grandfather was asked to leave the home and the Appellants informed him that his contact with his grandchildren would be limited due to his behavior. The following day, the Department received an anonymous report of suspected neglect of Emma.

20. The parents believe that this report was initiated by the grandfather in retaliation from the prior day's events.

21. On January 28, 2019, the maternal grandfather filed a report of neglect with concerns for the mother's mental health and erratic behavior and Emma's physical health.

22. On March 1, 2019, Savannah placed Emma on a counter while Savannah prepared a snack for Emma. Emma fell off the counter and was injured. The mother called the father at work and he came home to take Emma to the hospital. Emma had a fracture of her left femur which was consistent with the explanation for the injury.

23. On March 2, 2019, Emma was seen for follow up on the broken leg and the physician filed a report of suspected neglect on March 4, because Emma had not been walking for three months and had restricted range of motion in both knees. The provider recommended follow up at CCMC and the Appellant Katharine refused.

24. The Appellants brought Emma to Yale on March 8, 2019 and CCMC on March 9th.

25. Yale and CCMC both filed reports of suspected medical neglect due to Emma's condition (that she was not able to walk) and lack of follow through by her parents to address her illness.

26. The CCMC Orthopedic Physician Assistant, Kevin Fitzsimmons, filed an affidavit, dated March 27, 2019. According to this document, Mr. Fitzsimmons was under the mistaken impression that Emma had not

Anthony and Katharine P. Substantiation Hearing Decision
January 28, 2021
Page 4

walked for two years.  He opined that fractures of this nature are more common in non-ambulatory patients, and wrote:

> Due to Emma being non-ambulatory for nearly two years, not walking under her own power, the lower extremity bones become osteopenic, or lose the ability to form new bone and become more fragile. The type of injury she sustained due to the decreased bone density from not walking from untreated juvenile idiopathic arthritis is called an insufficiency fracture. (Exhibit #11.)

27. At the Department's insistence, all four of the Appellant's children were seen by physicians for well child checkups in March 2019.  The parents took Emma to see Dr. Pamela Santapaola, a naturopathic physician.  Dr. Santapaola observed that Emma was unable to walk.  She also assessed an enlarged liver and a mass in her stomach around Emma's bladder that the physician believed was related to Emma's diet.  Dr. Santapaola was not familiar with some of the supplements being prescribed by the health club.  Dr. Santapaola was aware that Emma was diagnosed with Juvenile Arthritis and said that Emma's case was the worst case of arthritis she had ever seen.

28. Dr. Santapaola recommended lab work and additional testing to include an ultrasound of Emma's abdomen and pelvis.  Dr. Santapaola also recommended dietary changes and asked her own medical director to speak with the parents to stress the importance of the tests.  The parents refused the recommendations and declined to work with the practice.

29. During the spring of 2019, the Department had releases to speak with the health club and attempted to get the club to provide Mr. Morse's (the Department and the Appellants were all under the impression still that Morse was an actual physician) progress notes and treatment plan.  Notes provided by the office were minimal and contained little useful information about Emma's condition or the practice's treatment of her.

30. The investigator attempted to confirm Morse's licensure with Florida and was unable to determine his credentials.  This information was shared with the Appellants who were confident in his abilities due to his work with people around the world.

31. The Department continued to suggest follow up for Emma with a Connecticut based physician.  The parents offered to take Emma to Florida so that she could be seen in Morse's office.

32. The Appellant Katharine and Emma flew to Florida and went to the health club office without an appointment on March 28, 2019. Prior to flying to Florida, Emma was seen in the orthopedist's office and was cleared to fly.

33. The Department filed a motion for an Order of Temporary Custody of Emma that was granted on March 28, 2019.  Florida child protective services and sheriffs were contacted and located the mother and Emma.  Emma was taken into custody and brought to the hospital.

34. Photographs taken of Emma at the time of her removal show significant swelling in her joints, particularly her right knee, wrists and knuckles.

35. The Department's investigator flew Emma back to Connecticut and Emma was immediately admitted into CCMC for care.

36. Emma remained hospitalized for about two weeks.  She had to wear braces on her legs to help straighten them.

Anthony and Katharine P. Substantiation Hearing Decision
January 28, 2021
Page 5

37. Emma was allowed to eat any type of food she wanted while she was in the hospital, including foods that are known to contribute to inflammation, such as dairy and wheat.

38. Emma was placed into foster care from the hospital. She was reunified into her father's care. The Appellant Anthony has sole medical decision making authority over Emma's care and is court ordered to comply with CCMC's follow up care for Emma's arthritis.

39. The Appellants continue to question Emma's diagnosis of arthritis; however, they are compliant with her treatment and she is doing well.

40. The Appellants were always appropriate and loving in their interactions with their daughter. As soon as they were permitted to visit her in the hospital, they did so regularly and with enthusiasm in their support of her full recovery.

41. On August 27, 2019, the Appellant Anthony texted the investigator after a phone call with Dr. Zemel. The Appellant thanked the investigator for "waking [him] up."


IV.    Applicable Law/Regulation and Policy

Substantiation and Central Registry Hearings conducted by the Department of Children and Families are held in accordance with state statutes (Conn. Gen. Stat. §§17a-101k, 46b-120 and 53a-18), state regulations (Regulations of Connecticut State Agencies §17a-101k-(1-16)), and Department Policy (6-5, 22-3 and 22-4). Copies of the relevant sections of these documents are available upon request through the Administrative Hearings Unit or may be accessed through the Department's website: www.ct.gov/dcf

V.    Decision

    A.    Medical neglect

The Department substantiated the Appellant's for medical neglect of their daughter after her physical condition deteriorated over months leading to the child's inability to walk, bear weight or straighten her legs. In order to confirm an allegation of medical neglect, the Department must establish that (1) the Appellants are persons responsible for the child's health, welfare, or care; or are persons given access to the child by a person responsible, or are persons entrusted with the care of the child; and (2) the Appellants unreasonably delayed, refused or failed to seek, obtain and or maintain those services necessary for medical, dental, or mental health care when the Appellant knew or should reasonably be expected to have known that such actions may have an adverse impact on the child. DCF Policy 22-3   The Appellants are Emma's mother and father. As such, they meet the definition of persons responsible for Emma's health, welfare or care and are subject to the Department's jurisdiction.

The record reflects that Emma became very ill in the early summer of 2018. The parents firmly believe that her illness was spurred by a tick bite and that her symptoms were consistent with Lyme Disease. They immediately sought treatment for their daughter from her pediatrician who took blood work which suggested Juvenile Idiopathic Rheumatoid Arthritis, and not Lyme. The pediatrician referred them to CCMC for a consultation with Dr. Zemel, a pediatric rheumatologist, who confirmed the arthritis diagnosis based on Dr.

Anthony and Katharine P. Substantiation Hearing Decision
January 28, 2021
Page 6

Alder's bloodwork. The Appellants, who had prior experience with the mother's Lyme diagnosis, did not agree with the arthritis diagnosis and sought treatment elsewhere from a naturopath who had expertise in Lyme. This physician, Dr. Layman, agreed to work with them and began treating Emma's symptoms which were also consistent with Lyme. The parents also went so far as to agree to a brief course of liquid steroids from APRN Laughinghouse to address Emma's pain and swelling. However, the Appellants, after some research, decided to treat their daughter holistically with an herbal protocol prescribed by Dr. Morse's Herbal Health Club in Florida, and discontinued any other traditional or naturopathic care for their daughter. The treatment prescribed by the Health Club was a rigid dietary and supplement protocol without any required in-person assessment of the child or her physical condition by a medially trained professional. Mr. Morse and Ms. Moyer relied on the parents' evaluation of Emma's progress and readings of Emma's eyes during bi-weekly skype sessions. Although the parents believed (wanted to believe) that this treatment was effective, the fact of the matter was that Emma was unable to walk for months, and the out of state providers chosen by the family could offer no empirical evidence of any clear plan or goals for treatment or any measurement for success.

There can be no doubt that the Appellant parents were conned and victimized by a pathological scam artist and his protégée. However, during this same period, at the insistence of the Department, the Appellants also brought their daughter to see a naturopathic physician, Dr. Santapaola, for assessment. Dr. Santapaola was alarmed by Emma's condition and made several recommendations based on her direct observations and medical evaluation of the child, which the parents flatly rejected. Their resistance to any sort of combination of treatment modalities, or even a recognition that Emma's symptoms, which then included a mass in her abdomen and an enlarged liver, might be signs of deterioration, denied Emma appropriate medical care for her illness. Dr. Santapaola's evaluation and her medical director's education should have made it abundantly clear to the Appellant's that a new or additional course(s) of treatment was prudent. Unfortunately, the Appellants held firm to their belief in the abilities of the health club providers and this failure to follow medical recommendations supports the Department's decision to substantiate the Appellants for medical neglect of Emma.

   B.  Physical neglect

The Department also substantiated the Appellants for physical neglect of Emma. In order to confirm an allegation of physical neglect, the Department must establish that the Appellants failed to provide and maintain adequate food, clothing, supervision, and/or safety for the child; and the failure resulted in an adverse physical impact on the child unless the act was a single incident that demonstrated a serious disregard for the child's welfare. DCF Policy 22-3

The Appellants' decision to remove Emma from a local practice that would be able to conduct in person assessments of Emma's very serious condition was a denial of proper care and attention that had a devastating impact on the child. The record reflects that Emma was still walking when Dr. Zemel consulted with the family in May or June 2018, and that Emma responded well to treatment from Drs. Layman and Laughinghouse shortly thereafter. However, the parents stopped these treatments in the fall of 2018 and Emma's condition clearly deteriorated. By March 2019, Dr. Santapaola determined that Emma's was the

Anthony and Katharine P. Substantiation Hearing Decision
January 28, 2021
Page 7

worst case of juvenile arthritis she had ever seen. In addition to swelling in her joints and the inability to walk, Emma's liver was enlarged, and she had developed a mass in her abdomen. Ultimately, Emma had to wear braces on her legs to straighten them after months of disuse and inflammation. While it is true that the Appellants sought additional treatments, including acupressure, Reiki and aquatics in addition to the herbal protocol, these other therapies only managed Emma's symptoms and did not treat the underlying diagnosis of either Lyme or juvenile arthritis. They may have had some impact on Emma's overall functioning, and there may have been some relief some of her symptoms on some days, but Emma did not begin to actually recuperate until she was removed from the Appellants' care and hospitalized with genuine treatment for her condition(s). The allegation of physical neglect is upheld due to a denial of proper care that led to an adverse impact on Emma's physical health.

C. Emotional neglect

The Department also substantiated the Appellants for emotional neglect of Emma. In order to confirm an allegation of emotional neglect, the Department must establish that the Appellants denied the child proper care and attention emotionally or failed to respond to a child's affective needs which had an adverse impact on the child or seriously interfered with his positive emotional development. An adverse impact is not necessary if the behavior was so egregious it demonstrated a serious disregard for the child's welfare. DCF Policy 22-3

The Department has not established that the Appellant's emotionally neglected their daughter. The record reveals that these parents were very connected to their children emotionally. During home visits, Department staff observed the parents attending to their children individually and collectively. Emma was frequently in someone's arms, and her parents were observed massaging and working on her legs while they held her. Emma was clearly nurtured and loved by the Appellants throughout her ordeal. The Appellants exercised very poor judgment in their blind acceptance of Morse's abilities, and this had a catastrophic effect on Emma's physical well-being. However, the evidence simply does not support a finding that the Appellants denied their daughter proper emotional care and therefore, the allegation of emotional neglect must be reversed.

D. Central Registry

Connecticut General Statutes require the Department to make a separate finding as to whether or not a person responsible for child abuse or neglect poses a risk to children, and if so, whether or not the person's name should be placed on the Department's Central Registry. In making this determination, the Department must consider the intent of the perpetrator, the severity of the conduct, chronicity or pattern of behavior and the presence of substance abuse or domestic violence. See DCF Policy 34-2-8 The Registry determination sets forth important public policy goals of protecting children from caregivers who might cause them harm.

In addressing intent, the Department examines whether there is reason to believe the perpetrator had sufficient knowledge and resources, the ability to utilize them and an understanding of the implications for failing to provide appropriate care, but made a conscious decision not to do so. Id. The Appellants did not intend to cause harm to their daughter, nor did they intend to neglect her medical and physical needs. This

**Anthony and Katharine P. Substantiation Hearing Decision**
**January 28, 2021**
**Page 8**

was not a situation where the parents simply disregarded their daughter's well-being.  Far from it.  These parents intended to treat their daughter's illness in a manner that would not cause further harm. Unfortunately, their efforts were misguided by prior bad experiences with western medicine and their beliefs that Emma's illness was amenable to nontraditional treatment remedies, a belief that was cultivated by a con artist.

When considering the severity of the Appellant's actions, the Department must determine if there was a serious adverse impact to the victim, or a serious disregard for the children's welfare.  *Id.* There is no doubt that the neglect involved in the Appellants' failure to secure appropriate treatment for their daughter had a serious adverse impact on Emma's condition. It is also clear that the neglect of her medical condition was chronic for a period of several months, particularly from November 2018 until the end of March 2019. However, the undersigned does not accept the Department's argument that this somehow translates to the Appellants' inability to appropriately care for their friends' children, chaperone a school field trip or lead a scout troop.  The Appellants made a serious mistake, which was acknowledged in the Appellant father's August 2019 text message to the investigator. This mistake was an error in judgment.  It was not brought about by substance abuse, family violence or a lack of concern for their child.  The parents did not fail to act, they just chose the wrong path. This does not mean that they pose a danger to children in the future or that other children need to be protected from them.  For these reasons, the Department's decision to place the Appellants' names on the Central Registry is not supported by the evidence and is reversed.

VI.    Right to Appeal

The right to appeal the final decision in this matter is governed by Connecticut General Statutes, section 4-183.


Robin D. O'Shea
_____
Robin D. O'Shea
Staff Attorney 3

**Anthony and Katharine P. Substantiation Hearing Decision**
**January 28, 2021**
**Page 9**


Copy:

Attorney Lisa Vincent, Certified Mail
Attorney Amy Klein
Frank Rotovnik, Investigator
Koren Kermashek, Supervisor
Jennifer Birden, Program Supervisor
Kelly McVey, Area Director
Charlotte Shea, Assistant Agency Legal Director
Zoe Stout, Assistant Agency Legal Director
Katherine Dwyer, Assistant Agency Legal Director
Maureen Duggan, Agency Legal Director
Gary Kleeblatt, Communications Director
Training Academy
Careline
File

Exhibit D



# State of Connecticut Judicial Branch
# Superior Court Case Look-up



Superior Court Case Look-up
Civil/Family
Housing
Small Claims

*e* **LLI-FA24-6035829-S**

**PILEGGI, KATHARINE v. PILEGGI, ANTHONY**

Prefix/Suffix:
[none]

**Case Type: F00  File Date: 02/22/2024  Return Date: 03/19/2024**

Attorney/Firm Juris Number Look-up 🖵 | Case Detail | Notices | History | Scheduled Court Dates | E-Services Login | Screen Section Help ▶

To receive an email when there is activity on this case, click here. 🖵

Case Look-up
   By Party Name
   By Docket Number
   By Attorney/Firm Juris Number
   By Property Address

Short Calendar Look-up
   By Court Location
   By Attorney/Firm Juris Number
   Motion to Seal or Close
   Calendar Notices

Court Events Look-up
   By Date
   By Docket Number
   By Attorney/Firm Juris Number

Legal Notices

Pending Foreclosure Sales 🖵

Understanding
Display of Case Information

Contact Us



**Comments**

Information Updated as of: 12/30/2025

## Case Information

**Case Type:** F00 - Family - Dissolution of Marriage - C.G.S. Chapter 815j
**Court Location:** LITCHFIELD JD
**Financial Disputes:** No
**Parenting Disputes:** No
**RFTD Referral:** No
**RFTD Accepted:** No
**Last Action Date:** 05/30/2024  (Last Action Date is a data entry date, not actual date)

## Disposition Information

**Disposition Date:** 05/07/2024
**Disposition:** JUDGMENT OF UNCONTESTED DISSOLUTION
**Judge or Magistrate:** HON ANN LYNCH

### Party/Appearance/ IV-D Authorized Filer Information

| Party | Party Details | | No Fee Party | Category |
|---|---|---|---|---|
| P-01 | KATHARINE PILEGGI<br>Non-Appearing | | | Plaintiff |
| D-01 | ANTHONY PILEGGI<br>Self-Rep: 107 SHIRE DRIVE<br>SUMMERVILLE, SC 29486 | File Date: 02/22/2024 | | Defendant |

**Viewing Documents on Family Cases:**

- Documents, court orders and judicial notices in electronic (paperless) family cases are not available publicly over the internet.*

- Documents, court orders and judicial notices in paper family files can be viewed at the Clerk's Office in the Judicial District where the case is located during normal business hours*

- If there is an *e* in front of the docket number of a case, the court file for that case is electronic (paperless). Documents and court orders in electronic (paperless) family cases can be viewed at public access computers in any judicial district courthouse during normal business hours.*

*Any documents protected by law or by court order that are not open to the public cannot be viewed by the public online and can only be viewed in person at the clerk's office where the file is located by those authorized by law or court order to see them

Motions / Pleadings / Documents / Case Status

| Entry No | File Date | Filed By | Description |
|---|---|---|---|
| | 02/22/2024 | P | SUMMONS |
| | 02/22/2024 | P | COMPLAINT |
| | 02/22/2024 | P | NOTICE OF AUTOMATIC COURT ORDERS |
| | 02/22/2024 | | APPEARANCE |
| 100.30 | 02/22/2024 | P | CERTIFICATION - PUBLIC ASSISTANCE |
| 100.31 | 02/22/2024 | P | BLANK APPEARANCE SERVED WITH COMPLAINT IN ACCORDANCE WITH PA 18-14 |
| 101.00 | 02/22/2024 | P | CERTIFICATION OF WAIVER OF SERVICE OF PROCESS - DISSOLUTION, LEGAL SEPARATION, OR ANNULMENT |
| 102.00 | 03/19/2024 | P | CASEFLOW REQUEST - FAMILY MATTERS (FORM JD-FM-292) |
| 102.10 | 03/19/2024 | C | ORDER<br>*RESULT* Granted 3/19/2024 HON ANDREW RORABACK |
| 103.00 | 04/17/2024 | P | CASEFLOW REQUEST - FAMILY MATTERS (FORM JD-FM-292)<br>*RESULT*. Granted 4/17/2024 HON ANDREW RORABACK |
| 104.00 | 04/19/2024 | P | MOTION TO WAIVE STATUTORY TIME PERIOD BY AGREEMENT OF THE PARTIES - DIVORCE OR LEGAL SEPARATION |
| 105.00 | 04/19/2024 | P | SEPARATION AGREEMENT |
| 106.00 | 04/19/2024 | P | REQUEST FOR APPROVAL OF FINAL AGREEMENT WITHOUT COURT APPEARANCE (FORM JD-FM-282)<br>*RESULT*· Granted 5/6/2024 HON ANN LYNCH<br>**Last Updated:** Result Information - 05/30/2024 |
| 107.00 | 04/19/2024 | P | AFFIDAVIT IN SUPPORT OF REQ FOR ENTRY OF JUDGMENT OF DISS OF MARRIAGE OR LEGAL SEP (FORM JD-FM-281) |
| 108.00 | 04/19/2024 | P | FINANCIAL AFFIDAVIT JD-FM-6-LONG |
| 109.00 | 04/19/2024 | P | AFFIDAVIT CONCERNING CHILDREN |
| 110.00 | 04/19/2024 | P | ADVISEMENT OF RIGHTS REGARDING INCOME WITHHOLDING |
| 111.00 | 04/19/2024 | D | FINANCIAL AFFIDAVIT JD-FM-6-LONG |
| 112.00 | 04/19/2024 | D | AFFIDAVIT IN SUPPORT OF REQ FOR ENTRY OF JUDGMENT OF DISS OF MARRIAGE OR LEGAL SEP (FORM JD-FM-281) |
| 113.00 | 04/25/2024 | C | ORDER<br>*RESULT*· Order 4/25/2024 HON ANN LYNCH |
| 114 00 | 04/26/2024 | P | WORKSHEET FOR THE CONNECTICUT CHILD SUPPORT AND ARREARAGE GUIDELINES CCSG-1 |
| 115.00 | 05/06/2024 | D | CERTIFICATION TO COURT OF PARENTING EDUCATION PROGRAM RESULTS BY FAM DIV CGS SEC. 46b-69b(c) |
| 116.00 | 05/06/2024 | P | CERTIFICATION TO COURT OF PARENTING EDUCATION PROGRAM RESULTS BY FAM DIV CGS SEC. 46b-69b(c) |
| 117.00 | 05/06/2024 | C | ORDER<br>*RESULT*. Order 5/6/2024 HON ANN LYNCH |
| 118.00 | 05/07/2024 | C | JUDGMENT OF UNCONTESTED DISSOLUTION<br>*RESULT*. HON ANN LYNCH |
| 119.00 | 05/14/2024 | C | JUDGMENT FILE<br>Agreement dated 4/19/2024 incorporated by reference |
| 120.39 | 11/04/2024 | C | ATTORNEY APPEARANCE(S) AUTOWITHDRAWN PB 3-9 |

| Scheduled Court Dates as of 12/29/2025 | | | | |
|---|---|---|---|---|
| LLI-FA24-6035829-S - **PILEGGI, KATHARINE v. PILEGGI, ANTHONY** | | | | |
| # | Date | Time | Event Description | Status |
| No Events Scheduled | | | | |

Judicial ADR events may be heard in a court that is different from the court where the case is filed. To check location information about an ADR event, select the **Notices** tab on the top of the case detail page.

