## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **KATHARINE PILEGGI ET AL.,** | ) | |
| | ) | |
| **Plaintiff** | ) | **CIVIL NO. 3:22-cv-01315-AWT** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MATHIAS ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | **JANUARY 30, 2026** |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), the undersigned defendants, **Connecticut Children's Medical Center ("CT Children's"), Lawrence Zemel, M.D., and Kevin Fitzsimmons**, P.A. (collectively, "the CT Children's defendants"), respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment. There are multiple grounds on which the CT Children's defendants are entitled to summary judgment.

*First*, the plaintiffs' claims against each of the CT Children's defendants are untimely under the applicable statute of limitations governing medical malpractice claims in Connecticut, Conn. Gen. Stat. § 52–584.

*Second*, the plaintiffs have failed to disclose any expert reports in support of their claims. Medical malpractice claims must be supported by expert opinion testimony as to standard of care, causation, and damages, and, in the absence of any such supporting opinion testimony, the plaintiffs' claims fail as a matter of law.

*Third*, even if the Court were to credit certain letters as appropriate expert reports under Rule 26(a)(2), which they are not, they are inadequate as a matter of law and do not disclose opinion testimony that would support a *prima facie* case of medical malpractice against any of the CT Children's defendants.

For each of these reasons, the CT Children's defendants respectfully move the Court to grant their Motion for Summary Judgment as to the plaintiffs' claims against them.

## I.    FACTUAL BACKGROUND

### A.    Factual History Underlying the Plaintiffs' Claims.

The claims in this case relate to medical care and treatment that the CT Children's defendants provided to a minor child, EP.[1] The child's parents, Anthony and Katharine Pileggi, allege that EP was bitten by a tick sometime prior to May 29, 2018. Local R. 56(a)1 Statement ¶ 1. On May 29, 2018, Ms. Pileggi brought EP, who was at that time two years and nine months old, to her pediatrician, Dr. Roman Alder. *Id.* ¶ 2. Ms. Pileggi reported a "1-2 week [history of] swollen knees and difficulty walking." *Id.* Dr. Alder examined EP, noting swelling and warmth in both of EP's knees. *Id.* He made a diagnosis of arthritis and ordered an x-ray as well as laboratory testing to rule out Lyme disease. *Id.* ¶ 3. The x-ray was negative for fracture or dislocation but demonstrated prominent soft tissue swelling. *Id.* The laboratory testing for Lyme disease was negative. *Id.* EP had an elevated C-reactive protein ("CRP") level of 37.7 mg/L, whereas the reference range is 0.1–1.0 mg/L. *Id.* ¶ 4. An elevated CRP is a marker of inflammation in the body, such as inflammation caused by arthritis. *Id.* ¶ 5.

 Dr. Alder referred EP to the defendant Dr. Zemel, a pediatric rheumatologist, for follow up. *Id.* ¶ 6. Dr. Zemel saw EP on June 1, 2018. *Id.* ¶ 7. Dr. Zemel noted that EP was having bilateral knee pain and swelling. *Id.* The medical records state that her parents were "generally carrying her everywhere now." *Id.* Dr. Zemel noted that Ms. Pileggi was convinced that EP had

---

[1]To protect the identity of the minor child, all references are made to the child's initials only. All exhibits appended to this Motion for Summary Judgment either have been redacted of personally identifying information of the child or, where impossible or where the document itself is confidential, such as in the case of medical records, have been filed under seal.

Epstein-Barr virus based on her own past experience with it. *Id.* During her deposition, Ms. Pileggi explained her view that Epstein-Barr virus is a "coinfection" with Lyme disease and that the two "usually go hand in hand." *Id.* ¶ 8. Dr. Zemel noted that the parents eschewed medication generally and had been treating EP with turmeric tea, ionized zinc, various vitamins, and echinacea. *Id.* ¶ 7. He noted that they adhered to a vegan diet. *Id.*

On examination, EP had joint pain ("arthralgias") and joint swelling with tenderness. *Id.* ¶ 9. She had mild synovitis[2] of her fourth right proximal interphalangeal joint ("PIP joint") in her finger and right ankle, as well as 2–3+ swelling of both knees. *Id.* Dr. Zemel also noted the presence of flexion contractures, or an inability to fully straighten her knees. *Id.*

In the context of this physical examination, a negative Lyme disease test, and a "markedly elevated CRP" in the labs ordered by Dr. Alder, Dr. Zemel assessed EP as suffering from juvenile idiopathic arthritis ("JIA"). *Id.* ¶ 10. He noted that "Lyme disease has been effectively ruled out." *Id.* He noted that the standard of care medical treatment for EP at that time, given that she was "quite disabled," would either be a combination of nonsteroidals medications plus short-term prednisone, or bilateral knee injections under sedation. *Id.* Dr. Zemel noted that Ms. Pileggi strongly refused either of these approaches or any medication being provided. *Id.* ¶ 11. Ms. Pileggi stated that she would be bringing EP to a naturopath the following week and would pursue a course of diet changes and supplements as opposed to medication. *Id.* Ms. Pileggi believed that EP had "the same EBV related illness that she had." *Id.* Dr. Zemel encouraged the parents to bring EP for a follow-up appointment in approximately four weeks and to call if EP was not improving. *Id.*

---

[2]Inflammation of the tissue lining the joints.

3

That day, on June 1, 2018, Dr. Zemel ordered further laboratory testing, including an ANA screening.[3] *Id.* ¶ 12. The result came back positive with a homogenous pattern, which is consistent with JIA. *Id.* He also tested for Epstein-Barr virus, which testing was negative for an acute or active infection but was suggestive of a recent or past infection. *Id.* ¶ 13.

Ms. Pileggi testified at her deposition that, due to her own experience with having Lyme disease, she was "very well-versed in Lyme" as of time of EP's initial treatment with Dr. Zemel. *Id.* ¶ 14. She testified that her purported experience with Lyme disease spurred her to attempt to obtain a doctorate degree in naturopathy, though that effort was unsuccessful. *Id.* Dr. Zemel told Mr. and Ms. Pileggi that he believed EP had juvenile idiopathic arthritis, but they did not agree with him. *Id.*

Ms. Pileggi testified that, following the initial visit with Dr. Zemel, she sought out providers who were "educated on Lyme disease" in order to obtain treatment for EP for Lyme. *Id.* ¶ 15. She testified that she looked for a provider specifically to treat EP for Lyme disease. *Id.* Mr. Pileggi similarly testified that, as of the first visit with Dr. Zemel, both he and Ms. Pileggi were convinced that EP had Lyme disease, and they did not agree with Dr. Zemel's diagnosis of juvenile idiopathic arthritis. *Id.* ¶ 16. Mr. Pileggi testified that he "absolutely" believed that EP had Lyme disease and that Dr. Zemel's diagnosis of juvenile idiopathic arthritis was not correct. *Id.* Ms. Pileggi ultimately brought the child to Dr. Diana Lopusny, a pediatrician at Preferred Pediatrics in Milford, who apparently agreed with Ms. Pileggi that EP did have Lyme disease, telling Ms. Pileggi "Absolutely. This is what's going on here." *Id.* ¶ 17. At EP's first visit with

---

[3]ANA, which stands for anti-nuclear antibody, is an immune screening that looks for antibodies to different proteins within the cell nucleus and is seen in certain rheumatic diseases, including JIA. Local R. 56(a)1 Statement ¶ 12.

1945235_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

Preferred Pediatrics on August 2, 2018, Mr. and Ms. Pileggi reported a chief complaint of "Lyme" as the reason that they were bringing in EP to be seen. *Id.* ¶ 18.

