IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KATHARINE PILEGGI ET AL., | ) | |
| | ) | |
| Plaintiff | ) | CIVIL NO. 3:22-cv-01315-AWT |
| | ) | |
| v. | ) | |
| | ) | |
| MATHIAS ET AL., | ) | |
| | ) | |
| Defendants. | ) | JANUARY 30, 2026 |

**LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1. Anthony and Katharine Pileggi allege that EP was bitten by a tick sometime prior to May 29, 2018. Ex. A, Katharine Pileggi Dep., Vol. I at 89:6–17.

2. On May 29, 2018, Ms. Pileggi brought EP, who was at that time two years and nine months old, to her pediatrician, Dr. Roman Alder. Ex. B, Roman Alder, M.D., Records at 1. Ms. Pileggi reported a "1-2 week [history of] swollen knees and difficulty walking." *Id.* Dr. Alder examined EP, noting swelling and warmth in both of EP's knees. *Id.*

3. Dr. Alder diagnosed arthritis and ordered an x-ray and testing to rule out Lyme disease. *Id.* The x-ray was negative for fracture or dislocation but demonstrated prominent soft tissue swelling. *Id.* at 2. The laboratory testing for Lyme disease was negative. *Id.* at 4.

4. EP had an elevated C-reactive protein ("CRP") level of 37.7 mg/L, whereas the reference range is 0.1–1.0 mg/L. *Id.*

5. An elevated CRP is a marker of inflammation in the body, such as inflammation caused by arthritis. Ex. C, Dr. Zemel Dep., Vol. I at 62:16–63:3.

6. Dr. Alder referred EP to the defendant Dr. Zemel, a pediatric rheumatologist, for follow up. Ex. B, Roman Alder, M.D., Medical Records at 5–6.

1

7. Dr. Zemel saw EP on June 1, 2018. *Id.*; *see also* Ex. D, Conn. Children's Med. Ctr. Records at 132.[1] Dr. Zemel noted that EP was having bilateral knee pain and swelling. *Id.* at 133. The medical records state that her parents were "generally carrying her everywhere now." *Id.* Dr. Zemel noted that Ms. Pileggi was convinced that EP had Epstein-Barr virus based on her own past experience with it. *Id.* Dr. Zemel noted that the parents eschewed medication generally and had been treating EP with tumeric tea, ionized zinc, various vitamins, and echinacea. *Id.* He noted that they adhere to a vegan diet. *Id.*

8. Ms. Pileggi believes Epstein-Barr virus is a "coinfection" with Lyme disease and that the two "usually go hand in hand." Ex. A, Katharine Pileggi Dep., Vol. I at 24:3–25.

9. On examination, EP had joint pain ("arthralgias") and joint swelling with tenderness. Ex. D, Conn. Children's Med. Ctr. Records at 134. She had mild synovitis of her fourth right proximal interphalangeal joint ("PIP joint") in her finger and right ankle, as well as 2–3+ swelling of both knees. *Id.* Dr. Zemel also noted the presence of flexion contractures, or an inability to fully straighten her knees. *Id.*

10. In the context of this physical examination, a negative Lyme disease test, and a "markedly elevated CRP" in the labs ordered by Dr. Alder, Dr. Zemel assessed EP as suffering from juvenile idiopathic arthritis ("JIA"). Ex. D, Conn. Children's Med. Ctr. Records at 135. He noted that "Lyme disease has been effectively ruled out." *Id.* He noted that the standard of care medical treatment for EP at that time, given that she was "quite disabled," would either be a combination of Nonsteroidals medications plus short-term prednisone, or bilateral knee injections under sedation. *Id.*

---

[1] All cited medical records, which have been filed under seal, have been Bates stamped. References are made to the Bates-stamped page numbers, which appear on the bottom center of each page.

11.     Dr. Zemel noted that Ms. Pileggi strongly refused either of these approaches or any medication being provided. Ex. D, Conn. Children's Med. Ctr. Records at 135. Ms. Pileggi stated that she would be bringing EP to a naturopath the following week and would pursue a course of diet changes and supplements as opposed to medication. *Id.* Ms. Pileggi believed that EP had "the same EBV related illness that she had." *Id.* Dr. Zemel encouraged the parents to bring EP for a follow-up appointment in approximately four weeks and to call if EP was not improving. *Id.* at 135–36.

