# Katharine Pileggi

## Pileggi vs. Mathias
## 3:22-cv-01315-AWT

## April 3, 2025





1000 Farmington Ave
Suite 103
West Hartford, CT 06107
860-269-9191

production@millerreporting.com
millerreporting.com

```
 1         A.    Correct.  So we had our first residence at
 2   ▓▓▓▓▓▓▓▓▓▓▓▓.  And once our lease was up, we moved to
 3   a new construction home.
 4         Q.    So when you say your first residence, that's
 5   not the one that was infested with mold?
 6         A.    No.  That was ▓▓▓▓▓▓▓▓▓▓.
 7         Q.    So ▓▓▓▓▓▓▓▓▓▓ was a temporary living
 8   situation while your new home was constructed?
 9         A.    We lived at ▓▓▓▓▓▓▓▓▓▓ searching for a
10   home.  Again, inventory was very low.  And then we found
11   a new construction rental right down the street from
12   where we were working, in our community.
13         Q.    Got it.  You mentioned earlier that you had
14   undertaken some training in naturopathy?
15         A.    Yes.
16         Q.    Could you describe that for me?
17         A.    So after I endured years of illness with Lyme
18   disease myself, which almost took my life, and I was
19   getting nowhere with treatment, I started looking at
20   alternative, what is considered alternative in order to
21   treat and get better, because I wanted to live for my
22   children.
23               So I started trying completely different
24   herbal programs, dietary.  And everything that I had
25   reversed.  So it sparked me to want to help other
```

```
 1    people, because amidst that, I had a business and 4,000
 2    clients, and they watched my journey, and a lot of
 3    people came to me and said, I have this and I have this,
 4    can you please help me.  And so it sparked my will to
 5    want to help people.
 6              So I decided to study.  And I eventually went
 7    to detoxification study with Dr. Robert Morse.  And then
 8    I wanted to go deeper and get a naturopathic doctor
 9    degree after completing -- well, I completed the course
10    through Dr. Robert Morse, but I was not allowed to
11    submit for my certification and I was not allowed to
12    enroll in naturopathic school.  So it all stopped at
13    that point.
14         Q.   So I'm going to ask you several questions
15    about all of that.  Just bear with me.  Okay?
16              So you said that you had been diagnosed
17    with -- well, strike that.
18              You said that you had Lyme disease.
19         A.   Yes.
20         Q.   When was it that you found out that you had
21    Lyme disease?
22         A.   So I contracted Lyme disease multiple times,
23    because I worked with animals.  So the first time
24    occurred around 2011.  And then I contracted it again
25    during my pregnancy with E█ and many times after that.
```

```
 1    But as I became better versed in medicine, I was able to
 2    alleviate every time that it happened again.
 3         Q.   Now, did you also contract Epstein-Barr virus?
 4         A.   So Epstein-Barr usually goes hand-in-hand with
 5    Lyme disease.  When you are bitten by a tick, it will
 6    trigger underlying viral illness in the body,
 7    Epstein-Barr being one of them.
 8              So I learned that when I had different
 9    symptomatic things pop up, Epstein-Barr was usually one
10    of them.  And it can progress into a couple different
11    stages.  So, yes, I had Epstein-Barr, as did E███.
12         Q.   All right.  So to be sure I understand, when
13    there is a reference in the record, for instance, to you
14    being concerned about yourself or your child having
15    Epstein-Barr, in your mind, Epstein-Barr and Lyme
16    disease go hand-in-hand?
17         A.   Usually.  Usually the infection after a tick
18    bite floods your system, it triggers the Epstein virus
19    in the body.  So you have this dual sickness going on
20    simultaneously which inflames the entire body.  I
21    learned this just through my own.
22              And that's why I asked a lot of questions and
23    gave a lot of information when E███ was first bitten to
24    test for certain things, because I knew what happened
25    afterwards, which was shown to be proven correct.
```

```
1    enroll in a detoxification program, which I did.  And I
2    sold my business in hopes of going the holistic route.
3    After I completed his program, I decided I would like to
4    get my doctorate in naturopathic studies.
5         Q.   What is Dr. Morse's detoxification program?
