**CERTIFIED COPY**

## In The Matter Of:

*Katharine Pileggi, Anthony Pileggi Also, as Next Friend to their Minor Child "EP" v. Kim Mathias Assistant Attorney General State of Connecticut, in her individual and Official capacity, Kaela Minerly in her Individual and official capacity, Frank Rotovnik in his individual and official capacity, Connecticut Children's Medical Center, Dr. Roman Alder, Dr. Lawrence Zemmel, Dr. Lindsey Laughinghouse, Dr. Andrew Bazos, Dr. Kevin Fitzsimmons, Connecticut Department of Children and Families ("DCF") and "John and Jane Does 1-10"*

---

*\*Dr. Lawrence Zemel\**

*July 25, 2025*

---

*A Plus Reporting Service LLC*

```
1        Q.    Please state your full name for the
2   record.
3        A.    Lawrence Zemel.
4        Q.    What is your current professional title
5   and place of employment?  Start with your title.
6        A.    I'm retired.
7        Q.    Oh.  And so what was your last place of
8   employment?
9        A.    Connecticut Children's Medical Center.
10       Q.    Can you describe your educational
11  background for me.
12       A.    Sure.  Starting with college?
13       Q.    Yes.  You can start there.
14       A.    Brooklyn College, the State University of
15  New York at Buffalo Medical School, pediatric
16  residency in Buffalo, rheumatology in Boston.
17       Q.    So your specialty is rheumatology?
18       A.    Pediatric rheumatology.
19       Q.    Prior to CCMC, were you employed
20  elsewhere?
21       A.    Newington Children's Hospital.
22       Q.    Prior to Newington Children's Hospital
23  were you employed?
24       A.    No.
25       Q.    So it was Newington and CCMC?
```

```
 1        A.    Those were my two employers.
 2        Q.    How long did you work for Newington
 3  Children's Hospital?
 4        A.    From 1978 until 1996.
 5        Q.    How did you come to -- well, what position
 6  did you begin when you started at Newington
 7  Children's Hospital?
 8        A.    I was head of pediatric rheumatology
 9  there.
10        Q.    So upon being hired in 1978, you were head
11  of pediatric rheumatology?
12        A.    Yes.
13        Q.    Okay.  So prior to Newington Children's
14  Hospital, where were you employed?
15        A.    I wasn't.  I was training, finishing my
16  training.
17        Q.    And when you say training, where were you
18  training?
19        A.    I did my pediatrics in Buffalo from
20  1975 -- excuse me, 1973 until 1975, and I did my
21  rheumatology fellowship from 1975 until 1977.
22        Q.    Okay.  How did you come to be the head of
23  pediatric rheumatology at Newington?
24        A.    Well, there was no position before I got
25  there so I created the position.
```

