# Katharine Pileggi - Vol II

## Pileggi vs. Mathias
## 3:22-cv-01315-AWT

### April 10, 2025



**ROBERT MILLER REPORTING**

1000 Farmington Ave
Suite 103
West Hartford, CT 06107
860-269-9191

production@millerreporting.com
millerreporting.com

1  A. Correct. When we first met him, 'cause we had
2  such a terrible experience with Zemel, and then we met
3  Fitzsimmons and we were like, okay, well, you know, he's
4  completely different. He had a good bedside manner. He
5  looked at us and listened to us.
6  When she healed so fast for her fracture, he
7  was like, what do you guys do at home, we don't normally
8  see this type of quick recovery. So we explained to
9  him, you know, we eat very healthy and clean.
10 Everything is organic.
11 Q. I need to come to your house.
12 A. It's important. We want everybody to feel
13 good. You know, we're doing some herbal protocols to
14 help with Lyme disease. So he was like, wow, I've never
15 seen a child turn around this fast. So that's when he
16 told Anthony and I both we can actually remove the cast
17 sooner than expected.
18 Q. Okay.
19 A. And then it switched.
20 Q. And when you say "it switched," what do you
21 mean? Please describe that.
22 A. So then when DCF got involved with the removal
23 of E▮▮▮, all of a sudden there was a report against us
24 with Fitzsimmons, when we had a great relationship with
25 him.

```
 1         Q.   With Fitzsimmons?
 2         A.   Correct.
 3         Q.   And so that's why he's named as a defendant?
 4         A.   Correct, because something happened along the
 5    lines to flip him, just like -- it's been a pattern
 6    throughout the case.  And the more that they push, the
 7    more that they started trying to get other avenues of
 8    reports or someone to turn against us, remove all the
 9    people that were of support of us.  Can't see this
10    therapist, can't see this doctor, can't see, can't see,
11    can't see.  You know, it was a pattern, because they
12    were trying to help and support.
13         Q.   Were you ever privy to the conversations
14    between DCF and the doctors?
15         A.   No.
16         Q.   But the doctors did speak with DCF?
17         A.   Correct.  CCMC doctors.
18         Q.   And that was specifically -- do you know who
19    they would speak with?
20         A.   No.
21         Q.   Okay.
22         A.   But I do know, looking at the medical records,
23    they have listed on there pediatrician, Dr. Lopusny, on
24    CCMC's medical records, but yet she was never contacted
25    for E███'s care.
```

```
 1        Q.   And it's written into CCMC medical records --
 2        A.   Yes.
 3        Q.   -- for E▓▓▓?
 4        A.   It says "Pediatrician, Dr. Diane Lopusny."
 5   She was never contacted.  She was never brought into any
 6   of it.
 7        Q.   No consultations?  Nothing?
 8        A.   No.
 9        Q.   Okay.
10        A.   There was a conversation between the two of
11   them that's on the medical records.  I guess this is
12   after, way after.  She must have contacted him, and she
13   suggested Lyme disease to him, and he wrote her off.
14        Q.   When you say "he," Zemel?
15        A.   Dr. Zemel, correct.
16        Q.   Okay.  And so Fitzsimmons filed a report to
17   DCF?
18        A.   Yes.
19        Q.   Did Fitzsimmons work with Zemel?
20        A.   After E▓▓▓ was removed?
21        Q.   Meaning during the time that you were seeing
22   Zemel.  During that time when he did the cast -- are
23   they in the same department?
24        A.   Not in the same department.  This was
25   through -- we brought her through the ER for casting for
```

```
 1    her.  So he came in through the ER.
 2         Q.   And he filed a DCF report after the cast was
 3    removed?
 4         A.   Yes, after she was removed.
 5         Q.   Was he treating her at that point?
 6         A.   No.  Exactly my point.
 7         Q.   Do you recall the basis of his report?
 8         A.   I do not.
 9         Q.   Upon reviewing the CCMC records, what you have
10    reviewed so far, are there inaccuracies that you have
11    noted --
12         A.   Yes.
13         Q.   -- that you can recall?
14         A.   So because I was removed completely from
15    having anything to do with E▮ and CCMC -- this is
16    where Tony and I both noticed last night, and because we
17    know each other so well, there are medical documents
18    with my initials on them that I never initialed,
19    because, again, I wasn't allowed to be a part of it.  I
20    was fully removed.  And even Tony said, "Those are not
21    your initials on there."
22              So there are documents through CCMC with my
23    initials on it that I don't know where those came from,
24    giving authorization.
25         Q.   Giving authorization to treat E▮?
```

```
 1         Q.   I'm going to ask you a few questions about
 2   Mr. Fitzsimmons.  I think you testified -- and again,
 3   correct me if I'm wrong, but my understanding of what
 4   you testified to was that the reason he is named as a
 5   defendant in this litigation was due to his coordination
 6   with DCF; is that fair?
 7         A.   Correct.
 8         Q.   And am I correct in understanding that
 9   Mr. Fitzsimmons did not provide any treatment for your
10   child's Lyme disease or juvenile idiopathic arthritis?
11         A.   No.
12         Q.   He did not?
13         A.   No.  Only for her leg fracture.
14         Q.   Okay.  You testified that during your review
15   of the Connecticut Children's medical chart in
16   continuation for today's deposition you noticed some
17   signatures that you believe were not your own, correct?
18         A.   Correct.
19         Q.   And you do not recall as you sit here today
20   what the pages were?
21         A.   No.  But again, I wasn't allowed to have any
22   involvement with CCMC, but yet my initials are on
23   releases, release forms.
24         Q.   Do you have any recollection of whether you
25   may have signed releases in the initial period of time
```

