Anthony Pileggi

Pileggi vs. Mathias
3:22-cv-01315-AWT

April 10, 2025



ROBERT MILLER REPORTING

1000 Farmington Ave
Suite 103
West Hartford, CT 06107
860-269-9191

production@millerreporting.com
millerreporting.com

1   work from Alder, and that was his diagnosis.
2       Q.   Did he, for instance, test your child's range
3   of motion in her knees?
4       A.   I believe he put her through a couple tests,
5   yes.
6       Q.   Do you recall anything about that examination?
7       A.   I do not recall.
8       Q.   Do you know whether Dr. Zemel ordered any
9   other lab testing at that visit or shortly thereafter?
10      A.   I do not recall.  I'm not sure.
11      Q.   Your impression based on this initial visit
12  was Dr. Zemel did not believe your child had Lyme,
13  correct?
14      A.   He did not.
15      Q.   What were Dr. Zemel's instructions to you and
16  Ms. Pileggi at the conclusion of this visit?
17      A.   I think he wanted to start treatment or treat
18  her for arthritis.  I'm just -- I'm not a hundred
19  percent sure.  I'd have to go back and look.
20      Q.   At that time, did you understand what the
21  treatment for arthritis would encompass?
22      A.   I did not.
23      Q.   Did you have an understanding of whether there
24  would be medical management of arthritis under
25  Dr. Zemel's recommendations?

```
 1         A.   No, because at that time -- I remember it
 2   now -- at the end of our visit with Zemel, we said, no,
 3   thank you, this is not for us.  We want to seek other
 4   opinions.  We wanted to get a second opinion.
 5         Q.   Right, because at that time, even as of the
 6   time you walked into the office, you were concerned that
 7   your child had Lyme disease, right?
 8         A.   Yes.
 9         Q.   So you were really interested in finding
10   someone who would evaluate and treat your child for Lyme
11   disease?
12         A.   Or test her and get an answer.
13         Q.   Around this time, around the time that you
14   found the tick on your child and removed it, did you
15   undertake any research on Lyme disease that you recall?
16         A.   Research myself?  No.
17         Q.   Do you understand whether your wife undertook
18   such research?
19         A.   Absolutely, yes.
20         Q.   Did you yourself read any books or social
21   media about Lyme disease at that time?
22         A.   No.  I mean, if she would bring up an article,
23   we would read it together.  When we started finding Lyme
24   doctors, I would be at the visits.
25         Q.   My understanding, though -- well, tell me if
```

1     Q.   What is your understanding of what happened
2  following that initial interview process with DCF around
3  July 2018?
4     A.   At that time, we were just trying to prove
5  everything that we were doing, all the people we had
6  helping her and around-the-clock care and just trying to
7  see why they're here.
8     Q.   Was it your that understanding that around
9  July 2018, DCF closed any investigation into your
10 child's care?
11    A.   Yes.  That was the Torrington office, right?
12    Q.   Well, I'm asking you if you remember.
13    A.   I believe so, yes.
14    Q.   Okay.  Now, for the remainder of 2018, am I
15 understanding correctly that your child did not treat
16 with anyone at Connecticut Children's?
17    A.   She did not.
18    Q.   So she treated with Dr. Layman for a period of
19 time?
20    A.   Dr. Layman, another doctor down in Florida.
21 We provided everything that we had to provide for DCF at
22 that time and her condition, and it satisfied them.
23    Q.   It's my understanding Dr. Layman was -- that
24 your child treated with her for a brief period of time,
25 but Ms. Pileggi was concerned she didn't have enough

CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 22nd day of April 2024.

*Janet C. Phillips*

Janet C. Phillips

Notary Public

CSR No. 124

My Commission expires:

October 31, 2026