**Anthony Pileggi**
**Volume II**

**Pileggi vs. Mathias**
**3:22-cv-01315-AWT**

**May 20, 2025**



**ROBERT MILLER REPORTING**

1000 Farmington Ave
Suite 103
West Hartford, CT 06107
860-269-9191

production@millerreporting.com
millerreporting.com

```
 1    treatment that was being provided by Dr. Zemel between
 2    October 2019 and June 2021, what was the nature of your
 3    disagreement, if any?
 4         A.   As we sit here today, my daughter had Lyme and
 5    she did not have arthritis.  That's why we're here.  So
 6    I do not agree with his diagnosis.  I never will.  And I
 7    stand firm that my child had Lyme.
 8         Q.   All right.  And your position that your
 9    daughter had Lyme disease during this period of time is
10    based on discussions that you had with providers after
11    June 2021; is that fair?
12         A.   No.  Prior, during, what we were treating her
13    for.
14         Q.   Okay.  So even during this October of 2019 to
15    June 2021 period of time, your testimony is that you
16    believed at the time your daughter had Lyme disease?
17         A.   Yes.  Absolutely.
18         Q.   Okay.  And during that October 2019 to June
19    2021 period of time, it's your testimony that you did
20    not believe that your daughter had arthritis?
21         A.   Yes.  And I still do not.
22         Q.   Okay.  And you during that October 2019 to
23    June 2021 period of time did not agree that your
24    daughter needed Enbrel?
25         A.   No, I do not agree.
```

```
1      Q.   So the last visit that I have in the record at
2   Connecticut Children's Medical Center was with Dr. Lapin
3   on June 23rd, 2021.  Does that sound right?
4      A.   Yes.
5      Q.   And after that period of time -- strike that.
6           After June 23rd, 2021, am I correct in
7   understanding that your daughter never treated with
8   Connecticut Children's Medical Center?
9      A.   She did not, no.  She wasn't released.  Lapin
10  didn't say okay, you guys are done.  I just stopped
11  bringing her.
12     Q.   Okay.  And why did you stop bringing her to
13  Connecticut Children's?
14     A.   Because it was up.  It was over.
15     Q.   What was over?
16     A.   Her going there and being treated.  I just
17  stopped doing the treatments and stopped bringing her.
18     Q.   All right.  How was she doing as far as first
19  her ability to walk on or around June 23rd, 2021?
20     A.   Doing pretty good.
21     Q.   So she was able around June 23rd, 2021, to
22  participate in all her activities of daily living?
23     A.   Yes, sometimes with still some swelling and
24  some discomfort.
25     Q.   As compared to when you reunified with her,
```

1      Q.  And how about weight gain?  Did your child
2   have normal weight gain during the period when you had
3   custody?
4      A.  Yes.
5      Q.  And, I'm sorry, I may have asked the question.
6   To your understanding, was it normal weight gain during
7   period of time?
8      A.  As she was growing, yes, as she should.
9      Q.  When you had custody of your daughter in
10  October 2019 to June 2021, were you bringing your child
11  or treating with Dr. Morse?
12     A.  I don't remember exactly, but I'm sure, yes.
13  That was where her protocol was originally from.
14     Q.  Right.  And as far as the protocol goes, when
15  you say "protocol," you mean the herbs and supplements
16  that Dr. Morse recommended?
17     A.  Yes.
18     Q.  Did you resume Dr. Morse's protocol when you
19  regained custody in October 2019?
20     A.  Yes, I did.
21     Q.  All right.  Did you do that immediately?
22     A.  Once she was weaned off of the Enbrel, the
23  methotrexate, and the folic acid.
24     Q.  All right.  It's my understanding, though,
25  that your daughter remained on Enbrel and methotrexate

1   for a period of time after her hospitalization, right?
2       A.   After her hospitalization when she was with
3   the foster?  Yes.
4       Q.   And even after you regained custody in October
5   of 2019, she was taking Enbrel for a period of time,
6   right?
7       A.   No.  Like I said before, we weaned her off of
8   it.  She was not on it anymore.
9       Q.   I guess I'm misunderstanding, though.  If
10  there are records of your daughter being on Enbrel in
11  October 2019, between then and June 2021, was your
12  daughter actually not taking Enbrel?
13      A.   She was not.  Like I said, again, we weaned
14  her off.  But I would fulfill the prescriptions in order
15  to protect my child.
16      Q.   So it's your testimony that when you regained
17  custody of your child in October 2019, this is during
18  the period of time when you were bringing your child to
19  see Dr. Zemel, right?
20      A.   Yes.
21      Q.   And Dr. Zemel for a period of time was
22  continuing to prescribe Enbrel, right?
23      A.   Yes.
24      Q.   He was also continuing to prescribe
25  methotrexate, right?

