**CERTIFIED COPY**

## In The Matter Of:

*Katharine Pileggi, Anthony Pileggi Also, as Next Friend to their Minor Child "EP" v. Kim Mathias Assistant Attorney General State of Connecticut, in her individual and Official capacity, Kaela Minerly in her Individual and official capacity, Frank Rotovnik in his individual and official capacity, Connecticut Children's Medical Center, Dr. Roman Alder, Dr. Lawrence Zemmel, Dr. Lindsey Laughinghouse, Dr. Andrew Bazos, Dr. Kevin Fitzsimmons, Connecticut Department of Children and Families ("DCF") and "John and Jane Does 1-10"*

*\*Dr. Kevin Fitzsimmons\**

*August 20, 2025*

*A Plus Reporting Service LLC*

1    A.    Correct.

2    Q.    Okay.  And then on-the-job training
3  comes -- who is responsible for that?  Withdrawn.
4  Let's be more specific.

5          Once you graduated from school, you said
6  you were an athletic trainer prior to graduation or
7  after?

8    A.    Prior.  It was my first profession.

9    Q.    That was your first profession.  At some
10 time you wanted to be a physician assistant and you
11 went to school.  After graduating from Quinnipiac,
12 what was your first employment?

13   A.    Here at Connecticut Children's.

14   Q.    And at the time when you became employed
15 at Connecticut Children's, how did you come to hear
16 about that position?

17   A.    I actually was an athletic trainer at
18 Connecticut Children's and left to go to physician
19 assistant school and when the sports medicine program
20 hired a new surgeon while I was in school I was
21 contacted to see if I had interest in coming back as
22 an orthopedic and sports medicine physician assistant
23 since I had previously worked in the department.

24   Q.    Okay.  So you were contacted by the
25 department head?

1   A.   Yes.

2   Q.   Who would that be?

3   A.   His name is Carl Nissan.  He was the

4   director of the sports medicine for Connecticut

5   Children's at the time.

6   Q.   Okay.  So did you interview for that

7   position?

8   A.   I did.

9   Q.   Had to fill out an application?

10  A.   Yes.

11  Q.   Went through the whole process?

12  A.   Oh, yes.  Yes.

13  Q.   All right.  And so at some point in

14  time -- withdrawn.

15       When you took the job, what was the exact

16  position?

17  A.   The exact position is -- so a physician

18  assistant in the orthopedic and sports medicine

19  department.

20  Q.   So it was directly into the orthopedic

21  department of sports medicine?

22  A.   Uh-hum.

23  Q.   And did you receive on-the-job training in

24  terms of orthopedics and sports medicine?

