**UNITED STATES DISTRCIT COURT**
**DISTRICT OF CONNECTICUT**

-----------------------------------------------x

KATHARINE PILLEGI, et al.,

        Plaintiffs,                        Case No.: 3:22-cv-01315-AWT

v.

KIM MATHIAS, et al.,

        Defendants.
-----------------------------------------------x

## PLAINTIFFS' OPPOSITION TO THE DCF DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

TRICIA S. LINDSAY
*Attorney for Plaintiffs*
531 E. Lincoln Ave STE 5B
Mount Vernon, NY 10552
Ph. (347) 386-4604;
Fax. (914) 840-1196
tricialindsaylaw@gmail.com

**TABLE OF CONTENTS**

**Page(s)**

I. PRELIMINARY STATEMENT………………………………………………….. 1-3

II. STATEMENT OF FACTS…………………………...……………………….. 3-6

    A. EP's Initial Medical History and Treatment…………………………………. 4

    B. The DCF Investigation……………………………………………….... 4-5

    C. Removal of EP and Juvenile Court Proceedings………………………….... 5-6

    D. Coercive Reunification Conditions…………………………………...…………. 6

III. STANDARD OF REVIEW………………………………………….……….. 7-8

    A. Summary Judgement…………………………………………………...…… 7

    B. Qualified Immunity………………………………………………...…….. 7-8

IV. ARGUMENT………………………………………………………………….. 8-36

    1. Genuine Disputes of Material Fact Preclude Summary Judgment
    on §1983 Claim…………………………………………………...…… 8-9

    2. Triable Issues Exist Regarding the Constitutional Adequacy
    of the DCF Investigation………...……………………………………….. 9-12

    3. Genuine Factual Disputes Exist Regarding Coercive State Action……………… 12-13

    4. The Self-Serving Affidavits of Defendants Cannot Erase Disputed Facts……….. 14-15

    5. Qualified Immunity Does Not Bar Plaintiffs' Claims…………………...….. 15-21

    6. Defendants' Procedural and Substantive Due Process Arguments Fail………..… 21-27

        A. Plaintiffs' Formal Participation in Court Proceedings
        Does Not Negate a Procedural Due Process Violation
        Where Their Consent Was Coerced………………………...……. 21-25

        B. Defendants' Coercive Interference with the Pileggi Family
        Unit Shocks the Conscience………………………………...…….. 25-27

    7. Intentional Infliction of Emotional Distress (IIED)…………………...…….. 27-31

**TABLE OF CONTENTS (Cont.)**

**Page(s)**

8. Evidentiary and Credibility Considerations……………...……………………. 32-36

V. CONCLUSION………………………………………………………………...………… 36

## TABLE OF AUTHORITIES

**Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986)…………………………………….......………. 7, 8, 15, 32, 33, 35

*Bailey v. Child Protective Servs.*,
No. 3:22-CV-1221 (SVN), 2022 WL 22842693 (D. Conn. Dec. 12, 2022)……….…… 16, 22, 25

*Collins v. City of Harker Heights*,
503 U.S. 115, 125 (1992)…………………………………………………………….. 8, 17

*County of Sacramento v. Lewis*,
523 U.S. 833, 847 (1998)……………………………………………….…… 13, 25, 26

*In re Alison M.*,
127 Conn. App. 197 (2011)………………………………………………………….. 26

*J.S.R. by & through J.S.G. v. Sessions*,
330 F. Supp. 3d 731 (D. Conn. 2018)………………………………………… 16, 21, 22, 25

*Mathews v. Eldridge*,
424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)……………………..………… 22, 25

*Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,*
475 U.S. 574, 586-87 (1986)……………………………………………..……… 2, 7

*Rivera v. Marcus*,
533 F. Supp. 203 (D. Conn.), *aff'd,* 696 F.2d 1016 (2d Cir. 1982)…..………… 15, 17, 21, 22, 25

*Sealed v. Sealed*,
125 F. App'x 338 (2d Cir. 2005)………………………………………..….. 16, 23

*Smith v. Half Hollow Hills Cent. Sch. Dist.*,
298 F.3d 168, 173 (2d Cir. 2002)………………………………..…….. 14, 25, 26, 27

*Stern v. Trs. of Columbia Univ.*,
131 F.3d 305, 315 (2d Cir. 1997)………………………………………… 7, 15, 32, 33, 35

*Van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*,
911 F.2d 863, 866 (2d Cir. 1990)………………………………………… 8, 9, 12, 17, 18, 21

*Walden v. Wishengrad,*
745 F.2d 149, 152 (2d Cir. 1984)…………………………………………..……….. 2

**TABLE OF AUTHORITIES (Cont.)**

**Page(s)**

*Ward v. Murphy*,
330 F. Supp. 2d 83 (D. Conn. 2004)…………………………………………………..……. 16, 22

*Wilkinson ex rel. v. Russell,*
182 F.3d 89, 99 (2d. Cir. 1999)………………………….……… 2, 7, 8, 9, 12, 16, 17, 18, 19, 20, 21

## I. PRELIMINARY STATEMENT

Defendants Kaela Minerly and Frank Rotovnik (the "DCF Defendants") seek summary judgment on claims arising from their investigation and the subsequent removal of Plaintiffs' minor child, EP, from her parents' custody. Their motion rests on a sanitized and incomplete account of the record, and on self-serving affidavits—most notably that of Defendant Rotovnik—offered in stark contrast to his deposition testimony. During his deposition, Defendant Rotovnik responded "I don't recall," to substantive questions on approximately *245 occasions*, including questions about his training (Plaintiffs' SUF ¶ 16), his communications with medical providers, the scope of his investigative steps, and the directions he gave the Pileggi family. This pervasive professed lack of memory on central issues, juxtaposed against the confident, categorical assertions in his later affidavit, presents a classic credibility issue that cannot be resolved on summary judgment.

The defense narrative is further undermined by internal inconsistencies between and within the DCF Defendants' own accounts. In her affidavit, Minerly professes extensive formal training in child welfare, medical evaluation of child abuse, meeting the health-care needs of children, and related subjects, and asserts that she acted in good faith and within the scope of that training. (Doc. No. 96-2 "Minerly Affidavit"). By contrast, when asked in his deposition what specific trainings he had received regarding medical neglect—particularly in the context of alternative medicine—Defendant Rotovnik repeatedly testified that he did not recall (Plaintiffs' SUF ¶ 16). Minerly also swears that she "did not ever advocate that the parents should divorce," while the record reflects Anthony Pileggi's testimony that (1) a DCF worker whispered to him and his attorney that he would get his daughter back sooner if the parents divorced, and (2) "Frank" told him "It would be better for me to get Emma back sooner if Katharine was not in the

1

home." These communications are further reflected in Exhibit I. These conflicts between sworn DCF testimony and the parents' testimony are central credibility disputes for a jury.

The documentary record—including the affidavits filed in support of the Order of Temporary Custody, the juvenile-court orders, and the DCF case materials appended to defendants' motion—shows that DCF presented the juvenile court with a one-sided and incomplete account of EP's medical care (Plaintiffs' SUF ¶ 19). In particular, DCF repeatedly characterized the parents as having "opted for naturopathic medicine" at great detriment to EP (*Id.*,), without disclosing to the court that EP was also being treated by a licensed medical doctor, Dr. Lopusny, during the relevant period—information that Defendant Rotovnik admits he did not know and did not include (Plaintiffs' SUF ¶¶ 18, 19, 24). At the same time, notes in DCF's own supervisory conference reflect that Dr. Lawrence Zemel was "very irate" with the Department for not having removed Emma earlier, and his views drove the legal intervention (Plaintiffs' SUF ¶ 27). Against this backdrop, DCF conditioned reunification on the effective banishment of Katharine from the home and later on a precondition that she undergo a follow-up psychological examination before she could seek any modification of custody, as memorialized in the October 9, 2019 order (Plaintiffs' SUF ¶ 33). These facts go to the heart of Plaintiffs' procedural and substantive due process claims and their intentional infliction of emotional distress claim.

