UNITED STATES DISTRCIT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------x

KATHARINE PILLEGI, et al.,

        Plaintiffs,                        Case No.: 3:22-cv-01315-AWT

v.

KIM MATHIAS, et al.,

        Defendants.

----------------------------------------------x

**PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT OF FACTS IN OPPOSITION TO THE DCF DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

**I. RESPONSES TO DEFENDANTS STATEMENT OF FACTS**

1.     The Department of Children and Families (DCF) is the executive branch agency responsible for child welfare in the State of Connecticut and authorized to bring petitions alleging child neglect and abuse before the Superior Court for Juvenile Matters in furtherance of its child protection duties. Conn. Gen. Stat. §§ 4-38c, 17a-2, 17a-3; 46b-121(a).

**RESPONSE:** Admitted.

2.     Social Worker Kaela Minerly is a social worker employed by DCF. She has a master's degree in social work and received training in child welfare social work. She was assigned the investigation into the Pileggi family on December 27, 2018. (Ex. A, Minerly Aff., ¶¶ 3-4) After taking initial steps to investigate, such as visiting the family and requesting medical records, she

1

was replaced by Frank Rotovnik, another DCF employee, as the investigator. ( *Id* ., ¶¶4,5)

Minerly was not assigned as a social worker to the Pileggi case after February 6, 2019. ( *Id* ., ¶5)

**RESPONSE:** Admitted.

3.      Social Worker Frank Rotovnik is a social worker employed by DCF. (Ex. B, Rotovnk

Aff., ¶ 2) He holds a master's degree in social work and a Licensed Master of Social Work

(LMSW) designation, and has received training in child welfare social work. (Id., ¶3). In 2019,

Rotovnik was an investigative social worker. He was assigned the Pileggi case on February 6,

2019. ( Id ., ¶4) Subsequent to his involvement as an investigator Rotovnik was promoted to

supervisor, and was involved in the Pileggi case as a supervisor until its conclusion in March

2020. ( Id ., ¶4)

**RESPONSE:** Denied as to the characterization and constitutional adequacy of Defendant

Rotovnik's training. Defendant Rotovnik's deposition testimony, in which he responded "I don't

recall" to numerous questions about his training, directly contradicts the assertion that he had

received adequate training for this matter. Specifically, he could not recall any training regarding

medical neglect or dealing with alternative medicine, creating a genuine dispute as to whether he

possessed the specific training necessary for this investigation.

4.      A minor child referred to herein as "EP" initially presented to the Connecticut Children's

Medical Center (CCMC) in June of 2018. The parents sought care for EP's bilateral knee

effusions and inability to ambulate with Dr. Lawrence Zemel, a Rheumatologist in the Pediatric

Rheumatology Department at CCMC. Dr. Zemel diagnosed the plaintiff child, EP, with

Idiopathic Rheumatoid Arthritis. (Amended Complaint,¶¶ 7,18; Ex. B-4, ¶¶3-4)

**RESPONSE:** Admitted.

5.      The parents of EP, Anthony and Katharine, refused recommended treatment for Idiopathic Rheumatoid Arthritis. (Amended Complaint, ¶ 33; Ex. B-1; Ex. B-4, ¶3)

**RESPONSE:** Denied. This statement presents an incomplete and materially misleading narrative. While Plaintiffs questioned a specific course of treatment recommended by CCMC, they concurrently sought and obtained care for EP from another licensed medical doctor, Dr. Lopusny. Defendants' characterization omits this critical fact, which Defendant Rotovnik admitted he failed to investigate or disclose to the juvenile court.

6.      Except for the time period immediately prior to his retirement Dr. Zemel was head of the Pediatric Rheumatology Department at CCMC. He is a medical doctor with advanced training in pediatric rheumatology and extensive experience treating both arthritis and lyme disease. (Ex. H, Zemel Depo, Vol I, pp.6-17, 34). He practiced pediatric rheumatology for over forty years from 1978 until his retirement in 2021. ( *Id.* , pp. 8, 10). At all times referenced in the complaint he was board certified in pediatrics and pediatric rheumatology. ( *Id* ., p. 13).

**RESPONSE:** Admitted as to Dr. Zemel's credentials and experience, but this statement omits the material context that Dr. Zemel was, according to DCF's own supervisory notes, "very irate" with the Department for not having removed EP earlier, and that his views improperly drove the subsequent legal intervention without an independent balancing of other medical input.

