# Exhibit B

**Katharine Pileggi**

**Pileggi vs. Mathias**
**3:22-cv-01315-AWT**

**April 3, 2025**



ROBERT
MILLER
REPORTING

1000 Farmington Ave
Suite 103
West Hartford, CT 06107
860-269-9191

production@millerreporting.com
millerreporting.com

Detoxification 1.

And I was not allowed to enroll in a naturopathic doctorate program, which was my next step, because DCF determined I was a -- these are their words -- threat to the medical and pharmaceutical industry, and it was quackery, and that if I did not stop my studies, I would never see my child again.

Q.   So it was DCF that prohibited you from continuing in your studies with Dr. Morse?

A.   Yes.

Q.   So after you were prohibited by DCF from continuing your studies with Dr. Morse, did you at any point afterward resume study to obtain your ND?

A.   Not at this point.  Until this is over and I'm cleared, I am not -- they said, "I will be watching you."  Now, if I could add --

Q.   Just before you go on, "they" being DCF?

A.   DCF, correct.

Q.   Go ahead.

A.   However, after our initial consult with Dr. Zemel, and me advocating for Emma to be tested for Lyme, coinfections, along with mycotoxins, he asked me a lot of questions about the knowledge that I knew, which I said I've been studying under the holistic field for quite some time due to my, you know, extensive dealings

Epstein-Barr, mycotoxin profiles, which correlated with the other doctors.

Q.   You said Galaxy testing?

A.   Correct.

Q.   What is Galaxy testing?

A.   It's another tick panel.

Q.   What is the name of this DO?

A.   Dr. Moorcroft.

Q.   Could you spell that, please?

A.   M-o-o-r-c-r-o-f-t.

Q.   Where is Dr. Moorcroft?

A.   In Berlin.

Q.   And the Galaxy testing is done by Dr. Moorcroft or does he send it out?

A.   He sends it out.

Q.   Where?

A.   To the Galaxy lab.  I believe they are in California.  I wanted to make sure there was an array of testing done from multiple different labs and avenues proving, so that we weren't just limited to one.

Q.   And again, these tests that were done were to confirm the presence of Lyme disease?

A.   Lyme disease, Epstein-Barr, coinfections. Also mycotoxin profiles.

Q.   What mycotoxin profiles were run; to your

Rachanelle Freggi
Copy

52

knowledge?

A.   All of them, all of the mycotoxin profiles were run, which came back positive, which you can see throughout each and every testing, whether it be through Moorcroft, Tara Tranguch, who has been submitted to you, along with other practitioners.

Q.   When you say you've used multiple labs, what other labs have you used that have confirmed the presence of Lyme disease in your child?

A.   So Tara Tranguch, who you have the profiles for -- I'm forgetting the lab that she used for that.  I didn't use labs, 'cause I have no --

MS. LINDSAY:  I was going to say, that she used labs or doctors.

A.   Doctors used labs, not myself personally.  I have no access to that.

Q.   That's my question.  I understand that doctors use labs.  But to your knowledge, if you have knowledge about the labs that were used to confirm the presence of Lyme disease, I'd be interested in knowing.  That's really the nature of my question.

A.   IGeneX, Galaxy.  And I would have to look to remember the labs that Tara Tranguch ran, what they came through.  Also, we have LifeWorks Wellness Center in the evidence.  They have run their own profile.  They're out

Rachael Braggi
Copy

53

of Florida.  We personally went there.  So that would be their in-home.

They also have the pictures of her broken blood from the Lyme and the damage that was done, which will be submitted, the broken blood platelets.  Now, can I add something to this?

Q.   Please do.

A.   Nowhere in any of this was there any labs run through an allopathic doctor, because they were denied. They were requested multiple times since the beginning.

However, through our knowledge of this, we know that they don't always show up in the labs.  But we didn't have access to anything run through.

Q.   When you say --

A.   Like a Quest or anything, you know, to that.

Q.   So there were Quest labs done, for instance, right?

A.   We requested them since the beginning, from Zemel and the initial pediatrician.

Q.   Right.  And we'll get to that.  But what you're talking about specifically are these allopathic labs that you pursued, the Galaxy testing?

A.   They were through -- well, her M.D. requested it, her pediatrician.

Q.   Who is that?

Rachaelme Freggi
Copy

89

child with arthritis?

A.   Never.

Q.   Prior to June 2018, had your child ever been diagnosed with Lyme disease?

A.   Never.

Q.   Okay.  I understand it's your claim in the case that your child was bitten by a tick sometime around June 2018.

A.   It's not a claim.  It's an absolute.  We brought the tick to both CCMC and to Dr. Alder.

Q.   I'll get there.  So your testimony is that your child was bitten by a tick around June 2018?

A.   Yes.

Q.   When did this happen exactly?

A.   Two days prior to us bringing her to Dr. Alder.  We found a tick on her.  We're not sure how long it was on her for.

Q.   Okay.  Again, please just wait for me to ask the questions.  I promise you I will get there.  Okay?

Did you see the tick actually attached to your child?

A.   Yes.

Q.   Where was it?

A.   On her lower leg, between her ankle and, like, her lower.

Q.    On the right leg?

A.    Her right leg, yes.

Q.    And did you yourself remove the tick?

A.    Anthony and I both did.

Q.    Okay.  How did you do that?

A.    We cleaned it and tried to remove everything, including the head, as far out as we could to get the whole tick, and placed it into a container so that we could bring it to have it tested by her pediatrician.

