Exhibit C

**CERTIFIED COPY**

**In The Matter Of:**

*Katharine Pileggi, Anthony Pileggi Also, as Next Friend to their Minor Child "EP" v. Kim Mathias Assistant Attorney General State of Connecticut, in her individual and Official capacity, Kaela Minerly in her Individual and official capacity, Frank Rotovnik in his individual and official capacity, Connecticut Children's Medical Center, Dr. Roman Alder, Dr. Lawrence Zemmel, Dr. Lindsey Laughinghouse, Dr. Andrew Bazos, Dr. Kevin Fitzsimmons, Connecticut Department of Children and Families ("DCF") and "John and Jane Does 1-10"*

_____

*Kaela Minerly*

*August 1, 2025*

_____

*A Plus Reporting Service LLC*

that time?

A.   No.

Q.   When a child is in a hospital and they're in DCF custody, who do the doctors consult with?

MR. TUCKER:  Objection as to form.

BY MS. LINDSAY:

Q.   If you know.

A.   I mean, the hospital decides what treatment needs to be made.  Do you mean consent for treatment?

Q.   Consent for treatment, yes.

A.   It is determined -- it depends on the legal status of the child.  If DCF is legal guardian, DCF would make those decisions.

Sometimes kids are in DCF custody and the court grants the department educational or medical decision-making.  It depends on the legal status or what the legal orders are in place at that time.

But when a child is removed under OTC and in under only an order for temporary custody, the biological parent typically, if that's the family makeup, remains the legal guardian.

So, say, for example, a child is under an order of temporary custody and they become committed to DCF, it's at that time of commitment that DCF

BY MS. LINDSAY:

Q. You can answer.

A. I'm not sure.

Q. Under what circumstances -- withdrawn.

Have you ever had -- please describe a circumstance if you had, if you experienced -- withdrawn.

Before DCF takes custody of a child through a petition in court, are the parents notified that the filing will take place?

MR. TUCKER: Objection to form.

A. So the department, the way that -- they should be. They should be.

BY MS. LINDSAY:

Q. Okay.

A. So unless there's a safety reason. So again, when you look at this role, this professional role from a place of safety, it has to come with consideration and understanding of the fact that sometimes people make unsafe decisions, so the department has to ensure child safety even with the decisions being made.

So for safety reasons would they not be notified? That is possible, yeah. Whenever a parent can be notified they certainly should be. Even if we

that case may warrant.

Q.    Okay.

A.    But sometimes we file a petition and it's a conversation between the family and the social worker.  It's not always a meeting but we do offer those meetings when our removal occurs or it's about to.

Q.    In the case of Emma's Pileggi -- withdrawn.

In the considered removal meeting, the parents are involved?

A.    Absolutely.

Q.    They're there?

A.    They must be.

Q.    And at that time -- I'm just walking back. They're pretty much informed of the concerns that DCF has, is that what occurs at those meetings?

A.    Correct.  And also, as I said, best case practice is for those meetings to occur prior to removal and in some cases it can't and it happens afterwards, but yes.

Q.    Okay.  Prior to the -- it is considered removal?

A.    Considered.

Q.    Thank you.

Prior to the considered removal meeting, is there anything that takes place?  In other words that indicates to the parents that the situation has gotten worse and this can be the next step.

MR. TUCKER:  Objection to form.

A.    Well, I mean, that should be the whole investigation process, right.  We're involved because of a concern.  Typically, the agency gathers their information, reviews it with parents, talks about what the concerns are, what needs to be done to mitigate that concern.

And we can, of course, make recommendations and parents can say no, I'm not doing that or yes, I got it.  It's really like if the safety concern remains, like if we have a reason to say, We're considering removing this child, that would be a time to have that meeting.

BY MS. LINDSAY:

Q.    Up until the time that the case was transferred from you, you had made three to four home visits, you said, with the Pileggis?

A.    I believe three, yes.

Q.    And at that time in your opinion was there a need to remove the child?  Was there a safety concern that warranted immediate removal of this

child?

MR. TUCKER:  Objection as to form.

