# Exhibit E

**CERTIFIED COPY**

# In The Matter Of:

*Katharine Pileggi, Anthony Pileggi Also, as Next Friend to their Minor Child "EP" v. Kim Mathias Assistant Attorney General State of Connecticut, in her individual and Official capacity, Kaela Minerly in her Individual and official capacity, Frank Rotovnik in his individual and official capacity, Connecticut Children's Medical Center, Dr. Roman Alder, Dr. Lawrence Zemmel, Dr. Lindsey Laughinghouse, Dr. Andrew Bazos, Dr. Kevin Fitzsimmons, Connecticut Department of Children and Families ("DCF") and "John and Jane Does 1-10"*

_____

*Frank Rotovnik*

*September 3, 2025*

_____

*A Plus Reporting Service LLC*

A.    I don't know what you mean.  What do you mean?  Specific like what trainings we've had, I don't recall.

Q.    What trainings have you had?

A.    I don't recall at this point in time. I know we've had trainings on medical concerns and neglect but I can't tell you specifically what trainings I have had specifically on medical neglect.

Q.    What is the last time you had the training in investigating medical neglect cases?

A.    I don't recall.

Q.    Have you ever had training with regard to medical neglect cases when it comes to alternative medicine?

A.    I don't recall.

MR. TUCKER:  Objection as to form.

BY MS. LINDSAY:

Q.    Have you ever had or attended training with regard to in terms of medical neglect and dealing with experts?

MR. TUCKER:  Objection to form.

BY MS. LINDSAY:

Q.    Medical experts.

A.    Had a training with a medical expert is

Response to Plaintiffs' First Request for Interrogatories, marked for identification.)

BY MS. LINDSAY:

Q.    Mr. Rotovnik, what was placed in front in you, Defendants' Responses to the Plaintiffs' First Request for Interrogatories, the document was signed by you, correct?  Have you seen this document before?

A.    I don't see my signature.  Here it is. Yes.

Q.    Have you seen this document before?

A.    Yes.

Q.    The responses in here are your responses, correct?

A.    From what I recall, yes.

Q.    Okay.  Interrogatory No. 2 you object to it.  You objected but stated your current role, right?  You said you do not generally conduct investigations of medical neglect but you just you told me a little while ago you told me you have done tons of them?

A.    I don't do any medical neglect.  I'm in foster care.  I haven't done them in almost two years.  November will make it two years.

retained the case until its completion?  In other words, did you see the case through to its completion with DCF?

A.   I believe so.  I believe so.

Q.   Prior to your position as supervisor in the Danbury office, what was your position?

A.   I was an investigative social worker and then I was an on-going social worker.  Ongoing investigative and then ongoing again.

Q.   When were you -- what timing?

A.   I don't recall.

Q.   -- of investigative social worker?

A.   I think I was put in investigations about five or six months after I started so it was either January of 2015 maybe, around that time, give or take.  Around that time a month or so.

Q.   So you were hired as a social worker?

A.   I'm still a social worker, so investigating and on-going, still the title social worker so I can see how that's confusing.

Q.   So when you were initially hired, you were hired into the service division of ongoing?

A.   Correct.

Q.   And then you were promoted?

A.   Not really promoted.  It's kind of

is neglect already on the case?

Q. Anything.

A. No, nothing that I can recall.

Q. Do you recall at what point you spoke with the RRG nurses?

A. It was throughout the case. I don't recall specifically when.

Q. Do you recall why you consulted with them?

A. Yeah. Any time there is any kind of medical providers involved we bring in the RRG nurses to communicate with the medical providers.

Q. Did you communicate with any of the medical providers yourself?

A. Possibly. I don't recall.

Q. Did you speak to Dr. Zemel?

A. I believe so, with my supervisor. I had spoken to him several times at the hospital as well.

Q. When you say at the hospital, is that when DCF took Emma into custody?

A. Yes.

Q. Did you speak to Dr. Zemel prior?

A. Yes. There was a concern. I don't know if it was me and my supervisor, just me or just my supervisor, but it's in my protocol where Dr. Zemel

Q.    Okay.

A.    Would you like me to keep looking?

Q.    Yes, you can.  Page 25?

A.    Where are you referring to on page 25?

Q.    Where it says 2/6/19 halfway down, a little less than halfway down:  Case reassigned to ISW Rotovnik.

A.    Yeah, but I don't see Dr. Zemel here. Didn't you ask me to look for my consultation with Dr. Zemel?

Q.    Well, yes.  I was just saying this looks like -- it looks like where your piece began.  If I'm wrong, find it.

A.    You're right.  Case reassigned to Social Worker Rotovnik.

Q.    Does that help find what you're looking for with regard to Dr. Zemel?

A.    No.  It just gives me a date to start off with.

Q.    Not a problem.

A.    Page 42, notes in the Supervisory Conference:  Dr. Zemel contacted RRG Nurse Aisha Velez and was very irate -- very irate with the Department not removing Emma from her parents care during the first case in Torrington.  Dr. Zemel will

Q.    We'll go through them after.  We'll take a break and then dig into the documents.

Did you ever initiate a call to Dr. Zemel?

A.    I don't recall.

Q.    Were you aware of Emma's other practitioners?

A.    Yes.

Q.    Do you recall their names?

A.    Dr. Lindsey Laughinghouse, Dr. Bazos. I don't recall.  There was five different reports that came in from five different providers and two non-accepted reports from two different providers.

Q.    What does that mean?

A.    It could be that it was not accepted to the department because the concern was already being addressed so like --

Q.    You're talking about reports of neglect or abuse?

A.    Correct.

Q.    Okay.  So you're saying that the reports that came in were from Laughinghouse, Bezos and who?

A.    I don't recall the rest.

Q.    Well, some Zemel you already named?

A.    Correct.  Fitzsimmons was an orthopedic, I believe.

this matter.

