UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
----------------------------------------------------------x
KATHARINE PILEGGI, et. al.

                **Plaintiffs,**

v.

KIM MATHIAS, et. al.

                **Defendants.**
----------------------------------------------------------x

**Civil Action No. 3:22-cv-01315-AWT**

## <u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

/s/ *Tricia Lindsay*  
    **TRICIA S. LINDSAY**  
    **Attorney for Plaintiffs**  
    531 E. Lincoln Ave., Suite 5B  
    Mount Vernon, NY 10552  
    Tel: (347) 386-4604 (347) 349-5433  
    Fax: (914) 840-1196  
    tricialindsaylaw@gmail.com  
    attorney@tricialindsaylaw.com

**TABLE OF CONTENTS**

**Page(s)**

I. PRELIMINARY STATEMENT ................................................................................1

II. FACTUAL BACKGROUND ................................................................................2

III. STANDARD OF REVIEW ................................................................................7

IV. ARGUMENT ................................................................ 8

    A. Genuine Disputes of Material Fact Pertaining to the Core Medical
Issues Preclude Summary Judgment ………..…………………………………….. 9

    B. Defendants' Motion Impermissibly Rests on Credibility Determinations
That Are Reserved for the Jury ...............................................................................10

    C. Defendants Fail to Establish That Plaintiffs' Claims Are Untimely .........................11

    D. Plaintiffs Have Adduced Sufficient Expert Evidence to Support Their
Claims ......................................................................................................................13

    E. Defendants Have Not Shown Entitlement to Judgment as a Matter of Law
on Timeliness Grounds ...........................................................................................15

    F. Plaintiffs Have Produced Admissible Expert Evidence ...........................................17

    G. Dr. Zemel's Specialty Does Not Control the Relevant Standard of Care ……........ 19

    H. Dr. Lopusny Is Qualified to Offer Expert Opinions and Her Letter Supports
Plaintiffs' Claims .................................................................................................... 21

    I. Defendants' Reliance on Themselves as Experts Is Unpersuasive ......................... 23

    J. The Court Should Not Resolve Credibility Determinations or Factual
Disputes on Summary Judgment ............................................................................24

    K. Defendants Have Not Established the Applicable Standard of Care or Their
Compliance with It ..................................................................................................26

V. CONCLUSION ..................................................................................... 28

## TABLE OF AUTHORITIES

**CASES**                                                                                      **Page(s)**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...............................................................................................7, 10, 24

*Ardoline v. Keegan,*
140 Conn. 552 (1954) ............................................................................................... 26

*BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.,*
77 F.3d 603 (2d Cir. 1996) ....................................................................................... 12

*Brierly v. Deer Park Union Free School Dist.,*
359 F. Supp. 2d 275 (E.D.N.Y. 2005) ................................................................. 11, 24

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
310 F.R.D. 69 (S.D.N.Y. 2015) ……………………………………………………....... 19

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ...............................................................................................8, 22

*Evanston Ins. Co. v. William Kramer & Assocs., LLC,*
890 F.3d 40 (2d Cir. 2018) ....................................................................................... 12

*Foley v. United States,*
294 F. Supp. 3d 83 (D. Conn. 2018) ......................................................................... 26

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997) .................................................................................................. 24

*I.M. v. United States,*
362 F. Supp. 3d 161 (S.D.N.Y. 2019) .............................................................. 14, 20, 21

*Jinghong Song v. Yao Bros. Grp. LP,*
*No. 10 CIV. 04157 RKE,* 2012 WL 1557372 (S.D.N.Y. May 2, 2012) ........................................ 17

*M.B. ex rel. Scott v. CSX Transp., Inc.,*
130 F. Supp. 3d 654 (N.D.N.Y. 2015) ...................................................................... 19

*Major League Baseball Props., Inc. v. Salvino, Inc.,*
542 F.3d 290 (2d Cir. 2008) ........................................................................... 7, 23, 27

*523 IP LLC v. CureMD.Com,*
48 F. Supp. 3d 600 (S.D.N.Y. 2014) ......................................................................... 23

**STATUTES**                                                                 **Page(s)**

Conn. Gen. Stat. § 52-584 ................................................................................ 11, 12, 15

Conn. Gen. Stat. § 52-184c ................................................................................ 14

**RULES**

Fed. R. Civ. P. 26(a)(2)(B) ........................................... ............................ 17

Fed. R. Civ. P. 26(a)(2)(C) ........................................... ............................ 17

Fed. R. Civ. P. 56(a) ........................................................................................ 7

Fed. R. Evid. 702 ........................................................................................ 21, 26

# I. <u>PRELIMINARY STATEMENT</u>

Plaintiffs Katharine and Anthony Pileggi submit this Memorandum of Law in opposition to the Motion for Summary Judgment filed by Defendants Connecticut Children's Medical Center ("CCMC"), Lawrence Zemel, M.D., and Kevin Fitzsimmons, P.A.. Defendants seek to have this action dismissed by mischaracterizing the central medical facts, improperly attempting to narrow the applicable standard of care to a specialty that was not at issue, and asking the Court to resolve glaring factual disputes and credibility issues in their favor. This is improper at the summary judgment stage.

This case arises from a profound and justified disagreement between loving parents seeking appropriate care for their medically complex child following a documented tick bite, and a group of medical providers who prematurely diagnosed juvenile idiopathic arthritis, ignored classic signs of Lyme disease, and then weaponized the Department of Children and Families ("DCF") to enforce their contested and ultimately incorrect diagnosis. The record, now supplemented by detailed affidavits from the Plaintiffs and a comprehensive expert report from a treating pediatrician, Dr. Diana Lopusny, is replete with evidence that Defendants' actions were not based on undisputed medical certainty, but on a series of flawed judgments, unsupported opinions, and a selective reading of their young patient's condition.

Defendants' motion for summary judgment should be denied for several reasons. First, multiple genuine issues of material fact exist as to the correct diagnosis, the applicable standard of care for a child presenting with EP's symptoms, the adequacy of Defendants' examinations, and the good faith of their decision to report the Pileggi family for neglect. Second, the credibility of the Defendant physicians and staff, particularly Dr. Zemel, is squarely at issue, and their self-serving affidavits and inconsistent deposition testimony cannot resolve these factual disputes as a

matter of law. Third, Plaintiffs have submitted sufficient expert evidence from Dr. Lopusny, a qualified pediatrician, whose testimony establishes both the standard of care and its breach. Defendants' attempt to disqualify her by framing this as exclusively a rheumatology case is a red herring; the primary issue was the diagnosis of a child with a tick-borne illness, a core competency of general pediatrics. Fourth, after a year of diligent search, Plaintiffs have now successfully retained a highly qualified physician epidemiologist, Harry F. Hull, M.D., to serve as their rebuttal expert. Because the record is filled with evidence from which a reasonable jury could find for the Plaintiffs on every count, summary judgment is inappropriate. The Court should deny the motion and allow this case to proceed to trial.

