# Exhibit 13



**88 NOBLE AVENUE SUITE 101, MILFORD, CT 06460-4738**

April 13, 2026

Re:     Emma Pileggi
64 Boardman Road
New Milford, CT 06776
DOB: 9/2/2015

To Whom It May Concern,

1.      I have been Emma's pediatrician since she began receiving care at my practice in August 2018. I am board certified in Pediatric Primary Care. Emma has been affected by Lyme disease with associated co-infections since 2018. In Connecticut, Lyme disease is a common and well-recognized condition that pediatricians routinely encounter, diagnose, and treat.

2.      I have reviewed the available medical history, clinical course, laboratory data, and treatment response pertaining to Emma. Based on this review the following opinions are offered.

3.      Emma was a healthy child with no significant medical history prior to a documented tick exposure on or about May 25-26, 2018. Previously, on February 22, 2018, she had a regular well-child checkup by her pediatrician, Dr. Alder. The follow-up was scheduled in six months (a copy of the well-child checkup, dated February 22, 2018, is annexed hereto as Attachment 1).

4.      As Emma's parents described that an engorged deer tick was removed on May 28, 2018 from Emma's right leg. She developed acute tick-borne infection symptoms including fever, fatigue, myalgia and arthralgia, drowsiness, localized erythematous rash at the site of the tick

bite, lymphadenopathy, and musculoskeletal pain. During this time, Emma also sustained a fall due to drowsiness, resulting in left knee injury and swelling.

5.    Emma's parents brought her to Dr. Alder, her pediatrician at that time, expressing concerns for acute tick-borne symptoms following a tick bite. According to the parents, they presented the removed engorged tick to Dr. Alder during the visit and showed the red rash on her right leg at the site of the tick bite. They also pointed out the abrasion and swelling on her left knee, which occurred on May 28, 2018, after she fell due to drowsiness following the bite.

6.    Dr. Alder ordered an X-ray of the left knee. The X-ray report dated May 29, 2018, noted possible joint effusion and prominent soft tissues, which may be due to soft tissue swelling (a copy of the left knee X-ray report is annexed hereto as Attachment 2).

7.    Dr. Alder's notes dated May 29, 2018, did not describe the site of the tick bite, the presence of a visible rash, or the fact that the tick was removed on May 28, 2018. The notes further omit the associated symptoms of tick-borne infection reported by the parents, though Dr. Alder did order Lyme serology.

8.    While Dr. Alder's records indicate the reason for the visit was "two swollen knees," the parents maintain that only the left knee was swollen. An X-ray was ordered for the left knee only, which had sustained an injury approximately 24 hours prior. According to the parents, the chief complaint presented was acute tick-borne infection symptoms, not arthritis.

9.    Dr. Alder did not administer prophylactic antibiotics. Instead, due to the knee swelling, arthritis was considered, and the patient was referred to a pediatric rheumatologist, Dr. Zemel.

10.    Dr. Zemel's notes of June 1, 2018, similarly failed to document the reported tick bite, the associated acute symptoms, or the injury sustained from the fall. He diagnosed Emma with juvenile idiopathic arthritis (JIA) based on a swollen knee and non-specific inflammatory

2

markers, including an elevated ESR and CRP, and a positive ANA. However, these markers are equally consistent with tick-borne illnesses, such as Lyme disease.

11. Given the negative RF and CCP results, the clinical data available at that time was insufficient to definitively exclude an acute tick-borne infection in favor of a JIA diagnosis.

12. Because ANA, CRP, and ESR are non-specific inflammatory markers that may be present in the setting of any active infection, clinical evaluation typically prioritizes presenting symptoms, such as fever, rash, and history of tick exposure, particularly in the early phase of Lyme disease. These laboratory findings must be interpreted within the full clinical context.

13. The non-specific inflammatory markers, such as ANA, CRP, and ESR do not exclude an infectious etiology of Lyme disease and are not specific to JIA.

14. Initial Lyme serologic testing ordered by Dr. Alder was performed two days after tick removal. It was negative. This is consistent with well-established limitations of early testing, as antibodies may not yet be detectable. No repeat serologic testing was performed during the appropriate 3-6 week window when seroconversion would be expected.

15. In June 2018 the rash at the bite site expanded to approximately 2.5 inches in diameter, consistent with erythema migrans, which is diagnostic of Lyme disease when correlated with the patient's clinical presentation.

16. By July 2018, Emma's condition progressed to include a second erythematous lesion on the scalp, migrating myalgias, followed by joint swelling, neurologic symptoms ( paresthesia and irritability), and cardiac manifestations, including palpitations and chest discomfort. This progression is consistent with early disseminated Lyme disease.

17. On August 2, 2018, I evaluated Emma and Lyme disease was clinically diagnosed. Despite this, antibiotic therapy was not initiated due to involvement of the Department of

3

Children and Families (DCF) requiring Emma to be treated by Dr. Zemel and CCMC with immunosuppressants for JIA. Her treatment was managed by Dr. Zemel, and from September 2018 through September 2020 she was unable to continue care within our practice.

