# Exhibit 17

Lawrence Zemel , v2

Page 200

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

                                    :

KATHARINE PILEGGI, ANTHONY        :
PILEGGI,

               Plaintiffs,        :
also, as Next Friend to their     :
Minor Child "EP"                  :
                                    :   CIVIL No.
 -vs-                             :   3:22-cv-01315-AWT
                                    :

KIM MATHIAS, Assistant Attorney   :
General State of Connecticut,     :
in her individual and official    :
capacity, Kaela Minerly in her    :
individual and official capacity:   Volume 2
Connecticut Children's Medical    :
Center, Dr. Roman Alder, Dr.      :
Lawrence Zimmel, Dr. Lindsey      :
Laughinghouse, Dr. Andrew Bazos,  :
Dr. Kevin Fitzsimmons,            :
Connecticut Department of         :
Children and Families ("DCF")     :
and "John and Jane Does 1-10"     :
               Defendants.       :
_____ :

           CONTINUED
DEPOSITION OF: LAWRENCE ZEMEL, M.D.
DATE TAKEN:    DECEMBER 12, 2025
LOCATION:      ZOOM VIDEO CONFERENCE

KATHLEEN S. NORTON, CSR #105

Lawrence Zemel , v2

Page 205

bite, she had an abnormal IgA finding?

MR. JOHNSON:  Objection to form.

BY MS. LINDSAY:

Q.    Was that clear?

MR. JOHNSON:  You can answer.

A.    Oh, her Lyme test was negative.

BY MS. LINDSAY:

Q.    But do you understand that -- are you aware she had an abnormal IgA finding which is indicative to Lyme and and co-infection?

A.    We don't pay attention to IgA.  It's IgG or IgN we pay attention to.

Q.    Why don't you pay attention to IgA?

A.    It's not recognized as being important in diagnosing Lyme disease.

Q.    Is that for -- is that at CCMC or is that just --

A.    That is nationally.

MR. JOHNSON:  You have to let her finish the question before you start answering.

A.    I'm sorry.  Go ahead.

BY MS. LINDSAY:

Q.    Well, if you heard me you can go ahead.  Is that at CCMC or in your opinion, or

Page 206

is that common medical practice?

A.    The latter.

Q.    Common medical practice.  Okay.  Are you aware that IgA is an antibody that protects the body to binding pathogens and toxins?

A.    IgA is a respiratory antibody that is present in nasal mucosa and respiratory mucosa, has nothing to do with Lyme disease.

Q.    Are you aware it protects the body from being -- it protects the body?

A.    Yes, protects the body from respiratory infections.

Q.    Are you aware that Emma has mold toxicity?

A.    I saw something in the notes about the previous house allegedly had mold.

Q.    Well, you saw that now.  Were you aware at that time?

A.    No.

Q.    Okay.  Are you aware that Emma has an MTHFR double-copy gene mutation?

A.    I don't recall.

Q.    You don't recall if she had it.  Do you recall, do you remember anything about that, about being aware of it?

Page 207

A.    I don't recall seeing that.

Q.    Okay.  I imagine that you're familiar with what I'm talking about, correct?

A.    Somewhat.

Q.    Are you aware that people who possess these gene mutations have a harder time detoxing and healing?

A.    No, I'm not aware of that.

Q.    Are you aware that medications she was placed on during her stay at CCMC was life-threatening to those who have MTHFR?

MR. JOHNSON:  Objection to form.

A.    No, that's not true.

BY MS. LINDSAY:

Q.    Well, you just said you weren't aware that people that have this gene mutation take a longer time detoxifying and healing.  Are you aware of the gene mutation?  Do you have knowledge of it?

A.    I'm somewhat aware of it but it was not part of my everyday practice.

Q.    Okay.  And you weren't aware she had this gene mutation, correct?

A.    That's what I said.

Q.    Okay.  So that was not taken into consideration when you prescribed the regimen that

Page 208

you placed her on?

