**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| KATHARINE PILEGGI and ANTHONY PILEGGI, Plaintiffs, | : | |
| v. | : | |
| KIM MATHIAS, JOETTE KATZ, KAELA MINERLY, FRANK ROTOVNIK, CONNECTICUT CHILDREN'S MEDICAL CENTER, DR. ROMAN ALDER, DR. LINDSEY LAUGHINGHOUSE, DR. ANDREW BAZOS, KEVIN FITZSIMMONS, P.A., HEATHER PERRAULT, CONNECTICUT DEPARTMENT OF CHILDREN AND FAMILIES, and LAWRENCE ZEMEL, M.D., Defendants. | : | Civil No. 3:22-CV-1315 (AWT) |

**RULING ON DCF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The remaining defendants in this case are Connecticut Children's Medical Center ("CT Children's"), Lawrence Zemel, M.D., and Kevin Fitzsimmons, P.A. (collectively, the "CT Children's Defendants"); and Kaela Minerly and Frank Rotovnik. Rotovnik and Minerly have moved for summary judgment on the remaining claims against them; the CT Children's Defendants have moved separately for summary judgment on the remaining claim against them.

For the reasons set forth below, the motion for summary

judgment filed by Frank Rotovnik and Kaela Minerly is being granted.

## I. FACTUAL BACKGROUND

The factual background in this case is extensive. Only the facts material to the remaining claims against defendants Kaela Minerly and Frank Rotovnik are set forth below.

The Department of Children and Families ("DCF") is "authorized to bring petitions alleging child neglect before the Connecticut Superior Court for Juvenile Matters in furtherance of its child protection duties." (ECF No. 109-1, Pls.' Local Rule 56(a)(2) Statement of Facts in Opp'n the DCF Defs.' Mot. Summ. J. ("56(a)(2) Statement") at ¶ 1.)[1] On December 27, 2018, Social Worker Kaela Minerly was assigned to investigate the Pileggi family. (See id. at ¶ 2.) After taking initial intake steps, such as visiting the family and requesting medical records, she was replaced as the investigator by Frank Rotovnik on February 6, 2019. (See id.) After February 6, 2019, Minerly was not assigned as a social worker to the case. (See id.) Frank Rotovnik served as the investigative social worker beginning February 6, 2019; he was later promoted to supervisor and remained involved until the case was closed in March 2020.

[1] When the court cites to a page number in an electronically-filed document, it is referring to the page number generated by the Electronic Case Filing system. It is not referring to the page number in the original document. The ECF-generated page number appears in the header of each page.

(See id. at ¶ 3.)

The minor child, EP, was diagnosed with Juvenile Idiopathic Rheumatoid Arthritis at Connecticut Children's Medical Center by Dr. Lawrence Zemel in June 2018. (See id. at ¶ 4.) The parents declined the treatment recommended by Dr. Zemel to pursue alternative options, eventually engaging a licensed pediatrician, Dr. Diana Lopusny, to oversee EP's care plan alongside naturopathic providers. (See id. at ¶ 5; Pls.' Statement of Additional Material Facts at ¶ 3.) Katharine Pileggi testified that EP subsequently received laboratory-supported diagnoses of Lyme disease. (ECF No. 109-3, Katharine Pileggi Dep. at 4:21 to 6:2.)

On March 28, 2019, Rotovnik submitted on behalf of DCF to the Connecticut Superior Court for Juvenile Matters an affidavit, a neglect petition, and a motion for an Order of Temporary Custody. In seeking the Order of Temporary Custody, DCF relied on information from medical providers who were reporting concerns over EP's medical condition. (See 56(a)(2) Statement at ¶ 7; see also ECF No. 96-2, Rotovnik Aff. at ¶ 5; 7.)

The Superior Court granted the ex parte Order of Temporary Custody on March 28, 2019. On April 5, 2019, the parents appeared with counsel and agreed to the Order of Temporary Custody.

Anthony Pileggi testified that on an unknown date, "one of the ladies [] from DCF" whispered to him and his attorney that he would get his daughter back sooner if the parents divorced. (ECF No. 109-9, Anthony Pileggi Depo. Tr. Vol. II at 5:9-21.) Anthony Pileggi also testified that Frank Rotovnik told him that he would more quickly get custody of EP if Katharine Pileggi were removed from the home. (See ECF No. 96-2, Anthony Pileggi Depo. Tr. Vol. II at 143:16-21 ("Q. And what Frank told you in these communications was what? A. If I removed Katharine from the home and I can provide him with a lease that Katharine is out of the home, that it would move the process along, it would be greatly appreciated.")).