Matters that appear on the Short Calendar are shown as scheduled court events on this page. The date displayed on this page is the date of the calendar.

The status of a Short Calendar matter is not displayed because it is determined by markings made by the parties as required by the calendar notices and the civil[⧉] standing orders. Markings made electronically can be viewed by those who have electronic access through the Markings History link on the Civil/Family Menu in E-Services. Markings made by telephone can only be obtained through the clerk's office. If more than one motion is on a single short calendar, the calendar will be listed once on this page. You can see more information on matters appearing on Short Calendars by going to the Civil/Family Case Look-Up[⧉] page and Short Calendars By Juris Number[⧉] or By Court Location[⧉].

Periodic changes to terminology that do not affect the status of the case may be made.

This list does not constitute or replace official notice of scheduled court events.

**Disclaimer:** For civil and family cases statewide, case information is displayed and is available for inquiry on this website for a period of time, one year to a maximum period of ten years, after the disposition date. To the extent that Connecticut Practice Book Sections 7-10 and 7-11 provide for a shorter period of time, this information will be displayed for the shorter period.

In accordance with the Federal Violence Against Women Act of 2005, cases involving relief from physical abuse (restraining orders), civil protection orders, foreign protective orders, and motions that would be likely to publicly reveal the identity or location of a protected party may not be displayed and may be available only at the courts.

Pursuant to section 47a-26j of the Connecticut General Statutes, certain eviction cases will be removed from this website 30 days after disposition or other final activity of the case.

Attorneys | Case Look-up | Courts | Directories | EducationalResources | E-Services | FAQ's | Juror Information | News & Updates | Opinions | Opportunities | Self-Help | Home

Common Legal Terms | Contact Us | Site Map | Website Policies

Copyright © 2025, State of Connecticut Judicial Branch

Page Created on 12/30/2025 at 12 09 39 PM

Exhibit E



**MOTION/ORDER OF TEMPORARY CUSTODY/ORDER TO APPEAR**
JD-JM-58   Rev. 12-15
C.G.S. § 46b-129(b) & (k), P.A. 09-185, Sec. 3, P B, 33a-6

Per C.G.S 51 193c, this document was filed electronically and has the same validity and status as a paper document signed or verified by the Petitioner or Judge of the Superior Court.

**STATE OF CONNECTICUT SUPERIOR COURT JUVENILE MATTERS**
www.jud ct.gov

| Address of Court | | Docket Number |
|---|---|---|
| 7 KENDRICK AVE WATERBURY CT 06702 | | U06CP19011728A |

| Name of Child/Youth | Address of Child/Youth | Date of Birth |
|---|---|---|
| EMMA P██████ | ████████████████ | █/2015 |

| Name, address, and type (if applicable) (mother father guardian, putative father) | Date of birth | Indian tribe/reservation |
|---|---|---|
| KATHARINE F████████████████ | █ 1985 | |

| Name, address, and type (if applicable) (mother father guardian, putative father) | Date of birth | Indian tribe/reservation |
|---|---|---|
| ANTHONY F██████████ | █/1980 | |

| Name, address, and type (if applicable) (mother father guardian, putative father) | Date of birth | Indian tribe/reservation |
|---|---|---|
| | | |

| Name, address, and type (if applicable) (mother father guardian, putative father) | Date of birth | Indian tribe/reservation |
|---|---|---|
| | | |

If parent(s) is/are minor(s), name(s) and address(es) of grandparent(s) or guardian(s):

## Motion

☐ The child or youth has been placed in the care and custody of the Commissioner of Children and Families pursuant to section 17a-101g (96 hour hold) on (date) _____ at (time) _____

Based on the allegations of the petition and verified affirmations of fact, the petitioner requests an ex parte Order of Temporary Custody/Order to Appear under section 46b-129(b) of the general statutes.

| Name of Petitioner | Address of Petitioner | Relationship to Child |
|---|---|---|
| DCF Comm Vannessa L Dorantes LMSW | 131 WEST STREET DEPT OF CHILD/FAMILIES DANI | Commissioner DCF |

| Signed (Petitioner) | Subscribed and sworn to before me on (Date) | Signed (Judge, Assistant Clerk, Notary  Comm. Superior Court) |
|---|---|---|
| DCF Comm Vannessa L Dorantes LMSW | 03/28/2019 | Maureen Duggan, Esq , Dir  DCF Legal Div |

## Order

The court having reviewed the verified affirmations of fact accompanying this motion hereby finds that there is reasonable cause to believe that:

☐ A  Said child or youth is suffering from serious physical illness or
☐ B  Said child or youth is suffering from serious physical injury or
☒ C  Said child or youth is in immediate physical danger from surroundings or

And    As a result of said conditions, the child's or youth's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's or youth's safety and continuation in the home is contrary to the welfare of said child or youth

It is Hereby Ordered That:

A. ☒ The temporary care and custody of said child or youth shall be vested in DCF pending a hearing as set forth below on the confirmation of this order

And it is further found that:

☒ Reasonable efforts to prevent or eliminate the need for removal of said child or youth were made by the State, or
☐ Reasonable efforts to prevent or eliminate the need for removal of said child or youth were not possible, or
☐ Reasonable efforts to prevent removal were not made

OR

B. ☐ The respondent(s) appear before the court as set forth below to determine whether an order vesting temporary custody of said child or youth  in a person related to the child or youth by blood or marriage or in some other person or suitable agency  should be issued pending disposition of the petition

And it is further ordered that the above-named mother/father/guardian be and hereby is/are summoned to appear before the court on the Hearing Date(s) set below  at the address shown above  by having a proper officer leave a true and attested copy of this order and summons with them or at their usual place of abode  or if so ordered  by publication or mail and return same to the court on or before the date indicated

OR

C. ☐ The motion is denied

**CERTIFIED COPY SEAL AFFIXED**

_signature_ Deputy Chief Clerk

| Hearing Date - Preliminary Hearing On Temporary Custody → | Date 4/5/2019 | Time of Hearing 12 00 PM M |
|---|---|---|
| Hearing Date - Petition → | Date 5/8/2019 | Time of Hearing 12 00 PM M |

| Court Location → | Court Location (Number, street, and town) 7 KENDRICK AVE WATERBURY CT 06702 | Telephone Number 2035964202 |
|---|---|---|

| Publication For | Statutory Mail For | Service on or Before (Date) 4/4/2019 | Return Date 4/4/2019 |
|---|---|---|---|

| Name of Judge Hon  JOHN TURNER | Signed (Judge) 413581 | Date Signed 03/28/2019 |
|---|---|---|

(Continued)

State of Connecticut

DOCKET NO  U06CP19011728-A

IN RE  P██████  Emma  (b ████ /15)          SUPERIOR COURT FOR
                                            JUVENILE MATTERS

                                            AT WATERBURY

                                            SIXTH JUDICIAL DISTRICT

                                            March 28, 2019

<u>**ORDER**</u>

The Court hereby ORDERS that the Department of Children and Families is

authorized to provide permission for the minor child  Emma P████ , to obtain any

necessary medical treatment, as recommended by any treating physician and/or,

medical specialist

Dated at Waterbury, Connecticut this *29th* day of *March*_____ 2019

BY THE COURT

ATTEST

_____
Clerk of the Court

*3 29 19 : Copy in person to AAG Bannan , no other attys appointed yet. (bp)*

6

TE OF ONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

JAN 2 0 2023

CERTIFIED COPY          Deputy Chief Clerk
SEAL AFFIXED

```
            SUPERIOR COURT - JUVENILE MATTERS
                CHILD PROTECTION DOCKET
               WATERBURY JUDICIAL DISTRICT
               AT WATERBURY, CONNECTICUT




                    IN RE  EMMA P
              NO  Uo6CP19011727-30A

                   APRIL 5, 2019




        BEFORE THE HONORABLE, AUDEN GROGINS JUDGE




A P P E A R A N C E S

    Representing the State of Connecticut

        ATTORNEY KIMBERLY MATHIAS
        Assistant State's Attorney


    Representing the Respondent Father

        ATTORNEY HEATHER PERREUALT


    Representing the Respondent Mother

        ATTORNEY GREGGORY JOHNSON and DANIEL READYOFF


    Representing the Respondent Child

        ATTORNEY ERIC PALLIDINO




                          Recorded By
                          ROSE LOPEZ

                          Transcribed By
                          Juanita Gibson
                          Court Recording Monitor
                          300 Grand Stret
                          Waterbury, Connecticut 06702
```

1        THE COURT   In the matter of Emma P   Will

2    parties identify themselves?

3        ATTY  MATHIAS   Good afternoon, Your Honor

4    Kim Mathias assistant attorney general representing

5    the Department of Children and Families

6        MS   KERMASHKA   Good afternoon, Your Honor

7    Korey Kermashka, DCF

8        THE FATHER   Anthony P, Emma's father

9        ATTY  PERREAULT   Heather Perreault of

10   Guendelsberger's Law Offices, attorney for the

11   respondent father.

12       THE COURT   All right, good afternoon

13       ATTY  PALLADINO   Eric Palladino, attorney for

14   the child

15       ATTY  READYOFF   Attorney Daniel Readyoff,

16   attorney for respondent mother

17       ATTY  JOHNSON   Attorney Greggory Johnson from

18   the same firm as Dan for Katherine P, the

19   respondent

20       THE COURT   I'm sorry, for who?

21       ATTY  JOHNSON   For the respondent, the mother

22   as well

23       THE COURT   Okay

24       ATTY  JOHNSON   There's just two of us here,

25   Your Honor   We need the help

26       THE COURT   All right, thank you   So, with

27   regard to service, Anthony and Katherine P were

1    served at their abode, ███████████████████

2    ███████████    There's no date of service.  So, are

3    you willing to waive service defect?

4        ATTY   JOHNSON·  We're willing to waive

5    service defect on the date, Your Honor

6        THE COURT.  All right, with regard to mom.

7    With regard to father dad?

8        ATTY. PERREALT   Yes, Your Honor

9        THE COURT.  All right   So, service defects

10    are waived   I will find service

11        You're both private counsel, right?  You're

12    not seeking appointment

13        ATTY   PERREAULT   That's correct

14        ATTY. JOHNSON   No, Your Honor

15        THE COURT.  All right, so is this both and

16    order of temporary custody and neglect petition?

17        ATTY. MATHIAS   It is, Your Honor   There are

18    also neglect petitions with--for three siblings.

19    It's my understanding there'll be agreement to

20    sustaining the order of temporary custody today and

21    enter pro forma denials for all four children, so

22    the parents don't have to come back of the plea

23    date

24        THE COURT·  All right, let me just--you can

25    sit down, please

26        ATTY. JOHNSON   Thank you, Your Honor

27        THE COURT   Let me just advise parents of

1    their rights  With regards to both the order of

2    temporary custody and the neglect petition  So,

3    have you--Dad, have you reviewed that with your

4    counsel, both petitions

5         THE FATHER  Yes, I have

6         THE COURT  All right   And mom, have you?

7         THE MOTHER  Yeah

8         THE COURT  All right  Just keep your voice

9    up, okay

10         THE MOTHER  Okay

11         THE COURT  I want to advise you of your

12    rights with regards to both of these petitions

13    So, there's two separate proceedings   One

14    proceeding is dealing with DCF taking temporary

15    physical custody of your children  Is it children

16    order child?  One child, okay

17         ATTY MATHIAS   One is under the order of

18    temporary custody

19         THE COURT  All right, one child  So, they've

20    taken temporary physical custody of your child.

21    You have the right to have a hearing within 10 days

22    to challenge the need for that, okay  If you

23    elected to have a hearing your lawyers would be

24    representing you  A judge would sit the case  And

25    DCF would have the burden of proving a ground to

26    keep your child under their physical custody by

27    what's called a fair preponderance of the evidence

1    That's the standard of proof   And during that

2    hearing your lawyers would have the right to

3    question witnesses presented by DCF to make sure

4    they're telling the truth and the child's

5    recollection and observations   You could present

6    your own defenses to these claims and allegations

7    You could put on your own witnesses   You could

8    testify if you chose to do so, although no one can

9    force you to testify   You could present any other

10    evidence relevant to your defense   I will tell you

11    if you had an order of temporary custody hearing

12    and you chose not to testify the judge could draw

13    what's called an adverse inference against you

14    that's a negative inference that could result in a

15    negative outcome from your not testifying at that

16    hearing   In any event, at the end of the hearing

17    if the judge determines that DCF had proven one of

18    the grounds to keep your child in their temporary

19    custody you would have the right to take an appeal

20    to a higher court to try and reverse that decision

21          Have you understood your rights, mom

22          THE MOTHER   Yes

23          THE COURT   And, dad?

24          THE FATHER   Yes, Your Honor

25          THE COURT   All right   So, no it's my

26    understanding that you want to keep the order of

27    temporary custody in place   You want to agree to

Case 3:22-cv-01315-AWT   Document 96-2   Filed 01/27/26   Page 69 of 179
Case 3 22-cv-01315-AWT   Document 27-2   Filed 02/02/23   Page 9 of 53

5

1    waive your right to the hearing and keep the order

2    in place   Is that correct, dad?

3         THE FATHER   Yes, Your Honor

4         THE COURT   And, mom?

5         THE MOTHER   Yes, Your Honor

6         THE COURT   All right   So, I just want to ask

7    you about your decision   Have you both had enough

8    time to talk to your lawyers about this decision?

9         Dad?

10        THE FATHER   Yes

11        THE COURT   Mom?

12        THE MOTHER   Yes, Your Honor

13        THE COURT   All right   And have you reviewed

14   the petition your lawyers, and the evidence that

15   DCF would have at a hearing if you had chosen to go

16   forward with the hearing?

17        THE FATHER   Yes, Your Honor

18        THE MOTHER   Yes, Your Honor

19        THE COURT   All right   And have you your

20   lawyers answered all your questions?

21        THE FATHER   Yes

22        THE MOTHER   Yes

23        THE COURT   I'm sorry?

24        THE MOTHER   Yes

25        THE COURT   And are you satisfied with their

26   advice?

27        THE FATHER   Yes

1          THE MOTHER    Yes

2          THE COURT    All right   Has anybody forced,

3     threatened you, or promised you anything to get to

4     agree to keep the order of temporary custody in

5     place?

6          THE FATHER    No, Your Honor

7          THE MOTHER    No, Your Honor

8          THE COURT    Are you both doing so voluntarily

9     and of your own free will?

10          THE FATHER    Yes, Your Honor

11          THE MOTHER    Yes

12          THE COURT    And do you understand that once I

13     accept your agreement and if I keep the order of

14     temporary custody in place you can't change your

15     mind down the road and ask for a hearing   It's a

16     final decision absent some legal reason that a

17     judge would have to decide   Do you understand

18     that, dad?

19          THE FATHER    Yes, Your Honor

20          THE MOTHER    Yes

21          THE COURT    All right, so--and I'll just hear

22     from child's attorney   Are you in support of the

23     OTC remaining in place?

24          ATTY PALLADINO    I am at this time, Your

25     Honor    I did see my client yesterday at

26     Connecticut Children's Medical Center    She is

27     improving, and that's certainly encouraging    And

1    DCF expects that at some point she'll be placed in

2    a therapeutic medical fragile foster home

3         THE COURT   All right, very good

4         ATTY  PALLADINO   And just as a side--

5         THE COURT   Yes

6         ATTY  PALLADINO   --Judge   In my 33 years of

7    doing this I've never been able to get into

8    Connecticut Children's Medical Center when they

9    have a confidential case   Through the assistance

10   of DCF yesterday I was able to do that

11        THE COURT   Oh, that's great   Okay  Well, I'm

12   glad   In sustaining the OTC do you want to mark

13   the summary of facts as an exhibit

14        ATTY  MATHIAS   To sustain the order of

15   temporary custody we don't need to, Your Honor

16        THE COURT   All right, very good   So, I will

17   find that parents' decision to sustain the order of

18   temporary custody has been freely and voluntarily

19   made with the assistance of competent counsel,

20   there's a factual basis to sustain the order of

21   temporary custody, so I will in fact sustain it

22   And the child's attorney supports that

23        Moving on to the neglect petition

24        Yes?  Did you want to say something?

25        ATTY  MATHIAS   Yes, please, Your Honor   No,

26   I just was going to say that because I know you

27   need to move on to the--

1    THE COURT   Moving on to the neglect petition

2    I just want to advise you of your rights with

3    regard to that   So, now that's a separate

4    petition   And you both reviewed that with your

5    lawyers, correct?

6         THE MOTHER   Yes

7         THE FATHER   Yes

8         THE COURT   All right   So, with regard to

9    that those are the proceedings we'll be dealing

10   with going forward since you already--we're not

11   going to have hearing on the order of temporary

12   custody   So, with regard to the neglect petition,

13   DCF has made certain claims that your child has

14   been neglected   DCF--The burden is on DCF to prove

15   those claims   You have--you have mostly the same

16   rights as you did under the order of temporary

17   custody   But I'll just review them again   So, you

18   have the right to be represented by a lawyer

19   through the proceedings, and you have lawyers to

20   represent you   You have the right to remain

21   silent   That means you don't have answer questions

22   about your case   If you decide to answer questions

23   you do have the right to have your lawyers present,

24   and you can stop answering questions at any time

25   You have the right to deny the allegations in the

26   neglect petition and ask for a trial , where it'll

27   be the same procedure   DCF would have the burden

1    of proving those allegations by the same standard

2    of proof of fair preponderance of the evidence    If

3    you elect to have a trial a judge will sit on the

4    case, listen to the evidence, and make a

5    determination at to whether or not DCF has proved

6    its case    Counsel, I just want dad to listen to

7    the rights, okay    During the trial your lawyers

8    again will have the right to question witnesses

9    presented by DCF, you would have the right to

10   present your own defenses if you choose to    That

11   means you can put on your own witnesses    You could

12   testify if you choose to do so    Again, no one can

13   force you to testify    But if you don't testify at

14   that trial the judge again, could draw an adverse

15   inference against you    That's that negative

16   inference that could result in a negative outcome

17   At the end of the trial if the judge determines

18   that DCF had proven a ground or a basis for the

19   neglect, one of the claims.   Then, and your child

20   was found to be neglected, you would have the right

21   to take an appeal from that decision to a higher

22   court to try to reverse that decision

23         Have you understood your rights with regards

24   to the neglect proceedings?

25         THE FATHER    Yes, Your Honor

26         THE COURT    Mom?

27         THE MOTHER    Yes, Your Honor

1          THE COURT   All right   Pro forma denials,

2    counsel?

3          ATTY  JOHNSON   Yes, Your Honor

4          ATTY  PEREAULT   Yes, Your Honor, on all four

5    petitions

6          THE COURT   Pro formal denial shall enter   Do

7    we have a case status conference date

8          ATTY  MATHIAS   Your Honor, the specific steps

9    that were provided to the parents on the OTC would

10   remain in effect

11         THE COURT   All right   Parents, you

12   understand that?  You were issued specific steps

13   that you have to comply with to resolve your case

14   with DCF and regain physical custody of your child

15   You understand those steps?

16         THE MOTHER   Yes, Your Honor

17         THE COURT   And you know you need to engage in

18   them?