On June 19, 2018, a nurse at Connecticut Children's called Ms. Pileggi to follow up on EP's status at Dr. Zemel's request. *Id.* ¶ 19. Ms. Pileggi reported that EP was receiving her own protocol for Epstein-Barr virus, including foods, herbs, acupuncture, energy healing, and heavy metal detoxification. *Id.* Ms. Pileggi cancelled EP's upcoming follow-up appointment with Dr. Zemel. *Id.*

In response, Dr. Zemel called Ms. Pileggi the following day, on June 20, 2018. *Id.* ¶ 20. He told her that he would be interested in seeing any improvement that EP had made, and Ms. Pileggi agreed to reschedule an appointment with him. *Id.* Dr. Zemel indicated in his note of this call that, if the appointment were not rescheduled, he would consider filing a report of medical neglect with the Department of Children and Families ("DCF"). *Id.*

On June 22, 2018, Dr. Zemel sent Mr. and Ms. Pileggi a letter by certified mail. *Id.* ¶ 21. In the letter, Dr. Zemel noted that "[i]t's very important that I see [EP] within the next 2 weeks" so that he could "document any changes in her arthritis." *Id.* He followed up by telephone call to Mr. and Ms. Pileggi on June 29, 2018, leaving a voicemail "explaining that state law requires me to file a report with Department of children and families." *Id.* ¶ 22. He noted that he would be filing the report in three days, and that he would welcome a telephone call before then if they had any additional information to share. *Id.*

Ms. Pileggi returned Dr. Zemel's call that evening. *Id.* ¶ 23. Dr. Zemel once again explained the importance of him seeing EP for follow up and that "there is a window during which it is imperative to get arthritis under control before it leads to permanent damage." *Id.* Ms. Pileggi told Dr. Zemel that EP was seeing a naturopath, and she did not need to continue treating

1945235_1

with Dr. Zemel. *Id.* Dr. Zemel disagreed, emphasizing the importance of EP being seen by a pediatric rheumatologist. *Id.* Dr. Zemel documented that Ms. Pileggi then went on a "lengthy rant about the evils of Western medicine," stated that she would "never place her daughter on any type of Western medicine," and that there were "poisons in the air that need to be removed from her daughter." *Id.* Dr. Zemel repeated that he was very concerned about EP's prognosis if she were to continue on her current course and that he would be making a report to DCF. *Id.* On July 3, 2018, Dr. Zemel made a report to DCF of suspected medical neglect. *Id.* ¶ 24.

After meeting with the family, DCF reported to Connecticut Children's that Mr. and Ms. Pileggi had started bringing EP to a naturopathic medicine provider, Dr. Katharine Layman, who had reported improvement in EP's condition. *Id.* ¶ 25. Because EP was receiving some treatment from a licensed professional for her condition, DCF closed its investigation at that time. *Id.* EP was not treated at Connecticut Children's or by Dr. Zemel for the remainder of 2018. *Id.* ¶ 26.

Over the ensuing nine months, several medical providers made reports to DCF of suspected medical neglect relating to EP's untreated arthritis. *Id.* ¶ 27. On March 4, 2019, a medical provider, who evaluated EP on March 2, 2019, reported that EP "does not walk," had not walked for three months, had "restricted range of motion in both of her knees," and "was in clear agony." *Id.* ¶ 28. On March 13, 2019, another medical provider made a report to DCF, noting that he or she had seen EP on March 8, 2019. *Id.* ¶ 28. This provider reported that EP had developed atrophy in her muscles in both her legs, had been non-ambulatory for eight months, and had contractures of her hamstrings and Achilles and was unable to straighten her legs. *Id.* The provider reported that there was a possibility that, if EP's condition continued to go untreated, she would not be able to walk and would require surgery. *Id.* On March 25, 2019, a naturopathic medical provider made another report to DCF, expressing concern that Ms. Pileggi

6

may be attempting to "doctor hop" until she found a doctor to agree that EP was healthy. *Id.* ¶ 30. This provider reported that EP had "the worst case of Juvenile Rheumatoid Arthritis that they have worked with."[4] *Id.*

After June 2018, the next time that EP was treated at Connecticut Children's was on March 9, 2019 in the emergency department. *Id.* ¶ 32. Mr. and Ms. Pileggi reported that, on March 1, 2019, one of EP's siblings had been attempting to carry her and had dropped her on the floor, causing a left femur fracture. *Id.* ¶ 33. An orthopedics consult was requested, and the defendant, PA Fitzsimmons, saw EP for evaluation of the femur fracture. *Id.* PA Fitzsimmons applied a new padded long leg split to the left leg. *Id.* He noted that the mechanism of injury provided by the parents fit the type of fracture that EP had sustained, and, therefore, a consultation with the suspected child abuse and neglect team at Connecticut Children's ("SCAN team") was not indicated. *Id.* PA Fitzsimmons instructed Mr. and Ms. Pileggi to follow up with orthopedics in five to seven days. *Id.* EP was discharged home that same day. *Id.*

PA Fitzsimmons saw EP in the outpatient clinic for follow up ten days later, on March 19, 2019. *Id.* ¶ 34. PA Fitzsimmons noted that EP was non-ambulatory at that time secondary to her chronic knee swelling. *Id.* He noted bilateral lower extremity flexion contractures, with abnormal extension in the knees bilaterally and atrophy of the lower leg muscles. *Id.* PA Fitzsimmons obtained new x-rays, which he reviewed. *Id.* He concluded that EP's femur fracture was healing as expected for this type of injury. *Id.* He instructed the family to follow up in approximately two weeks. *Id.* He made no recommendations regarding EP's juvenile idiopathic arthritis. *Id.*

---

[4] Some providers use the term "juvenile rheumatoid arthritis" and "juvenile idiopathic arthritis" interchangeably. Local R. 56(a)1 Statement ¶ 31.

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

On March 21, 2019, Dr. Zemel authored a note indicating that he had been informed that EP had been seen by orthopedics. *Id.* ¶ 35. He had reviewed PA Fitzsimmons' note, and he observed that PA Fitzsimmons had documented severe arthritic complications including flexion contractures of her knees and muscle wasting. *Id.* Dr. Zemel contacted DCF to express his concerns regarding EP's lack of appropriate medical care, and he recommended a 72-hour hold to stabilize her. *Id.*

On March 28, 2019, DCF filed a neglect petition with the Superior Court. *Id.* ¶ 36. In support of the petition, DCF submitted affidavits, including an affidavit signed by PA Fitzsimmons on March 27, 2019. *Id.* ¶ 37. He noted, consistent with his medical records, that the type of femur fracture that EP had suffered is called an "insufficiency fracture," and that it more commonly is seen in patients who are non-ambulatory. *Id.* He noted that he had reviewed the Connecticut Children's records from June 2018, and he observed that Dr. Zemel had diagnosed EP with juvenile idiopathic arthritis but the parents had declined treatment with Connecticut Children's. *Id.* He explained that lack of ambulation causes the lower extremity bones to become osteopenic, losing the ability to form new bone, which in turn causes them to be more fragile. *Id.* He affirmed, however, that EP's leg fracture had been healing well based on his evaluation of her on March 19, 2019. *Id.*

DCF also supported the petition with the affidavit of Ashia Velez, a DCF clinical nurse coordinator. *Id.* ¶ 38. Ms. Velez attested that she had spoken with Dr. Zemel on March 20, 2019. *Id.* Dr. Zemel reported to Ms. Velez that EP was suffering from lack of proper treatment for her arthritis and that the femur fracture was related to local osteoporosis caused by this lack of proper treatment. *Id.* Dr. Zemel expressed grave concern for EP and recommended a hospital admission for evaluation and treatment. *Id.*

1945235_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

On March 28, 2019, the date on which the petition was filed, the Superior Court granted an order of temporary custody of EP with DCF. *Id.* ¶ 39. The Court further ordered that DCF was authorized to provide permission for EP to obtain any necessary medical treatment as recommended by any treating physician or medical specialist. *Id.* ¶ 40.

DCF brought EP to the Connecticut Children's emergency department in the evening of March 29, 2019. *Id.* ¶ 41.[5] On admission to the hospital, EP was noted to be quiet, thin, and pale. *Id.* ¶ 43. She had fallen from the 20.6th percentile in weight to the 3.9th percentile in weight since June 2018 with no weight gain during that time. *Id.* It was noted that she had been on a diet of raw vegetables only. *Id.* Joint pain and swelling were noted, and the SCAN team instructed emergency department providers to document the severity of the swelling and EP's overall body habitus with photographs. *Id.* ¶ 44. In particular, she had swelling with deformity and decreased range of motion in the fingers of both her hands, both her wrists, and her right knee and ankle. *Id.* ¶ 45. Her fingers were noted to be "sausage-like" and her right knee appeared edematous with a cachectic appearing right leg. *Id.* ¶ 46. Her left leg was still in a cast and was not evaluated at that time. *Id.* ¶ 47.

Dr. Zemel evaluated EP on March 31, 2019. *Id.* ¶ 48. He could not evaluate her right hand and wrist due to the presence of an IV. *Id.* He noted swelling and loss of range of motion in the fingers of her left hand, left wrist, both elbows, both knees, and both ankles, with significant atrophy of the thighs and the calves. *Id.* He noted that she had developed significant contractures in the elbows, knees, and ankles bilaterally. *Id.* ¶ 49. He observed that "[i]t is unlikely that medication and physical therapy alone will increase knee extension enough to allow for

---

[5] References in the Connecticut Children's medical records to a patient with the initials "ED" are to EP. This was a pseudonym that was used for EP after a family member called the hospital impersonating a DCF social worker and attempting to solicit information concerning EP. Local R. 56(a)1 Statement ¶ 42.

ambulation since these contractures have been present for over a year." *Id.* He planned for intensive in-hospital rehabilitation with serial casting under sedation to attempt to reduce the severe knee flexion contractures. *Id.* ¶ 50.