12.     On June 1, 2018, Dr. Zemel ordered further testing, including an ANA screening. Ex. D, Conn. Children's Med. Ctr. Records at 137. ANA, which stands for anti-nuclear antibody, is an immune screening that looks for antibodies to different proteins within the cell nucleus and is seen in certain rheumatic diseases, including JIA. Ex. C, Dr. Zemel Dep., Vol. I at 62:3–9. The result came back positive with a homogenous pattern, which is consistent with JIA. Ex. D, Conn. Children's Med. Ctr. Records at 137.

13.     Dr. Zemel also tested for Epstein-Barr virus, which testing was negative for an acute or active infection but was suggestive of a recent or past infection. *Id.* at 138; *see also* Ex. C, Dr. Zemel Dep., Vol. I at 101:7–12.

14.     Ms. Pileggi testified at her deposition that, due to her own past experience with having Lyme disease, she was "very well-versed in Lyme" as of time of EP's initial treatment with Dr. Zemel. Ex. A, Katharine Pileggi Dep., Vol. I at 108:14–20. She testified that her purported experience with Lyme disease spurred her to attempt to obtain a doctorate degree in naturopathy, though that effort was unsuccessful. *Id.* at 22:13–23:13, 28:20–29:7. Dr. Zemel told Mr. and Ms. Pileggi that he believed EP had juvenile idiopathic arthritis, but they did not agree with him. *Id.* at 105:2–23; *see also* Ex. C, Dr. Zemel Dep., Vol. I at 52:18–21.

15. Ms. Pileggi testified that, following the initial visit with Dr. Zemel, she sought out providers who were "educated on Lyme disease" to obtain treatment for EP for Lyme. Ex. A, Katharine Pileggi Dep., Vol. I at 112:21–113:5. She testified that she looked for a provider specifically to treat EP for Lyme disease. Ex. E, Katharine Pileggi Dep., Vol. II at 439:15–440:8.

16. Mr. Pileggi testified that, as of the first visit with Dr. Zemel, both he and Ms. Pileggi were convinced that EP had Lyme disease, and they did not agree with Dr. Zemel's diagnosis of juvenile idiopathic arthritis. Ex. F, Anthony Pileggi Dep., Vol. I at 38:23–39:8. Mr. Pileggi testified that he "absolutely" believed that EP had Lyme and that Dr. Zemel's diagnosis of juvenile idiopathic arthritis was not correct. Ex. G, Anthony Pileggi Dep., Vol. II at 112:4–21.

17. Immediately after consulting with Dr. Zemel in June 2018, Mr. and Ms. Pileggi facilitated treatment for EP for purported Lyme disease with several different providers that they selected, including Dr. Diana Lopusny, a pediatrician at Preferred Pediatrics in Milford. Ex. A, Katharine Pileggi Dep., Vol. I at 112:21–114:20. Dr. Lopusny agreed with Ms. Pileggi that EP had Lyme disease, telling Ms. Pileggi "Absolutely. This is what's going on here." *Id.* at 113:11–15. The plaintiffs started EP on homeopathic treatments for Lyme disease during this time, around June 2018. *Id.* at 112:21–114:20.

18. At EP's first visit with Preferred Pediatrics on August 2, 2018, Mr. and Ms. Pileggi reported a chief complaint of "Lyme." Ex. H, Preferred Pediatrics Records at 1.

19. On June 19, 2018, a nurse at Connecticut Children's called Ms. Pileggi to follow up on EP's status at Dr. Zemel's request. Ex. D, Conn. Children's Med. Ctr. Records at 130–31. Ms. Pileggi reported that EP was receiving her own protocol for Epstein-Barr virus, including foods, herbs, acupuncture, energy healing, and heavy metal detoxification. *Id.* Ms. Pileggi cancelled EP's upcoming follow-up appointment with Dr. Zemel. *Id.* 123, 131.