6         A.   What does it entail?
7         Q.   Sure.
8         A.   It is Level One, it's a yearlong program into
9    learning how the entire body functions, specifically
10   looking at the lymphatic system, how to successfully
11   detox out viral loads, infections, autoimmune,
12   et cetera.
13             There is multiple levels.  I was only able to
14   complete Level One due to the case.  There's four
15   levels, including two levels of iridology to look deep
16   into the body.  But the first year was very medical.
17        Q.   When did you start the Level One course; if
18   you recall?
19        A.   Around 2015.
20        Q.   And I recall you saying that you were not
21   allowed to obtain your ND?
22        A.   Yes.  I was -- sorry.
23        Q.   Could you just explain what you mean by that?
24        A.   Yes.  I was not allowed to submit my school
25   work to Dr. Morse to receive my certification on
```

```
 1    Detoxification 1.
 2         And I was not allowed to enroll in a
 3    naturopathic doctorate program, which was my next step,
 4    because DCF determined I was a -- these are their
 5    words -- threat to the medical and pharmaceutical
 6    industry, and it was quackery, and that if I did not
 7    stop my studies, I would never see my child again.
 8         Q.   So it was DCF that prohibited you from
 9    continuing in your studies with Dr. Morse?
10         A.   Yes.
11         Q.   So after you were prohibited by DCF from
12    continuing your studies with Dr. Morse, did you at any
13    point afterward resume study to obtain your ND?
14         A.   Not at this point.  Until this is over and I'm
15    cleared, I am not -- they said, "I will be watching
16    you."  Now, if I could add --
17         Q.   Just before you go on, "they" being DCF?
18         A.   DCF, correct.
19         Q.   Go ahead.
20         A.   However, after our initial consult with
21    Dr. Zemel, and me advocating for E▮ to be tested for
22    Lyme, coinfections, along with mycotoxins, he asked me a
23    lot of questions about the knowledge that I knew, which
24    I said I've been studying under the holistic field for
25    quite some time due to my, you know, extensive dealings
```

```
 1    child with arthritis?
 2        A.   Never.
 3        Q.   Prior to June 2018, had your child ever been
 4    diagnosed with Lyme disease?
 5        A.   Never.
 6        Q.   Okay.  I understand it's your claim in the
 7    case that your child was bitten by a tick sometime
 8    around June 2018.
 9        A.   It's not a claim.  It's an absolute.  We
10    brought the tick to both CCMC and to Dr. Alder.
11        Q.   I'll get there.  So your testimony is that
12    your child was bitten by a tick around June 2018?
13        A.   Yes.
14        Q.   When did this happen exactly?
15        A.   Two days prior to us bringing her to
16    Dr. Alder.  We found a tick on her.  We're not sure how
17    long it was on her for.
18        Q.   Okay.  Again, please just wait for me to ask
19    the questions.  I promise you I will get there.  Okay?
20             Did you see the tick actually attached to your
21    child?
22        A.   Yes.
23        Q.   Where was it?
24        A.   On her lower leg, between her ankle and, like,
25    her lower.
```

```
 1    talk about this.
 2         Q.   Again, slow down.  Let's back up.  So
 3    Dr. Zemel expressed to you that he did not believe this
 4    was Lyme disease that your child had, but, rather, that
 5    it was --
 6         A.   JRA.
 7         Q.   JRA is what he said?  Did he use the term
 8    juvenile idiopathic arthritis?
 9         A.   Right, which is what JA -- whatever it is,
10    yes.  The abbreviation and the name, he used both.
11         Q.   Did Dr. Zemel explain to you what to you what
12    juvenile idiopathic arthritis is?
13         A.   Somewhat, but I stopped him again.  I said,
14    "No, we need to talk about what just happened to my
15    daughter."
16         Q.   Okay.  So when Dr. Zemel expressed to you that
17    he believed your child had juvenile idiopathic
18    arthritis, you stopped him?
19         A.   Right.  Yes.
20         Q.   All right.  You did not agree with him?
21         A.   Neither one of us did.  We said, whoa, hold on
22    here, because he stopped us about the tick, so I stopped
23    him.
24         Q.   So in any event, Dr. Zemel clearly did not
25    agree that your child had Lyme disease?
```