1  Q. And was that an opportunity granted by the
2  school? By the hospital?
3  A. By the hospital.
4  Q. By the hospital. Can you describe the
5  training in Buffalo that you went through?
6  A. Yes. I did two years of pediatric
7  residency, which was a comprehensive training program
8  in all aspects of pediatrics.
9  Q. And the fellowship, was that similar?
10  A. The fellowship was focused on arthritic or
11  rheumatic diseases of children.
12  Q. How did you come to be employed or
13  actually when did you leave Newington Children's
14  Hospital?
15  A. 1996.
16  Q. And when were you employed by CCMC?
17  A. We moved from Newington Children's
18  directly into the newly built Connecticut Children's.
19  Q. So when you say we --
20  A. We, the entire hospital closed and
21  everything was merged into the new building.
22  Q. Okay. And so when you began at CCMC in
23  1996, what was your position there?
24  A. Head of pediatric rheumatology.
25  Q. And is that the position you remained in

```
 1    throughout your tenure at CCMC?
 2         A.    Until the last couple of years when
 3    I turned the administrative role over to my second in
 4    command.
 5         Q.    And so you remained in that until -- when
 6    did you retire?
 7         A.    2021, April 2021.
 8         Q.    And you said you turned it over to your
 9    second in command?
10         A.    Well, I turned it over a couple of years
11    before because I was reducing my time in anticipation
12    of retirement.
13         Q.    Who was your second in command?
14         A.    Barbara Edelheit.
15         Q.    Can you spell the last name?
16         A.    E-D-E-L-H-E-I-T.
17         Q.    In your training, did any of that training
18    have to do with Lyme disease?
19               MR. JOHNSON:  Objection to form.  You
20               can answer, I just object to the form.
21         A.    Lyme disease was first described really in
22    1977 so my education about Lyme disease came more
23    from the literature than my formal training.
24    BY MS. LINDSAY:
25         Q.    And when you say came from the literature,
```

```
 1   BY MS. LINDSAY:
 2        Q.    Did you call Dr. Alder at any point in
 3   time?
 4        A.    Yes.
 5        Q.    And did you ask him for the blood test?
 6        A.    We already had the blood work results.
 7        Q.    Did you ask him for timing as far as when
 8   he took the blood test, the timing between her
 9   exposure -- withdrawn.
10              You testified that you didn't know that
11   she was exposed to a tick?
12        A.    Correct.
13        Q.    So when you spoke to Dr. Alder, what was
14   that conversation about?
15        A.    Oh, I told him she had juvenile idiopathic
16   arthritis and this is how we want to treat her and
17   the parents wanted to do their own treatment.
18        Q.    What was that treatment that the parents
19   wanted to do?
20        A.    Mrs. Pileggi was adamant that this was
21   Epstein-Barr Virus and she knew how to treat it.
22        Q.    Was Mr. Pileggi present in your office
23   with Ms. Pileggi?
24        A.    Yes.
25        Q.    Did Mr. Pileggi also request that you test
```

```
 1      A.    Correct.
 2      Q.    If you never asked Dr. Alder about the
 3 timing of this test, how could you be sure that the
 4 child did not have Lyme disease?
 5      A.    Because by the time a child develops
 6 arthritis, it's at least several months after
 7 exposure and the blood test is always positive.
 8      Q.    You said it was several weeks a couple of
 9 moments ago.
10      A.    Two to three months at least.
11      Q.    Did you conduct a blood test of E███?
12      A.    Yes.
13      Q.    Was it a test -- what specific -- is there
14 a specific blood test for Lyme?
15      A.    Yes.
16      Q.    Okay.  What is that specific blood test?
17      A.    Well, it's usually a two-stage test, an
18 initial screening test and then there's a follow-up
19 called Immunoblot or Western Blot.
20      Q.    And when you tested, you also tested her
21 for rheumatoid arthritis?
22      A.    We ran standard rheumatic disease tests
23 and one of the tests was positive that usually goes
24 along with juvenile rheumatoid arthritis or juvenile
25 idiopathic arthritis.  Same thing.
```

```
 1        A.    The ANA test was positive.
 2   BY MS. LINDSAY:
 3        Q.    And ANA being?
 4        A.    Anti-nuclear antibody.
 5        Q.    Can you please explain the role of ANA.
 6        A.    ANA is an immune test that looks for
 7   antibodies to different proteins within the cell
 8   nucleus and it's seen in a number of different
 9   rheumatic diseases.
10        Q.    RF?
11        A.    Rheumatoid factor is a blood test that's a
12   little more specific for rheumatoid arthritis in
13   adults but rarely seen in children.
14        Q.    RF is rarely seen in children?
15        A.    That is correct.
16        Q.    ESR?
17        A.    ESR is an inflammation test that's often
18   elevated in different inflammatory arthritides.
19        Q.    Can you explain that a little more?
20        A.    It's a nonspecific measure of inflammation
21   and does not differentiate one type of arthritis from
22   another.
23        Q.    So it just pretty much indicates
24   arthritis?
25        A.    Inflammation.  Can be an infection,
```

```
 1    malignancy, arthritis, et cetera.
 2        Q.    And CRP?
 3        A.    Similar to ESR.
 4        Q.    Imaging?
 5        A.    What about imaging?
 6        Q.    When you're looking at imaging when you're
 7    running tests, looking at imagings, do you take
 8    x-rays of the child or of the patient?
 9        A.    We often do.
10        Q.    So you're looking pretty much for swelling
11    of the knees and joints and things of that nature?
12        A.    Well, early on imaging will show swelling
13    which we can see by exam but it doesn't usually show
14    bone damage yet, early on.
15        Q.    And bone damage, is that a result of
16    rheumatoid arthritis or Lyme disease?
17        A.    Oh, it would be extraordinarily rare to
18    see that in Lyme disease.  We would be looking for it
19    more in rheumatoid arthritis.
20        Q.    Are these the tests that you use to rule
21    out Lyme disease?
22              MR. JOHNSON:  Objection to form.
23        A.    The Lyme test, the Lyme screening test is
24    the essential test to rule out Lyme disease at the --
25    in the third stage of Lyme disease, plus the
```

```
1       A.      Yes, I have.
2       Q.      Did you come to learn that she thought
3   that E▮▮▮ -- it was her opinion E▮▮▮ had been
4   misdiagnosed?
5       A.      I know that she thought E▮▮▮ had Lyme
6   disease wrongly.
7       Q.      You say wrongly?
8       A.      Yes.
9       Q.      Why do you say wrongly?
10      A.      For all the reasons I already elaborated.
11      Q.      Did there come a time when the Pileggis
12  were forced, to your knowledge, to stop seeing
13  Dr. Lopusny?
14      A.      Not that I'm aware of.
15      Q.      You made the call to the Department of
16  Children and Families to report the Pileggis,
17  correct?
18      A.      Correct.
19      Q.      And that was because -- could you explain
20  why?  Again, I believe you may have explained it
21  before but can you refresh my memory?
22      A.      Sure.  I was seeing this beautiful
23  disabled child who was at risk for permanent
24  disability and the parents were refusing approved
25  medical care that could treat her successfully.
```

```
 1    Withdrawn.
 2              How soon after did you learn that E███ had
 3    a history of Epstein-Barr?
 4              MR. JOHNSON:  After what?
 5    BY MS. LINDSAY:
 6         Q.   After she appeared in your office.
 7         A.   When I had the blood results and
 8    Epstein-Barr is divided into two different antibody
 9    times.  The test for current EBV was negative and the
10    test for previous EBV was slightly positive.
11         Q.   The test for current was negative?
12         A.   Uh-hum.  That's right.
13         Q.   And the test for past was positive?
14         A.   Yes.
15         Q.   The test for current EBV, is that the
16    viral capsid?
17         A.   Well, it's the IGM predominantly.
18         Q.   That's for current?
19         A.   Uh-hum.
20         Q.   And so she had Epstein-Barr, a history of
21    Epstein-Barr.  You didn't bother to check for
22    Babesiosis or Bartonella even though they're a
23    co-infection of Lyme disease, right, and you tested
24    for ANA, but you imputed everything she was going
25    through to rheumatoid arthritis?
```

CERTIFICATE OF REPORTER

I, Kathleen S. Norton, a Registered Professional Reporter/Commissioner within and for the State of Connecticut, do hereby certify that I took the deposition of LAWRENCE ZEMEL, MD, on July 25, 2025, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my direction by means of Computer Assisted Transcription, and that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in the outcome of the action.

IN WITNESS THEREOF, I have hereunto set my hand July 31, 2025.

_____
Kathleen S. Norton,  LSR #105

Notary Public
My commission expires:  8-31-2026