1  Q. Now, you were testifying a bit about Healing
2  Duo. Do you recall that?
3  A. Correct.
4  Q. And you had a concern that Dr. Santapaola did
5  not really have the expertise to treat Lyme disease,
6  right?
7  A. Correct.
8  Q. And so on that basis, you elected not to use
9  Dr. Santapaola, right?
10  A. Right. It was just an initial interview that
11  we went to go see her.
12  Q. And you saw Healing Duo around March 2019,
13  right, approximately?
14  A. Approximately, yeah.
15  Q. Is it fair to say that you were seeking out
16  providers who had specialty in Lyme disease?
17  A. We were, yes.
18  Q. Okay. So you were really looking for a
19  provider who, number one, would treat your child for
20  Lyme disease, correct?
21  A. Correct. We wanted other specialists involved
22  to work alongside of a pediatrician, because it wasn't
23  her, you know, absolute. We wanted someone that solely
24  focused on that.
25  Q. Solely focused on Lyme disease?

```
 1         A.   Correct.
 2         Q.   Okay.  And you --
 3         A.   So we were covered.
 4         Q.   And so you wanted a provider who specialized
 5    in Lyme disease and would provide treatment for Lyme
 6    disease?
 7         A.   Correct.  Our daughter wasn't being treated by
 8    anybody anywhere.
 9         Q.   I had a couple of questions about -- I'm
10    sorry.  Do you need a minute?
11         A.   No.  No.
12         Q.   I have a couple of questions about Heather
13    Perreault.
14         A.   Um-hum.
15         Q.   There was this incident where you confronted
16    her in court, right?
17         A.   Correct.
18         Q.   And am I understanding correctly you did not
19    get divorced after that court hearing?
20         A.   Nope.
21         Q.   You did not?
22         A.   Did not.
23         Q.   Did Heather Perreault continue representing
24    Mr. Pileggi after that time?
25         A.   Yes, until we got ▮▮▮▮ back and discontinued
```

```
 1                    C E R T I F I C A T E

 2              I hereby certify that I am a Notary Public, in

 3     and for the State of Connecticut, duly commissioned and

 4     qualified to administer oaths.

 5              I further certify that the deponent named in

 6     the foregoing deposition was by me duly sworn, and

 7     thereupon testified as appears in the foregoing

 8     deposition; that said deposition was taken by me

 9     stenographically in the presence of counsel and reduced

10     to typewriting under my direction, and the foregoing is

11     a true and accurate transcript of the testimony.

12              I further certify that I am neither of counsel

13     nor attorney to either of the parties to said suit, nor

14     am I an employee of either party to said suit, nor of

15     either counsel in said suit, nor am I interested in the

16     outcome of said cause.

17              Witness my hand and seal as Notary Public

18     this 22nd day of April 2024.

19

20
                                  [signature: Janet C. Phillips]
21                                Janet C. Phillips

22                                Notary Public

23                                CSR No. 124

24     My Commission expires:

25     October 31, 2026
```