1   A.  Yes.
2   Q.  So it's your testimony that even though
3   Dr. Zemel was prescribing Enbrel and methotrexate, after
4   you regained custody of your daughter in October 2019,
5   you never gave her those medications?
6   A.  I did not. Well, I did give her for a little
7   bit. Like I said, with the Dr. Lopusny's guidance, we
8   weaned her off of it.
9   Q.  When did you resume bringing your child to
10  Dr. Lopusny?
11  A.  Probably right after, because there was a time
12  when we weren't allowed to bring her there because DCF
13  stated it was too far at the beginning, because that was
14  our child's doctor.
15  Q.  So after -- do you recall when it was
16  Dr. Lopusny recommended weaning your child off Enbrel?
17  A.  I'm sure we have the records somewhere, yes.
18  Q.  And as you sit here today, you don't recall
19  specifically?
20  A.  Not exactly no. I don't want to misspeak.
21  Q.  Was there a period of time that you were
22  weaning your daughter off Enbrel per Dr. Lopusny's
23  recommendations, but you did not inform Dr. Zemel of
24  that fact?
25  A.  Yes, the whole time. Absolutely.

```
 1         Q.   When you say there was a little bit of time
 2   that you continued to provide Enbrel and methotrexate as
 3   prescribed by Dr. Zemel following your reunification in
 4   October 2019, can you be any more specific as to how
 5   long a period of time it was?
 6         A.   Probably a month or two.  It wasn't overnight
 7   that we just took it off on our own.  We had to ask our
 8   doctor and see what she had recommended, 'cause she had
 9   seen Emma from the beginning and knew that this wasn't
10   what she had, arthritis.
11         Q.   Setting aside Dr. Lopusny, were there any
12   other providers with whom you resumed treating your
13   daughter when you regained custody in October 2019?
14         A.   Off the top of my head, I do not recall.  It's
15   going to be Lopusny, probably the herbal protocols from
16   Morse.
17         Q.   Anything else that you can recall?
18         A.   Not off the top of my head, no.
19         Q.   At some point, did your ex-wife regain the
20   ability to see your child?
21         A.   Yes.
22         Q.   When was that, to your recollection?
23         A.   Are we talking before I had her back or after?
24         Q.   After.
25         A.   After?  I mean, immediately.
```

```
 1     had a completely different opinion.
 2          Q.   So am I understanding you correctly that the
 3     nature of your claim against Mr. Fitzsimmons relates to
 4     that report that he made to DCF following the femur
 5     fracture?
 6          A.   Yes.
 7          Q.   Focusing on now the next paragraph, which is
 8     labeled During Removal on page 3 of Defendants'
 9     Exhibit B, do you see that paragraph, first of all?
10          A.   Yes.
11          Q.   I want to understand, to your knowledge, what
12     is the time frame that this During Removal paragraph
13     refers to?
14          A.   This is when we were able to go in to DCF and
15     see our child.
16          Q.   So am I correct in understanding it's
17     approximately March 29, 2019, through reunification in
18     October 2019?
19          A.   Yes.
20          Q.   My understanding is that your daughter has
21     never been diagnosed with autism spectrum disorder; is
22     that right?
23          A.   That is correct.
24          Q.   When it says here that your daughter was
25     nonverbal, again, this is referring to the time period
```

C E R T I F I C A T E

       I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

       I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

       I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

       Witness my hand and seal as Notary Public this 9th day of June 2025.

*Janet C. Phillips*

Janet C. Phillips
Notary Public
CSR No. 124

My Commission expires:
October 31, 2026