25  A.   Yes, for several months prior.

1   Q. And who trained you, if you can recall?
2   A. It's a pretty in depth training program
3   rotating through all our orthopedic surgeons.
4   Q. Okay.
5   A. Over the course of the first four to six
6   months of my -- prior to my seeing patients.
7   Q. During on-the-job training, you're not
8   seeing patients on your own?
9   A. No.
10  Q. So are you shadowing the surgeons and the
11  doctors? Describe the training process for me.
12  A. Training is being in -- at that time, I'm
13  a certified -- board certified physician assistant
14  and I am allowed to -- I was not having
15  responsibility for the patient but I would be in
16  clinic with the doctors, seeing patients with them,
17  so I would see patients before the doctor and then
18  would take a history, do a physical exam and then
19  report back to the physician and then we would go see
20  the patient together.
21  Q. So almost like triaging them for the
22  surgeon? More than triage, but -- or is it more in
23  depth?
24  A. It's more in depth. Triaging would be
25  just establishing -- I don't think triage is the

```
 1   correct word for that.
 2        Q.    Okay.
 3        A.    This is direct patient care trying to
 4   solve their problem or concern.
 5        Q.    Okay.  So you were a physician assistant
 6   pretty much providing preliminary treatment or
 7   assessments?
 8        A.    Initial assessment and then reviewing it
 9   with the physician who then would -- we would
10   communicate directly and then go together to go see
11   the patient and come up with a treatment plan.
12        Q.    Okay.  What year was it that you graduated
13   from Quinnipiac, please?
14        A.    2011.
15        Q.    And what year was it that you accepted the
16   job at CCMC?
17        A.    The physician assistant role?
18        Q.    Yes.
19        A.    It was 2011.
20        Q.    And you're still employed with CCMC?
21        A.    Yes, I am.
22        Q.    In the same capacity?
23        A.    Yes.
24        Q.    And when you say yes, are you --
25        A.    I have a leadership role now.
```

```
 1   our chairman of orthopedics.
 2        Q.    Okay.  Have you published any articles?
 3        A.    Yes.
 4        Q.    Approximately how many?
 5        A.    Five or six.
 6        Q.    Any studies?
 7        A.    No studies.
 8        Q.    What were the topics of your articles?
 9        A.    One was a literature review for current
10   treatments in patellar instability, kneecap
11   instability, and then several surgical technique
12   articles.
13        Q.    With regard to orthopedics?
14        A.    Orthopedics, correct, and sports medicine.
15        Q.    What journals were these published in?
16        A.    The procedure articles are
17   arthroscopy techniques.  And off the top of my head
18   I actually can't -- the review article was like a
19   general pediatrics -- like a review for general
20   pediatric care was that patella instability article.
21        Q.    Do you treat adults as well as children?
22        A.    Yes, I do.
23        Q.    What is an insufficiency fracture, please?
24        A.    An insufficiency fracture is when the bone
25   has less structural support from disuse.  Bone
```

```
 1        Q.    You said she had a history of JIA.  Where
 2   did you acquire that information?
 3        A.    That information was available in her
 4   chart.
 5        Q.    And who did you consult with, if anyone,
 6   concerning her history of JIA?
 7                  MR. JOHNSON:  Objection to form.  At
 8              what time?
 9   BY MS. LINDSAY:
10        Q.    The day when she was before you.
11        A.    I spoke to my supervising physician.
12        Q.    Who is that person?
13        A.    At the time it was John Gilbert.
14        Q.    Was Mr. Gilbert a specialist in Lyme
15   disease?
16        A.    He was treating E███ for a fracture and he
17   is an orthopedic surgeon I was on call with.
18        Q.    Throughout the time you treated E███ on
19   that day and the subsequent follow-up that she had
20   with you, did you consult with any doctors with
21   regards to potential Lyme disease or with regards to
22   her alleged JIA as diagnosed?
23                  MR. JOHNSON:  Objection to form.
24        A.    At that time I don't recall Lyme disease
25   ever being brought up to me.
```

```
 1   BY MS. LINDSAY:
 2        Q.    Was Mr. and Mrs. Pileggi with E███ when
 3   she came into CCMC to be treated by you?
 4        A.    I think in the emergency room I believe
 5   so.
 6        Q.    And at any time did they mention Lyme
 7   disease to you?
 8        A.    Not that I recall, no.
 9        Q.    Mr. and Mrs. Pileggi did not tell you
10   anything about E███ knees being related to Lyme
11   disease?
12        A.    I don't recall that.
13        Q.    Did they tell you anything about a tick
14   bite?
15        A.    Again, not that I recall.  I don't
16   remember that.
17        Q.    Did you -- you said the history that
18   you're speaking of with JIA was noted in E███
19   chart, correct?
20        A.    That is correct.
21        Q.    Were there any -- was there any
22   information in E███ chart with regards to an
23   assumption or ruled-out diagnosis or anything
24   mentioning Lyme disease, potential Lyme disease?
25        A.    I don't recall.
```

```
 1          Q.    Did you ever reach out to E▇
 2   pediatrician?
 3                MR. JOHNSON:  Objection to form.
 4          A.    I don't think so.
 5   BY MS. LINDSAY:
 6          Q.    Did you ever reach out to E▇   other
 7   physicians, naturopathic or medical physicians?
 8          A.    I reached out to Dr. Zemel who had treated
 9   her for the idiopathic arthritis.
10          Q.    When did you reach out to Dr. Zemel,
11   please?
12          A.    I don't recall.
13          Q.    Well, you only treated -- you treated E▇
14   how many times approximately?
15          A.    Twice.
16          Q.    And so between the first time she came to
17   you and the time she followed up, did you -- was it
18   during that time that you consulted with Dr. Zemel?
19          A.    Yes.
20          Q.    And why did you consult with Dr. Zemel?
21          A.    E▇   had re-presented with her fracture
22   and had not followed up with Dr. Zemel for the
23   diagnosis of the JIA that she had previously -- that
24   she had previously been --
25          Q.    I'm sorry.
```

1    A.    That I don't -- again, I don't know the
2    relation between fracture healing and juvenile
3    idiopathic arthritis.
4    Q.    Is there an overlap between JIA and
5    orthopedics, even sports medicine?
6              MR. JOHNSON:  Objection to form.
7    A.    We have to, in orthopedics, have concerns
8    and knowledge of JIA but we do not treat JIA.  When
9    we have concerns about patients that have multiple
10   joint swelling, pain, possibly elevated inflammatory
11   markers, if we ordered those like we talked about
12   earlier, we would refer to rheumatology and we do
13   that not infrequently.
14   BY MS. LINDSAY:
15   Q.    Can you repeat that?
16   A.    We have patients that present to us in
17   orthopedics with joint pain and swelling.
18   Q.    Okay.
19   A.    And because -- that's just what most
20   people think and then it's our job to stratify is
21   this like a structural orthopedic concern, is it a
22   fracture, a ligament injury, something in our realm.
23   If it does not appear to be that way we have an
24   understanding of other conditions that could
25   potentially be causing these symptoms and then refer

```
 1   them to the proper specialists.
 2        Q.    So earlier this morning you said that when
 3   a patient presents, you can correct me if I'm wrong,
 4   to your department and it appears that they may have
 5   Lyme arthritis, that there's a series of testing done
 6   to determine if that's what's actually going on.  So
 7   what specifically made you rule out Lyme disease
 8   without diagnostic testing of E███ when she presented
 9   to you?
10        A.    She was presenting with a fracture.
11        Q.    Right, okay.
12        A.    And that's my wheelhouse, that's what I'm
13   treating.  Her clinical presentation again with
14   bilateral effusions and flexion contractures are not
15   something we see with Lyme.
16        Q.    To your knowledge?
17        A.    To my knowledge.
18        Q.    Okay.
19              MS. LINDSAY:  Can we mark that as C,
20         please.
21              (Plaintiff's Exhibit C, 3/19/2019
22         Office visit record, marked for
23         identification.)
24              MS. LINDSAY:  The witness has been
25         handed a three-page document.  It's a
```

# CERTIFICATE OF REPORTER

I, Kathleen S. Norton, a Registered Professional Reporter/Commissioner within and for the State of Connecticut, do hereby certify that I took the deposition of KEVIN FITZSIMMONS, on AUGUST 20, 2025, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my direction by means of Computer Assisted Transcription, and that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in the outcome of the action.

IN WITNESS THEREOF, I have hereunto set my hand August 26, 2025.

_____
Kathleen S. Norton, CSR #105

Notary Public
My commission expires: 8-31-2026