The DCF Defendants' legal arguments are also premised on mischaracterizations of controlling authority and improper summary-judgment standards. Their memorandum overreads decisions such as *Walden v. Wishengrad,* 745 F.2d 149, 152 (2d Cir. 1984) and *Wilkinson ex rel. v. Russell,* 182 F.3d 89, 99 (2d. Cir. 1999) to suggest an almost automatic immunity for child-welfare officials even in the face of seriously flawed investigations, and misuses *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) and

related summary-judgment precedents to heighten Plaintiffs' burden beyond what the Supreme Court and Second Circuit require. As the accompanying analysis shows, *Walden* concerns prosecutorial-type absolute immunity for a government attorney, not the standards governing field social-work investigations; *Wilkinson* recognizes that caseworkers must at least have a reasonable basis for their abuse findings and cannot ignore exculpatory information; and *Matsushita* does not license courts to weigh credibility or disregard reasonable inferences in favor of the non-movant.

When the record is viewed in the light most favorable to Plaintiffs, there are pervasive, material disputes as to the thoroughness and neutrality of the DCF investigation, the accuracy and completeness of what the juvenile court was told about EP's medical care, including her diagnosis of Lyme Disease, (Plaintiffs' SUF ¶ 7), the coercive conditions imposed on the family (including pressure on Anthony to remove Katharine from the home as a price of reunification) (Plaintiffs' SUF ¶¶ 20, 21), the voluntariness of the state-court "agreements," and the credibility and consistency of both Minerly and Rotovnik. Under clearly established law protecting family integrity and requiring fair procedures before the State disrupts the parent-child relationship, these disputes preclude summary judgment and defeat the DCF Defendants' assertion of qualified immunity.

## II. STATEMENT OF FACTS

This action arises from the investigation and subsequent removal of Plaintiffs' minor child, EP, by the Connecticut Department of Children and Families ("DCF"). The facts, viewed in the light most favorable to Plaintiffs, demonstrate a fundamentally flawed investigation, the presentation of a skewed and incomplete medical narrative to the juvenile court, and the use of coercive tactics to interfere with Plaintiffs' family integrity.

**A.     EP's Initial Medical History and Treatment**

In June 2018, Plaintiffs' three-year-old daughter, EP, was bitten by a tick and subsequently developed symptoms including joint pain, weakness, and fatigue (Plaintiffs' SUF ¶ 24). Plaintiffs sought care from their pediatrician, who referred them to Dr. Lawrence Zemel, a rheumatologist at Connecticut Children's Medical Center ("CCMC") (Plaintiffs' SUF ¶ 1). Dr. Zemmel diagnosed EP with Juvenile Idiopathic Rheumatoid Arthritis (Plaintiffs' SUF ¶ 2). The parents, believing further testing was required, declined the recommended treatment at that time and requested that the tick be tested, which Dr. Zemmel refused to do (*Id.*).

Following the CCMC visit, the parents sought care from other practitioners, including naturopathic providers and a licensed medical doctor, Dr. Diana Lopusny, to oversee EP's care plan (Plaintiffs' SUF ¶ 4). EP subsequently received diagnoses of Lyme disease from multiple practitioners, which were supported by laboratory testing; and developed chronic Lyme disease due to the prolonged delay in treatment (Plaintiffs' SUF ¶ 7).

**B.     The DCF Investigation**

DCF's involvement began on December 27, 2018, when Defendant Kaela Minerly was assigned to investigate (Plaintiffs' SUF ¶ 13). Ms. Minerly's involvement was brief; she visited the family home, obtained medical records, and consulted a DCF-employed nurse before Defendant Frank Rotovnik took over the investigation on February 6, 2019 (Plaintiffs' SUF ¶ 14). Mr. Rotovnik remained involved in the case, first as the investigator and later as a supervisor, until it closed in March 2020.

Mr. Rotovnik's investigation was constitutionally deficient. At his deposition, he could not recall receiving any specific training regarding medical neglect, particularly in cases

involving alternative medicine or dealing with medical experts (Plaintiffs' SUF ¶ 16). Most critically, Mr. Rotovnik failed to conduct a thorough investigation into EP's medical care (Plaintiffs' SUF ¶ 24, 25). He admitted at his deposition that he was unaware that EP was concurrently being treated by a licensed medical doctor, stating he "had no knowledge she was being treated by a medical doctor" and had "never heard" Dr. Lopusny's name (Plaintiffs' SUF ¶ 18).

As a result, the affidavit Mr. Rotovnik submitted to the juvenile court presented a materially misleading narrative. It asserted that the parents had "opted for naturopathic medicine… at a high cost and detriment to Emma's well-being," while omitting any mention of the concurrent care being provided by Dr. Lopusny (Plaintiffs' SUF ¶ 19). The investigation also appears to have been improperly influenced by CCMC physician Dr. Zemel, who DCF's own supervisory notes described as "very irate" with the Department for not having removed EP from her parents' care during a prior case (Plaintiffs' SUF ¶ 27).

## C.    Removal of EP and Juvenile Court Proceedings

On March 1, 2019, EP sustained a femur fracture (Plaintiffs' SUF ¶ 26). Shortly thereafter, while Katharine Pileggi was in Florida with EP seeking treatment, Connecticut DCF contacted Florida authorities to effectuate EP's unjustified removal (Plaintiffs' SUF ¶ 36). A "BOLO" (Be On the Lookout) was issued that described EP as malnourished (Plaintiffs' SUF ¶ 37).

On March 28, 2019, DCF filed neglect petitions and obtained an *ex parte* Order of Temporary Custody ("OTC") for EP based on affidavits that presented the one-sided narrative developed by Mr. Rotovnik (Plaintiffs' SUF ¶ 28, 29). While in state custody EP was vaccinated without parental consent, despite having prior religious and medical exemptions on file

(Plaintiffs' SUF ¶ 41). During her hospitalization, her name was changed to an alias, and Mr. Rotovnik could not recall if the parents were informed of her location (Plaintiffs' SUF ¶ 39, 40).

On April 5, 2019, the parents, represented by counsel, appeared in juvenile court and agreed to sustain the OTC (Plaintiffs' SUF ¶ 31). Plaintiffs assert this agreement, and all subsequent agreements, were not voluntary but were the product of unconstitutional coercion during their period of vulnerability as a result of desperation to regain custody of EP.

**D.    Coercive Reunification Conditions**

The record contains evidence that DCF personnel leveraged the State's custody of EP to pressure the parents to alter their marital and living arrangements. Text messages from June 2019 between Anthony Pileggi and his attorney document that DCF would not hold a meeting to discuss EP's return "until I confirm that divorce paperwork filed and that Katie moved out," and that his attorney needed to provide "divorce confirmation" to "Frank" (Plaintiffs' SUF ¶ 20, 21). Mr. Rotovnik himself testified that DCF has "no authority" to force a parent to move out of their home as a condition for a child's return (Plaintiffs' SUF ¶ 22).

This alleged pressure culminated in the October 9, 2019 court order that revoked EP's commitment (Plaintiffs' SUF ¶ 31). While the order returned EP to the family, it did so under specific, restrictive terms. The Pillegi's were forced treat EP using only Dr. Zemel and were not allowed to continue with Dr. Lopusny. The order also vested primary physical custody with the father, Anthony Pileggi, and granted him final decision-making authority in the event of any disagreement (Plaintiffs' SUF ¶ 32). Critically, the order further imposed a "threshold requirement" that Katharine Pileggi must first undergo a follow-up psychological examination

6

before she could even file a motion to seek future modification of custody (*Id.*). The DCF case formally closed in March 2020.