7.      Beginning on February 6, 2019 Frank Rotovnik investigated reported child neglect related to the Pileggi family. He reported information to the juvenile session of superior court in an affidavit submitted to the court. (Ex. B-1, Rotovnik Aff. 3/28/2019) The information reported included statements from the parents or information provided by the parents related to EP, the social worker's observations of the family, and information from medical providers. ( Id .)

3

**RESPONSE:** Denied to the extent it implies the investigation was adequate or that the information reported was complete and accurate. Defendant Rotovnik's investigation was constitutionally deficient. He failed to inform himself of EP's full course of medical care and presented the juvenile court with a one-sided and materially misleading narrative that, among other things, omitted that EP was being treated by a licensed medical doctor, Dr. Lopusny.

8.      EP sustained a left distal femur fracture after being dropped by a family member in March, 2019. (Ex. B-4, ¶2) Because EP was non-ambulatory for a significant period of time prior to this injury her lower extremity had become fragile. "The type of injury she sustained due to the decreased bone density from not walking from untreated idiopathic arthritis is called an insufficiency fracture. This type of insufficiency fracture is seen more commonly in patient[s] [who] are non-ambulatory, and/or wheelchair bound." (Ex. B-4, ¶4)

**RESPONSE:** Admitted.

9.      On March 20, 2019, Dr. Zemel opined that EP was "completely disabled" and was "deteriorating and is showing muscle wasting in her legs as a result of lack of proper treatment for her arthritis." (Ex. B-1, ¶38) Dr. Zemel opined that EP "needs medical intervention in order to prevent further damage and have a chance of recovery." (Ex. B-1, ¶38) ( *See* Zemel Depo Vol II, pp.253-257; Vol I, pp. 49, 71).

**RESPONSE:** Admitted that Dr. Zemel made these statements. This paragraph, however, omits the critical context that Defendants' investigation was improperly driven by the opinions of this single, emotionally engaged physician, without independent investigation or balancing of other medical perspectives.

10.     Dr. Zemel was of the view that EP's prognosis without standard of care treatment was "grim" and he had "grave concerns" -- including "that she was looking at permanent disability and the inability to walk." (Ex. H, Zemel Depo Vol II, pp.253-257; *see* Vol I, pp. 49, 71). He communicated his concerns to a DCF nurse. ( *Id* ., 256).

**RESPONSE:** Admitted that Dr. Zemel expressed these views, which further demonstrates Defendants' uncritical and constitutionally impermissible reliance on a single provider's opinion.

11.     DCF medical director, Dr. Nicole Taylor, opined that she had "grave concern" for EP's medical safety and her family's ability to meet the child's needs in light of her current presentation and medical status. (Ex. B-1, ¶41)

**RESPONSE:** Denied to the extent this opinion was based on the incomplete and misleading information supplied by Defendant Rotovnik, who failed to discover or disclose that EP was under the concurrent care of another licensed medical doctor. An opinion formed on the basis of a constitutionally deficient investigation is not an undisputed fact.

12.     Pamela Santapaola, N.D., is a naturopathic physician who the plaintiff parents consulted. Dr. Santapaola opined: "Based upon my medical opinion this child may suffer from irreversible damage or injury if left untreated by conventional means." (Ex. B-3, Santapaola Aff)

**RESPONSE:** Admitted. This fact demonstrates that Plaintiffs were receiving advice that acknowledged the role of conventional medicine, a material fact that undermines the Defendants' misleading narrative that Plaintiffs had wholly rejected conventional care.

13.     On March 28, 2019, the Department of Children and Families filed neglect petitions in the juvenile session of superior court regarding the plaintiff-parents' children: SP (born 2009), NP (born 2012), EP (born 2015) and MP (born 2017). (Court orders and transcript attached as

Ex. E.) The Department also filed a motion for *ex parte* order of temporary custody ("OTC") with regard to EP. On March 28, 2019, the trial court ( *Turner, J.* ) granted the motion for order of temporary custody of EP, finding that the child was in immediate physical danger from her surroundings in the parental home. The trial court ( *Turner, J.* ) further ordered that DCF was authorized to consent to necessary medical treatment for EP as recommended by her treating physician or medical specialist. (Ex. E)

**RESPONSE:** Admitted that these procedural steps occurred. Denied to the extent it implies the petitions or the resulting OTC were based on a complete and accurate factual record. The OTC was obtained on the basis of affidavits from DCF that presented a one-sided and incomplete account of EP's medical care, omitting material exculpatory and contextual facts.