Q.    And what did the tick look like when you removed it?

A.    It was engorged.  And the bite site was red, 'cause it was already burrowed into her skin.

Q.    So when you say the tick was engorged, how large was it; if you know?

A.    I'm not sure what size it was.

Q.    For instance, it wasn't as small as a poppy seed, as some ticks can be?

A.    No.  Regular tick size.  One that you could pick up.

Q.    Well, right.  It was a regular tick size, but it appeared to have been there for some time, based on your seeing it?

A.    Right, because it was engorged into her skin, and we had to remove, everything including the head, out

Rachaelle Breggi
Copy

91

of her skin.

Q. And you said the site of the tick on your child was red?

A. Right, from her being bitten by it.

Q. Okay. Was it inflamed?

A. Yes.

Q. Any other symptoms that you appreciated at the time?

A. That we found the tick?

Q. At that time, yes.

A. No.

Q. So it was red and it was inflamed?

A. Correct, at the tick bite site.

Q. Okay.

A. Right.

Q. So you said you preserved the tick?

A. Correct.

Q. You put it into a, what, a small container?

A. Correct.

Q. After you removed the tick, did you take any measures to treat the site on your child's leg?

A. Yes. Everything was cleaned out. We called our pediatrician right away.

Q. Okay. Cleaned it how? Soap and water?

A. Soap and water, alcohol, antibacterial.

Copy

92

Q.   Antibacterial ointment?

A.   Ointment.

Q.   You put a Band-Aid on it?

A.   No.  We left it open to heal, because it was red and inflamed.

Q.   Did you provide your child any homeopathic remedies at that point in time?

A.   No.  I called Dr. Alder right away.  I actually requested preventative antibiotics since it was so early on.

Q.   So before we start talking about Dr. Alder, how soon after you removed the tick were you able to see Dr. Alder?

A.   The day after, I believe it was, when she was starting to exhibit signs.

Q.   Right.  That's my next question.  In the period of time between identifying the tick, removing the tick, and seeing Dr. Alder, did you notice any symptoms in your child?

A.   Yes, she was already starting to get a fever, swollen joints, stiffness, stomach pain, heart palpitations.

Q.   Okay.  As far as fevers go, did your child ever register a fever on a thermometer?

A.   Yes, she did.

Katharine Pileggi
Copy

93

Q.    Okay.  Do you remember what it was?

A.    Probably low 101, 102 range.

Q.    Okay.  You mentioned --

A.    I don't know an exact.

Q.    That's fine.  You mentioned palpitations.  How did you appreciate that your child had palpitations?

A.    Well, we could feel it.  We could hear it. And she even said, "Mommy, my heart."  So that's when I said to Dr. Alder, "You need to get her in right away," because I know what happens.

Q.    Okay.  You said you noticed joint stiffness?

A.    Yes.  She just -- she felt achy, like flu symptoms, almost.

Q.    So whole body aches?

A.    Whole body.

Q.    Not just limited to the legs?

A.    No.  Her neck was stiff.

Q.    Did you notice any fatigue?

A.    She actually was tired.  Her stomach hurt.

Q.    Any loss of appetite?

A.    Yes.  She wasn't too hungry in the beginning either, actually throughout.

Q.    Did she have any eye pain?

A.    Eye pain, eye burning.

Q.    Any photophobia associated with the eye pain,

aversion to light?

A.    Oh, yeah, absolutely.  Another classic Lyme trait.

Q.    Did you notice any leg pain that was more pronounced than the whole body aches that you have described or was it just the general achiness?

A.    It was general all over achiness.  She did say her legs hurt, but --

Q.    How soon after the tick was removed did you start noticing these symptoms?

A.    The day after.

Q.    Prior to taking her to Dr. Alder?

A.    So, yeah, the day after we removed the tick, she started exhibiting symptoms.

Q.    Okay.  The day after you removed the tick, had the appearance of the site changed at all?

A.    No.

Q.    So it was still red?

A.    Still red.

Q.    And it was still swollen?

A.    Still swollen.

Q.    Was your child able to walk immediately prior to bringing her to Dr. Alder?

A.    Yes.

Q.    Aside from Dr. Alder, did you call any other

Katharine Fileggi

Copy

95

health care providers about the tick --

A.   No.

Q.   -- prior to seeing Dr. Alder?

A.   No.  I trusted him.

Q.   Did you call any of your other family members after you removed the tick and prior to seeing Dr. Alder?

A.   Maybe.  I'm not sure.

Q.   Not that you recall sitting here?

A.   Not that I recall.

Q.   So the day after you removed the tick from your child, you brought your child to Dr. Alder?

A.   Right to Dr. Alder.

Q.   And did Dr. Alder examine the child?

A.   Yes.

Q.   Do you remember the findings of Dr. Alder's examination?

A.   He didn't seem concerned.

Q.   Okay.  Do you remember what he said to you during that visit?

A.   He was going to do a blood panel, he refused to do preventative antibiotics, and he would call us when he got the results back.  And I said, "Well, even if you tested her for Lyme now, it's not going to show up."

Katharine Pileggi
Copy

96

Q.    And why is that?

A.    It doesn't show up right away, if you're lucky, if it even does show up on a generalized Quest diagnostic tick panel.  But I said, "In the meantime, can you please take the tick and send it out?"  "No."

Q.    So Dr. Alder did not test the tick itself?

A.    No.

Q.    Did you bring the tick with you?

A.    We did.

Q.    So is it your understanding that Dr. Alder performed a panel testing for the presence of antibodies to B. burgdorferi; is that right?  Do you know what I mean by that, first of all?

A.    Of Lyme, yes, he was supposed to.  No, I never got any of his results.  Everything was forwarded right to CCMC and they took over.