A.      I didn't find an imminent threat to Emma's safety during my home visits to the home.  My involvement was really surrounding fact gathering. I had a lot of conversation with Mr. and Ms. Pileggi about what was going on with Emma and their efforts to treat her condition.

Yes, I was looking at small child who could walk that wasn't.  She had visible discomfort, however, Mr. and Mrs. Pileggis were reporting to me and demonstrating to me and working cooperatively with me to demonstrate all they were doing to address those concerns.  And so what I had done was reached out to all of the providers working with Emma to get a sense of what were their assessments, what were their concerns, what were they doing.  Did they have concerns of abuse or neglect.

I am not a medical expert and her medical condition is complicated and complicated for everyone to really meet her needs through.  So a lot of my conversations with Mrs. and Mr. Pileggi was, I understand these are the treatments that you're moving toward or utilizing, are they working.  Right. And so, is this effective for Emma.

A lot of their requests for information that I had made sort of remained -- I did get some things back but a lot things remained pending.  I did have a lot of challenges reaching people during that timeframe.  I don't know if, like, the holiday season played a role in that.

BY MS. LINDSAY:

Q.   When you say people, what people?

A.   So medical providers, her primary care doctor.  Mom was working with a therapist at the time.  I reached out to that provider.  So you'll see a lot in my notes was called, called, followed up, followed up.  I was really working with the parents to understand where Emma was at in terms of her treatment.

Q.   Okay.  And in your experience, were the Pileggis responsive to your requests?

A.   They were.

Q.   Okay.  I noted in your notes a few times -- I'm trying to find specifically where it was.  It took a little bit for Emma to warm up to you at certain points when you went to the house?  You described your interactions with the different children.

A.   Okay.  Emma, when you say warmed up,

Q.    And Mr. Morse's clinic was going to send you information but you hadn't gotten it, is that what you're saying?

A.    I had sent, we have what are called Collateral Requests for Information forms and I sent those out and made phone calls. I was waiting for information to come back.

Q.    And the case was transferred?

A.    Anything that came in after the fact when it came to me I gave it straight to Frank although I don't ever recall that even happening.  I think everything that came in went separate to him. And Mrs. Pileggi had given me documentation, I printed that and gave it to Frank as well.

Q.    Does DCF have a naturopath doctor or nurse on staff?

A.    Not to my knowledge.

Q.    Okay.  So the only person to consult with in terms of their alternative treatment were medical professionals?

A.    Yes.  And then we have like our nurses. They have their own chain of command, too, right.  So they consult on their case and talk to their chain of command about the medical pieces.

Q.    But, to your knowledge, there is no one

that's, I guess, degreed or is a specialist in naturopath?

A.    I'm not sure.

Q.    Did you speak with anyone concerning this case that was a specialist in terms of naturopathy?

A.    Internally at DCF, no.

Q.    Okay?   Do you have a nutritionist on staff at DCF?

A.    Not to my knowledge.

Q.    So in terms of Emma Pileggi who was on a vegan diet and antiinflammatory diet, there would be no one at DCF to consult in terms of that particular, I guess, regimen or her diet in terms of whether it was healthy or not --

MR. TUCKER:   Objection to form.

BY MS. LINDSAY:

Q.    -- for her?

A.    I would consult our nurse.   That's who I would consult when it comes to that.

Q.    Okay.   And again, that was Ms. Velez?

A.    Yes.

Q.    Aisha?

A.    Yes.

Q.    Are you aware of any circumstances in your time as a social worker where a child was removed

Kaela Minerly

Q.    Well --

A.    Part of filing a neglect petition is having the court order specific steps.  And sometimes in those specifics steps at court, right, like the court will order be it by DCF recommendation or attorneys' agreement or whatever, some of those specific steps can include the parent cannot leave the state with their child.

I'm speaking in general, not with Emma because I don't know if that was the case.

Q.    Right.  If that occurs, you're saying it's supposed to be done by court order.  If there are restrictions placed on a parent's ability to travel with the child, it's done by court order is what you're saying?

MR. TUCKER:  Objection to form.