Q.   I'm talking about during your time. I spoke with Ms. Minerly.

A.   All right.

Q.   I'm asking during your time working on the case specifically, not Kaela Minerly.  I can't ask you about her.  I can only ask about you.  You don't recall DCF forbidding the Pileggis from taking her to specific doctors?

A.   I do not.

Q.   They were free to see any doctor?

A.   Yes.

Q.   So what happened with Mr. Morse?

A.   Mr. Morse is not a doctor.  Mr. Morse was not -- they were continuing to see Mr. Morse.  There was never a refusal that they were told not to see Dr. Morse.  They were seeing Mr. Morse the entire time.

Q.   So please describe why -- please describe what happened in Florida.

A.   What do you mean?

Q.   Do you recall what happened when Ms. Pileggi went to Florida with the permission of DCF?

A.   What do you mean do I recall?  I know

**Frank Rotovnik**

what happened.  She went to Florida.

Q.    Do you recall when Emma was -- when DCF took custody of Emma?

A.    I believe it was March of 2019.

Q.    Do you recall the circumstances around that?

A.    Yes, it was in Florida.

Q.    Then why are you asking me, acting as if you don't know what I'm talking about.

MR. TUCKER:  Object to the form of the question.

A.    I'm confused by what you're saying.

BY MS. LINDSAY:

Q.    In March of 2019 --

A.    Right.

Q.    -- is that when Emma Pileggi was taken into custody by DCF?

A.    Yes, I believe.

Q.    Do you recall where that was?

A.    In Florida.

Q.    Do you recall why Ms. Pileggi went to Florida?

A.    Ms. Pileggi took Emma.

Q.    And Ms. Pileggi was free at that time to take Emma to Florida to see Dr. Morse?

A.    Correct.

Q.    Do you recall that DCF made a call to Florida DCF regarding Ms. Pileggi?

A.    I was informed that by my supervisor.

Q.    By your supervisor.  Do you recall who made that call to Florida DCF?

A.    I do not know.  I believe it was my supervisor.

Q.    Okay.  And did your supervisor tell you, as the investigating social worker assigned to the case, why she called DCF in Florida?

A.    We were removing Emma.  They had to contact Florida.

Q.    Do you recall why DCF waited until Ms. Pileggi got to Florida to remove Emma?

MR. TUCKER:  Objection to form.

A.    Rephrase.

BY MS. LINDSAY:

Q.    Why did they wait until Ms. Pileggi got to Florida?

A.    I believe Ms. Pileggi did not have an appointment that day.  She went to Florida without an appointment.  What we heard from Mr. Morse was the same things that we had heard prior. Ms. Pileggi was measuring all Emma's swelling.

I don't believe she was capable of doing that.  And Mr. Morse was saying she was doing great.  Her swelling was down 50 percent.  Her joints were acting better.  When we asked Mr. Morse who was making these measurements, he had stated it was Mrs. Pileggi.

Q.    When did you speak to Mr. Morse?

A.    I'm not sure.  I believe it was around the time Emma was removed.  I believe it was me and my supervisor.

Q.    Are you aware of whether or not Ms. Pileggi contacted DCF before she went to Florida?

A.    Yes.

Q.    Did she or did she not?

A.    Am I aware she did, yes, she did.

Q.    Yet DCF said that she could go?

A.    DCF can't stop her from going.

Q.    That's not what I asked you.  Did DCF allow her to go?

A.    We cannot stop her from going.  There was no allowing.

Q.    Did they object to her going?

MR. TUCKER:  Object to the form of the question.

**Frank Rotovnik**

luckily Mr. Morse was there the day of because he was not scheduled to have an appointment with her. Mr. Morse did see Emma that day.

Q.    So because she did not have an appointment with Mr. Morse, was that a reason to take Emma into custody?

MR. TUCKER:  Object to the form of the question.

A.    I don't know.

BY MS. LINDSAY:

Q.    Was Ms. Pileggi made aware that DCF was going to take Emma into custody prior to leaving?

A.    No, we would not inform anybody that a removal would be taking place.

Q.    Okay.  So are you aware of how or when Ms. Pileggi contacted DCF to inform them, to inform your agency about her trip to Florida?

A.    I don't recall.

Q.    So you don't know that.  You don't know the specific time when she left or how protracted a time was between her informing DCF and her actually leaving?

MR. TUCKER:  Object to the form of the question.

A.    Can you rephrase that, please.

the question.

BY MS. LINDSAY:

Q.   You can answer.

A.   Rephrase.

Q.   What is the next step taken by DCF if there's a case that is outside the wheelhouse of knowledge for your medical staff?

A.   I don't know.  We went to our medical director.  We went to our RRG supervising nurse appeared to have knowledge and worked on the case.

Q.   So there is nothing that's done outside of the RRG nurses?

MR. TUCKER:  Object as to the form of the question.

BY MS. LINDSAY:

Q.   There is no other staff, no outside medical expert that is consulted?

A.   I don't know.

Q.   Sir, I'm asking you what you did.

A.   I'm saying I don't know.  What did I do --

Q.   You don't know what you did?

A.   I know what I did.  I consulted with our RRG team and you asked me if there is something else we go to and I responded I don't know.

**Frank Rotovnik**

working on.

Q.   So then you'll all just operate on misinformation then?

                    MR. TUCKER:   Object to the form of
               the question.