## II. <u>FACTUAL BACKGROUND</u>

This action arises from a dispute between Plaintiffs Katharine and Anthony Pileggi and the medical professionals at Connecticut Children's Medical Center ("CCMC") regarding the appropriate medical care for their minor daughter, "EP," following a documented tick bite. The extensive factual record, detailed in Plaintiffs' affidavits and the expert report of Dr. Diana Lopusny, reveals a cascade of medical and parental rights violations rooted in Defendants' premature and incorrect diagnosis.

Prior to the events central to this litigation, EP was a completely healthy and active child with no significant medical history or concerns prior to a documented tick bite after woodland exposure in Connecticut. A well-child examination was performed by her pediatrician, Dr. Alder, on February 22, 2018, which documented a normal evaluation. *Plaintiffs' Local Rule 56(a)(2) Statement* ¶ 1. On May 28, 2018, when EP was two years and nine months old, her parents removed a fully engorged black-legged deer tick from her right leg. *Id.*, ¶ 2. They believe the bite occurred on May 25 or May 26, 2018, while she was playing near the woods. *Id.*, ¶ 4. Photographs

of EP taken near the time of the tick bite on May 25-26, 2018, shows a happy, healthy, and active child, who was running, walking, squatting, playing miniature golf and hiking in the woods with her parents.  *Id*., ¶ 2.

Immediately following the tick removal, on May 28, 2018, EP developed a sudden onset of acute symptoms, including fever, chills, drowsiness, malaise, fatigue, muscle and joint aches, swollen lymph nodes, loss of appetite, abdominal pain, and a red rash at the bite site *Plaintiffs' Local Rule 56(a)(2) Statement* ¶ 3. Her drowsiness caused her to fall and sustain an abrasion to her left knee, which became swollen. *Id*.

The next day, May 29, 2018, the Pileggis brought EP to her pediatrician, Dr. Roman Alder, specifically requesting an evaluation and prophylactic treatment for Lyme disease. They brought the engorged tick and showed Dr. Alder the rash and her swollen knee. *Plaintiffs' Local Rule 56(a)(2) Statement* ¶ 4. Dr. Alder's testing revealed an elevated C-reactive protein ("CRP") level of 37.7 mg/L, elevated eosinophils, low hemoglobin and hematocrit, and a left knee X-ray indicating possible joint effusion and soft tissue swelling. An initial Lyme ELISA test was negative, which is consistent with the early stage of infection before antibodies have developed. *Id*., ¶ 8. Despite the parents' concerns and EP's classic symptoms, Dr. Alder declined to prescribe antibiotic treatment and referred EP to CCMC without specifying a provider. *Id*., ¶ 9.

On June 1, 2018, the Pileggis took EP to CCMC, where they learned the referral was to Defendant Dr. Lawrence Zemel, a pediatric rheumatologist. The Pileggis again brought the tick, asked Dr. Zemel to evaluate the bite site and rash, and requested treatment for an acute tick-borne infection. *Plaintiffs' Local Rule 56(a)(2) Statement* ¶ 13. According to Mrs. Pileggi, their concerns were ignored, the tick was discarded, and Dr. Zemel "threw Emma onto the examining table and started to manipulate her joints." *Exhibit 3* ¶ 19 . Plaintiffs assert Dr. Zemel breached the standard

of care by failing to physically examine the tick bite site, the associated rash, or her swollen lymph nodes. *Exhibit 13* ¶¶ 10-13; *Plaintiff's Local Rule 56(a)(2) Statement* ¶¶ 17, 21-22. Instead, he focused exclusively on her joints and, after this single brief examination, diagnosed the previously healthy child with juvenile idiopathic arthritis ("JIA"). He noted that "[EP] emphatically did not have Lyme Disease." *Exhibit 11*. When the Pileggis stated their intent to treat the acute infection first and seek a second opinion, Dr. Zemel authoritatively told them they were "not doctors" and needed to follow his direction to treat arthritis. *Exhibit 3* ¶ 21.

After this single visit, Dr. Zemel began calling the Pileggis, urging them to return for arthritis treatment and threatening to file a report with the Department of Children and Families ("DCF") if they did not *Exhibit 3* ¶ 24. On June 29, 2018, Dr. Zemel left a voicemail for the Pileggis explaining that "state law requires me to file a report with Department of children and families." On July 3, 2018, he made good on his threat and filed a report with DCF for suspected medical neglect, asserting that his exclusive care was required. *Id.*, ¶ 25. DCF initially closed its investigation because EP was receiving care from a licensed professional.

Throughout June and July 2018, EP's symptoms of tick-borne illness progressed. The rash at the bite site expanded to 2.5 inches in diameter, consistent with erythema migrans, and a second rash appeared on her scalp. *Exhibit 3* ¶ 27. She developed migrating joint swelling, palpitations, an irregular heartbeat, tingling and numbness in her hands and feet, burning pain along her spine, and ongoing fatigue. *Exhibit 13* ¶¶ 15,16. Dr. Lopusny later opined that this progression is consistent with early disseminated Lyme disease. *Id.*, ¶ 18.

On August 2, 2018, the Pileggis took EP to a new pediatrician, Dr. Diana Lopusny, who clinically diagnosed Lyme disease based on her evaluation and symptoms. *Exhibit 13* ¶ 17.

However, antibiotic therapy was not initiated due to DCF's interference and the directive that EP be treated exclusively by Dr. Zemel at CCMC for JIA. *Exhibit 3* ¶ 29.

Over the ensuing months, as the Pileggis pursued alternative care, other providers made reports to DCF. On March 9, 2019, EP was brought to the CCMC emergency department after a sibling dropped her, causing a left femur fracture; she was seen by Defendant PA Kevin Fitzsimmons, who applied a splint.

Following these events, on March 28, 2019, DCF initiated legal action, filing neglect petitions concerning *all three* Pileggi children. The petition regarding EP alleged she was "being denied proper care and attention." An addendum filed with the court made the inflammatory claims that the Pileggis "failed to address EP's medical condition which has resulted in her being significantly compromised to the point of probable irreversible damage" and that Mrs. Pileggi suffered from "unaddressed mental health issues that impact her ability to safely parent her children." That same day, based on these unsubstantiated allegations, the court granted DCF an ex parte Order of Temporary Custody, finding EP was in "immediate physical danger." EP was forcibly removed from her parents and placed in foster care from March 2019 to October 2019. *Exhibit 3* ¶ 31.