18. Between 2018 and 2020, Emma experienced progressive symptoms consisted with Lyme disease, including migratory musculoskeletal pain, fatigue, joint swelling, neurologic and cardiac complaints. During this period, she was treated by Dr. Zemel and CCMC for presumed juvenile idiopathic arthritis with the following medications: NSAIDs, Prednisone, Etanercept (Enbrel), Adalimumab (Humira), and Methotrexate.

19. Antibiotic therapy was not administered at our office due to a risk of drug interaction with immunosuppressive medications administered by Dr. Zemel and CCMC. If used concurrently, such treatments require coordination with close clinical monitoring.

20. Laboratory test reported on May 13, 2020 demonstrated positive Lyme IgG by ImmunoBlot, as well as reactive Bartonella co-infection reported on November 11, 2020 (a copy of the Lyme IgG report of May 13, 2020 and Bartonella report dated November 11, 2020, are annexed hereto as Attachment 3).

21. At that time, Emma remained symptomatic, consistent with late disseminated Lyme disease. She was also evaluated by Dr. Tom Moorcroft between September and December 2020. He diagnosed her with Lyme disease and tick-borne co-infections based on history, clinical presentation, and positive Lyme IgG, as well as reactive Bartonella co-infection. He expressed his clinical opinion that Emma required treatment with antibiotics.

22. I contacted Dr. Zemel at CCMC to express concern that Emma had Lyme disease and required antibiotic treatment. This would have required either pausing immunosuppressive therapy during antibiotic use or carefully managing both treatments to avoid drug interactions.

4

23.    Dr. Zemel did not agree to initiate antibiotic therapy. He expressed his opinion to me on the phone, which is reflected in his record, stating that Emma does not have Lyme disease and should not be placed on antibiotics. He continued treatment with immunosuppressants (a copy of Dr. Zemel's progress record, dated April 7, 2021, is annexed hereto as Attachment 4).

24.    Prior to recent antimicrobial therapy with antibiotics, Emma continued to exhibit recurrent symptoms consistent with late disseminated Lyme disease, including migratory joint and muscle pain, recurrent knees swelling, fatigue, irritability, distal paresthesia, spinal pain with burning characteristics, palpitations, chest pressure, and intermittent dizziness.

25.    The Lyme ImmunoBlot IgG testing, repeated on March 4, 2026, was positive ( a copy of the report of Lyme IgG testing, dated March 4, 2026, is annexed hereto as Attachment 5).

26    Emma completed a 28-day course of antibiotic therapy with Amoxicillin that began on March 9, 2026. Following this course of antibiotic therapy, there was a clear, objective, and clinically significant improvement in her condition.

27.    Specifically, there was a marked reduction in joint pain and swelling, near-complete resolution of back and spinal pain, improved energy level and mood, decreased numbness and tingling, complete resolution of dizziness, and resolution of palpitations and chest-related symptoms.

29.    This documented and substantial response to appropriate antibiotic therapy is medically significant. Such improvement is consistent with a bacterial etiology of Borrelia burgdorferi, the causative agent of Lyme disease, and provides strong corroborative evidence supporting the diagnosis of Lyme disease, and its role in her prior symptomatology.

30.    Based on the documented history of tick exposure in highly endemic area, the presence of erythema migrans lesions, progression of symptoms consistent with early disseminated Lyme

5

disease, progression to late disseminated Lyme disease, confirmatory serologic findings, and a clear and measurable response to antibiotic therapy, it is my medical opinion, to a reasonable degree of medical probability, that:

1) Emma developed Lyme disease as a direct result of the tick exposure around May 25, 2018.

2) The disease progressed to disseminated Lyme disease due to the absence of timely antibiotic treatment.

3) The symptoms experienced between 2018 and 2026 are consistent with Lyme disease.

4) The significant clinical improvement following antibiotic therapy further confirms both the diagnosis and the causal relationship between Lyme infection and her symptoms.

31.    Continued monitoring and reassessment are warranted to determine the need for additional treatment and to ensure sustained clinical recovery.

I am the treating physician for Emma Pileggi. I wrote this letter based on the patient's history, review of medical records, clinical evaluation, review of laboratory tests, my personal knowledge, and treatment of the patient. The facts and opinions herein are true and correct. I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 13. 2026

Sincerely,

Diana Lopusny, MD
License Number: 043 810
Preferred Pediatrics
Tel: 203-874-2800

6

## Certification of Medical (Business) Records

I am, Diana Lopusny, MD, a pediatrician at Preferred Pediatrics and I am familiar with the manner in which medical records are created and maintained in this practice. The document(s), such as the letter of Diana Lopusny, MD, dated April 13, 2026, along with three Attachments, are true and accurate copies of records kept in the course of a regularly conducted activity of this practice.

These records were made at or near the time of the events recorded by, or from information transmitted by, a person with knowledge of those events. It is the regular practice of this office to make and maintain such records. I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2026.

Diana Lopusny, MD
License Number: 043810
Preferred Pediatrics
Tel: 203-874-2800

7