A.    It was not a consideration.

Q.    Okay.  So are you aware that it can cause severe abdominal pain?

A.    The mutation causes abdominal pain?

Q.    Along with the regimen that you placed her on, yes.

A.    No, I'm not aware of that.

Q.    Okay.  And heart increased heart rate?

A.    I disagree.

Q.    You disagree.  What's the basis of your disagreement?

A.    It's not standard practice to, A, to test for it, number one; and B, to monitor your heart rate if somebody has a genetic mutation for that.  That's not standard practice.

Q.    Is it standard practice to consider a person's medical history before placing them on a medical regimen?

A.    Yes.

Q.    Okay.  Are you aware that Emma's medical records show her Lyme history which was communicated to both yourself and DCF?

MR. JOHNSON:  Objection to form.

A.    Yes.

3 (Pages 205 - 208)

Lawrence Zemel , v2

Page 209

BY MS. LINDSAY:

Q.   When you called DCF on the Pileggis, Emma was eventually removed.  Did you consider the emotional and psychological harm that would have on her?

A.   Yes.

Q.   Did you consider the impact that that psychological and emotional harm would have on her healing?

A.   On balance it was more important to get her healthy.

Q.   More important to what?

A.   To get her healthy and to prevent a lifetime of disability.

Q.   Do you know anything about medical kidnapping?

A.   I'm not aware of the term.

Q.   So you're not aware that it refers to children that are taken from families under the pretext of medical and healthcare disputes?

A.   No.

Q.   Okay.  Are you aware of the hospital and child welfare that hold partnerships together?

MR. JOHNSON:  Objection to form.

Page 210

BY MS. LINDSAY:

Q.   Child welfare agencies.

MR. JOHNSON:  Objection to form.

A.   I don't understand the question.

BY MS. LINDSAY:

Q.   Are you aware that -- okay.

Are you aware that hospitals and child welfare agencies, some hospitals and child welfare agencies have partnerships?

A.   Yes.

MR. JOHNSON:  Objection to form.

BY MS. LINDSAY:

Q.   Can you tell me if CCMC is one of them?

MR. JOHNSON:  I'm just going to object to the form.  I think it's vague but you can answer if you can.

BY MS. LINDSAY:

Q.   You said that you're aware of the partnerships between hospitals and child welfare agencies.  You said yes, correct?

A.   Yes.

Q.   Is CCMC one of the hospitals that holds partnerships with child welfare agencies?

MR. JOHNSON:  Objection to form.

A.   Literally every children's hospital

Page 211

works closely with child protection services under certain circumstances.

BY MS. LINDSAY:

Q.   What are the circumstances, please?

A.   Well, if there is evidence of medical abuse or if there is evidence of child abuse or medical neglect.

Q.   And so when you called Department of Children and Families on the Pileggis, you felt that there was evidence of medical neglect?

A.   Yes.

Q.   And that is because you did not agree with their choice to seek alternative treatments for their daughter, correct?

MR. JOHNSON:  Objection to form.

You can answer.

A.   I knew that their choice of alternative intervention was putting their child at risk.

BY MS. LINDSAY:

Q.   Yet you testified that you know nothing about naturopathy, correct?

A.   Well, I wouldn't say nothing but I know that naturopaths have no training in rheumatology.

Q.   And you never reached out to any of her doctors to determine if they were medical doctors

Page 212

as well as naturopathic doctors, correct?

MR. JOHNSON:  Objection to form.

A.   Well, it's a loaded question.  A naturopathic doctor does not have a medical degree.

BY MS. LINDSAY:

Q.   Are you sure about that?

A.   Yes.

Q.   Okay.  But you never reached out to any of her doctors to determine the care that she was receiving from them to determine if she was under medical care or strictly naturopathic care, correct?

A.   Yes.

Q.   Okay.  Are you aware Emma now suffers from PTSD from this?

MR. JOHNSON:  Objection.

BY MS. LINDSAY:

Q.   Are you aware Emma suffers now from PTSD from being taken from her parents and the treatment that she was receiving?

A.   I'm not aware and I haven't seen any documentation that that is the case.

Q.   Are you aware of the negative reviews of CCMC?

MR. JOHNSON:  Objection to form.