On October 9, 2019, the Superior Court approved a written agreement revoking EP's commitment and placing EP under protective supervision. The court gave Anthony Pileggi primary physical custody and final decision-making authority. The court ordered that if Katharine Pileggi wished to seek a future modification of custody, she must first undergo a follow-up psychological examination. The juvenile case formally closed in March 2020.

Beginning in November 2020, a DCF administrative hearing officer conducted a Substantiation Hearing, where the Pileggis were represented by counsel. The hearing officer upheld DCF's charges of medical and physical neglect against the parents in a

final decision dated January 28, 2021, which the parents did not appeal.

Katharine Pileggi subsequently filed for a dissolution of marriage on February 22, 2024, and a judgment of dissolution was entered on May 14, 2024.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce of Indus. Ins. Co., 524 F.2d 1317, 1319–20 (2d Cir.

1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge . . . ." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being

granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. See Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("'[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" (quoting Celotex, 477 U.S. at 323)). Immaterial factual disputes will not prevent summary judgment.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant . . . and draw all reasonable inferences in [the non-movant's] favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990) (alteration in original)). Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (Calabresi, J., dissenting) (internal quotation marks omitted) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)).

Also, the nonmoving party cannot simply rest on the

allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Weinstock, 224 F.3d at 41. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," id., if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial," Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (emphasis, quotation marks and citations omitted). "Accordingly, unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

Finally, "the Court may consider only admissible evidence in ruling on summary judgment." Ferraresso v. Town of Granby, 646 F. Supp. 2d 296, 301 (D. Conn. 2009).

## III. DISCUSSION

There are three related claims against Rotovnik and Minerly. In Count Three, there are two claims brought pursuant to 42 U.S.C. § 1983: a procedural due process claim and a substantive due process claim. Count Eight is a claim for intentional infliction of emotional distress.

**A. Frank Rotovnik**

**1. Procedural Due Process**

The plaintiffs contend that "[the] facts would allow a reasonable jury to conclude that Defendant Rotovnik lacked a 'reasonable basis' for the full scope of his neglect allegations because he failed to discover or disclose material medical information (including the involvement of a licensed medical doctor), relied almost exclusively on the views of a single 'very irate' specialist, and could not recall fundamental investigative steps or training relevant to evaluating complex medical evidence." (ECF No. 109, Pls.' Opp'n to DCF Defs.' Mot. Summ. J. at 17.) The plaintiffs assert that "[i]n turn, those same disputed facts support an inference that the investigation was not impartial or reasonably thorough and thus did not satisfy the constitutional standard articulated in Wilkinson and Van Emrik." Id. (citing Wilkinson ex rel. Wilkinson v. Russell, 182 F.3d 89, 104-05 (2d Cir. 1999) and van Emrik v. Chemung Cnty. Dep't of Soc. Servs., 911 F.2d 863, 866 (2d Cir. 1990)).

In Wilkinson, the court stated, "[t]his Circuit has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse." Wilkinson, 182 F.3d at 104 (quoting van Emrik, 911

F.2d at 866). The court explained that "[i]n applying a reasonableness standard in the abuse context, courts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between 'difficult alternatives' often need to be made on the basis of limited or conflicting information." Id. "[T]he basic precept [is] that a mere failure to meet local or professional standards, without more, should not be elevated to the status of a constitutional violation." Id. at 106. "As a result, even a faulty investigation does not necessarily rise to the level of an unconstitutional investigation." Id.

At the request of Katharine Pileggi and Anthony Pileggi, a Substantiation Hearing for the neglect charges DCF brought against them was held on November 18, 2020, December 8, 2020, and January 8, 2021. The parties at the hearing were listed as "Katharine P., Appellant," "Anthony P., Appellant," and "Frank Rotovnik, Investigator." (ECF No. 96-2, Final Decision of DCF at 48.) The Pileggis were represented by Attorney Lisa Vincent, and DCF was also represented. "At issue in the hearing was the Department's decision to substantiate the Pileggis for physical, emotional and medical neglect of their daughter, [EP], following a report to the Department on December 26, 201[8]." Id.