19         THE FATHER   Yes, Your Honor

20         THE COURT   All right   Yes?

21         ATTY  MATHIAS   We do have a case status

22   conference   This is schedule for all four children

23   on May 23, 2019   I provide madam clerk--

24         ATTY  PALLADINO   I believe it's May 28

25         ATTY  MATHIAS   Oh, I apologize   I didn't

26   change my--May 28 at 11 o'clock

27         THE COURT   All right so parents need to be

```
 1        here on May 28 at 11 o'clock   If you don't appear

 2        at court hearing, you can be defaulted    Your

 3        counsel can tell you what that means   But you

 4        forfeit your right to participate in the hearing,

 5        so

 6               ATTY  MATHIAS   And finally, Your Honor, we do

 7        have an agreement for a psychological evaluation

 8        We would just need the Court to order it and sign

 9               THE COURT   All right   Everyone's in

10        agreement for the psychological?

11               ATTY  JOHNSON   Yes, Your Honor

12               ATTY  PERREAULT   Yes, Your Honor

13               ATTY  PALLDINO   Yes, Your Honor

14               ATTY  MATHIAS   Yes, Your Honor

15               THE COURT   All right, I'll order that

16        You'll work out the questions   And I think that

17        takes care of everything, right?   And that's for

18        all 4 children   We're doing that today   The pro

19        forma denials enter for all four even though one's

20        named today, okay

21               THE CLERK   Would you the MRP dates?

22               ATTY  MATHIAS   Yes

23               THE CLERK   The written perm plan is due

24        November 13, 2019, and the hearing is December 8,

25        2019, at 11

26               ATTY  MATHIAS   And that dates for Emma only,

27        because we only have--
```

1           THE CLERK   Yeah, okay

2           THE COURT   All right, we're all set; no

3       further issues

4           ATTY  MATHIAS   No, thank you

5           THE COURT   Thank you

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

SUPERIOR COURT - JUVENILE MATTERS
CHILD PROTECTION DOCKET
WATERBURY JUDICIAL DISTRICT
AT WATERBURY, CONNECTICUT


IN RE· EMMA P
NO· Uo6CP19011727-30A

APRIL 5, 2019




C E R T I F I C A T I O N




I hereby certify the foregoing pages are a true and
correct transcription of the audio recording of the above-
referenced case, heard in Superior Court, Judicial District of
Waterbury, at Waterbury, Connecticut, before the Honorable Auden
Grogins, Judge on the 5th day of April, 2019.



Dated this 12th day of January, 2023, in Waterbury,
Connecticut


Juanita Gibson
Court Recording Monitor

Superior Court Juvenile Matters
at WATERBURY
4/5/2019

| | | | |
|---|---|---|---|
| Docket No | U06CP19011728A | AAG | ALLISON MATHIAS |
| In re | EMMA P██████ | Judge | AUDEN GROGINS |
| Petition | OTC | Monitor | Rose Lopez |
| Purpose | OTC Preliminary Hearing | Clerk | Nicole Hayes |

## APPEARANCES

| Person Name | Type | Represented By | Appeared |
|---|---|---|---|
| ERIC JOSEPH PALLADINO | Attorney for Juvenile | | Yes |
| GUENDELSBERGER LAW OFFICES LLP | Attorney for Father | | Yes |
| ALLINGHAM READYOFF & HENRY LLC | Attorney for Mother | | Yes |
| KATHARINE P████ | Mother | ALLINGHAM READYOFF & HENRY LLC | Yes |
| ANTHONY P████ | Father | GUENDELSBERGER LAW OFFICES LLP | Yes |
| Korey Kermashka | DCF SOCIAL WORKER | Supervisor (covering) | Yes |
| ALLISON MATHIAS | AAG | | Yes |

## SERVICE

| Parent Name | Petition | Service | Service Date | Conf | |
|---|---|---|---|---|---|
| ANTHONY P████ | NEGLECT, ABUSED | Waived | 4/5/2019 | Y | 4/5/2019 |
| ANTHONY P████ | OTC | Waived | 4/5/2019 | Y | 4/5/2019 |
| KATHARINE P████ | NEGLECT, ABUSED | Waived | 4/5/2019 | Y | 4/5/2019 |
| KATHARINE P████ | OTC | Waived | 4/5/2019 | Y | 4/5/2019 |

## OTC Disposition

| Hearing Outcome | Who Gets Custody | Settlement | RSVP |
|---|---|---|---|
| Sustained | DCF | Disp after OTC Prelim Hearing | |

## ALLEGATION

| Parent Name | Allegation | Plea | Findings | Adjudication | Amend |
|---|---|---|---|---|---|
| ANTHONY P████ (Father) | ABUSED MALTREAT | PD | | | |
| ANTHONY P████ (Father) | CONDITIONS INJ | PD | | | |
| ANTHONY P████ (Father) | NO CARE/ATTENTN | PD | | | |
| KATHARINE P████ (Mother) | ABUSED-MALTREAT | PD | | | |
| KATHARINE P████ (Mother) | CONDITIONS INJ | PD | | | |
| KATHARINE P████ (Mother) | NO CARE/ATTENTN | PD | | | |

E OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

JAN 2 0 2023

## FINDINGS

CERTIFIED COPY
SEAL AFFIXED

*signature*

Deputy Chief Clerk

| Petition | | | Type | Decision |
|---|---|---|---|---|
| ORDER OF TEMPORARY CUSTODY | | | Contrary To Welfare | Made |
| ORDER OF TEMPORARY CUSTODY | | | Prevent Removal | Made |

## CONTINUANCE

| Date and Time | Room | Purpose | Reason | Notice |
|---|---|---|---|---|
| 5/28/2019 11 00 | B | Case Status Conference | | N |
| 11/13/2019 00 00 | | Written | Permanent Plan Due Date - Efforts to Reunite | N |
| 12/18/2019 11 00 | B | Permanency Plan Hearing | | N |

## COMMENT

Mother and father waive service defects

Mother and father advised of their rights on the OTC

Mother and father waive right to have a hearing and would like to sustain the OTC  Court canvasses mother and father about their decision  Court finds there is a factual basis to sustain the OTC  OTC is sustained

Atty Palladino reports re child

Mother and father are advised of their rights on the Neglect

AAG requests that specific steps remain in effect for both mother and father

Specific steps reaffirmed for both mother and father

The plea date on 5/8/19 at 12PM is marked off

The next date will be a CSC scheduled on 5/28/19 at 11AM  Even though, today's hearing is only concerning matters of Emma P████ and not those of her siblings, there is an agreement by all parties for the CSC scheduled on 5/28/19 at 11AM to be for Emma and her 3 siblings

The WPP is due on 11/13/19 and the MRP hearing is scheduled for 12/18/19 at 11AM  The scheduled MRP dates are only for Emma

---- ------- -------- ---------- ------    --- -------  --      ---  -------- --------- --------

ST  O CC NECTICUT
SUPERIOR COURT
JUVENILE MATTERS

Honorable AUDEN GROGINS          436588                              4/5/2019

JAN 2 0 2023

CERTIFIED COPY
SEAL AFFIXED
BY___ __ |‾‾ (_ | ) | _ t o
Deputy Chief Clerk
Deputy Chief Clerk

Docket No    U06CP1901▨728A

SUPERIOR COURT - JUVENILE MATTERS
CHILD PROTECTION SESSION
WATERBURY JUDICIAL DISTRICT
AT WATERBURY, CONNECTICUT

IN RE   MAIRIN P
U06-CP19-011727-A

EMMA P
U06-CP19-011728-A

NOAH P
U06-CP19-011729-A

SAVANNAH P
U06-CP19-011730-A

SEPTEMBER 19, 2019

BEFORE THE HONORABLE WILLIAM T   CREMINS,
JUDGE TRIAL REFEREE


A P P E A R A N C E S

Representing the Petitioner

ATTORNEY KIM MATHIAS
ASSISTANT ATTORNEY GENERAL

Representing the Respondent Mother·

ATTORNEY ISIDRO RUEDA

Representing the Respondent Father

ATTORNEY HEATHER PERREAULT

Representing the Respondent Minor Children.

ATTORNEY ERIC PALLADINO

Also Present

Mr  Christopher Andujar,
The Department of Children and Families

*This transcript is confidential  It may not be further
disclosed, directly or indirectly, except as authorized by
section 46b-124 of the Connecticut General Statutes, by
order of the court or as otherwise provided by law.

Recorded By
Shirley Ann Fogle

Transcribed By
Shirley Ann Fogle
Court Recording Monitor
300 Grand Street
Waterbury, CT 06702

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 81 of 179
Case 3 22-cv-01315-AWT   Document 27-2   Filed 02/02/23   Page 21 of 53

1

1   THE COURT   This is CP2, is that correct?

2   THE CLERK   Yes, Your Honor

3   ATTY MATHIAS   Correct, Your Honor

4   THE COURT   Okay.  Matters at CP2, Mairin P.,

5   Emma P , Noah P, Savannah P , can I ask everyone

6   present to identify themselves for the record,

7   please?

8   ATTY MATHIAS:  Good afternoon, Your Honor.  Kim

9   Mathias, Assistant Attorney General, representing The

10  Department of Children and Families

11  MR ANDUJAR.  Christopher Andujar, Supervisor

12  with The Department of Children and Families

13  ATTORNEY RUEDA   Attorney Rob Rueda representing

14  Kathy P , mother

15  THE RESPONDENT MOTHER   Katharine [P], mother

16  ATTY  PALLADINO:  Eric Palladino, attorney for

17  children

18  THE COURT:  Sir?

19  THE RESPONDENT FATHER·  Anthony [P] father

20  ATTY. PERREAULT:  Heather Perreault, attorney

21  for the father.

22  THE COURT.  All right   Counsel, what's before

23  the Court today?

24  ATTY  MATHIAS.  Your Honor, this matter was

25  scheduled for a judicial pretrial before Your Honor

26  Following discussions with counsel, and the Court,

27  parties were able to come to an agreement, and the

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 82 of 179
Case 3 22-cv-01315-AWT   Document 27-2   Filed 02/02/23   Page 22 of 53

2

1      agreements have been reduced to a blue form   Briefly

2      stated, mother and father enter pleas of nolo

3      contendere today to the sole allegation of permitted

4      to live under conditions injurious to their well-

5      being for the four children   The remaining

6      allegations will be withdrawn   On disposition, we're

7      asking the Court to mark the originally filed social

8      study as well as the addendum, that was e-filed for

9      today's purposes.

10           THE COURT   And counsel, the original date on

11     the social study is 20 May 2019

12           ATTY  MATHIAS   Yes

13           THE COURT   And the addendum is dated, 10

14     September 2019, is that correct?

15           ATTY. MATHIAS   Ten.  Oh, yes, yes.  Yes, 10

16     September, yes

17           MR. ANDUJAR   September

18           THE COURT:  Right, okay

19           ATTY. MATHIAS:  The recommended disposition,

20     Your Honor, is protective supervision of Savannah,

21     Mairin -

22           THE RESPONDENT FATHER   Mairin

23           THE RESPONDENT MOTHER·  Mairin.

24           ATTY. MATHIAS - Mairin, and Noah in the father's

25     custody for a period of six months.  Emma will be

26     committed to The Department of Children and Families,

27     and the -

Case 3:22-cv-01315-AWT   Document 96-2   Filed 01/27/26   Page 83 of 179
Case 3 22 cv-01315-AWT   Document 27-2   Filed 02/02/23   Page 23 of 53

3

1    THE COURT   All right

2    ATTY MATHIAS   - and the parents have signed

3    specific steps   I'm going thru - and then there's

4    special conditions, Your Honor, that I can also read

5    into the record if you'd like

6    THE COURT:   Would these incorporate the

7    agreement that's in front of the Court or should I

8    read the agreement into the record first?

9    ATTY MATHIAS   I believe I've read all of it

10   except for the special conditions, Your Honor.

11   THE COURT   All right   Can we read the special

12   conditions into the record, please?

13   ATTY. MATHIAS   May I do that, Your Honor.

14   THE COURT·   Please

15   ATTY. MATHIAS   Doctor Ciarmella's report is

16   expected to be filed with the court on or before

17   September 27, 2019   An in-court review is to be

18   scheduled for October 9, 2019 to revoke commitment as

19   to Emma and to go to protective supervision in

20   father's custody for a period of six months.

21   Transition to father's custody and revocation of

22   commitment will be guided by Doctor Ciarmella's

23   recommendations   DCF will proceed with unsupervised

24   contact with father and Emma as soon as recommended

25   by RTFT or Doctor Ciarmella.   Mother's visitation

26   with Emma will continue with the Therapeutic Family

27   Time, TFT Program, while committed to DCF   Visits

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 84 of 179
Case 3 22-cv-01315-AWT   Document 27-2   Filed 02/02/23   Page 24 of 53

4

1    under protective supervision will be as agreed with

2    father  Mother's visits with Savannah, Mairin -

3         THE COURT  Okay  Can I - can I -

4         ATTY MATHIAS  I'm sorry

5         THE COURT  All right  Should we, Counsel - can

6    I see counsel for a moment please?  I just want to

7    make sure this is -  are we off, Shirley?

8         THE MONITOR·  Yes

9         (OFF THE RECORD)

10         (BACK ON THE RECORD)

11         THE COURT·  I'm sorry, Counsel  Are we back on

12    the record, Shirley, yes?

13         THE MONITOR·  Yes

14         THE COURT  All right.  Please continue then

15         ATTY  MATHIAS·  Mother's visits with Savannah,

16    Mairin, Noah, as agreed with father

17         THE COURT.  Counsel, just one point of

18    clarification, this was probably discussed, but I

19    want to be sure there are no outstanding issues

20    With respect to Emma, the six months would begin not

21    from today, but from the date of the revocation of

22    the - is that correct?

23         ATTY. MATHIAS   That is correct

24         THE COURT   And is that everyone's

25    understanding?

26         ATTY. PERREAULT:  Yes, Your Honor

27         ATTY  PALLADINO   Yes, Your Honor.

5

1       ATTY RUEDA   It is   We can deal with maybe

2  retroactive afterwards depending on how the case is

3  going.  Because if the case is going to end on the

4  three children, I don't know what the purpose would

5  be to keep it open for the fourth child

6       THE COURT: Well, no   Counsel, I mean that's

7  something that you can work out   For purposes of

8  today, the six months starts for the three children

9  today

10      ATTY  RUEDA   Yes

11      THE COURT   And then starts upon the revocation

12  for Emma.  I just want to be sure that there's no

13  confusion   And everyone agrees that, as of today,

14  that's the way we are proceeding, is everyone

15  agreeable to that?

16      ATTY. RUEDA   Yes, Your Honor

17      ATTY. PERREAULT   That's my understanding, Your

18  Honor.

19      THE COURT.  Okay

20      ATTY. MATHIAS.  Thank you, Your Honor.

21      THE COURT   Okay   Counsel, with respect to Mr.

22  [P], he signed – could you see if that's signed in

23  the correct place?  That's the town –

24      ATTY  PERREAULT   Oh, I apologize

25      THE COURT:  I think just changing it to

26  signature is adequate

27      ATTY  PERREAULT·  Thank you.

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 86 of 179
Case 3 22-cv-01315-AWT    Document 27-2    Filed 02/02/23    Page 26 of 53

6

1    THE COURT   And then initialing that, please

2    Thank you   Okay   Thank you.   Okay   Attorney

3    Palladino, any comments before I canvass the

4    respondent parties?

5        ATTY  PALLADINO   I've seen the three children

6    in father's care, Noah, Savannah, and Mairin

7    They're doing well, Your Honor, and I'm scheduled to

8    see them again this Sunday   I saw Emma yesterday in

9    non-relative foster care, and she's doing well, Your

10   Honor   She does want to return home to father's

11   care.  So, I certainly believe that the contents of

12   this agreement are in the best interest of my

13   clients

14        THE COURT   Okay   Thank you   Any other

15   comments before I canvass the respective parties?

16        ATTY. MATHIAS   No, Your Honor

17        ATTY  RUEDA   No, Your Honor.

18        ATTY  PERREAULT   No, Your Honor

19        THE COURT: Okay.  I'm going to ask the parents

20   a series of questions   Anything you don't

21   understand, either one of you stop me, and you can

22   discuss the question with your attorney, okay   Do

23   you both understand you gotta respond to the

24   questions I ask?  Okay   Do you both understand the

25   proceedings here today, Ma'am?

26        THE RESPONDENT MOTHER   Yes

27        THE COURT   Sir?

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 87 of 179
Case 3 22-cv-01315-AWT    Document 27-2    Filed 02/02/23    Page 27 of 53

7

1        THE RESPONDENT FATHER    Yes

2        THE COURT.  Have you both had enough time to

3    talk to your attorney about your decisions to plead

4    no contest to the allegations in the petition?  Have

5    a seat, Sir, no need to stand   Have you talked to

6    your attorney - had time to talk to your attorney

7    about your decision to plead no contest to the

8    allegations in the petition?

9        THE RESPONDENT FATHER    Yes

10        THE COURT.  Ma'am?

11        THE RESPONDENT MOTHER    Yes

12        THE COURT   Are you satisfied with their

13    representation of you?

14        THE RESPONDENT FATHER    Yes

15        THE RESPONDENT MOTHER.  Yes.

16        THE COURT·  Has your - have your attorneys

17    discussed with you the evidence that the state has

18    and the burden of proof the state has if the case

19    were to trial?

20        THE RESPONDENT FATHER·  Yes.

21        THE COURT·  Ma'am?

22        THE RESPONDENT MOTHER:  Yes.

23        THE COURT   By entering a plea of no contest,

24    you are giving up certain rights   The right to

25    continue to remain silent.  The right to have a trial

26    in front of a Judge   The right to continue to deny

27    the allegations in the petition   The right to force

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 88 of 179
Case 3 22-cv-01315-AWT    Document 27-2    Filed 02/02/23    Page 28 of 53

8

1    the state to prove the allegations by a fair

2    preponderance of evidence at a trial    The right to

3    examine the state's witnesses and present your own

4    witnesses    The right to testify in the case if you

5    did decide to testify    The right to present any

6    defense to the allegations in the petition    By

7    entering a plea of no contest, Ma'am, you understand

8    you give up all those rights?

9        THE RESPONDENT MOTHER    Yes

10        THE COURT    Any questions about that?  Don't

11    tell -

12        THE RESPONDENT MOTHER    No, no

13        THE COURT.  All right.  Don't tell me what you

14    think I want to hear, just be truthful    All right

15    Again, do you understand you're giving up all those

16    rights that I just reviewed with you?

17        THE RESPONDENT MOTHER:  Yes

18        THE COURT    Sir, do you understand you're giving

19    up all those rights?

20        THE RESPONDENT FATHER·  Yes.

21        THE COURT    You both understand that by entering

22    the pleas of no contest, once I accept the pleas you

23    cannot withdraw the pleas or take them back unless

24    the Court permits you to do that    Ma'am, do you

25    understand that?

26        THE RESPONDENT MOTHER.  Yes

27        THE COURT:  Sir, do you understand that?

Case 3:22-cv-01315-AWT   Document 96-2   Filed 01/27/26   Page 89 of 179
Case 3 22-cv-01315-AWT   Document 27-2   Filed 02/02/23   Page 29 of 53

9

1       THE RESPONDENT FATHER   Yes

2       THE COURT   You understand by entering these

3  pleas today there will be no trial now in the case

4  Ma'am, do you understand that?

5       THE RESPONDENT MOTHER   Yes

6       THE COURT:  Sir, do you understand that?

7       THE RESPONDENT FATHER   Yes

8       THE COURT   Has anyone forced, threatened, or

9  promised either of you anything to enter the pleas

10  here today?

11       THE RESPONDENT FATHER   No

12       THE COURT   Ma'am?

13       THE RESPONDENT MOTHER   No

14       THE COURT   Are you doing this of your own free

15  will?

16       THE RESPONDENT MOTHER:  Yes.

17       THE COURT·  Okay.  You understand that the

18  disposition at this point for the three children,

19  Mairin, Noah, and Savannah is protective supervision

20  for a period of six months with the respondent

21  father.  With respect to Emma, the particulars are

22  set forth in the agreement that was put on the record

23  by counsel.  Is that, Ma'am, your understanding of

24  the disposition in the case?

25       THE RESPONDENT MOTHER.  Yes

26       THE COURT   Sir, is that your understanding of

27  the disposition in the case?

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 90 of 179
Case 3 22-cv-01315-AWT    Document 27 2    Filed 02/02/23    Page 30 of 53

10

1    THE RESPONDENT FATHER.   Yes.

2    THE COURT   Okay   Are we withdrawing any

3    particular allegations, other than the ones set forth

4    in nolo contendere pleas?

5    ATTY  MATHIAS   We are, Your Honor   We are

6    withdrawing the allegation of denied proper care and

7    attention

8    THE COURT.  Okay   Counsel, any reason why the

9    pleas should not be accepted?