On April 1, 2019, Dr. Zemel reevaluated EP. *Id.* ¶ 51. Her peripheral IV had been removed, allowing him to evaluate her right hand. *Id.* He noted swelling with pain in the fingers of her right hand and her right wrist, similar to his findings on the left hand. *Id.*

Dr. Zemel performed bilateral joint aspiration and injections of the knees with casting on April 5, 2019. *Id.* ¶ 52. EP tolerated the procedure well and was returned to the nursing floor following the procedure. *Id.* On April 9, 2019, the casts were removed and braces were placed on both knees. *Id.* ¶ 53. The procedure was successful and tolerated by EP, and she was returned to the nursing floor afterward. *Id.*

EP was discharged from Connecticut Children's on April 12, 2019, following a two-week admission to the hospital. *Id.* ¶ 54. Her discharge summary noted that she received physical therapy throughout her hospitalization and that it would continue on an outpatient basis. *Id.* She was to continue taking methotrexate, naproxen, prednisolone, and etanercept (Enbrel). *Id.* She was planned for outpatient follow-up appointments with rheumatology. *Id.*

Dr. Zemel saw EP for her first outpatient rheumatology visit ten days later on April 22, 2019. *Id.* ¶ 55. EP was living with a foster family at that time. *Id.* EP had been wearing her leg braces overnight. *Id.* She continued on her medications as listed above. *Id.* Dr. Zemel noted that her joints were quiet with the exception of some pain in her left subtalar joint (a joint between two of the tarsal bones in the foot), and he found that the medication seemed to be effective in quieting down her arthritis. *Id.* Dr. Zemel adjusted her medications and planned to continue following her on an outpatient basis. *Id.*

1945235_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

Dr. Zemel continued to see EP at outpatient visits until his retirement in April, 2021. *Id.* ¶ 56. Dr. Zemel saw EP on May 15, 2019; July 15, 2019; October 10, 2019; December 10, 2019; March 10, 2020; June 10, 2020; October 20, 2020; and April 7, 2021. *Id.* EP remained in foster care until October 9, 2019, at which point she returned to living with Mr. Pileggi. *Id.* ¶ 57. On May 15, 2019, while EP remained in foster care, Dr. Zemel noted that she was taking steps at home while wearing her braces. *Id.* ¶ 58. All her joints were quiet, with the exception of her knees, which still had some loss of range of motion with extension bilaterally. *Id.* By the next visit two months later, on July 15, 2019, while EP still was in foster care, Dr. Zemel noted that EP was able to run while playing, and her knee extension was almost full. *Id.* ¶ 59. He personally observed EP running up and down the hallway with her foster sister. *Id.* He noted that "[EP's] arthritis appears to be in remission, on combination disease modifying medication. We have successfully reduced her previously fixed knee flexion contractures, and she functionally went from not walking for longer than a year, to now running around effortlessly." *Id.*

During his deposition, Mr. Pileggi testified that, after regaining custody of EP in October, 2019, he stopped following Dr. Zemel's treatment advice and was not compliant in providing the medications that Dr. Zemel had prescribed to her. *Id.* ¶ 60. Mr. Pileggi testified that there was a "month or two" after regaining custody while he continued to provide the medications that Dr. Zemel had prescribed, including Enbrel and methotrexate, but, after that period of time, he ceased giving her any of the medications prescribed by Dr. Zemel. *Id.* He continued to bring EP to appointments with Dr. Zemel but did not advise Dr. Zemel that he was not being compliant with EP's treatment protocol. *Id.* The records reflect that Mr. Pileggi told Dr. Zemel that EP was receiving her medications as ordered, and Dr. Zemel made numerous adjustments to her medications during this time frame. *Id.*

11

Mr. Pileggi testified that he stopped providing EP her medications in consultation with a pediatrician, Dr. Lopusny. *Id.* ¶ 61. The first note in the records of Dr. Lopusny's practice, Preferred Pediatrics, following the October, 2019 reunification is dated September 21, 2020. *Id.* ¶ 62. It noted, among other things, "[EP] has lyme disease" and lists as its sole assessment of EP as "Lyme disease." *Id.* It further noted "[p]arental concerns" that EP was "never treated for lyme." *Id.* A follow-up note by Dr. Lopusny dated October 15, 2020 stated that EP will treat with Dr. Thomas Moorecroft who "focuses on chronic lyme and baronella [sp] and pans. . . . Dr Tom is thinking of treating with azithromycin for lyme." *Id.* ¶ 63.

On June 23, 2021, EP had a follow-up rheumatology visit with Dr. Zemel's former partner, Dr. Lapin. *Id.* ¶ 64. Dr. Lapin noted the presence of swelling and reduced range of motion in both knees and found that she had active arthritis in both knees. *Id.* He recommended to Mr. Pileggi that EP undergo sedated joint injections in the knees, but Mr. Pileggi declined. *Id.* EP's August 5, 2021 follow-up appointment with Dr. Lapin was cancelled. *Id.* ¶ 65. A rescheduled follow-up appointment for November 4, 2021 similarly was cancelled. *Id.* ¶ 66. EP did not treat with Connecticut Children's Medical Center after that time. *Id.* ¶ 67.

## B.    Claims in the Present Case.

The plaintiffs initially filed their initial Complaint on October 19, 2022. Compl., ECF No. 1. The plaintiffs' initial Complaint alleged twelve counts, five of which were directed at least in part against the undersigned defendants. Specifically, Count Six alleged negligence against the undersigned defendants for allegedly filing a false report with DCF against the plaintiffs. *Id.* ¶ 96–100. Count Six was emphatic that this was not a medical malpractice claim: Paragraph 97 of Count Six alleged "**Said claims are not medical malpractice claims.**" *Id.* ¶ 97 (emphasis in original). Count Seven alleged negligent infliction of emotional distress in that the defendants

12

knew or should have known that that their allegedly false report to DCF would likely result in emotional distress. *Id.* ¶ 101–03. Count Eight alleged intentional infliction of emotional distress on this same basis. *Id.* ¶ 104–07. Count Ten alleged civil battery against all the defendants in the action, claiming that "[t]he outrageous conduct of the Defendants resulted in numerous harmful offensive conducts to EP arising from physical removal as well as the denial and delay of essential medical care." *Id.* ¶ 114–17. Finally, Count Eleven alleged a cause of action against all the defendants pursuant to Conn. Gen. Stat. § 52–568 for wrongfully initiating a DCF complaint, without probable cause. *Id.* ¶ 118–22. As set forth above, none of these claims alleged a medical malpractice claim against any of the CT Children's defendants.

The CT Children's defendants appeared on December 29, 2022; ECF Nos. 11–13; and filed their Rule 12(b)(6) Motion to Dismiss on January 31, 2023. ECF No. 25. On April 27, 2023, the plaintiffs filed a Motion to Amend the Complaint. ECF No. 42. The Court granted this Motion on May 12, 2023; ECF No. 46; and the plaintiffs filed their Amended Complaint on May 15, 2023. ECF No. 47. This is the operative Complaint for purposes of this Motion for Summary Judgment.

The plaintiffs' Amended Complaint alleged twelve counts, seven of which were directed at least in part against the undersigned defendants. Specifically, Count One purported to allege a claim pursuant to 42 U.S.C. § 1983 against each of the defendants for a violation of the plaintiffs' liberty interest to raise their child, as guaranteed by the First and Fourteenth Amendments. Am. Compl., ECF No. 47 at 21. Count Six alleged negligence against the CT Children's defendants for allegedly filing a false report with DCF against the plaintiffs. *Id.* at 29– 30. Count Seven alleged negligent infliction of emotional distress in that the defendants knew or should have known that that their allegedly false report to DCF would likely result in emotional

distress. *Id.* at 31. Count Eight alleged intentional infliction of emotional distress on the same basis. *Id.* Count Nine alleged a violation of CUTPA as against the CT Children's defendants. *Id.* at 32. Count Ten alleged a cause of action against all the CT Children's defendants pursuant to Conn. Gen. Stat. § 52–568 for wrongfully initiating a DCF complaint. *Id.* at 33. Finally, Count Twelve alleged, for the first time in the case, a medical malpractice claim against the CT Children's defendants on the basis of their allegedly incorrect diagnosis of juvenile idiopathic arthritis. *Id.* at 35–37.