20. In response, Dr. Zemel called Ms. Pileggi the following day, on June 20, 2018. *Id.* at 128–29. He told her that he would be interested in seeing any improvement that EP had made, and Ms. Pileggi agreed to reschedule an appointment with him. *Id.* at 128. Dr. Zemel indicated in his note of this call that, if the appointment were not rescheduled, he would consider filing a report of medical neglect with the Department of Children and Families ("DCF"). *Id.* at 128–29.

21. On June 22, 2018, Dr. Zemel sent Mr. and Ms. Pileggi a letter by certified mail. *Id.* at 126–27. In the letter, Dr. Zemel noted that "[i]t's very important that I see [EP] within the next 2 weeks" so that he could "document any changes in her arthritis." *Id.* at 126.

22. He followed up by telephone call to Mr. and Ms. Pileggi on June 29, 2018, leaving a voicemail "explaining that state law requires me to file a report with Department of children and families." *Id.* at 125. He noted that he would file the report in three days, and that he would welcome a telephone call before then if they had any additional information. *Id.*

23. Ms. Pileggi returned Dr. Zemel's call that evening. *Id.* at 124. Dr. Zemel once again explained the importance of him seeing EP for follow up and that "there is a window during which it is imperative to get arthritis under control before it leads to permanent damage." *Id.* Ms. Pileggi told Dr. Zemel that EP was seeing a naturopath, and she did not need to continue treating with Dr. Zemel. *Id.* Dr. Zemel disagreed, emphasizing the importance of EP being seen by a pediatric rheumatologist. *Id.* Dr. Zemel documented that Ms. Pileggi then went on a "lengthy rant about the evils of Western medicine," stated that she would "never place her daughter on any type of Western medicine," and that there were "poisons in the air that need to be removed from her daughter." *Id.* Dr. Zemel repeated his concern about EP's prognosis if she were to continue on her current course and that he would be making a report to DCF. *Id.*

24. On July 3, 2018, Dr. Zemel made a report to DCF of suspected medical neglect. Ex. C, Dr. Zemel Dep., Vol. I at 71:15–18; *see also* Ex. I, Dep't Children & Families Investigation Records at 2.

25. After meeting with the family, DCF reported to Connecticut Children's that EP had started seeing naturopathic medicine provider, Dr. Katharine Layman, who had reported improvement in EP's condition. Ex. D, Conn. Children's Med. Ctr. Records at 121. Because EP was receiving some treatment from a licensed professional for her condition, DCF closed its investigation at that time. *Id.*

26. EP was not treated at Connecticut Children's or by Dr. Zemel for the remainder of 2018. Ex. F, Anthony Pileggi Dep., Vol. I at 45:8–17.

27. Over the ensuing nine months, several medical providers made reports to DCF of suspected medical neglect relating to EP's untreated arthritis. Ex. I, Dep't Children & Families Investigation Records at 2–3.

28. On March 4, 2019, a medical provider, who evaluated EP on March 2, 2019, reported that EP "does not walk," had not walked for three months, had "restricted range of motion in both of her knees," and "was in clear agony." *Id.* at 2, 4.

29. On March 13, 2019, another medical provider made a report to DCF, noting that he or she had seen EP on March 8, 2019. *Id.* at 2–3, 5. This provider reported that EP had developed atrophy in her muscles in both her legs, had been non-ambulatory for eight months, and had contractures of her hamstrings and Achilles and was unable to straighten her legs. *Id.* at 3, 5. The provider reported that there was a possibility that, if EP's condition continued to go untreated, she would not be able to walk and would require surgery. *Id.*

30. On March 25, 2019, a naturopathic medical provider made another report to DCF, expressing concern that Ms. Pileggi may be attempting to "doctor hop" until she found a doctor to agree that EP was healthy. *Id.* at 3, 6. This provider reported that EP had "the worst case of Juvenile Rheumatoid Arthritis that they have worked with." *Id.*

31. Some providers use the term "juvenile rheumatoid arthritis" and "juvenile idiopathic arthritis" interchangeably. Ex. C, Dr. Zemel Dep., Vol. I at 59:20–25.