1  objecting and putting it there because it's a
2  mischaracterization of her testimony.
3          MR. PLUMRIDGE:  That's fine.  I am trying
4  to finish today.
5          MS. LINDSAY:  That's fine.  And I'm
6  allowing to you.  But the three times that I
7  said something, all of a sudden it's a
8  problem.
9          THE WITNESS:  What's a problem?  Do I
10  need to clarify anything?
11          MS. LINDSAY:  No.
12      Q.  There's no question pending.  Please let me
13  ask you a question.
14          So as I understand it, as of the time of your
15  initial visit with Dr. Zemel -- obviously this came
16  after your own experience with Lyme disease?
17      A.  Correct.
18      Q.  And so you had already researched Lyme disease
19  on your own, correct?
20      A.  Right.  I was very well-versed in Lyme.
21  That's why I was scared for my child.
22      Q.  Right.  And you had treated with Dr. Alder,
23  you said, for Lyme disease?
24      A.  No.  I treated with New Milford Medical Group.
25  But in the midst of me being very ill, Dr. Alder had

1          And it seems to be a trend.  And I have
2   actually -- that's something else I want to submit is
3   all of the reviews on Zemel.  Seems to be a trend in
4   pattern with his patients, that question, I want to ask
5   questions about their child.
6          Q.   Did Dr. Zemel make any recommendations during
7   this initial visit regarding potentially medical
8   management of your child?
9          A.   No.  His way, do what he says, schedule it or
10  else.  That's it.  He mentioned him, him, him, and him.
11  That's it.
12         Q.   All right.  I understand that.  My question is
13  did Dr. Zemel make any specific recommendations for
14  medical management of your child at this initial visit?
15         A.   No.
16              MS. LINDSAY:  Asked and answered.  Three
17         times.
18              MR. PLUMRIDGE:  If the answer is no, then
19         it's no.
20         A.   No.
21         Q.   Thank you.  After your initial visit with
22  Dr. Zemel, did you consult with any other health care
23  provider regarding the potential for Lyme disease in
24  your child?
25         A.   Yes.  We didn't go back to Alder, since he was

```
 1    not helping us.  So I looked up someone local that was
 2    supposed to be educated on Lyme disease, because we saw
 3    her worsening.  So we contacted someone local named
 4    Katherine Layman.  She went in, started treating E███
 5    with natural homeopathy and other recommendations.
 6            We started to see that she was not, in our
 7    eyes, fit, because she didn't seem confident in her
 8    plans, and we didn't want anything to happen to our
 9    daughter early on.  We were very concerned.  She was
10    very little.
11            So we then found Preferred Pediatrics, 'cause
12    we knew we needed to have a pediatrician behind us along
13    with a tick specialist.  So we found Preferred
14    Pediatrics, saw Dr. Lopusny, and she said, "Absolutely.
15    This is what's going on here."
16        Q.  So when did you reach out to Dr. Layman?
17        A.  Right away after we left Zemel's.
18        Q.  And you said she initiated some homeopathic
19    treatment?
20        A.  Right.
21        Q.  What treatment was that?
22        A.  I don't recall.  It was not like a Dr. Morse
23    protocol with herbs and getting to the root cause.  It
24    was more homeopathy.  And we just didn't think that it
25    was going to be aggressive enough.
```

```
 1    knew it was tick disease.  And she said, "That is so
 2    wrong, and that is complete medical malpractice.  This
 3    child has Lyme disease.  This is consistent with her
 4    eyes."  'Cause he kept saying, "Oh, her eyes will be
 5    damaged.  She has arthritis eyes."  So we had everything
 6    checked out.
 7            Now, I have not been able to get a document
 8    from her yet out of fear, but if you brought her in to
 9    testify, that's what she said.  She said, "This child
10    does not have arthritis.  That is a wrong diagnosis and
11    a wrongdoing on this baby's behalf."
12        Q.  Did Dr. Marcone express any opinion about
13    Mr. Fitzsimmons?
14        A.  Not that I'm aware of.  But again, he wasn't
15    the one that was diagnosing her with arthritis.  Zemel
16    was.
17        Q.  Right.  Mr. Fitzsimmons was not diagnosing --
18        A.  Yeah.  He had nothing to do with it.
19        Q.  With the diagnosis of arthritis?  You're
20    shaking your head no?
21        A.  No.  Sorry.
22        Q.  That's okay.  And I think I heard you testify
23    that, to your knowledge, there's nothing in writing
24    reflecting Dr. Marcone's criticism of Dr. Zemel?
25        A.  No.  I'm working on it.
```

```
 1    daughter's removal, it affected her for life and our
 2    family for life.  And since, we still haven't been able
 3    to pick up the pieces.  This will never leave us.  And
 4    my marriage is destroyed.
 5            And E███ still has privacy issues, you know,
 6    because between DCF and the worker and his
 7    inappropriateness, and then what happened in foster
 8    care, with their inappropriateness, and what was done to
 9    Tony and I in between, you know, DCF and divorce and
10    harassment and threatening.
11            It goes way beyond just simple things, you
12    know.  Our nanny had to move out of state because she
13    was harassed by DCF.  You know, it's a lot.  It
14    encompasses a lot.  And it's for forever.
15            I mean, I've tried to reopen businesses since,
16    and half my clientele is gone because they think that
17    I'm this person that was put out there, you know, when
18    I'm not.  I was fighting for my child, you know.
19    There's a lot of public knowledge.  It destroys you in
20    many, many different ways.
21        Q.  So let's start with Mr. Fitzsimmons, because I
22    think it's probably a little bit more cabined.  Is the
23    conduct -- well, you tell me.  What is specifically
24    Mr. Fitzsimmons' conduct that contributed to the damages
25    that you're setting forth here in the first paragraph of
```

```
 1   paragraph 1?
 2        A.    That he went from supporting us and saying we
 3   were doing everything that we could in treating our
 4   daughter to making a call to DCF and jumping on the
 5   bandwagon, because I'm sure he was paid off or I'm sure
 6   DCF threatened him, because it was -- from how he was
 7   with us to that, it was -- I mean, we were shocked and
 8   taken off guard.
 9             How could this person who's saying you're
10   doing such a good job, look at her, she's healing so
11   fast, to Frank saying, oh, we got a report from
12   Fitzsimmons.  Look who got paid off.
13        Q.    So when you say a report, it's my
14   understanding Mr. Fitzsimmons submitted an affidavit to
15   DCF; is that right?
16        A.    No, there was a report made, like a call in or
17   a, whatever, same as Zemel.  He made a report too
18   against us.
19        Q.    So it's that report that is the nature of your
20   claim against Mr. Fitzsimmons?
21        A.    Yeah.  Like, why throw us under the bus?  I've
22   done extensive research on how this all works when they
23   need more mandated reporters in order to uphold their
24   case for removal and ultimately selling off a child or
25   whatever, because that's where they were heading.
```