## III. STANDARD OF REVIEW

**A.    Summary Judgement**

Summary judgment is appropriate only when the moving party demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to the non-moving party—here, the Plaintiffs—and draw all reasonable inferences in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may not weigh credibility or resolve contested issues of fact at this stage; those functions are reserved for the jury. *Id.* at 255; *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997) (explaining that "mere speculation and conjecture" is insufficient to defeat summary judgment, but that inferences must be drawn in favor of the non-movant). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once the moving party has carried its initial burden under Rule 56, the non-moving party must do more than show "some metaphysical doubt as to the material facts" and must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

**B.    Qualified Immunity**

Qualified immunity protects government officials from liability for civil damages unless their conduct violates a "clearly established statutory or constitutional right of which a reasonable person would have known." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 102

(2d Cir. 1999). The analysis involves two inquiries: (1) whether the facts, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right; and (2) whether the right was clearly established at the time of the alleged misconduct—that is, whether, in light of preexisting law, the unlawfulness would have been apparent to a reasonable official in the defendants' position. *Id.* at 102–04. In the child-abuse and neglect context, the Second Circuit has "adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context," but it has made clear that an investigation "passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse," and that caseworkers may not, for example, fabricate evidence or ignore overwhelming exculpatory information. *Wilkinson*, 182 F.3d at 104–05 (quoting *Van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990)).

Because the qualified-immunity inquiry often turns on the historical facts of what the officials knew, what they did, and whether they had a reasonable basis for their actions, summary judgment on qualified immunity is improper where the objective reasonableness of an official's conduct depends on disputed material facts and credibility determinations. *Anderson*, 477 U.S. at 255; *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

## IV. ARGUMENT

**1.    Genuine Disputes of Material Fact Preclude Summary Judgment on §1983 Claim**

Summary judgment must be denied on Plaintiffs' 42 U.S.C. § 1983 claim because the record is replete with genuine disputes of material fact regarding the constitutionality of Defendants' conduct. The right to family integrity and to direct the care, custody, and medical treatment of one's children is a fundamental liberty interest protected by the Due Process Clause.

Government interference with that interest—particularly through a biased or incomplete investigation, the presentation of a misleading evidentiary record to a juvenile court, or the imposition of coercive reunification conditions; gives rise to a cognizable § 1983 claim. The disputed facts here go to both procedural due process (whether Plaintiffs received fundamentally fair procedures) and substantive due process (whether Defendants' conduct was arbitrary and conscience-shocking).

In addition, the record contains material inconsistencies between Defendants' own affidavits and their deposition testimony, and between the accounts given by Minerly and Rotovnik regarding their training, investigative steps, and involvement in reunification conditions. These conflicts present classic credibility questions that cannot be resolved on summary judgment.

2.      **Triable Issues Exist Regarding the Constitutional Adequacy of the DCF Investigation**

A constitutionally adequate investigation into allegations of child neglect must be impartial and reasonably thorough; at a minimum, child-protection caseworkers must have a "reasonable basis" for their findings and may not disregard obvious exculpatory or contextual information. *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104–05 (2d Cir. 1999) (quoting *Van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990)). The evidence here, viewed in the light most favorable to Plaintiffs, would allow a reasonable jury to conclude that the investigation led by Defendant Rotovnik fell short of that standard and was neither impartial nor reasonably thorough.

First, there is substantial evidence that Defendant Rotovnik failed to inform himself adequately about EP's full course of medical care and then presented the juvenile court with a skewed narrative (Plaintiffs' SUF ¶ 18, 19, 25). In his sworn neglect petition, he asserted that

9

Mr. and Mrs. Pileggi "failed to address Emma's medical condition which had resulted in her being significantly compromised, probably with irreversible damage, and [that] Mrs. and Mr. Pileggi have opted for naturopathic medicine but at a high cost and detriment to Emma's well-being." Yet, when questioned about this passage at his deposition, he admitted that "nowhere in here" did he state that EP was also being treated medically, and he acknowledged that he "had no knowledge she was being treated by a medical doctor," specifically stating that he did not know of Dr. Lopusny and "never heard his name." (Plaintiffs' SUF ¶ 18.) He reiterated that he did "not recall" Dr. Lopusny's name, did not remember having "anything to do with him," and thus could not have informed the court that EP was concurrently under the care of a licensed medical doctor. A jury could find that omitting this information while telling the court that the parents had "opted" for naturopathy created a materially misleading picture of the parents' medical decision-making.

Second, the record reflects that Defendant Rotovnik's investigation was heavily and perhaps *exclusively* driven by the opinions of a single, emotionally engaged CCMC physician, Dr. Zemel, without independent balancing of other medical input. This is especially egregious given the one-year gap between Dr. Zemel's visits with EP. Additionally, DCF supervisory-conference notes document that "Dr. Zemel contacted RRG Nurse Aisha Velez and was very irate — very irate — with the Department not removing Emma from her parents care earlier" (Plaintiffs' SUF ¶ 27). Defendants' summary-judgment memorandum further recounts that on March 20, 2019, Zemel told DCF that EP was "completely disabled," "deteriorating," and exhibiting muscle wasting, that she "needs medical intervention in order to prevent further damage and have a chance of recovery," and that without standard-of-care treatment her prognosis was "grim," with "grave concerns" that she faced permanent disability and inability to

10

walk. Yet at his deposition, when asked whether he had ever initiated a call to Dr. Zemel himself, Defendant Rotovnik testified that he did not recall, and he likewise could not recall whether he personally communicated with other medical providers (Plaintiffs' SUF ¶ 17). A factfinder could reasonably infer from this testimony that, rather than conducting an active, balanced investigation, he passively accepted and relayed the views of a single "very irate" specialist while failing to take reasonable steps to understand or weigh other medical perspectives, including those of providers like Dr. Lopusny. Notably, in or about March 2019, it had been almost a year since Dr. Zemel saw Emma and therefore had no medical basis for his opinion or assertion. This crucial fact was uninvestigated and ignored by the DCF defendants.

Third, Defendant Rotovnik's own testimony calls into question the extent of his preparation and training for handling complex medical-neglect allegations. In contrast to Minerly, who describes in detail her bachelor's and master's degrees in social work and a long list of DCF trainings—including training in "meeting the healthcare needs of children" and "medical evaluation of child abuse"—Defendant Rotovnik testified that he did not recall, "at this point in time," what specific trainings he had had regarding medical neglect, and that although he knew of trainings on "medical concerns and neglect," he could not identify any particular training on medical neglect or alternative medicine (Plaintiffs' SUF ¶ 16). He similarly professed not to recall whether he had ever attended training focused on medical neglect and dealing with medical experts (*id.*).

These discrepancies between the detail in Minerly's account of her training and Rotovnik's professed inability to recall any specific medical-neglect training underscore a factual dispute about the adequacy of his preparation for assessing complex competing medical opinions.

11

Taken together, these facts would allow a reasonable jury to conclude that Defendant Rotovnik lacked a "reasonable basis" for the full scope of his neglect allegations because he failed to discover or disclose material medical information (including the involvement of a licensed medical doctor), relied almost exclusively on the views of a single "very irate" specialist, and could not recall fundamental investigative steps or training relevant to evaluating complex medical evidence. In turn, those same disputed facts support an inference that the investigation was not impartial or reasonably thorough and thus did not satisfy the constitutional standard articulated in *Wilkinson* and *Van Emrik*. *Wilkinson*, 182 F.3d at 104–05; *Van Emrik*, 911 F.2d at 866.