14.     On April 5, 2019, a preliminary hearing was held in state court. All parties agreed to sustain the OTC of EP. The trial court ( *Grogins, J.* ) canvassed the parents and found that their agreement was voluntarily and knowingly made with the effective assistance of counsel and that there was a factual basis for the OTC. (Ex. E)

**RESPONSE:** Denied. While Plaintiffs, represented by counsel, entered into a formal stipulation, this statement omits the coercive context in which that "agreement" was secured. The voluntariness of this and all subsequent agreements is a central disputed fact, as Plaintiffs were subjected to unconstitutional pressure, including statements from DCF personnel that EP's return would be expedited if her parents divorced or if Katharine Pileggi was removed from the home.

15.     If any party had wished to contest the OTC, that party would have been entitled to an expeditious evidentiary hearing within ten days. See Conn. Gen. Stat. § 46b-129 (b); Conn. Practice Bk. §§ 33a-6, 33a-7 (d).

6

**RESPONSE:** Admitted that Connecticut law provides for such procedures. The theoretical availability of a hearing does not cure a due process violation where a party's purported consent is procured through state-sponsored coercion and duress, rendering their "agreement" involuntary.

16.    On September 19, 2019, by agreement of all parties, the trial court ( *Cremins, J* .) adjudicated all of the Pileggi children neglected, including EP. (Ex. E) By agreement of all parties the trial court committed EP to the Department of Children and Families. The trial court ordered a period of protective supervision of the other children from September 19, 2019 to March 19, 2020. (Ex. E) By agreement of all parties the trial court vested custody of the other children in the father, Anthony Pileggi. The trial court canvassed the parents and found that the agreement was knowingly and voluntarily made with the effective assistance of counsel and that there was a factual basis for the parents' plea. (Ex. E)

**RESPONSE:** Denied as to the characterization of the proceedings as a voluntary "agreement." As stated in response to paragraph 14, any "agreement" was the product of a coercive environment created by Defendants, which leveraged the State's custody of EP to pressure changes in the family's structure. The voluntariness of the parents' plea is therefore a disputed issue of material fact.

17.    If any party had wished to contest the Department's petition the court would have held an evidentiary hearing. Conn. Gen. Stat. § 46b-129 (j) (2)); *See* Conn. Practice Bk. §§ 35a-7, 35a-8, 35a-9, 35a-10, 35a-11.

**RESPONSE:** Admitted that Connecticut law provides for such procedures. This fact is immaterial to whether Plaintiffs' "agreements" were truly voluntary or were the product of unconstitutional coercion that deprived them of a meaningful opportunity to be heard.

18.    On October 9, 2019, pursuant to DCF's motion and with the agreement of all parties, the trial court ( *Turner, J* .) revoked EP's commitment and placed her under protective supervision vested with her father to run concurrently with the other children. (Ex. E)

**RESPONSE:** Denied to the extent it characterizes the events as a voluntary agreement. While an order to this effect was entered, it memorialized the coercive conditions imposed by DCF. The order returned EP to her father's primary physical custody, granted him final decision-making authority, and imposed a threshold requirement that Katharine undergo a psychological examination before seeking any modification of custody. Plaintiffs contend these terms are the concrete manifestations of the coercive pressure they faced.

19.    After EP was removed from the parents' custody and care, she received treatment for Idiopathic Rheumatoid Arthritis at Connecticut Children's Medical Center (CCMC). (Ex. B, ¶8) EP's treatment included medication, physical therapy, aquatics therapy, occupational therapy and nutritional and orthopedic consults. ( *Id* .) After a period of in-patient hospitalization EP continued treatment on an outpatient basis while she was placed in a DCF licensed foster home that was supported by a visiting nurse service. ( *Id* .) Also registered nurses employed by DCF were involved in monitoring her care. CCMC staff informed the Department that EP's treatment was successful. ( *Id* .) Before she received treatment she was unable to walk. (Id.) After treatment Rotovnik observed that she was able to walk without difficulty and she appeared to have regained good health. ( *Id.* )

**RESPONSE:** Admitted.

20.    On February 18, 2020, the trial court ( *Turner, J.* ) held an in- court review of the case. All parties and the court agreed to allow protective supervision to expire as scheduled on March 19, 2020. (Ex. E) On March 19, 2020, the juvenile case ended. ( *Id* .)