Q.    All right.  So how did -- well, let me take a step back.  Strike that.

A.    I still don't have those records from Alder.

Q.    So you raised your concern about Lyme disease with Dr. Alder at that visit?

A.    Yes, Anthony and I both did.

Q.    And what do you recall saying to Dr. Alder about the basis for your concern of Lyme disease at that time aside from --

97

A.    The obvious?

Q.    Correct.

A.    Because he watched me almost die from Lyme disease.

Q.    Who watched you almost die?

A.    Dr. Alder, because he wasn't just our family doctor, he was also a client of mine.  He watched me, three years of suffering from Lyme disease.  He actually even gave me treatment for Lyme disease at one point, because I stopped walking as well.

Q.    So Dr. Alder examined your child, but he did not prescribe antibiotics at that time?

A.    No.

Q.    You said he ordered some blood tests?

A.    Um-hum.

Q.    Yes?

A.    Yes.

Q.    Did Dr. Alder provide any other treatment at that time?

A.    No.  It was a very sketchy visit.

Q.    A very sketchy visit?

A.    Very sketchy visit.

Q.    What about it was sketchy?

A.    That's why I'm very concerned with his relationship with Dr. Zemel and what went on, because I

Katharine Pileggi
Copy

98

never had really any issues with Dr. Alder.  Again, he was a client of mine too.

And it wasn't until this point with the tick and then him referring me right to CCMC -- which I wasn't even given a name or where I was going, I was just given an address -- but nothing was done, and then he wanted me to refer to his colleague.  And he was so gung-ho about it.  It was just very odd.

Q.    So Dr. Alder referred you to Connecticut Children's?

A.    Correct.

Q.    Do you recall if he told you why he was doing that?

A.    No.  He wasn't tell me why.  Another sketchy -- he just put fear in us and said, "There's something really, really wrong here, and you have to refer to my colleague up at CCMC" -- oh, no, I'm sorry, no, no -- "you have to refer to my colleague."  And I said, "Well, who is this?"  He said, "Just go to the address."

It was -- he had fear and panic at the same time that I had fear and panic that my daughter was wasn't feeling well.  And I was given no information.  So, of course, as a mother, what is wrong with my child.  "Well, here's the address.  You've got to go there

Katharine Pileggi
Copy

99

tomorrow."  And then we show up and we see CCMC Children's Hospital.

Q.  So let's slow down.  Did Dr. Alder say to you there was something really, really wrong with your child?

A.  Yes.

Q.  He used those words?

A.  He used those words, but he was also very panicky and full of fear.

Q.  Did Dr. Alder ever state to you that he thought your child had Lyme disease?

A.  No.  Didn't even want to have the conversation, which seemed to be the theme throughout this.  Once I brought up Lyme --

Q.  So at least your understanding, based on this visit with Dr. Alder, was he was simply referring you to a Connecticut Children's doctor?

A.  Correct, which I didn't know until after we arrived there.

Q.  He just gave you the address?

A.  He just gave me the address.  He said, "There's something really wrong here.  We're not talking about Lyme.  We're not treating Lyme.  You need to meet with my colleague."

Q.  So that appointment was made for the following

Copy

100

day?

A.   I believe so.

Q.   All right.  And you brought your child to this address?

A.   Correct.

Q.   And who did you see at this next visit?

A.   Dr. Zemel.

Q.   All right.  Who went with you to that visit?

A.   Anthony.

Q.   So it was you, obviously your child, and Anthony?

A.   And Anthony.

Q.   So when you met with Dr. Zemel, did he perform an evaluation?

A.   He took Emma -- and you'll hear this next week when Tony speaks -- he took Emma, threw her onto the table, manipulated her body roughly and aggressively, said, "Your child has arthritis.  You've got to do what I say."  And I said, "Excuse me?  Number one, who are you and what's going on?"  Didn't even introduce himself.  Just threw my child onto the table.

Q.   He threw your child?

A.   Threw her onto the table and aggressively manipulated her, and said, "She has JRA."  And I said, "What?  What are you talking about?"  So I got into the

Katharine Pileggi
Copy

101

whole background of the tick.  "Don't talk to me about that.  I don't want to hear it.  I don't know who you think you are, where you got your education from."

And I said, "No, we're going to logically talk about Lyme disease and ticks.  And what you're telling me makes no sense," because, number one, from a logic standpoint -- no, I'm going to speak -- you don't get arthritis overnight.  It's going to be a progressive decline.  Number two, tick bites and arthritis mimic the same thing.

But he refused to hear me and said I was crazy, and said, "You listen to what I tell you and what I recommend or there's going to be consequences."  And we said, "Thank you very much.  We're going to get a second opinion."  And that was the conclusion.

Q.  Please let me ask the questions.  I will get there.  I just really want to take this in sequence. I'm trying to finish this today.  But I need you to focus on the question that I'm asking you.

A.  Well, that was part of the question.

Q.  Please listen to my question I'm asking you, okay?  Please.

So Dr. Zemel performed an examination of your child?

A.  An aggressive examination, yes.

Katharine Pileggi
Copy

102

Q.   Okay.  So he, as you said, manipulated the joints?

A.   Yes.

Q.   What do you mean by that?  What did he do?

A.   Pulled her legs and her arms and her fingers around after he aggressively threw her up onto the table.

Q.   Did your child have full range of motion during this exam?

A.   Yes.  For the most part, yes.  She was very stiff.

Q.   What do you mean by "for the most part"?

A.   She was stiff.  She was in pain.  She didn't want to have her arms and her legs ripped around her body.

Q.   Could she fully extend her knee, for example?

A.   Yes.  They were just at that point then first starting to get swelling on both legs.

Q.   So there had been an increase in swelling from the tick bite to the time of Dr. Zemel's examination?

A.   Correct.  She started getting swelling in her knees, her ankles, and in her fingers.

Q.   Okay.  Were there any other symptoms that had developed since the tick bite?

A.   The heart palpitations were getting worse.

103

She did have -- still had the fever, which we were treating her with some Advil for and for pain, and she just felt terrible.  She just felt sick.