A.    Uh-hum.

BY MS. LINDSAY:

Q.    And if it's done by court order, the parent is then notified of that, correct?

A.    So if it's done by court order, the court is responsible for noticing parents and, you know, court ordered specific steps receive a physical copy, the parents sign them.

Q.    So it's a typical court case?

A.    Juvenile Court, yes.

Q.    So if a parent is not told that there are restrictions on travel with a child, that parent can travel with the child who is in their custody, correct, unless specifically told not to?

MR. TUCKER:  Objection to form.

A.    It's not just being told, parents have the right to if the child is in their custody and guardianship, they have parental decision-making around that.  If DCF is the custodian or there are court orders in place or DCF is the guardian, then as the guardian DCF can make that decision.  But yeah, otherwise, even if parents say, Yes, sure, I won't do it and then they go do it, DCF can take a separate action but that's not -- there's not a -- there is not oversight to that, it's just a verbal agreement. Does that make sense?

BY MS. LINDSAY:

Q.    Understood.  But if they're restricted, it has to come by court order?

A.    Right.  For all people.

Q.    I'm just asking.  I'm a mere attorney walking my way through this.

In the investigation of the Pileggis case, did you speak with the caller who had made the

**Kaela Minerly**

to all the providers, getting all the information, and I don't know if Mr. Pileggi was present for appointments or not, but seems to have an equal understanding what the plan for her was as was Mrs. Pileggi, but Mrs. Pileggi was sort of spearheading it all.  Took the lead, but I don't want to make it sound like he wasn't involved.  He was very involved and an active parent.

Q.    Okay.  Just asking because it seems like when the case was discussed the focus was primarily on Mrs. Pileggi many times.  I wanted to understand.

A.    Yes.  It's the whole family we were focused on.

Q.    In your experience as a social worker, a social work supervisor, have you ever encountered a case where DCF required a couple to be divorced in order to regain custody.

MR. TUCKER:  Objection to form.

A.    No.

BY MR. TUCKER:

Q.    Is that a policy or procedure?

A.    No.

Q.    At DCF?

A.    No.

Q.    Is it a policy or procedure that for a

safety concern is mitigated.

Honestly, in my experience one parent will say, I will leave or go here or there to assure safety, or in order to enroll the child in the right school, whatever, that child's welfare piece is. So it's not a policy but does it happen, yeah.

Q.    And in your experience, when that happens what is usually the situation or circumstances surrounding that?

MR. TUCKER:  Objection to form.

A.    It depends.  Like I said, it has to be a safety reason or people have the right to decide. Like sometimes a person will say, You know what, this relationship I have with this person is causing these other challenges in my life, be it whatever, I choose to leave this person.  In doing so the safety concern is mitigated.  Our agency wouldn't object to that. Do you know what I mean?

Q.    I do.  But when DCF -- have you had a situation where DCF required --

A.    No.

BY MS. LINDSAY:

Q.    -- that person to leave, a person to leave their home?

A.    No.  I have had discussions where there is

Kaela Minerly

a safety concern in a physical home and the parent has agreed, like in response to the safety concern I agree to leave the home or I agree to stay with my mother or I agree to stay with somebody else, but it's not -- you can't force somebody to leave their home.

Q. In that situation, in other words, what has to occur for a parent to have to be -- or to be suggested to leave their home for the child to come back home?

MR. TUCKER: Objection to form.

BY MS. LINDSAY:

Q. In other words, the level of danger or safety?

A. Imminent danger. It has to be unsafe. It can't be at risk, right. We could all possibly in a certain set of circumstances something could happen but it's not a decision made on a woulda shoulda coulda. This is a concern right now. We need to make sure it's safe for today for permanency, right. So if we say, okay, we're going to reunify this child knowing there is a safety concern, how is the agency then achieving permanency for that kid. Right, we want to make sure we're sending you to a safe, stable, ongoing place forever, not for right now,

right.  Not until something else happens, we want to make sure that permanency piece is there.

Q.    In your experience, as a social worker or supervisor, have you or anyone, to your knowledge, any of your colleagues, to your knowledge, instructed a parent that they could not seek treatment for their child by a particular medical provider?