A.   That's very inaccurate.

BY MS. LINDSAY:

Q.   Do you have information -- do you have knowledge of juvenile idiopathic arthritis?

A.   No.

Q.   Do you have knowledge of Lyme disease?

A.   No.  We consulted with doctors that did, such as Dr. Zemel.

Q.   Does Dr. Zemel have a study in naturopathic medicine?

A.   He has studied in rheumatoid arthritis which is what the diagnosis was of Emma.

Q.   And he also heads up the Lyme disease clinic at CCMC, correct?

A.   I don't know.

Q.   You don't know?

A.   I don't recall.  No, I don't know.

Q.   Wow.  Okay.

                    MR. TUCKER:   Objection to counsel's
               use of the word wow.  Move to strike it.

figure out how to ask this question.

What was the reason that you understood Ms. Pileggi was in Florida?

A.    To see Mr. Morse.

Q.    Okay.  Was that the information provided to DCF in Florida as to the reason why she was there?

A.    I don't know.

Q.    In your time as a social worker with DCF, how many instances are you aware of that DCF has traveled, contacted DCF in other states to take a child into custody?

A.    I don't know.  I can't answer.

Q.    Have you ever had that happen?

A.    I don't recall.

Q.    You don't know if any of your cases -- let's talk specifically your cases.  Have you ever had a case whereby you had to contact DCF in another state --

A.    Yes.

Q.    -- to take a child into custody from its mother?

A.    No, not that I recall.

Q.    Have you ever had a case where a child was taken from its mother at gun point?

A.      Not that I'm aware of.

I'm a little uncomfortable with you constantly looking at me and giving me dirty looks.

MS. PILEGGI:  It's my deposition. I'm allowed to be here.

MS. LINDSAY:  She's not giving you dirty looks.

THE WITNESS:  I don't know if you can see her.

MS. LINDSAY:  I can.  She can sit here.

THE WITNESS:  I didn't say she can't. I'm just stating a fact.

MS. PILEGGI:  He's just uncomfortable.

MS. LINDSAY:  Let's take a break.

THE WITNESS:  Okay.

(A recess was taken from 12:03 p.m. to 12:27 p.m.)

BY MS. LINDSAY:

Q.      First off, do you remember speaking to a Dr. Katherine Layman?

A.      I don't recall.

Q.      Do you recall if the Pileggis signed a release?

**Frank Rotovnik**

A.   It says medical release at the top.

Q.   With regards to what doctor particularly?

A.   Katherine Layman.

Q.   You don't recall seeing this ever?

A.   No.   There is no DCF -- there is nothing that I see.

Q.   Did you look at it to see if it says DCF? Do you see this page back here?  Is that a DCF document?

A.   Yes.

Q.   So is that a release of records that is being released to DCF for medical records?

A.   Dated 7/12/18.

Q.   So that is a release signed by the Pileggis to speak with --

A.   I'm not sure whose signature this is but if Ms. Pileggi says it's her signature, correct.

Q.   To receive medical records from Dr. Layman, correct?

A.   Correct.

Q.   You said in 2019 when you became the supervisor at Danbury -- is it the Danbury office? You were reassigned Emma's case, correct?

A.   I was reassigned the Pileggi case.

Q.   Emma Pileggi.  And so in October of 2020

already provided releases?

A.   I don't know that.

Q.   But you knew releases were on file?

A.   I believe so.

Q.   So when you testified earlier that you don't know if you had permission or releases to talk to -- you couldn't recall whether or not Ms. Pileggi provided releases to talk to providers, she did in fact provide releases, correct?

MR. TUCKER:   Object to the form of the question.

A.   I believe what was stated or what the question was from what I recall we just talked about was certain providers.  I didn't state which ones were not and which ones were, so -- we had an on-going conversation with Morse's office.

BY MS. LINDSAY:

Q.   In that email when she's being asked by Ms. Kermashek, why would the doctors need permission for Emma to travel outside of the state, that's because Ms. Pileggi was free to move about with Emma?

A.   We were not restricting her.

Q.   You were not restricting her travel or her access in February?

Frank Rotovnik

A.    If you're asking if it's protocol to have police involved, it's not.  Do they have police involved often, we do.

Q.    Under what particular situation are police involved?

A.    Safety, confrontation for us and the family.

Q.    And during your time investigating the Pileggis' case, did you have any reason to feel that there were safety risks to approaching them?

A.    No.

Q.    Did you ever feel a need to elicit the need of police in going to their home and speaking to them?

A.    No.

Q.    So in a situation like this, would this have been -- is this considered out of the norm of standard protocol?

            MR. TUCKER:  Object to the form of
            the question.

A.    I can't state what norm is for DCF.

BY MS. LINDSAY:

Q.    Well, you just said that in the usual circumstances you don't elicit police officers, correct?

BY MS. LINDSAY:

Q.   Without telling the parents that's what's going to happen?

A.   I don't know.  There might have been a safety reason if the parent was not told or a concern.  I don't recall.

Q.   I'm not asking if you recall.  Was that within DCF's authority to do that without telling the parents?

A.   If a child belongs to the State of Connecticut, comes into the State's care, the child needs to come back to the State.

Q.   Right.  But is there notice that is supposed to be given to the parent?

A.   Yes, if it's appropriate to do so, no safety concerns or issues, correct.

Q.   In this case, you were the social worker --

A.   Right.

Q.   -- even though you were in a different capacity at DCF, you said that there were -- to your knowledge there were no safety concerns in dealing with the Pileggis?

A.   Correct.  In my interactions with them, that is correct.

Q.    So in your interactions with them, would it have been -- in your interactions with them in terms of this case, did they deem -- were they a safety risk?

A.    In my interactions with the family they were not a safety risk to me.

Q.    Did you report Emma as being malnourished?

A.    I don't recall.

Q.    Did Emma appear to be malnourished to you in or about February of 2019?

A.    When I first received the case I don't believe so.  I don't recall.  I know there was a concern regarding her weight.

Q.    Do you see Paragraph 2 on the back, right there where you're reading?

A.    Yes.

Q.    Where it says:  The child Emma was in the arms of her mother Katherine Pileggi.  The BOLO -- I'm not sure what that means.