During the period from 2018 to 2020, under Dr. Zemel's care, EP was treated for presumed JIA with a host of powerful immunosuppressive medications, including NSAIDs, Prednisone, Etanercept (Enbrel), Adalimumab (Humira), and Methotrexate. During this time, she experienced progressive symptoms consistent with disseminated Lyme disease. *Exhibit 13* ¶ 18.

Subsequent medical evidence has confirmed the Lyme disease diagnosis that Defendants rejected. On May 13, 2020, a lab test demonstrated a positive Lyme IgG by Immunoblot, and a later test on November 11, 2020, showed a reactive Bartonella co-infection. Dr. Lopusny contacted

Dr. Zemel to express her concern that EP had Lyme disease and required antibiotic treatment. *Plaintiffs' Local Rule 56(a)(2) Statement* ¶ 33. Dr. Lopusny expressed her opinion to Dr. Zemel that antibiotic treatment would require either temporary suspension of immunosuppressive therapy, or careful coordination of antibiotic and immunosuppressive regimens with close monitoring. *Id*., ¶¶ 29, 30. Dr. Zemel did not agree to initiate antibiotic therapy and maintained the position that Emma did not have Lyme disease. *Id*. ¶ 31. Dr. Zemel's failure to coordinate antimicrobial therapy in the presence of clinically diagnosed Lyme infection represents a departure from accepted standards of care, as treatment of infection should be prioritized. *Id*., ¶ 32. Most recently, a repeat Lyme Immunoblot IgG test on March 4, 2026, was again positive. *Id*., ¶ 36. As a result of this positive test, on March 9, 2026, EP began a 28-day course of Amoxicillin. *Id*., ¶ 39. The results were dramatic. Following antibiotic therapy, EP experienced a "clear, objective, and clinically significant improvement in her condition," including a marked reduction in joint pain and swelling, near-complete resolution of spinal pain, improved energy, and resolution of all cardiac and neurological symptoms. *Id.*, ¶ 40. Dr. Lopusny opines that this substantial response to antibiotics provides "strong corroborative evidence supporting the diagnosis of Lyme disease, and its role in her prior symptomatology." *Id*., ¶ 41.

The IGeneX laboratory is a CLIA-certified high-complexity laboratory. Clinical Laboratory Improvement Amendments (CLIA) is the federal regulatory agency governing U.S. laboratories that perform testing on human specimens for purposes of diagnosis, prevention, treatment, or health assessment. *Plaintiffs' Local Rule 56(a)(2) Statement* ¶ 37. The program is jointly administered by three federal agencies: the Centers for Medicare & Medicaid Services (CMS), the Food and Drug Administration (FDA), and the Centers for Disease Control and Prevention (CDC). *Id.*

Based on the full clinical picture, Dr. Lopusny concludes to a reasonable degree of medical probability that EP developed Lyme disease from the May 2018 tick bite, that it progressed to disseminated Lyme disease due to the absence of timely antibiotic treatment, and that her years of symptoms were caused by the Lyme infection. Dr. Harry F. Hull, Plaintiff's retained expert, has completed his review of all the medical records and is prepared to opine similarly.

### III. STANDARD OF REVIEW

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rules of Civil Procedure, Rule 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Once this burden is met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

The party opposing summary judgment cannot defeat a properly supported motion by relying on "conclusory statements, conjecture, or speculation." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). Instead, the non-movant must present admissible evidence to establish that a genuinely disputed factual issue exists. *Id.*. However, the standard for admissibility at the summary judgment stage is liberal, reflecting a "presumption of admissibility" for evidence, particularly expert evidence.

Crucially, in deciding a motion for summary judgment, the court's role is not to weigh the evidence, determine the truth of the matter, or resolve credibility disputes. *Anderson*, 477 U.S. at 249. As the Supreme Court has emphasized, "[c]redibility determinations, the weighing of the

7

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. The court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought. *Id.*.

Where the record presents conflicting inferences, where the credibility of witnesses is at issue, or where evidence is "shaky but admissible," summary judgment must be denied. *See Id.*

The Supreme Court has made clear that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," not pre-trial exclusion. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). If, after viewing the entire record in the light most favorable to the non-moving party, a reasonable jury could return a verdict in their favor, the motion for summary judgment must be denied and the case must proceed to trial.

## IV. <u>ARGUMENT</u>

Defendants' motion for summary judgment should be denied because it is built upon a selective and self-serving interpretation of a record that is rife with genuine disputes of material fact. Far from establishing the absence of a triable issue, the evidence, when viewed in the light most favorable to Plaintiffs, demonstrates that a reasonable jury could find in their favor on every claim. Defendants improperly ask this Court to resolve genuinely disputed material facts, make credibility determinations, and ignore a wealth of record evidence—including detailed affidavits from the Plaintiffs and a comprehensive expert report from a treating pediatrician—from which a reasonable jury could find in Plaintiffs' favor. The core of this case is not, as Defendants suggest, a simple matter of mandatory reporting based on clear medical evidence. Rather, it is about whether a group of medical providers, disagreeing with parents about a complex and contested diagnosis, wrongfully and pretextually used the immense power of a state agency to override the

Pileggis' parental rights. Because the record is replete with evidence of pretext, bad faith, and deviations from the standard of care, summary judgment is wholly inappropriate.

**A.      Genuine Disputes of Material Fact Pertaining to the Core Medical Issues Preclude Summary Judgment**

This case presents a classic factual dispute over the nature of a child's illness, a dispute that cannot be resolved on a motion for summary judgment. Defendants' entire motion is premised on the factual assertion that EP suffered from juvenile idiopathic arthritis ("JIA") and that Dr. Zemel's diagnosis and actions were therefore correct and justified. This premise is vigorously and credibly disputed by an overwhelming volume of evidence.

A reasonable jury could find that EP suffered from Lyme disease, not JIA. The record shows that EP was a healthy child until she was bitten by a fully engorged deer tick in May 2018 *Plaintiffs' Local Rule 56(a)(2) Statement* ¶ 1. Immediately thereafter, she developed a constellation of symptoms classic for an acute tick-borne infection, including fever, fatigue, swollen lymph nodes, and a rash at the bite. *Id.*, ¶ 2. The rash later expanded to 2.5 inches in diameter, and a second rash appeared on her scalp—a presentation consistent with erythema migrans, which is diagnostic for Lyme disease. *Id.*, ¶ 20. Her symptoms progressed to include migrating joint pain, palpitations, and neurological complaints, all consistent with early disseminated Lyme disease.