4 (Pages 209 - 212)

Lawrence Zemel , v2

Page 213

BY MS. LINDSAY:

Q. By the community.

A. No.

Q. You have never seen any?

A. Well, maybe 15 years ago, you know, we had an issue with public health over some systems issues but recently whenever I talk to friends or family, people are uniformly positive about the hospital.

Q. Have you ever seen the medical reviews of yourself, the reviews of yourself?

A. No, I don't pay attention to that.

Q. You've testified during the last deposition that you wrote a number of articles on Lyme disease. Do you recall that?

A. I testified that I what on Lyme disease?

Q. You've written a number of articles.

A. Yes, that is correct.

Q. Have you ever in your years practicing, have you ever gone back and refuted your articles, corrected them, updated them with information that may have -- that may be different today than it was when you first initially wrote it or do you stand by your articles?

A. Yes, I stand by the articles. I mean,

Page 214

there may have been some new information but it didn't refute some previous information.

Q. Do you recall writing a 1986 article Lyme Disease is Up Among Children --

A. Yes.

Q. -- in the New York Times? Do you recall that article?

A. Yes, I vaguely recall but I don't remember exactly the content of that.

Q. Well, the 1986 article quotes you as saying Lyme disease is much more common in children than adults and often misdiagnosed as juvenile arthritis, but in your transcript from your initial deposition you downplayed misdiagnosed risks. How do you reconcile this with your 1986 statement in this case?

A. Well --

Q. I can put up the article. If you would like me to show you the article I can.

A. Well, I'm not going to argue the points of an article that was written 30 years ago.

Q. Well, that's why I asked if you stand by what you're saying because you said that Lyme disease is often misdiagnosed, right, as juvenile arthritis. And isn't that the situation that is

Page 215

here?

A. What you're missing, Attorney Lindsay, is the nuance. You're making a blanket statement without any nuance.

Q. I'm not making a blanket statement. I'm asking you a question about your statement. You made a statement and I'm asking you about your statement.

A. Well, if a child presents with a single swollen knee, juvenile idiopathic arthritis, which used to be called juvenile rheumatoid arthritis is a consideration initially and that was especially true during the early history of Lyme disease in this country which was the '70s on and '80s. But once it became clear that the arthritis quickly disappeared, then that ruled out juvenile idiopathic arthritis. JIA has a persistent arthritis. Lyme disease generally in the early stages does not have a persistent arthritis.

Q. But you didn't test Emma so you didn't know whether she was in early stages or not. Okay. At least that's what you've testified to.

The article discussed a new clinic for Lyme at Newington Children's Hospital. That's your first employer, correct?

Page 216

A. That's right.

Q. Given your -- given that your early involvement in the clinic, why didn't you refer Emma to similar testing protocols in 2018 despite the endemic area risks?

A. Why did I --

Q. That you spoke about in your article. Uh-hum.

MR. JOHNSON: Are you talking about the 1986 article?

MS. LINDSAY: Yes.

BY MS. LINDSAY:

Q. When you spoke about routine Lyme testing -- let me be clear.

You spoke about routine Lyme testing and yet you denied Emma those protocols?

A. Emma did not have Lyme disease.

Q. But you didn't put her through the testing protocols?

A. She was tested before I saw her. She does not have Lyme disease.

Q. And we went through that whole testimony. You didn't gather information. You didn't retest her. That's fine. I'm simply asking why didn't you put her through the protocols that

5 (Pages 213 - 216)

potential tick exposure at which time the blood test would become positive.

Q.    And at that point, can that child be -- can the disease progress to stage two or three within a couple of weeks?

A.    Possibly.

Q.    So why wait?

A.    We often don't wait.  If the child had a history of tick bites and developed flu-like symptoms we would usually treat presumptively.

Q.    So if you're waiting the two to three weeks for symptoms to appear before testing, tell me if I'm wrong, I'm trying to follow you, is there any treatment done in the meantime to prevent -- any preventative measures taken?

A.    As I just said, if the child has flu-like symptoms with a history of tick exposure, then we would treat and not wait.

Q.    Okay.  What does that treatment look like?

A.    Oral antibiotics.

Q.    Would you perform blood work at that point if there is no rash apparent but they have flu-like symptoms with the tick or you just assume it's Lyme disease?

A.    Depends on how long symptoms were going