With respect to medical neglect, the Final Decision of DCF (the "Decision") stated:

> The Department substantiated the [Pileggis] for medical neglect of their daughter after her physical condition deteriorated over months leading to the child's inability to walk, bear weight or straighten her legs. In order to confirm an allegation of medical neglect, the Department must establish that (1) the [Pileggis] are persons responsible for the child's health, welfare, or care; or are persons given access to the child by a person responsible, or are persons entrusted with the care of the child; and (2) the [Pileggis] unreasonably delayed, refused or failed to seek, obtain and[/]or maintain those services necessary for medical, dental, or mental health care when the [Pileggis] knew or should reasonably be expected to have known that such actions may have an adverse impact on the child. DCF Policy 22-3.

Id. at 52.

The Decision summarized the relevant facts as follows:

> The record reflects that [EP] became very ill in the early summer of 2018. The parents firmly believe that her illness was spurred by a tick bite and that her symptoms were consistent with Lyme Disease. They immediately sought treatment for their daughter from her pediatrician who took blood work which suggested Juvenile Idiopathic Rheumatoid Arthritis, and not Lyme. The pediatrician referred them to CCMC (the Connecticut Children's Medical Center) for a consultation with Dr. Zemel, a pediatric rheumatologist, who confirmed the arthritis diagnosis based on Dr. Alder's bloodwork. The [Pileggis], who had prior experience with the mother's Lyme diagnosis, did not agree with the arthritis diagnosis and sought treatment elsewhere from a naturopath who had expertise in Lyme. This physician, Dr. Layman, agreed to work with them and began treating [EP]'s symptoms which were also consistent with Lyme. The parents also went so far as to agree to a brief course of liquid steroids from APRN Laughinghouse to address [EP]'s pain and swelling. However, the [Pileggis], after some research, decided to treat their daughter holistically with an herbal protocol prescribed by Dr. Morse's Herbal Health Club in Florida, and discontinued any other traditional or naturopathic care for their daughter. The treatment prescribed by

> the Health Club was a rigid dietary and supplement protocol without any required in-person assessment of the child or her physical condition by a [medically] trained professional. Mr. Morse and Ms. Moyer relied on the parents' evaluation of [EP]'s progress and readings of [EP]'s eyes during biweekly [S]kype sessions. Although the parents believed (wanted to believe) that this treatment was effective, the fact of the matter was that [EP] was unable to walk for months, and the out of state providers chosen by the family could offer no empirical evidence of any clear plan or goals for treatment or any measurement for success.
>
> There can be no doubt that the [Pileggis] were conned and victimized by a pathological scam artist and his protegee. However, during this same period, at the insistence of the Department, the [Pileggis] also brought their daughter to see a naturopathic physician, Dr. Santapaola, for assessment. Dr. Santapaola was alarmed by [EP]'s condition and made several recommendations based on her direct observations and medical evaluation of the child, which the parents flatly rejected. Their resistance to any sort of combination of treatment modalities, or even a recognition that [EP]'s symptoms, which then included a mass in her abdomen and an enlarged liver, might be signs of deterioration, denied [EP] appropriate medical care for her illness. Dr. Santapaola's evaluation and her medical director's education should have made it abundantly clear to the [Pileggis] that a new or additional course(s) of treatment was prudent.

Id. at 52–53. The Hearing Officer, Robin D. O'Shea, found that, "[u]nfortunately, the [Pileggis] held firm to their belief in the abilities of the health club providers and this failure to follow medical recommendations supports the Department's decision to substantiate the [Pileggis] for medical neglect of [EP]." Id. at 53.

With respect to physical neglect, the Decision states:

> The Department also substantiated the [Pileggis] for physical neglect of [EP]. In order to confirm an allegation of physical neglect, the Department must establish that the [Pileggis] failed to provide and maintain adequate food, clothing, supervision, and/or safety for the child; and the failure resulted in an adverse physical impact on the child unless the act was a single incident that demonstrated a serious disregard for the child's welfare. DCF Policy 22-3.

Id. at 53.