10    ATTY   RUEDA   No, Your Honor

11    ATTY   PALLADINO.  No, Your Honor

12    ATTY. PERREAULT   No, Your Honor

13    THE COURT   Okay   The Court then finds that the

14    pleas are knowingly and voluntarily made with the

15    assistance of counsel   There's a factual basis for

16    the pleas   The pleas are accepted   The Court makes

17    an adjudication of neglect based on permitted to live

18    under conditions injurious.  The Court finds that

19    with respect to the three children, Mairin, Noah, and

20    Savannah protective supervision for a period of six

21    months, in the custody of the father, is in the best

22    interest of those children.  With respect to Emma,

23    okay, and this is going to be commitment to The

24    Department of Children and Families, that is found to

25    be, at this point, in the best interest of the

26    children

27    Offered as full exhibits, are a Social Study

Case 3:22-cv-01315-AWT   Document 96-2   Filed 01/27/26   Page 91 of 179
Case 3 22-cv 01315-AWT   Document 27-2   Filed 02/02/23   Page 31 of 53

11

1    which is dated May 20, 2019, court stamped 28 May

2    2019, offered as State's Exhibit A; is there any

3    objection to that offer?

4          ATTY  PERREAULT   No objection

5          ATTY  PALLADINO·  No objection

6          ATTY  RUEDA   No objection for today's purposes

7          THE COURT   Okay   Full exhibit without

8    objection for today's purposes.  Also offered is

9    State's Exhibit B, Addendum to the Social Study, date

10   10 September 2019, date stamped today 19, December

11   (sic), 2019, offered as full exhibit.  For today's

12   purposes, any objection to that?

13         ATTY. PALLADINO·  No objection.

14         ATTY  RUEDA.  No objection, Your Honor

15         ATTY  PERREAULT:  No objection.

16         THE COURT:  Pleas are now accepted   Counsel, do

17   you wish the Court to notate the agreement?

18         ATTY. RUEDA   Yes, please, Your Honor

19         ATTY. MATHIAS:  Yes, please, Your Honor.

20         ATTY. PERREAULT.  Yes, please, Your Honor.

21         THE COURT.  Okay.  That agreement's accepted by

22   the Court.  With respect to the specific steps,

23   Attorney Rueda, with respect to your client, have the

24   specific steps been reviewed with your client?

25         ATTY. RUEDA   Yes, Your Honor.  I went through

26   the steps with my client   She understands them, and

27   we would ask that the sticker be applied to the steps

1    for mother.

2        THE COURT    Is there any objection to having

3    these admitted then as final steps?

4        ATTY  RUEDA    No objection

5        ATTY  PALLADINO    No objection

6        ATTY. PERREAULT    No objection

7        ATTY  MATHIAS    And, Your Honor, just for

8    benefit of counsel, as well as DCF, if the Court

9    could just read what the sticker saids

10        THE COURT    DCF must provide all counsel and

11    respondents with prompt written notice of referrals

12    to service providers and any non-compliance

13        ATTY. MATHIAS    So, father's counsel may wish

14    the same sticker to be applied

15        THE COURT.  Okay   Well, I'll get there

16        ATTY  MATHIAS.  Yes

17        THE COURT.  Again, counsel, any objection to

18    these being offered with respect to your client,

19    Attorney Rueda, as full - as final steps?

20        ATTY. RUEDA·  No objection, Your Honor

21        THE COURT:  Okay.  Thank you.  Okay.  Attorney

22    Perreault, have you reviewed - have you reviewed with

23    your client the specific steps?

24        ATTY. PERREAULT    I have, Your Honor.

25        THE COURT:  Okay.  Is there any objection to

26    these being admitted as final steps at this point?

27        ATTY. PERREAULT    No, Your Honor, but we are

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 93 of 179
Case 3 22-cv 01315-AWT   Document 27-2   Filed 02/02/23   Page 33 of 53

13

1    also requesting that the sticker be applied

2        THE COURT   Okay   So, counsel, anything – other

3    than setting review dates, at this point, is there

4    anything else that the Court would need to address,

5    please?

6        ATTY  MATHIAS   Not for today, Your Honor   We

7    are asking that there be a – we'd like to keep the

8    Monday.  We'd like to come back at noon, on Monday,

9    which was our – gonna be a trial date to put on the

10   record we anticipated agreement for custody

11   arrangements, once commitment is revoked   That's –

12   that's the request of the attorneys for the parents,

13   since we are – we have some momentum   So, if we

14   could just keep this case on for noon, for any

15   further agreement

16       THE COURT   Do you see any issue with – who's

17   going to be here on Monday?

18       ATTY  MATHIAS:  Somebody was assigned for trial

19       THE COURT.  No, no.  I just want to be sure – I

20   just –

21       THE CLERK   Are you –

22       THE COURT   The only reason I asked the question

23   is Judge Grogins, should not probably hear this

24   matter at this point –

25       ATTY. MATHIAS.  Okay.

26       THE COURT.  – because she's scheduled to do the

27   trial, but there are two other judges that are here

1    ATTY MATHIAS   Oh, excellent

2    THE COURT.  So, the matter will stay on for

3    9/23   Do we also need to keep on the 9/25 date?

4    ATTY  MATHIAS   No, Your Honor

5    ATTY  RUEDA   No, Your Honor

6    ATTY  PERREAULT   No, Your Honor

7    THE COURT   No, all right   So, 9/23, noon.  And

8    the other — there were three additional trial dates;

9    is that correct?

10    ATTY. MATHIAS.  They can go off, Your Honor

11    THE COURT   Those can be marked off   Do we need

12    to set review dates or we're going to do that on

13    Monday?

14    ATTY  MATHIAS:  We can — we can do all that on

15    Monday.

16    THE COURT.  Okay.

17    THE CLERK:  So, we're gonna keep the dates

18    that's right now?

19    THE COURT   Just one — just the Monday date

20    ATTY  MATHIAS:  Just the Monday.

21    THE CLERK   Okay

22    ATTY  RUEDA:  At noon

23    ATTY  MATHIAS.  I'm sorry

24    THE CLERK   As an in-court review   My question

25    is clarification for the Clerk, Your Honor

26    THE COURT   Sure.

27    THE CLERK   The rest of the trial dates, can

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 95 of 179
Case 3 22 cv-01315-AWT   Document 27 2   Filed 02/02/23   Page 35 of 53

15

1    they be marked off today by agreement?

2        ATTY MATHIAS   Yes

3        ATTY RUEDA   Yes

4        ATTY PERREAULT   Yes

5        THE CLERK  So that will be September 26th,

6    September 27th, September 30th, are now marked off

7    We're coming back at 12 noon by agreement on Monday

8    September 23rd

9        ATTY MATHIAS   Correct.

10       ATTY RUEDA   Correct.

11       ATTY MATHIAS· And if the - if Madam Clerk, can

12   give us our six-month date?

13      THE CLERK· Yes  I got PS with father will run

14   until March 19, 2020  We gonna bring this back for

15   the purpose of the in-court review on February 18,

16   2020 at 2.00

17      ATTY. RUEDA:  Can we have a three court - a

18   three months in-court review?  Is there any

19   objections to that?

20      ATTY. MATHIAS  No, let's just pick that - let

21   just wait though until Monday because I know the

22   Court has to leave

23      ATTY. RUEDA· Okay

24      ATTY MATHIAS: We're running late

25      ATTY RUEDA  We'll -

26      THE CLERK   And then -

27      ATTY RUEDA. - address that on Monday

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 96 of 179
Case 3 22-cv-01315-AWT    Document 27-2    Filed 02/02/23    Page 36 of 53

16

1    THE CLERK    And then the child that is

2    committed, which I believe is child -

3    THE COURT·  Emma

4    THE CLERK:  - Emma.

5    THE COURT.  Yes

6    THE CLERK    There's a filing of the permanency

7    plan -

8    ATTY  MATHIAS·  Madam Clerk, I have the dates

9    of -

10    THE CLERK.  Do you have the dates?

11    ATTY  MATHIAS   - November 13, 2019, coming back

12    December 18, 2019 at 11:00

13    THE CLERK    Correct

14    ATTY. MATHIAS:  We might be able to use that for

15    one of our dates

16    THE CLERK:  Okay

17    ATTY  MATHIAS    Thank you

18    THE CLERK    And I'm sorry    Monday it will be

19    in-court review at 12 noon as to all the children to

20    go over -

21    ATTY. MATHIAS    Further agreement.

22    THE CLERK    Okay.

23    THE COURT·  Counsel, anything else, please?

24    ATTY  MATHIAS    Nothing further, Your Honor.

25    Thank you

26    ATTY. RUEDA·  Nothing further

27    THE COURT:  Okay.  Thank you.

Case 3:22-cv-01315-AWT    Document 96-2    Filed 01/27/26    Page 97 of 179
Case 3 22-cv-01315 AWT   Document 27-2   Filed 02/02/23   Page 37 of 53

17

1        ATTY. PERREAULT    Nothing further, Your Honor.

2        (The matter was concluded )

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

```
            SUPERIOR COURT - JUVENILE MATTERS
               CHILD PROTECTION SESSION
              WATERBURY JUDICIAL DISTRICT
              AT WATERBURY, CONNECTICUT


                IN RE   MAIRIN P
                U06-CP19-011727-A

                   EMMA P.
                U06-CP19-011728-A

                   NOAH P
                U06-CP19-011729-A

                 SAVANNAH P.
                U06-CP19-011730-A



             C E R T I F I C A T I O N
```

I hereby certify the foregoing pages are a true and correct audio recording of the above-referenced case heard in Superior Court, Judicial District of Waterbury, Waterbury, Connecticut, before the Honorable William T Cremins, Judge Trial Referee, on the 19th day of September 2019

Dated this 15th, day of December 2022 in Waterbury, Connecticut.

```
                    _____
                    Shirley Ann Fogle
                    Court Recording Monitor
```

**ADJUDICATORY/DISPOSITIONAL
ORDERS**
JD-JM-85  Rev  4-12
C.G.S. §§ 46b-120, 121  129j  17a-93(i)
PA 11-240, Sec. 2

**STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS**
*www.jud ct gov*



| **ADA NOTICE** |
|---|
| The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA  contact a court clerk or an ADA contact person listed at *www.jud ct gov/ADA.* |

| Address of court | Docket number |
|---|---|
| 7 KENDRICK AVE  WATERBURY CT 06702 | U06CP19011727A |

| Name of petitioner | Name of child or youth | Date of birth |
|---|---|---|
| DANBURY DCF OFFICE | MAIRIN P ▇▇▇ | ▇▇/2019 |

| Name of father | Address of father |
|---|---|
| ANTHONY P ▇▇▇ | ▇▇▇ |

| Name of mother | Address of mother |
|---|---|
| KATHARINE P ▇▇▇ | ▇▇▇ |

| Name of guardian (*if applicable*) | Address of guardian (*if applicable*) |
|---|---|

The court makes the following findings and enters the following orders in the best interest of the child or youth named above at a session of the Superior Court and in accordance with the statutes that apply to the case

## Adjudication

The court finds the child or youth    [x] Neglected    [ ] Uncared for    [ ] Abused    **or**

[ ] The court has found the child or youth    [ ] Neglected    [ ] Uncared for    [ ] Abused    **on** _____

## Reasonable Efforts Finding *(If necessary)*

Continuation in the home is *contrary to the welfare* of the child or youth and

[ ] Voluntary placement

     [ ] Such out-of-home placement is in the best interests of the child or youth

[ ] Reasonable efforts to *prevent removal* finding

     [ ] Reasonable efforts to prevent or eliminate the need for removal of the child or youth were made by the state

     [ ] Reasonable efforts to prevent or eliminate the need for removal of the child or youth from the home
     were not possible

     [ ] Reasonable efforts were not made

STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

**JAN 20 2023**

CERTIFIED COPY
SEAL AFFIXED
BY_____

Deputy Chief Clerk

## Disposition

1  [x] The court finds that the following disposition is in the best interest of the child or youth    **or**

2  [ ] The court grants the motion to reopen and modify the prior disposition in this case  and finds  the
     following modified disposition to be in the best interest of the child or youth

[ ] **A  Commitment** The child or youth is committed until further order of the court to the Commissioner of Children
     and Families who shall be the guardian of the child or youth according to the statutes in such cases
     Commitment is effective _____

[x] **B. Protective Supervision** Continuation in the home is not contrary to the best interest of the child or youth.
     The Commissioner of Children and Families shall provide Protective Supervision for the child or youth
     beginning  9/19/2019  until  3/19/2020    Child's place of abode is with
     (name)  ANTHONY P ▇▇▇    who is a suitable and worthy person

☐ C **Custody/Guardianship** The ☐ custody ☐ guardianship of the child or youth is vested in
(name) _____ who is or are found to be suitable and worthy caretaker(s)

    ☐ Subject to an order of Protective Supervision for the child or youth
    beginning _____ until _____

☐ D **Extension of protective supervision** The Commissioner of Children and Families shall provide Protective
Supervision for the child or youth for an additional period beginning _____ until _____

☐ E **Termination of Protective Supervision** The period of Protective Supervision previously ordered will end on

_____

## Further Order Of The Court

☐ The above order incorporates the services and steps set out in the attached Specific Steps

☐ The Commissioner of Children and Families shall file

    ☐ **A Status Report** on or about _____

    ☐ **A Motion for Review of Permanency Plan** on or before _____

    A hearing to review the permanency plan shall be held on _____

    ☐ **A Motion for**

        ☐ **Revocation/Transfer of Guardianship** no later than *(date)* _____

        ☐ **Modification of disposition** no later than *(date)* _____

        A hearing to review the motion shall be held on *(date)* _____

    ☐ **A Petition for Termination of Parental Rights** no later than *(date)* _____

☒ **An In-Court Judicial Review** shall be held on *(date)* 2/18/2020 _____

☐ Other orders _____
_____
_____
_____
_____
_____
_____

STATE O  CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

JAN 20 2023

CERTIFIED COPY
SEAL AFFIXED
BY _____
Deputy Chief Clerk

| Name of Judge | Signed *(Judge)* | Date ordered |
|---|---|---|
| Hon  WILLIAM CREMINS | 418033 | 9/19/2019 |

The above is a true copy of the order and was provided to the Commissioner of Children and Families.

| Signed *(Judge, Clerk)* | At *(Town)* | On *(Date)* |
|---|---|---|
| KELLY PINTO | WATERBURY | 9/19/2019 |

JD-JM-65  Rev. 4-12 (Page 2)

**Pursuant to C G S 51-193c, this document was signed or verified electronically by a judge or judge trial referee of the Superior
Court and has the same validity and status as a paper document that was signed or verified by such person**

**ADJUDICATORY/DISPOSITIONAL ORDERS**
JD-JM-65 Rev 4 12
C.G.S. §§ 46b-120 121 129j, 17a-93(l)
PA 11-240, Sec. 2

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
**JUVENILE MATTERS**
*www.jud.ct.gov*



| ADA NOTICE |
|---|
| The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA  contact a court clerk or an ADA contact person listed at *www.jud ct gov/ADA*. |

| Address of court | Docket number |
|---|---|
| 7 KENDRICK AVE WATERBURY CT 06702 | U06CP19011728A |

| Name of petitioner | Name of child or youth | Date of birth |
|---|---|---|
| DANBURY DCF OFFICE | EMMA P▇▇▇ | ▇▇2015 |

| Name of father | Address of father |
|---|---|
| ANTHONY P▇▇▇ | ▇▇▇▇▇▇ |

| Name of mother | Address of mother |
|---|---|
| KATHARINE P▇▇▇▇ | ▇▇▇▇▇▇ |

| Name of guardian (*if applicable*) | Address of guardian (*if applicable*) |
|---|---|
| | |

The court makes the following findings and enters the following orders in the best interest of the child or youth named above at a session of the Superior Court and in accordance with the statutes that apply to the case

## Adjudication

The court finds the child or youth    ☒ Neglected    ☐ Uncared for    ☐ Abused    **or**

☐ The court has found the child or youth    ☐ Neglected    ☐ Uncared for    STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

## Reasonable Efforts Finding *(If necessary)*

Continuation in the home is *contrary to the welfare* of the child or youth and

☐ Voluntary placement                                                **JAN 20 2023**

    ☐ Such out-of-home placement is in the best interests of the child or youth

☐ Reasonable efforts to *prevent removal* finding                    CERTIFIED COPY
SEAL AFFIXED

    ☐ Reasonable efforts to prevent or eliminate the need for removal of the child or youth were made by the state

    ☐ Reasonable efforts to prevent or eliminate the need for removal of the child or youth from the home
    were not possible                                            Deputy Chief Clerk

    ☐ Reasonable efforts were not made

## Disposition

1  ☒ The court finds that the following disposition is in the best interest of the child or youth    **or**

2  ☐ The court grants the motion to reopen and modify the prior disposition in this case  and finds  the
    following modified disposition to be in the best interest of the child or youth

☒ **A  Commitment** The child or youth is committed until further order of the court to the Commissioner of Children
    and Families who shall be the guardian of the child or youth according to the statutes in such cases
    Commitment is effective  **9/19/2019**

☐ **B  Protective Supervision** Continuation in the home is not contrary to the best interest of the child or youth.
    The Commissioner of Children and Families shall provide Protective Supervision for the child or youth
    beginning _____ until _____ Child's place of abode is with
    (name) _____ who is a suitable and worthy person

☐ C  **Custody/Guardianship** The ☐ custody ☐ guardianship of the child or youth is vested in
(name) _____ who is or are found to be suitable and worthy caretaker(s)

☐ Subject to an order of Protective Supervision for the child or youth
beginning _____ until _____

☐ D  **Extension of protective supervision** The Commissioner of Children and Families shall provide Protective
Supervision for the child or youth for an additional period beginning _____ until _____

☐ E  **Termination of Protective Supervision** The period of Protective Supervision previously ordered will end on
_____

## Further Order Of The Court

☒ The above order incorporates the services and steps set out in the attached Specific Steps

☐ The Commissioner of Children and Families shall file

☐ A **Status Report** on or about _____

☐ A **Motion for Review of Permanency Plan** on or before _____

A hearing to review the permanency plan shall be held on _____

☐ A **Motion for**                                              OF ECTICUT
                                                    SUPERIOR COURT
                                                    JUVENILE MATTERS

☐ **Revocation/Transfer of Guardianship** no later than *(date)* _____

☐ **Modification of disposition** no later than *(date)* _____      JAN 20 2023

A hearing to review the motion shall be held on *(date)* _____

☐ A **Petition for Termination of Parental Rights** no later than *(date)* _____      CERTIFIED COPY
                                                                    SEAL AFFIXED

☐ An **In-Court Judicial Review** shall be held on *(date)* _____            Deputy Chief Clerk

☐ Other orders. _____
_____
_____
_____
_____
_____
_____

| Name of Judge | Signed *(Judge)* | Date ordered |
|---|---|---|
| Hon. WILLIAM CREMINS | 418033 | 9/19/2019 |

The above is a true copy of the order and was provided to the Commissioner of Children and Families

| Signed *(Judge, Clerk)* | At *(Town)* | On *(Date)* |
|---|---|---|
| KELLY PINTO | WATERBURY | 9/19/2019 |

JD-JM-65  Rev 4 12 (Page 2)

Pursuant to C G S 51 193c, this document was signed or verified electronically by a judge or judge trial referee of the Superior
Court and has the same validity and status as a paper document that was signed or verified by such person

**ADJUDICATORY/DISPOSITIONAL ORDERS**
JD-JM-65 Rev 4-12
C.G.S. §§ 46b-120, 121 129j, 17a-93(i)
PA 11-240, Sec. 2

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
**JUVENILE MATTERS**
*www.jud.ct.gov*



| ADA NOTICE |
|---|
| The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA* |

| Address of court | Docket number |
|---|---|
| 7 KENDRICK AVE WATERBURY CT 06702 | U06CP19011729A |

| Name of petitioner | Name of child or youth | Date of birth |
|---|---|---|
| DANBURY DCF OFFICE | NOAH P█ | █2012 |

| Name of father | Address of father |
|---|---|
| ANTHONY P█ | ███████████ |

| Name of mother | Address of mother |
|---|---|
| KATHARINE P█ | ███████████ |

| Name of guardian (*if applicable*) | Address of guardian (*if applicable*) |
|---|---|

The court makes the following findings and enters the following orders in the best interest of the child or youth named above at a session of the Superior Court and in accordance with the statutes that apply to the case

## Adjudication

The court finds the child or youth    ☒ Neglected    ☐ Uncared for    ☐ Abused    **or**

☐ The court has found the child or youth.  ☐ Neglected    ☐ Uncared for    ☐ Abused    on

*OF CONNECTICUT*
*SUPERIOR COURT*
*JUVENILE MATTERS*

### Reasonable Efforts Finding (*If necessary*)

Continuation in the home is *contrary to the welfare* of the child or youth and

☐ Voluntary placement                                                         **JAN 20 2023**

☐ Such out of-home placement is in the best interests of the child or youth

☐ Reasonable efforts to *prevent removal* finding

☐ Reasonable efforts to prevent or eliminate the need for removal of the child or youth were made by the state
*CERTIFIED COPY*
*SEAL*