On June 5, 2023, the CT Children's defendants again moved to dismiss each of the plaintiffs' claims against them. ECF No. 53. The CT Children's defendants raised a number of grounds, including mandated reported immunity under Conn. Gen. Stat. § 17a–101a(a) and untimeliness under the applicable statute of limitations, Conn. Gen. Stat. § 52–584. *Id.*

The Court granted the CT Children's defendants' Motion to Dismiss on all counts except Count Twelve, alleging medical malpractice. *See* Mem. of Decision, ECF No. 82. The Court dismissed Count One, alleging a claim under 42 U.S.C. § 1983, on the basis that the Complaint could not plausibly allege that the CT Children's defendants acted under color of state law. *Id.* at 12–14. The Court determined that the CT Children's defendants were entitled to mandated reporter immunity under Conn. Gen. Stat. § 17a–101a(a) as to the claims in Counts Seven, Eight, Nine, Ten, and the claims in Count Six relating to the filing of the DCF reports at issue. *Id.* at 12–22, 27. The Court found that the remainder of the allegations in Count Six were barred by the applicable statutes of limitations. *Id.* at 22–26.

The Court denied the Motion to Dismiss as to Count Twelve, alleging medical malpractice. *Id.* at 28–29. The Court found that the plaintiffs "allege that the first date on which they discovered or in the exercise of reasonable care should have discovered that they had a

cause of action for medical malpractice against the CCMC Defendants was in December 2021." *Id.* at 29. Thus, drawing all reasonable inferences in favor of the plaintiffs as the Court must at the pleadings stage, the Court denied the Motion to Dismiss Count Twelve. *Id.* As a result, only the medical malpractice claim in Count Twelve has survived in this action against the CT Children's defendants. *Id.* at 29–30.

## II.   LAW AND ARGUMENT

### A.   Standard on Motion for Summary Judgment.

Federal Rule of Civil Procedure 56(a) provides in relevant part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"[T]he nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. . . . '[U]nsupported allegations do not create a material issue of fact.' . . . If the nonmovant fails to meet this burden, summary judgment should be granted." *Corley v. United States*, No. 3:22-cv-1007 (AWT), 2025 U.S. Dist. LEXIS 118329, at *14–15 (D. Conn. June 23, 2025) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Indeed, courts regularly grant summary judgment where medical records directly contradict a plaintiff's allegations." *Brown v. Jeanty*, No. 03 Civ. 8712 (LTS) (JCF), 2009 U.S. Dist. LEXIS 126155, at *23 (S.D.N.Y. July 23, 2009).

###### B.    All the Plaintiffs' Claims Against the Undersigned Defendants Are Untimely.

The plaintiffs' claims against these defendants are untimely. Specifically, the plaintiffs' medical malpractice claim in Count Twelve, the only claim that survived the defendants' Motion to Dismiss, was brought well beyond the applicable limitations period. Conn. Gen. Stat. § 52–584. The first Complaint to make these allegations was filed on May 15, 2023, more than two years after the plaintiffs discovered the alleged harms and more than three years after the claimed negligence occurred. In particular, the plaintiffs had actual knowledge that Dr. Zemel had diagnosed EP with juvenile idiopathic arthritis on June 1, 2018 and they believed, at that time, that his diagnosis was incorrect. At the absolute latest, the plaintiffs had actual knowledge of the alleged negligence on September 21, 2020, when another provider diagnosed EP with Lyme disease rather than juvenile idiopathic arthritis and disagreed with Dr. Zemel's diagnosis. Under either scenario, the plaintiffs' medical malpractice claims were brought beyond the statute of limitations.

###### 1.    The plaintiffs' claims are untimely under the two-year discovery period within the statute of limitations.

Conn. Gen. Stat. § 52–584 provides a two-year limitations period for medical malpractice claims in Connecticut. It provides in relevant part: "No action to recover damages for injury to the person . . . caused by . . . malpractice of a physician . . . shall be brought but within two years from the date when injury is first sustained or discovered or in the exercise of reasonable care should have been discovered . . . ."

The Connecticut Supreme Court has construed the term "injury" to mean some form of "actionable harm." *Catz v. Rubenstein*, 201 Conn. 39, 43–44 (1986). "[T]he term injury is synonymous with legal injury or actionable harm. Actionable harm occurs when the plaintiff

16

discovers, or in the exercise of reasonable care, should have discovered the essential elements of a cause of action." *Jackson v. Tohan*, 113 Conn. App. 782, 787, 967 A.2d 634 (2009) (internal quotation marks omitted). "The focus is on the plaintiff's knowledge of facts, rather than on discovery of applicable legal theories. . . . Although an expert opinion may lead to discovery of an 'actionable harm' . . . it does not follow that a plaintiff cannot reasonably discover an injury absent verification by a qualified expert." *Mountaindale Condominium Ass'n, Inc. v. Zappone*, 59 Conn. App. 311, 323, 757 A.2d 608 (2000) (citations omitted; internal quotation marks omitted); *see also Gugliemi v. Willowbrook Condominium Ass'n, Inc.*, 151 Conn. App. 806, 810, 96 A.3d 634 (2014).

Moreover, "the harm complained of need not have reached its fullest manifestation in order for the limitation period to begin to run; a party need only have suffered some form of 'actionable harm.'" *Lagassey v. State*, 268 Conn. 723, 749, 846 A.2d 831 (2004). Summary judgment is appropriate when the plaintiffs knew of or should have discovered actionable harm but failed to bring their action in a timely fashion. *Burns v. Hartford Hospital*, 192 Conn. 451, 472 A.2d 1257 (1984); *Merly v. State*, 211 Conn. 199, 207–08, 558 A.2d 977 (1989).

"The two-year discovery portion addresses the plaintiff's knowledge of the injury and not the defendant's act or omission. Once the plaintiff has discovered her injury, the statute begins to run." *Rosato v. Mascardo*, 82 Conn. App. 396, 405, 844 A.2d 893 (2004).

> [T]he accrual of the cause of action is a singular moment in time. Allowing that point in time to be pushed forward as long as it is claimed that the negligent conduct continued would eviscerate the policies underlying the statute of limitations. The plaintiff would be allowed to acquiesce in the defendant's conduct as long as it was convenient to the plaintiff. That would undermine the promotion of finality in the litigation process . . . and the prevention of the unexpected enforcement of stale claims concerning which the persons interested have been thrown off their guard by want of prosecution.

*Id.* at 405–06 (citations omitted; internal quotation marks omitted).

17

The plaintiffs' claims are untimely even when accounting for the suspension of statutes of limitation that resulted from Governor Lamont's Executive Orders relating to the COVID-19 pandemic. The Governor's Executive Orders are a matter of public record of which the Court may take judicial notice. *E.g.*, *Taylor v. Pillai*, No. 3:21-cv-00623 (SALM), 2022 U.S. Dist. LEXIS 159977, at *7 (D. Conn. Sep. 6, 2022) (taking judicial notice of Governor Lamont's Executive Orders relating to the COVID-19 pandemic).

As Judge Merriam summarized in *Taylor*, Connecticut courts routinely have determined that Governor Lamont's Executive Order 7G, dated March 19, 2020, operated to suspend all statutes of limitation in civil actions until that suspension eventually was lifted by Executive Order 10A, dated March 1, 2021. *Id.*, at *10–11. The result was a nearly one-year suspension of the statute of limitations, totaling 347 days. *Id.*

The operation of these Executive Orders in this case is as follows. As of March 19, 2020, Dr. Zemel's allegedly incorrect diagnosis of juvenile idiopathic arthritis on June 1, 2018 would have been made 1 year, 9 months, and 18 days ago, leaving less than three months to bring an action under the two-year discovery period in § 52–584. Those limitation periods then were suspended until March 1, 2021 by operation of the Governor's Executive Orders 7G and 10A. On March 1, 2021, the statute began to run again. The remaining two months and twelve days expired on May 13, 2021 for claims governed by the two-year discovery period in § 52–584, namely, the medical malpractice claim set forth in Count Twelve of the Amended Complaint.

The plaintiffs did not file a medical malpractice claim against the CT Children's defendants until May 15, 2023. ECF No. 47. *E.g.*, *Keenan v. Yale New Haven Hospital*, 167 Conn. 284, 285, 355 A.2d 253 (1974) ("An amendment to a complaint which sets up a new and different cause of action speaks as of the date when it is filed."). Quite to the contrary, the initial

Complaint expressly disavowed making a medical malpractice claim. Compl., ECF No. 1 ¶ 97. Thus, the plaintiffs' medical malpractice claim is *more than two years too late* under the two-year discovery period within § 52–584.

The plaintiffs clearly had reasonable notice of "the essential elements of a cause of action" for medical malpractice as of June 1, 2018. *Jackson*, 113 Conn. App. at 787. Both Mr. and Ms. Pileggi disagreed at that time with Dr. Zemel's diagnosis of juvenile idiopathic arthritis. They refused to follow Dr. Zemel's recommendations for treatment on the basis of their fervent belief that EP had Lyme disease. Ms. Pileggi in particular was driven by her own history of purportedly having Lyme disease, an event that affected her so significantly that she wanted to become a naturopathic doctor herself, though she never became one. The plaintiffs' position now is *exactly* what it was in June, 2018: that EP had Lyme disease when Dr. Zemel evaluated her on June 1, 2018, and that Dr. Zemel's diagnosis of juvenile idiopathic arthritis was wrong.