32. After June, 2018, the next time EP was treated at Connecticut Children's was on March 9, 2019 in the ED. Ex. D, Conn. Children's Med. Ctr. Records at 85–120.

33. Mr. and Ms. Pileggi reported that, on March 1, 2019, one of EP's siblings had been attempting to carry her and had dropped her on the floor, causing a left femur fracture. *Id.* at 87. An orthopedics consult was requested, and the defendant, PA Fitzsimmons, saw EP for evaluation of the femur fracture. *Id.* at 96. PA Fitzsimmons applied a new padded long leg split to the left leg. *Id.* at 98. He noted that the mechanism of injury provided by the parents fit the type of fracture that EP had sustained, and, therefore, a consultation with the suspected child abuse and neglect team at Connecticut Children's ("SCAN team") was not indicated. *Id.* PA Fitzsimmons instructed Mr. and Ms. Pileggi to follow up with orthopedics in five to seven days. *Id.* EP was discharged home that same day. *Id.*

34. PA Fitzsimmons saw EP in the outpatient clinic for follow up ten days later, on March 19, 2019. *Id.* at 79–84. PA Fitzsimmons noted that EP was non-ambulatory at that time secondary to her chronic knee swelling. *Id.* at 80. He noted bilateral lower extremity flexion contractures, with abnormal extension in the knees bilaterally and atrophy of the lower leg muscles. *Id.* at 80–81. PA Fitzsimmons obtained new x-rays, which he reviewed. *Id.* at 81. He concluded that EP's femur fracture was healing as expected for this type of injury. *Id.* He

instructed the family to follow up in approximately two weeks. *Id.* He made no recommendations regarding EP's juvenile idiopathic arthritis. *Id.*

35. On March 21, 2019, Dr. Zemel noted that he had been informed that EP had been seen by orthopedics. *Id.* at 78. He had reviewed PA Fitzsimmons' note, and he observed that PA Fitzsimmons had documented severe arthritic complications including flexion contractures of her knees and muscle wasting. *Id.* Dr. Zemel contacted DCF to express his concerns regarding EP's lack of appropriate medical care, and he recommended a 72-hour hold to stabilize her. *Id.*

36. On March 28, 2019, DCF filed a neglect petition. Ex. J, Neglect Pet.

37. In support of the petition, DCF submitted affidavits, including an affidavit signed by PA Fitzsimmons on March 27, 2019. *See* Ex. K, PA Fitzsimmons Aff. He noted, consistent with his medical records, that the type of femur fracture that EP had suffered is called an "insufficiency fracture," and that it more commonly is seen in patients who are non-ambulatory. *Id.* at 3. He noted that he had reviewed the Connecticut Children's records from June, 2018, and he observed that Dr. Zemel had diagnosed EP with juvenile idiopathic arthritis but the parents had declined treatment with Connecticut Children's. *Id.* at 2. He explained that lack of ambulation causes the lower extremity bones to become osteopenic, losing the ability to form new bone, which in turn causes them to be more fragile. *Id.* He affirmed, however, that EP's leg fracture had been healing well based on his evaluation of her on March 19, 2019. *Id.* at 3.

38. DCF also supported the petition with the affidavit of Ashia Velez, a DCF clinical nurse coordinator. Ex. L, Ashia Velez Aff. Ms. Velez attested that she had spoken with Dr. Zemel on March 20, 2019. *Id.* at 5 ¶ 12. Dr. Zemel reported to Ms. Velez that EP was suffering from lack of proper treatment for her arthritis and that the femur fracture was related to local

osteoporosis caused by this lack of proper treatment. *Id.* Dr. Zemel expressed grave concern for EP and recommended a hospital admission for evaluation and treatment. *Id.*

39. On March 28, 2019, the Superior Court granted an order of temporary custody of EP with DCF. Ex. I, Dep't Children & Families Investigation Records at 7–8.

40. The Court further ordered that DCF was authorized to provide permission for EP to obtain any necessary medical treatment as recommended by any treating physician or medical specialist. Ex. D, Conn. Children's Med. Ctr. Records at 1.