| | |
|---|---|
| 1 | They had no plans to return E███ home to us. |
| 2 | They planned to give her to the foster parents until I |
| 3 | raised hell in court and I got my child back.  So this |
| 4 | encompasses so much more. |
| 5 | So again, all these reports and all these |
| 6 | people jumping on, when initially you had good |
| 7 | intentions, and then because now DCF wants to do -- |
| 8 | Heather Perreault is another one.  They all started |
| 9 | lining up doing what DCF wanted. |
| 10 | So again, who paid you, who threatened you, I |
| 11 | don't know, but you still did wrong on my child.  And in |
| 12 | the end, she was removed from my home.  And she will |
| 13 | have this lifelong trauma with her family to deal with, |
| 14 | you know. |
| 15 | Q.   All right. |
| 16 | A.   So that's my issue with Fitzsimmons is doing |
| 17 | the wrong thing. |
| 18 | Q.   Okay.  Have we covered all of the conduct that |
| 19 | you are alleging on Mr. Fitzsimmons' behalf that you're |
| 20 | alleging caused your child's injuries that are the |
| 21 | subject of this lawsuit? |
| 22 | A.   Right.  He was a piece of it. |
| 23 | Q.   Okay.  So Dr. Zemel is obviously a little bit |
| 24 | of a broader question, so let me see if I can break it |
| 25 | down.  Obviously -- we're staying in this first |

```
 1                      C E R T I F I C A T E

 2            I hereby certify that I am a Notary Public, in

 3    and for the State of Connecticut, duly commissioned and

 4    qualified to administer oaths.

 5            I further certify that the deponent named in

 6    the foregoing deposition was by me duly sworn, and

 7    thereupon testified as appears in the foregoing

 8    deposition; that said deposition was taken by me

 9    stenographically in the presence of counsel and reduced

10    to typewriting under my direction, and the foregoing is

11    a true and accurate transcript of the testimony.

12            I further certify that I am neither of counsel

13    nor attorney to either of the parties to said suit, nor

14    am I an employee of either party to said suit, nor of

15    either counsel in said suit, nor am I interested in the

16    outcome of said cause.

17            Witness my hand and seal as Notary Public

18    this 15th day of April 2025.

19

20
                                   *Janet C. Phillips*

                                   Janet C. Phillips
21                                 Notary Public
                                   CSR No. 124
22

23    My Commission expires:
      October 31, 2026
24

25
```