A jury could reasonably conclude that this failure to discover or disclose readily available, highly relevant medical information was, at a minimum, reckless and deprived DCF of the "reasonable basis" for its neglect findings that is required for an abuse investigation to pass constitutional muster. *See Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104–05 (2d Cir. 1999); *Van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990).

**3.    Genuine Factual Disputes Exist Regarding Coercive State Action**

The core of Plaintiffs' substantive due process claim rests on allegations that Defendants used their authority to unlawfully interfere with the Pileggi family structure, leveraging the skewed investigative record described above to pressure the parents to alter their marital and living arrangements as a condition of reunification. Defendants flatly deny advocating for a divorce or separation, but this denial is directly contradicted by Plaintiffs' sworn testimony, creating a classic credibility contest for a jury to decide. Anthony Pileggi testified that on an unknown date a "lady from DCF" whispered to him and his attorney that he would get his daughter back sooner if the parents divorced, and that "Frank" (understood to be Defendant

12

Rotovnik) told him, "It would be better for me to get Emma back sooner if Katharine was not in the home." (Plaintiffs' SUF ¶ 34). Those alleged statements must also be considered alongside the October 9, 2019 order returning EP to father's primary physical custody, granting him final decision-making authority in the event of disagreement, and imposing a threshold requirement that Katharine undergo a psychological evaluation before seeking any modification of custody (Plaintiffs' SUF ¶ 32, 33), which a jury could reasonably view as concrete manifestations of the coercive pressure described by Anthony.

These alleged statements present a direct and coercive use of state power, conditioning the return of a child on the effective separation of her parents and be treated by the doctors of *their choosing*. In his affidavit, Defendant Rotovnik categorically denies ever advocating that the parents should divorce, and Minerly likewise swears that she "did not ever advocate that the parents should divorce." Yet at his deposition, when asked what authority DCF had "to force Ms. Pileggi to move out of her home in order for her daughter to be returned," Defendant Rotovnik answered, "None." (Plaintiffs' SUF ¶ 22). The conflict between (1) Anthony Pileggi's specific recollection of DCF personnel communicating that divorce or Katharine's absence from the home would hasten reunification and (2) Defendants' categorical affidavit denials coupled with Defendant Rotovnik's professed inability to recall the circumstances surrounding Katharine's departure, creates a quintessential issue of fact. If a jury credits Mr. Pileggi's account and views the resulting juvenile-court order—which returned Emma to father's primary physical custody, gave him final decision-making authority, and imposed a psychological-evaluation precondition on Katharine before she could seek custody modification—as the product of that pressure, it could reasonably find that Defendant Rotovnik engaged in arbitrary, "conscience-shocking" conduct that interfered with Plaintiffs' fundamental right to family integrity.; *County of*

13

*Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002).

**4.      The Self-Serving Affidavits of Defendants Cannot Erase Disputed Facts**

Defendants rely heavily on their own self-serving affidavits—submitted by both Minerly and Rotovnik—to assert that their conduct was lawful, undertaken in good faith, and consistent with their training, and to deny that they advocated divorce or otherwise coerced family separation. These affidavits are insufficient to carry their burden on summary judgment where they are contradicted by deposition testimony, juvenile-court orders, and other record evidence. The summary-judgment record includes Anthony Pileggi's testimony, acknowledged in Defendants' own memorandum, that "Frank" told him it would be better to get Emma back sooner if Katharine was not in the home, and that a DCF worker whispered that divorce would speed reunification. It also includes the October 9, 2019 order requiring that Emma reside primarily with her father, granting him final decision-making authority, and imposing a threshold psychological-evaluation requirement on Katharine before she could seek modification of custody. To the extent the affidavits attempt to paint a picture of neutral, non-coercive practice, they conflict with this evidence and cannot be treated as dispositive.

Defendant Rotovnik's affidavit is particularly suspect given his near-total failure of memory during his deposition on almost every material aspect of the case, where he responded, "I don't recall," approximately *245 times* on topics including his training, his communications with RRG nurses and CCMC physicians, his knowledge of EP's treating doctors, and DCF's authority to require Katharine's removal from the home. A party cannot erase a genuine dispute of material fact simply by submitting a later affidavit that fills in details he repeatedly professed not to recall under oath, or that is rendered incredible by pervasive and selective amnesia.

14

Credibility determinations of this kind—whether to credit the parents' testimony, the juvenile-court orders, or Defendants' affidavits, and how to reconcile those with Defendant Rotovnik's deposition non-answers—are for the jury, not the Court, to resolve. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997).

Far from eliminating factual disputes, the contrast between Defendants' polished affidavits and their inconsistent or evasive deposition testimony underscores why summary judgment is inappropriate.

**5.    Qualified Immunity Does Not Bar Plaintiffs' Claims**

Defendants' assertion of qualified immunity fails because the constitutional rights they are alleged to have violated were clearly established, and genuine disputes of material fact exist as to whether their conduct was objectively reasonable. Qualified immunity is not a license for government officials to engage in biased investigations or coercive conduct that infringes upon fundamental rights. Where, as here, the reasonableness of an official's actions is contingent upon disputed facts and credibility determinations—including what Defendants knew about EP's medical care, what they told the juvenile court, and whether they pressured Anthony to remove Katharine from the home—summary judgment is inappropriate.

The fundamental right to family integrity and to be free from arbitrary and coercive state interference in familial matters was clearly established at the time of Defendants' conduct. In *Rivera v. Marcus*, the court held that a foster parent had a liberty interest in her family-like relationship with the children in her care and was entitled to robust procedural protections before the State could terminate that relationship, recognizing more broadly that "freedom of personal choice in matters of family life" is a protected interest. 533 F. Supp. 203, 210–11 (D. Conn.

15

1982). In *J.S.R. by and through J.S.G. v. Sessions*, the court emphasized that procedural due process requires more than physical presence at a hearing and held that separating children from their parents without adequate notice and a fair opportunity to be heard violated fundamental liberty interests in family integrity. 330 F. Supp. 3d 731, 744–49 (D. Conn. 2018). In *Bailey v. Child Protective Servs.,* No. 3:22-CV-1221 (SVN), 2022 WL 22842693 (D. Conn. Dec. 12, 2022), the court reiterated that parents' fundamental liberty interest "does not evaporate" when they temporarily lose custody and examined whether child-protection proceedings afforded meaningful procedural safeguards. Likewise, *Ward v. Murphy* upheld emergency removal only where a prompt post-removal hearing validated the decision on substantially the same facts, underscoring that timing and fairness of proceedings—not mere attendance—determine whether due process is satisfied. 330 F. Supp. 2d 83, 92–94 (D. Conn. 2004). And in *Sealed v. Sealed*, the Second Circuit acknowledged that Connecticut's child-welfare statutes can create liberty interests triggering due process protections. 125 F. App'x 338, 340–41 (2d Cir. 2005). Collectively, these cases put Connecticut child-welfare officials on clear notice, well before 2018–2019, that both the removal of children and the conditions for reunification must comport with meaningful procedural and substantive due process protections and may not be imposed through coercion or misrepresentation.

Similarly, the right to a child-abuse or neglect investigation that is not predicated on fabricated evidence or the willful disregard of exculpatory information was clearly established. In *Wilkinson ex rel. Wilkinson v. Russell*, the Second Circuit adopted a "reasonable basis" standard for caseworkers' abuse findings, recognizing a need for "unusual deference in the abuse investigation context" but holding that an investigation passes constitutional muster "provided simply that case workers have a 'reasonable basis' for their findings of abuse," and cautioning

16

that obvious extremes—such as fabricating evidence or ignoring overwhelming exculpatory information—remain unconstitutional. 182 F.3d 89, 104–05 (2d Cir. 1999). The court cited *Van Emrik v. Chemung County Department of Social Services* for the principle that caseworkers must act on a reasonable suspicion of abuse and may not act in the face of unequivocally exculpatory evidence. 911 F.2d 863, 866 (2d Cir. 1990). While *Collins v. City of Harker Heights* cautioned courts to exercise restraint in expanding substantive due process, the Supreme Court reaffirmed that government actions that are arbitrary in the constitutional sense and "conscience shocking" remain prohibited. 503 U.S. 115, 125 (1992). These authorities, correctly understood, do not confer blanket qualified immunity on child-welfare officials; they require that officials have a reasonable basis for their actions and that they neither misrepresent nor conceal material information when invoking state power to intrude on family integrity.