8

**RESPONSE:** Admitted.

21.    The involvement of Kaela Minerly ended before the petitions were filed in the juvenile session of superior court. She had no role in vaccinating the plaintiff children. She did not contact the police or child welfare authority in Florida nor did she submit any filings in the juvenile session of superior court. (Ex. A, Minerly Aff., ¶¶ 7, 8)

**RESPONSE:** Admitted.

22.    Frank Rotovnik did not play any role in vaccinating the Pillegi children or contacting the police or child welfare authority in Florida except to the extent that he spoke with a Florida social worker named Nicole in order to arrange to pick up EP in the airport. (Ex. B, Rotovnik Aff. ¶12) He was not responsible for providing notice for the court hearing on the order of temporary custody. ( *Id* .) The clerk's office provides such notice. In fact, the parents were in attendance at the OTC preliminary hearing. (Ex. B, Rotovnik Aff. ¶13).; Ex. E--Transcript April 5, 2019)

**RESPONSE:** Denied.

23.    At the request of the plaintiff parents DCF held an administrative hearing during which the parents were represented by legal counsel. In a decision dated January 28, 2021, the hearing officer upheld substantiations of medical and physical neglect of EP. (Ex. C) The plaintiff parents did not appeal the hearing officer's decision as they had a right to do under the Uniform Administrative Procedure Act (UAPA), Conn. Gen. Stat. § 4-166, *et seq*.

**RESPONSE:** Admitted that these procedural events occurred. The administrative hearing and its outcome do not cure the underlying constitutional violations, as the proceedings were predicated on the same flawed, incomplete, and biased investigation conducted by Defendant Rotovnik, and

were tainted by the same coercive conduct that rendered the juvenile court "agreements" involuntary.

## II. PLAINTIFF'S ADDITIONAL MATERIAL FACTS

1.  In June 2018, the PLAINTIFFS' child, EP who was three (3) years old at the time, was bitten by a tick. As a result, EP was experiencing symptoms including, but not limited to, a low-grade fever, vomiting, joint pain, weakness, fatigue, and swollen lymph nodes. PLAINTIFFS immediately took EP to their family Pediatrician Roman Alder, M.D. [Ex. A ¶ 17].

2.  Dr. Adler simply told the PLAINTIFFS they needed to see Dr. Lawrence Zemmel, a Rheumatologist at Connecticut Children's Medical Center ("CCMC") in the Pediatric Rheumatology Department. Dr. Zemmel diagnosed EP with Juvenile Idiopathic Rheumatoid Arthritis. At that time, the PLAINTIFFS were presented with treatment options for EP, per the standard of care for treating RA, but the PLAINTIFFS' declined this treatment as they felt further testing was necessary, which is what they requested. With that, Plaintiff requested alternative options and again suggested the tick be tested. [*Id.,* ¶ 18].

3.  Following the June 2018 CCMC visit, the Pileggis sought care for EP from other practitioners, including a naturopathic provider associated with "Dr. Morse's Herbal Health Care," a local naturopathic physician, and a licensed medical doctor, Dr. Lopusny. [*Id.*, ¶¶ 37, 38, 86].

4.  The family engaged Dr. Diana Lopusny, a pediatrician (M.D.) at Preferred Pediatrics who, according to Katharine Pileggi, was experienced in treating Lyme disease, so that a medical doctor would oversee EP's care plan. [Ex. B, p. 26:11-15].

5.  Social worker Kaela Minerly testified that, to her knowledge, DCF did not have a naturopathic doctor or a nutritionist on staff to consult regarding alternative treatments or specialized diets. [Ex. C, p. 8:15-17].

6.  When the family first met with Dr. Lawrence Zemmel at CCMC, he diagnosed EP with juvenile idiopathic (juvenile rheumatoid) arthritis, refused to test the tick, and stated that he did not want to discuss Lyme disease. [Ex. B, p. 17:15-21].

7.  EP received a medical diagnosis of Lyme disease from multiple practitioners, including Dr. Lopusny (M.D.), Tara Tranguch (N.D.), Dr. Moorcroft (D.O.), and Dr. Minkoff and his associates at LifeWorks Wellness Center. [*Id.*, pp. 43-44:23-4].

8.  Katharine Pileggi testified that these Lyme disease diagnoses were supported by laboratory testing performed by multiple specialty laboratories, including IGeneX and Galaxy Diagnostics. [*Id.*, p. 4:22-25].

9.  In a March 27, 2019 affidavit submitted in the juvenile proceeding, Fitzsimmons recounted that EP initially presented to CCMC in June 2018 with bilateral knee effusions and inability to ambulate, that Dr. Zemel diagnosed JIA, and that EP did not follow up or initiate the care plan prescribed by Dr. Zemel. [Ex. D].