Q.  Aside from Advil, had you given your child any other treatment for the tick bite --

A.  No.

Q.  -- as of the time of Dr. Zemel's initial evaluation?

A.  No, because nobody would prescribe anything.

Q.  Did you bring the tick with you to see Dr. Zemel?

A.  Yes.

Q.  All right.  And he declined to test the tick for Lyme disease?

A.  He declined.  He said, "Put it away.  We don't do that here.  She doesn't have Lyme."

Q.  I'm sorry.  Say that again.

A.  He said, "Put it away.  This doesn't belong here because she doesn't have Lyme."

Q.  Okay.  So Dr. Zemel told you at this initial visit that your child did not have Lyme disease?

A.  Yes.

Q.  Did he explain to you his basis for believing that?

A.  Yes.  He pulled out blood work.  And then he

Katharine Pileggi
Copy

104

requested more blood work.  But he was talking about ANA panel.

Q.   Okay.  So Dr. Zemel pulled out blood work that had been taken previously?

A.   I'm sorry.  Pulled up blood work, which was the basis of our recommendation to him from Alder.  I wasn't allowed to see that blood work, but he talked about it to us.

MS. LINDSAY:  Slow down.  It's fine, but just slow down.

Q.   So the blood work that you're saying Dr. Zemel referred to during this evaluation, do you understand that to be the blood work that Dr. Alder had ordered?

A.   Originally, correct, yes.  Now, Dr. Zemel then ordered more blood work, which I have the printout for.

Q.   Okay.  So at that initial visit with Dr. Zemel, he ordered additional blood work?

A.   Correct.  But going back to the initial blood work, which is why we were at CCMC, I was not allowed to view the blood work, neither was Anthony.

And how he came to his conclusion based off of a very, to my knowledge, baseline blood work, do you see where -- you can't just throw things out there as an absolute, your child has JRA.  So that's when I started saying, well, we're going to sit down and we're going to

Katharine Flagg

Copy

105

talk about this.

Q.   Again, slow down.  Let's back up.  So Dr. Zemel expressed to you that he did not believe this was Lyme disease that your child had, but, rather, that it was --

A.   JRA.

Q.   JRA is what he said?  Did he use the term juvenile idiopathic arthritis?

A.   Right, which is what JA -- whatever it is, yes.  The abbreviation and the name, he used both.

Q.   Did Dr. Zemel explain to you what to you what juvenile idiopathic arthritis is?

A.   Somewhat, but I stopped him again.  I said, "No, we need to talk about what just happened to my daughter."

Q.   Okay.  So when Dr. Zemel expressed to you that he believed your child had juvenile idiopathic arthritis, you stopped him?

A.   Right.  Yes.

Q.   All right.  You did not agree with him?

A.   Neither one of us did.  We said, whoa, hold on here, because he stopped us about the tick, so I stopped him.

Q.   So in any event, Dr. Zemel clearly did not agree that your child had Lyme disease?

Katharine Pileggi
Copy

106

A.    Correct.  The head of the Lyme department didn't agree that the child had Lyme, even though we brought him the tick.

Q.    I'm still talking about Dr. Zemel here.

A.    That's who I'm talking about, Dr. Zemel. Dr. Zemel, who is head of the Lyme department at CCMC, that we brought the tick to, still didn't even believe that our daughter had Lyme disease, even though she was bitten by a tick, we brought the tick, and she was exhibiting tick-like symptoms.

Q.    Dr. Zemel, though, believed that your child was exhibiting symptoms that were consistent with juvenile idiopathic arthritis, correct?

A.    That's what he said because he wanted us to just believe in that and didn't want to go down the Lyme route.

Q.    Had you spoken to any other physician aside from Dr. Alder or Dr. Zemel at the time of Dr. Zemel's evaluation regarding the tick bite?

A.    After we left there is when we started going to Preferred Pediatrics.

Q.    That's not my question.  My question is at the time of Dr. Zemel's evaluation, had you spoken with any other physician regarding the tick bite other than Dr. Alder or Dr. Zemel?

MS. LINDSAY:  Let him finish.

A.    Sorry.  I thought you were done.

Q.    I think my question is you told Dr. Zemel during this initial visit that you wanted another opinion on whether your child had Lyme disease, right?

A.    Anthony and I both said to him we wanted a second opinion because we did not like that he was so narrow-viewed, and that we truly wanted her treated because she was sick.

So we both told him that we wanted a second opinion, which is our right, which is the basis of all of the medical kidnaps, when you ask for a second opinion and you don't agree with the doctor, because that was when he started threatening us, well, if you don't put her in surgery and start draining her knees and follow my protocol, I'm going to have to call the state on you, and your wife is crazy.  He started mouthing off to us.

Q.    When you're saying all these things that Dr. Zemel said -- again, I am still focused on this initial visit -- did Dr. Zemel say --

A.    This is the initial visit.

Q.    Okay.  Please let me ask the question.  During the initial visit with Dr. Zemel, did he say to you if you did not begin treatment for juvenile idiopathic

Katharine Pileggi

Copy

111

arthritis, he would have to contact DCF?

A.    He didn't say DCF.    He said, "If you don't listen to my advice, I'm going to have to make a phone call."    He put it out there.

Q.    All right.    So Dr. Zemel obviously made it very clear that he believed your child needed to be treated for juvenile idiopathic arthritis starting immediately?

A.    Correct.

Q.    Okay.    Did he say to you during this initial visit that in a child with juvenile idiopathic arthritis, if left untreated it can result in permanent damage to the child?