MR. TUCKER:  Objection to form.

A.    Can you just rephrase?

BY MS. LINDSAY:

Q.    Sure.  In your experience as a social worker or supervisor, have you ever had an occurrence or know of one where a parent was restricted to what medical provider they could seek treatment from for their children?

MR. TUCKER:  Objection as to form.

A.    Only by court order, right.  So there has been times the Juvenile Court has said, DCF, you're making medical decisions, or DCF and parent or just parent, the court has ordered that the Department or the parent will seek treatment for the child via X, Y, Z but not like DCF specific, no, unless there was something overtly dangerous I would say, Do not take your child to that dangerous whatever, but unless the parent said, Too bad, I'm going anyway, then we'd

have to take action but it would have to be imminent.

BY MS. LINDSAY:

     Q.     As far as the consent decree, wasn't there a goal that placement with children removed from homes should be primarily with families when possible?

               MR. TUCKER:  Objection as to form.

     A.     I don't know about that specification of the consent decree.

BY MS. LINDSAY:

     Q.     Is that a goal of DCF?

               MR. TUCKER:  Objection as to form.

     A.     The Department always aims to place a child with someone that they know before strangers when you're able to do so.

BY MS. LINDSAY:

     Q.     What are the requirements -- I know you said they have to do through foster care, do you know specifically any of the requirements for placement recommendations that DCF would be looking for?

               MR. TUCKER:  Objection as to form.

     A.     Yes.  It does go through our foster care division but I don't know all the policies and procedures but I do know the agency does work hard to license relatives.  Like, there are some times when

are times when families truly don't have anyone they can name or who they know is appropriate and a safe person.

We have had times where a child says, My best friend is Timmy and Timmy's mom and I stay there sometimes. We go and make contact with Timmy's mom because, you know, our child's mom may not know Timmy's mom. So it depends on the circumstances of the family. So that's -- it's not always 15, it's not always zero. Most people have at least one safe person in their life that we can explore. At least one.

Q. At least one. And if that one person is someone that checks all the boxes, that's the preference to place the child with that person?

A. Correct.

MR. TUCKER: Objection to form as to that question.

A. And that person also has to be willing to do it. It's a high threshold to be a foster parent. It's the hardest job to be a relative foster parent. It requires a lot of work. That team work about it is really important too.

BY MS. LINDSAY:

Q. You say it's a lot of work. Describe that

BY MS. LINDSAY:

Q.    Okay.  Did you say you spoke with the grandfather?

A.    Yes.

Q.    The maternal grandfather?

A.    Yes.

Q.    How many times?  Approximately how many times did you speak with him?

A.    I definitely only spoke with him once. The case had just been reassigned from me and he had called me and then I said I'd speak with him for a moment and let him know the case had been reassigned. I want to tell you I gave him Frank's information, I'm sure I did that, but I was no longer involved so I remember I typed that note and sent it.

Q.    You didn't speak with him to get a sense of whether his report was disingenuous or not?

A.    Correct, yes.

Q.    When you filled Mr. Rotovnik in on the case, did you speak to your thoughts as to whether your impression regarding the grandfather's report?

A.    No.  I don't recall ever doing that.

Q.    Okay.  Did you ever speak to the grandmother or anyone else in the family?

A.    No.

provider in Florida and this provider had no idea about some of Emma's specific circumstances in Connecticut that would be of concern.

BY MS. LINDSAY:

Q.    How does DCF view a parent's disagreement with medical treatment, recommended medical treatment for their children?

MR. TUCKER:  Objection to the form.

BY MS. LINDSAY:

Q.    Based on your experience.

A.    I'm not sure how to respond to that on behalf of the entire agency.  People have the right to decide how they're going to treat their child medically.  Where it can be neglect and where DCF may enter is if that treatment is having an adverse impact.

Q.    And at the time -- during the time that you were the social worker on the matter, did you form an opinion as to whether or not the treatment Emma was receiving or not receiving had an adverse impact on her health?

MR. TUCKER:  Objection to the form of the question.

MR. PLUMRIDGE:  Same objection.

A.    I didn't ever formulate an opinion of it,