A.    Neither am I.

Q.    I have to find that out.

-- that was issued for Emma described Emma to be malnourished wearing a cast on her foot, and swelling in her arms.

Q.    Prior to this, DCF had acquired a court order granting them custody of Emma Pileggi, correct?

A.    Correct.

Q.    So it is safe to say that the report for Florida DCF came from Connecticut DCF?

MR. TUCKER:  Object to the form of the question.

A.    Can you repeat the question, please?

BY MS. LINDSAY:

Q.    Is it safe to say that the report to DCF in Florida came from Connecticut DCF office?

A.    As far as my knowledge.

Q.    Okay.  You testified a few moments ago that you did not make references -- you don't recall making references to Emma being malnourished at this time in any of your reports?

A.    I don't recall.

Q.    But Emma did not appear to you to be malnourished at that time?

A.    What you asked me earlier when I first met them in February, she did not appear to be malnourished.

Q.    Did you meet them in 2018 or 2019?

A.    2019.

refreshes my memory.

Q. As you sit here now, after reading this email does this refresh your memory that you were informed that the Pileggi children were on an organic food diet?

A. Yes. I believe one of the children was not. I believe it was Noah who was not on an organic food diet that I recall.

Q. And by diet, what did you understand that to mean?

A. What they ate.

Q. Okay.

(Plaintiff's Exhibit H, Hospital food menu for Emma, marked for identification.)

BY MS. LINDSAY:

Q. Take a look at Rotovnik H, please. This is what is before you. Have you seen this before?

A. I don't believe so from what I recall.

Q. Okay. Well, at the top it says -- can you tell me the person's name at the top?

A. Emma -- Emily Darling.

Q. Emily who?

A. Darling.

Q. Darling. Do you know why Emma's name was

changed to Darling?

A.    I don't recall.  It was a situation that occurred where my supervisor informed me that they were changing Emma's name.  There was a certain restriction.

Q.    Why?

A.    I don't recall.

Q.    Is that normal?

A.    For a child restriction, absolutely not unless there was a safety concern.

Q.    So going back to the Pileggis.  Have they ever demonstrated to be a threat --

A.    Not to myself.

Q.    -- at DCF?

A.    I don't know about DCF.  I can only speak to myself.

Q.    Did you ever see notes in the file about the Pileggis being a threat?

A.    I don't recall.  What I do recall from this now that we're refreshing my memory is that her sister called the hospital impersonating one of us according to my supervisor and this is why her name was changed.  There was a security put on her name. Her sister, according to my supervisor, what I was informed, called the hospital pretending to be one

of us trying to gather information on Emma.

Q.    How did your supervisor know it was the sister?

A.    I don't know.

Q.    So you don't know if it's true, just what your supervisor told you?

A.    That's what I was informed, allegedly, sure, but that's what I was informed by my supervisor.

Q.    Okay.  Why would Emma's name need to be changed to Darling because the sister called to inquire about her sister?

A.    I don't recall.

Q.    Was Ms. Pileggi informed where Emma was going?

A.    I don't know.  I don't recall.

Q.    Well, you were the social worker, right?  It's your case.

A.    Right.  No, it's not my case.  It's the State's case I'm working on.

Q.    Right, but you are assigned to the case?

A.    Correct.

Q.    It was your -- this was your responsibility.

A.    Not necessarily, no.  It's the

**Frank Rotovnik**

responsibility of the agency, not me.  I have a supervisor and a program supervisor.

Q.   Go ahead.

A.   If I was informed not to tell them, then I could not tell them.

Q.   I'm asking you, this was your case?

A.   That was the State's case I was working on, that is correct.

Q.   Were you told not to inform Ms. Pileggi as to where her the child was?

A.   I don't recall.

Q.   So you can recall details about what your supervisor said with regards to the child.  You recall all these other things but certain pertinent information you cannot recall?

MR. TUCKER:  Object to the form of the question.  Argumentative.

BY MS. LINDSAY:

Q.   There are certain things you cannot recall?

A.   Rephrase the question, please.

Q.   Were you told not to inform the Pileggis of the whereabouts of her child?

A.   I don't recall.  I don't recall.  I did not -- I don't recall.  I believe so but I don't

**Frank Rotovnik**

to find out information about Emma, that that's why her name was changed?

A.    What I said was what I was told, I believe, she impersonated someone at the State, impersonated, I was told someone at DCF to try to gather information.

Q.    So did she call DCF or the hospital?

A.    The hospital.

Q.    That's what I said.  She called the hospital?

A.    Right.

Q.    Okay.  And that's why Emma's name was changed?

A.    From what I believe.

Q.    You don't recall if you told Ms. Pileggi where Emma was?

A.    I don't recall calling Ms. Pileggi.

Q.    You don't recall?

A.    No.

Q.    At this time Ms. Pileggi did not know where her child was?

A.    I don't know.

Q.    Nor do you recall calling Mr. Pileggi?

A.    No.

Q.    What was the urgency that took place all

**Frank Rotovnik**

of a sudden?  Why Connecticut had to go and take Emma from Ms. Pileggi's hands in Florida?

A.    I don't recall.

            MR. TUCKER:  Object to the form of the question.

BY MS. LINDSAY:

Q.    What prompted the decision?

A.    I don't recall.

Q.    Was it Dr. Zemel's phonecall?

A.    I'm sure it was many things, that being one of them.

Q.    Dr. Zemel's phonecall?

A.    It might have been one of them.

Q.    So Dr. Zemel was the primary impetus for DCF's movements?

            MR. PLUMRIDGE:  Objection to the form of the question.

BY MS. LINDSAY:

Q.    Or decisions?

A.    I can't answer that.  We have five different reports.

Q.    Who did you call?

A.    I don't recall.

Q.    You don't recall if you spoke to Dr. Zemel more than you spoke to others?

**Frank Rotovnik**

Pileggis to Mr. Johnson?