Plaintiffs' claims are supported by the expert opinion of Dr. Diana Lopusny, a board-certified pediatrician, who opines to a reasonable degree of medical probability that EP developed Lyme disease from the tick bite and that the disease progressed due to the absence of timely antibiotic treatment. Dr. Lopusny explains that the initial negative Lyme test ordered by Dr. Alder was to be expected, as antibodies may not be detectable in the earliest phase of the infection. *Exhibit 13* ¶ 14. Critically, Dr. Lopusny details EP's "clear, objective, and clinically significant

improvement" following a 28-day course of antibiotics in March and April 2026, which led to a "marked reduction in joint pain and swelling, near-complete resolution of back and spinal pain, improved energy level and mood," and resolution of cardiac and neurological symptoms. *Id.*, ¶¶ 26, 27. Dr. Lopusny concludes this response provides "strong corroborative evidence supporting the diagnosis of Lyme disease."

This evidence directly contradicts Defendants' central narrative and Dr. Zemel's conclusory assertion on June 1, 2018, that "[EP] emphatically did not have Lyme Disease." The clash between Dr. Zemel's JIA diagnosis and Dr. Lopusny's Lyme disease diagnosis, supported by years of clinical history and a dramatic response to antibiotic treatment, creates a quintessential battle of the experts that must be resolved by a jury.

**B.      Defendants' Motion Impermissibly Rests on Credibility Determinations That Are Reserved for the Jury**

At its core, Defendants' motion asks the Court to find their version of events credible and the Pileggis' version not. This is not the function of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). The credibility of Dr. Zemel, in particular, is riddled with weaknesses, implausibilities, and inconsistencies, rendering summary judgment wholly inappropriate.

A detailed review of the record reveals a pattern of testimony from Dr. Zemel that is inconsistent and unreliable. His credibility is immediately called into question by his contradictory statements about his experience with naturopathic medicine—the very form of care he criticized the Pileggis for pursuing. This is compounded by his admission that he was unaware of the family's concerns about mold toxicity during his involvement in EP's care (*Exhibit 17, Zemel Depo*. p. 206:13-19), a fact a jury could see as evidence of an incomplete and biased evaluation.

10

Furthermore, Dr. Zemel's testimony regarding his knowledge of EP's medical history is fundamentally inconsistent. He claimed ignorance of the specific treatments EP received prior to her admission while simultaneously concluding that this unknown care constituted neglect. (*Exhibit 17, Zemel Depo*. 212:8-13). Plaintiffs' affidavits also paint a picture of a physician who was not engaged in a good-faith diagnostic process but was actively hostile to the parents' concerns. They attest that Dr. Zemel ignored their request to examine the bite site and rash, "threw Emma onto the examining table," and immediately threatened them with a DCF report when they expressed a desire for a second opinion. *Exhibit 3* ¶¶ 17, 24. Additionally, Dr. Zemel himself has published articles noting that Lyme Disease is often misdiagnosed as Juvenile Arthritis. (*Exhibit 17, Zemel Depo*. 214:10-21).

This pattern of rigid, contradictory, and defensive behavior would permit a jury to conclude that Dr. Zemel did not conduct a good-faith diagnostic inquiry, but rather sought to build a case for his preferred diagnosis while deflecting any contradictory evidence. This fact is further evidenced by Dr. Zemel referring to diagnoses of Lyme Disease as "health care fraud" in a 2019 article he wrote for the *CT Mirror*. *Exhibit 16*. Because a jury could find Dr. Zemel's testimony incredible, it could also find that his proffered reasons for his actions were "unworthy of credence" and that the report to DCF was pretextual, defeating a key element of Defendants' Section 1983 defense. *Brierly v. Deer Park Union Free School Dist.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005). The resolution of these inconsistencies is a task for the jury, which must be permitted to observe Dr. Zemel's demeanor and weigh his testimony against the conflicting evidence in the record.

**C.      Defendants Fail to Establish That Plaintiffs' Claims Are Untimely**

Defendants' argument that Plaintiffs' claims are barred by the statute of limitations under Connecticut General Statutes § 52–584 fails because it is based on a flawed interpretation of the

11

discovery rule, ignores the tolling effect of the continuing course of conduct doctrine and falsely claims that Plaintiffs commenced this action on May 15, 2023, which is utterly false. Plaintiffs commenced this action on October 19, 2022 (Dkt. No. 1), and amended their complaint on May 15, 2023 (Dkt. No. 47).

First, a genuine factual dispute exists as to when Plaintiffs discovered or reasonably should have discovered the "injury." Defendants argue that the two-year discovery period began on June 1, 2018, because the Pileggis disagreed with Dr. Zemel's diagnosis. This argument improperly conflates a parental disagreement with a specialist with the discovery of actionable medical malpractice. The "injury" here was not merely a difference of opinion, but the failure to diagnose and treat a progressive infectious disease, leading to years of suffering and the traumatic removal of a child from her home. It is unreasonable to expect laypersons, while under threat of a DCF investigation from a medical authority figure, to have sufficient notice of the essential elements of a cause of action for malpractice and "the court will refuse to grant summary judgment for the defendant if there is an issue of fact as to when the limitations period began." *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 609 (2d Cir. 1996). A jury could easily find that the injury was not reasonably discoverable until much later, such as when Dr. Lopusny rendered her contrary diagnosis, when lab tests in 2020 confirmed active infections, or even as late as 2026, when antibiotic treatment produced dramatic improvements confirming the misdiagnosis; as these events were what gave rise to the requisite "knowledge of facts" required to begin the statute of limitations. *Id.*

Second, even if the repose period is implicated, Plaintiffs' claims are saved by the continuing course of conduct doctrine. This doctrine tolls the statute of limitations where a defendant fails to correct an initial wrong and has a continuing duty to the plaintiff. *Evanston Ins.*

12

*Co. v. William Kramer & Assocs., LLC,* 890 F.3d 40 (2d Cir. 2018). Here, Dr. Zemel's initial alleged negligence on June 1, 2018—the misdiagnosis and the threatening DCF report—was not a discrete event. It set in motion a chain of events over which he and CCMC exercised continuing control. DCF's involvement, precipitated by Dr. Zemel, explicitly required that EP be treated exclusively by him. He continued to treat EP with powerful immunosuppressants for years while rebuffing evidence of Lyme disease, including a direct appeal from Dr. Lopusny.