The Decision summarized the relevant facts as follows:

> The record reflects that [EP] was still walking when Dr. Zemel consulted with the family in May or June 2018, and that [EP] responded well to treatment from Drs. Layman and Laughinghouse shortly thereafter. However, the parents stopped these treatments in the fall of 2018 and [EP]'s condition clearly deteriorated. By March 2019, Dr. Santapaola determined that [EP]'s was the worst case of juvenile arthritis she had ever seen. In addition to swelling in her joints and the inability to walk, [EP]'s liver was enlarged, and she had developed a mass in her abdomen. Ultimately, [EP] had to wear braces on her legs to straighten them after months of disuse and inflammation. While it is true that the [Pileggis] sought additional treatments, including acupressure, Reiki and aquatics [i]n addition to the herbal protocol, these other therapies only managed [EP]'s symptoms and did not treat the underlying diagnosis of either Lyme or juvenile arthritis. They may have had some impact on [EP]'s overall functioning, and there may have been some relief [of] some of her symptoms on some days, but [EP] did not begin to actually recuperate until she was removed from the [Pileggis]' care and hospitalized with genuine treatment for her condition(s).

Id. at 53–54. The Hearing Officer concluded that "[t]he [Pileggis]' decision to remove [EP] from a local practice that would be able to conduct in person assessments of [EP]'s very serious condition was a denial of proper care and attention that

had a devastating impact on the child." Id. at 53. The Hearing Officer found that "[t]he allegation of physical neglect is upheld due to a denial of proper care that led to an adverse impact on [EP]'s physical health." Id. at 54.

"The Department also substantiated the [Pileggis] for emotional neglect of [EP]." Id. at 54. The Hearing Officer reversed this determination as well as a determination that the Pileggis' names should be placed on DCF's Central Registry.

The Decision informed the Pileggis of their right to appeal. It stated: "The right to appeal the final decision in this matter is governed by Connecticut General Statutes, section 4-183." Id. at 55.

The purpose of collateral estoppel is "to protect the finality of judicial determinations, to conserve the time of the court, and to prevent wasteful litigation." Solon v. Slater, 345 Conn. 794, 810 (2023) (citation omitted) (cleaned up). "The doctrine of collateral estoppel prevents 'a party from relitigating issues and facts that have been actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them on a different claim' . . . ." Id. (quoting Rocco v. Garrison, 268 Conn. 541, 555 (2004)) (cleaned up).

"To invoke collateral estoppel the issues sought to be litigated in the new proceeding must be *identical* to those

considered in the prior proceeding." Solon, 345 Conn. at 811 (quoting MacDermid, Inc. v. Leonetti, 328 Conn. 726, 739-40 (2018)) (emphasis in original). "For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." Solon, 345 Conn. at 810-11. "As a general proposition . . . administrative adjudications have a preclusive effect when the parties have had an adequate opportunity to litigate." Lafayette v. Gen. Dynamics Corp./Elec. Boat Div., 255 Conn. 762, 773 (2001) (quotations omitted).

The plaintiffs are collaterally estopped from litigating the issue of whether defendant Rotovnik had a "reasonable basis" for finding that the Pileggis had abused EP.

As reflected in the Decision, the question of whether the Pileggis had abused EP by engaging in, inter alia, medical and physical neglect, was fairly and fully litigated over the course of the three-day hearing, and those questions were actually decided. The finding that the Pileggis had engaged in medical and/or physical neglect was necessary to the Hearing Officer's decision to uphold DCF's decision to substantiate the Pileggis for neglect under DCF Policy 22-3.

Finally, the Pileggis had a full and fair opportunity during the administrative hearing to contest Rotovnik's finding

that they had abused EP. They were represented by an attorney throughout the multi-day proceedings. In addition, the Decision explicitly informed the plaintiffs of their right to appeal the administrative decision to the Connecticut Superior Court pursuant to Connecticut General Statutes § 4-183, something they chose not to do.

Therefore, the plaintiffs are precluded from relitigating the issue of whether they had engaged in physical and medical neglect at the time that Rotovnik made his finding that they had abused EP. The fact that the Pileggis had engaged in physical and medical neglect of EP constituted a reasonable basis for Rotovnik's finding that they had abused EP. Therefore, the plaintiffs are unable to create a genuine issue as to a material fact with respect to their procedural due process claim under the standard set forth in Wilkinson, and defendant Rotovnik is entitled to summary judgment on the procedural due process claim.