☐ Reasonable efforts to prevent or eliminate the need for removal of the child or youth from the home were not possible
*Deputy Chief Clerk*

☐ Reasonable efforts were not made

## Disposition

1  ☒ The court finds that the following disposition is in the best interest of the child or youth    **or**

2  ☐ The court grants the motion to reopen and modify the prior disposition in this case  and finds  the following modified disposition to be in the best interest of the child or youth

☐ **A  Commitment** The child or youth is committed until further order of the court to the Commissioner of Children and Families who shall be the guardian of the child or youth according to the statutes in such cases Commitment is effective _____

☒ **B. Protective Supervision** Continuation in the home is not contrary to the best interest of the child or youth The Commissioner of Children and Families shall provide Protective Supervision for the child or youth beginning  **9/19/2019**  until  **3/19/2020**  Child's place of abode is with (name)  **ANTHONY P█**  who is a suitable and worthy person

☐ C. **Custody/Guardianship** The ☐ custody ☐ guardianship of the child or youth is vested in
  (name) _____ who is or are found to be suitable and worthy caretaker(s)

  ☐ Subject to an order of Protective Supervision for the child or youth
  beginning _____ until _____

☐ D. **Extension of protective supervision** The Commissioner of Children and Families shall provide Protective
  Supervision for the child or youth for an additional period beginning _____ until _____

☐ E. **Termination of Protective Supervision** The period of Protective Supervision previously ordered will end on
  _____

## Further Order Of The Court

☐ The above order incorporates the services and steps set out in the attached Specific Steps

☐ The Commissioner of Children and Families shall file

  ☐ A Status Report on or about _____

  ☐ A Motion for Review of Permanency Plan on or before _____

  A hearing to review the permanency plan shall be held on _____

  ☐ A Motion for

    ☐ Revocation/Transfer of Guardianship no later than *(date)* _____

    ☐ Modification of disposition no later than *(date)* _____

    A hearing to review the motion shall be held on *(date)* _____

  ☐ A Petition for Termination of Parental Rights no later than *(date)* _____

☒ An In-Court Judicial Review shall be held on *(date)*    2/18/2020 _____

*[stamp: CONNECTICUT SUPERIOR COURT JUVENILE MATTERS  JAN 20 2023  CERTIFIED COPY SEAL AFFIXED  BY _____ Deputy Chief Clerk]*

☐ Other orders

_____
_____
_____
_____
_____
_____
_____

| Name of Judge | Signed *(Judge)* | Date ordered |
|---|---|---|
| Hon  WILLIAM CREMINS | 418033 | 9/19/2019 |

The above is a true copy of the order and was provided to the Commissioner of Children and Families

| Signed *(Judge, Clerk)* | At *(Town)* | On *(Date)* |
|---|---|---|
| KELLY PINTO | WATERBURY | 9/19/2019 |

JD-JM-85  Rev 4 12  (Page 2)

**Pursuant to C G S 51-193c, this document was signed or verified electronically by a judge or judge trial referee of the Superior Court and has the same validity and status as a paper document that was signed or verified by such person**

**ADJUDICATORY/DISPOSITIONAL ORDERS**
JD-JM-65  Rev 4-12
C.G.S §§ 46b-120, 121  129j, 17a-93(f)
PA 11-240, Sec. 2

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
**JUVENILE MATTERS**
*www jud ct gov*



---

**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud ct.gov/ADA*

---

| Address of court | | Docket number |
|---|---|---|
| 7 KENDRICK AVE  WATERBURY CT 06702 | | U06CP19011730A |

| Name of petitioner | Name of child or youth | Date of birth |
|---|---|---|
| DANBURY DCF OFFICE | SAVANNAH P | 2009 |

| Name of father | Address of father |
|---|---|
| ANTHONY P | |

| Name of mother | Address of mother |
|---|---|
| KATHARINE P | |

| Name of guardian *(if applicable)* | Address of guardian *(if applicable)* |
|---|---|

The court makes the following findings and enters the following orders in the best interest of the child or youth named above at a session of the Superior Court and in accordance with the statutes that apply to the case

## Adjudication

The court finds the child or youth   [x] Neglected   [ ] Uncared for   [ ] Abused   or

[ ] The court has found the child or youth   [ ] Neglected   [ ] Uncared for   [ ] Abused   or

## Reasonable Efforts Finding *(If necessary)*

Continuation in the home is *contrary to the welfare* of the child or youth and

[ ] Voluntary placement

    [ ] Such out-of-home placement is in the best interests of the child or youth

[ ] Reasonable efforts to *prevent removal* finding

    [ ] Reasonable efforts to prevent or eliminate the need for removal of the child or youth were made by the state

    [ ] Reasonable efforts to prevent or eliminate the need for removal of the child or youth from the home were not possible

    [ ] Reasonable efforts were not made

STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

JAN 20 2023

CERTIFIED COPY

_____
Deputy Chief Clerk

## Disposition

1  [x] The court finds that the following disposition is in the best interest of the child or youth   or

2  [ ] The court grants the motion to reopen and modify the prior disposition in this case  and finds  the following modified disposition to be in the best interest of the child or youth

[ ] A  **Commitment** The child or youth is committed until further order of the court to the Commissioner of Children and Families who shall be the guardian of the child or youth according to the statutes in such cases Commitment is effective _____

[x] B  **Protective Supervision** Continuation in the home is not contrary to the best interest of the child or youth The Commissioner of Children and Families shall provide Protective Supervision for the child or youth beginning   9/19/2019   until   3/19/2020   Child's place of abode is with (name)   ANTHONY P   who is a suitable and worthy person

☐ **C Custody/Guardianship** The ☐ custody  ☐ guardianship of the child or youth is vested in
(name) _____ who is or are found to be suitable and worthy caretaker(s)

   ☐ Subject to an order of Protective Supervision for the child or youth
   beginning _____ until _____

☐ **D Extension of protective supervision** The Commissioner of Children and Families shall provide Protective
Supervision for the child or youth for an additional period beginning _____ until _____

☐ **E Termination of Protective Supervision** The period of Protective Supervision previously ordered will end on
_____

## Further Order Of The Court

☐ The above order incorporates the services and steps set out in the attached Specific Steps

☐ The Commissioner of Children and Families shall file

   ☐ A **Status Report** on or about _____

   ☐ A **Motion for Review of Permanency Plan** on or before _____

   A hearing to review the permanency plan shall be held on _____

   ☐ A **Motion for**

     ☐ Revocation/Transfer of Guardianship no later than *(date)* _____

     ☐ Modification of disposition no later than *(date)* _____

     A hearing to review the motion shall be held on *(date)* _____

   ☐ A **Petition for Termination of Parental Rights** no later than *(date)* _____

☒ An **In-Court Judicial Review** shall be held on *(date)*    2/18/2020 _____

☐ Other orders

_____
_____
_____
_____
_____
_____

*(stamp:)* ⊃ CONNECTICUT SUPERIOR COURT JUVENILE MATTERS

JAN 20 2023

CERTIFIED COPY SEAL AFFIXED

Deputy Chief Clerk

| Name of Judge | Signed *(Judge)* | Date ordered |
|---|---|---|
| Hon WILLIAM CREMINS | 418033 | 9/19/2019 |

The above is a true copy of the order and was provided to the Commissioner of Children and Families

| Signed *(Judge, Clerk)* | At *(Town)* | On *(Date)* |
|---|---|---|
| KELLY PINTO | WATERBURY | 9/19/2019 |

JD-JM-65  Rev 4 12 (Page 2)

Pursuant to C G S 51-193c, this document was signed or verified electronically by a judge or judge trial referee of the Superior Court and has the same validity and status as a paper document that was signed or verified by such person

**REVOCATION OF ORDER OF COMMITMENT/GUARDIANSHIP CUSTODY/TEMPORARY CUSTODY AND SUBSEQUENT ORDER OF CUSTODY/TEMPORARY CUSTODY GUARDIANSHIP/PROTECTIVE SUPERVISION**

JD-JM-76  Rev 4-12
C.G.S. § 46b-129(m)
P.B  §§ 26-1(q), 35a 12  35a-14a  35a-16

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
**JUVENILE MATTERS**
*www.jud ct.gov*



**ADA NOTICE**
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA.*

| Juvenile Matters At *(Address of court)* | Docket Number |
|---|---|
| 7 KENDRICK AVE  WATERBURY CT 06702 | U06CP19011728A |

| Name of Minor Child or Youth | Date of Birth | Place of Birth |
|---|---|---|
| EMMA P▮ | ▮2015 | DANBURY CT |

| Name of Mother | Address of Mother |
|---|---|
| KATHARINE P▮ | ▮ |

| Name of Father | Address of Father |
|---|---|
| ANTHONY P▮ | ▮ |

| Name of Guardian *(If applicable)* | Address of Guardian *(If applicable)* |
|---|---|

## Order of Custody/Guardianship

The court enters the following orders in the best interest of the child or youth named above and as a matter of the Superior Court and in accordance with the statutes that apply to the case

STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

1  Temporary custody is vested in

| Name  *(Other than Commissioner of DCF)* | Relationship to Child or Youth *(If any)* |
|---|---|
| | JAN 20 2023 |

Address

CERTIFIED COPY
SEAL AFFIXED

2  The order of    BY _____

[x] Commitment and/or    [ ] Custody    [ ] Temporary Custody    [x] Guardianship    Deputy Chief Clerk

to  DCF    entered on  9/19/2019

with respect to the minor child or youth named above is revoked or modified and the child's or youth's

*Primary Physical*
[x] Custody *w/Father, Joint*    [x] Guardianship    •    [ ] Temporary Custody
*Legal Custody With Mother and Father.*

[x] Reverts To    [ ] Is Transferred To:    [ ] Is vacated

| Name *(Other than Commissioner of DCF)* | Relationship to Child or Youth *(If any)* |
|---|---|
| ANTHONY P▮ | Father |

Address
▮

3  [x] Protective Supervision is ordered  beginning  10/9/2019    until  3/19/2020
The child or youth is to reside with the custodian and/or guardian named above subject to the services and steps set out in the Specific Steps

| Dated At  *(Town)* | On *(Date)* |
|---|---|
| WATERBURY | 10/9/2019 |
| By *(Type name of Judge)* | Signed *(Judge/Clerk)* |
| Hon  JOHN TURNER | 413581 |

**Distribution**    Original  File    Copy 1  Parent or Guardian    Copy 2  Commissioner of D C F

Pursuant to C.G.S 51-193c  this document was signed or verified electronically by a judge or judge trial referee of the Superior Court and has the same validity and status as a paper document that was signed or verified by such person

Superior Court Juvenile Matters
at WATERBURY
10/9/2019

| | | | | |
|---|---|---|---|---|
| Docket No | U06CP19011728A | | AAG | ALLISON MATHIAS |
| In re | EMMA P█████ | | Judge | JOHN TURNER |
| Petition | REVOCATION | | Monitor | Shirley Ann Fogle |
| Purpose | Plea | | Clerk | Nicole Hayes |

## APPEARANCES

| Person Name | Type | Represented By | Appeared |
|---|---|---|---|
| ERIC JOSEPH PALLADINO | Attorney for Juvenile | | Yes |
| ISIDRO RUEDA | Attorney for Mother | | Yes |
| HEATHER LAMBERT PERREAULT | Attorney for Father | | Yes |
| KATHARINE P█████ | Mother | ISIDRO RUEDA | Yes |
| ANTHONY P█████ | Father | HEATHER LAMBERT PERREAULT | Yes |
| FRANK ROTOVNIK | DCF SOCIAL WORKER | | Yes |
| ALLISON MATHIAS | AAG | | Yes |

## DISPOSITION

STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

| | |
|---|---|
| Overall Disposition | Approved |
| Overall Secondary Disposition | Reunification with Protective Supervision |
| Achieve Permanency Plan Findings | |
| Effective Date | 10/9/2019 |
| PS Term | 162 |
| PS Type | D |
| Expiration Date | 3/19/2020 |
| Settlement Codes | Disp by Agree/Parties |
| Person Agency | |
| Comments | W/ Anthony P█████ (father) |

JAN 20 2023

CERTIFIED COPY
SEAL AFFIXED
BY _Jill Prto_

Deputy Chief Clerk

## FINDINGS

| Petition | Type | Decision |
|---|---|---|
| REVOCATION | Achieve then Plan | Select |

## CONTINUANCE

| Date and Time | Room | Purpose | Reason | Notice |
|---|---|---|---|---|
| 2/5/2020 00 00 | | Written | Protective Supervision Expiration Date | N |
| 2/18/2020 02 00 | B | In-court Review | Status of Protective Supervision | N |

<u>COMMENT</u>

Court in session at 3 13PM
AAG reports that siblings on PS w/father
AAG withdraws step 5 of the addendum agreement to Specific Steps filed by on 9/23/19
Addendum agreement to Specific Steps with the modification of step 5 being withdrawn by the AAG is
signed by judge  Addendum agreement to Specific Steps entered as a court order
Motion to revoke filed by AAG with all parties in agreement to revoke commitment
Court states that if either party wants to modify custody, it will have to be modified in family court
Atty  Palladino reports re  child
—The recommended disposition in the study is modified w/ mother and father sharing joint legal custody
Study in support of Revoking Commitment is marked Exhibit A
Court canvasses mother and father about the agreement to revoke commitment
Court grants Motion for revocation of commitment by agreement of all parties finding that the cause for
commitment no longer exists and that it is in Emma's best interest  PS w/ father to run concurrently with
siblings ending on 3/19/20
— Primary physical custody with father and joint legal custody with mother and father  Custody agreement
outlined in body of motion for revocation of commitment
Specific steps were previously ordered.
Dates - SR due on 2/5/20 and ICR PS 2/18/20 at 2PM ✓
MRP hearing on 12/18/19 at 11AM is marked off  o/c

STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

JAN 2 0 2023

CERTIFIED COPY
SEAL AFFIXED
BY_____ Deputy Chief Clerk

Honorable JOHN TURNER          413581                                    10/9/2019

Pursuant to C G S 51 193c, this document was signed or verified electronically by a judge or judge trial
referee of the Superior Court and has the same validity and status as a paper document that was signed or
verified by such person

Docket No   U06CP19011728A

Superior Court Juvenile Matters
at WATERBURY
2/18/2020

| | | | | |
|---|---|---|---|---|
| Docket No | U06CP19011727A | | AAG | JEANET LASKOS |
| In re | MAIRIN P██████ | | Judge | JOHN TURNER |
| Petition | NEGLECT | | Monitor | Rose Lopez |
| Purpose | In-court Review | | Clerk | Carlie Grycz |

## APPEARANCES

| Person Name | Type | Represented By | Appeared |
|---|---|---|---|
| ERIC JOSEPH PALLADINO | Attorney for Juvenile | | Yes |
| ISIDRO RUEDA | Attorney for Mother | | Yes |
| HEATHER LAMBERT PERREAULT | Attorney for Father | | Yes |
| KATHARINE P██████ | Mother | ISIDRO RUEDA | Yes |
| ANTHONY P██████ | Father | HEATHER LAMBERT PERREAULT | Yes |
| JEANET LASKOS | AAG | | Yes |
| Monique P | DCF SOCIAL WORKER | | Yes |

STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

## COMMENT

SR supports PS to expire as scheduled on 3/19/20, court accepts
Atty Palladino reports on children,

*ok*

JAN 20 2023

CERTIFIED COPY
SEAL AFFIXED
BY _Kim P iñol_
Deputy Chief Clerk

------------- -----        ------------------- --- ------ --------------------        -- -        ------ -----

Honorable JOHN TURNER          413581                                    2/18/2020

Pursuant to C G S 51-193c, this document was signed or verified electronically by a judge or judge trial
referee of the Superior Court and has the same validity and status as a paper document that was signed or
verified by such person

Superior Court Juvenile Matters
at WATERBURY
2/18/2020

| | | | |
|---|---|---|---|
| Docket No | U06CP19011728A | AAG | JEANET LASKOS |
| In re | EMMA P ██████ | Judge | JOHN TURNER |
| Petition | NEGLECT, ABUSED | Monitor | Rose Lopez |
| Purpose | In court Review | Clerk | Carlie Grycz |

## APPEARANCES

| Person Name | Type | Represented By | Appeared |
|---|---|---|---|
| ERIC JOSEPH PALLADINO | Attorney for Juvenile | | Yes |
| ISIDRO RUEDA | Attorney for Mother | | Yes |
| HEATHER LAMBERT PERREAULT | Attorney for Father | | Yes |
| KATHARINE P ██████ | Mother | ISIDRO RUEDA | Yes |
| ANTHONY P ██████ | Father | HEATHER LAMBERT PERREAULT | Yes |
| JEANET LASKOS | AAG | | Yes |
| Monique P | DCF SOCIAL WORKER | SUPERIOR COURT JUVENILE MATTERS | Yes |

## COMMENT

SR supports PS to expire as scheduled on 3/19/20, court accepts.
Atty  Palladino reports on children,   ⌀⌀

JAN 2 0 2023

C  RTIFIED COPY
⌐ FFIXED          Deputy Chief Clerk

---------- ----------- -------------------------------- -- ------------       -------------- ----------------------- -------

Honorable JOHN TURNER        413581                                             2/18/2020
    Pursuant to C G S 51-193c, this document was signed or verified electronically by a judge or judge trial
referee of the Superior Court and has the same validity and status as a paper document that was signed or
verified by such person

Superior Court Juvenile Matters
at WATERBURY
2/18/2020

| | | | |
|---|---|---|---|
| Docket No | U06CP19011729A | AAG | JEANET LASKOS |
| In re | NOAH P█████ | Judge | JOHN TURNER |
| Petition | NEGLECT | Monitor | Rose Lopez |
| Purpose | In-court Review | Clerk | Carlie Grycz |

## APPEARANCES

| Person Name | Type | Represented By | Appeared |
|---|---|---|---|
| ERIC JOSEPH PALLADINO | Attorney for Juvenile | | Yes |
| ISIDRO RUEDA | Attorney for Mother | | Yes |
| HEATHER LAMBERT PERREAULT | Attorney for Father | | Yes |
| KATHARINE P█████ | Mother | ISIDRO RUEDA | Yes |
| ANTHONY P█████ | Father | HEATHER LAMBERT PERREAULT | Yes |
| JEANET LASKOS | AAG | | Yes |
| Monique P | DCF SOCIAL WORKER | | Yes |

STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

## COMMENT

SR supports PS to expire as scheduled on 3/19/20, court accepts
Atty Palladino reports on children,    *ok*

JAN 20 2023

CERTIFIED COPY
SEAL AFFIXED Deputy Chief Clerk
BY _____

------- ------- ----- -    ---      ---                ---      ------------        ----------- -------------------

Honorable JOHN TURNER          413581_____    2/18/2020

Pursuant to C G S 51-193c, this document was signed or verified electronically by a judge or judge trial
referee of the Superior Court and has the same validity and status as a paper document that was signed or
verified by such person

Superior Court Juvenile Matters
at WATERBURY
2/18/2020

| | | | |
|---|---|---|---|
| Docket No | U06CP19011730A | AAG | JEANET LASKOS |
| In re | SAVANNAH P███████ | Judge | JOHN TURNER |
| Petition | NEGLECT | Monitor | Rose Lopez |
| Purpose | In-court Review | Clerk | Carlie Grycz |

## APPEARANCES

| Person Name | Type | Represented By | Appeared |
|---|---|---|---|
| ERIC JOSEPH PALLADINO | Attorney for Juvenile | | Yes |
| ISIDRO RUEDA | Attorney for Mother | | Yes |
| HEATHER LAMBERT PERREAULT | Attorney for Father | | Yes |
| KATHARINE P███████ | Mother | ISIDRO RUEDA | Yes |
| ANTHONY P█████ | Father | HEATHER LAMBERT PERREAULT | Yes |
| JEANET LASKOS | AAG | | Yes |
| Monique P | DCF SOCIAL WORKER | | Yes |

STATE OF CONNECTICUT
SUPERIOR COURT
JUVENILE MATTERS

## COMMENT

SR supports PS to expire as scheduled on 3/19/20, court accepts
Atty Palladino reports on children, ∂/∠

JAN 2 0 2023

CERTIFIED COPY
SEAL AFFIXED
BY K C H   CFO        Deputy Chief Clerk

-------------------------------------------------------------------------

Honorable JOHN TURNER        413581                                    2/18/2020

Pursuant to C G S 51-193c, this document was signed or verified electronically by a judge or judge trial
referee of the Superior Court and has the same validity and status as a paper document that was signed or
verified by such person

Exhibit F

**Katharine Pileggi - Vol II**

**Pileggi vs. Mathias**
**3:22-cv-01315-AWT**

**April 10, 2025**



**ROBERT**
**MILLER**
**REPORTING**

1000 Farmington Ave
Suite 103
West Hartford, CT 06107
860-269-9191

production@millerreporting.com
millerreporting.com

VOLUME II

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                                  :
KATHARINE PILEGGI, ET AL.,
                                  :
              Plaintiffs,
                                  :  Civil Action No.
vs.                                  3:22-cv-01315-AWT
                                  :
MATHIAS, ET AL.,
                                  :
              Defendants.
                                  :
- - - - - - - - - - - - - - - - - x

          Continued deposition of KATHARINE

     PILEGGI, taken pursuant to the Federal Rules

     of Civil Procedure, at the law offices of

     Danaher Lagnese, PC, 21 Oak Street, Hartford,

     Connecticut, before Janet C. Phillips,

     CSR No. 124, a Registered Professional

     Reporter and Notary Public in and for the

     State of Connecticut, on Thursday, April 10,

     2025, at 10:13 a.m.