Even if the Court were to determine that the plaintiffs did not have a reasonable basis in June 2018 that they had a cause of action for medical malpractice, the cause of action certainly had accrued by September 21, 2020. By that time, EP had undergone a two-week-long hospitalization in March and April 2019. She had been removed from her parents' custody for approximately seven months. Although Mr. Pileggi continued to bring EP to appointments with Dr. Zemel, based on his conviction that EP did not in fact have juvenile idiopathic arthritis—and never had juvenile idiopathic arthritis—he ceased providing EP the medication that Dr. Zemel had prescribed. By Mr. Pileggi's testimony, he took this action within one or two months after he regained custody of EP in October 2019.

Mr. Pileggi also testified that he stopped giving EP her arthritis medications in consultation with Dr. Lopusny. There is no note from Dr. Lopusny in this time frame; the first

1945235_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

note from Preferred Pediatrics after October, 2019 is from September 21, 2020. That note, however, is unequivocal that "[EP] has lyme disease." Local R. 56(a)1 Statement ¶ 62. It also noted "[p]arental concerns" that EP was "never treated for lyme." *Id.*

Therefore, by September 21, 2020, not only were the plaintiffs of the long-held belief that the CT Children's defendants had misdiagnosed EP with juvenile idiopathic arthritis, but they also had obtained a diagnosis of Lyme disease for EP. Although this additional medical opinion was not necessary to trigger the two-year discovery portion of the statute of limitations; *Mountaindale Condominium Ass'n, Inc.*, 59 Conn. App. at 323; as of September 21, 2020 the plaintiffs clearly had sufficient notice of the essential elements of a cause of action for medical malpractice.

On September 21, 2020, the two-year statute of limitations for bringing such a claim had been tolled, as detailed above, and it restarted on March 1, 2021. Under this scenario, the statute of limitations began to run on March 1, 2021 and expired on March 1, 2023. The plaintiffs did not file their medical malpractice claim until May 15, 2023. ECF No. 47. Therefore, the claim was filed untimely, and the CT Children's defendants are entitled to summary judgment.

## 2.     The plaintiffs' claims are untimely under the repose portion of the statute of limitations.

Regardless of when the plaintiffs' had reasonable notice of the essential elements of a cause of action in medical malpractice, all their claims are barred by the three-year statute of repose. Conn. Gen. Stat. § 52–584 provides in relevant part: "No action to recover damages for injury to the person, or to real or personal property, caused by . . . malpractice of a physician . . . may be brought more than three years from the date of the act or omission complained of . . . ." Conn. Gen. Stat. § 52–584.

1945235_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

"It is well established that the relevant date of the act or omission complained of, as that phrase is used in § 52–584, is the date when the negligent conduct of the defendant occurs and . . . not the date when the plaintiff first sustains damage. . . . Therefore, an action commenced more than three years from the date of the negligent act or omission complained of is barred by the statute of limitations contained in § 52–584, regardless of whether the plaintiff had not, or in the exercise of [reasonable] care, could not reasonably have discovered the nature of the injuries within that time period." *Neuhaus v. DeCholnoky*, 280 Conn. 190, 201, 905 A.2d 1135 (2006).

As set forth above, the allegedly negligent diagnosis of juvenile idiopathic arthritis was made on June 1, 2018. Even accounting for the tolling of statutes of limitations caused by COVID-19-era executive orders, the three-year period to bring a medical malpractice claim relating to that alleged misdiagnosis expired on May 14, 2022, three years and 347 days later. The plaintiffs did not file their medical malpractice claim until May 15, 2023, one year after the repose portion of the statute of limitations had elapsed.

Similarly, the claims against PA Fitzsimmons are untimely under the statute of repose. He treated EP on only two occasions, on March 9, 2019, and March 19, 2019. Three years and 347 days from March 19, 2019 was March 1, 2023. The plaintiffs did not file their medical malpractice claim against PA Fitzsimmons until more than two months later, and, therefore, it is untimely under the statute of repose.

Although the Amended Complaint does not invoke any tolling doctrine specifically, there is language in Count Twelve suggesting that the plaintiffs intend to argue that their medical malpractice claims were tolled by virtue of continuing to treat with the CT Children's defendants. *See* Am. Compl., ECF No. 47 at 36 ¶ 185 ("The defendants continued treating EP for the wrong illness and ignored the worsening of her condition for more than two (2) years, then

1945235_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

imputed blame for EP's failure to improve to the PLAINTIFFS. This was intentionally and maliciously communicated to DCF."). Neither the continuing treatment doctrine nor the continuing course of conduct doctrine, however, operate to save the plaintiffs' claims in this case.

*First*, the plaintiffs clearly had notice of the purported negligent misdiagnosis of JIA in June 2018. Both the continuing treatment doctrine and the continuing course of conduct doctrine apply only to toll the three-year repose period in the statute of limitations, not the two-year discovery period. "[B]oth tolling doctrines apply only to the repose portion of the statute and not to the discovery portion. The two-year discovery portion addresses the plaintiff's knowledge of the injury and not the defendant's act or omission. Once the plaintiff has discovered her injury, the statute begins to run." *Rosato*, 82 Conn. App. at 405.

As set forth in detail above, there is a wealth of evidence of the plaintiffs' actual notice of the alleged negligence at the time of Dr. Zemel's purportedly incorrect June 1, 2018 diagnosis of juvenile idiopathic arthritis. For this reason, the two-year discovery period in the statute of limitations began to run at that time, and neither tolling doctrine saves the plaintiffs' claims.

*Second*, the continuous treatment doctrine does not apply because the plaintiffs stopped bringing EP to treat with Dr. Zemel after his June 1, 2018 diagnosis of JIA. "A comparison of the elements of the continuous treatment doctrine with the elements of the continuing course of conduct doctrine reveals that the primary difference between the doctrines is that the former focuses on the *plaintiff's* reasonable expectation that the treatment for an existing condition will be ongoing, while the latter focuses on the *defendant's* duty to the plaintiff arising from his knowledge of the plaintiff's condition. As we have indicated, the policy underlying the continuous treatment doctrine is to allow the plaintiff to complete treatment for an existing

22

condition with the defendant and to protect the doctor-patient relationship during that period."
*Grey v. Stamford Health Sys.*, 282 Conn. 745, 755, 924 A.2d 831 (2007) (emphases in original).

As noted above, the plaintiffs chose not to pursue further treatment with Dr. Zemel after his June 1, 2018 evaluation of EP because they disagreed with his diagnosis of JIA and wanted EP treated for Lyme disease, not JIA.[6] The plaintiffs had no expectation of ongoing treatment with the CT Children's defendants after June 1, 2018, as they terminated EP's care with them. "[O]ur emphasis in *Grey* regarding the plaintiff's reasonable expectation of further treatment was made in a context in which an ongoing physician-patient relationship was presumed. When no such relationship exists, however, or when the defendant is not engaged in an ongoing course of treatment or monitoring that was explicitly anticipated by both parties even after the termination of such a relationship, we have concluded that the [continuous treatment] doctrine does not apply regardless of whether the plaintiff had a subjective expectation that further treatment or monitoring would in fact be provided." *Martinelli v. Fusi*, 290 Conn. 347, 369, 963 A.2d 640 (2009). Thus, the continuous treatment doctrine plainly does not apply. Permitting the plaintiffs on the one hand to argue that they understood in June 2018 that EP really had Lyme disease and for that reason stopped treating with the CT Children's defendants; *e.g.*, Am. Compl., ECF No. 47 at 8 ¶ 20 (EP displaying "obvious Lyme Disease symptoms" in June, 2018); and yet toll their claim based on continuing treatment would be contrary to the policies underlying the doctrine. *Rosato*, 82 Conn. App. at 405–06.

*Third*, to the extent the plaintiffs intend to invoke the continuing course of conduct doctrine, it must be noted that the Connecticut Supreme Court has cautioned against applying that doctrine to a claim against a physician relating to an allegedly incorrect diagnosis. "[W]e

---

[6] Dr. Zemel only became involved with EP's care again after DCF obtained custody of her in March 2019.

disagree with the premise that a physician who has performed a misdiagnosis has a continuing duty to correct that diagnosis in the absence of proof that he subsequently learned that his diagnosis was incorrect. While there may be instances in product liability situations where a continuing duty to warn may emanate from a defect, without proof that the manufacturer actually knew of the defect . . . the same principle does not apply to a physician's misdiagnosis. To apply such a doctrine to a medical misdiagnosis would, in effect, render the repose part of the statute of limitations a nullity in any case of misdiagnosis." *Martinelli*, 290 Conn. at 360 (internal quotation marks omitted).