41. DCF brought EP to the Connecticut Children's emergency department in the evening of March 29, 2019. *Id.* at 53, 56.

42. References in the Connecticut Children's medical records to a patient with the initials "ED" are to EP. This was a pseudonym that was used for EP after a family member called the hospital impersonating a DCF social worker and attempting to solicit information concerning EP. Ex. M, Frank Rotovnik Dep. at 130:20–131:5, 131:20–132:1.

43. On admission to the hospital, EP was noted to be quiet, thin, and pale. Ex. D, Conn. Children's Med. Ctr. Records at 57. She had fallen from the 20.6th percentile in weight to the 3.9th percentile in weight since June, 2018 with no weight gain during that time. *Id.* at 58. It was noted that she had been on a diet of raw vegetables only. *Id.* at 57.

44. Joint pain and swelling were noted, and the SCAN team instructed emergency department providers to document the severity of the swelling and EP's overall body habitus with photographs. *Id.* at 57–59, 76–77.

45. In particular, she had swelling with deformity and decreased range of motion in the fingers of both her hands, both her wrists, and her right knee and ankle. *Id.* at 58.

46.     Her fingers were noted to be "sausage-like" and her right knee appeared edematous with a cachectic appearing right leg. *Id.* at 60, 76–77.

47.     Her left leg was still in a cast and was not evaluated at that time. *Id.* at 60.

48.     Dr. Zemel evaluated EP on March 31, 2019. *Id.* at 70–75. He could not evaluate her right hand and wrist due to the presence of an IV. *Id.* at 71. He noted swelling and loss of range of motion in the fingers of her left hand, left wrist, both elbows, both knees, and both ankles, with significant atrophy of the thighs and the calves. *Id.*

49.     Dr. Zemel noted that she had developed significant contractures in the elbows, knees, and ankles bilaterally. *Id.* at 75. He observed that "[i]t is unlikely that medication and physical therapy alone will increase knee extension enough to allow for ambulation since these contractures have been present for over a year." *Id.*

50.     Dr. Zemel planned for intensive in-hospital rehabilitation with serial casting under sedation to attempt to reduce the severe knee flexion contractures. *Id.*

51.     On April 1, 2019, Dr. Zemel reevaluated EP. *Id.* at 68–69. Her peripheral IV had been removed, allowing him to evaluate her right hand. *Id.* He noted swelling with pain in the fingers of her right hand and her right wrist, similar to his findings on the left hand. *Id.*

52.     Dr. Zemel performed bilateral joint aspiration and injections of the knees with casting on April 5, 2019. *Id.* at 46–52. EP tolerated the procedure well and was returned to the nursing floor following the procedure. *Id.* at 52.

53.     On April 9, 2019, the casts were removed and braces were placed on both knees. *Id.* at 36–45. The procedure was successful and tolerated by EP, and she was returned to the nursing floor afterward. *Id.* at 37, 44–45.

54. EP was discharged from Connecticut Children's on April 12, 2019, following a two-week admission to the hospital. *Id.* at 54, 62. Her discharge summary noted that she received physical therapy throughout her hospitalization and that it would continue on an outpatient basis. *Id.* at 63. She was to continue taking methotrexate, naproxen, prednisolone, and etanercept (Enbrel). *Id.* She was planned for outpatient follow-up with rheumatology. *Id.*

55. Dr. Zemel saw EP for her first outpatient rheumatology visit ten days later, on April 22, 2019. *Id.* at 34. EP was living with a foster family at that time. *Id.* EP had been wearing her leg braces overnight. *Id.* She continued on her medications as listed above. *Id.* Dr. Zemel noted that her joints were quiet with the exception of some pain in her left subtalar joint (a joint between two of the tarsal bones in the foot), and he found that the medication seemed to be effective in quieting down her arthritis. *Id.* at 34–35. Dr. Zemel adjusted her medications and planned to continue following her on an outpatient basis. *Id.* at 35.