In light of this body of clearly established law, any reasonable DCF social worker in 2018–2019 would have understood that conditioning the return of a child on the effective expulsion of one parent from the home—as Anthony testified occurred when "Frank" told him, "It would be better for me to get Emma back sooner if Katharine was not in the home," and when a DCF worker whispered that divorce would expedite reunification—is constitutionally impermissible coercion. Likewise, a reasonable social worker would have known that presenting the juvenile court with a narrative that the parents had "opted" for naturopathic medicine "at a high cost and detriment to Emma's well-being," while omitting the existence of a licensed medical doctor, Dr. Lopusny, who was treating EP at the same time, violates the duty not to mislead the court and is inconsistent with the "reasonable basis" standard for abuse and neglect findings. Under *Rivera*, *J.S.R.*, *Wilkinson*, *Van Emrik*, and related authority, Defendants cannot

17

plausibly claim that the constitutional constraints on such coercive and misleading conduct were unclear.

The core of the qualified immunity analysis here thus turns on objective reasonableness, a question that cannot be resolved on the present record. The parties sharply dispute, among other things: (1) whether Defendant Rotovnik knew or reasonably should have known that EP was under the concurrent care of a licensed medical doctor such as Dr. Lopusny; (2) whether he or other DCF personnel told Anthony that EP's return would be faster if the parents divorced or if Katharine left the home; (3) whether he selectively relied on the views of a single "very irate" specialist, Dr. Zemel, while failing to seek, document, or weigh other medical opinions; and (4) whether he possessed and applied adequate training in medical-neglect investigations despite professing an almost total lack of recall about such training. These are not abstract disagreements; they go directly to whether Defendants had any "reasonable basis" for their actions under *Wilkinson* and *Van Emrik* and thus to whether qualified immunity can apply.

First, an objectively reasonable social worker does not conduct a one-sided investigation. Defendant Rotovnik's *sole* reliance on Dr. Zemel—whom his own supervisory-conference notes recorded as "very irate" with the Department not removing Emma from her parents care during the first case in Torrington—while simultaneously failing to discover or consult with EP's other medical doctors, such as Dr. Lopusny, falls far short of this standard. According to his deposition, he could not recall whether he ever initiated a call to Dr. Zemel, could not recall whether he communicated directly with other providers, did not recall the identity of EP's pediatrician during the relevant period, and did not remember the names of several treating physicians, despite acknowledging that there had been multiple reports from multiple providers. An investigation passes constitutional muster only when caseworkers have a "reasonable basis"

18

for their findings. *Wilkinson*, 182 F.3d at 104–05. Building a case for removal based largely on the opinion of one emotionally invested physician, while ignoring or failing to uncover other avenues of medical inquiry and omitting known or reasonably discoverable exculpatory context (such as concurrent treatment by a licensed M.D.), is not a reasonable basis under that standard. Defendant Rotovnik's professed ignorance of any specific training in medical-neglect investigations, particularly regarding alternative medicine and working with medical experts, further undermines the reasonableness of his actions. Additionally, DCF's lack of any in-house medical professional equipped to address EP's Lyme disease symptoms, her testing, or her treatment, erodes their credibility as an organization in this matter and underscores heir blind faith in Dr. Zemel who clearly had an agenda when it came to EP and axe to grind with her parents (noting Dr. Zemel being "very irate" that DCF did not remove EP sooner.)

Next, an objectively reasonable social worker would not believe it lawful to use the State's custody of a child as leverage to pressure a parent to leave the family home or to dissolve a marriage. The conflict between Anthony's specific recollection of explicit statements tying reunification to Katharine's absence from the home, the juvenile-court order's resulting allocation of primary custody and decision-making authority, and Defendant Rotovnik's categorical affidavit denial and professed inability to recall the circumstances surrounding Katharine's departure presents a paradigmatic factual and credibility dispute. If a jury credits Anthony's testimony, it could reasonably find that Defendants' conduct was not merely ill-advised but constitutionally coercive and "conscience shocking," which no reasonable official could have believed was lawful in light of the clearly established protections for family integrity.

Because a reasonable jury could find that Defendants lacked a reasonable basis for their neglect allegations, relied on a skewed and incomplete medical record, and imposed or promoted

19

coercive reunification conditions that violated clearly established rights to family integrity and fair child-protection procedures, qualified immunity cannot bar Plaintiffs' § 1983 claims at the summary-judgment stage.

Defendants' attempt to shield themselves by claiming reasonable reliance on medical experts is unavailing. While social workers may rely on experts, that reliance must itself be reasonable. In *Wilkinson ex rel. Wilkinson v. Russell*, the Second Circuit emphasized that abuse investigations "pass constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse," but cautioned that obvious extremes—such as fabricating evidence or ignoring exculpatory information—remain unconstitutional. 182 F.3d 89, 104–05 (2d Cir. 1999). It is not reasonable, and in fact, extremely irresponsible, to rely exclusively on an expert who is known within the agency to be "very irate — very irate" about the Department's prior failure to remove the child, without seeking corroboration or a second opinion or meaningfully weighing other medical input. Nor is it reasonable to misrepresent or withhold material facts from the juvenile court—such as the family's continued engagement with another medical doctor—when presenting the expert-driven narrative. Defendant Rotovnik admitted that he had "no knowledge" that EP was being treated by Dr. Lopusny, that he did "not recall" the doctor's name, and that he never heard of him, and thus did not disclose concurrent M.D. treatment in his neglect petition, which instead asserted that the parents had "opted" for naturopathic medicine at great detriment to EP. A jury could reasonably find that this omission rendered the expert reliance itself unreasonable and contributed to a one-sided, misleading narrative. The defense of reliance on experts does not immunize a defendant who, through action or reckless omission, shapes a distorted record or fails to satisfy the "reasonable basis" standard

20

recognized in *Wilkinson* and *Van Emrik v. Chemung County Department of Social Services*, 911 F.2d 863, 866 (2d Cir. 1990).

Because the objective reasonableness of Defendants' conduct—including the thoroughness and neutrality of the investigation, the manner and extent of their reliance on CCMC experts, and the alleged coercive statements and reunification conditions—is inextricably linked to disputed material facts and witness credibility, Defendants are not entitled to qualified immunity as a matter of law. The rights at issue—the parents' fundamental right to family integrity and to be free from arbitrary, coercive state interference, and their right to meaningful, fair procedures before taking the extreme measure of removal and imposing unreasonable conditions on reunification—were clearly established well before 2018–2019. *See, e.g.*, *Rivera v. Marcus*, 533 F. Supp. 203, 210–11 (D. Conn. 1982); *J.S.R. by and through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 744–49 (D. Conn. 2018). Where, as here, the historical facts and the credibility of key witnesses are hotly contested, the qualified-immunity question cannot be resolved at summary judgment.

6.      **Defendants' Procedural and Substantive Due Process Arguments Fail**

Defendants' contention that Plaintiffs' due process rights were satisfied merely because they were represented by counsel and "agreed" to state-court orders ignores the coercive context in which those agreements were secured and the incompleteness of the information presented to the juvenile court. Genuine disputes of material fact regarding the voluntariness of Plaintiffs' consent, the fairness of the underlying juvenile and administrative proceedings, and the conscience-shocking nature of Defendants' conduct preclude summary judgment on both procedural and substantive due process grounds.