10. Fitzsimmons' March 27, 2019 affidavit stated that because EP had been non-ambulatory for nearly two years, her lower extremity bones had become osteopenic and more fragile, predisposing her to an insufficiency fracture. However, this statement was false, as EP was not "non-ambulatory for nearly two years." [*Id.*]

11

11. In a January 28, 2021 DCF Administrative Hearing Final Decision, the hearing officer found that Mr. Fitzsimmons had been mistaken in believing that EP had not walked for two years. [Ex. E, p. 36:17-22].

12. In her Affidavit, Minerly attested that she visited the Pileggi home, interviewed the parents, observed the children, obtained medical information regarding EP, learned that the parents had been consulting with "Dr. Morse's Herbal Health Care," requested records from CCMC and EP's pediatrician Dr. Adler, and sought the involvement of a DCF-employed registered nurse to assist the social work team in understanding EP's medical circumstances. [Doc. No. 96-2 "Minerly Affidavit" ¶ 4].

13. Rotovnik averred that he served first as the investigator on the Pileggi case beginning on February 6, 2019, and then, after a promotion to supervisor, continued to be involved in the case in a supervisory capacity until it closed in March 2020. [*Id.*, "Rotovnik Affidavit" ¶ 4].

14. In his Affidavit dated March 28, 2019, Rotovnik made clear that he was responsible for gathering information from medical providers, including CCMC physicians and DCF's RRG nurses, assessing allegations of medical neglect, and participating in preparation of affidavits and petitions submitted to the Superior Court for Juvenile Matters in support of DCF's neglect petitions and motion for an order of temporary custody. [*Id.*, Ex. B-1].

15. At his deposition, Rotovnik testified that he did not recall what specific trainings he had attended with respect to medical neglect or whether he had ever had training dealing with medical neglect in the context of alternative medicine. [Ex. E, p. 2:10-16].

16. At his deposition, Rotovnik acknowledged that there were multiple medical providers involved in EP's care and testified that he was aware of multiple reports from different

12

providers, but he could not recall their names and described there being reports from approximately five different providers he could not identify. [*Id.*, p. 7:9-22].

17. At his deposition, Rotovnik testified that he did not recall ever being told about Dr. Lopusny, had no knowledge that EP was being treated by a medical doctor concurrently with naturopathic providers, and had never heard Dr. Lopusny's name. [*Id.*, p. 40:3-25].

18. In his affidavit and petition submitted to the juvenile court, Mr. Rotovnik stated that the parents had "opted for naturopathic medicine" for EP, and he testified that this filing did not mention that EP was also being treated by a medical doctor. [*Id.*, p.44:3-25].

19. During his deposition, Frank Rotovnik was presented with text message exchanges between Anthony Pileggi and Attorney Perrault, including a June 7, 2019 message in which Mr. Pileggi stated that DCF would not have conversations with supervisory staff about returning EP "until I confirm that divorce paperwork filed and that Katie moved out." [*Id.*, pp. 48-50].

20. The text messages presented to Mr. Rotovnik included messages from Attorney Perrault to Mr. Pileggi stating that "They would not have a meeting at all to discuss until the divorce papers were done" and referencing an upcoming meeting with "Frank" that she could "push harder" for once she provided him with "divorce confirmation." [*Id.*, p. 49:7-19].

21. Mr. Rotovnik testified that DCF has no authority to force a parent to move out of his or her home. [*Id.*, p. 46:2-5].

22. DCF was aware of the fact that EP was seeing pediatrician Dr. Lopusny. [Ex. B, p. 33:2-6].

13

23. Defendant Rotovnik failed to inform himself adequately about EP's full course of medical care. [Ex. E, p. 44-45:17-1].

24. During his deposition, when questioned about which medical providers he had spoken with and about the reasons for escalating EP's case to removal, Mr. Rotovnik frequently responded that he did not recall. [*Id.*, p. 5:13-15].

25. On March 1, 2019, while non-ambulatory, EP sustained a left distal femur fracture after being dropped by her young sister. [Doc. No. 96-2, p. 26].

26. Following EP's March 1, 2019 fracture, communications between CCMC and DCF increased, and DCF supervisory conference notes reflect that Dr. Zemel contacted DCF RRG Nurse Aisha Velez and was described as "very irate" about DCF not having removed EP from her parents' care during an earlier case. [Ex. E, p. 6:21-25].