A.    No.

Q.    Okay.    Did he stress the importance, nonetheless, during this initial visit of your child receiving treatment for juvenile idiopathic arthritis immediately?

A.    No.    He stressed that we had to listen to his opinion and do it immediately.    It was more of an egotistical, I know everything, you do what I say or else.    That was it.    It was a very vague, but threatening -- again, I as a parent wanted to sit down and discuss logically what was transpiring with my daughter.    There was none of that.

113

not helping us.  So I looked up someone local that was supposed to be educated on Lyme disease, because we saw her worsening.  So we contacted someone local named Katherine Layman.  She went in, started treating Emma with natural homeopathy and other recommendations.

We started to see that she was not, in our eyes, fit, because she didn't seem confident in her plans, and we didn't want anything to happen to our daughter early on.  We were very concerned.  She was very little.

So we then found Preferred Pediatrics, 'cause we knew we needed to have a pediatrician behind us along with a tick specialist.  So we found Preferred Pediatrics, saw Dr. Lopusny, and she said, "Absolutely. This is what's going on here."

Q.    So when did you reach out to Dr. Layman?

A.    Right away after we left Zemel's.

Q.    And you said she initiated some homeopathic treatment?

A.    Right.

Q.    What treatment was that?

A.    I don't recall.  It was not like a Dr. Morse protocol with herbs and getting to the root cause.  It was more homeopathy.  And we just didn't think that it was going to be aggressive enough.

Dr. Lopusny?

A.   That would have been it.  And then we started getting Dr. Morse involved.  And I do not recall the dates, but we started putting together a team of people. She also is one that wrote in a letter, her opinion letter.

Q.   When did your child start to treat with Dr. Tranguch?

A.   That would have been after we got Emma back.

Q.   So your child was not treating with Dr. Tranguch starting around the June 2018 time frame?

A.   No.  We found her later.  Took us a while to find someone really good.

Q.   So you started with Dr. Layman, correct?

A.   Correct.

Q.   You moved on to Dr. Lopusny around the same time?

A.   Not moved on, but we needed an M.D. to back up.

Q.   Okay.  So Dr. Lopusny is a pediatrician?

A.   Dr. Lopusny is a pediatrician, M.D. Dr. Layman was an N.D.  We wanted to make sure we had both.

Q.   Sure.  What treatment, if you recall, did Dr. Lopusny recommend initially when you started

118

treating around June 2018?

A.   Because she also knows Lyme very, very well with all the kids that she treats.  She recommended the alkaline diet, herbal protocols, homeopathic protocols, and then all the things that we were doing for Emma, the reflexology, the acupuncture, the swimming.  We bought an in-home pool for her.  So everything that we were already starting to implement too, she also recommended.

Q.   All right.  So you had already been starting to implement a protocol for your child prior to consulting with Dr. Lopusny?

A.   As far as physical activities and other practitioners to come in, yes.  Reflexology, massage, you name it, she was going to on a weekly basis.  But the herbal protocols and the alkaline diet and the specifics were between her and the N.D.

Q.   Did Dr. Lopusny recommend any energy healing?

A.   That's me.  I recommended it.

Q.   Okay.  What is the energy healing that you started with your child?

A.   She did a matrix energetic, because all things come from a spiritual and trickle down into a physical. So we did her energy body.  We had her doing Reiki and Reiki massage.

Q.   Did you consult with a Reiki?

Katharine Pileggi

Copy

121

Q.   Like what?

A.   Lavender, chamomile.  Things to keep her calm while she was going through this.

Q.   Any other home remedies that you were employing in this June 2018 time frame?

A.   We bought an in-home therapy pool for her.

Q.   Okay.  So what kind of in-home therapy was your child undergoing in the June 2018 time frame?

A.   We bought a chemical-free pool for the inside of the house for her to swim in daily to get range of motion in her legs, which we have pictures of.  I'm happy to send them over.

She also was doing physical therapy at New Milford Sports Medicine.  They gave her some exercise bands, because they said with Lyme disease, it's really difficult until you clear it.

And then she was going to play therapy and swim lessons for extra swimming at New Milford Sports Club.

Oh, we also sent her to Chamomile Foods to have a kinesiology test too to confirm, which came back for the Lyme and Epstein-Barr.

Q.   What is Chamomile Foods?

A.   There is a specialist there.  He's a kinesiology specialist, and he's also very versed on

Copy

127

notate.

Q.   So you would dispute it?

A.   Yes.  That is not even verbiage he uses.

Q.   Is that your recollection of the state of your child's knees at the end of November of 2018, they looked like tennis balls?

A.   Not like tennis balls, no.  They were swollen, absolutely.

Q.   Had the swelling gotten any better between, let's say, July 2018 and November 2018?

A.   After we started implementing the herbal protocols, they started to improve.

Q.   When did you start implementing the herbal protocols?

A.   September maybe.  I don't know exact dates.  I could find them with my invoices.  But at that time DCF was fully involved.  It's important.

Q.   If Dr. Morse noted on November 30, 2018, that your child's joints are on fire, would you have any reason to dispute that?

A.   Again, this is not verbiage that he uses.

Q.   Okay.  So you don't agree that as of November 30, 2018, your child's joints were on fire?

          MS. LINDSAY:  Objection.  That's not what she said.

Katharine Diegg

Copy

132

Q.   And he made multiple calls to you attempting to get you to see someone to evaluate her --

A.   Only him.  He was the only way.  It was him or the highway.  Let's make that clear.  He threatened me, him or I'm in trouble.  I use him, his protocol or else. There was no talks about any other doctors being involved or my right to get anybody else involved.  It was him or nothing.