A.   No.

Q.   Do you recall the reports about Mr. Johnson and the history of Mr. Johnson in terms of the family?

A.   I don't recall but I recall not placing the children with her father due to some concerns with him.

Q.   Okay.  How is the removal meeting conducted?  Please describe that.

A.   Can you be more specific?

Q.   In other words, you have a removal meeting.  What's the purpose?

A.   To discuss the removal, we usually like to have it prior to the removal.

Q.   When you say removal --

A.   Removal of the child.

Q.   Wasn't she already removed?

A.   She was.

Q.   So this was taking place after she was already removed?

A.   That is correct.

Q.   After she was in the hospital?

A.   Correct.

Q.   Was there one that took place prior to?

A.    Nope.    I don't believe so.

Q.    What's the purpose of the removal meeting?

A.    To discuss possible ways we cannot remove, resources, and other things we can do to discuss the case.  Sometimes we're not able to have the removal prior due to concerns.

Q.    So while DCF was filing a petition to remove the child from custody and petitioned the court for a hearing, no one -- you did not have a meeting to discuss the potential of some other avenue?

A.    The considered removal meeting involved the parents.

Q.    Sorry?

A.    The considered removal meeting involved the parents.  We had many meetings before that but not a considered removal meeting with the parents.

Q.    So what was this?

A.    A considered removal meeting.  You're asking if we met with the parents after.

Q.    No.

A.    Please rephrase your question.

Q.    I'm asking, you said the purpose of the removal meeting is to discuss other avenues other

than removing the child?

A.    Correct.

Q.    And you said you all didn't consider that prior to the drastic measure of sending police --

A.    That's not what I said.  I'm sorry if I confused you.  What I'm saying is considered removal meetings are meant to be with parents only.  We did have meetings internally within the department regarding what was going on with Emma.

Q.    And this considered a removal meeting with the parents?

A.    Yes.

Q.    Why wasn't this had before?

A.    It was a safety concern.  We had to bring Emma into care.  Sometimes it doesn't occur beforehand.  Considered removals don't always occur before the child is removed.  Sometimes it occurs afterwards.

Q.    So the issue that came into play was Dr. Zemel making the call about Emma potentially getting worse?

                MR. PLUMRIDGE:  Objection to form.

A.    I don't recall.  Possibly.  One of the reasons, yes.

BY MS. LINDSAY:

Q.   And to your knowledge, no one called any of her other -- any of Emma's other practitioners --

A.   Not to my knowledge.

Q.   -- prior to removing her?

A.   We had affidavits from two providers and five reports from providers.

Q.   Were they any of the providers that were seeing her?

A.   Yes, they all saw Emma.

Q.   So Dr. Zemel was seeing her at the time?

A.   No, the other providers.

Q.   Mr. Fitzsimmons was one that provided an affidavit, correct?

A.   I believe it is.  I'm not sure which providers provided it.

Q.   Are you aware Mr. Fitzsimmons had only seen Emma for her broken leg?

A.   I believe so, yes.  I believe he was the provider that stated her leg might not have been broken if she was in a different state.

Q.   And he's the same provider that placed in his affidavit she had not been walking for over a year or something, right?

A.   Yes.

Q.    And familiar people?

A.    Yes.

Q.    Right.  So of all the people that appeared to take Emma, not one of them qualified as a safe placement for her?

A.    I don't know.  I don't recall.

Q.    But you were at the meeting, sir.

A.    It was six years ago.  I don't recall.

Q.    You're giving me other details in here and you can't recall that?

            MR. TUCKER:  Object to the form of the question.

A.    No.  No, I don't recall.

BY MS. LINDSAY:

Q.    You don't know why none of these people, Emma was placed with none of these people?

A.    That is correct.

Q.    Why did she end up in foster care then?

A.    What do you mean?

Q.    Did she end up in foster care?

A.    If she is in the State's care and we don't have a placement for her, she goes into foster care.

Q.    Why didn't she have a placement?

A.    I don't recall.  I don't know.  I don't

A.    I don't recall.

Q.    Did you all receive training with regard to that government oversight?

A.    Maybe.  I don't recall.

Q.    Wouldn't that be something that would be important to a social worker if the agency they're working for has been pretty much given corrective action by the government?

A.    Sure.

MR. TUCKER:  Object to the form of the question.

BY MS. LINDSAY:

Q.    As you sit here today, you don't recall?

A.    It's in the past.  I don't need to remember things that occurred in the past.  I don't need to remember why we were under a federal -- I don't recall.

Q.    You don't need to remember that?

A.    I don't recall why.  I don't need to know why.

Q.    Then how do you make sure that you stay clear of the violations that DCF was cited for?

MR. TUCKER:  Object to form.

Argumentative.

A.    Rephrase the question, please.

Q.    Right.  But you still took their opinion?

A.    I don't recall.  I don't recall.

Q.    You don't recall what?

A.    I don't recall the time frame.  When I did this I probably did and had a rationale for doing it.  At this point in time, six years later, I don't recall.

Q.    So in March of 2019 you had a reason for taking the opinion of a doctor who had not treated nor seen a patient for more than a year?

MR. PLUMRIDGE:  Objection to form.

A.    I don't recall the timeframe of Dr. Zemel seeing Emma.  It's like I knew when Dr. Zemel saw Emma last.

BY MS. LINDSAY:

Q.    I'm making you aware that Dr. Zemel did not see Emma since June or July of 2018?

A.    I don't know that.

Q.    And you called and you all filed a petition in March of 2019 on his word.

MR. PLUMRIDGE:  Objection to form.