Prior to this, on or about September 21, 2020, Dr. Lopusny made a provisional (presumptive) diagnosis of Lyme disease. That diagnosis, however, was expressly disputed by Dr. Zemel and CCMC, as reflected in Dr. Zemel's note dated April 7, 2021. *Exhibit 11.*  In that note, Dr. Zemel stated: "Her pediatrician, Dr. Lopusny, called me last week with concern about renewed knee swelling. . . . She felt that EP had Lyme disease. I told her that EP emphatically did not have Lyme disease based on previous negative testing and her clinical features." Dr. Zemel further stated: "EP does not have Lyme disease and should not be placed on antibiotics." *Exhibit 11*. This was Dr. Zemel's opinion, as EP's treating physician, up until at least April 7, 2021. *Id.*  Dr. Zemel maintained that position until his retirement on or about June 24, 2021. In light of these directly conflicting medical opinions, Plaintiffs, as laypersons, lacked sufficient notice at that time that EP had been misdiagnosed. Plaintiffs first received sufficient notice of Lyme disease misdiagnosis on in or around October 2022, when Dr. Lopusny confirmed EP's diagnosis and issued her written opinion on or about October 24, 2022.  *Exhibit 10*.

Hence, years of the Defendants' intentional interference with EP's treatment for Lyme Disease directly resulted in an unnecessary and severe exacerbation of her medical condition and prolonged suffering resulting in severe medical harm.  This course of conduct, in which

Defendants continually failed to reconsider their initial, flawed diagnosis and actively prevented alternative treatment, constitutes a continuing wrong that tolls the statute of limitations.

**D.    Plaintiffs Have Adduced Sufficient Expert Evidence to Support Their Claims**

Defendants' argument that Plaintiffs' claims fail for lack of qualified expert testimony is without merit. This argument is predicated on a deliberate mischaracterization of the required medical specialty and an unsupported attack on the sufficiency of Dr. Lopusny's expert opinion letter.

First, Defendants' attempt to disqualify Dr. Lopusny by framing this as a case that only a pediatric rheumatologist can address is a red herring. The central act of negligence alleged is not the improper treatment of JIA, but the *failure to diagnose Lyme disease in the first place*. The evaluation and diagnosis of a child presenting with a tick bite and symptoms of an infectious disease is squarely within the core competency of a board-certified pediatrician. Dr. Lopusny is a board-certified pediatrician who routinely diagnoses and treats Lyme disease in her practice. Under Connecticut law, the question is whether the expert is a "similar health care provider," which focuses on the specific medical issue at hand. *See* Conn. Gen. Stat. § 52–184c. Because the primary medical issue is pediatric infectious disease, not rheumatology, Dr. Lopusny is more than qualified to opine on the standard of care for diagnosing EP. A court is not required to hold that only a specialist in the defendant's exact field may testify when the alleged negligence falls within a broader, more fundamental area of medicine. *See I.M. v. United States*, 362 F. Supp. 3d 161, 196 (S.D.N.Y. 2019) (noting an expert "need not be a specialist in the exact area of medicine implicated by the plaintiff's injury").

Second, Dr. Lopusny's letter is more than sufficient to support Plaintiffs' claims at the summary judgment stage. It is a detailed, multi-page report that recounts EP's history, explains

14

the pathophysiology of Lyme disease, analyzes lab results, describes the standard of care for diagnosis (e.g., recognizing erythema migrans, understanding the limits of early serology), and states her opinions on breach, causation, and damages to a reasonable degree of medical probability. This is far from the "conclusory" or insufficient disclosure Defendants allege.

Finally, as to PA Fitzsimmons, his involvement must be viewed in the context of the overall negligent care provided at CCMC under Dr. Zemel's direction. While his specific role was limited, he was an agent of the institution that was perpetuating the misdiagnosis. Any lack of specific criticism of him in Dr. Lopusny's letter does not negate the overall institutional negligence and is a matter that can be further developed in discovery and at deposition. A plaintiff is not required to have a separate expert for every single provider in a chain of negligent care.

**E.      Defendants Have Not Shown Entitlement to Judgment as a Matter of Law on Timeliness Grounds**

Defendants' contention that Plaintiffs' claims are time-barred under either the discovery or repose portions of Connecticut General Statutes § 52–584 is incorrect and rests on a distorted view of the facts, the applicable tolling doctrines and the false premise that Plaintiffs commenced this action on May 15, 2023, which is utterly false.  Plaintiffs commenced this action on October 19, 2022 (Dkt. No. 1), and amended their complaint on May 15, 2023 (Dkt. No. 47).

. Summary judgment is improper because genuine issues of material fact exist as to when Plaintiffs reasonably discovered their injury, the statute of repose was tolled by Defendants' continuing course of negligent conduct which occurred up to April 7, 2021, and Plaintiffs commenced this action on October 19, 2022.

Defendants argue that the two-year discovery period began to run on June 1, 2018, the date of the initial visit with Dr. Zemel, because the Pileggis disagreed with his diagnosis of JIA. This misconstrues the law. A simple disagreement with a physician's opinion, particularly by

15

laypersons under duress, does not automatically trigger the statute of limitations. The discovery of an "injury" requires notice of the "essential elements of a cause of action" for medical malpractice, not merely a difference of opinion. The injury here was not the diagnosis itself, but the multi-year failure to treat a progressive infectious disease, the administration of harmful and unnecessary immunosuppressants, and the resulting physical and emotional trauma, including the forcible removal of EP from her home.

A reasonable jury could find that the Pileggis did not, and could not, have reasonably discovered the full extent of this actionable harm on June 1, 2018. At that time, they were being threatened with a DCF report by an authority figure who dismissed their concerns and authoritatively told them they were "not doctors." *Exhibit 3* ¶ 21. The date on which the injury became reasonably discoverable is a question of fact for the jury. Plausible dates for discovery are much later, May 2020, when a positive Lyme IgG test was returned; or even March 2026, when EP's dramatic recovery on antibiotics provided the most powerful evidence of Defendants' misdiagnosis. Because the date of discovery is genuinely disputed, summary judgment is inappropriate.

Furthermore, Plaintiffs' claims are not barred by the three-year statute of repose because the continuing course of conduct doctrine applies to toll the statute. This doctrine applies where a defendant breaches a continuing duty to the plaintiff that existed after the commission of the original wrong. Dr. Zemel's initial misdiagnosis and subsequent DCF report on July 3, 2018, were not discrete events; they were the beginning of a year-long course of negligent conduct.