While the plaintiffs base their claim on the standard set forth in Wilkinson, it should be noted that this is a case where, after DCF obtained the ex parte Order of Temporary Custody, the plaintiffs had a meaningful opportunity to be heard at the April 5, 2019 hearing in Superior Court in Waterbury. See Hadwan v. United States Dep't of State, 139 F.4th 209, 225 (2d Cir. 2025) ("The fundamental requirement of due process is

the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"). The plaintiffs do not contend that they were not afforded a meaningful opportunity to be heard at the April 5, 2019 hearing.

At that hearing, Katharine Pileggi was represented by Attorney Greggory Johnson and Attorney Daniel Readyoff, and Anthony Pileggi was represented by Attorney Heather Perreault. (ECF No. 96-2 Tr. of April 5, 2019 Hearing at 64.) The parties were in court for two purposes, one of which was the Order of Temporary Custody with respect to EP. The Pileggis agreed to the Order of Temporary Custody. The judge canvassed Katharine Pileggi and Anthony Pileggi to ensure that they understood their rights, including their right to appeal. (See Tr. of April 5, 2019 Hearing at 67:11-68:20.) Then the following exchange occurred:

> THE COURT: Have you understood your rights, mom[?]
>
> THE MOTHER: Yes[.]
>
> THE COURT: And, dad?
>
> THE FATHER: Yes, Your Honor[.]
>
> THE COURT: All right[.] So no[w] it's my understanding that you want to keep the order of temporary custody in place[.] You want to agree to waive your right to the hearing and keep the order in place[.] Is that correct, dad?
>
> THE FATHER: Yes, Your Honor[.]
>
> THE COURT: And, mom?

THE MOTHER: Yes, Your Honor[.]

THE COURT: All right[.] So, I just want to ask you about your decision[.] Have you both had enough time to talk to your lawyers about this decision? Dad?

THE FATHER: Yes[.]

THE COURT: Mom?

THE MOTHER: Yes, Your Honor[.]

THE COURT: All right[.] And have you reviewed the petition [with] your lawyers, and the evidence that DCF would have at a hearing if you had chosen to go forward with the hearing?

THE FATHER: Yes, Your Honor[.]

THE MOTHER: Yes, Your Honor[.]

THE COURT: All right[.] And have [] your lawyers answered all your questions?

THE FATHER: Yes[.]

THE MOTHER: Yes[.]

THE COURT: I'm sorry?

THE MOTHER: Yes[.]

THE COURT: And are you satisfied with their advice?

THE FATHER: Yes[.]

THE MOTHER: Yes[.]

THE COURT: All right[.] Has anybody forced, threatened you, or promised you anything to get [you] to agree to keep the order of temporary custody in place?

THE FATHER: No, Your Honor[.]

THE MOTHER: No, Your Honor[.]

THE COURT: Are you both doing so voluntarily and of your own free will?

THE FATHER: Yes, Your Honor[.]

THE MOTHER: Yes[.]

(Tr. of April 5, 2019 Hearing at 68:21-70:11.)

Thus, there is no genuine issue as to the fact that the plaintiffs had a meaningful opportunity to be heard in a meaningful manner at every stage of the proceedings with respect to the charges brought by DCF that they had abused EP. Nor is there a genuine issue as to the fact that after reviewing the charges in the petition with their attorneys, the plaintiffs chose not to contest the charges and agreed to keep the Order of Temporary Custody in place.

**2. Substantive Due Process**

"The core of Plaintiffs' substantive due process claim rests on allegations that Defendants used their authority to unlawfully interfere with the Pileggi family structure, leveraging the skewed investigative record described above to pressure the parents to alter their marital and living arrangements as a condition of reunification." (Pls.' Opp'n to DCF Defs.' Mot. Summ. J. at 12.)