1

2                        A P P E A R A N C E S

3

4     LAW OFFICES OF TRICIA S. LINDSAY
      Attorneys for the Plaintiffs
5     531 E. Lincoln Avenue - Suite 5B
      Mount Vernon, Connecticut  10552
6     Phone:  (347) 386-4604
      Email:   tricialindsaylaw@gmail.com
7              attorney@tricialindsaylaw.com
         By:  TRICIA SOPHIA LINDSAY, Esq.
8

9     DANAHER LAGNESE, PC
      Attorneys for the Defendants Connecticut Children's
10    Medical Center, Lawrence Zemel, M.D. and Kevin
      Fitzsimmons, PA
11    21 Oak Street
      Hartford, Connecticut  06106
12    Phone:  (860) 247-3666
      Email:   tplumridge@danaherlagnese.com
13             spayne@danaherlagnese.com
               dltran@danaherlagnese.com
14       By:  THOMAS J. PLUMRIDGE, Esq.

15

16    OFFICE OF THE ATTORNEY GENERAL
      Attorneys for the Defendants
      165 Capitol Avenue
17    Hartford, Connecticut  06106
      Phone:  (860) 808-5318
18    Email:   john.tucker@ct.gov
               samuel.shapiro@ct.gov
19       By:  JOHN TUCKER, Esq.
                    -and-
20            SAMUEL SHAPIRO, Esq.

21

22

23

24

25

Katharine Pileggi - Vol II
Copy

295

1        A.    Correct.

2        Q.    And so is it fair -- is Morse an herbalist?

3        A.    No, he is an N.D.

4        Q.    And does he --

5        A.    Also, sorry, excuse me, he is also a

6    herbalist, but he's a naturopathic doctor, biochemist,

7    and herbalist.

8        Q.    Okay.  So he believes that using certain kinds

9    of herbal regimens is the key to treating disease?

10       A.    Correct.  But he doesn't just believe.  He's

11   proven this, as did his predecessor, Dr. Sebi, who won

12   Supreme Court cases using the same exact type of

13   treatment.  It was in New York Supreme Court.

14       Q.    And did you consult with Dr. Morse on Emma's

15   treatment or Emma's symptoms in, I guess it would have

16   been 2018?

17       A.    Correct.  But we also had her pediatrician

18   involved as well.  So it wasn't just us contacting

19   Morse.  We had other people.

20       Q.    How did you contact Morse?

21       A.    So when Anthony and I were looking up top

22   doctors or top specialists within the Lyme field to

23   bring in -- because, again, this is something that I was

24   very well-versed in, having Lyme myself and almost

25   dying, and I was part of the Western medicine route when

Katharine Pileggi - Vol II
Copy

305

1    bacterium die-off in the body.  So you get very, very

2    sick.  It's like having the flu all the time.

3        Q.   Was that something you learned from Dr. Morse?

4        A.   No.   That's something I experienced and I

5    talked to my doctors about.

6        Q.   Let me ask you, where did Dr. Morse go to

7    school?

8        A.   He studied at the University of England, I

9    believe.  A university in England.

10       Q.   In England.

11       A.   Yes.

12       Q.   Do you know what the university in England

13   was?

14       A.   I could pull it up for you.

15       Q.   Let's just work with what you know.

16       A.   I don't recall the exact.  No.  But I will get

17   it.

18       Q.   And so he studied at this university in

19   England.  What degree, if any, was awarded to him?

20       A.   N.D.

21       Q.   And N.D. is?

22       A.   Naturopathic doctor.

23       Q.   And do you know when he got that?

24       A.   I do not.

25       Q.   Do you know how long the course of study was

Katharine Pileggi - Vol II
Copy

306

1    at the university in England?

2        A.    No.   It's not something I asked him.   We

3    weren't like close friends.   He was just treating my

4    daughter.

5        Q.    Sure.   And was he awarded any other degrees,

6    to your knowledge?

7        A.    I believe biochemistry was one of his studies,

8    because that something that -- he gets into very

9    medical -- he knows the whole body, you know, like a

10   Western medical doctor.   So I believe biochemistry was

11   another area of study.

12       Q.    Where did he study biochemistry?

13       A.    I believe that was also -- based off of our

14   research of Dr. Morse and where he had gone to school,

15   it looked like it was in England.

16       Q.    In England.   Was it the same school he went

17   for the N.D.?

18       A.    I'm not sure.   I didn't ask him.

19       Q.    Okay.   So you're not sure where the school was

20   for that.   Did he get any additional degrees, to your

21   knowledge?

22       A.    I have no idea.   I didn't ask him.

23       Q.    Okay.   Fair enough.

24       A.    He was just helping our daughter, and we were

25   happy.

Katharine Pileggi - Vol II
Copy

307

```
 1          Q.   And do you know whether he is licensed to

 2    provide health care?

 3          A.   With detoxification, especially in the state

 4    of Florida, even in Connecticut, it doesn't require a

 5    license.

 6          Q.   Okay.  So as far as you know, he's not

 7    licensed as a health care provider?

 8          A.   No, 'cause you're not prescribing medications.

 9    You're prescribing herbal protocols.

10               MS. LINDSAY:  Licensed by who?

11               MR. TUCKER:  Well, I was thinking

12               licensed by a state authority in Florida or

13               any other state in the union.

14          Q.   How about that?

15          A.   You don't need a license to give herbal

16    protocols.  Like, say I was able to go get my

17    detoxification, correct, and open my business that I had

18    sitting waiting, I wouldn't have to go to the state and

19    say, hey, I need to license to do detoxification and

20    herbal protocols.  It wouldn't be something that I would

21    have to go and apply for.

22          Q.   That's fair.  But just to answer my question,

23    as far as you know, he's not licensed as a health care

24    provider in any state that you're aware of?

25          A.   No, because he doesn't advertise as a health
```

1    care provider.

2         Q.   Okay.  Fair enough.  Let me have you take a

3    look at Exhibit H.  I'll have you take a look at that

4    for a minute.  Don't read it aloud, but just review it

5    for a minute, see if you recognize that document.

6                   (Pause in the proceedings.)

7         A.   Lovely.

8         Q.   Are you familiar with that document?

9         A.   No.

10        Q.   Okay.

11        A.   I don't believe so.  This is off his website?

12        Q.   I would represent to you I did print it off

13   the internet, and it purports to be about Dr. Morse.

14        A.   Oh, there you go.  We all use the internet.

15        Q.   But does that describe his --

16        A.   Reflective of Dr. Morse.

17                   (Reporter interruption.)

18        Q.   And it talks about regenerative detoxification

19   there.

20        A.   Correct.

21        Q.   What's regenerative detoxification?

22        A.   Again, that's addressing the body as a whole

23   to remove any blockages, stagnation, accumulated toxins,

24   acids, mucus, to regenerate the body back to health.  So

25   it's, again, getting to the root cause, what is

Katharine Pileggi - Vol II
Copy

315

1    didn't acknowledge all the learning and expertise you

2    had.  I mean, is that a fair statement?

3        A.    No.  No.  I don't have the learning and

4    expertise.  Let alone the side that I was sick with

5    Lyme, right, that alone was a lot of fear around our

6    child and her ever being as sick as I was.

7            So we were coming in as concerned parents

8    saying our child had a tick and now she's very, very

9    sick.  I wasn't saying that I'm some sort of a doctor

10   and I'm a know-it-all.  We were just coming as concerned

11   parents and said this is what's going on, she was just

12   bitten by a tick, she's exhibiting the same symptoms

13   that I had, and I just recovered and I almost died.

14           So we wanted it acknowledged and we wanted her

15   tested, we wanted her treated.  We asked for

16   antibiotics.  Nothing was even considered or listened

17   to.  It was just no, no, no, no, stop talking, what do

18   you think you know.

19           And we said, you know, also when I had Lyme

20   disease, I also had Epstein-Barr, and that is another

21   viral load that makes you really, really sick.  We also

22   want to test for that to see if she has that going on.

23   It wasn't just stuff we pulled out of thin air.

24       Q.    What do you know about Dr. Zemel's educational

25   and professional experience?

Katharine Pileggi - Vol II
Copy

316

1          A.    He's a doctor of rheumatology.

2          Q.    Do you know where he went to school?

3          A.    I don't care to know where he went to school

4     because he doesn't act like a professional.

5          Q.    Okay.  So would that be no, you don't know?

6          A.    No.

7          Q.    Okay.  Do you know where he did his residency?

8          A.    No.

9          Q.    Do you know whether he received any advanced

10    training?

11         A.    No.

12         Q.    Do you know how long he's been a physician?

13         A.    No.

14         Q.    And then what kind of doctor is he?

15         A.    Rheumatology.  But head of the Lyme disease

16    department.

17         Q.    Well, I was going to ask you that.  Is there

18    actually a Lyme disease department at CCMC?

19         A.    There's a Lyme specialty department,

20    absolutely.  And it was advertised on CCMC's website.

21         Q.    And so he is the head of the Lyme department,

22    as far as you know?

23         A.    Yes.

24         Q.    But he is actually a pediatric rheumatologist,

25    right?

Katharine Pileggi - Vol II
Copy

317

1          A.   Correct.

2          Q.   Okay.  And is he head of that department?

3          A.   I have no idea.

4          Q.   Okay.  And what is rheumatology?

5          A.   The study of joints, rheumatic conditions in

6    people.

7          Q.   And you so had this initial appointment with

8    Dr. Zemel.  And actually it was you and Tony at the

9    appointment?

10         A.   Correct.  Always.

11         Q.   And Dr. Zemel was there?

12         A.   Correct.

13         Q.   And presumably Emma was there too?

14         A.   Um-hum.

15         Q.   And before that point, did you have any

16   contact with Dr. Zemel or was that your first point of

17   contact?

18         A.   First point of contact.

19         Q.   Okay.  And after that, did either he or

20   members of his staff at CCMC try to reach out to you

21   either by telephone or email or some other way?

22         A.   Yes, Dr. Zemel reached out to me, specifically

23   my phone number.

24         Q.   He had your phone number?

25         A.   Yes.

1                    C E R T I F I C A T E

2              I hereby certify that I am a Notary Public, in

3       and for the State of Connecticut, duly commissioned and

4       qualified to administer oaths.

5              I further certify that the deponent named in

6       the foregoing deposition was by me duly sworn, and

7       thereupon testified as appears in the foregoing

8       deposition; that said deposition was taken by me

9       stenographically in the presence of counsel and reduced

10      to typewriting under my direction, and the foregoing is

11      a true and accurate transcript of the testimony.

12             I further certify that I am neither of counsel

13      nor attorney to either of the parties to said suit, nor

14      am I an employee of either party to said suit, nor of

15      either counsel in said suit, nor am I interested in the

16      outcome of said cause.

17             Witness my hand and seal as Notary Public

18      this 22nd day of April 2024.

19

20

21                          Janet C. Phillips

22                          Notary Public

23                          CSR No. 124

24      My Commission expires:

25      October 31, 2026

Exhibit G

**Anthony Pileggi**
**Volume II**

**Pileggi vs. Mathias**
**3:22-cv-01315-AWT**

**May 20, 2025**



**ROBERT**
**MILLER**
**REPORTING**

1000 Farmington Ave
Suite 103
West Hartford, CT 06107
860-269-9191

production@millerreporting.com
millerreporting.com

VOLUME II

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - x
                                    :
KATHARINE PILEGGI, ET AL.,
                                    :
                Plaintiffs,
                                    :  Civil Action No.
vs.                                    3:22-cv-01315-AWT
                                    :
MATHIAS, ET AL.,
                                    :
                Defendants.
                                    :
- - - - - - - - - - - - - - - - - - x

            Continued deposition of ANTHONY PILEGGI,

        taken pursuant to the Federal Rules of

        Civil Procedure, at the law offices of

        Danaher Lagnese, PC, 21 Oak Street,

        Hartford, Connecticut, before Janet C.

        Phillips, CSR No. 124, a Registered

        Professional Reporter and Notary Public in and

        for the State of Connecticut, on Tuesday,

        May 20, 2025, at 10:29 a.m.

Anthony Pileggi
Volume II
Copy

80

1

2                        A P P E A R A N C E S

3

4       LAW OFFICES OF TRICIA S. LINDSAY
        Attorneys for the Plaintiffs
5       531 E. Lincoln Avenue - Suite 5B
        Mount Vernon, Connecticut  10552
6       Phone:  (347) 386-4604
        Email:   tricialindsaylaw@gmail.com
7                attorney@tricialindsaylaw.com
            By:  TRICIA SOPHIA LINDSAY, Esq.
8

9       DANAHER LAGNESE, PC
        Attorneys for the Defendants Connecticut Children's
10      Medical Center, Lawrence Zemel, M.D. and Kevin
        Fitzsimmons, PA
11      21 Oak Street
        Hartford, Connecticut  06106
12      Phone:  (860) 247-3666
        Email:   tplumridge@danaherlagnese.com
13               spayne@danaherlagnese.com
                 dltran@danaherlagnese.com
14          By:  THOMAS J. PLUMRIDGE, Esq.

15

16      OFFICE OF THE ATTORNEY GENERAL
        Attorneys for the Defendants
        165 Capitol Avenue
17      Hartford, Connecticut  06106
        Phone:  (860) 808-5318
18      Email:   john.tucker@ct.gov
            By:  JOHN TUCKER, Esq.
19

20

21

22

23

24

25

Robert Miller Reporting Services

Anthony Pileggi
Volume II
**Copy**

124

```
 1        Q.   And how about weight gain?  Did your child
 2   have normal weight gain during the period when you had
 3   custody?
 4        A.   Yes.
 5        Q.   And, I'm sorry, I may have asked the question.
 6   To your understanding, was it normal weight gain during
 7   period of time?
 8        A.   As she was growing, yes, as she should.
 9        Q.   When you had custody of your daughter in
10   October 2019 to June 2021, were you bringing your child
11   or treating with Dr. Morse?
12        A.   I don't remember exactly, but I'm sure, yes.
13   That was where her protocol was originally from.
14        Q.   Right.  And as far as the protocol goes, when
15   you say "protocol," you mean the herbs and supplements
16   that Dr. Morse recommended?
17        A.   Yes.
18        Q.   Did you resume Dr. Morse's protocol when you
19   regained custody in October 2019?
20        A.   Yes, I did.
21        Q.   All right.  Did you do that immediately?
22        A.   Once she was weaned off of the Enbrel, the
23   methotrexate, and the folic acid.
24        Q.   All right.  It's my understanding, though,
25   that your daughter remained on Enbrel and methotrexate
```

Anthony Pileggi
Volume II
**Copy**

125

1    for a period of time after her hospitalization, right?

2        A.    After her hospitalization when she was with

3    the foster?  Yes.

4        Q.    And even after you regained custody in October

5    of 2019, she was taking Enbrel for a period of time,

6    right?

7        A.    No.  Like I said before, we weaned her off of

8    it.  She was not on it anymore.

9        Q.    I guess I'm misunderstanding, though.  If

10   there are records of your daughter being on Enbrel in

11   October 2019, between then and June 2021, was your

12   daughter actually not taking Enbrel?

13       A.    She was not.  Like I said, again, we weaned

14   her off.  But I would fulfill the prescriptions in order

15   to protect my child.

16       Q.    So it's your testimony that when you regained

17   custody of your child in October 2019, this is during

18   the period of time when you were bringing your child to

19   see Dr. Zemel, right?

20       A.    Yes.

21       Q.    And Dr. Zemel for a period of time was

22   continuing to prescribe Enbrel, right?

23       A.    Yes.

24       Q.    He was also continuing to prescribe

25   methotrexate, right?

Anthony Pileggi
Volume II
**Copy**

126

1        A.    Yes.

2        Q.    So it's your testimony that even though

3    Dr. Zemel was prescribing Enbrel and methotrexate, after

4    you regained custody of your daughter in October 2019,

5    you never gave her those medications?

6        A.    I did not.  Well, I did give her for a little

7    bit.  Like I said, with the Dr. Lopusny's guidance, we

8    weaned her off of it.

9        Q.    When did you resume bringing your child to

10   Dr. Lopusny?

11       A.    Probably right after, because there was a time

12   when we weren't allowed to bring her there because DCF

13   stated it was too far at the beginning, because that was

14   our child's doctor.

15       Q.    So after -- do you recall when it was

16   Dr. Lopusny recommended weaning your child off Enbrel?

17       A.    I'm sure we have the records somewhere, yes.

18       Q.    And as you sit here today, you don't recall

19   specifically?

20       A.    Not exactly no.  I don't want to misspeak.

21       Q.    Was there a period of time that you were

22   weaning your daughter off Enbrel per Dr. Lopusny's

23   recommendations, but you did not inform Dr. Zemel of

24   that fact?

25       A.    Yes, the whole time.  Absolutely.

Anthony Pileggi
Volume II
Copy

127

```
 1        Q.   When you say there was a little bit of time
 2   that you continued to provide Enbrel and methotrexate as
 3   prescribed by Dr. Zemel following your reunification in
 4   October 2019, can you be any more specific as to how
 5   long a period of time it was?
 6        A.   Probably a month or two.  It wasn't overnight
 7   that we just took it off on our own.  We had to ask our
 8   doctor and see what she had recommended, 'cause she had
 9   seen Emma from the beginning and knew that this wasn't
10   what she had, arthritis.
11        Q.   Setting aside Dr. Lopusny, were there any
12   other providers with whom you resumed treating your
13   daughter when you regained custody in October 2019?
14        A.   Off the top of my head, I do not recall.  It's
15   going to be Lopusny, probably the herbal protocols from
16   Morse.
17        Q.   Anything else that you can recall?
18        A.   Not off the top of my head, no.
19        Q.   At some point, did your ex-wife regain the
20   ability to see your child?
21        A.   Yes.
22        Q.   When was that, to your recollection?
23        A.   Are we talking before I had her back or after?
24        Q.   After.
25        A.   After?  I mean, immediately.
```

Anthony Pileggi
Volume II
**Copy**

160

1     Q.   I'd like to show you what's been marked as

2   Defendants' Exhibit C.

3               MR. TUCKER:  And I provided counsel all

4           those exhibits that I'm going to show

5           Mr. Pileggi.  And I'd like to show him the one

6           that's marked Defendants' Exhibit C.

7     Q.   If I could ask you just to look at that,

8   please, sir.

9     A.   Okay.

10    Q.   Have you had a chance to look at it?

11    A.   I remember this like it was yesterday, yes.

12    Q.   And at the top of that, is this a text

13  message?

14    A.   Yes, it is.

15    Q.   And was it sent on August 27, 2019?

16    A.   At 2:22 p.m.

17    Q.   Yes.

18    A.   Yes.

19    Q.   And was this sent by you?

20    A.   Yes.

21    Q.   And to whom was it sent?

22    A.   I believe this was Frank, right?  Yes.

23    Q.   And this is Frank, the social worker who's a

24  defendant here?

25    A.   Rotovnik, yes.

Anthony Pileggi
Volume II
Copy

161

1      Q.   And why did you send this email?

2      A.   I sent it just to show that I was -- I was

3  trying to get my daughter back, and I would have done

4  anything.  This was desperation.

5      Q.   Okay.  Well, let me go through and ask you a

6  few things about it.  The first line says "Just wanted

7  to let you know I had a great conversation with

8  Dr. Zemel."

9           First of all, did you, in fact, have a

10  conversation with Dr. Zemel?

11      A.   I must have, yes, if I said it.

12      Q.   And do you recall when you had that

13  conversation?

14      A.   It must have been before August 27th.  I think

15  this is when they were starting to try to brief me on

16  her treatment.

17      Q.   And Dr. Zemel was doing that?

18      A.   I believe so.  I was allowed on one of the

19  calls.