The CT Children's defendants never received information that led them to believe that their initial diagnosis of juvenile idiopathic arthritis was incorrect. Rather, it is the CT Children's defendants' position that the diagnosis of juvenile idiopathic arthritis was correct; thus, they could have no duty to inform the plaintiffs of a supposedly incorrect diagnosis. In such a circumstance, the continuing course of conduct doctrine does not apply. *Grey*, 282 Conn. at 757 ("when *only* the defendant has knowledge of the need for additional treatment or monitoring, only the continuing course of conduct doctrine is implicated") (emphasis added).

For all the above reasons, neither the continuing treatment doctrine nor the continuing course of conduct doctrine applies in the present case. As such, the plaintiffs' claims are untimely, and the Court should grant summary judgment for the CT Children's defendants.

### C.    The Plaintiffs Have Failed to Disclose Expert Opinion Testimony to Support a *Prima Facie* Case of Medical Negligence.

Even setting aside the issue of the statute of limitations, the CT Children's defendants are entitled to summary judgment because the plaintiffs have not disclosed any Rule 26(a)(2) expert reports to support their medical malpractice claims. The plaintiffs' failure to disclose expert reports in this matter pursuant to Rule 26(a)(2) is fatal to their claims. "Professional negligence

24

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

or malpractice . . . [is] defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services. . . . Malpractice presupposes some improper conduct in the treatment or operative skill [or] . . . the failure to exercise requisite medical skill . . . . To prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." *Gold v. Greenwich Hospital Ass'n*, 262 Conn. 248, 254–55, 811 A.2d 1266 (2002) (citations omitted; emphasis omitted; internal quotation marks omitted); *see also Boone v. William W. Backus Hospital*, 272 Conn. 551, 571, 864 A.2d 1 (2005); *Hammer v. Mount Sinai Hospital*, 25 Conn. App. 702, 717, 596 A.2d 1318 (1991).

Both the standard of care and a deviation from the standard of care must be proven by expert testimony. "To recover in a malpractice action against a physician the plaintiff must prove that the defendant failed to exercise that degree of care, skill or diligence ordinarily had and exercised by physicians engaged in the same line of practice . . . . Ordinarily this proof must rest upon the testimony of an expert witness who is qualified to express an opinion as to the standard of care . . . ." *Ardoline v. Keegan*, 140 Conn. 552, 556, 102 A.2d 352 (1954) (citations omitted).

Similarly, causation also must be proven by expert testimony. "All medical malpractice claims, whether involving acts or inactions of a defendant physician, require that a defendant physician's conduct proximately cause the plaintiff's injuries. The question is whether the conduct of the defendant was a substantial factor in causing the plaintiff's injury. Expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere

25

of the common knowledge of the lay person." *Poulin v. Yasner*, 64 Conn. App. 730, 738, 781 A.2d 422 (2001) (internal quotation marks omitted).

To be entitled to damages, the plaintiff must establish, on the basis of reasonable medical probability, the "necessary causal connection" between his alleged injuries and the alleged negligence of the defendant. *Labieniec v. Baker*, 11 Conn. App. 199, 203, 526 A.2d 1341 (1987). "The question is whether the conduct of the defendant was a substantial factor in causing the plaintiff's injury." *Drew v. William W. Backus Hospital*, 77 Conn. App. 645, 652, 825 A.2d 810 (2003). "[T]he plaintiff must show that what was done or failed to be done probably would have affected the outcome." *Labieniec*, 11 Conn. App at 207.

The plaintiffs have not disclosed expert reports as required by Rule 26(a)(2). In the absence of such supporting opinion testimony, their medical negligence claims fail as a matter of law. "The failure to timely file expert reports, leaving elements of Plaintiff's medical malpractice claim without evidentiary support, is grounds to grant summary judgment in favor of Defendants and dismiss this case." *Grenier v. Stamford Hospital Stamford Health Sys.*, No. 3:14-cv-0970 (VLB), 2017 U.S. Dist. LEXIS 207143, at *7 (D. Conn. June 26, 2017) (collecting decisions of the Court of Appeals for the Second Circuit affirming decisions granting summary judgment where plaintiff failed to timely disclose expert opinions).

> **D.    Even If the Court Were to Construe Letters Authored by Certain Treating Healthcare Providers as Expert Reports, They Are Insufficient to Maintain a *Prima Facie* Claim for Medical Negligence.**

Although the plaintiffs have not disclosed expert reports pursuant to Rule 26(a)(2), the defendants have received through discovery certain letters from two of the minor child's treating providers, Dr. Lopusny and Dr. Tranguch, a pediatrician and a naturopath, respectively. Even if the Court were to construe these documents as "expert reports" within the meaning of Rule

26

26(a)(2), which it should not, they are plainly insufficient to maintain a cause of action for

medical malpractice against any of the CT Children's defendants.

> **1.      Neither of the plaintiffs' letters was authored by a "similar healthcare provider" to Dr. Zemel, as he is a pediatric rheumatologist.**

Neither Dr. Lopusny nor Dr. Tranguch is qualified to testify that Dr. Zemel deviated from

the standard of care that applied to a pediatric rheumatologist at the times at issue in this case.

Neither one has any specialized training in pediatric rheumatology or any related field with the

same or greater qualifications. As such, under Connecticut law, their expert opinion testimony is

not sufficient to maintain a cause of action against Dr. Zemel.

Conn. Gen. Stat. § 52–184c(a) provides in relevant part:

> In any civil action to recover damages resulting from personal injury . . . in which it is alleged that such injury or death resulted from the negligence of a health care provider, as defined in section 52-184b, the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate *by reasonably prudent similar health care providers*.

Conn. Gen. Stat. § 52–184c(a) (emphasis added).

General Statutes § 52–184c(b) and (c) define "similar health care provider" depending on

whether the defendant is a specialist or is not a specialist.

If the defendant is not a specialist, a "similar health care provider" is defined by General

Statutes § 52–184c(b):

> If the defendant health care provider is not certified by the appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself out as a specialist, a "similar health care provider" is one who: (1) is licensed by the appropriate regulatory agency of this state or another state requiring the same or greater qualifications; and (2) is trained and experienced in the same discipline or school of practice and such training and

27

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

experience shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim.

Conn. Gen. Stat. § 52–184c(b).

If the defendant is a specialist, a "similar health care provider" is defined by General

Statutes § 52–184c(c):

> If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a "similar health care provider" is one who: (1) is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a "similar health care provider."

Conn. Gen. Stat. § 52–184c(c).

Dr. Zemel is trained and experienced in a medical specialty, namely, pediatric rheumatology. Local R. 56(a)1 Statement ¶ 68. He completed a fellowship at the State University of New York at Buffalo Medical School in rheumatology, which was focused on arthritic or rheumatic diseases of children. *Id.* He was the Chief of Pediatric Rheumatology at Newington Children's Hospital from 1978 until 1996, and he then served as the Chief of Pediatric Rheumatology at Connecticut Children's Medical Center from 1996 until approximately two years prior his retirement in 2021. *Id.* There can be no dispute that Dr. Zemel was at all times relevant to this case a specialist in pediatric rheumatology.

Neither Dr. Lopusny nor Dr. Tranguch have similar training or experience in pediatric rheumatology. According to Dr. Lopusny's letter, she is a general practice pediatrician and is board-certified in "Peditric [sic] Primary Care." *Id.* ¶ 69. She does not set forth any other qualifications in the letter, and she does not identify any familiarity with the standards of care that would apply to a pediatric rheumatologist. She does not appear to have any fellowship

training, and she sets forth no other training or experience in the field of rheumatology or the specialized study of arthritic conditions. In sum, she identifies absolutely no "training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care" in pediatric rheumatology. Conn. Gen. Stat. § 52–184c(d).

A general practice pediatrician, lacking fellowship training or specialized experience in rheumatology, is neither "trained and experienced in the same specialty" as a pediatric rheumatologist nor "certified by the appropriate American board in the same specialty." Conn. Gen. Stat. § 52–184c(c). The Connecticut Supreme and Appellate Courts have made clear that only a specialist both trained and experienced in the same specialty and board-certified in the same specialty satisfies the definition of a "similar health care provider" under Conn. Gen. Stat. § 52–184c(c). *E.g.*, *Bennett v. New Milford Hospital, Inc.*, 300 Conn. 1, 23–24, 12 A.3d 865 (2011) (board-certified general surgeon with subcertifications in critical care and trauma surgery not similar healthcare provider to emergency medicine physician); *Labissoniere v. Gaylord Hospital, Inc.*, 182 Conn. App. 445, 455, 185 A.3d 680 (2018) (board-certified general surgeon not similar healthcare provider to internal medicine physician); *Torres v. Carrese*, 149 Conn. App. 596, 610, 90 A.3d 256 (2014) (board-certified urologist not similar healthcare provider to obstetrician-gynecologist).