56. Dr. Zemel continued to see EP until his retirement in April, 2021. *Id.* at 9–11. Dr. Zemel saw EP on May 15, 2019; *id.* at 31–33; July 15, 2019; *id.* at 28–30; October 10, 2019; *id.* at 25–27; December 10, 2019; *id.* at 21–24; March 10, 2020; *id.* at 18–20; June 10, 2020; *id.* at 16–17; October 20, 2020; *id.* at 12–15; and April 7, 2021; *id.* at 9–11.

57. EP remained in foster care until October 9, 2019, at which point she returned to living with Mr. Pileggi. *Id.* at 26.

58. On May 15, 2019, Dr. Zemel noted that she was taking steps at home while wearing her braces. *Id.* at 31. All her joints were quiet, with the exception of her knees, which still had some loss of range of motion with extension bilaterally. *Id.* at 32.

59. By July 15, 2019, while EP still was in foster care, Dr. Zemel noted that EP was able to run while playing, and her knee extension was almost full. *Id.* at 29. He personally

11

observed EP running up and down the hallway with her foster sister. *Id.* He noted that "[EP's] arthritis appears to be in remission, on combination disease modifying medication. We have successfully reduced her previously fixed knee flexion contractures, and she functionally went from not walking for longer than a year, to now running around effortlessly." *Id.* at 30.

60. During his deposition, Mr. Pileggi testified that, after regaining custody of EP in October, 2019, he stopped following Dr. Zemel's treatment advice and was not compliant in providing the medications that Dr. Zemel had prescribed to her. Ex. G, Anthony Pileggi Dep., Vol. II at 124:18–127:10. Mr. Pileggi testified that there was a "month or two" after regaining custody while he continued to provide the medications that Dr. Zemel had prescribed, including Enbrel and methotrexate, but, after that period of time, he ceased giving her any of the medications prescribed by Dr. Zemel. *Id.* He continued to bring EP to appointments with Dr. Zemel but did not advise Dr. Zemel that he was not being compliant with EP's medications. *Id.* The records reflect that Mr. Pileggi told Dr. Zemel that EP was receiving her medications as ordered, and Dr. Zemel made numerous adjustments to her medications during this time frame. Ex. D, Conn. Children's Med. Ctr. Records at 17, 20, 24.

61. Mr. Pileggi testified that he stopped providing EP her medications in consultation with a pediatrician, Dr. Lopusny Ex. G, Anthony Pileggi Dep., Vol. II at 124:18–127:10.

62. The first note in the records of Dr. Lopusny's practice, Preferred Pediatrics, following the October, 2019 reunification is dated September 21, 2020. Ex. H, Preferred Pediatrics Records at 4. It noted, among other things, "[EP] has lyme disease" and lists as its sole assessment of EP as "Lyme disease." *Id.* at 5. It further noted "[p]arental concerns" that EP "never treated for lyme." *Id.* at 4.

63. A follow-up note by Dr. Lopusny dated October 15, 2020 stated that EP will treat with Dr. Thomas Moorecroft who "focuses on chronic lyme and baronella [sp] and pans. . . . Dr Tom is thinking of treating with azithromycin for lyme." *Id.* at 7.

64. On June 23, 2021, EP had a follow-up rheumatology visit with Dr. Zemel's former partner, Dr. Lapin. Ex. D, Conn. Children's Med. Ctr. Records at 4–8. Dr. Lapin noted the presence of swelling and reduced range of motion in both knees and found that she had active arthritis in both knees. *Id.* at 6–7. He recommended to Mr. Pileggi that EP undergo sedated joint injections in the knees, but Mr. Pileggi declined. *Id.* at 7–8.

65. EP's August 5, 2021 appointment with Dr. Lapin was cancelled. *Id.* at 3.

66. A rescheduled appointment for November 4, 2021 was cancelled. *Id.* at 2.

67. EP did not treat with Connecticut Children's Medical Center after that time. Ex. G, Anthony Pileggi Dep., Vol. II at 119:6–11.