### A. Plaintiffs' Formal Participation in Court Proceedings Does Not Negate a Procedural Due Process Violation Where Their Consent Was Coerced

21

Defendants argue that procedural due process was satisfied because Plaintiffs attended hearings with counsel and entered into agreements, such as sustaining the Order of Temporary Custody. This argument improperly conflates physical presence with a meaningful opportunity to be heard. Procedural due process is not satisfied by sham proceedings where a party's "consent" is the product of duress and state-sponsored coercion. As courts in this district have recognized, due process requires more than mere presence; it demands a fair opportunity for a hearing before the State deprives an individual of a fundamental liberty interest, including the right to family integrity protected by the Fourteenth Amendment. *See J.S.R. by and through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 744–49 (D. Conn. 2018); *Rivera v. Marcus*, 533 F. Supp. 203, 210–11 (D. Conn. 1982).

Under *Mathews v. Eldridge*, courts assess procedural sufficiency by balancing (1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the probable value of additional safeguards, and (3) the governmental interest. 424 U.S. 319, 335 (1976). Where, as here, the private interest is the parents' fundamental interest in the care, custody, and management of their child, the risk of error is amplified if the State presents a skewed evidentiary record or procures "agreements" through coercion, and the value of additional safeguards—such as full disclosure of all treating providers and the absence of coercive conditions—is substantial. In *Bailey v. Child Protective Services*, the court recognized that parents' liberty interests "do not evaporate" when they lose temporary custody and that there is no procedural due process satisfaction where proceedings are fundamentally unfair or substantial irregularities prevent meaningful participation, even if parents are physically present with counsel. Similarly, in *Ward v. Murphy*, the court held that an emergency removal could satisfy due process because a prompt post-removal hearing validated the removal on

22

substantially the same facts, underscoring that it is the timing and nature of the hearings—not mere attendance—that determine whether due process is met. 330 F. Supp. 2d 83, 92–94 (D. Conn. 2004). Here, the Pillegi's were under fire from DCF who was threatening removal and had a plan to *adopt EP out to another family*. Under these circumstances, their mere attendance at the hearing cannot be said to satisfy due process.

In *Sealed v. Sealed*, the Second Circuit acknowledged that Connecticut's child-welfare statutes can create liberty interests in receiving child-protective services that are subject to due process protection, reinforcing that statutory procedures must provide meaningful safeguards. 125 F. App'x 338, 340–41 (2d Cir. 2005). And *Rivera v. Marcus* emphasized that, even in the foster-care context, due process requires robust protections—including timely and adequate notice of the reasons for state action, an opportunity to present evidence and argument, the right to confront and cross-examine adverse witnesses, an impartial decisionmaker, and a written statement of decision—before the State may terminate or severely alter a protected familial relationship. 533 F. Supp. at 210–12. These authorities make clear that physical presence in court, even with counsel, does not by itself cure coercion, misrepresentation, or structural unfairness in child-protection proceedings.

Here, a jury could readily find that Plaintiffs' agreements were not voluntary. The record contains direct evidence that Defendant Rotovnik leveraged the State's custody of EP to manipulate the family unit, explicitly telling Mr. Pileggi, "It would be better for me to get Emma back sooner if Katharine was not in the home." Defendants' own memorandum summarizes this testimony, noting that Anthony "did not identify the alleged whisperer as either Minerly or Rotovnik," but that he testified "Frank" communicated that it would be better for him to get Emma back sooner if Katharine was not in the home. Anthony further testified that a "lady from

23

DCF" whispered to him and his attorney that he would get his daughter back sooner if the parents divorced. These alleged statements, if credited, amount to an ultimatum: accept the effective exile of Katharine from the home (and ultimately from the marriage) or face prolonged state custody of EP.

The tension between Anthony's specific testimony that DCF personnel tied reunification to Katharine's absence from the home, the categorical affidavit denials, and Defendant Rotovnik's professed inability to recall the circumstances of Katharine's departure from the home presents a quintessential factual and credibility dispute for the jury.

Additionally, the resulting juvenile-court orders bear the imprint of this alleged coercion. The October 9, 2019 Waterbury Juvenile order revoking EP's commitment provided that Father "shall enjoy primary physical custody" of all four children, that the parties "shall share legal custody" but Father would have "final decision-making authority" in the event of disagreement, and that Mother's parenting time would be "liberal and flexible" but subject to Father's agreement. Critically, the order also imposed a threshold condition that "[s]hould Mother wish to modify legal and/or physical custody of the minor child(ren), there shall first be a threshold requirement that she have a follow-up psychological examination by Dr Ciarametta before proceeding with a motion for modification with the Court." These were not momentary, emergency measures; they were long-term structural constraints on Katharine's custodial rights and her ability even to seek judicial modification, and they flowed from a process in which, by Anthony's account, he was told that EP's return would be faster if Katharine left the home.

When consent is obtained under such duress, it is legally meaningless, and the procedures that follow cannot be deemed constitutionally adequate under *Mathews*'s requirement of a meaningful opportunity to be heard or under *Rivera*'s requirement of full and fair procedures

24

before the State interferes with familial relationships. *See Mathews*, 424 U.S. at 335; *Rivera*, 533 F. Supp. at 210–12. Whether Plaintiffs' stipulations to sustain the OTC and to accept the October 2019 disposition were truly voluntary, and whether the juvenile and administrative proceedings afforded them a fundamentally fair opportunity to contest DCF's allegations free from coercion and misrepresentation, are classic questions of fact and credibility that cannot be resolved on summary judgment.

These same coercive dynamics, moreover, are not limited to procedural deficiencies; they also inform the substantive due process analysis, because conditioning reunification on the banishment of a parent from the home and the imposition of onerous, stigmatizing conditions on that parent's future custodial rights can be found to constitute arbitrary, conscience-shocking executive action, as addressed in the following subsection.

### B. Defendants' Coercive Interference with the Pileggi Family Unit Shocks the Conscience

A substantive due process violation occurs when executive action is so egregious and arbitrary that it "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). In this Circuit, conscience-shocking conduct is that which is "brutal" and "offensive to human dignity." *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002). In the child-welfare context, this inquiry is applied against the backdrop of the fundamental liberty interest in family integrity and the care, custody, and management of one's children, an interest repeatedly recognized by courts in this District. *See, e.g.*, *Rivera v. Marcus*, 533 F. Supp. 203, 210–12 (D. Conn. 1982); *J.S.R. by and through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 744–49 (D. Conn. 2018). Governmental efforts to coerce family breakup or to condition reunification on the removal of a parent from the home implicate this core liberty interest and fall squarely within the ambit of substantive due process protections.

25

Here, a reasonable jury could find that Defendants used state power to fracture the Pileggi family as a practical condition of reunification and that this conduct was not a mere "suggestion" but a coercive directive.

Defendants argue that even if they had advocated for divorce, such a suggestion would not be so "brutal" or "offensive to human dignity" as to shock the conscience within the meaning of *Smith*. But *Smith*'s standard focuses on the qualitative nature of the conduct, not on the label used to describe it. 298 F.3d at 173. In contrast to the circumstances in *Smith*, the conduct alleged here involves state officials leveraging the State's physical custody of a young child to pressure her parents to separate and to restrict the mother's custodial rights through binding court orders and a mandated psychological-examination precondition. A jury could readily conclude that conditioning the speed of reunification on the mother's removal from the home and subjecting her to special, stigmatizing hurdles before she can even seek modification of custody is precisely the kind of "brutal" and "offensive to human dignity" interference with family integrity that satisfies the *Smith*/*Lewis* standard. *See County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *Smith*, 298 F.3d at 173.