27. On March 28, 2019, DCF submitted affidavits from Fitzsimmons, DCF personnel, and medical opinions of CCMC providers to the Superior Court for Juvenile Matters in support of DCF's neglect petitions concerning the Pileggi children and DCF's ex parte application for an Order of Temporary Custody (OTC) for EP. [Ex. F].

28. On March 28, 2019, the Superior Court for Juvenile Matters granted DCF's ex parte OTC for EP. [Doc. No. 96-2, Ex. E, p. 63].

29. On April 5, 2019, Katharine and Anthony Pileggi, represented by separate counsel, appeared at the preliminary hearing on the OTC and, as reflected in the juvenile-court transcript and orders, agreed to sustain the OTC while EP remained in DCF custody. [*Id.*, pp. 64-67]

14

30. On October 9, 2019, in the Superior Court for Juvenile Matters at Waterbury, the court granted DCF's motion to revoke EP's commitment and approved a written agreement (Schedule A) resolving the neglect petitions, incorporating that agreement into the court's order. [*Id.*, p. 103].

31. Under the October 9, 2019 order, the court provided that Anthony Pileggi would have primary physical custody of the four minor children, that Katharine Pileggi would have parenting time as mutually agreed upon by the parties with liberal and flexible terms, that Anthony would not unreasonably deny Katharine's parenting-time requests, and that the parties would share legal custody for major decisions concerning the children, with Anthony having final decision-making authority in the event of disagreement. [Ex. G].

32. The October 9, 2019 order further provided that if Katharine Pileggi wished to seek modification of legal and/or physical custody of the minor children in the future, there would be a threshold requirement that she first obtain a follow-up psychological examination by Dr. Ciarametta before proceeding with a motion for modification in court. [*Id.*].

33. Anthony Pileggi testified that on an unknown date a "lady from DCF" whispered to him and his attorney that he would get his daughter back sooner if the parents divorced, and that "Frank" (understood to be Defendant Rotovnik) told him, "It would be better for me to get Emma back sooner if Katharine was not in the home." [Ex. H, p. 5 :14-21].

34. The October 9, 2019 revocation order contemplated a period of protective supervision until approximately March 19, 2020, concurrent with the siblings' matter, and DCF closed the case in March 2020. [Doc. No. 96-2, Ex. E, p. 103].

35. In March 2019, Katharine Pileggi traveled with EP to Florida to seek treatment from Mr. Morse, and DCF social worker Frank Rotovnik testified that he was aware Ms. Pileggi had contacted DCF before the trip, that DCF could not stop her from traveling, and that the agency was not restricting her movements at that time. [Ex. E, p. 11:17-22].

36. While Ms. Pileggi was in Florida, Connecticut DCF contacted child welfare authorities in Florida to effectuate the removal of EP from her mother's care, and Mr. Rotovnik testified that his supervisor informed him of this action, that he believed his supervisor made the call to Florida DCF, and that the reason for contacting Florida was that "we were removing Emma." [*Id.*, p. 11:2-13].

37. The information Connecticut DCF communicated to Florida authorities included a "BOLO" (Be On the Lookout) which described EP as malnourished. [*Id.*, p. 21:18-25].

38. Frank Rotovnik testified that police involvement in removals is not standard protocol and is generally reserved for situations involving safety or confrontation concerns, and he further testified that he had no such safety concerns in his interactions with the Pileggi family. [*Id.*, p. 19:1-15].

39. Frank Rotovnik testified that, during EP's hospitalization, her name in the hospital system was changed to "Emily Darling" after his supervisor informed him that Ms. Pileggi's sister had allegedly called the hospital impersonating DCF staff to obtain information about EP, and he stated that such a name change for a child in care is not typical unless there is a safety concern. [*Id.*, pp. 23-25:22-13].

16

40. Mr. Rotovnik testified that he did not recall whether he or anyone else at DCF informed Katharine Pileggi of EP's specific placement or whereabouts after EP's removal and name change. [*Id.*, p. 25:14-16].

41. EP was vaccinated while in state custody without parental consent and that EP had religious and medical exemptions from vaccination on file prior to her removal, including a medical exemption from Dr. Lopusny related to Lyme disease. [Ex. B, p. 47:2-16].

Dated: April 20, 2026

Respectfully submitted,

*Tricia S. Lindsay*

TRICIA S. LINDSAY
*Attorney for Plaintiffs*
531 E. Lincoln Ave STE 5B
Mount Vernon, NY 10552
Ph. (347) 386-4604;
Fax. (914) 840-1196
tricialindsaylaw@gmail.com

17