Q.   Do you recall whether Dr. Zemel said it had to be him specifically or whether he would be open to a situation where you consulted with a different pediatric rheumatologist?

A.   No.  Him or nothing.

Q.   Did he express concern to you during these calls in June 2018 that an N.D. or a pediatrician were not the right providers to provide treatment for potential juvenile idiopathic arthritis?

A.   No.  He was the end-all, pretty much.  That's what he said.

Q.   All right.  In any event, he advised you that if you did not return to see him to have your child evaluated for juvenile idiopathic arthritis, he was going to file a DCF report?

A.   He said if we don't use him and go his route which he recommended, he was calling the state to have

Katharine Pileggi

Copy

133

our child taken from us.  So he openly threatened me on a phone call, with Tony present.

Q.    When was this phone call?

A.    He called us for two weeks straight.  I don't know.  But DCF showed up at my door the next day.

Q.    Who from DCF showed up at your door?

A.    Torrington, Amanda Burgess.

Q.    And what happened during that meeting?

A.    Actually, the entire case through Torrington DCF was closed, because they said that we've done nothing wrong.  They even had their nurse come in.

We did a couple weeks, showed everything, documentations, all the people who were involved in her care.  There was no neglect.  All the false outlandish claims that he made against us, they closed out, and then it was done.

Q.    I understand there was a remote meeting in connection with that DCF investigation in which Dr. Layman participated; is that right?

A.    Yes.

Q.    And Dr. Layman explained to the DCF investigators what treatment your child was receiving at that time?

A.    Yes.

Q.    All right.  And it was on that basis that DCF

Katharine Fitzgeri

Copy

140

declined?

A. After they said we could only go to their doctors and no longer Dr. Lopusny. It was a whole agenda. Remove our people, only implement DCF people, get Dr. Zemel back in the mix, and create a -- see where I'm going there?

Q. Go ahead.

A. So create a whole agenda based off of only their people, because they ultimately knew what they were planning on doing with Emma later on.

Q. So did your child -- again, staying in this December 2018 to March 2019 time frame -- start treating with any of those DCF providers?

A. So because they started threatening us too with her removal, we started then bending and saying fine, we will go see your person. We didn't want to lose our child.

MS. LINDSAY: What's the time frame?

MR. PLUMRIDGE: December 2018 until March 2019.

A. So we stopped seeing Dr. Lopusny, and we had to go see Lindsey Laughinghouse, another practitioner that refused to test, refused to treat for Lyme. I said, "Why is nobody giving this child antibiotics?"

Q. Had your child received any antibiotics

Katharine Piseggi

Copy

141

through that period of time?

A.  No.  But by that time, it was too far gone.

Q.  Did you ask Lindsey Laughinghouse to prescribe antibiotics?

A.  Yes, and to test.  Refused.  But again, it was too late at that point.  Even Dr. Lopusny said -- that's why the herbal and getting to the base core of the Lyme bacteria and treating the Epstein-Barr was crucial. Once it's in, it's in, and there's no penetrating it. And this is stuff that we knew.

Q.  Setting aside Lindsey Laughinghouse, were there any other providers recommended to you by DCF that your child saw in that December 2018 to March 2019 time frame?

A.  No.  It was remove our pediatrician, replace it with their recommended pediatrician.  And that's when they started building their case.

Q.  All right.  I want to keep moving ahead here. I understand that your child experienced a leg fracture on March 1st, 2019?

A.  Yes.

Q.  Please describe for me what happened, briefly.

A.  My daughter Savannah picked her up to go to the kitchen to make her a smoothie as part of her alkaline regimen.  And Savannah slipped and dropped her.

Copy

142

And because Emma didn't have the best extension at that point and swollen joints, she didn't catch herself when she dropped her on the floor.

Q.    Did you see this happen?

A.    Yes.    I was like 10 feet away with the baby.

Q.    Did anybody else see this happen other than you and Savannah?

A.    Savannah.

Q.    That's it?

A.    Yes.

Q.    I understand that you took your child to the New Milford emergency room department?

A.    Right to the ER.

Q.    Who went with her?

A.    I think Tony and I both went, Anthony and I both.

Q.    Did you bring the entire family, then, all of your children?

A.    I don't remember.

Q.    Who would have stayed behind with the kids if you didn't bring everyone?

A.    My mom or my sister.  I don't know.  We may have.  Usually they're always with us.

Q.    Do you recall anything about the visit in the New Milford Emergency Department that day?

femur?

A. Very slightly. They looked at the X-rays, and then -- we don't have the right materials here to make what she needs, because she's so little.

Q. What was the appearance of your child's leg around the area of the femur following the fall?

A. There wasn't any change to it.

Q. There was no bruising, for instance?

A. I don't believe so, no. There may have been slight, but there wasn't like -- it was a very, very hairline. She dropped from a very small counter.

Q. Did she fall from a counter or did your daughter Savannah drop her?

A. She tried to place her up on a counter, but she didn't make it there, and she dropped Emma halfway, and she fell.

Q. All right. Do you recall what, if any, Nurse Holmes' recommendations were following the March 8, 2019, evaluation?

A. Vaccines.

Q. As far as the leg, did she make any recommendations as to how to treat the femur fracture?

A. No. She said we had to see a specialist that does children. And she recommended CCMC. We then called Danbury Hospital. We didn't want to keep

Katharine Pileggi
Copy

152

He said -- and we may even have it documented -- he said, "Whatever you're doing with Emma to treat her, I've already seen improvement, not only with how fast she's healing with her fracture, but also the swelling of her knees."  So he was very much on our side, again, until DCF got to him.

Q.   This was the first time that your child had seen Mr. Fitzsimmons, right?

A.   Correct.

Q.   Aside from commenting, as he did in that respect, did Mr. Fitzsimmons actually make any recommendations for the treatment of Lyme disease in your child?