A.    Not just his word.  That's incorrect. There were five different reporters.

BY MS. LINDSAY:

Q.    Dr. Fitzsimmons being one?

final decision by the Department of Children and Families, correct?

A.    This is an appeal decision, so yes.

Q.    I'm reading from the top, what it's labeled, Administrative Hearing An Appeal, Administrative Hearing.

For the record, I'm reading it so we know what the document it is.  So it's the Department of Children and Families, Administrative Hearing, a Final Decision Substantiation Hearing.  Right, correct?

A.    Correct.

Q.    Date of decision is January 28, 2021 and so, on Paragraph 26, it makes reference to Mr. Fitzsimmons, correct?

A.    Correct.

Q.    And his mistaken impression that Emma had not walked for two years?

A.    Correct.

Q.    And he opined about her fractures and within his affidavit he put she had not walked for two years which was incorrect.

So when Mr. Fitzsimmons filed his affidavit in March of 2019 to support the petition of removal, he did not have full information or correct

So being that he based his opinion on his mistaken belief that she had not walked for two years which led to what he said was the lower extremity bones becoming osteopenic it caused everything else that happened.  So would you say his opinion was wrong?

MR. PLUMRIDGE:  Objection to form.

MR. TUCKER:  Objection to form.

A.    I can't answer that.

BY MS. LINDSAY:

Q.    So you're sitting here and if you had to read this and assess this for your report and a doctor gave you an opinion and said that the child's situation was caused by her -- the fact that she had not walked for two years and you later find out that the child -- that the information is absolutely wrong, you don't think that his opinion is flawed?

MR. PLUMRIDGE:  Objection.

MR. TUCKER:  Objection as to the form.

A.    Say again?

BY MS. LINDSAY:

Q.    In your professional capacity as a social worker, reading a doctor's affidavit and opinion and using it as a basis for your petition, did you use

Mr. Fitzsimmons report and affidavit as a basis to file your petition --

A.    I believe so, yes.

Q.    -- to remove Emma?

A.    Yes.

Q.    So as a professional who is using a doctor's opinion as a support for a petition to remove a child from their parents based on medical neglect and you read the doctor's opinion and it says because she did not walk for two years it led to a decrease in other areas which further compromised her and led to the fracture that she had and once you find out the doctor's opinion is based upon flawed information, do you question the rest of the opinion?

MR. TUCKER:  Objection as to the form.

MR. PLUMRIDGE:  Object to form.

MS. LINDSAY:  Let the record be shown the witness wanted me to explain what I was asking him.

A.    I'm kind of confused.  I understand that this was -- that this is what he was stating is mistaken, but this is two years later so I don't know how I can go back in time to know that he was

**Frank Rotovnik**

MR. PLUMRIDGE:  Objection to form.

MR. TUCKER:  Objection to form.

A.    Rephrase your question, please.

BY MS. LINDSAY:

Q.    How do you rely on a doctor's opinion who had not seen a patient since almost a year before?

MR. PLUMRIDGE:  Same objection.

MR. TUCKER:  Objection to form.

A.    I don't know how I can answer that question.

MR. TUCKER:  Counsel, can we take a five-minute break?

MS. LINDSAY:  Sure.

(A recess was taken from 2:31 p.m. to 2:41 p.m.)

BY MS. LINDSAY:

Q.    Can you tell me the difference between those two documents, if they're the same.  I don't know if I'm missing something while I'm looking at it.  I'm not sure.  It's probably the same document just given to me twice maybe.

A.    The documents are attached to different --

Q.    Okay.  All right.  Thank you.  But this section is all the same?

Q.    Arthritis, juvenile arthritis.

A.    Repeat your question.  I'm sorry.

Q.    Were you ever told by any of Emma's medical providers, naturopath or MD, that she was actually suffering from untreated Lyme disease as opposed to juvenile idiopathic arthritis?

A.    I don't recall.

Q.    Do you recall talking to Dr. Lopusny and her telling you Emma had Lyme disease, not arthritis?

A.    That's the same doctor you mentioned earlier today.  I don't remember the name.

Q.    Preferred Pediatrics?

A.    I don't recall.

Q.    Did you speak with any of Emma's pediatricians?

A.    I'm sure I did.

Q.    But you don't know?  You don't recall speaking to Lopusny?

A.    Correct.

Q.    Who was her pediatrician?

A.    I don't recall.  Is there a date somewhere?  Was it prior to me?

Q.    During the time you were on the case.

A.    I don't recall.

then we need to work toward an adoption.

Q.    Who determines if the child is adopted out?

A.    The team.  The DCF team that is working on the case.

Q.    You're part of the team?

A.    As well as the courts and the legal system.

Q.    That's where the opinions come into play?

A.    What opinions?

Q.    Your opinions, the team's opinion.

A.    It's an assessment.

Q.    Your assessment is your opinion, is it not?

A.    I don't believe so.

            MR. TUCKER:  Objection to form.

BY MS. LINDSAY:

Q.    What's in your assessment?

A.    What I see and what I view.  There is no opinion.

Q.    What you see and what you view.  And what do you do with what you see and view?

A.    I provide that on paper and provide it to my superior.

Q.    Based on?

Frank Rotovnik

BY MS. LINDSAY:

Q.   So the only choice Mr. and Mrs. Pileggi had was to abide by DCF's orders based upon the doctors' orders even though a full assessment had not been made?

MR. PLUMRIDGE:  Objection to form.

MR. TUCKER:  Objection to form.

BY MS. LINDSAY:

Q.   Yes?

A.   I don't know.

Q.   You don't know.  So if they didn't abide by the orders that were given to them by DCF based upon the doctors' orders, their child would have been adopted?

A.   I can't say that.

Q.   Was she in foster care at any point?

A.   She was.

Q.   If they didn't abide by what you told them to do, she would have been adopted, correct?

A.   I don't know.

Q.   Sir, it says concurrent goal versus permanency goal.

A.   Right.

Q.   So the permanency goal is to reunify her and if they don't, you just testified a little while

speech.  Move to strike.