Dr. Zemel and CCMC had a continuing duty to EP. They breached this duty by: (1) using the DCF process to mandate that EP be treated exclusively by Dr. Zemel, thereby preventing her parents from seeking effective care elsewhere (*Exhibit 3* ¶ 29); (2) administering a cocktail of

powerful immunosuppressants for years based on the flawed diagnosis (*Plaintiffs' Local Rule 56(a)(2) Statement* ¶ 24); and (3) repeatedly refusing to reconsider the diagnosis even in the face of mounting contradictory evidence, including positive serology and a direct appeal from another physician, Dr. Lopusny. *Exhibit 3* ¶ 22. This was not a single act of negligence but a continuous failure to correct a known error while maintaining control over the patient's treatment. This continuing course of conduct tolled the statute of repose, rendering Plaintiffs' claims timely.

**F.      Plaintiffs Have Produced Admissible Expert Evidence**

Defendants' argument that Plaintiffs' medical malpractice claims must fail as a matter of law for lack of a formal expert report under Federal Rule of Civil Procedure 26(a)(2) is unavailing. This position ignores the less stringent disclosure requirements for treating physicians and the substantial, detailed expert opinion letter from Dr. Diana Lopusny, which is more than sufficient to support Plaintiffs' claims at this stage.

As a treating physician, Dr. Lopusny is not required to submit a formal expert report that complies with the rigorous standards of Rule 26(a)(2)(B). Instead, her disclosures are governed by Rule 26(a)(2)(C), which requires only a summary of the facts and opinions to which the witness is expected to testify. Defendants' own briefing acknowledges this distinction, noting that the core inquiry is whether the disclosure "provides sufficient detail to permit defendants to prepare their defense." Dr. Lopusny's comprehensive letter easily surpasses this standard.

Dr. Lopusny's letter is not a "mere passing reference" or a collection of "conclusory opinions." It is a detailed narrative and analysis that establishes all necessary elements of Plaintiffs' medical malpractice claim. The letter:

(1) Summarizes the Facts: It recounts EP's entire relevant medical history, including her healthy status prior to the tick bite, the onset of classic Lyme

17

symptoms, the progression to disseminated disease, the results of various lab tests, and the year-long treatment course under Defendants.

(2) States Her Opinions Clearly: Dr. Lopusny opines to a reasonable degree of medical probability that EP suffered from Lyme disease, that the disease progressed due to the absence of timely antibiotics, that her years of symptoms were caused by the infection, and that the diagnosis was confirmed by her dramatic and objective improvement after receiving antibiotic therapy.

(3) Explains the How and Why: The letter explains *why* the initial negative Lyme test was not dispositive, *why* the expanding rash was diagnostic of erythema migrans, *why* the non-specific inflammatory markers were also consistent with a tick-borne illness, and *why* the subsequent positive response to antibiotics provides strong corroborative evidence of causation. This is precisely the kind of reasoning—the "how and why the expert reached a particular result"—that Rule 26 disclosures are intended to provide. *Jinghong Song v. Yao Bros. Grp. LP*, No. 10 CIV. 04157 RKE, 2012 WL 1557372 (S.D.N.Y. May 2, 2012).

This detailed disclosure provides Defendants with more than sufficient notice of the expert testimony they will face at trial, allowing them to prepare their defense and avoid any ambush. The failure to timely file a formal report is only grounds for summary judgment where the plaintiff's claims are left with no evidentiary support. That is not the case here. Plaintiffs have provided substantive, admissible expert evidence establishing breach of the standard of care and causation.

Any challenges Defendants raise regarding Dr. Lopusny's credentials, or her methodology are matters that go to the weight of her testimony, not its admissibility at the summary judgment

18

stage. The Second Circuit recognizes a "presumption of admissibility of [expert] evidence" (*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69 (S.D.N.Y. 2015), and disputes as to the strength of an expert's credentials "go to the weight, not the admissibility, of his testimony." *M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d 654 (N.D.N.Y. 2015). Dr. Lopusny's letter establishes a prima facie case of medical negligence sufficient to defeat summary judgment.

Notwithstanding the foregoing,  Plaintiffs have retained Dr. Harry F. Hull, a prominent pediatric physician and specialist in epidemiology with more than 40 years of experience in infectious disease control.  Dr. Hull is an expert in the epidemiology of infectious diseases, food borne disease, vaccine preventable diseases and disease outbreak control, including Lyme Disease. Dr. Hull has reviewed the extensive case file and is finalizing his report.  Plaintiffs' Rule 56 Motion seeking leave of this court to extend the time to disclose Plaintiffs expert for good cause, is currently pending.  Upon a favorable ruling of the court, said report is ready and can immediately be disclosed.

**G.      Dr. Zemel's Specialty Does Not Control the Relevant Standard of Care**

Defendants' attempt to shield Dr. Zemel from liability by narrowly defining the applicable standard of care as that of a pediatric rheumatologist is a red herring designed to distract from the true nature of the alleged negligence. This case is not about the esoteric treatment of a confirmed case of juvenile idiopathic arthritis ("JIA"). It is about the fundamental failure to correctly diagnose a child who presented with a classic case of tick-borne illness following a documented tick bite. Therefore, the operative standard of care is that of a reasonably prudent physician presented with this clinical scenario, a standard well within the expertise of a general pediatrician.

Defendants argue that because Dr. Zemel is a specialist in pediatric rheumatology, only another pediatric rheumatologist can opine on his conduct, effectively seeking to disqualify Plaintiffs' pediatric expert, Dr. Lopusny. This argument would only hold weight if EP had an established diagnosis of JIA and the dispute was over the specific treatment protocols for that rheumatic disease. That is not this case. The negligence occurred at the threshold: the diagnostic phase.

When EP presented to Dr. Zemel on June 1, 2018, she was a two-year-old child from a Lyme-endemic area who, days after the removal of an engorged deer tick, had developed an acute onset of fever, fatigue, a localized rash, and migrating joint pain. The central medical task at that moment was to conduct a differential diagnosis. The standard of care was not dictated by the specialized knowledge of rheumatology, but by the general and fundamental principles of pediatric infectious disease diagnosis. As Dr. Lopusny, a board-certified pediatrician, attests, Lyme disease is a "common and well-recognized condition that pediatricians routinely encounter, diagnose, and treat" in Connecticut.