The plaintiffs' claim rests on two factual contentions, a purported statement to Anthony Pileggi by an unidentified DCF employee, and a purported statement to Anthony Pileggi by

Rotovnik. The plaintiffs assert:

> The record contains direct evidence that Defendant Rotovnik leveraged the State's custody of EP to manipulate the family unit, explicitly telling Mr. Pileggi, "It would be better for me to get Emma back sooner if Katharine was not in the home." Defendants' own memorandum summarizes this testimony, noting that Anthony "did not identify the alleged whisperer as either Minerly or Rotovnik," but that he testified "Frank" communicated that it would be better for him to get Emma back sooner if Katharine was not in the home. Anthony further testified that a "lady from DCF" whispered to him and his attorney that he would get his daughter back sooner if the parents divorced. These alleged statements, if credited, amount to an ultimatum: accept the effective exile of Katharine from the home (and ultimately from the marriage) or face prolonged state custody of EP.

(Pls.' Opp'n to DCF Defs.' Mot. Summ. J. at 23-24.)

As to the alleged statement by an unidentified DCF employee, it is hearsay, and the plaintiffs have proffered no evidence (nor, for that matter, any argument) that could be a basis for this statement being admissible against Rotovnik.

As to the statement made by Rotovnik to Anthony Pileggi, the plaintiffs state:

> 19. During his deposition, Frank Rotovnik was presented with text message exchanges between Anthony Pileggi and Attorney Perrault, including a June 7, 2019 message in which Mr. Pileggi stated that DCF would not have conversations with supervisory staff about returning EP "until I confirm that divorce paperwork filed and that Katie moved out."
>
> 20. The text messages presented to Mr. Rotovnik included messages from Attorney Perrault to Mr. Pileggi stating that "They would not have a meeting at all to discuss until the divorce papers were done" and referencing an upcoming meeting with "Frank" that she could "push harder" for once she provided him with

"divorce confirmation."

(ECF No. 109-1, Pls.' Local Rule 56(a)(2) Statement of Facts in Opp'n the DCF Defs.' Mot. Summ. J., Additional Material Facts ("Pls. Statement of Additional Material Facts") at ¶¶ 19-20 (citations to deposition omitted).)

The deposition testimony on which paragraphs 19 and 20 rely begins with plaintiff's counsel reading from an exchange of text messages between Anthony Pileggi and his attorney, Heather Perrault, who had represented him at the April 5, 2019 hearing in Connecticut Superior Court.

> Q. So Ms. Perrault saying: Haven't read it. While Mr. Pileggi -- let's start with him. On June 7 of 2019: Did you get the case plan from DCF? It says: Emma is completely dependent on caregivers. Target date for reunification 12/30/2019, Mr. Pileggi. Haven't read it yet. Doesn't have any bearing on what we had discussed from last court date. Just that DCF will not have conversation with supervisory staff about returning her to you and what barriers there are until I confirm that divorce paperwork filed and that Katie moved out. When did you get the case plan? I don't have anything. That's Ms. Perrault. To which Mr. Pileggi responds: Right before I text you. I will send to you right when I get home. She says okay. And Mr. Pileggi goes on, also talks about gathering -- or getting Emma vaccinated. Ms. Perrault says: Has Katie moved out? Mr. Pileggi says: She is in the process of moving her stuff over to her studio with Frank. Anthony asked: How did it go? He says: Very well. Want to chat for a second, I'm at the office. I will call you, he says. Then Ms. Perrault, next page, says: They would not have a meeting at all to discuss until the divorce papers were done. She was served 6/25 and they assigned a docket number on 7/5. Frank, etcetera, will have a meeting and I can push harder. They wouldn't do anything until they were sure that you were going through with the divorce and not just doing it for one

> reason only. Be careful, again, about listening to Katie. I already wrote Frank an email for a meeting and gave him divorce confirmation. I will forward to you to see. Please understand I'm doing all I can here right now. Can you do next Friday morning for a meeting with Frank?
>
> A. This seems to me she is pushing him to get a divorce. Be careful, again, about listening to Katie. I don't know where this confirms me saying they needed a divorce to move on. I don't recall ever telling them they needed to be divorced.

(ECF No. 109-6, Frank Rotovnik Dep. at 49:3-50:24.)

Thus, in paragraphs 19 and 20 of their Additional Statement of Material Facts, the plaintiffs are not relying on a sworn declaration of Anthony Pileggi, nor are they relying on Anthony's Pileggi's deposition testimony. Nor are they attempting to rely on the actual text messages themselves. Rather, in paragraphs 19 and 20, the plaintiffs rely on a lengthy question that counsel for the plaintiffs asked Frank Rotovnik during Rotovnik's deposition, in response to which Rotovnik denied that the text messages should be interpreted in the manner suggested by the plaintiff's counsel. Rotovnik also points out that a fair reading of the statement by Attorney Perrault to Anthony Pileggi is that Attorney Perrault is pushing Anthony Pileggi to get a divorce and telling him he should be careful about listening to Katharine Pileggi.