20      Q.   And was this conversation by cell phone --

21      A.   I'm not sure exactly.

22      Q.   -- or was it face-to-face?

23      A.   I'm not sure exactly.

24      Q.   Okay.  And you indicated that "The

25  conversation was short, as he's busy, but he took my

Anthony Pileggi
Volume II
**Copy**

162

1  call right away."  Is that accurate?

2      A.   If that's what I put here, yes.

3      Q.   And "I started off with thanking him and his

4  team," exclamation point, exclamation point.  Is that

5  accurate?  Did you, in fact, thank him and his team?

6      A.   Yes.

7      Q.   And "On another note, Emma was discharged from

8  PT."  Is that accurate?

9      A.   Yes.  We all see it here.  We see it.  Come

10  on.

11      Q.   Well, but you made that representation.  I

12  assume that was your knowledge at the time.  Am I

13  correct in understanding that?

14      A.   Yes.

15      Q.   All right.  "Also wanted to thank you guys for

16  waking me the F up."

17      A.   F stands for fuck.

18      Q.   Okay.  And why did you say that?

19      A.   Again, like I was telling you at the beginning

20  here when you first asked me about this is I was

21  starting to see how the game worked and trying to get my

22  daughter back, and desperate.

23          So if you take a father, who's meant to

24  protect their child, their third child, their daughter,

25  you tie their hands behind their back and you dangle the

Anthony Pileggi
Volume II
**Copy**

163

```
 1    daughter in front of their face, it makes you do things.

 2    Right?

 3         Q.   Well, would it be fair to say that when you

 4    said "Also wanted to thank you guys for waking me the F

 5    up," that you were not being sincere when you said that?

 6         A.   Yeah, like I just said.

 7         Q.   "Of course this is not how I could have

 8    imagined it going, but had to happen to make me a better

 9    father and wake me up."  Were you being truthful when

10    you said that or insincere?

11         A.   Insincere.

12         Q.   Okay.  "Sorry if I'm being emotional, but it's

13    an emotional day for me.  As to the day, it's been five

14    months."  Is that part accurate?

15         A.   Yes.

16         Q.   "Emma has been gone from me, and with her

17    birthday coming up, she's always in my thoughts,"

18    exclamation point, exclamation point.  Is that part

19    accurate?

20         A.   Yes, it's there.

21         Q.   And you're being truthful for that part of it?

22         A.   Yes.

23         Q.   Let me also have you take a look at -- and let

24    me just have you hand me back that document.  Let me

25    have you take a look at a different document.  And this
```

Anthony Pileggi
Volume II
**Copy**

170

1          A.    To commission it, no.

2          Q.    Okay.  What was the tactic?  What did you

3     think was the tactic?

4          A.    To get my daughter back.  Heather was telling

5     me, recommending me stuff, what I could do, what we

6     should do to get your daughter back to you, 'cause I'm

7     not a lawyer.

8          Q.    And how does this report fit into that tactic,

9     if you know?

10         A.    I'm not sure.

11         Q.    But at a certain point, was it around April

12    2019 that you were able to look at the report?

13         A.    I'm not sure when exactly I looked at it.

14         Q.    Okay.  Were you provided a copy of the report?

15         A.    I believe so, yes.

16         Q.    And that was by Attorney Perreault?

17         A.    Yes.

18         Q.    Okay.  If I could have the exhibit back.  I'm

19    notorious about losing exhibits.

20               Now, I think in your prior testimony, you had

21    indicated that you were divorced from Katharine, and

22    that was in 2024?

23         A.    '25, I believe -- or, no, '24, yes.

24         Q.    And that was up here in Connecticut?

25         A.    Yes.

Anthony Pileggi
Volume II
**Copy**

171

1      Q.   And did you indicate to anybody from DCF that

2   you were thinking about divorce prior to that time?

3      A.   No.

4      Q.   You never mentioned that to any representative

5   of DCF that you can recall?

6      A.   I was told if I divorced Katharine, that I

7   would get my daughter back sooner, I would get her back

8   before the evaluation that we had to take -- I forget

9   exactly where it was, but the psych evaluation that you

10  guys forgot to come to the first time.

11     Q.   Okay.  Who told you that?

12     A.   Who told us what?

13     Q.   What you just indicated, they you'd get your

14  daughter back sooner?

15     A.   At one of the meetings that we had in DCF.

16     Q.   And who was at the meeting?

17     A.   I believe Frank, Cory.  Was Cory one of the

18  people there?  I do not recall exactly, but there was a

19  couple people in the meeting.

20     Q.   When was the meeting?

21     A.   Sometime when you guys had her.  I don't know

22  exactly.

23     Q.   So --

24     A.   It was before -- maybe the evaluation was in

25  July, if I recall, when you guys had her.

Anthony Pileggi
Volume II
**Copy**

172

```
 1         Q.    What year?

 2         A.    2000- -- I'm not sure exactly.  When you guys

 3    had her, I said.  There's been a lot of dates thrown

 4    around today.

 5         Q.    When she was in the guardianship --

 6         A.    Yes.

 7         Q.    -- of the Department of Children and Families?

 8         A.    Yes.

 9         Q.    And where did the meeting take place?

10         A.    At the Danbury office.

11         Q.    And you're not sure who was there.  Who said

12    that to you?

13         A.    Who said what to me?

14         Q.    That you'd get your daughter back faster if

15    you divorced.

16         A.    It was whispered outside after the meeting to

17    Heather and to one of the ladies there from DCF.

18         Q.    It was whispered.  So it wasn't said to you

19    directly?

20         A.    It was whispered to me, Heather, and the lady

21    who said it.  We were outside the office.

22         Q.    So it was a lady who did the whispering?

23         A.    From your DCF, yes, dude.

24         Q.    And who was the lady who did the whispering?

25         A.    One of your ladies.  I answered that.
```

1          MS. LINDSAY:  He asked and answered that

2      three times.

3          MR. TUCKER:  Well, I'm just trying to

4      find out who whispered.

5          MS. LINDSAY:  He said he didn't know.  He

6      said a lady from DCF.

7      Q.   Is that true?  You don't know who the lady is

8  who did the whispering?

9          MS. LINDSAY:  He can't remember the name,

10      he said.

11          MR. TUCKER:  I would ask that the actual

12      witness testify.

13          MS. LINDSAY:  He said it three times.

14          MR. TUCKER:  I didn't understand that.

15      Q.   So you don't know who the lady was who

16  whispered that.  And this was outside the meeting,

17  right?

18      A.   Yes.

19      Q.   Okay.  And so aside from this whispering

20  following a meeting, was there any other time that

21  anyone from the Department of Children and Families

22  talked to you about divorce?

23      A.   Yes.

24      Q.   When was that?

25      A.   Don't have exact dates, but that was a Frank

Anthony Pileggi
Volume II
**Copy**

174

1    conversation.  It was also a Frank conversation that if

2    I removed Katharine from my home, I would get my

3    daughter back sooner as well.  And that I do have on

4    text.

5           Q.    Okay.  And do you know what year that was?

6           A.    That was when you guys had her in custody.

7           Q.    Okay.  And was this -- were you meeting with

8    Frank?  Was it just Frank or were there other people

9    there?

10          A.    At what time?

11          Q.    When Frank told you that if the mother was

12   removed from the home, you'd get custody faster.

13          A.    It wasn't an exact meeting, like, at DCF

14   office.  It was through text, through a phone call,

15   through DCF with Frank.

16          Q.    And what Frank told you in these

17   communications was what?

18          A.    If I removed Katharine from the home and I can

19   provide him with a lease that Katharine is out of the

20   home, that it would move the process along, it would be

21   greatly appreciated.

22          Q.    Okay.  So what he was talking about is her not

23   being in the home when the children were reunified with

24   you?

25          A.    No, prior to.

Anthony Pileggi
Volume II
Copy

175

1          MS. LINDSAY:  Objection.

2      Q.   Prior to what?  I'm sorry.  Let me back up a

3  little bit.  So Frank is saying to you, I think, that if

4  Katharine -- if you and Katharine weren't living

5  together, the child could be reunified more quickly than

6  if Katharine was with you?  Is that sort of the essence

7  of what he said to you?

8          MS. LINDSAY:  Objection.  Why don't we

9              narrow down whether this was prior to or after

10             the reunification, 'cause your question is

11             assuming facts that have not been put on the

12             record yet.

13          MR. TUCKER:  Well, let me ask the

14             question, then.

15          MS. LINDSAY:  Yes, please.

16      Q.   Were these communications from Frank prior to

17  the reunification or after the reunification?

18      A.   Prior to.  This was all -- with the divorce

19  and with removing her from the home, this was all

20  leading up to it.

21      Q.   So this would have been 2019?  Does that sound

22  right to you?

23      A.   I believe so, yes, if that's when.

24      Q.   And you mentioned that there was a phone call

25  and there was a text message.  Was the substance of the

Anthony Pileggi
Volume II
Copy

176

1    phone call and text message essentially the same?

2        A.    Yes.

3        Q.    Okay.  And the essence of it was it would be

4    better for your case if Katharine moved out of where you

5    were living at the time?

6        A.    It would be better for me to get Emma back

7    sooner if Katharine was not in the home.

8        Q.    Got it.  Okay.  Well, let me ask you -- let me

9    have you take a look at Exhibit E, if you would, which

10   is a nine-page document.

11                   (Pause in the proceedings.)

12       A.    Okay.

13       Q.    So let me ask you, have you seen this document

14   before?

15       A.    I don't believe so, unless I got a copy a long

16   time ago with all the family stuff.

17       Q.    Okay.  And it indicates it's a final decision

18   of Administrative Hearing Officer Attorney Robin D.

19   O'Shea.  First of all, do you remember participating in

20   an administrative hearing before Robin O'Shea?

21       A.    Yes.

22       Q.    And was that in 2020 and 2021?

23       A.    Yes.

24       Q.    And it indicates that there is an Attorney

25   Lisa Vincent for the appellants, in other words, for you

213

1                    C E R T I F I C A T E

2            I hereby certify that I am a Notary Public, in

3    and for the State of Connecticut, duly commissioned and

4    qualified to administer oaths.

5            I further certify that the deponent named in

6    the foregoing deposition was by me duly sworn, and

7    thereupon testified as appears in the foregoing

8    deposition; that said deposition was taken by me

9    stenographically in the presence of counsel and reduced

10   to typewriting under my direction, and the foregoing is

11   a true and accurate transcript of the testimony.

12           I further certify that I am neither of counsel

13   nor attorney to either of the parties to said suit, nor

14   am I an employee of either party to said suit, nor of

15   either counsel in said suit, nor am I interested in the

16   outcome of said cause.

17           Witness my hand and seal as Notary Public

18   this 9th day of June 2025.

19

20

                              _Janet C. Phillips_

                              Janet C. Phillips
21                            Notary Public
                              CSR No. 124
22

23   My Commission expires:
     October 31, 2026
24

25

Exhibit H

# CERTIFIED COPY

## In The Matter Of:

*Katharine Pileggi, Anthony Pileggi Also, as Next Friend to their Minor Child "EP" v. Kim Mathias Assistant Attorney General State of Connecticut, in her individual and Official capacity, Kaela Minerly in her Individual and official capacity, Frank Rotovnik in his individual and official capacity, Connecticut Children's Medical Center, Dr. Roman Alder, Dr. Lawrence Zemmel, Dr. Lindsey Laughinghouse, Dr. Andrew Bazos, Dr. Kevin Fitzsimmons, Connecticut Department of Children and Families ("DCF") and "John and Jane Does 1-10"*