Although "a medical professional who is board certified in the same specialty but has greater training and experience" satisfies the requirements of Conn. Gen. Stat. § 52–184c(c); *Wilkins v. Connecticut Childbirth & Women's Ctr.*, 314 Conn. 709, 727, 104 A.3d 671 (2014); that is not the case here. *Wilkins* provided a limited exception in the circumstance of two practitioners within the same field, in that case, obstetrics and nurse midwifery. *Id.* The Supreme

29

Court emphasized, outside that particular context of two different practitioners within the same field, and an expert within the field commenting on the standard of care that applied to a midlevel provider within that same field, § 52–184c(c) was designed to require "a medical professional *with expertise in the particular medical field involved in the claim* to offer his or her professional opinion that the standard of care was breached in a particular instance." *Id.* at 730 (emphasis added).

Dr. Lopusny's letter does not set forth any such expertise in the field of pediatric rheumatology or any other basis for her to offer opinion testimony as to the standards of care that applied to it at the times at issue in this case. In fact, Dr. Lopusny's letter does not use the term "standard of care" at all; the closest it comes to levying a standard of care criticism is to allege that "[EP] was misdiagnosed with Idiopathic Rheumatoid Arthritis." Ex. N, Dr. Lopusny Letter. Aside from this conclusory statement, she does not describe what the standard of care required, whether or how the supposed misdiagnosis was a deviation from the standard of care, or, indeed, how any of the CT Children's defendants breached the standard of care in any respect whatsoever. In any event, Dr. Lopusny is plainly unqualified to testify to the standard of care that applied to fellowship-trained pediatric rheumatologists such as Dr. Zemel.

Dr. Tranguch is even further removed: She is not a medical doctor whatsoever, but, rather, has a degree in naturopathy. Local R. 56(a)1 Statement ¶ 70. As such, not only is she not board-certified in the same medical specialty as Dr. Zemel, she is not board-certified in *any* medical specialty. Naturopathic medicine providers are governed by entirely separate state statutes regarding examination, board certification, and licensure than are medical doctors. *Compare* Conn. Gen. Stat. §§ 20–34 to 20–42a (provisions governing naturopathic medicine providers) *with* Conn. Gen. Stat. §§ 20–8a to 20–14s (provisions governing medical doctors). Dr.

Tranguch has absolutely no qualifications whatsoever that would allow her to testify as to the standards of care that applied to a fellowship-trained pediatric rheumatologist with more than four decades of experience.

Perhaps cognizant of her lack of qualifications to comment on the standards of care that apply to pediatric rheumatologists, Dr. Tranguch's letter is notably silent as to what those standards of care were, what they required, and whether or how the CT Children's defendants violated them. Rather, her letter is limited to essentially a factual recitation of her involvement with EP and falls short of providing *any* opinion testimony, never mind admissible expert opinion testimony offered to a reasonable degree of medical probability.

In sum, neither of these letters sets forth any admissible expert opinion testimony that Dr. Zemel or anyone else at CT Children's deviated from the applicable standard of care. In the absence of such testimony, the plaintiffs cannot carry their burden of proof, and the CT Children's defendants are entitled to summary judgment.

### 2. Neither of the plaintiffs' letters was authored by a "similar healthcare provider" to PA Fitzsimmons, as he is a pediatric orthopedics physician assistant.

The above analysis with equal force to PA Fitzsimmons. PA Fitzsimmons is a physician assistant who specializes in orthopedics. Local R. 56(a)1 Statement ¶ 71. He has published medical literature in the fields of orthopedics and sports medicine. *Id.* His first job after completing his physician assistant program was at Connecticut Children's in the department of orthopedics and sports medicine, where he has remained to the present time. *Id.*

Even setting aside the issue that PA Fitzsimmons was not providing treatment for JIA or Lyme disease; *see* Part II.E, *infra*; neither Dr. Lopusny nor Dr. Tranguch are qualified to offer standard of care testimony against PA Fitzsimmons. They are not physician assistants, they do

31

not have training or experience in orthopedics or sports medicine, and they do not supervise orthopedic physician assistants.

For substantially these reasons, the exception in *Wilkins*, discussed above, does not apply. Although PA Fitzsimmons is a midlevel provider, Dr. Lopusny may not comment on the standard of care that applied to him merely because she is a medical doctor. Rather, only a physician within the field of orthopedics and sports medicine would be competent to satisfy the requirements of General Statutes § 52–184c(c). In such a case, such an orthopedics and sports medicine physician would be a "medical professional with expertise in the [same] particular medical field" and thus could comment on the standard of care that applied to PA Fitzsimmons. *Wilkins*, 314 Conn. at 730. Dr. Lopusny is not board-certified in orthopedics and sports medicine, however, and, as such, the exception within *Wilkins* does not apply.

In the absence of any expert opinion testimony from a provider within the field of orthopedics and sports medicine or with familiarity with the standards of care that apply to that field, the plaintiffs cannot demonstrate a *prima facie* case of medical malpractice against PA Fitzsimmons. For these reasons, the Court should grant summary judgment in his favor.

> **3.    Neither of the plaintiffs' letters mentions or even makes a mere passing reference to PA Fitzsimmons or alleges any deviation from the standard of care in his care and treatment of the minor child.**

In addition to the obvious deficiencies with the plaintiffs' letters given that neither Dr. Lopusny nor Dr. Tranguch is an orthopedics physician assistant, neither letter is sufficient to maintain a cause of action against PA Fitzsimmons because neither letter criticizes or even mentions his care and treatment of EP. As noted above, Dr. Lopusny's criticism of EP's care at Connecticut Children's appears to be that "[EP] was misdiagnosed with Idiopathic Rheumatoid Arthritis." Ex. N, Dr. Lopusny Letter. Dr. Tranguch's letter does not levy a standard of care

32

criticism at all. Ex. O, Dr. Tranguch Letter. Neither one mentions PA Fitzsimmons or his care of EP, which was limited to an emergency department visit on March 9, 2019 and a single follow-up appointment on March 19, 2019.

"[F]or Rule 26(a)(2)(C) to have any meaning, summary disclosures must contain more than mere passing reference to the care a treating physician provided." *Michel v. Yale Univ.*, No. 3:20-cv-01080 (SALM), 2022 U.S. Dist. LEXIS 186114, at *11 (D. Conn. Mar. 30, 2022).

"Although less is required in a [Rule 26(a)(2)(C)] disclosure, it is not acceptable to provide scant details. . . . Rule 26(a)(2)(C) . . . clearly requires treating physicians to, at a minimum, produce and disclose 'summaries' of the facts and opinions to which the physician expects to testify. . . . Ultimately, the question is whether the disclosure provides sufficient detail to permit defendants to prepare their defense." *Alexander v. Lewis*, No. 3:20-cv-370 (VAB), 2024 U.S. Dist. LEXIS 156327, at *20 (D. Conn. Aug. 30, 2024).

"Under Rule 26(a), a report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources. . . . Expert reports must include how and why the expert reached a particular result, not merely the expert's conclusory opinions." *Whalen v. CSX Transp., Inc.*, 2016 U.S. Dist. LEXIS 135061, at *9 (S.D.N.Y. Sep. 29, 2016) (citations omitted; internal quotation marks omitted).

Without any reference to PA Fitzsimmons or his care and treatment of EP, the CT Children's defendants are left to speculate what, exactly, (if anything) Dr. Lopusny or Dr. Tranguch would say the standard of care required PA Fitzsimmons to do differently. Simply put, the CT Children's defendants have not been put on notice of *any* standard of care opinions

against PA Fitzsimmons. For this reason, the plaintiffs' disclosures are not sufficient, and the CT Children's defendants are entitled to summary judgment.

> **4.    Neither of the plaintiffs' letters is sufficient, because neither one causally relates, to a reasonable degree of medical probability, any of the CT Children's defendants' conduct to the minor child's alleged harms.**

Neither Dr. Lopusny's nor Dr. Tranguch's letter provides an opinion, to a reasonable degree of medical probability, that the CT Children's defendants' conduct was a proximate cause of any damages to EP. Without expert opinion testimony causally relating the CT Children's defendants' care and treatment of EP to some discernible damage, the plaintiffs have failed to prove a *prima facie* case of medical malpractice. For this reason, the CT Children's defendants are entitled to summary judgment.

"The first component of legal cause is causation in fact. Causation in fact is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct. . . . The second component of legal cause is proximate cause . . . . [T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries. . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection. . . . This causal connection must be based upon more than conjecture and surmise. . . . An actual cause that is a substantial factor in the resulting harm is a proximate cause of that harm. . . . The finding of actual cause is thus a requisite for any finding of proximate cause." *Theodore v. Lifeline Sys. Co.*, 173 Conn. App. 291, 309–10, 163 A.3d 654 (2017) (citation omitted; internal quotation marks omitted).