68. Dr. Zemel is trained and experienced in a medical specialty, namely, pediatric rheumatology. Ex. C, Dr. Zemel Dep., Vol. I at 7:17–18. He completed a fellowship at the State University of New York at Buffalo Medical School in rheumatology, which was focused on arthritic or rheumatic diseases of children. *Id.* at 7:10–16, 8:17–21, 9:9–11. He was the Chief of Pediatric Rheumatology at Newington Children's Hospital from 1978 until 1996, and he then served as the Chief of Pediatric Rheumatology at Connecticut Children's Medical Center from 1996 until approximately two years prior his retirement in 2021. *Id.* at 8:2–12, 9:12–10:12.

69. Dr. Lopusny is a general practice pediatrician and is board-certified in Pediatric Primary Care. Ex. N, Dr. Lopusny Letter at 1.

70. Dr. Tranguch is not a medical doctor, but, rather, has a degree in naturopathy. Ex. O, Dr. Tranguch Letter.

71. PA Fitzsimmons is a physician assistant who specializes in orthopedics. Ex. P, PA Fitzsimmons Dep. at 15:15–16:3, 16:15–17:7. He has published medical literature in the fields of orthopedics and sports medicine. *Id.* at 19:2–20. His first job after completing his physician assistant program was at Connecticut Children's in the department of orthopedics and sports medicine, where he has remained to the present time. *Id.* at 14:5–15:22.

72. Both Mr. and Ms. Pileggi testified that Mr. Fitzsimmons was not providing care and treatment for EP's JIA. Ex. A, Katharine Pileggi Dep., Vol. I at 204:12–21.

73. PA Fitzsimmons testified that he did not recall discussing either Lyme disease or a tick bite with Mr. or Ms. Pileggi. Ex. P, PA Fitzsimmons Dep. at 42:18–43:16.

74. PA Fitzsimmons testified that he was treating her leg fracture, and that orthopedic physician assistants do not treat JIA. *Id.* at 80:4–8, 81:2–15.

75. On both his evaluation of EP in the ED on March 9, 2019 and at a follow-up appointment on March 19, 2019, PA Fitzsimmons was providing care and treatment for EP's femur fracture, not her arthritis. Ex. E, Katharine Pileggi Dep., Vol. II at 437:8–13.

76. PA Fitzsimmons did not provide any other care to EP, other than these two visits. *Id.* at 158:4–7; Ex. P, PA Fitzsimmons Dep. at 44:13–15.

77. Ms. Pileggi testified during her deposition that the nature of her claim against Mr. Fitzsimmons is that he made a false report to DCF. Ex. A, Katharine Pileggi Dep., Vol. I at 224:21–226:21; Ex. E, Katharine Pileggi Dep., Vol. II at 398:1–399:12, 400:16–401:6, 437:1–7.

78. Mr. Pileggi testified that the nature of their claim against Mr. Fitzsimmons was that he made a false report to DCF, as opposed to any of the care that he provided to EP. Ex. G, Anthony Pileggi Dep., Vol. II at 152:2–6.

|     | THE DEFENDANTS,<br>CONNECTICUT CHILDREN'S MEDICAL CENTER, LAWRENCE ZEMEL, M.D., AND KEVIN FITZSIMMONS |
|---|---|
| BY: | */s/ Thomas J. Plumridge, Esq.*<br>Joyce A. Lagnese, Esq.<br>Fed. Bar No. ct05527<br>Stuart C. Johnson, Esq.<br>Fed. Bar No. ct20277<br>Thomas J. Plumridge, Esq.<br>Fed. Bar No. ct29394<br>DANAHERLAGNESE, P.C.<br>21 Oak Street, Suite 700<br>Hartford, Connecticut 06106<br>Telephone: 860.247.3666<br>Facsimile: 860.547.1321<br>Email: jlagnese@danaherlagnese.com<br>sjohnson@danaherlagnese.com<br>tplumridge@danaherlagnese.com |

## CERTIFICATE OF SERVICE

      I hereby certify that on January 30, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                             */s/ Thomas J. Plumridge, Esq.*
                                             Thomas J. Plumridge, Esq.

1946510_1

DANAHERLAGNESE, PC • 21 OAK STREET, HARTFORD, CT 06106 • (860) 247-3666