Defendants also invoke *In re Alison M.*, 127 Conn. App. 197 (2011), to suggest that DCF or a court may appropriately require a parent to separate from a spouse or partner in certain cases. But *Alison M.* involved separation from a partner whose own behaviors posed a direct, independent threat to the children's safety. Here, by contrast, the alleged condition targeted an actively involved mother based on disputed medical-treatment issues and was deployed as leverage during reunification negotiations, rather than as a measured response to a demonstrable, independent danger she posed. A jury could distinguish *Alison M.* on these grounds and find that Defendants' conduct here was arbitrary and conscience-shocking.

26

The state may not weaponize a parent's love for a child to coerce the breakup of the family unit or to impose onerous, stigmatizing conditions on one parent as the price of reunification. Whether Defendant Rotovnik made the statements attributed to him, whether DCF personnel in fact suggested divorce as a means to hasten EP's return, and whether the resulting juvenile-court orders reflect the implementation of those coercive conditions are classic questions of fact and credibility. If a jury credits Mr. Pileggi's sworn testimony over Defendant Rotovnik's affidavit and selective amnesia, it can find that Defendants engaged in an outrageous and conscience-shocking abuse of their authority in violation of Plaintiffs' substantive due process rights. *See Smith*, 298 F.3d at 173. Accordingly, whether Defendants' interference with the Pileggi family unit "shocks the conscience" cannot be decided as a matter of law on this record, and summary judgment must be denied.

**7.   Intentional Infliction of Emotional Distress (IIED)**

Plaintiffs have adduced sufficient evidence to create a genuine dispute of material fact as to each element of their claim for intentional infliction of emotional distress ("IIED"), precluding summary judgment on Count 8. Under Connecticut law, a plaintiff must establish that: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of the conduct; (2) the conduct was extreme and outrageous, that is, it exceeded all bounds usually tolerated by decent society; (3) the conduct was the cause of the plaintiff's distress; and (4) the emotional distress suffered by the plaintiff was severe. Connecticut appellate courts have emphasized that whether conduct is "extreme and outrageous" and whether the resulting emotional distress is sufficiently "severe" are ordinarily questions for the trier of fact, particularly where, as here, the conduct occurred in the context of a

27

power-imbalanced relationship such as that between state child-protection officials and parents whose child has been removed.

First, a jury could easily find Defendants' conduct "extreme and outrageous." While social workers must often make difficult decisions, their conduct is not immunized when it exceeds all possible bounds of decency. Rotovnik's threats regarding conditioning EP's return to the home on the removal of Katharine did not occur in a vacuum; it must be viewed in conjunction with the October 9, 2019 juvenile-court order returning EP to the primary physical custody of her father, granting him final decision-making authority in the event of disagreement regarding the children, and imposing a "threshold requirement" that, should Mother seek to modify legal and/or physical custody, she must first undergo a follow-up psychological examination by Dr. Ciarametta before proceeding with any motion for modification. A reasonable jury could conclude that these long-lasting, stigmatizing conditions on Katharine's parental rights were the concrete implementation of the coercive pressure described by Anthony and part of a continuing pattern of extreme and outrageous conduct, rather than isolated remarks.

The alleged coercive statements were also intertwined with an investigation that, on Plaintiffs' evidence, was biased and one-sided. As discussed above, Defendant Rotovnik's neglect petition asserted that Mr. and Mrs. Pileggi "failed to address Emma's medical condition" and had "opted naturopathic medicine … at a high cost and detriment to Emma's well-being," but omitted any mention that EP was also being treated by a licensed medical doctor, Dr. Lopusny, during the relevant period. In his deposition, Defendant Rotovnik admitted he had "no knowledge" that EP was under Dr. Lopusny's care, did "not recall" the doctor's name, and "never heard his name," despite acknowledging multiple provider reports. A jury could view the combination of (a) presenting a skewed medical narrative that characterized the parents as

28

having "opted" only for naturopathy while omitting concurrent conventional care, and (b) using the State's custody of EP as leverage to pressure Katharine's removal from the home and to impose a psychological-evaluation precondition on her future custodial rights, as conduct that, taken together, far exceeds the bounds of decency and thus satisfies the "extreme and outrageous" element.

Defendants themselves acknowledge that Plaintiffs have repeatedly complained that Minerly and Rotovnik acted "discourteously" and "unprofessionally," but attempt to minimize these concerns as mere incivility. A jury, however, could find that Defendants' conduct went well beyond discourtesy: it included the orchestration of a removal and subsequent reunification process based on a selectively presented medical record and the conditioning of family reunification on the effective banishment of a parent from the home and the imposition of ongoing psychological-evaluation requirements. That pattern, if proven, could reasonably be found "extreme and outrageous" under Connecticut law.

Next, a jury could infer the requisite intent or recklessness from Defendants' actions. The alleged statement attributed to Defendant Rotovnik—that "It would be better for me to get Emma back sooner if Katharine was not in the home"—is not merely negligent; it is a targeted, coercive communication made by a state official who knew that Anthony and Katharine were desperate to regain custody of their non-ambulatory young child. A jury could conclude that the natural and probable consequence of telling a father that he must oust his wife from their home to regain custody of his daughter is severe emotional distress, and that Defendant Rotovnik either intended this result or, at minimum, acted in reckless disregard of the likelihood that such distress would ensue. Under Connecticut IIED doctrine, such reckless disregard of the high probability of causing emotional harm is sufficient to satisfy the intent element.

29

Moreover, Defendant Rotovnik testified that DCF has "none" when asked what authority it had "to force Ms. Pileggi to move out of her home in order for her daughter to be returned," and when asked why she nevertheless left, he responded only, "I believe she moved out on her own. I don't recall that." If a jury credits Anthony's testimony that Defendant Rotovnik communicated that Katharine's absence from the home would hasten EP's return, it could reasonably infer that he knowingly exceeded his lawful authority, or at least recklessly misrepresented that authority, in order to pressure a change in the family's living arrangements, again supporting the IIED intent/recklessness element.

Finally, a reasonable jury could find the causation element satisfied. The alleged coercive statements and the biased investigation were not abstract; they had concrete consequences. EP was removed from her home and placed in a DCF-licensed foster home supported by a visiting nurse service while she underwent treatment, and DCF staff and nurses monitored her care. The October 9, 2019 order, entered after these events and against the backdrop of the alleged pressure on Anthony to have Katharine leave the home, returned EP to father's primary physical custody, vested him with final decision-making authority in the event of parental disagreement, limited Katharine's role to "liberal and flexible" parenting time subject to Anthony's agreement, and conditioned her ability to seek any modification of custody on her undergoing a psychological evaluation by a specified provider. A jury could reasonably conclude that the investigation and the coercive comments were substantial factors in bringing about both the removal and the subsequent imposition of these restrictive, stigmatizing conditions on Katharine's parental rights, and thus that Defendants' conduct was a proximate cause of the emotional distress she and Anthony experienced.

30

Accordingly, the record is sufficient to create a triable issue on the severity of Plaintiffs' emotional distress. Having one's three-year-old non-ambulatory child removed by the State, placed in foster care, subjected to invasive medical treatment over parental objection, and then returned only under conditions that effectively exclude the mother from the home and impose a psychological-evaluation precondition on her ability to seek custody modification, is inherently and profoundly distressing. A jury is entitled to infer severe emotional distress from these circumstances alone: for example, the trauma of watching EP taken into State custody; the anguish of being told that reunification would be faster if Katharine left the home; the humiliation and stigma of being made subject to a court-ordered psychological evaluation as a threshold requirement before she can even petition for modification; and the strain on the marital relationship culminating in a later dissolution proceeding. Connecticut courts routinely leave the question of whether distress is "severe" to the jury when the underlying conduct involves the disruption of core family relationships and the exercise of coercive governmental power.