A.   Yes, he did.

Q.   What were those?

A.   That she should have more blood testing done through CCMC for Lyme.

Q.   So he recommended additional blood tests?

A.   Which wasn't done.

Q.   Okay.  But Mr. Fitzsimmons recommended additional blood tests?

A.   Yes.

Q.   Did he make any other recommendations for the treatment of Lyme disease in your child?

A.   No.  But then later on, when DCF got involved,

Katharine Pileggi
Copy

153

he completely said no, it's not Lyme disease, and then wrote a report against us, when actually he was working with us.

He also made a false report about the removal of her casting, because she was healing so fast that she can remove the cast and she no longer needed it.  And when she went to see Dr. Robert Morse in Florida, he told DCF that I removed the cast without medical consult, which was not true.  And Tony was at that appointment.

Q.    Let's slow down.

A.    I know, but it's important.

Q.    I understand it's important, but I do have an outline, and it's in the outline.

A.    I know, but this is also my time to speak.  I've waited six years.

Q.    What I'm saying, Ms. Pileggi, is I'm trying to finish today.

A.    Understood.

Q.    I don't want to have to ask you to come back.  We really don't want to have that happen.  But this is taking a very long time.  So please focus on the questions as I'm asking them, okay?

So staying with the March 9, 2019, emergency department visit, I understand that Mr. Fitzsimmons was

He said, at this point, based off of her new X-rays and how she was doing, he said, "Remove the cast. She's good."  And he's a witness to it, 'cause he was there too.  But then he changed his story.

Q.   Okay.  When you say "he's a witness," you're gesturing to Mr. Pileggi?

A.   Fitzsimmons changed his story once DCF --

Q.   I understand.  When you say, "he's a witness to it," you were gesturing to --

A.   Anthony is a witness to it, yeah.

Q.   He's sitting in the lobby out there.

A.   Correct.

Q.   All right.  And what is your testimony as far as when Mr. Fitzsimmons changed his story?

A.   As soon as DCF got involved to remove Emma.

Q.   Was this after the visit to Dr. Morse in Florida?

A.   So they -- after she was removed and taken from me in Florida, I had realized that they were building this case prior.  The Florida trip was just a setup.  So CCMC, Fitzsimmons, and DCF all had this pre-planned.

Q.   Before we get to Dr. Morse, aside from the March 9, 2019, emergency department visit and the March 19, 2019, office visit, do you recall ever

speaking with Mr. Fitzsimmons?

A. Yes, on the phone, before our trip to Florida.

Q. Okay. When was that phone call?

A. About a week or two prior, to make sure that -- no, a week prior, because we were given the opportunity to go to Florida within, like, days, like, you do this or else. So it was like the week before we traveled to Florida, I had spoken to him to make sure that she'd be okay to fly, if there was anything I needed to bring, if we needed to change her casting. And he said, "Actually, you can remove it at this point. She's good."

Q. All right. So sometime prior to your trip to Florida, you spoke with Mr. Fitzsimmons, and he advised you that the cast could be removed?

A. Correct, which, again, Anthony was part of the conversation.

Q. All right. Do you recall any other content of that discussion with Mr. Fitzsimmons?

A. No. It was just based off of we're flying with her, what is your recommendations, is she okay, do we need to get any other casting. It was just a phone call for flying.

Q. All right. Other than the March 9, 2019, emergency department visit, the March 19 office visit,

Katharine Pileggi

Copy

172

A.    Just 'cause I don't have custody doesn't mean I don't have rights to my child.  You cannot vaccinate and do things to a child without their parents' consent.

Q.    Did you have medical decision-making authority for your child at that time?

A.    We did then, yes, absolutely.

Q.    So it's your testimony here today that you had to consent to the procedures that were performed at Connecticut Children's?

A.    Yes.  Absolutely.

Q.    Have you ever reviewed the court's order to remain in custody and placing your child into foster care?

A.    That wasn't by my choice.

Q.    Have you reviewed the order?

A.    Oh, I reviewed it.

Q.    And it's nonetheless your understanding that you had medical decision-making authority for your child while she was admitted to Connecticut Children's in March and April 2019?  You can answer the question. It's clear.

MS. LINDSAY:  If she recalls.

Q.    If you know.

A.    Yes.  I've answered that.  Especially when it comes around vaccinating.

186

Q.    Okay.

A.    They, not us.  They.  'Cause she was still -- we were still getting everything wrapped up with our last court date and restoring everything.  And so they removed her braces.

Q.    Before the time that you regained custody?

A.    He had custody of her.

Q.    But before the time that you --

A.    But before we all started living together again.

Q.    Before the time that you all started living together, the braces were removed?

A.    Right.

Q.    You mentioned that Dr. Lopusny recommended a detoxification program, right?

A.    She said put her back on what she was on before.

Q.    That's the Dr. Morse protocol?

A.    Correct.  Put her back on the clean diet.  Get her back on all the therapies you guys were doing before.  Get her off the Enbrel, because that's not what she has, and it has devastating side effects, which I'm sure you're well aware of, right?

Let's treat her for what she really has.  Get a specialist involved that's really well-versed in Lyme,

Katharine Pileggi

Copy

188

referring to?

A.    I'm sure, yeah, I think so.

Q.    And those are the panels that, as I understand it, returned positive for Lyme disease, Babesia, Bartonella, anaplasmosis, parasites, and mold?