MS. LINDSAY:  We're not striking anything.  You made your speech earlier. We're striking nothing.  We're taking a break because the mother needs a break.

(A recess was taken from 3:18 p.m. to 3:28 p.m.)

BY MS. LINDSAY:

Q.    Why did DCF tell the Pileggis they could not continue treating with Dr. Lopusny?

A.    I don't know if that occurred.

Q.    You don't recall telling Mr. and Mrs. Pileggi they could not take her to Dr. Lopusny?

A.    I don't recall saying that.

Q.    You don't recall directing them to other practitioners and they had to see doctors in your network?

A.    No.  I believe we asked them to see a doctor after they refused to.

Q.    After they refused to see what, a doctor?

A.    I believe so, yes.

Q.    When did they refuse to see a doctor?

A.    I don't recall.

Q.    Do you know that Dr. Lopusny is an MD?

A.    I don't know.

BY MS. LINDSAY:

Q.    In your petition, Rotovnik Exhibit L, you said that Mr. and Mrs. Pileggi failed to address Emma's medical condition which had resulted in her being significantly compromised, probably with irreversible damage, and Mrs. and Mr. Pileggi have opted for naturopathic medicine but at a high cost and detriment to Emma's well-being.

Did you refer to naturopath here?

A.    Yes.

Q.    But nowhere in here did you say she was being treated medically as well and that the medical care she was receiving wasn't working?

A.    I believe that's summed up in that statement.

Q.    No.  It says:  Failed to address Emma's medical condition which has resulted in her being significantly compromised to the point of probably irreversible damage because they have opted -- Mr. and Mrs. Pileggi have opted naturopathic medicine.  But you did not put in here that she was also being treated alongside a medical doctor?

A.    I had no knowledge she was being treated by a medical doctor.  How can I say that if I did

Frank Rotovnik

not know Dr. Lopusny, how can I state that?

Q.    So are you saying Kaela Minerly was negligent in failing to include that Dr. Lopusny was the doctor treating the family?

MR. TUCKER:  Objection as to form.
Argumentative.

MS. LINDSAY:  I'm asking a simple question.  I'm not arguing.

A.    Say it again.

BY MS. LINDSAY:

Q.    Are you saying that Kaela Minerly was negligent in failing to include Dr. Lopusny in her report, in the file?

A.    I don't know.  I don't know if Kaela had any idea of that doctor either.  I can't make a conclusion for her.

Q.    And your testimony is that you were not told about Mr. Lopusny or other doctor except for the five that you can't name?

MR. PLUMRIDGE:  Objection to form.

A.    I said I do not recall.  I do not remember Dr. Lopusny's name nor do I remember having anything to do with him.  I never heard his name.

BY MS. LINDSAY:

Q.    And the only other names that you can

(Counsel speaks to Ms. Pileggi)

Q.    What authority does DCF have to force Ms. Pileggi to move out of her home in order for her daughter to be returned?

A.    None.

Q.    So why was she made to leave the house?

A.    I believe she moved out on her own. I don't recall that.

Q.    You have a selective memory.

MR. TUCKER:  Objection as to counsel's comment.  Objection as to counsel's speech.

MS. LINDSAY:  That's not going to help.  He has a selective memory.

THE WITNESS:  I can't recall.

MS. LINDSAY:  That's fine but you can recall fine details for certain things but other major things you don't recall at all.

MR. TUCKER:  Objection as to the speech.

MS. LINDSAY:  That's fine.  Selective memory.

MR. TUCKER:  And objection to that speech.

A.    I don't know.

Q.    That's fine.  Dr. Lopusny directly says Lyme.  Is that what you're saying, Preferred Pediatrics?

A.    I'm reading that he or she, Diana, is making that statement.

Q.    Okay.  Well, Borrella Burgdorferi, Bartonella and Babesia infections, that's what Dr. Tranguch --

A.    I have no idea what that is.  I don't know if that's a form of Lyme.  I'm not sure.

Q.    It is.  It's a test they run to indicate whether Lyme is present or not.

(Discussion held off the record.)

Q.    Are you aware CCMC was under investigation?

MR. PLUMRIDGE:  Objection.

BY MS. LINDSAY:

Q.    Due to children not being -- not receiving the proper care?

MR. PLUMRIDGE:  Objection to form.

A.    No.

BY MS. LINDSAY:

Q.    And Director of Health taking over -- Commissioner of Health.  I'm sorry.

it does not bring any recollection of me pushing them to get a divorce.

Q.   So Ms. Perrault saying:  Haven't read it. While Mr. Pileggi -- let's start with him.

On June 7 of 2019:  Did you get the case plan from DCF?  It says:  Emma is completely dependent on caregivers.  Target date for reunification 12/30/2019, Mr. Pileggi.

Haven't read it yet.  Doesn't have any bearing on what we had discussed from last court date.  Just that DCF will not have conversation with supervisory staff about returning her to you and what barriers there are until I confirm that divorce paperwork filed and that Katie moved out.  When did you get the case plan?  I don't have anything. That's Ms. Perrault.

To which Mr. Pileggi responds:  Right before I text you.  I will send to you right when I get home.

She says okay.

And Mr. Pileggi goes on, also talks about gathering -- or getting Emma vaccinated.

Ms. Perrault says:  Has Katie moved out?

Mr. Pileggi says:  She is in the process of moving her stuff over to her studio.

Ms. Perrault says:  Just got off the phone with Frank.

Anthony asked:  How did it go?

He says:  Very well.  Want to chat for a second, I'm at the office.

I will call you, he says.