Dr. Zemel's rush to a JIA diagnosis while summarily ruling out Lyme disease was a breach of this general diagnostic standard. As Dr. Lopusny explains, the inflammatory markers on which Dr. Zemel relied (elevated ESR and CRP, positive ANA) are non-specific and are "also consistent with tick-borne illnesses, such as Lyme disease." The standard of care required a full clinical evaluation that prioritized the presenting symptoms—the documented tick exposure and erythema migrans—rather than jumping to a diagnosis of exclusion based on non-specific labs.

To argue that only a rheumatologist can testify as to whether Dr. Zemel breached the standard of care is to argue that only a rheumatologist can identify Lyme disease—a proposition that is medically and legally unsupportable. Federal courts in this circuit do not require such a rigid

20

specialist-for-specialist match. An expert "need not be a specialist in the exact area of medicine implicated by the plaintiff's injury." *I.M. v. United States*, 362 F. Supp. 3d 161, 196 (S.D.N.Y. 2019). The appropriate inquiry is whether the expert is familiar with the specific condition and procedures at issue. Here, the condition is Lyme disease, and the procedure is a differential diagnosis in a child. Dr. Lopusny is an expert in both.

Defendants are effectively asking the Court to hold that they can define the standard of care based on a diagnosis that Plaintiffs contend, with substantial expert support, the patient never had. The negligence alleged is the failure to diagnose the illness EP *did* have—Lyme disease—not the mistreatment of the illness she did not. Because the core issue is one of pediatric diagnosis, the standard of care is that of a reasonably prudent pediatrician, and Dr. Zemel's specialty does not immunize him from scrutiny under that standard.

### H.    Dr. Lopusny Is Qualified to Offer Expert Opinions and Her Letter Supports Plaintiffs' Claims

Defendants' argument that Plaintiffs' claims must fail for want of a qualified expert is without merit. Plaintiffs have proffered the expert opinions of Dr. Diana Lopusny, EP's treating pediatrician, whose credentials, experience, and detailed analysis are more than sufficient to create a genuine issue of material fact and defeat summary judgment. Dr. Lopusny is a board-certified pediatrician practicing in Connecticut who routinely diagnoses and treats Lyme disease. Under the liberal standard for qualifying expert witnesses, her extensive experience with the central medical issue in this case—the diagnosis of a tick-borne illness in a child—renders her eminently qualified to testify. *See* Fed. R. Evid. 702; *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (noting the "liberal thrust" of the rules governing expert qualification).

The core purpose of expert testimony is to help the trier of fact to understand the evidence or to determine a fact in issue. Here, the central fact in issue is whether EP suffered from Lyme

disease or JIA. Dr. Lopusny's testimony directly assists the jury in understanding why the evidence points overwhelmingly to Lyme disease. Her qualifications are established not just by her board certification, but by her direct, practical experience in the relevant field. Defendants' attempt to dismiss her as a "general practice pediatrician" is precisely the point: the diagnosis of Lyme disease is the bread and butter of general pediatrics in Connecticut, not the exclusive domain of rheumatology. An expert need not have the same specialization as the defendant, particularly when the alleged negligence involves a failure at the initial diagnostic stage that falls within a broader medical field. *See I.M. v. United States*, 362 F. Supp. 3d 161, 196 (S.D.N.Y. 2019) (an expert "need not be a specialist in the exact area of medicine implicated by the plaintiff's injury").

Furthermore, Dr. Lopusny's opinion letter is sufficiently detailed and reliable to support Plaintiffs' claims at this stage. An expert opinion cannot be based on mere "subjective belief or unsupported speculation". Dr. Lopusny's opinion is the opposite; it is grounded in a thorough review of EP's entire clinical course and explains, with clear reasoning, how she reached her conclusions. Her letter demonstrates that her opinion rests on a reliable foundation, as required by *Daubert* and its progeny.

Specifically, Dr. Lopusny's letter establishes the standard of care for diagnosing a potential tick-borne illness by explaining that clinical evaluation must prioritize presenting symptoms like erythema migrans and a history of tick exposure, particularly given the known limitations of early serologic testing; explains how Dr. Zemel breached that standard by ignoring the clinical signs of Lyme, prematurely diagnosing JIA based on non-specific inflammatory markers also consistent with infection, and failing to order repeat serologic testing during the appropriate window, and provides a strong basis for causation, opining that the failure to provide timely antibiotic treatment directly led to the progression of EP's illness to disseminated Lyme disease. Critically, Dr.

22

Lopusny also provides powerful corroborating evidence of her diagnosis by documenting EP's "clear, objective, and clinically significant improvement" following a course of antibiotics—a response she correctly identifies as medically significant evidence of a bacterial etiology.

This is not a conclusory or speculative opinion. It is a well-reasoned analysis based on the facts in the record and established medical principles. Any criticisms Defendants have regarding Dr. Lopusny's methodology or credentials are matters for "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof"—they are not grounds for excluding her testimony at summary judgment. Disputes as to the strength of an expert's credentials or methodology go to the weight, not the admissibility, of the testimony. Dr. Lopusny's opinions create a quintessential battle of the experts that a jury must resolve.

## I.    Defendants' Reliance on Themselves as Experts Is Unpersuasive

Defendants improperly offer contested "expert opinions" of Dr. Zemel and P.A Fitzsimmons, who both have an interest in the outcome of this matter, as undisputed factual statements without laying the necessary foundation required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court functions as the "gatekeeper for expert testimony," a role that applies with equal force at the summary judgment stage. *See 523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 644 (S.D.N.Y. 2014). Defendants' core medical conclusions—including that EP was a victim of medical neglect, that the parents' choices were medically inappropriate, and that certain clinical findings like the abnormal IgA finding were irrelevant (*Exhibit 17, Zemel Depo*. p. 205:11-15)—are all expert opinions. Presenting these opinions as established facts in a memorandum or Rule 56(a) statements is improper. "An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary

23

judgment." *Major League Baseball*, 542 F.3d at 311. An expert opinion requires an explanation of the methodology and evidence substantiating the conclusion, not simply the *ipse dixit* of the expert. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

For these reasons, Plaintiffs request that the Court strike or disregard the inadmissible hearsay, speculative assertions, and un-vetted "expert opinions" contained within Defendants' evidentiary submissions and deny the motion for summary judgment that improperly relies upon them.

**J.    The Court Should Not Resolve Credibility Determinations or Factual Disputes on Summary Judgment**

At its core, Defendants' motion asks this Court to improperly assume the role of the jury by weighing evidence, resolving testimonial conflicts, and making credibility determinations in their favor. This is not the function of summary judgment. The Supreme Court has unequivocally held that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Because the record in this case is saturated with conflicting testimony, competing expert opinions, and profound questions regarding the credibility of the Defendants, summary judgment must be denied.