Anthony Pileggi did testify during his deposition that

Rotovnik told him that "[i]f I removed Katharine from the home and I can provide him with a lease that Katharine is out of the home, that it would move the process along, it would be greatly appreciated." See ECF No. 96-2, Anthony Pileggi Depo. Tr. Vol. II at 143:18-21. The plaintiffs do not provide a specific date or dates for the communications Anthony Pileggi is describing, but they must have been made in the context of the juvenile court proceedings, in which Anthony Pileggi was represented by Attorney Perrault. At that point, DCF had developed a case plan and Anthony Pileggi was represented by counsel in both his discussions with Rotovnik and in the proceedings in Connecticut Superior Court leading up to the October 9, 2019 order revoking EP's commitment and placing EP under protective supervision. This order gave Anthony Pileggi primary physical custody and final decision-making authority. The court also required Katharine Pileggi to undergo a follow-up psychological evaluation if she wished to seek a modification of the custody order. In this context, the testimony by Anthony Pileggi cannot support a finding by a reasonable jury that Rotovnik did anything more than explain to Anthony Pileggi what would move the process along.

Consequently, the plaintiffs have failed to proffer any admissible evidence in support of either their contention that Rotovnik threatened them with prolonged state custody of EP or

their contention that he made the Pileggis' divorce a condition of EP's release.

Therefore, Rotovnik is entitled to summary judgment with respect to the substantive due process claim.

**3. Intentional Infliction of Emotional Distress**

"In order for the plaintiff to prevail in a case for liability under ... [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Petyan v. Ellis, 200 Conn. 243, 253 (1986) (internal quotation marks omitted). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine . . . Only where reasonable minds disagree does it become an issue for the jury." Appleton v. Bd. of Educ. of Town of Stonington, 254 Conn. 205, 210 (2000) (citation and internal quotation marks omitted).

"Liability for intentional infliction of emotional distress requires conduct that exceeds 'all bounds usually tolerated by decent society....'" Id. (quoting W. Prosser & W. Keeton, Torts

(5th Ed.1984) § 12, p. 60). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Id. at 210-11 (citation and internal quotation marks omitted).

In Carroll v. Ragaglia, a foster parent who was determined by DCF to have abused a foster child brought an action against the Commissioner of DCF and two DCF social workers, asserting claims for, inter alia, intentional infliction of emotional distress. 292 F. Supp. 2d 324 (D. Conn. 2003), aff'd in part, rev'd in part on other grounds, 109 Fed. Appx. 459 (2d Cir. 2004). DCF received a report on its hotline of suspected child abuse concerning the child. See id. at 330. DCF assigned one of the individual defendants to investigate the report of abuse. Subsequently, DCF "notified Plaintiff that he had been substantiated as an abuser," after which "Plaintiff demanded an appeal of the substantiation." Id. at 333. After the substantiation was upheld, the plaintiff's attorney requested an administrative hearing to challenge the determination. Subsequently, the plaintiff was arrested and charged with

assault in the third degree and risk of injury to a minor. Id.

The plaintiff argued that: "[b]eing retaliated against for complaining, being 'substantiated' as a perpetrator of abuse, having your name put on a child abuse registry, and getting arrested because of someone's refusal to disclose all relevant information, could hardly be considered the 'rough and tumble of everyday life.'" Id. at 344. However, the court concluded that the social worker defendants "did not act unreasonably in the investigation process, and [one of the social worker defendants'] decision to substantiate child abuse was not unreasonable given the visible marks on the child and the observations of multiple people. As a matter of law, under the circumstances, Defendants did not act extremely or outrageously." Id.