---

*\*Dr. Lawrence Zemel\**

*July 25, 2025*

---

*A Plus Reporting Service LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
------------------------------------ :
KATHARINE PILEGGI, ANTHONY PILEGGI :
                        Plaintiffs,   :
also, as Next Friend to their         :
Minor Child "EP"                      :
                                      :   Docket No.
 -vs-                                 :   22-cv-1315
                                      :
KIM MATHIAS, Assistant Attorney       :
General State of Connecticut, in      :
her individual and Official           :
capacity, KAELA MINERLY in her        :
individual and official capacity,     :
FRANK ROTOVNIK in his individual      :
and official capacity, CONNECTICUT :
CHILDREN'S MEDICAL CENTER,            :
DR. ROMAN ALDER, DR. LAWRENCE         :
ZIMMEL, DR. LINDSEY LAUGHINGHOUSE, :
DR. ANDREW BAZOS, DR. KEVIN           :
FITZSIMMONS, CONNECTICUT DEPARTMENT:
of CHILDREN and FAMILIES ("DCF")     :
and "JOHN and JANE DOES 1-10",       :
                        Defendants    :
_____   :
```

DEPOSITION OF: DR. LAWRENCE ZEMEL
DATE TAKEN:      JULY 25, 2025
LOCATION:        APLUS REPORTING SERVICES, LLC
                 55 WHITING STREET
                 PLAINVILLE, CT  06062

Reporter: KATHLEEN S. NORTON, LSR #105

## APPEARANCES

Representing the Plaintiffs: Katharine and Anthony

 Pileggi

Law Office of Tricia S. Lindsay, PC
531 E. Lincoln Ave, Suite 5B
Mount Vernon, New York 10552
By: Tricia S. Lindsay, Esq.
    tricialindsaylaw@gmail.com

Representing the Defendant:

Danaher Lagnese, P.C.
21 Oak Street
Hartford, CT  06106
Phone: 860.247.3666 Fax: 860.547.1321
By: Stuart Johnson, Esq.
    sjohnson@danaherlagnese.com

Representing the Defendant: State of Connecticut

Office of the Attorney General
General Litigation Department
165 Capitol Avenue
Hartford, CT  06106
By: John Essex Tucker, Esq.
    john.tucker@ct.gov
    Samuel Shapiro, Esq.
    samuel.shapiro@ct.gov

Also present:

Katharine Pileggi

1    A.    Yes.

2    Q.    Okay.  Good.  That helps.  So you know

3    that when you're here I'm going to be asking you a

4    series of questions related to the complaint that has

5    been filed where you've been named as one of the

6    defendants.  I tend to speak quickly sometimes and

7    once we get started with the questions sometimes

8    I could speak overtalk you, you can overtalk me

9    assuming you know my question.  I'm going to ask you

10   to try to wait until I'm done asking the question so

11   you're clear about what I'm asking.

12   A.    Right.

13   Q.    And to answer verbally so that the court

14   reporter can get down what you're saying and I will

15   try to do the same.  If I ask you something that you

16   don't understand, please ask me to repeat it or to

17   clarify.  If I begin to speak too quickly ask me to

18   slow down and I will.

19   A.    Okay.

20   Q.    Do you have any questions for me?

21   A.    No.

22   Q.    No.  Okay.  Did you take any medications

23   today that would prevent you from answering

24   truthfully?

25   A.    No.

1    Q.    Please state your full name for the

2    record.

3    A.    Lawrence Zemel.

4    Q.    What is your current professional title

5    and place of employment?  Start with your title.

6    A.    I'm retired.

7    Q.    Oh.  And so what was your last place of

8    employment?

9    A.    Connecticut Children's Medical Center.

10    Q.    Can you describe your educational

11    background for me.

12    A.    Sure.  Starting with college?

13    Q.    Yes.  You can start there.

14    A.    Brooklyn College, the State University of

15    New York at Buffalo Medical School, pediatric

16    residency in Buffalo, rheumatology in Boston.

17    Q.    So your specialty is rheumatology?

18    A.    Pediatric rheumatology.

19    Q.    Prior to CCMC, were you employed

20    elsewhere?

21    A.    Newington Children's Hospital.

22    Q.    Prior to Newington Children's Hospital

23    were you employed?

24    A.    No.

25    Q.    So it was Newington and CCMC?

1       A.      Those were my two employers.

2       Q.      How long did you work for Newington

3   Children's Hospital?

4       A.      From 1978 until 1996.

5       Q.      How did you come to -- well, what position

6   did you begin when you started at Newington

7   Children's Hospital?

8       A.      I was head of pediatric rheumatology

9   there.

10      Q.      So upon being hired in 1978, you were head

11  of pediatric rheumatology?

12      A.      Yes.

13      Q.      Okay.  So prior to Newington Children's

14  Hospital, where were you employed?

15      A.      I wasn't.  I was training, finishing my

16  training.

17      Q.      And when you say training, where were you

18  training?

19      A.      I did my pediatrics in Buffalo from

20  1975 -- excuse me, 1973 until 1975, and I did my

21  rheumatology fellowship from 1975 until 1977.

22      Q.      Okay.  How did you come to be the head of

23  pediatric rheumatology at Newington?

24      A.      Well, there was no position before I got

25  there so I created the position.

1    Q.    And was that an opportunity granted by the

2  school?  By the hospital?

3    A.    By the hospital.

4    Q.    By the hospital.  Can you describe the

5  training in Buffalo that you went through?

6    A.    Yes.  I did two years of pediatric

7  residency, which was a comprehensive training program

8  in all aspects of pediatrics.

9    Q.    And the fellowship, was that similar?

10    A.    The fellowship was focused on arthritic or

11  rheumatic diseases of children.

12    Q.    How did you come to be employed or

13  actually when did you leave Newington Children's

14  Hospital?

15    A.    1996.

16    Q.    And when were you employed by CCMC?

17    A.    We moved from Newington Children's

18  directly into the newly built Connecticut Children's.

19    Q.    So when you say we --

20    A.    We, the entire hospital closed and

21  everything was merged into the new building.

22    Q.    Okay.  And so when you began at CCMC in

23  1996, what was your position there?

24    A.    Head of pediatric rheumatology.

25    Q.    And is that the position you remained in

1    throughout your tenure at CCMC?

2         A.    Until the last couple of years when

3    I turned the administrative role over to my second in

4    command.

5         Q.    And so you remained in that until -- when

6    did you retire?

7         A.    2021, April 2021.

8         Q.    And you said you turned it over to your

9    second in command?

10        A.    Well, I turned it over a couple of years

11   before because I was reducing my time in anticipation

12   of retirement.

13        Q.    Who was your second in command?

14        A.    Barbara Edelheit.

15        Q.    Can you spell the last name?

16        A.    E-D-E-L-H-E-I-T.

17        Q.    In your training, did any of that training

18   have to do with Lyme disease?

19             MR. JOHNSON:  Objection to form.  You

20             can answer, I just object to the form.

21        A.    Lyme disease was first described really in

22   1977 so my education about Lyme disease came more

23   from the literature than my formal training.

24   BY MS. LINDSAY:

25        Q.    And when you say came from the literature,

1    what types of literature did you use?

2         A.    Articles in scientific journals and

3    meetings.

4         Q.    Meetings?  What kind of meetings?

5         A.    Continuing medical education meetings.

6         Q.    Approximately how many classes did you

7    take continuing learning education classes in Lyme

8    disease?

9         A.    I would typically take 80 to 100 hours a

10   year.

11        Q.    But that wasn't all based on -- that

12   wasn't all -- that didn't all have to do with Lyme

13   disease, did it?

14        A.    Correct.

15        Q.    So specifically Lyme, how many hours would

16   you say?

17        A.    I couldn't recall.

18             MR. JOHNSON:  Wait until she finished

19             asking before you start your answer.

20   BY MS. LINDSAY:

21        Q.    Can you start your study as extensive or

22   baseline?  How would you describe it without giving

23   me exact hours?

24             MR. JOHNSON:  Object to form.  You

25             can answer.

1                    THE WITNESS:  I'm sorry?

2                    MR. JOHNSON:  You can answer.

3       A.    Okay.  It was extensive.

4  BY MS. LINDSAY:

5       Q.    Were there any particular experts that you

6  gleaned your information from in reading these

7  journals?

8                    MR. JOHNSON:  Objection to form.

9       A.    Probably mostly Dr. Alan Steere.

10 BY MS. LINDSAY:

11      Q.    S-T-E-E-R?

12      A.    S-T-E-E-R-E.

13      Q.    What is his title, do you know, or his

14 specialty?

15      A.    Well, at the time initially he was an

16 associate professor at Yale.

17      Q.    Anyone else that you can recall?

18                    MR. JOHNSON:  Objection to form.  You

19                    can answer.

20      A.    No.

21 BY MS. LINDSAY:

22      Q.    Have you ever had any board certifications

23 lapse?

24      A.    Lapse?

25      Q.    Yes.

1    A.    As I was planning to retire I allowed my
2    pediatric rheumatology certification to lapse.
3         Q.    That's the only time?
4         A.    That's the only time.
5         Q.    Have you ever faced any disciplinary
6    actions?
7         A.    No.
8         Q.    So I take it you're board certified in
9    rheumatology, pediatric rheumatology?
10        A.    Yes, and pediatrics.
11        Q.    Have you published any articles?
12        A.    Yes.
13        Q.    Approximately how many?
14        A.    Approximately 40.
15        Q.    On what topics?
16        A.    Mostly on Lyme disease.
17        Q.    Any other topics?
18        A.    Yes, juvenile idiopathic arthritis,
19    systemic lupus, dermatomyositis and others.
20        Q.    Have you done any research papers --
21        A.    Yes.
22        Q.    -- published any research papers?
23        A.    Yes.  Most of these publications were
24    research papers.
25        Q.    Were they particularly on Lyme disease?

1    A.    Some were lyme disease, as I said, and

2    some were other illnesses.

3    Q.    Can you describe some of them for me?

4    Give me, you know, examples.

5    A.    Sure.  I was a coauthor on the national

6    guidelines on the diagnosis and treatment of Lyme

7    disease that was published in 2020, I believe.

8    Q.    Any before 2020?

9    A.    Any articles before?

10    Q.    Any articles, I'm sorry.

11    A.    Yes.

12    Q.    On Lyme disease particularly?

13    A.    Some on Lyme disease, yes.

14    Q.    Could you name some more for me, please?

15    A.    Sure.

16    Q.    Or describe some more?

17    A.    I published comprehensive review of Lyme

18    disease in the Journal of Rheumatology in, maybe it

19    was 1992 approximately.

20    Q.    Have you ever testified as an expert?

21    A.    Yes.

22    Q.    Approximately how many times would you

23    say?

24    A.    Four.

25    Q.    And what types of cases were they?

1    A.    One was a case of lupus, one was a case of

2  vasculitis, one was a case of Lyme disease, and

3  that's all I can recall right now.

4    Q.    Okay.  In your research articles or

5  studies, your publications regarding Lyme disease,

6  could you just give me a sense of what you published

7  regarding Lyme disease in pediatrics?

8                MR. JOHNSON:  Objection to form.

9    A.    Well, as I said, one was national

10 guidelines of the diagnosis and treatment of Lyme

11 disease.

12 BY MS. LINDSAY:

13    Q.    Okay.

14    A.    And another was a review of my first one

15 hundred cases of Lyme disease.

16    Q.    And can you just give me some information,

17 your national guidelines and treatment of Lyme

18 disease, that was based on your opinions, I'm sure,

19 and research that you had done, correct?

20    A.    It wasn't based on my opinion.

21    Q.    Okay.

22    A.    It was based on a comprehensive review of

23 the world's literature, no.

24    Q.    It was not an opinion piece, a research?

25    A.    This was a meta analysis of the world's

1    literature on Lyme disease.

2        Q.    When you say world's literature on Lyme

3    disease, where did that literature come from?  You

4    said the world literature.

5        A.    It's all publicly available.

6        Q.    What sources, though, I'm asking.

7        A.    PubMed would be one of the search engines

8    we used.

9        Q.    Okay.

10       A.    That was the main one that I used.

11       Q.    Okay.  And that one, that one was done in

12   2020, published in 2020, you're saying?

13       A.    I believe when you looked at my CV you

14   probably saw the dates so you probably have a better

15   sense of it than I do right now.  So do you want to

16   tell me what the date was?

17       Q.    No.

18       A.    Okay.

19       Q.    And when you did your review of the first

20   one hundred cases of Lyme disease --

21       A.    Yes.

22       Q.    -- what year was that about?

23       A.    Probably maybe around 2000.  I'm just

24   guessing right now.

25       Q.    Upon doing a review of your first one

1    A.    Some were lyme disease, as I said, and

2    some were other illnesses.

3    Q.    Can you describe some of them for me?

4    Give me, you know, examples.

5    A.    Sure.  I was a coauthor on the national

6    guidelines on the diagnosis and treatment of Lyme

7    disease that was published in 2020, I believe.

8    Q.    Any before 2020?

9    A.    Any articles before?

10   Q.    Any articles, I'm sorry.

11   A.    Yes.

12   Q.    On Lyme disease particularly?

13   A.    Some on Lyme disease, yes.

14   Q.    Could you name some more for me, please?

15   A.    Sure.

16   Q.    Or describe some more?

17   A.    I published comprehensive review of Lyme

18   disease in the Journal of Rheumatology in, maybe it

19   was 1992 approximately.

20   Q.    Have you ever testified as an expert?

21   A.    Yes.

22   Q.    Approximately how many times would you

23   say?

24   A.    Four.

25   Q.    And what types of cases were they?

1    A.    One was a case of lupus, one was a case of

2  vasculitis, one was a case of Lyme disease, and

3  that's all I can recall right now.

4    Q.    Okay.    In your research articles or

5  studies, your publications regarding Lyme disease,

6  could you just give me a sense of what you published

7  regarding Lyme disease in pediatrics?

8                MR. JOHNSON:    Objection to form.

9    A.    Well, as I said, one was national

10  guidelines of the diagnosis and treatment of Lyme

11  disease.

12  BY MS. LINDSAY:

13    Q.    Okay.

14    A.    And another was a review of my first one

15  hundred cases of Lyme disease.

16    Q.    And can you just give me some information,

17  your national guidelines and treatment of Lyme

18  disease, that was based on your opinions, I'm sure,

19  and research that you had done, correct?

20    A.    It wasn't based on my opinion.

21    Q.    Okay.

22    A.    It was based on a comprehensive review of

23  the world's literature, no.

24    Q.    It was not an opinion piece, a research?

25    A.    This was a meta analysis of the world's

1    literature on Lyme disease.

2        Q.    When you say world's literature on Lyme

3    disease, where did that literature come from?  You

4    said the world literature.

5        A.    It's all publicly available.

6        Q.    What sources, though, I'm asking.

7        A.    PubMed would be one of the search engines

8    we used.

9        Q.    Okay.

10       A.    That was the main one that I used.

11       Q.    Okay.  And that one, that one was done in

12   2020, published in 2020, you're saying?

13       A.    I believe when you looked at my CV you

14   probably saw the dates so you probably have a better

15   sense of it than I do right now.  So do you want to

16   tell me what the date was?

17       Q.    No.

18       A.    Okay.

19       Q.    And when you did your review of the first

20   one hundred cases of Lyme disease --

21       A.    Yes.

22       Q.    -- what year was that about?

23       A.    Probably maybe around 2000.  I'm just

24   guessing right now.

25       Q.    Upon doing a review of your first one

1    BY MS. LINDSAY:

2        Q.    What would the Lyme Disease Clinic of

3    CCMC, what were the key protocols for testing and

4    treatment?

5                    MR. JOHNSON:    Objection to form.

6        A.    These were standard protocols that we

7    follow nationally or internationally.

8    BY MS. LINDSAY:

9        Q.    And so in your practice throughout your

10   career, have you treated adults or has it been a

11   hundred percent pediatric patients?

12       A.    A hundred percent pediatric unless you

13   consider an 18 or 19 year old an adult in which case

14   I would include them as well.

15       Q.    How many Lyme disease cases did you

16   oversee yearly in 2018 until your time of

17   requirement?

18       A.    From 2018?

19       Q.    Until your time of the retirement.

20       A.    Oh, I couldn't tell you.

21       Q.    Thousands?  Hundreds?

22       A.    Probably a couple hundred a year.

23       Q.    And prior to 2018, was that number lower

24   or lesser or higher?

25       A.    Probably the same.

BY MS. LINDSAY:

Q.    Okay.  Why don't we talk about the cause at hand.

What was the basis of your decision to report the Pileggis to the Department of Children and Families?

A.    This was a child who was already not walking and disabled with potential for further disability.

Q.    Your testimony is that when Emma Pileggi presented to your office she was not walking?

A.    It's well documented, yes.

Q.    How did you get Emma Pileggi as a patient?

A.    Her pediatrician Dr. Alder referred her.

Q.    When Dr. Alder referred her, what did he say?  He referred her because he thought she had Lyme disease, correct?

A.    No.

MR. JOHNSON:  Object to form.

A.    He ran a blood test for Lyme disease and it was negative.

BY MS. LINDSAY:

Q.    So why did he send her to you?

A.    Because she had arthritis and he wanted to know what type of arthritis it was and how best to

*Dr. Lawrence Zemel*

1    his blood test in comparison -- in relation to

2    Emma's, E.P., exposure to Lyme disease, possible Lyme

3    disease?

4        A.    I didn't make this clear before.  By the

5    time the child develops arthritis as a result of Lyme

6    disease this is a late manifestation, at least

7    several months after exposure and the blood test is

8    always positive at the time of arthritis.

9        Q.    Okay.  So she had Lyme disease when she

10   came to your office?

11       A.    Her Lyme test was negative and she did not

12   look like Lyme disease at all.  For example, she had

13   arthritis at least in one finger and that's not

14   characteristic of Lyme disease.

15       Q.    What about untreated Lyme disease?

16       A.    Same thing.  You don't generally get

17   arthritis in the fingers, as a general rule, but

18   importantly the blood test was negative.

19       Q.    The blood test that you ran or the blood

20   test from Dr. Alder?

21       A.    Dr. Alder.

22       Q.    You did not ask him when he took the blood

23   test in comparison to -- and if you she had been

24   exposed to a tick or anything of that sort?

25       A.    It was a recent blood test.  It was

1    probably within a couple of weeks of the visit.

2         Q.    My question is very specific, sir.  Did

3    you ever ask Dr. Alder when he administered the blood

4    test in relation to Emma's exposure to a tick or to

5    Lyme disease?

6         A.    There was no history of Emma being exposed

7    to a tick.

8         Q.    Did you ask if she had been exposed -- did

9    you ask him why he gave her a blood test?

10        A.    Well, it's standard if a child develops

11   arthritis and you're investigating the child for

12   different causes, a Lyme test is usually standard of

13   care so I did not ask him why he ran that.

14        Q.    Okay.  So it's understood that you had

15   that knowledge.  Did you ask him when was her

16   suspected exposure to Lyme?

17        A.    She didn't have Lyme disease.

18        Q.    That's not what I asked you.

19        A.    Well, then the answer to your question is

20   no.

21        Q.    So you didn't inquire?

22        A.    About tick exposure?

23        Q.    About the reason why he gave her a test

24   for Lyme disease.

25        A.    I just explained it to you.  If a child

1    has --

2                        MR. JOHNSON:  Let her finish and then

3              you can start your answer.

4        A.    Go ahead.  I'm sorry.

5    BY MS. LINDSAY:

6        Q.    Finish.  Go ahead.

7        A.    If a child has arthritis and a blood test

8    for Lyme disease is negative, that child does not

9    have Lyme disease.

10       Q.    Now, let me be clear.  I'm asking you,

11   because you said that timing is very important in

12   this matter, right?  You said that it takes weeks for

13   Lyme to develop in the blood, right, for antibodies,

14   for early onset --

15       A.    Early Lyme disease.  That's different.

16       Q.    Okay.  So by the time Emma or the Pileggis

17   brought there daughter to you, how long had it been

18   since she had rheumatoid arthritis, that she was

19   manifesting the symptoms?

20       A.    Well, based on her exam it had to be at

21   least several weeks.

22       Q.    Did you inquire as to when she started

23   demonstrating symptoms?

24       A.    Yes.

25       Q.    And who did you inquire of that?

1      A.    Yes, I have.

2      Q.    Did you come to learn that she thought

3  that Emma -- it was her opinion Emma had been

4  misdiagnosed?

5      A.    I know that she thought Emma had Lyme

6  disease wrongly.

7      Q.    You say wrongly?

8      A.    Yes.

9      Q.    Why do you say wrongly?

10     A.    For all the reasons I already elaborated.

11     Q.    Did there come a time when the Pileggis

12 were forced, to your knowledge, to stop seeing

13 Dr. Lopusny?

14     A.    Not that I'm aware of.

15     Q.    You made the call to the Department of

16 Children and Families to report the Pileggis,

17 correct?

18     A.    Correct.

19     Q.    And that was because -- could you explain

20 why?  Again, I believe you may have explained it

21 before but can you refresh my memory?

22     A.    Sure.  I was seeing this beautiful

23 disabled child who was at risk for permanent

24 disability and the parents were refusing approved

25 medical care that could treat her successfully.

CERTIFICATE OF REPORTER

I, Kathleen S. Norton, a Registered Professional Reporter/Commissioner within and for the State of Connecticut, do hereby certify that I took the deposition of  LAWRENCE ZEMEL, MD, on July 25, 2025, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my direction by means of Computer Assisted Transcription, and that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in the outcome of the action.

IN WITNESS THEREOF, I have hereunto set my hand July 31, 2025.

Kathleen S. Norton,  LSR #105

Notary Public
My commission expires:  8-31-2026

Lawrence Zemel , v2

Page 200

1    UNITED STATES DISTRICT COURT
2     DISTRICT OF CONNECTICUT
3
4   ——————————————————— :

5  KATHARINE PILEGGI, ANTHONY :
   PILEGGI,
6       Plaintiffs, :
  also, as Next Friend to their :
7  Minor Child "EP" :
         : CIVIL No.
8   -vs-     : 3:22-cv-01315-AWT
         :
9  KIM MATHIAS, Assistant Attorney :
  General State of Connecticut, :
10  in her individual and official :
  capacity, Kaela Minerly in her :
11  individual and official capacity: Volume 2
  Connecticut Children's Medical :
12  Center, Dr. Roman Alder, Dr. :
  Lawrence Zimmel, Dr. Lindsey :
13  Laughinghouse, Dr. Andrew Bazos,:
  Dr. Kevin Fitzsimmons, :
14  Connecticut Department of :
  Children and Families ("DCF") :
15  and "John and Jane Does 1-10" :
       Defendants. :
16   ——————————————————— :
17
18      CONTINUED
19   DEPOSITION OF: LAWRENCE ZEMEL, M.D.
20   DATE TAKEN:  DECEMBER 12, 2025
21   LOCATION:  ZOOM VIDEO CONFERENCE
22
23
24
25    KATHLEEN S. NORTON, CSR #105

Lawrence Zemel , v2

1                        **APPEARANCES**
2        Representing the Plaintiff:
3        Law Offices of Tricia Sophia Lindsay, Esq.
         531 E. Lincoln Ave Ste 5b
4        Mount Vernon, NY  10552
         Phone:  347.386.4604
5        By: Tricia Lindsay, Esq.
              tricialindsaylaw@gmail.com
6
7
8        Representing the Defendant:
9
10       Office of the Attorney General
11       165 Capitol Avenue
12       Hartford, CT  06106
13       By: John E. Tucker, AAG
14            john.tucker@ct.gov
15
16
17
18       Representing the Defendant:
19
20       Danaher Lagnese, P.C.
21       21 Oak Street
22       Hartford, CT  06106
23       Phone: 860.247.3666 Fax: 860.547.1321
24       By: Stuart Johnson, Esq.
25            sjohnson@danaherlagnese.com

Lawrence Zemel, v2

Page 253

1    considered the possible emotional impact of

2    providing treatment to Emma and I think you had

3    answered that --

4                    MS. LINDSAY:  I object.  That was

5              not my question, but go ahead.

6                    MR. TUCKER:  Well, that was my

7              understanding of it.

8                    MS. LINDSAY:  Well, it was not my

9              question.  I asked about the emotional

10             impact of treatment along with calling

11             DCF on the family.  That was my question,

12             but go ahead.

13                   MR. TUCKER:  Well, the record is the

14             record.

15                   MS. LINDSAY:  That's fine.

16   BY MR. TUCKER:

17       Q.    So I believe you answered that it would,

18   quote, prevent a lifetime of disability, and you

19   felt that that outweighed any emotional impact.

20             Could you, Doctor, explain what you

21   meant by that?

22       A.    Yes.  That the emergent or urgent issue

23   at hand was her pain, stiffness, inability to walk,

24   a future that was grim.  And I thought that we

25   could provide appropriate medical care as well as a

Lawrence Zemel , v2

Page 254

1    loving environment to minimize that impact.  And,

2    in fact, DCF provided Emma with a wonderful

3    temporary foster mother and foster sister and

4    I witnessed the interactions of the three of them

5    and it was as loving as could be.  Obviously, you

6    can't replace the love from the parents, but it

7    really provided a really warm environment and I saw

8    that.  So that reinforced our decision to at least

9    have an order of temporary custody.

10         Q.    And in your view, in your opinion, if

11   Emma had continued not to receive the standard of

12   care treatment, what would be -- what, if any,

13   consequences would result to her if no treatment

14   was provided?

15         A.    Well, the short answer to that is pretty

16   grim and that is she was failing to strive when she

17   was hospitalized.  Her weight went from the 20th

18   percentile to the 4th percentile.  She had not

19   gained any weight in a year.  She was malnourished.

20   She was lacking some critical elements of

21   nutrition:  Iron, vitamin D, phosphorus, protein.

22   And then also, I mean, her knee contractures, that

23   is her inability to straighten out her legs

24   progressed dramatically from when I first saw her.

25   She had 10 degree contractures, meaning she only

Lawrence Zemel , v2

Page 255

1    was lacking those last 10 degrees to 60-degree

2    contractures.  If we did nothing, that would

3    progress further to 90 degrees contractures.  She

4    would basically be confined to a wheelchair for the

5    rest of her life.

6         Q.    So in your opinion she was looking at

7    permanent disability and the inability to walk if

8    she did not receive standard of care treatment?

9         A.    Correct.

10        Q.    And then, Doctor, did you convey your

11    concerns to the Department of Children and Families

12    about her outlook and your concerns?

13        A.    Yes, I did.

14        Q.    And did you -- I realize this is back a

15    few years, but in March of 2019 do you recall

16    having a conversation with a DCF nurse named Ashia

17    Valez?

18        A.    Yes.

19        Q.    And in the course --

20            MS. LINDSAY:  Objection.  This is

21            beyond the scope of my questioning.

22            MR. TUCKER:  Yes.  Your objection is

23            noted.

24            MS. LINDSAY:  It's an objection.

25            This is beyond the scope of my direct.

Lawrence Zemel , v2

Page 256

1          We're not supposed to go into this.

2          You're supposed to ask questions within

3          the line of my questions.  I believe it's

4          within the line.  I didn't ask about any

5          conversation with DCF.

6               MR. TUCKER:  I think you did.

7               MS. LINDSAY:  The last deposition or

8          today's deposition?

9               MR. TUCKER:  Both.

10  BY MR. TUCKER:

11       Q.    Doctor, you -- in speaking to the nurse,

12  you verbalized that you thought that Emma required

13  medical intervention in order to prevent further

14  damage and have a chance of recovery; is that

15  correct?

16       A.    Yes, that is correct.

17       Q.    And you recommended hospitalization for

18  her?

19       A.    Yes.

20       Q.    And you expressed grave concerns if she

21  didn't receive treatment, correct?

22       A.    Correct.

23       Q.    And then based on your -- I believe it

24  was your testimony, and I just want to clarify it,

25  so she was in the hospital for approximately two

Lawrence Zemel , v2

Page 257

```
 1    weeks?
 2         A.    Yes.
 3         Q.    And you provided her standard of care
 4    treatment at that time, correct?
 5         A.    It was probably above standard of care.
 6         Q.    Okay.  And you observed improvement in
 7    her condition during that period of time?
 8         A.    Yes.
 9         Q.    Thank you.  That's all I have.
10    I appreciate your answering questions today,
11    Doctor.
12                  MS. LINDSAY:  I will have follow-up
13                  questions just to let you know.
14                  MR. JOHNSON:  Just a few questions
15                  from me.
16
17                  CROSS-EXAMINATION
18    BY MR. JOHNSON:
19         Q.    Ms. Lindsay asked you about whether you
20    collaborated with any of Emma's other medical
21    providers and I just want to flush that out a
22    little bit.
23                  Did you collaborate with Dr. Alder?
24         A.    Yes, I spoke with Dr. Alder and he
25    received a copy of my first note while he was still
```

Lawrence Zemel , v2

Page 266

```
 1              CERTIFICATE OF REPORTER
 2
 3        I, Kathleen S. Norton, a Registered Professional
          Reporter/Commissioner within and for the State of
 4        Connecticut, do hereby certify that I took the
          deposition of  LAWRENCE ZEMEL, M.D., on DECEMBER 12,
 5        2025, who was by me duly sworn to testify to the truth
          and nothing but the truth; that he was thereupon
 6        carefully examined upon his oath and his examination
          reduced to writing under my direction by means of
 7        Computer Assisted Transcription, and that this
          deposition is a true record of the testimony given by
 8        the witness.
 9
10        I further certify that I am neither attorney nor
          counsel for, nor related to, nor employed by any of
11        the parties to the action in which this deposition is
          taken and further that I am not a relative or employee
12        of any attorney or counsel employed by the parties
          hereto, nor financially interested in the outcome of
13        the action.
14
15        IN WITNESS THEREOF, I have hereunto set my hand
          December 26, 2025.
16
17
18
19        Kathleen S. Norton
20
21
          Kathleen S. Norton,   LSR #105
22
23
24        Notary Public
25        My commission expires:  8-31-2027
```