In Connecticut, the test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries. *Wu v. Fairfield*, 204 Conn. 435, 438,

528 A.2d 364 (1987). It is the plaintiff who bears the burden "to prove an unbroken sequence of events that tied his injuries to the [defendant's conduct]." *Id.* at 428–38 (citing *Boehm v. Kish*, 201 Conn. 385. 391, 517 A.2d 624 (1986)); *see also Procaccini v. Lawrence & Memorial Hospital, Inc.*, 175 Conn. App. 692, 718, 168 A.3d 538 (2017). "The existence of the proximate cause of an injury is determined by looking from the injury to the negligent conduct." *Wu*, 204 Conn. at 439.

Causation must be removed from the realm of speculation and conjecture. *Pisel v. Stamford Hospital*, 180 Conn. 334, 334–42, 430 A.2d 1 (1980). "The expert opinion that seeks to establish the causal connection between the injury and the alleged negligence must rest upon more than surmise or conjecture." *Shelnitz v. Greenberg*, 200 Conn. 58, 66, 509 A.2d 1023 (1986). "Expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." *Sherman v. Bristol Hospital, Inc.*, 79 Conn. App. 78, 88, 828 A.2d 1260 (2003) (internal quotation marks omitted) (granting summary judgment where none of the plaintiffs' expert evidence could show that the defendants' alleged negligence caused the plaintiff's injuries).

In *Grenier v. Stamford Hospital Stamford Health Sys.*, No. 3:14-cv-0970 (VLB), 2017 U.S. Dist. LEXIS 207143 (D. Conn. June 26, 2017) the District Court found a causation opinion inadequate when the expert could opine only that "early detection and management of acute ischemic stroke *can* improve neurologic recovery and *can reduce* disability," and that "the proper evaluation and management of [the decedent's condition would have] afford[ed] her only chance of survival" impermissibly speculative. *Id.*, at *5–6 (emphases in original). The Court held that the expert's "opinions regarding what could have conceivably affected [the decedent's]

outcome and whether [the decedent] may have had a chance of survival is too evanescent to constitute an expert opinion on causation." *Id.* at *6.

Neither Dr. Lopusny's letter nor Dr. Tranguch's letter causally relates—even in conclusory terms—any defendants' conduct with any harms suffered by EP. Dr. Lopusny's letter does not identify any harm that was caused to EP as a result of any supposedly negligent conduct by the CT Children's defendants. Although she claims that EP's "joints were still swollen, especially in her knees, gingival polyps, and other complications" while taking medications for JIA and that "this year [2022] I have seen tremendous results in [EP]," Dr. Lopusny stops short of opining that different treatment in 2018 or 2019 more likely than not would have changed EP's medical course at that time. Ex. N, Dr. Lopusny Letter. In that respect, her opinions are noticeably short of even those offered by the expert in *Grenier*.

Insofar as Dr. Lopusny's letter offers any causation testimony, it is particularly speculative when viewed in the overall context of this case. The medical records in the case clearly demonstrate that EP improved dramatically while she was in DCF custody, living with a foster family and treating with Dr. Zemel and Connecticut Children's between March 29, 2019 and July, 2019. *See* Local R. 56(a)1 Statement ¶ 59. By July, 2019, there is documentation in the records that EP could run unassisted. *Id.* The records reflect, in contrast, that EP appeared to start declining around the time that Mr. Pileggi began withholding her medications for JIA. Dr. Lopusny does not comment on these facts, and she seems to be entirely unaware of them. Particularly in view of all the evidence in the case, Dr. Lopusny's opinions on causation, to the extent she articulates any, are impermissibly speculative and lack appropriate foundation. *Shelnitz*, 200 Conn. at 66.

It also must be noted that, immediately after June 2018, Mr. and Ms. Pileggi facilitated treatment for EP for purported Lyme disease with several different providers that they selected, including Dr. Lopusny. Local R. 56(a)1 Statement ¶ 17. They started EP on homeopathic treatments for Lyme disease during this time. *Id.* Thus, the supposed misdiagnosis of juvenile idiopathic arthritis did not result in any failure to treat EP.

Dr. Tranguch, by comparison, does not even *approach* offering causation opinions. She notes that she "established care on 10/28/2021" and that EP had "swollen knees that were not painful and did not impact quality of life." Ex. O, Dr. Tranguch Letter. She remarks on lab work that she ran for EP and notes "[t]reatment focused on reducing knee swelling as a result of vector borne diseases, and patient improved." *Id.* This is plainly insufficient to causally relate any of the CT Children's defendants' conduct with any alleged harms in EP. Merely summarizing her own care and treatment of EP and noting her view that EP improved over time is not a causation opinion at all, much less one that is sufficient to establish a claim for medical malpractice to a reasonable degree of medical probability.

For all these reasons, the plaintiffs have failed to adduce sufficient expert opinion testimony causally relating the conduct of the CT Children's defendants with the harms that the plaintiffs are alleging EP suffered, and the CT Children's defendants are entitled to summary judgment.

### E. The Court Should Grant Summary Judgment in Favor of Kevin Fitzsimmons Because He Did Not Provide Care and Treatment for the Minor Child's Arthritis.

Through discovery, it has been made clear that the true nature of the plaintiffs' claim against PA Fitzsimmons is not his care and treatment of EP on March 9, 2019 or March 19, 2019, but, rather, his coordination with DCF that DCF then used in support of the neglect

37

petition that it filed with the Superior Court on March 28, 2019. *See* Ex. K, PA Fitzsimmons Aff. The Court, however, has dismissed this claim as barred by the immunity provisions of Conn. Gen. Stat. § 17a–101a. *See* Mem. of Decision, ECF No. 82 at 12–22. The plaintiffs have failed to demonstrate a claim for medical malpractice against PA Fitzsimmons, and the Court should grant summary judgment in his favor.

Both Mr. and Ms. Pileggi testified that Mr. Fitzsimmons was not providing care and treatment for EP's JIA. Local R. 56(a)1 Statement ¶ 72. PA Fitzsimmons similarly testified that he did not recall discussing either Lyme disease or a tick bite with Mr. or Ms. Pileggi. *Id.* ¶ 73. He further testified that he was treating her leg fracture, and that orthopedic physician assistants do not treat JIA. *Id.* ¶ 74. Rather, on both his evaluation of EP in the emergency department on March 9, 2019 and at a follow-up appointment ten days later, on March 19, 2019, PA Fitzsimmons was providing care and treatment for EP's femur fracture, not her arthritis. *Id.* ¶ 75. PA Fitzsimmons did not provide any other care to EP, other than these two visits. *Id.* ¶ 76.

Ms. Pileggi testified during her deposition that the nature of her claim against Mr. Fitzsimmons is that he made a false report to DCF. *Id.* ¶ 77. Mr. Pileggi testified consistently that the nature of their claim against Mr. Fitzsimmons was that he made a false report to DCF, as opposed to any of the care that he provided to EP. *Id.* ¶ 78.

Those claims have been dismissed. The only claim that the Court has permitted to proceed in this case is one for medical malpractice based on an alleged misdiagnosis of juvenile idiopathic arthritis. *See* Mem. of Decision, ECF No. 82 at 28–30. PA Fitzsimmons did not make that diagnosis, nor was he involved in any way with EP's care in 2018. In absence of any evidence that PA Fitzsimmons misdiagnosed EP with JIA, the plaintiffs have failed to prove the

1945235_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666

only claim against him that the Court has allowed past the pleadings stage. For this reason, the

Court should grant summary judgment in PA Fitzsimmons' favor.

### III.    <u>CONCLUSION</u>

For all the above reasons, the defendants, Connecticut Children's Medical Center,

Lawrence Zemel, M.D., and Kevin Fitzsimmons, respectfully submit that the Court should grant

their Motion for Summary Judgment in its entirety.

**THE DEFENDANTS,
CONNECTICUT CHILDREN'S MEDICAL
CENTER, LAWRENCE ZEMEL, M.D., AND
KEVIN FITZSIMMONS**

BY:      */s/ Thomas J. Plumridge, Esq.*
Joyce A. Lagnese, Esq.
Fed. Bar No. ct05527
Stuart C. Johnson, Esq.
Fed. Bar No. ct20277
Thomas J. Plumridge, Esq.
Fed. Bar No. ct29394
DANAHERLAGNESE, P.C.
21 Oak Street, Suite 700
Hartford, Connecticut 06106
Telephone: 860.247.3666
Facsimile: 860.547.1321
Email: jlagnese@danaherlagnese.com
          sjohnson@danaherlagnese.com
          tplumridge@danaherlagnese.com

1945235_1

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on January 30, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


                                      */s/ Thomas J. Plumridge, Esq.*
                                        Thomas J. Plumridge, Esq.

1945235_1
DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666