Defendants' denials underscore that there is a genuine factual dispute for the jury. Minerly's affidavit flatly states that she "did not ever advocate that the parents should divorce," and Defendant Rotovnik likewise denies ever advocating that the parents should divorce. Those categorical denials stand in direct tension with Anthony's testimony. These conflicts, coupled with Defendant Rotovnik's pervasive "I don't recall" responses on related topics, including why Katharine left the home, are classic credibility issues that a jury—not the Court on summary judgment—must resolve, and they go directly to whether the alleged extreme and outrageous conduct occurred.

31

8.     **Evidentiary and Credibility Considerations**

Summary judgment is fundamentally improper where the credibility of the moving party's key witness is a central issue. Defendant Rotovnik's affidavit, upon which Defendants heavily rely, is undermined by his own deposition testimony. Throughout his deposition, Defendant Rotovnik demonstrated a profound and selective failure of memory, answering that he "did not recall," "did not know," or the equivalent to substantive questions on approximately 245 separate occasions, including questions about his training, his communications with medical providers, his knowledge of EP's treating physicians, and his role in key decisions. This is not a case of a witness forgetting peripheral details; it reflects an asserted inability or unwillingness to testify about the core of his conduct as a state official in a case that resulted in the removal of a child and the imposition of long-term custodial conditions. A party cannot shield himself from liability with a self-serving affidavit after building a fortress of "I don't recall" during his deposition. The assessment of Defendant Rotovnik's credibility, and the weight to be given to his affidavit in light of his deposition testimony, is squarely a matter for a jury, not for the Court on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997).

The pattern of evasion is stark when contrasting the vague deposition with the clear assertions in his sworn affidavit. This creates direct conflicts and material credibility questions that preclude summary judgment.

Further, the contrast between Defendant Rotovnik's vague recollections and co-defendant Minerly's detailed account of her training and conduct further underscores that credibility determinations cannot be made on summary judgment. In her affidavit, Minerly specifically lists her bachelor's and master's degrees in social work and describes numerous DCF trainings she

32

completed, including pre-service training, structured decision-making, child welfare, legal, permanency, "meeting the healthcare needs of children," "medical evaluation of child abuse," and other topics related to health and child development, and she affirms that at all relevant times she acted in good faith and within the scope of her duties and training. By contrast, when asked at his deposition what trainings he had received on medical neglect, particularly in the context of alternative medicine or working with medical experts, Defendant Rotovnik repeatedly answered that he did not recall what specific trainings he had attended and could not identify any particular training on medical neglect. He similarly professed not to recall the timing of his investigative roles, his communications with key medical providers, or his knowledge of EP's other treating physicians, including Dr. Lopusny. This intra-DCF inconsistency—one social worker providing concrete, detailed recollections of training and role, the other asserting near-blanket amnesia on core topics central to this litigation—further demonstrates that the credibility and reliability of Defendant Rotovnik's testimony, and the weight to give his later, more confident affidavit, are issues for a jury.

Courts in this Circuit have recognized that, on summary judgment, a party cannot manufacture the appearance of undisputed facts through a self-serving affidavit that is inconsistent with or unsupported by prior deposition testimony; such conflicts reinforce, rather than resolve, the existence of genuine issues of material fact and preclude summary disposition. *See Anderson*, 477 U.S. at 255; *Stern*, 131 F.3d at 315. Given Defendant Rotovnik's pervasive "I don't recall" testimony on critical matters, his categorical affidavit denials regarding coercive statements, and the inconsistencies between his account and those of co-defendant Minerly, as well as the parents' testimony and the juvenile-court orders, the Court cannot credit his affidavit as dispositive on this record. These evidentiary and credibility disputes must be

33

resolved by a jury, and they independently require denial of Defendants' motion for summary judgment.

Defendant Rotovnik's investigation into the Pileggis' medical choices forms the basis for his entire intervention. Yet he could not recall what training, if any, he had received in investigating medical neglect, particularly regarding alternative medicine or working with medical experts, testifying only that he knew he had trainings on "medical concerns and neglect" but that he could not "tell you specifically what trainings I have had specifically on medical neglect" and did not recall whether he had any training regarding alternative medicine. Most critically, he claimed to have no knowledge of EP's treating medical doctor, Dr. Lopusny, stating that he did not recall the name, had never heard it, and "had no knowledge she was being treated by a medical doctor." This professed ignorance is material because, in his neglect petition and related affidavit (Ex. B-1, as described in Defendants' brief), he alleged that Mr. and Mrs. Pileggi "failed to address Emma's medical condition" and had "opted naturopathic medicine … at a high cost and detriment to Emma's well-being," without disclosing the parents' concurrent use of a licensed medical doctor such as Dr. Lopusny or acknowledging that EP had an identified pediatrician. A jury must be permitted to decide whether Defendant Rotovnik was merely negligent in failing to learn and disclose this information or was willfully blind to it, and whether his deposition testimony is a truthful account of his memory or a convenient way to avoid accountability for a constitutionally deficient and misleading investigation.

Defendant Rotovnik also could not recall if he ever initiated a call to Dr. Zemel, the primary CCMC physician whose opinions drove the DCF action, testifying, when asked whether he had initiated such a call, "I don't recall." He similarly testified that, although RRG nurses routinely serve as intermediaries between DCF and medical providers, he did not recall

34

specifically when he spoke with them in this case and could only say that it was "throughout the case." He further acknowledged that there were "five different reports" from five different providers and two non-accepted reports from two additional providers but could not recall their names. These gaps in memory are particularly striking given that his own protocol notes record that "Dr. Zemel contacted RRG Nurse Aisha Velez and was very irate — very irate — with the Department not removing Emma from her parents care during the first case in Torrington," underscoring that Zemel's views were central to the Department's decision-making. This failure of memory about who he spoke with, when, and what was said directly impacts the reasonableness of his reliance on a single, "very irate" physician and a handful of intermediaries, yet he asks the Court to accept his affidavit's generalized conclusions that his actions were proper and his reliance on CCMC providers reasonable.

Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir. 1997). A defendant cannot effectively obstruct discovery with a wall of claimed non-recollection on core topics only to later submit a polished affidavit to secure summary judgment. Defendant Rotovnik's testimony is so riddled with inconsistencies, omissions, and convenient memory lapses on material issues—including matters as fundamental as his training, his communications with medical providers, and his knowledge of treating physicians such as Dr. Lopusny—that no reasonable fact-finder would be required to accept his affidavit as true. When that testimony is contrasted with co-defendant Minerly's detailed recollection of her own training and investigative steps, the need for a jury to evaluate the

35

relative credibility of these witnesses is even more apparent. His credibility is a central, disputed material fact in this case, and for this reason alone, the motion must be denied.

## V. CONCLUSION

WHEREFORE, for all the foregoing reasons—including the pervasive disputes of material fact, the significant credibility conflicts between and within the testimony and affidavits of Defendants Minerly and Rotovnik, and the mischaracterizations of both the evidentiary record and governing law identified herein—Plaintiffs Katharine Pileggi and Anthony Pileggi, individually and as next friends to EP, respectfully request that this Court enter an Order denying in its entirety the DCF Defendants' Motion for Summary Judgment.


Dated: April 20, 2026


Respectfully submitted,

*Tricia S. Lindsay*
_____
TRICIA S. LINDSAY
*Attorney for Plaintiffs*
531 E. Lincoln Ave STE 5B
Mount Vernon, NY 10552
Ph. (347) 386-4604;
Fax. (914) 840-1196
tricialindsaylaw@gmail.com