A.    Yes.

Q.    Okay.  Do you have an understanding of what the laboratory was that produced that lab report?

A.    That one I forget.  I know it wasn't IGeneX or Galaxy.  I have to look back.

Q.    What was the first one?  I'm sorry.

A.    It wasn't IGeneX, I don't think, or Galaxy.

Q.    IGeneX?

A.    Yeah, which is a very well-known tick lab.  But we do have all of her diagnoses on every lab.  Like, IGeneX, Galaxy, Tara's.  And then we had another one done too, and then Moorcroft.  But they all showed the same thing.  They were consistent.

Q.    Do you have in your possession, not here today, obviously, but generally that December 2021 lab report?

A.    Yes.

Q.    Has your child ever received a medical diagnosis of Lyme disease?

A.    Yes.

Katharine Pfleghar

Copy

189

Q.    By whom?

A.    Dr. Lopusny, Tara Tranguch, Dr. Moorcroft, LifeWorks Wellness Center, Dr. Minkoff and his associates.    And who else -- yes.    So four or five.

Q.    Let's go through those.    Dr. Lopusny is a pediatrician, right?

A.    Yes.

Q.    Correct?

A.    Yes.

Q.    Dr. Tranguch is an N.D.?

A.    Yes.

Q.    And I apologize, but I lost track after that.

A.    LifeWorks Wellness Center.

Q.    Who are they?

A.    They are out of Florida.    They do a more comprehensive, like, panel.    So we wanted to go another step further.    Plus, they provided an ozonation for her blood, because of the broken blood from what the coinfections had done.    So we implemented them as well into the mix to give her services to heal faster.

So we had LifeWorks, who also did a panel, plus looked at her blood under the microscope, and then gave us that therapy, the in-home therapy with the ozonation.    And then we had Moorcroft.

Q.    I'm really sorry to interrupt.    I'll get back

191

So as she's healing, we were providing her all these extra therapies to heal the body faster.  So that's why we chose who we chose, but also respectable.

Q.   So as far as providers who have made a medical diagnosis of Lyme disease in your child, I have Dr. Lopusny, Dr. Tranguch, Dr. Minkoff, potentially someone else at LifeWorks --

A.   Right.

Q.   -- whose name you do not recall sitting here right now.  Dr. Moorcroft?

A.   Correct.

Q.   Is there anyone else that you recall?

A.   No, other than her chiropractor down in Florida who did X-rays, 'cause, again, I explained to him her history, and I said they were saying that, you know, arthritis, seems like you could just look at her X-rays.  He's like, "Lyme.  There's no sign of arthritis."  He said, "That's completely false."  So that would be the only other person.  He has the X-rays.

Q.   The chiropractor?

A.   Her chiropractor down in South Carolina.

Q.   Is that McIntyre family?

A.   Yes, 'cause we were doing chiropractic treatments as well as everything else.

Q.   All right.  So it's April of 2025.  How is

Katharine Pileggi

Copy

192

your child doing right now?

A.    Perfect.

Q.    Is she currently able to walk?

A.    Oh, yeah.  She's a skier.  She does ballet. She does gymnastics.  She's a runner.  She does pool, she does swimming.  She does it all.

Q.    She's 10 now or almost 10?

A.    She'll be 10.

Q.    Is she in public schools right now?

A.    Private school.

Q.    Does she require the use of any assistive devices to ambulate?

A.    No.  She's starting track this year.

Q.    You mentioned skiing, ballet.

A.    Gymnastics, swimming.  She was on the swim team down in South Carolina.  That's all she's doing this year.  And then track this spring.

Q.    So she did swim in South Carolina, you said?

A.    She did swim in South Carolina.

Q.    When was she able to start swimming on, like, a team?

A.    Right away, after we -- Emma was very --

        MS. LINDSAY:  When you say "right away," clarify.

A.    Let me clarify that.  When Emma returned to

246

records, which now I know is not the full extent of it, and I looked over it, Tony and I are like, they vaccinated her.  And we had talked to our attorneys previous to Attorney Lindsay --

Q.   Well, I don't want to know about those conversations.

A.   No.  No.  Well, that it's not -- you can't do that.  Even if DCF steps in to remove a child, you can't do that, especially when you have religious exemptions involved and that sort of thing.

Q.   Did you claim a religious exemption?

A.   All of my kids have religious exemptions.

Q.   Do you have those in writing somewhere?

A.   Oh, yeah.  They're all filed.  They're all in the school file.  Emma has a religious and a medical exemption as well.

Q.   What's the medical exemption?

A.   From the Lyme, from Dr. Lopusny.

Q.   Dr. Lopusny.  Okay.  And I understand the inflammatory diet that's referenced during the During Removal paragraph -- I think you mentioned the dietitian at Connecticut Children's who brought your child, I think you mentioned McDonald's and Taco Bell; is that correct?

A.   Correct.

Katharine Pilleggi
Copy

247

Q.   Anything else as far as improper diet that's encompassed in this paragraph?

A.   Yes.   Mac and cheese, Jell-O and pudding cups, cheese sticks.  So again, from a logical standpoint, right, even if you know nothing about medical, if a child has anything inflammatory, whatever you want to call it, we don't have even have to look at Lyme disease, if the child has inflammatory symptoms going on, why would you feed them inflammatory foods so that it will fuel that?  Because it just reiterates the problem and makes you look like, oh, yeah, she has this problem going on.  But you're further perpetuating.

So wouldn't you want to feed a child good, wholesome food that's trying to heal and has an inflammatory problem?  So, yeah, McDonald's, Taco Bell, cheese sticks, mac and cheese, pizza.

Q.   All right.  Has any -- well, strike that.

A.   Can we just go back to that quickly?  Do you want to look at the before and after photos of Emma from --

MS. LINDSAY:  I'm going to turn them over.

Q.   So my understanding is there's going to be some production, and it will happen between now and Thursday.  So I'll take a look at it and we'll talk