Then Ms. Perrault, next page, says:  They would not have a meeting at all to discuss until the divorce papers were done.  She was served 6/25 and they assigned a docket number on 7/5.  Frank, etcetera, will have a meeting and I can push harder.  They wouldn't do anything until they were sure that you were going through with the divorce and not just doing it for one reason only.  Be careful, again, about listening to Katie.  I already wrote Frank an email for a meeting and gave him divorce confirmation.  I will forward to you to see.  Please understand I'm doing all I can here right now.  Can you do next Friday morning for a meeting with Frank?

A.    This seems to me she is pushing him to get a divorce.  Be careful, again, about listening to Katie.  I don't know where this confirms me saying they needed a divorce to move on.  I don't recall ever telling them they needed to be divorced.

Q.    Do you recall meeting with Mr. Pileggi

**Frank Rotovnik**

and Ms. Perrault?

A.    Possibly.  I don't recall.

Q.    Do you recall them sending you divorce papers?

A.    Possibly, yes.

Q.    Do you recall that being presented to the judge?

A.    I'm sure it was because everything is presented whether it's relevant or not.

Q.    Why would they need to prove -- I'm not sure if you were finished.

      Why would they need to show you they were getting divorced?

A.    I don't know.  I don't recall.

Q.    Why would you meet with them and discuss the divorce?

A.    If they asked to meet with me I'll meet with them.

Q.    For a divorce?

A.    I won't tell them no if they want a conversation with me.

Q.    With Ms. Perrault and Mr. Pileggi?

A.    I don't recall.

            (Plaintiff's Exhibit V,

            Photographs, marked for identification.)

the Pileggis there.  They attended -- I wouldn't say all, Mr. and Mrs. Pileggi, or separately.

Q.   Mr. Pileggi noted swelling in Emma's knees and fingers during foster care.  Were you aware of these ongoing symptoms?

MR. PLUMRIDGE:  Objection to form.

MR. TUCKER:  Objection to form.

A.   Rephrase the question.

BY MS. LINDSAY:

Q.   Were you aware of the ongoing swelling in Emma's fingers and knees during foster care?

MR. PLUMRIDGE:  Objection.

MR. TUCKER:  Same objection.

A.   I don't recall.  Definitely I remember her being swollen, but I don't remember if it was in foster care.  I remember prior.  There was probably a certain point in time when she was first put in foster care that swelling might have been there but I'm speculating.  I can't recall.

BY MS. LINDSAY:

Q.   You testified that Mr. Pileggi was following the treatment protocols once he regained custody of Emma.  How was he being monitored?

A.   Through the providers.  We'd check in with the providers ensuring that he's following up

**Frank Rotovnik**

He didn't testify to that.  You're twisting his testimony and leading him down a path to get the answer you want.  That's not what he testified to.

MR. TUCKER:  Well, I think it is.

MS. LINDSAY:  It's not.

BY MR. TUCKER:

Q.   Let me ask you.  Tell me about the RRGs.  What are RRGs at the Department of Children and Families?

A.   They're the Regional Resource Group.  We have several in all different modalities:  Nurses, mental health, substance abuse, educators and we have attorneys.  I'm sorry, not attorneys.  They're not part of our RRG.

Q.   And there's a pediatrician also who is a part of the RRG network, if you will?

A.   I don't know if Dr. Taylor is a pediatrician but there are medical providers that are definitely part of our RRG.

Q.   Would you agree with me it's the best practice where you have a medical issue in a case to rely on people who have expertise in medical issues?

MS. LINDSAY:  Objection to the form of the question.

right?

A.   That's very much correct.  My apology.  Yes.

Q.   That's all I have.  Thank you.


REDIRECT EXAMINATION

BY MS. LINDSAY:

Q.   Mr. Rotovnik, what evidence do you have that the family members did not request an evidentiary hearing?

A.   Say that again?

Q.   Your counsel just said, and you agreed, that the family did not ask for an evidentiary hearing once Emma was removed from their custody.  What are you basing your answer on?

A.   They were in court and agreed to the commitment and waived their right to a trial.

Q.   You were in court with them?

A.   I don't recall.

Q.   So how do you know what they did?

A.   It was provided by our AAG.

Q.   What was provided?

A.   The documentation of what occurred in court.

Q.   The AAG sitting next to you?

A.    No.

Q.    What AAG?

A.    I don't recall.

Q.    He said they agreed to Emma's placement?

A.    Yes.  They waived their right for a trial and agreed to the commitment and at the ten-day hearing they waived their right to a trial and agreed for the OTC.  There was no way we would be able to move forward if they did not agree.  We would have to go to trial.

Q.    Do you know why they agreed to it?

A.    I don't know.  That's their decision.

Q.    And so your answer is based strictly on the AG's document that was given to you?

A.    Not necessarily.  I'm sure I was there but I don't recall.  So I could have been there. It could have been my superior as well as the AG in the court.  There is court documentation to everything that occurs as well, just like this is. It's with a judge.

Q.    Your attorney asked you if you were -- if Emma was removed by the juvenile court and you answered yes.  Do you recall that?

A.    Yes.

Q.    It was based on a petition filed by

yourself as well as your superior at DCF?

A.   Based on -- yes, a collective by the department.

Q.   So it was DCF that petitioned the court to have Emma removed?

A.   Correct.

Q.   RRGs, you testified earlier that they are medical.  That they are nurses?

A.   Correct.

Q.   And they don't have a particular type of specialty?

A.   Correct.

Q.   Okay.  So you didn't rely on experts in any particular field with regard to Emma's medical assessment?

A.   I don't know what you refer to as an expert.  I think that's probably opinion based.  So I would say they're experts in their field.

Q.   Well, what field?  What is their field?

A.   Nursing.

Q.   Do you know that there are different types of nurses?

A.   Sure.

Q.   Do you know if any of them specialize in orthopedics?