The credibility of Defendant Dr. Lawrence Zemel is not merely at issue; it is a central, dispositive question that a jury must decide. His deposition testimony is rife with "weaknesses, implausibilities, inconsistencies, [and] incoherences" from which a jury could find his proffered reasons for his actions "unworthy of credence." *Brierly v. Deer Park Union Free School Dist.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005). For example, Dr. Zemel's testimony regarding his knowledge of EP's prior care is fundamentally contradictory; he claimed ignorance of the treatments she was receiving while simultaneously condemning those same unknown treatments

24

as constituting neglect. A jury must decide whether Dr. Zemel's conclusions were based on a thorough medical inquiry or on unsupported assumptions and bias.

Moreover, there is a stark conflict between Dr. Zemel's account of the June 1, 2018, visit and the sworn testimony of both Katharine and Anthony Pileggi. While Defendants' motion paints a picture of concerned medical practice, the Pileggis attest that Dr. Zemel was dismissive and hostile, refusing to examine the tick bite or rash, physically mishandling their child, and immediately threatening a DCF report when they simply expressed their right to seek a second opinion. Whether Dr. Zemel's dismissal of the parents' concerns was a reasonable medical judgment or a biased refusal to consider alternatives is a classic question of credibility and motive for the jury.

Similarly, the direct clash between Dr. Zemel's diagnosis of JIA and Dr. Lopusny's diagnosis of Lyme disease—supported by years of clinical observation and EP's objective recovery on antibiotics—presents a quintessential "battle of the experts." Resolving this conflict requires the jury to assess the credibility of each expert, the reliability of their methodologies, and the strength of their reasoning. It is not a determination that can be made on a paper record. Disputes regarding an expert's credentials or methodology go to the weight of the evidence, not its admissibility, and are reserved for the jury.

These are not peripheral details; they go to the heart of Defendants' entire defense. The "good faith" of the DCF report, the "objective reasonableness" required for qualified immunity, and the non-pretextual basis for Defendants' actions all hinge on the jury believing Dr. Zemel's version of events. Plaintiffs have a Seventh Amendment right to have a jury of their peers hear the testimony, observe the witnesses' demeanor, and decide who and what to believe. To grant summary judgment here would be to usurp that fundamental role.

25

**K.      Defendants Have Not Established the Applicable Standard of Care or Their Compliance with It**

Defendants' motion for summary judgment is fatally deficient because they have failed to meet their initial burden of establishing the applicable standard of care and their adherence to it. A defendant moving for summary judgment in a medical malpractice case cannot simply declare their conduct was appropriate; they must affirmatively establish, through admissible expert evidence, what the prevailing professional standard of care was and how their actions conformed to it. *See Ardoline v. Keegan*, 140 Conn. 552, 556 (1954). Defendants have failed to make this essential prima facie showing, relying instead on conclusory statements and speculative opinions that are insufficient as a matter of law.

Defendants' submissions fail to articulate, let alone establish, the governing standard of care for a physician confronted with a child presenting with EP's symptoms. For instance, when dismissing a key abnormal lab result, Dr. Zemel testified, "We don't pay attention to IgA. It's IgG or IgN we pay attention to" (*Exhibit 17, Zemel Depo*. p. 205:11-12). This is not an articulation of a recognized medical standard; it is a conclusory and self-serving statement about his team's idiosyncratic practice. As the court in *Foley v. United States*, 294 F. Supp. 3d 83 (D. Conn. 2018), found, an expert's failure to "explain any standard practice" for a particular medical decision is a critical flaw that renders the opinion insufficient to support summary judgment. Defendants have provided no admissible evidence explaining the standard of care for a physician presented with a child from a Lyme-endemic area with a documented tick bite, an expanding rash consistent with erythema migrans, and a constellation of systemic symptoms.

Furthermore, Defendants' justification for their actions relies on speculative opinions that lack a proper evidentiary foundation. There is a gaping analytical chasm between Defendants' observation of a disagreement with the Pileggis over the course of treatment and their drastic

26

conclusion that state intervention was necessary. This dire prognosis is offered without any detailed, fact-based medical analysis that would be admissible under Federal Rule of Evidence 702. Such unsupported and conclusory opinions are insufficient to sustain a motion for summary judgment. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment.")

Finally, a defendant cannot establish a prima facie case of adherence to the standard of care by relying on the testimony of a witness whose credibility is so thoroughly undermined and who has a direct interest in the outcome of the matter. As detailed previously, Dr. Zemel's deposition is rife with inconsistencies regarding his knowledge of EP's prior care, his familiarity with naturopathic medicine, and the diagnostic process for Lyme disease. During his deposition, Zemel testified "We often don't wait. If the child had a history of tick bites and developed flu-like symptoms we would usually treat presumptively." (*Exhibit 17, Zemel Depo*. Vol. 1, p. 20: 8-10). He further stated, "As I said, if the child has flu-like symptoms with a history of tick exposure, then we would treat and not wait." Id at lines 16-18.

It is logically impossible for Defendants to establish adherence to the standard of care when their key witness claims ignorance of the very treatments EP was receiving while simultaneously condemning those unknown treatments as a breach of that standard (*Exhibit 17, Zemel Depo*. p. 206:13-19). Such testimony does not demonstrate the absence of a genuine dispute of material fact; it creates one.

Because Defendants have failed to come forward with admissible, non-conclusory expert evidence establishing the applicable standard of care and their adherence to it, they have not met

their initial burden as the moving party. Without such a showing, the burden never shifts to Plaintiffs to demonstrate a triable issue of fact, and the motion for summary judgment must be denied.

## V. <u>CONCLUSION</u>

For all the foregoing reasons and based upon the extensive record of disputed material facts, Plaintiffs respectfully request that this Honorable Court deny Defendants' Motion for Summary Judgment in its entirety. The evidence demonstrates that this case is fundamentally about contested facts, conflicting expert opinions, and the credibility of the parties—all matters that must be resolved by a jury at trial. Plaintiffs have met their burden to show that a reasonable jury, viewing the evidence in the light most favorable to them, could return a verdict in their favor. Accordingly, this matter should be permitted to proceed to trial on all claims.

Dated: April 23, 2026

Respectfully submitted,

*Tricia Lindsay*

TRICIA S. LINDSAY
*Attorney for Plaintiffs*
531 E. Lincoln Ave STE 5B
Mount Vernon, NY 10552
Ph. (347) 386-4604; (347) 349-5433
Fax. (914) 840-1196
tricialindsaylaw@gmail.com
attorney@tricialindsaylaw.com

28