Here, the plaintiffs argue that "a jury could easily find Defendants' conduct 'extreme and outrageous.'" Pls.' Opp'n to DCF Defs.' Mot. Summ. J. at 33. The plaintiffs assert:

> Rotovnik's threats regarding conditioning EP's return to the home on the removal of Katharine did not occur in a vacuum it must be viewed in conjunction with the October 9, 2019 juvenile-court order returning EP to the primary physical custody of her father, granting him final decision-making authority in the event of disagreement regarding the children, and imposing a "threshold requirement" that, should Mother seek to modify legal and/or physical custody, she must first undergo a follow-up psychological examination by Dr. Ciarametta before proceeding with any motion for modification.

Id. In addition, the plaintiffs argue that "[t]he alleged coercive statements were also intertwined with an investigation that, on Plaintiffs' evidence, was biased and one-sided." Id. at 33.

The evidence proffered by the plaintiffs cannot support a conclusion that Rotovnik made threats to Anthony Pileggi related to EP's return. As discussed above, DCF had developed a case plan in the context of the juvenile court proceedings. Anthony Pileggi was represented by counsel in both his discussions with Rotovnik and in the proceedings in Connecticut Superior Court. Anthony Pileggi testified that, leading up to the October 9, 2019 hearing, Rotovnik had shared with him how to "move the process along." (See ECF No. 96-2, Anthony Pileggi Depo. Tr. Vol. II at 143:20.) At that October 9, 2019 hearing, the court revoked EP's commitment, placed EP under protective supervision, gave Anthony Pileggi primary physical custody, and imposed conditions Katharine Pileggi had to satisfy if she wished to seek a modification of custody.

Looking at Anthony Pileggi's deposition testimony in context, at no point does he suggest that he interpreted any communication from Rotovnik as a threat. A finder of fact would have to speculate as to what words were actually said by Rotovnik and the context in which he said those words--none of which the plaintiffs proffer--in order to conclude that Rotovnik

threatened the plaintiffs.

To the extent the plaintiff relies on "alleged coercive statements [that] were also intertwined with an investigation that . . . was biased and one-sided," the findings that the Pileggis had engaged in physical and medical neglect of EP were upheld at the conclusion of the Substantiation Hearing.

Thus, the plaintiffs claim that Rotovnik engaged in conduct that was "extreme and outrageous" rests solely on evidence that Rotovnik told Anthony Pileggi how to "move the process along" in terms of his juvenile court proceedings. Under the circumstances present here, Rotovnik making such a statement falls well short of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See Perez-Dickson v. City of Bridgeport, 304 Conn. 483, 528 (2012) (citing Appleton, 254 Conn. at 210-11) ("trial court properly granted defendant's motion for summary judgment on plaintiff's claim for intentional infliction of emotional distress when defendants made condescending comments about plaintiff in front of colleagues, questioned plaintiff's vision and ability to read, informed plaintiff's daughter that she was acting differently and should take time off, asked police to escort plaintiff from school, required plaintiff to subject herself to psychiatric testing, forced plaintiff to take

leave of absence, suspended plaintiff, and forced plaintiff to resign"); id (citing Tracy v. New Milford Public Schools, 101 Conn. App. 560, 567-70 (2007)) ("trial court properly granted motion to strike plaintiff's claim for intentional infliction of emotional distress when plaintiff claimed that defendants conspired to engage in pattern of harassment including denial of position, initiated disciplinary actions without proper investigation, and defamed and intimidated plaintiff").

Therefore, defendant Rotovnik is entitled to summary judgment on the plaintiff's claim for intentional infliction of emotional distress.

**A. Kaela Minerly**

Kaela Minerly was assigned the investigation into the Pileggi family on December 27, 2018. She was not involved in the matter after she was replaced by Frank Rotovnik on February 6, 2019.

With respect to the procedural due process claim, the plaintiffs proffer no evidence that Minerly had any involvement in the events that are the basis for that claim. However, even if Minerly had been involved, she would be entitled to summary judgment on this claim for the same reasons that defendant Rotovnik is entitled to summary judgement.

With respect to the substantive due process claim, there is no evidence that defendant Minerly had any involvement in the

events that are the basis for that claim.

With respect to the claim for intentional infliction of emotional distress, there is no evidence that defendant Minerly had any involvement in the events that are the basis for that claim.

Therefore, defendant Minerly is entitled to summary judgment on Count Three and Count Eight.

## IV. CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment in Favor of Kaela Minerly and Frank Rotovnik (ECF No. 96) is hereby GRANTED.

It is so ordered.

Dated this 30th day of September 2026, at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge